ACCEPTED
03-15-00416-CV
7412400
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/16/2015 1:43:12 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00416-CV

**IN THE THIRD COURT OF APPEALS**
**AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
10/16/2015 1:43:12 PM
JEFFREY D. KYLE
Clerk

**OAK MORTGAGE GROUP, INC.; MICHAEL H. NASSERFAR;**
**MICHAEL E. TASK; and TYCORD R. GOSNAY,**

**Appellants,**

**v.**

**AMERIPRO FUNDING, INC.,**

**Appellee.**

On Appeal from the 345th District Court of Travis County, Texas
Hon. Gisela D. Triana, Presiding

**BRIEF OF APPELLEE**
**AMERIPRO FUNDING, INC.**

Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com

## IDENTITY OF PARTIES AND COUNSEL

**Appellants/Plaintiffs/**
**Counter-Defendants**

Oak Mortgage Group, Inc.
Michael H. Nasserfar
Michael E. Task
Tycord R. Gosnay

**Attorneys for Appellants/Plaintiffs/**
**Counter-Defendants**

Wm. Charles Bundren
WM. CHARLES BUNDREN & ASSOCIATES
Law Group, PLLC
2591 Dallas Parkway, Suite 300
Frisco, Texas  75034
(214) 808-3555 (Telephone)
(972) 624-5340 (Facsimile)
Charles@bundrenlaw.net

**Appellee/Defendant/**
**Counter-Plaintiff**

Ameripro Funding, Inc.

**Attorneys for Appellee/Defendant**
**Counter-Plaintiff**

Susan P. Burton
Eric G. Behrens
GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas  78701
(512) 480-5600 (Telephone)
(512) 536-9908 (Facsimile)
sburton@gdhm.com
ebehrens@gdhm.com

ii

## ABBREVIATIONS AND RECORD CITATIONS

The following abbreviations and notations are used in this Brief:

CR; 1CR; 2CR          References to the Clerk's Record (record, supplement I, and supplement II).

1RR; 2RR; 3RR          References to the Reporter's Record (three volumes – Index, Transcript).

AX; PX; CX          References to the exhibits (in Vol. 4 of the Reporter's Record:  Applicant Ameripro's exhibits, Plaintiffs' exhibits, Court exhibit).

App. Br.          References to Brief of Appellants.

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .................................................................ii

ABBREVIATIONS AND RECORD CITATIONS ......................................................iii

TABLE OF CONTENTS ......................................................................................iv

TABLE OF AUTHORITIES ..................................................................................ix

STATEMENT OF THE CASE ...............................................................................xiv

STATEMENT REGARDING ORAL ARGUMENT ...................................................xv

ISSUES PRESENTED .........................................................................................xvi

STATEMENT OF FACTS ......................................................................................1

    I.      Introduction: overview of the conduct which led to the injunction........1

    II.     Ameripro's creation of the Lakeway branch office, and
         the Individual Appellants' fiduciary roles for Ameripro ........................4

    III.    The non-solicitation clauses and ownership
         provisions in the Ameripro contracts .......................................................4

        A.    Ameripro's confidential information includes each
             category outlined in the Temporary Injunction............................5

        B.    Brohn, Clark Wilson, and Seaholm were Ameripro
             customers under the contractual non-solicitation clauses..............5

        C.    Oak Mortgage's actual knowledge of the contract provisions ......7

    IV.    The Individual Appellants admitted that they took Ameripro's
         confidential information and provided it to Ameripro's
         competitor. They began doing so months before they resigned ............7

A.    Appellants also downloaded and copied Ameripro's financial and customer data from its office and computers ........... 8

B.    The confidential information that Appellants took from Ameripro enabled them to jumpstart a competing office ............ 12

V.    Appellants began soliciting Ameripro's customers for Oak Mortgage, even before the Individual Appellants had resigned from Ameripro ................................................. 13

A.    One month before the Individual Appellants resigned as fiduciaries, Oak Mortgage agreed to indemnify them against Ameripro, and told them they could solicit its customers ........... 13

B.    While they were Ameripro's fiduciaries, the Individual Appellants began soliciting Ameripro customers for a competitor. Oak Mortgage sent "scripts" for them to use .......... 14

VI.    In addition to transmitting confidential data to Oak Mortgage before they resigned, the Individual Appellants removed over 20,000 Ameripro files and kept them as agents of Oak Mortgage ....... 16

VII.    The Individual Appellants destroyed Ameripro documents, including its customer files, and destroyed files after the district court issued a TRO compelling their return ............................. 17

VIII.    Appellants' successful disruption of Ameripro's business ................... 19

SUMMARY OF THE ARGUMENT ............................................................... 20

ARGUMENT .............................................................................................. 22

I.    The Temporary Injunction satisfies the requirements of Rule 683 ...... 22

A.    The reasons stated in the Temporary Injunction, which Appellants do not address or even mention in their brief ............ 22

v

B.    The reasons stated in the Temporary Injunction go further than is required by Rule 683, as shown by multiple decisions ....23

C.    The decisions cited by Appellants do not assist them. One such decision lists the language from this Temporary Injunction as examples that "*comply* with rule 683" ...................28

II.    Appellants' own admissions establish that Ameripro's builder clients are "customers" under the non-solicitation clauses...................30

A.    Appellants make no attempt to address the testimony (including their own sworn admissions) that customers include borrowers *and* "builder customers"................................30

B.    The evidence regarding builder customers is consistent with the non-solicitation clause. .................................32

C.    Appellants' argument that the definition of "customers" should be construed against Ameripro conflicts with the contracts, which disclaim that either party is sole drafter............34

III.    Injunctive relief was also independently warranted because Appellants were barred from soliciting Ameripro customers for a *competitor* in breach of fiduciary duties, separate and apart from their breaches of contract and misappropriation .................35

A.    Appellants did not merely take the names of builder customers. They took pricing, lender credit data, compilations of builder preferences, and multiple other data from computers .................36

B.    Appellants' solicitation of Ameripro customers and use of confidential information for that purpose, even while the Individual Appellants were still Ameripro's fiduciaries..............37

C.    Even if Appellants supposedly *could* have publicly obtained some of the data they took from Ameripro computers, they tortiously downloaded Ameripro's work product........................40

IV.  Appellants' argument that they had returned all confidential information of Ameripro prior to the hearing is also false ...................42

  A.  Appellants did not return all confidential information, they violated the TRO, and they specifically stripped out system metadata from the documents they did provide ...............43

  B.  Appellants destroyed documents even after a TRO commanded their return ......................................................44

  C.  The fact that a competitor misappropriated confidential information at all also supports issuing the injunction ................45

  D.  Appellants *used* Ameripro's confidential information, but *taking* such data was also wrongful misappropriation ...........46

V.  The district court correctly found that Ameripro does not have an adequate legal remedy ................................................47

  A.  The district court found Ameripro has a likelihood of success on multiple tort theories for which injunction is the only effective relief, not just breach of contract ................49

  B.  Even in pure contract cases, findings of inadequate remedy will be upheld where, as here, some evidence supports it ...........50

  C.  Injunctive relief is consistent with Ameripro's claim for damages for Appellants' *past* conduct .........................51

  D.  Appellants' argument, in addition to being baseless, is outside the hearing record and should be disregarded.................53

VI.  The Temporary Injunction is not overly broad, and instead is narrowly tailored to protect against imminent irreparable harm ..........54

PRAYER...................................................................................................59

CERTIFICATE OF COMPLIANCE ..................................................................60

CERTIFICATE OF SERVICE ............................................................................................ 60

APPENDIX

Temporary Injunction Order .................................................................. Tab 1

Highlighted testimony cited in this brief
from Volume 2 of the Reporter's Record (2RR) ...................................... Tab 2

Highlighted testimony cited in this brief
from Volume 3 of the Reporter's Record (3RR) ...................................... Tab 3

(Exhibits cited in this brief are bookmarked.)

# TABLE OF AUTHORITIES

**CASES**                                             **PAGE(S)**

*Amalgamated Acme Affiliates, Inc. v. Minton,*
    33 S.W.3d 387 (Tex. App. – Austin 2000, no pet.) ......................................27

*American Precision Vibrator Co. v. National Air Vibrator Co.,*
    764 S.W.2d 274 (Tex. App. – Houston),
    *appeal stayed,* 771 S.W.2d 562 (Tex. App. – Houston 1989) ...............41, 42

*Branch Banking & Trust Co. v. TCI Luna Ventures, LLC,*
    2013 WL 1456651 (Tex. App. – Dallas Apr. 9, 2013, no pet.) ...................53

*Butnaru v. Ford Motor Co.,*
    84 S.W.3d 198 (Tex. 2002) ........................................................................52

*Byrd Ranch, Inc. v. Interwest Savings Association,*
    717 S.W.2d 452 (Tex. App. – Fort Worth 1986, no writ) ..........................28

*Cardinal Health Staffing Network, Inc. v. Bowen,*
    106 S.W.3d 230 (Tex. App. – Houston [1st Dist.] 2003, no pet.) ..........52, 53

*Conley v. DSC Commun. Corp.,*
    1999 WL 89955 (Tex. App. – Dallas Feb. 24, 1999, no pet.) .....................26

*Cornelison v. Offshore Entertain. Corp.,*
    2002 WL 34231619 (Tex. App. –
    Corpus Christi Dec. 5, 2002, no pet.) .........................................................29

*Correa v. Houston Surg. Asst. Serv., Inc.,*
    2013 WL 3958499 (Tex. App. –
    Houston [14th Dist.] July 30, 2013, no pet.) ...............................................55

*ERI Consult. Engrs., Inc. v. Swinnea,*
    318 S.W.3d 867 (Tex. 2010) ......................................................................35

*Fasken v. Darby,*
    901 S.W.2d 591 (Tex. App. – El Paso 1995, no pet.) .................................29

*Flake v. EGL Eagle Global Logistics, L.P.*,
    2002 WL 31008136 (Tex. App. –
    Houston [14th Dist.] Sept. 5, 2002, no pet.) ..................................................49

*Fox v. Tropical Warehouses, Inc.*,
    121 S.W.3d 853 (Tex. App. – Fort Worth 2003, no pet.) ............................25

*Frequent Flyer Depot, Inc. v. American Airlines, Inc.*,
    281 S.W.3d 215 (Tex. App. – Fort Worth 2009,
    pet. denied), *cert. denied*, 559 U.S. 1036 (2010) ..................................50, 56

*Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*,
    303 S.W.3d 700 (Tex. 2010) ......................................................................34

*Garth v. Staktek Corp.*,
    876 S.W.2d 545 (Tex. App. – Austin 1994, writ dism'd w.o.j.) ...........49, 58

*General Homes, Inc. v. Wingate Civic Ass'n*,
    616 S.W.2d 351 (Tex. Civ. App. –
    Houston [14th Dist.] 1981, no pet.) ...........................................................29

*Guy Carpenter & Co. v. Provenzale*,
    334 F.3d 459 (5th Cir. 2003) .......................................................................58

*Hartwell's Office World, Inc. v. Systex Corp.*,
    598 S.W.2d 636 (Tex. Civ. App. –
    Houston [14th Dist.] 1980, writ ref'd n.r.e.) ..............................................50

*Hill v. McLane Co., Inc.*,
    2011 WL 56061 (Tex. App. – Austin Jan. 5, 2011, no pet.) 26, 42,48, *passim*

*Hunter Bldgs. & Mfg., LP v. MBI Global, LLC*,
    436 S.W.3d 9 (Tex. App. – Houston [14th Dist.] 2014, pet. denied) .....35, 37

*IAC, ltd. v. Bell Helicopter Textron, Inc.*,
    160 S.W.3d 191 (Tex. App. – Fort Worth 2005, no pet.).................24, 25, 26

*Inex Indus., Inc. v. Alpar Resources, Inc.,*
　717 S.W.2d 685 (Tex. App. – Amarillo 1986, no writ)...............................27

*In re Longview Energy Co.,*
　464 S.W.3d 353 (Tex. 2015) .................................................................35

*International Brotherhood of Elect. Workers v. Becon Construct. Co., Inc.,*
　104 S.W.3d 239 (Tex. App. – Beaumont 2003, no pet.) ............................29

*Intercontinental Terminals Co., LLC v. Vopak North America, Inc.,*
　354 S.W.3d 887 (Tex. App. –
　Houston [1st Dist.] 2011, no pet.) ........................................................29, 30

*Kotz v. Imperial Cap. Bank,*
　319 S.W.3d 54 (Tex. App. – San Antonio 2010, no pet.)...........................29

*Lasser v. Amistco Separation Prods., Inc.,*
　2014 WL 4952501 (Tex. App. –
　Houston [1st Dist.] Oct. 2, 2014, no pet.) ......................................................46

*Lynd v. Bass Pro Outdoor World, Inc.,*
　2014 WL 1010120 (Tex. App. – Dallas 2014, pet. denied)........................45

*Matrix Network, Inc. v. Ginn,*
　211 S.W.3d 944 (Tex. App. – Dallas 2007, no pet.) ...................................58

*Miller Paper Co. v. Roberts Paper Co.,*
　901 S.W.2d 593 (Tex. App. – Amarillo 1995, no pet.) .........................49, 56

*Monsanto Co. v. Davis,*
　25 S.W.3d 773 (Tex. App. – Waco 2000, writ dism'd w.o.j.) ....................29

*Moreno v. Baker Tools, Inc.,*
　808 S.W.2d 208 (Tex. App. – Houston [1st Dist.] 1991, no pet.) ..............29

*Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Ass'n,*
　77 S.W.3d 487 (Tex. App. – Texarkana 2002, pet. denied) .......................28

*Reach Group, LLC v. Angelina Group*,
    173 S.W.3d 834 (Tex. App. – Houston [14th Dist.] 2005, no pet.) ........52, 53

*Reliant Hosp. P'ship, LLC v. Cornerstone Healthcare Group Holdings, Inc.*,
    374 S.W.3d 488 (Tex. App. – Dallas 2012, pet. denied) ............................41

*Renewdata Corp. v. Strickler*,
    2006 WL 504998 (Tex. App. – Austin 2006, no pet.)..................................42

*Rimkus Consult. Group, Inc. v. Budinger*,
    2001 WL 619067 (Tex. App. –
    Houston [14th Dist.] June 7, 2001, no pet.) ............................................57, 58

*Rugen v. Interactive Business Systems, Inc.*,
    864 S.W.2d 548 (Tex. App. – Dallas 1993, no pet.) ...................................24

*Salas v. Chris Christensen Sys., Inc.*,
    2011 WL 4089999 (Tex. App. – Waco Sept. 14, 2011, no pet.) ...........50, 58

*Sharma v. Vinmar Int'l, Ltd.*,
    231 S.W.3d 405 (Tex. App. – Houston [14th Dist.] 2007, no pet.) ..............57

*State v. Cook United, Inc.*,
    464 S.W.2d 105 (Tex. 1971) .......................................................................29

*Stoner v. Thompson*,
    553 S.W.2d 150 (Tex. Civ. App. –
    Houston [1st Dist.] 1977, writ ref'd n.r.e.) .................................................29

*Texas Tech University Health Sciences Center v. Rao*,
    105 S.W.3d 763 (Tex. App. – Amarillo 2003, pet. dismissed) ....................27

*Topheavy Studios, Inc. v. Doe*,
    2005 WL 1940159 (Tex. App. –
    Austin Sept. 14, 2005, no pet.) ..............................................................26, 52

*Tranter, Inc. v. Liss*,
    2014 WL 1257278 (Tex. App. –
    Fort Worth March 27, 2014, no pet.) ..........................................................25

*Universal Health Serv. v. Thompson*,
　24 S.W.3d 570 (Tex. App. – Austin 2000, no pet.) ..........................33, 34, 51

*University Interschol. League v. Torres*,
　616 S.W.2d 355 (Tex. Civ. App. – San Antonio 1981, no pet.) ..................29

*Walling v. Metcalfe*,
　863 S.W.2d 56 (Tex. 1993) ..........................................................51

*W.R. Grace & Co. v. Henson*,
　2007 WL 2389547 (Tex. App. –
　Corpus Christi Aug. 23, 2007, no pet.) ...................................52, 53

**STATUTES AND RULES**

12 C.F.R. § 1016, *et seq*. (Regulation P)..................................................10

Tex. Civ. Prac. & Rem. Code § 134A.002(3) & (6)
(Texas Uniform Trade Secrets Act ("TUTSA")) ......................................36, 37, 47

Tex. R. Civ. P. 683.................................................. 20, 22, 23, 24, *passim*

## STATEMENT OF THE CASE

This is an interlocutory appeal from a Temporary Injunction that the district court issued in favor of Appellee, Ameripro, on June 16, 2015. CR 223-27.

Ameripro filed an application for injunctive relief and counterclaim against Appellants on April 1, 2015, for misappropriation, conversion, breach of fiduciary duty (and aiding and abetting those breaches), breach of contract (and tortious interference with contract), and conspiracy. CR 44-68. The district court granted a Temporary Restraining Order against Appellants on May 11, 2015. CR 95-98.

The district court conducted a two-day evidentiary hearing on Ameripro's application for temporary injunction on May 26-27, 2015. At the conclusion of the hearing, the district court orally granted Ameripro's application and dictated the parameters of the injunction. 3RR 208-14. The parties submitted forms of order. CR 160-81; CR 182-202; CR 207-22. The court entered a Temporary Injunction Order in favor of Ameripro on June 16, 2015, and entered a separate order denying Appellants' application for a temporary restraining order. CR 223-27; CR 228-29.

## STATEMENT REGARDING ORAL ARGUMENT
## (ORAL ARGUMENT NOT NECESSARY)

Appellee believes that the record clearly shows that the district court did not abuse its discretion in entering the temporary injunction at issue, and that oral argument is not necessary. The district court heard two days of evidence and had full briefing, and as cited below, ample evidence supports its issuance of the injunction. If the Court of Appeals grants oral argument, Appellee does not waive argument, but will appear and argue for affirmance.

# ISSUES PRESENTED

1.     Does the Temporary Injunction's list of reasons why there is imminent and irreparable injury — including Appellants' attempts "to permanently destroy Ameripro documents," their misappropriation of "confidential and proprietary information" from "Ameripro's computer network and premises," their commission of breach of contract and multiple torts, and the multiple findings of inadequacy and difficulty of quantifying damages — satisfy Rule 683 requirements, and does the evidence support those findings?

2.     Did the district court correctly determine that builders are "customers" of Ameripro under the contracts with Ameripro, in light of the evidence of Appellants' admissions, Ameripro's testimony, and the text of the contracts, and does evidence of Appellants' breach of fiduciary duty serve as an independent basis for the injunction?

3.     Are the Temporary Injunction's findings that Appellants misappropriated confidential information "stored on Ameripro's computer network," including "customer and referral lists and contact information," "pricing information," compilations of "builder preferences," "general ledgers," and other customer and financial data, supported by the evidence?

4.     Did the district court properly issue a Temporary Injunction despite Appellants' claim that they returned the confidential records prior to the hearing, in light of the evidence that they stripped out metadata from the copies of documents they returned, destroyed Ameripro client files after the TRO had issued, and their admissions that they still retained Ameripro records?

5.     Is there evidence to support the Temporary Injunction's findings that Ameripro "does not have a legal remedy that is adequate," that the full extent of its injury would "be very difficult to ascertain or quantify," that an award of damages "would not fully or adequately compensate Ameripro," and its related findings?

6.     Did the district court abuse its discretion in tailoring the terms of the injunction to track the threat of imminent and irreparable injury to Ameripro?

## I.    Introduction:  overview of the conduct which led to the injunction.

Appellee Ameripro Funding, Inc. ("Ameripro") is an Austin-based residential mortgage lender.  2RR 41-42, 44.  By the nature of its lending business, Ameripro receives borrower loan applications, social security numbers, credit reports, and other confidential consumer information, the privacy of which is statutorily protected.  2RR 86, 143-45, 160-61, 169-72; 3RR 30, 39.

Appellants Michael H. Nasserfar, Michael E. Task, and Tycord R. Gosnay (the "Individual Appellants") are former agents and employees who worked at Ameripro's branch office in Lakeway, Texas.  2RR 45.  Each of the Individual Appellants owed formal fiduciary duties to Ameripro during his employment with the company, including a duty of loyalty.  2RR 182-83, 194; 3RR  38-39, 58.

On January 15-16, 2015, the Individual Appellants resigned from Ameripro without prior notice.  2RR 52-54, 154; AX 2-4.  The following Monday, they opened a new branch office for Ameripro's competitor, Appellant Oak Mortgage, in the same office complex.  2RR 60-61, 154; 3RR 31-32.

Ameripro subsequently discovered that the Individual Appellants had been secretly transmitting copies of its confidential records to Oak Mortgage, beginning *over two months* before they resigned (during a time when they were still fiduciaries for Ameripro).  *E.g.*, 3RR 44-46 & AX 27.  Oak Mortgage actively

solicited that information from the Individual Appellants, and scanned and downloaded copies of Ameripro reports onto Oak Mortgage's own computer network. 3RR 44-46, 127-28; 2RR 88-94; AX 27; AX 70 at 890-93.[1]

The Individual Appellants also secretly downloaded and printed Ameripro's confidential customer and financial records, and personnel files of other Ameripro employees, without Ameripro's (or the customers' or other employees') knowledge or authorization. 2RR 154-60, 170-75, 178, 184; 3RR 45-46, 127-28.[2] The Individual Appellants admitted that the Ameripro records were confidential, that they gave copies of those confidential records to Ameripro's competitor, Oak Mortgage, and that they continued to keep copies of all those records once they

---

[1] *See, e.g.*, 3RR 45-46 ("Q. Exhibit 27 is an example of AmeriPro's competitor asking you for confidential information without AmeriPro's knowledge, correct? A. Correct. They asked for information in that e-mail. … Q. You did give him a copy of a profitability report, didn't you? A. I don't remember the exact title of the report, but I gave him the report," adding that at a November 17, 2014 meeting "I did give him the report."); 3RR 46 (Nasserfar provided the report "in direct response to Oak Mortgage asking you for the profit and loss statement of AmeriPro"); 3RR 39-41 ("Question, Line 9: 'And earlier we talked about this, and you testified that a general ledger would be confidential; is that correct?' Answer: 'A general ledger would be confidential information.' … Question: 'So your testimony is that either you or Mr. Task provided Exhibit 12 [AX 28], which is the general ledger by branch to Oak Mortgage?' Answer: 'Correct.'").

[2] *See, e.g.*, 2RR 156-57 ("Q. You didn't ask anyone's permission at AmeriPro to take this information home with you, did you? A. I did not. … Q. The day before – the day before you resigned from AmeriPro, you filled a bankers box with these monthly general ledgers and several other Ameripro financial records to take with you, correct? A. I made copies. … Q. And you had copies of personnel records of other employees of AmeriPro at your house even after you resigned from the company, correct? A. I had copies, correct."); 2RR 174-75 (downloaded Ameripro's confidential financial records "off of AmeriPro's computer network that you had to access through a password"); 2RR 184 ("Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you? A. I did not.").

became officers and agents of Oak Mortgage. 2RR 163-71, 174-75, 177-78, 183-84; 3RR 39-41; *see also* 2RR 80-81.[3] At the hearing, Appellants' counsel told the district court that Appellants "returned over 20,000 – I think it's *over 20,000 electronic files*" to Ameripro on April 27, 2015 alone. 2RR 22.

In addition to taking customer data from Ameripro's computers, the Individual Appellants also began secretly soliciting customers on behalf of Oak Mortgage, despite their fiduciary relationships and non-solicitation agreements with Ameripro. One month before they resigned, Oak Mortgage instructed them that they could "solicit to your book of business and your builder/realtor relationships" and "solicit to your past customer database." 2RR 191-93; AX 56. They proceeded to do so. In December 2014, for example, Nasserfar reported to Oak Mortgage that he was driving almost 200 miles to contact all Ameripro builder customers — even though he was still serving as a Branch Manager and fiduciary for Ameripro at that same time. 3RR 58; AX 63.[4]

---

[3] *See, e.g.*, 3RR 127-28 ("Q. You gave copies of that bankers box full of financial information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct? A. We scanned them, correct."); 2RR 155-56 ("Question: 'And you knew you still had those AmeriPro financial records, those confidential records, ever since you've resigned, correct? It's not something you just forgot you had?' Answer: 'No, I had not forgotten.'").

[4] 3RR 58 ("Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct? A. Correct. Q. You were still under a duty of loyalty to AmeriPro at that time, correct? A. Yes, sir.").

## II. Ameripro's creation of the Lakeway branch office, and the Individual Appellants' fiduciary roles for Ameripro.

Ameripro was founded as a residential mortgage lending company in 2003, headquartered in Austin. 2RR 41-42.

At the request of Michael Nasserfar, Ameripro created a branch office in Lakeway, Texas, in 2014. 2RR 46-47. Ameripro promoted Nasserfar to be its Branch Manager at that location. 2RR 47. Michael Task served as Sales Manager, and Tycord Gosnay served as a Loan Officer and agent, at the same location. 2RR 45. The Individual Appellants were Ameripro's only three employees at its Lakeway office. 2RR 45.

## III. The non-solicitation clauses and ownership provisions in the Ameripro contracts.

As a condition to their employment, and before they could receive access to any of Ameripro's confidential information, the Individual Appellants were required to sign employment and confidentiality agreements with Ameripro. 2RR 63, 77. The Individual Appellants contractually agreed:

(a)     that Ameripro is the exclusive owner of all information they created or to which they were given access during their employment,

(b)     that they would protect the confidentiality of all such information, and would not use or disclose it except to perform their duties, and

(c)     that upon their termination, they would return all such information to

4

Ameripro, and would not retain any portions for any purpose.

AX 7-11, 13-19, 21-24.

## A. Ameripro's confidential information includes each category outlined in the Temporary Injunction.

After the Individual Appellants signed their employment contracts, Ameripro gave them access to confidential information, including the records listed in the Temporary Injunction. 2RR 66-67, 70-71, 80-82, 88-94, 142-43, 183-84. That information would give others a competitive advantage if used or disclosed, and Ameripro had multiple security systems in place to protect its secrecy, including consumer data. 2RR 66-68, 70-71, 81-82, 89-91, 99, 143.

Ameripro never gave them permission to take or disclose any of its information, let alone to a competitor. 2RR 81-82, 88-89, 92-94.

## B. Brohn, Clark Wilson, and Seaholm were Ameripro's customers under the contractual non-solicitation clauses.

Although Appellants argue that "customers" under the Ameripro contracts does not include builders, Nasserfar admitted that part of his job at Ameripro was to build goodwill with Ameripro's "builder customers," and stated that Ameripro was the "exclusive lender" for Brohn and Clark Wilson. 3RR 50-53; AX 67. Likewise, Task understood that Ameripro's "customers" as used in the contracts he signed included its builders and other referral sources, whom he was contractually barred from soliciting, and admitted that Ameripro's "clients"

5

included builders. 2RR 185-86; AX 55. Nasserfar admitted that he developed a "builder centric model" for Ameripro. 3RR 48-50; AX 75.

Builders Brohn Homes, Clark Wilson Builders, and Seaholm Residences, in particular, were customers of Ameripro. 2RR 50, 69-70, 100-02; 3RR 51-52, 67-68.[5] Nasserfar and Task did not have a customer relationship with them until after they were employed at Ameripro. 2RR 100-02, 201; 3RR 67-68, 177-78. Prior to when Nasserfar and Task resigned from Ameripro, neither did Oak Mortgage. 2RR 52.

Nasserfar and Task contractually agreed that for one year following their termination, they would not solicit similar business from "any customer" who was doing business with Ameripro as of his termination, or "otherwise knowingly interfere with the business of the Company." AX 11, AX 17.

Each of the Individual Appellants also contractually agreed that "all leads and loans in process are Company's property," they would not take any action to divert loan business "to a competitor or away from Company," and they would provide Ameripro a "written account of any and all open leads, business prospects, and/or loans in process as of the date" of his termination. AX 11; AX 17-18.

---

[5] *E.g.*, 2RR 100-102 (Brohn became a "customer of Ameripro," and identifying Seaholm as a customer); 3RR 51-52 (Nasserfar admits Ameripro was the lender for Clark Wilson and Brohn Homes); 2RR 50 (Ameripro's business relationship with "builders or other corporate customers").

**C.     Oak Mortgage's actual knowledge of the contract provisions**.

At least as early as December 10, 2014 (more than one month before the Individual Appellants resigned from Ameripro), they gave Oak Mortgage copies of their employment agreements with Ameripro, which Oak Mortgage reviewed. AX 56.  Oak Mortgage consequently had actual knowledge of the confidentiality, exclusive ownership, and non-solicitation provisions in the Ameripro contracts.

**IV.    The Individual Appellants admitted that they took Ameripro's confidential information and provided it to Ameripro's competitor. They began doing so months before they resigned.**

Oak Mortgage is a direct competitor of Ameripro.  2RR 60.  Prior to 2015, it did not have an office in the Austin area.  3RR 32-33; 2RR 60.  In September 2014, Nasserfar began negotiating with Oak Mortgage about becoming its branch manager at the same location where he managed Ameripro's branch.  3RR 43.

More than two months before the three Ameripro fiduciaries resigned, Nasserfar began funneling copies of Ameripro's confidential information to Oak Mortgage.  On November 12, 2014, for example, Oak Mortgage's Senior Vice President e-mailed Nasserfar that Oak Mortgage "will need some more information from you," including Ameripro's product mix and detailed breakdowns, "compensation" of other Ameripro employees, copies of Ameripro's 2013 and 2014 profit and loss statements (so Oak Mortgage would know the "monthly expenses"), and Ameripro "Pricing" on deals so Oak Mortgage could

7

"compare it to our pricing." AX 27; 3RR 44-45.

Nasserfar admitted that "AmeriPro's competitor [was] asking you for confidential information without AmeriPro's knowledge," and that he provided it to Oak Mortgage. 3RR 45-46; AX 70 at 890-93. At least one month before they resigned as fiduciaries, the Individual Appellants also transmitted an electronic copy of Ameripro's Loan Profitability Report to Oak Mortgage, listing Ameripro's revenues and margins for every loan at its Lakeway branch, together with consumer names and account numbers. Oak Mortgage then analyzed the report for several hours on December 17, 2014. AX 49-50; 2RR 230-32.

### A. Appellants also downloaded and copied Ameripro's financial and customer data from its office and computers.

In the month before they resigned, the Individual Appellants also removed electronic and paper copies of virtually every category of confidential financial and customer information from Ameripro's Lakeway office. Testimony at the hearing established:

i) The day before they resigned, Task filled a bankers box full of Ameripro financial records for the past year. He and Gosnay scanned them at Oak Mortgage's offices. 2RR 156-57; 3RR 127-28.[6] Task admitted his

---

[6] 2RR 156-57 (Task "filled a bankers box with these monthly general ledgers and several other Ameripro financial records to take with you."); 3RR 127-28 ("Q. You have copies of that

8

contracts barred him from taking the records, but he took them anyway, without Ameripro's knowledge.  2RR 158-59, 166-67, 174.

ii) Nasserfar likewise downloaded Ameripro confidential documents onto a USB device, and kept it when he became Oak Mortgage's Vice President.  2RR 178.

iii) Appellants also downloaded confidential profit and loss reports from Ameripro's computer network.  2RR 177-78.[7]

iv) Appellants took electronic and hard copies of Ameripro's monthly general ledgers for 2014, admitted that the ledgers were Ameripro's confidential information, and admitted that they gave the ledgers to Oak Mortgage.    2RR 156-57, 164-65; 3RR 42.[8]    Oak Mortgage even produced copies in discovery.  AX 28; PX 6.

v) Task and Nasserfar "intentionally" took lists of Ameripro borrowers (including their social security numbers) when they resigned from

bankers box full of financial information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct?  A. We scanned them, correct.").

[7] 2RR 177-78 ("Q. The day before you resigned from AmeriPro, you also took copies of its profit and loss reports off the computer system, correct?  A. Correct," but he is not sure of date).

[8] 2RR 156-57 (they took Ameripro's "monthly general ledgers"); 3RR 42 ("Q. And you answered 'correct' when she asked you if you or Mr. Task gave it [AX 28] to Oak Mortgage, correct?  A. Correct."); 2RR 164-65 ("Q. And then the question: 'This is information you obtained electronically on AmeriPro's computer network, correct?'  Answer: 'Correct.' … Question: 'And you understood then that it was AmeriPro's confidential information that you have in these general[] ledgers, correct?'  Answer: "I would agree.'").

9

Ameripro. Task admitted that they obtained those records from Ameripro's secure network, and that federal regulations barred them from doing so. 2RR 160-61, 167-72; 12 C.F.R. § 1016, *et seq.*[9] They also failed to obtain permission from any of the borrowers before removing their private financial information from Ameripro. 2RR 184.[10]

vi) Appellants downloaded still other borrower information onto a thumb drive, including nonpublic lists of loans that had not closed yet, and admitted that federal regulation barred that conduct. 2RR 170-71.[11] Nasserfar sent a similar "pipeline" report of unclosed Ameripro loans to

---

[9] 2RR 160-61 ("Q. Now, both you and Mr. Nasserfar intentionally took list of AmeriPro borrowers including their loan numbers and other financial information with you when you resigned from AmeriPro, correct? A. Correct."); 2RR 168-69 ("Q. You understood that the social security number of a borrower of AmeriPro is confidential information, didn't you? A. I understand that. Q. And you understand that federal regulations prohibits you from taking that information, don't you? A. I do now, yes, sir."); 2RR 171-72 ("Q. All of the information you took when you resigned relating to AmeriPro borrowers was information you obtained off of AmeriPro's computer system, correct? A. Correct. Q. You didn't obtain any of that information from public sources, did you? A. No. … Q. Under Regulation P, you derived that information from something a borrower submitted to the lender. You're not allowed to take that. It's protected too. Do you understand that? A. I do now. … Q. You took it all off of AmeriPro's protected website and computer network, correct? A. From their network.").

[10] 2RR 184 ("Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you? A. I did not.").

[11] 2RR 170-71 ("Q. And the day before you resigned from AmeriPro, you also, in addition to this bankers box, downloaded on a thumb drive information about a AmeriPro borrowers and loans that hadn't even closed yet, correct? A. Correct. … Q. And you understand that under Regulation P that's nonpublic private financial information of those borrowers that you had in your possession, correct? A. I had it in my possession. Q. And you took it home too, correct? A. Correct."). As quoted above, they scanned the entire box of records at Oak Mortgage.

Oak Mortgage, also in violation of federal regulations.  2RR 85-86.

vii)  Appellants took Ameripro's Funded Loan Report for 2014, which included the names of each consumer whose loan was processed through Ameripro's Lakeway branch, their account numbers, and the fees they paid, in violation of federal regulations.  2RR 92-93.[12]  Oak Mortgage produced a copy in discovery.  AX 30; PX 7; 2RR 92.

viii)  The Individual Appellants printed and gave Oak Mortgage a copy of Ameripro's Statement of Income reports for 2014.  Oak Mortgage produced copies in discovery.  AX 29; AX 33-34; PX 5; 2RR 91-92.

ix)  Task took copies of Ameripro's internal pro forma reports, outlining Ameripro's future plans for the Lakeway office.  2RR 183-84.

x)  On January 13, 2015 (the day before he resigned, and while still a fiduciary), Gosnay downloaded and e-mailed to his personal gmail account a copy of Ameripro's computer compilation of contact information and loan preferences for three Ameripro builder customers, including Brohn Homes and Clark Wilson Builders, their fees and tax rates (broken down by community), working capital, and closing

---

[12] 2RR 92-93 ("Q. So is it your understanding these [AX 28-30] were produced in discovery by Oak Mortgage?  A. Yes.  Q. Okay.  Any reason – any legitimate reason why Oak Mortgage should have these exhibits like Exhibit 30?  A. No."  It included borrower names, "all the

preferences, requirements, and nonpublic lender credit arrangements Ameripro made with those customers. He also downloaded and sent to his personal e-mail Ameripro rate information, and Ameripro templates and forms. AX 35-36, 38; 2RR 93-94, 96-98.

Appellants knew they did not have Ameripro's consent to take its information, and knew that their contracts prohibited it. 2RR 158-59, 170-71.[13]

In their haste in downloading and using Ameripro's documents, Appellants even forgot to remove Ameripro's address from the templates they took. Appellants began using exactly the same forms at their new business, with Oak Mortgage's logo, but with Ameripro's address still affixed. 2RR 96-98; *compare* AX 36 (the attachment Gosnay e-mailed to his gmail account) with AX 37.

## B. The confidential information that Appellants took from Ameripro enabled them to jumpstart a competing office.

Access to Ameripro's records and data would give a competitor "a head start in starting a new location" in an accelerated time frame. 2RR 81, 90, 99. For example, it took 10-12 months of time and expense to launch Ameripro's Lakeway

---

revenue associated to the specific loan," expenses specifically related to it, and "total loan/income," and that "None of that is publicly available.").

[13] 2RR 158 ("Q. You chose not to comply with your contract provisions with AmeriPro and took its financial information and borrower list to your house instead, correct? A. I made copies."); 2RR 170-71 ("Q. You knew that you were taking AmeriPro information home with you for a purpose other than what AmeriPro had given you consent for, correct? A. Correct.").

office.  2RR 47-48.  In contrast, after misappropriating substantially all of that data, Appellants were able to open a new branch in the same complex within one business day after the Individual Appellants resigned.  3RR 31-32; 2RR 154.

Similarly, Ameripro developed its proprietary forms over the course of twelve years.  2RR 98-99.  By simply downloading all of that information *en masse*, Appellants were able to use the product of Ameripro's forms, templates, and customer compilations the same month they opened their branch. AX 35-38.

By transmitting the details of Ameripro's builder preferences, lender credits for loans, product mix, pricing, rates, fees, margins, and other internal records to a competitor (e.g. AX 27-38), Appellants consequently had the benefit of that data when they solicited Ameripro's customers at their jumpstarted branch.  The builder customer data, in particular, would aid a competitor in soliciting Ameripro customers because it would show the type and amount of business obtained through each builder.  2RR 70-71.

## V.  Appellants began soliciting Ameripro's customers for Oak Mortgage, even before the Individual Appellants had resigned from Ameripro.

### A.  One month before the Individual Appellants resigned as fiduciaries, Oak Mortgage agreed to indemnify them against Ameripro, and told them they could solicit its customers.

On December 10, 2014 (over one month before the Individual Appellants resigned from their fiduciary roles at Ameripro), Oak Mortgage wrote Nasserfar

13

and Task that it had reviewed their employment agreements, and that they could "solicit to your book of business," solicit their "past customer database," and solicit from the "builder/realtor relationships." 2RR 191-93; AX 56.

The next day, December 11, 2014, Oak Mortgage agreed to indemnify them in litigation with Ameripro. 2RR 193; AX 53; AX 81.[14] They nevertheless continued to serve as fiduciaries at Ameripro for a full month. 2RR 182-83, 194.[15]

**B.** **While they were Ameripro's fiduciaries, the Individual Appellants began soliciting Ameripro customers for a competitor. Oak Mortgage sent "scripts" for them to use**.

One week after Oak Mortgage told Ameripro's employees they could solicit its "customers," Nasserfar e-mailed Task a list of major Ameripro builder customers, including principal employees. AX 59. A few days later, Nasserfar e-mailed Oak Mortgage and reported he was "dropping in on all builder contacts," driving almost 200 miles to do so. AX 63. Nasserfar admitted he reported his progress to "the competitor of the company you were working for," at a time when

---

[14] AX 53 and AX 81 are Oak Mortgage's Offer Package to Nasserfar and Task, and state: "Per the phone conversation held on December 11, 2014," Oak Mortgage Group "agrees to provide Michael with legal support and protection ('Legal Support and Protection') in the event a law suit is filed against Michael by Michael's previous employer, AmeriPro Funding, Inc. … by covering the cost of Michael's legal fees associated with defending the law suit filed by Ameripro."

[15] 2RR 182-83 ("Q. After the December 11 conversation, you continued working as a fiduciary for AmeriPro for another month, correct? A. I did continue to work for AmeriPro for another month, yes. … Q. And not only were you a fiduciary for AmeriPro, you were also the co-manager at the Lakeway branch for that full month, correct? A. Correct.").

Nasserfar admitted he still owed a duty of loyalty to Ameripro itself. 3RR 58.[16]

On January 8, 2015, while Nasserfar was still a fiduciary to Ameripro, Oak Mortgage also sent him "scripts" to use for "All previous clients & database," "Borrowers in Pipeline," "Realtors in Pipeline," and "All other Realtors." AX 78. Nasserfar also contacted principals and employees of Ameripro's existing customers about his plan to open a competing office with Oak Mortgage – at the same time Nasserfar was paid by Ameripro to help build goodwill with those same builder customers. 3RR 53, 58-59, CX 1 at 15-16. Despite the non-solicitation provisions in his contracts with Ameripro, Nasserfar prepared a "To Dos" list on January 5, 2015, which included drafting a "new intro email to be sent to clients (both new and old)," and continued to notify Ameripro customers (but not Ameripro itself) about his plans. AX 58, 80; 3RR 55-57, 60-61.[17] As noted above, Gosnay downloaded customer compilations and forms and e-mailed them to his personal account. AX 35-36, 38.

Although the Individual Appellants contractually agreed that Ameripro

---

[16] 3RR 58 ("Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct? A. Correct. Q. You were still under a duty of loyalty to AmeriPro at that time, correct? A. Yes, sir."). Nasserfar sent that update in response to Oak Mortgage's e-mail about celebrating their "next chapter" and "all the work put in to serve all those clients, referral partners!" AX 63.

[17] At 3RR 60-61, Nasserfar was impeached with his prior testimony, in which he admitted that a text from one such customer went to him personally. Nasserfar then testified that he never saw

owned "all leads" (AX 11; AX 17-18), they also met with business prospects while they fiduciaries of Ameripro (but to benefit Oak Mortgage, not Ameripro), and scheduled future meetings to occur on dates when they would be working at Oak Mortgage. AX 60-62, 2RR 203-05.

Despite the non-solicitation clause in Nasserfar's and Task's contracts, Oak Mortgage also e-mailed them instructions on how to evade detection of such violations. For example, Oak Mortgage e-mailed Nasserfar and Task on January 8, 2015: "Just have Ty [Gosnay] resign PRIOR to the Michaels. As long as he resigns before we are ok. … Wait 1 month before you go after the other person." AX 57; 2RR 196-97.[18]

## VI. In addition to transmitting confidential data to Oak Mortgage before they resigned, the Individual Appellants removed *over 20,000 Ameripro customer and financial files* and kept them as agents of Oak Mortgage.

On January 19, 2015, Nasserfar became the Vice President for Oak Mortgage, Task became Oak's Mortgage's Austin Area Sales Manager, and Gosnay became its Mortgage Banker in Austin. As of that date, they were Oak Mortgage's entire sales force in Austin. AX 67; AX 69; AX 81.

---

it. On the face of AX 58, however, Nasserfar not only received the text but also *responded* to it, and the context makes clear he had previously advised the customer about his competing office.

[18] 2RR 196-97 (Task impeached: "Q. Question: 'Is there any business reason that you can think of about waiting one month before you go after the other person, other than to make it appear that it's not a solicitation?' Answer: 'You'd have to ask him. No.'").

Once they formally became officers and agents of *Oak Mortgage*, they continued to keep possession of all of the confidential and customer data they had taken from Ameripro's computer network and offices. 2RR 54, 75-78, 159, 178.

Counsel for Appellants told the district court that "on April the 27th [2015] we returned over 20,000 – I think it's *over 20,000 electronic files* to them." 2RR 22 (emphasis added). Those 20,000+ Ameripro files were "returned" only after Ameripro filed applications for injunction to get back its internal files. CR 44-68.

Task returned the bankers box of records even later, on May 5, 2015 (six days before the initial injunction hearing). PX 34; CR 95-98. After the district court issued a TRO on May 11, 2015, Appellants produced still more Ameripro records they had stored on ten different thumb drives, laptops, and external storage devices, but stripped out the system metadata. AX 48; 2RR 226-27. Appellants had the use of those thousands of Ameripro records during the intervening months.

**VII. The Individual Appellants destroyed Ameripro documents, including its customer files, and destroyed files after the district court issued a TRO compelling their return.**

Appellants discussed the prospect of litigation with Ameripro at least as early as December 11, 2014, when Oak Mortgage agreed to indemnify them. AX 53; AX 81. Task nevertheless manually deleted all of his text messages through January 20, 2015, after he left the company, including all of the texts he

17

exchanged with Ameripro customers and the other Appellants. 2RR 182-83.[19]

On January 15, 2015 (the day before he resigned), Task also inserted a USB device in the laptop Ameripro had issued to him for work, to download the documents stored on it, and then deleted 911 "ameriprofunding-clients" files from the laptop before giving it back to Ameripro. 2RR 217-21; AX 3 (laptop return); AX 43 (expert analysis). Task had previously moved those files to the local drive of the laptop, so that information would not be backed up on Ameripro's network, would not be accessible to its IT personnel, and documents transmitted to Oak Mortgage could not be detected. 2RR 174, 219.[20]

Appellants also destroyed documents subject to the TRO. The TRO issued on May 12, 2015. CR 95-98. Two days later, Appellants deleted 140 folders from a USB hard drive labeled "Nasserfar External Drive." 2RR 233-36; AX 46. The pathnames for the deleted folders show they were part of what the TRO commanded to be returned to Ameripro, including: "AMB Loan Funded Report Jan-Aug" files, "AMB Profit & Loss Jan-Aug" files, "APF Accounting System

---

[19] 2RR 182-83 (Task knew of prospective litigation with AmeriPro on December 11, 2014, and admitted: "Q. And after that, you deleted every text message that existed before then, all the way through January 20, after you left the company, correct? A. Yes.").

[20] 2RR 174 ("Q. – Ameripro wouldn't be able to tell if you sent it, for instance, to Oak Mortgage, would it? A. They would not have been able to, I guess. Q. So by having it on the local drive of your computer, you were able to send it any where you want without being detected, correct? A. If I chose to, I believe.").

Loan Details '14," "Monthly Pipeline Details," and "Loan_files" and "Loan Details" for several months. AX 46.

## VIII. Appellants' successful disruption of Ameripro's business.

When the Individual Appellants left Ameripro, they still had loans in the process of being closed. CX 1 at 18. Despite the clause in their contracts regarding being "available to help with and participate in the closing process when requested" (AX 11, AX 17-18), the Individual Appellants did not return telephone calls or cooperate on the transition of the pending loans. 2RR 53, 55; 3RR 56.

The Individual Appellants' contracts also required them to provide a "written account" of all open leads, business prospects, and loans in process as of their termination. AX 11, AX 17-18. Those provisions were designed to "make a smooth transition for the current customers in the company's pipeline." 2RR 78-79. They did not provide those lists, however, and did not inform Ameripro of their conversations with borrowers. 2RR 55-56, 79-80. One major builder described the impact that the breach had on Ameripro's goodwill, including that "there's been a much higher level of complaint" for the loans Nasserfar handled and left, some of the loans did not close, and in the resulting confusion Ameripro was rated "very low" on borrower surveys relating to those loans. CX 1 at 19-21.

In sum, Appellants took the entirety of Ameripro's confidential financial and customer data for the Lakeway branch, and used Ameripro's confidential

information to compete for the very customers they had contractually agreed not to solicit. Ameripro's pipeline of business at the Lakeway office fell off dramatically, and its Lakeway branch closed down. 2RR 45-46.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its discretion in entering the Temporary Injunction. This is a case of blatant misappropriation of Ameripro's confidential information and solicitation of its customers for a competitor, which began at the behest of Oak Mortgage while the Individual Appellants were still fiduciaries of Ameripro. The evidence amply supports that each of the Appellants conspired and participated in those violations of common law, statute, and contract.

Appellants' argument that the Temporary Injunction does not provide "any explanation or description" to satisfy Rule 683 is without merit. Nowhere in Appellants' brief do they mention the Temporary Injunction findings that they attempted to "permanently destroy Ameripro documents and files," removed "confidential and proprietary information belonging to Ameripro," took builder customer and other confidential data from "Ameripro's computer network and premises," or the multiple specific findings regarding imminent irreparable harm. Case law shows that the district court's reasons satisfy Rule 683.

Appellants' own testimony confirms that the three builders listed in the

20

Temporary Injunction are "customers" of Ameripro, including under the non-solicitation provision of the contracts. That evidence is consistent with the contract language as well.

Appellants did not merely take names of builders from Ameripro. Appellants misappropriated Ameripro's confidential compilations of multiple categories of pricing, customer, and financial data (including those listed in the Temporary Injunction, none of which Appellants mention or address in their brief). They downloaded that data from Ameripro's computers. Independent of the non-use, non-disclosure, and non-solicitation provisions of the contracts, their conduct was an egregious breach of fiduciary duty, in which Oak Mortgage knowingly participated, and independently supported issuance of an injunction.

The record establishes that Appellants had not returned all of Ameripro's confidential information as of the hearing. Instead, Appellants destroyed documents after the TRO issued, stripped out metadata from copies they "returned," and still retained documents. Even for the documents they did return, their wrongful retention and use of thousands of that information in a competing business for several months separately supports issuance of the injunction.

The evidence supports the district court's multiple findings that Ameripro does "not have a legal remedy that is adequate," that damages "would not fully or adequately compensate Ameripro" and would be "very difficult to ascertain or

quantify," and related findings about the inadequacy of any remedy at law. Appellants do not mention or address those findings anywhere in their brief, or any of the evidence relating to them.

The district court narrowly tailored the Temporary Injunction, and its exercise of discretion in fashioning the injunctive relief is tied to the imminent irreparable harm as shown by the evidence.

## ARGUMENT

## I. The Temporary Injunction satisfies the requirements of Rule 683.

Appellants argue that the Temporary Injunction states mere conclusions and does not provide "any explanation or description" why an injunction is needed to prevent irreparable injury to Ameripro. [App. Br. 25.] Based on that false premise, they argue that the Temporary Injunction does not comply with Rule 683.

### A. The reasons for issuance stated in the Temporary Injunction, which Appellants do not address or even mention in their brief.

Appellants' argument is false on its face. The Temporary Injunction states that Appellants "attempted to permanently destroy Ameripro documents," that they "have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro," and it itemizes several categories of confidential customer and financial files that Appellants wrongfully took from "Ameripro's computer network and premises," including "customer and

22

referral lists," "builder preferences," and multiple categories of internal financial data ranging from Ameripro's "general ledgers" to its "pricing information." CR 223-24. The Temporary Injunction expressly adds:

> "The Court further finds, based upon the evidence, that Ameripro has met its burden to establish that it will <u>suffer a probable, imminent, and irreparable injury</u> until trial on the merits, absent entry of a temporary injunction, <u>in that</u> Ameripro has shown that <u>the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify, a future award of damages would not fully or adequately compensate Ameripro, Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief, and even to the extent that a legal remedy might be available, its redress will be limited and inadequate</u>. The Court further finds that the balancing of the equities as between Ameripro and Counter-Defendants … favors the issuance of this temporary injunction, and that <u>this temporary injunction is necessary to preserve the status quo between the parties pending trial on the merits</u>."

CR 224 (emphasis added).

None of the foregoing detailed reasons — stated directly in the Temporary Injunction — are mentioned anywhere in Appellants' brief. Appellants simply ignore them. Their argument that the Temporary Injunction does not give "any explanation or description" of its reasons is without merit.

**B.     The reasons stated in the Temporary Injunction go further than is required by Rule 683, as shown by multiple decisions**.

As a matter of law, the reasons set out in the Temporary Injunction satisfy Rule 683 requirements, as illustrated by multiple decisions (including those cited by Appellants).

23

In *IAC, ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191 (Tex. App. –

Fort Worth 2005, no pet.), the court rejected a similar challenge under Rule 683.

In affirming a temporary injunction, the *IAC* court stated:

> "When a defendant possesses trade secrets and is in a position to use them, harm to the trade secret owner <u>may be presumed</u>. [Citations omitted.] The threatened disclosure of trade secrets <u>constitutes irreparable injury as a matter of law</u>."

160 S.W.3d at 200 (emphasis added). In fact, "At times, an injunction is the <u>only</u>

effective relief an employer has when a former employee possesses confidential

information." *Rugen v. Interactive Business Systems, Inc.*, 864 S.W.2d 548, 552

(Tex. App. – Dallas 1993, no pet.) (emphasis added).

Just as importantly, the *IAC* court noted that the same reasons contained in

the Temporary Injunction satisfied Rule 683: "The injunction further states that

Bell's injury is irreparable because 'it cannot be adequately compensated in

damages or the damages cannot be measured by any pecuniary standard' and that

'a legal remedy may be also inadequate since an award of damages may come too

late.' Accordingly, we hold that the injunction adequately sets forth the reasons

for its issuance by identifying Bell's harm and explaining why it is irreparable."

160 S.W.3d at 201.[21]

---

[21] Here, Appellants actually used Ameripro's confidential information. Oak Mortgage analyzed a copy of Ameripro's profitability report for several hours, even while the Individual Appellants (who supplied the report) were still Ameripro fiduciaries. AX 49-50; 2RR 230-32.

Here, the Temporary Injunction includes the reasons found sufficient in *IAC*, but also recites much more egregious conduct. For example, Appellants' attempts to "<u>permanently</u> destroy Ameripro documents and files," and their possession of confidential information belonging to Ameripro, describe threats of irreparable injury as a matter of law.[22]

So too does the Individual Appellants' breaches of contract, with which Oak Mortgage tortiously interfered. CR 223. *Tranter, Inc. v. Liss*, 2014 WL 1257278 *9 (Tex. App. – Fort Worth March 27, 2014, no pet.) (quoting with approval, "'In Texas, injury resulting from breach of non-compete covenants is the epitome of irreparable injury."). The Temporary Injunction also found that Appellants took Ameripro's "customer and referral lists and contact information," compilations of "builder preferences," its "pricing information," and other specific examples of customer and financial data which would epitomize irreparable harm if placed in the hands of a competitor. CR 224.

Even if the district court had not explicitly found the likelihood that

---

*Compare: Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App. – Fort Worth 2003, no pet.) ("TWI is not required to prove that Fox is actually using the information; it need only prove that he is in possession of the information and is in a position to use it").

[22] The record supports those reasons as well. 2RR 217-21 & AX 43 (over 900 "ameriprofunding-clients" files destroyed from Ameripro laptop); 2RR 233-36 & AX 46 (140 "loan files," "pipeline," and other Ameripro files destroyed); 2RR 182-83 & AX 53 (Task manually deleted all text messages that existed during his employment, after Oak Mortgage agreed to indemnify him in litigation against Ameripro).

Appellants engaged in misappropriation and destructive behavior, their wrongful *acquisition* of Ameripro's confidential information, by itself, also gives rise to a presumption of irreparable harm. *Hill v. McLane Co., Inc.*, 2011 WL 56061 *5 (Tex. App. – Austin Jan. 5, 2011, no pet.) (where appellant "acquired" trade secret information, a plaintiff "need not demonstrate" actual misappropriation before trial, and "[i]nstead, 'harm to the trade secret owner may be presumed," citing *IAC*); *Conley v. DSC Commun. Corp.*, 1999 WL 89955 *5 (Tex. App. – Dallas Feb. 24, 1999, no pet.) (although "no evidence shows any misconduct" by a former employee, that did "not change the fact that the employee is in possession of confidential, proprietary information," and did "not bar the trial court from entering a temporary injunction.").

Moreover, the Temporary Injunction findings that i) "the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify," ii) a future award of damages "would not fully or adequately compensate Ameripro," iii) Ameripro "does not have a legal remedy that is adequate in lieu of injunctive relief," and iv) "even to the extent that a legal remedy might be available, its redress will be limited and inadequate," are independent reasons why irreparable harm would result which satisfy Rule 683, and as shown in Section V below, are fully supported by the record. *Topheavy Studios, Inc. v. Doe,* 2005 WL 1940159 *6 (Tex. App. – Austin Sept. 14, 2005, no

pet.) ("A party proves irreparable harm by showing an injury for which there can be no real legal measure of damages or for which damages cannot be ascertained with a sufficient degree of certainty.").

In sum, the district court's reasons for issuance, as stated in the Temporary Injunction, are much more detailed than Rule 683 requires. *See also Amalgamated Acme Affiliates, Inc. v. Minton*, 33 S.W.3d 387, 397 (Tex. App. – Austin 2000, no pet.) (injunction satisfied Rule 683 when it stated the appellant misrepresented itself with intent to interfere, and in the same order, stated that "without the issuance of this temporary injunction, said Defendant will alter the status quo and Plaintiffs will be without any adequate remedy at law"); *Inex Indus., Inc. v. Alpar Resources, Inc.*, 717 S.W.2d 685, 688 (Tex. App. – Amarillo 1986, no writ) (cited with approval by this Court in *Amalgamated* as holding "the trial court sufficiently stated its reasons 'that Wallace and Inex would, if allowed to continue, alter the status quo, tend to make ineffectual a judgment in favor of Alpar, and leave Alpar without an adequate remedy at law,'" and that "these recitations were held to satisfy Rule 683 as interpreted by the supreme court"); *Texas Tech University Health Sciences Center v. Rao*, 105 S.W.3d 763, 768 (Tex. App. – Amarillo 2003, pet. dismissed) ("a recitation of the reasons an injunction issued was because the defendants had no adequate remedy at law, the rights involved were unique and irreplaceable, and money damages would not be a sufficient remedy were

sufficient to meet Rule 683 requisites," and adding, "We agree with that holding") (citing *Pinebrook Properties, Ltd. v. Brookhaven Lake Property Owners Association*, 77 S.W.3d 487, 504-05 (Tex. App. – Texarkana 2002, pet. denied)).

**C.  The decisions cited by Appellants do not assist them.  One such decision lists the language from this Temporary Injunction as examples that "*comply* with rule 683."**

The authority that Appellants cite at pages 22-24 of their brief actually defeat their argument:  one decision listed *some* of the same reasons contained in this Temporary Injunction, and described them as examples that have "been held sufficient to comply with rule 683."  The remaining decisions that Appellants cite are inapposite — the language in those orders did not recite any reasons at all, and in several instances did not even mention the word "injury."

Appellants cite *Byrd Ranch, Inc. v. Interwest Savings Association*, 717 S.W.2d 452, 454-55 (Tex. App. – Fort Worth 1986, no writ).  The *Byrd* court, however, contrasted its facts with examples from decisions where "an order has been held <u>sufficient</u> to comply with rule 683," including:

- "the conduct 'would alter the status quo and tend to make a final judgment in favor of appellees impossible or difficult to enforce;'"

- The "moving party 'would be harmed unless the temporary injunction were issued, as the status quo could not be maintained without the injunction;'"

- "or that the moving party 'will probably sustain irreparable injury and damage to its business' if the conduct continues."

28

Here, the district court states "Ameripro will suffer a probable, imminent, and irreparable injury," and then proceeds to list *those same reasons*. CR 224. In addition, the Temporary Injunction states multiple other reasons as well, as quoted above. CR 223-24.

The other decisions that Appellants cite are inapposite, because the temporary injunction orders in those decisions did not list any reasons for issuance, and in several instances did not mention "injury" at all.[23]

As stated in *Intercontinental Terminals Company, LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 899 (Tex. App. – Houston [1st Dist.] 2011, no pet.), which Appellants cite in their brief, "An explanation of the pending harm to

_____

[23] *Moreno v. Baker Tools, Inc.*, 808 S.W.2d 208, 211 (Tex. App. – Houston [1st Dist.] 1991, no pet.) (order does not mention "injury" or otherwise state why an injunction was issued); *Fasken v. Darby*, 901 S.W.2d 591, 593 (Tex. App. – El Paso 1995, no pet.) (the order "makes no effort" to list any reason and does not even mention "injury"); *Monsanto Co. v. Davis*, 25 S.W.3d 773, 789 (Tex. App. – Waco 2000, writ dism'd w.o.j.) (order states there is "probable injury" but does not state that it is "irreparable" nor attempt to state any reasons); *Cornelison v. Offshore Entertain. Corp.*, 2002 WL 34231619 *2 (Tex. App. – Corpus Christi Dec. 5, 2002, no pet.) (states there will be "irreparable injury," but "wholly fails to identify" any); *International Brotherhood v. Becon Construct. Co., Inc.*, 104 S.W.3d 239, 244 (Tex. App. – Beaumont 2003, no pet.) (order does not attempt to state any reasons why there might be irreparable injury); *University Interschol. League v. Torres*, 616 S.W.2d 355, 356-58 (Tex. Civ. App. – San Antonio 1981, no pet.) (same); *General Homes, Inc. v. Wingate Civic Ass'n*, 616 S.W.2d 351, 353 (Tex. Civ. App. – Houston [14th Dist.] 1981, no pet.) (order states there will be irreparable injury, but no reasons recited); *Stoner v. Thompson*, 553 S.W.2d 150, 151 (Tex. Civ. App. – Houston [1st Dist.] 1977, writ ref'd n.r.e.) (order stated the situation was "harmful," but failed to state any reason); *Kotz v. Imperial Cap. Bank*, 319 S.W.3d 54, 56 (Tex. App. – San Antonio 2010, no pet.) ("Merely stating that 'irreparable injury will result,'" without more, insufficient); *State v. Cook United, Inc.*, 464 S.W.2d 105, 106-07 (Tex. 1971) (The Supreme Court *reinstated* the temporary

29

the temporary injunction applicant, along with a specific recitation of the conduct enjoined, is all that is necessary to achieve Rule 683's purpose." This Temporary Injunction does so in detail.[24]

## II. Appellants' own admissions establish that Ameripro's builder clients are "customers" under the non-solicitation clauses.

Appellants state in their brief that they disagree with the "district court's construction of the employment contract term 'customer' to include residential homebuilders," such as Brohn, Clark Wilson, and Seaholm. App. Br. 30. They argue that when the non-solicitation provisions in their contracts refer to "customers," they had intended to use the narrower phrase "borrowers" instead. Appellants' argument, however, is without merit for several reasons.

### A. Appellants make no attempt to address the testimony (including their own sworn admissions) that customers include borrowers *and* "builder customers."

First, Appellants' argument is contradicted by their own admissions. At the injunction hearing, Nasserfar admitted that part of his job at Ameripro was to build goodwill with Ameripro's "builder customers," and that he would submit expense

---

injunction, despite no reference to "injury," because the violated "statute itself declares the injury" and "the "order need not restate the words of the statute").

[24] Appellants' reasons for citing *Intercontinental* are particularly unclear: that court *affirmed* a temporary injunction despite the fact that the trial court (unlike the instant case) "struck-through" a paragraph relating to the applicant's "probable right of recovery." 354 S.W.3d at 898-99.

reports to Ameripro for entertaining them. 3RR 52-53.[25] Task admitted that Ameripro "customers," as used in the contracts, included referral sources, and that he was contractually barred from soliciting them unless they were his customers before he joined Ameripro. 2RR 185-86.[26]

Nasserfar further stated that Ameripro was the "exclusive lender" for Brohn and Clark Wilson. 3RR 50-52; AX 67. In fact, Nasserfar admitted that as Ameripro's branch manager, he developed a "builder centric model" for Ameripro. 3RR 48-50; AX 75. In social media, Task as well admitted that Ameripro "clients" included builders. AX 55.

In addition, Ameripro's President testified that Ameripro's customer base included "builders" with whom Ameripro had business relationships (including for lender credits on loan transactions), and who served as referral sources. 2RR 68-71, 142-43. Brohn Homes, Clark Wilson Builders, and Seaholm Residences (the only builders listed in the Temporary Injunction) in particular were "customers" of

---

[25] 3RR 52-53 (He asked Ameripro to reimburse him for lunches and dinners with "Centerra, Brohn, and other clients." "Q. Part of what AmeriPro paid you to do was to build goodwill with its builder customers, correct? A. It wasn't in my employment agreement. Q. But that's part of what you did as your job was to build goodwill with these customers, right? A. I believe so.").

[26] 2RR 185-86 ("Q. On Page 112, Line 22, 'If you developed a relationship with a referral source after you began at AmeriPro, do you believe you can solicit to them?' … Answer: 'If it was a new referral source, I wouldn't solicit them. They can solicit me. They can call me, but I can't solicit them.' Question: 'And you can't solicit them under the employment agreement as you understand them' – 'understood them, correct?' Answer: 'It's my understanding for 12

Ameripro when the Individual Appellants worked there, 2RR 50, 69-70, 100-02; 3RR 67-68, and therefore fell within the terms of the non-solicitation provisions.

Contrary to statements in Appellants' brief, Nasserfar and Task did <u>not</u> have a customer relationship with those three entities until after they were employed at Ameripro, so as to fit within any exception to the non-solicitation clauses. 2RR 100-02, 201; 3RR 67-68, 177-78. Neither did Oak Mortgage. 2RR 52.

**B.     The evidence regarding builder customers is consistent with the non-solicitation clause**.

Appellants also argue that a reference in the employment agreements to "customer and their loan" means that the court should substitute the narrower phrase "borrower" in place of the broader term "customer." The "customers" of Ameripro's lending business, however, encompassed services for *both* builders and borrowers, not one *or* the other. In addition to stating that Ameripro was the "exclusive lender" for builders Brohn and Clark Wilson, Nasserfar wrote that the "builder centric model" at Ameripro led to "timely closings, and assisting on making sales for our builder partners." AX 75; *see also* 2RR 50-51, 68-71, 142-43. Appellants' own admissions show that the reference to "loan" is consistent with the district court's belief that "customers" as used in the contracts was

months.' … Question: 'Who do you believe you can solicit business from?' Answer: 'Any client, customer, business referral, realtor source that I knew prior to AmeriPro Funding.'").

intended to include builder customers. Moreover, the one-year non-solicitation would be meaningless if restricted to homebuyers, given the unlikelihood that a typical buyer would purchase another home so quickly after their last purchase, in contrast to the continuous business relationship that Ameripro had with its builder customers.

In their brief, Appellants make no attempt to explain or otherwise address any of the above testimony and documentary evidence. They make no attempt to explain their prior admissions that "customers" under the contracts include builders, or the testimony that Ameripro's "customers" specifically included Brohn, Clark Wilson, and Seaholm. They simply ignore it.

Appellants' wholesale failure to mention any of the evidence which contradict their arguments should be fatal to their appeal. A reviewing court "cannot reverse a trial court's order if the trial court was presented with conflicting evidence and the record includes evidence that reasonably supports the trial court's decision." *Universal Health Serv. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App. – Austin 2000, no pet.). "The evidence is viewed in the light most favorable to the trial court's order, indulging every reasonable inference in its favor," and the reviewing court may reverse only if the district court's order "was so arbitrary as to exceed the bounds of reasonable discretion." *Id*.

**C.     Appellants' argument that the definition of "customers" should be construed against Ameripro conflicts with the plain language of the contracts, which disclaim that either party is sole drafter.**

Appellants also argue that the employment agreements do not define "customer," and therefore the phrase should be construed against Ameripro. The contracts themselves, however, negate Appellants' argument.

Nasserfar and Task agreed that "no party shall be deemed to be the drafter" and the provisions shall not be construed "against either party as the drafter." AX 11, 17. Gosnay likewise agreed that his contract "shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter." AX 18.

Appellants' argument also fails because it disregards the applicable standard of review, which indulges every reasonable inference in *favor* of the trial court's ruling, not against it. *Universal*, 24 S.W.3d at 576. Their latent ambiguity argument is unsound for the same reason: *Gallagher Headquarters Ranch Dev., Ltd. v. City of San Antonio*, 303 S.W.3d 700 (Tex. 2010) was a *summary judgment* appeal, and therefore applied an appellate standard *opposite* that of temporary-injunction review.

Nor would a drafter's rule aid Appellants. Appellants' brief states that customer is "generally defined" as one who regularly has "'business dealings" with a business or "'who customarily has dealings with a business establishment.'"

34

App. Br. 32. That plain English definition, however, supports the district court's finding, and is consistent with testimony from both sides which construes "customers" to include Ameripro's "builder customers."

## III. Injunctive relief was also independently warranted because Appellants were barred from soliciting Ameripro customers for a *competitor* in breach of fiduciary duties, separate and apart from their breaches of contract and misappropriation.

Appellants also argue that the identity of builders is not "secret" or confidential information. Appellants' overly simplistic argument, however, mischaracterizes the customer information they actually stole from Ameripro, which was far more extensive, and how they went about taking it.

Just as importantly, Appellants ignore the district court's findings that they violated multiple other tort and contract duties, which Appellants do not address in their brief. The district court's findings of "breach of fiduciary duty," breach of contract, tortious interference, conversion, and misappropriation, each separately and <u>independently</u> warranted injunctive relief. *ERI Consult. Engrs., Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010) ("courts may fashion equitable remedies" when a fiduciary "competes with a principal" or usurps an opportunity); *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015) (same); *Hunter Bldgs. & Mfg., LP v. MBI Global, LLC*, 436 S.W.3d 9, 15 (Tex. App. – Houston [14th Dist.] 2014, pet. denied) (claimant "has the same equitable remedies" against

35

a party who knowingly "participates" in another's breach of fiduciary duty).

**A.    Appellants did not merely take the names of builder customers. They took pricing, lender credit data, compilations of builder preferences, and multiple other computer data.**

Ameripro's confidential customer information is not simply builders' names and telephone numbers, but includes the lender credits for loans, and its compilation of builder closing preferences and other details which Ameripro has aggregated over time — all of which Appellants fail to mention anywhere in their brief.

The Temporary Injunction specifically lists Ameripro's "pricing information," "builder preferences," and "transaction details," among the data that Appellants misappropriated from its computer network and premises.  CR 224. Appellants' brief makes no mention anywhere of those findings.  Ameripro's lender credits for loans and customer compilations, for example, are not publicly available information, Ameripro made reasonable efforts to maintain secrecy of that information, and disclosure of that information would give an economic advantage to a competitor.  2RR 66-68, 70-71, 81-82, 89-91, 99, 143.  That would appear to be why Appellants secretly downloaded it from Ameripro's computers in the first place.

For the same reasons, that evidence also satisfies the Texas Uniform Trade Secrets Act's ("TUTSA") elements of a "trade secret," which explicitly includes a

36

"compilation," "financial data," or "list of actual or potential customers" which have economic value and for which reasonable efforts were made to maintain secrecy. Tex. Civ. Prac. & Rem. Code § 134A.002(6).

> **B.      Appellants' solicitation of Ameripro customers and use of confidential information for that purpose, even while the Individual Appellants were still Ameripro's fiduciaries**.

Appellants also ignore the Temporary Injunction findings that they engaged in multiple other tort and contract violations, which independently support the Temporary Injunction.

Appellants' *sole* reference to "fiduciary" is to claim that Oak Mortgage did not owe a duty itself. App. Br. 57. However, the evidence shows that Oak Mortgage was a knowing participant in the Individual Appellants' breaches of fiduciary duty, and also conspired with them, which makes it "jointly liable" for that conduct. *Hunter*, 436 S.W.3d at 15; *Sharma v. Vinmar Int'l, Ltd*., 231 S.W.3d 405, 429 (Tex. App. – Houston [14th Dist.] 2007, no pet.) (injunctive relief by necessity must be full and complete so that those who have "'breached their fiduciary relationship, <u>as well as those who willfully and knowingly have aided them</u> in doing so, will be effectively denied the benefits and profit flowing from the wrongdoing'") (emphasis added).

Appellants' failure to address breach of fiduciary duty is particularly amazing, given that it was a focal point of evidence and argument below. 2RR

182-83, 192-94; 3RR 38-39, 187-88, 193. On December 10, 2014, well before the Individual Appellants resigned from their fiduciary roles, Oak Mortgage wrote them that they could "solicit to your book of business," solicit their "past customer database," and solicit from the "builder/realtor relationships." 2RR 191-92; AX 56. The next day, December 11, 2014, Oak Mortgage agreed to indemnify them in future litigation with Ameripro. AX 53; AX 81.[27] Even after securing a *competitor's* agreement to indemnify them *against* their principal, they continued serving as fiduciaries for Ameripro for another month. 2RR 182-83, 194.

While he was still Ameripro's fiduciary, Nasserfar reported to Oak Mortgage that he was "dropping in on <u>all</u> builder contacts," having driven almost 200 miles to do so. AX 63 (emphasis added). Nasserfar admitted he reported that solicitation progress to "the competitor of the company you were working for," and that he still owed a duty of loyalty to Ameripro at the time. 3RR 58.

On January 8, 2015 – again while Nasserfar was still a fiduciary to Ameripro – Oak Mortgage also sent him "scripts" to use for "All previous clients & database," "Borrowers in Pipeline," "Realtors in Pipeline," and "All other Realtors." AX 78; 3RR 59. Nasserfar also contacted principals and employees of Ameripro's existing customers about his plan to open a competing office with Oak

---

[27] AX 53 and AX 81 are Oak Mortgage's Offer Package to Nasserfar and Task, and

38

Mortgage (even as he was paid to build goodwill for his principal, Ameripro). 3RR 53, 56-57; CX 1 at 15-16.

The confidential information Appellants stole was also intertwined with their solicitation of Ameripro customers in violation of fiduciary duties and the non-solicitation clauses. They downloaded Ameripro's computer compilations for three Ameripro builder customers, including Brohn Homes and Clark Wilson Builders, their fees and tax rates (broken down by community), working capital, and closing preferences, requirements, lender credits for loans, and other non-public customer information. AX 35; 2RR 93-94. They met with business prospects for the benefit of Oak Mortgage – while they were still fiduciaries of Ameripro – and scheduled future meetings to occur on dates when they would be working at Oak Mortgage. 2RR 203-05; AX 60-62.

Oak Mortgage also e-mailed them instructions on how to evade detection of their violations. AX 57. Task could not think of an explanation for the instructions, except to make it appear they were not soliciting. 2RR 196-97.[28]

None of this evidence is even mentioned anywhere in Appellants' brief. They simply ignore it. The evidence does not support their argument that they

---

memorializes the December 11, 2014 agreement.

merely took and used only publicly-available *names* of builders.

Appellants also completely ignore the multiple other categories of confidential information listed in the Temporary Injunction, which would equally assist them in unfairly competing. Their brief makes no reference to "general ledgers," "profitability," "pro forma," and other categories of data they not only stole, but that Oak Mortgage uploaded and analyzed. AX 28-36, 49. Appellants' counsel told the district court that Appellants had returned "over 20,000 electronic files" to Ameripro on April 27, 2015 alone — meaning that those competitors not only took Ameripro's information, but had held it for several months after they opened their competing office. 2RR 22.

In sum, Appellants' argument that someone can do a Google search to find a builder's name does not begin to scratch the surface of the confidential information they downloaded and gave to a competitor, nor does it address the several categories of tort and contract duties the district court found they violated.

C.   **Even if Appellants supposedly *could* have publicly obtained some of the data they took from Ameripro computers, they tortiously downloaded Ameripro's work product**.

Appellants' argument that they *could* have conducted public searches to

---

[28] 2RR 196-97 (Task impeached: "Q. Question: 'Is there any business reason that you can think of about waiting one month before you go after the other person, other than to make it appear that it's not a solicitation?' Answer: 'You'd have to ask him. No.'").

40

compile the customer information stored on Ameripro's computers, aside from being false, does not defeat the trade secret status of Ameripro's data. Nor would that possibility give them license to thieve copies from Ameripro's computers.

In *Reliant Hospital Partners, LLC v. Cornerstone Healthcare Group Holdings, Inc.*, 374 S.W.3d 488, 500-01 (Tex. App. – Dallas 2012, pet. denied), the appellants argued that a "compilation" of target market opportunities was not secret because "such information was readily available through the internet or by exerting minimal effort to talk with others." 374 S.W.3d at 500-01. Unlike the instant case, the appellants in *Reliant* were not restricted by a non-solicitation clause. But the *Reliant* court rejected their argument, noting "the question is not 'How *could* he have secured the knowledge?' but 'How *did* he?'" *Id*. The court held that the compilation of market targets constituted a "trade secret" which one of the appellants obtained while still employed by his prior employer. *Id*.

Similarly, in *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 277 (Tex. App. – Houston), *appeal stayed*, 771 S.W.2d 562 (Tex. App. – Houston 1989), the court rejected the appellant's argument that "customer lists" were not trade secret because the information was "readily accessible from other sources." The court stated that "'the mere fact that such lawful acquisition is available does not mean that he may, through a breach of confidence, gain the information in usable form and escape the efforts of inspection and analysis,'" and

noted that while some of the information at issue was publicly available, evidence showed that "not all" of it was. 764 S.W.2d at 277.

The Individual Appellants' conduct not only breached the employment contracts, but also their common law duties. Oak Mortgage actively participated in both. In *Hill*, this Court quoted with approval, "'But it is well established that even without an enforceable contractual restriction, a former employee is precluded from using for his own advantage, and to the detriment of his former employer, confidential information <u>or</u> trade secrets acquired by or imparted to him in the course of his employment.'" 2011 WL 56061 at *2; *Renewdata Corp. v. Strickler*, 2006 WL 504998 *12 (Tex. App. – Austin 2006, no pet.) (same). The fact that the Individual Appellants were *fiduciaries* when they committed their acts, and had signed contracts under which Ameripro is sole owner of the records they took, makes their conduct particularly inexcusable.

## IV. Appellants' argument that they had returned all confidential information of Ameripro prior to the hearing is also false.

Appellants also argue "all confidential information of Ameripro – both paper and electronic – was returned to Ameripro prior to the temporary injunction hearing," and there is no harm caused by their "previous possession of confidential information of Ameripro." App. Br. 27, 39-40, 47. Those admissions confirm that Appellants took "confidential information of Ameripro" in the first place.

Their claim that they "returned" all of it before the hearing, however, is false in several respects, in terms of Ameripro documents they kept and did not return, the system metadata they stripped out of the Ameripro documents, and the documents Appellants destroyed even after a TRO commanded their return.

**A.  Appellants did not return all confidential information, they violated the TRO, and they specifically stripped out system metadata from the documents they did provide**.

Appellants did not return all of the confidential information they downloaded from Ameripro's computers and removed from its premises, as they tried to argue in the district court.

When the TRO issued, Appellants were commanded to return Ameripro's confidential documents "in whatever medium such documents and information exists." CR 97. Appellants disobeyed that command, however, by keeping <u>all</u> of the media on which those documents had been downloaded, and instead sending Ameripro only copies, of selectively picked portions, with all of the system metadata stripped out. 2RR 227 (expert discusses "'selective production'" and "file system metadata or any other artifacts" which is missing even for the documents that were provided).

At the temporary injunction hearing, Appellants' counsel admitted that Appellants had not returned the media, and argued that Ameripro could "come to my office, we'll arrange to make that available for their [Ameripro's] forensics to

look at it." 2RR 28. To avoid a repeat of the TRO violation, the district court included detailed instructions about the forensic images that Appellants were required to return to Ameripro. CR 224-25.

When the district court announced her ruling from the bench at the temporary injunction hearing, Appellants' counsel confirmed that the court ruled that his forensic expert "is *going to* provide" the forensic images, and added, "All those files *will be* returned, if they haven't already been returned." 3RR 206.

In short, the court was not required to accept Appellants' inconsistent statements that they had already returned all of the information, in the face of evidence which clearly showed they had not. That is particularly so, given their pattern of misconduct: they previously tried to evade detection of their solicitation activities, while they were still fiduciaries, violated federal regulations, and hid from Ameripro that they had taken its confidential records. AX 57; 2RR 155-56, 160-61, 167-72, 174, 184, 196-97.

**B.** **Appellants destroyed documents even after a TRO commanded their return**.

In addition, Appellants destroyed customer files that the court previously commanded them to return to Ameripro. That was a continuation of the practice Appellants had engaged in before, where they attempted to "permanently destroy Ameripro documents and files." CR 223. Instead of returning all Ameripro

documents prior to the temporary injunction hearing, Appellants busily engaged in committing additional violations.

The TRO commanded Appellants to "return to Ameripro all confidential documents and information they removed from Ameripro, in whatever medium such documents and information exists." CR 97. Two days after the TRO issued, Appellants deleted 140 folders from a USB device they had labeled "Nasserfar External Drive." 2RR 233-36; AX 46. The pathnames for the deleted folders show that they were part of what the TRO commanded to be returned to Ameripro, including: "AMB Profit & Loss Jan-Aug" files, "APF Accounting System Loan Details '14," "Monthly Pipeline Details," and "Loan_files" and "Loan Details" for several months. AX 46. In *Lynd v. Bass Pro Outdoor World, Inc*., 2014 WL 1010120 *8 (Tex. App. – Dallas 2014, pet. denied), the court held that "the trial court did not err by implicitly finding that the harm was imminent and not speculative," noting that the conduct had continued up "until the entry of the temporary restraining order" and appellant was forced to stop. Here, even a TRO did not dissuade Appellants from continuing their misconduct.

## C. The fact that a competitor misappropriated confidential information at all also supports issuing the injunction.

Leaving aside Appellants' failure to return Ameripro's confidential information, the fact that they took Ameripro's protected property in the first place

warranted injunctive relief. *Lasser v. Amistco Separation Prods., Inc.*, 2014 WL 4952501 *8-9 (Tex. App. – Houston [1st Dist.] Oct. 2, 2014, no pet.) (inclusion of a requirement the appellant "has already performed" was appropriate under Rule 683, helps "prevent the repetition of the offending conduct," and prevents the need to revise the order "should it be discovered … that [appellant] has any additional confidential information").

Appellants also argue that they should not be enjoined because they "do not need" Ameripro's confidential information given their "extensive industry knowledge." App. Br. 40. Again, that begs the question why Appellants misappropriated over 20,000 confidential documents from Ameripro in the first place, and why its competitor, Oak Mortgage, specifically requested those records. For example, when Nasserfar was still acting as Ameripro's fiduciary, Oak Mortgage wrote him that it needed "some more information from you," including Ameripro's "Product Mix," profit and loss statements, "Pricing" so Oak Mortgage could "compare it to our pricing," and other employees' compensation. AX 27; 3RR 44-46. The district court was not required to accept Appellants' representation, particularly given the evidence of its falsity.

**D. Appellants *used* Ameripro's confidential information, but *taking* such data was also wrongful misappropriation.**

Appellants' argument that "Ameripro offered no evidence of any past

46

improper *use* of any alleged confidential information by Appellants" is also false. App. Br. 41. For example, after Nasserfar gave Oak Mortgage a copy of Ameripro's profitability report, Oak Mortgage uploaded and analyzed it for several hours. They engaged in that misappropriation even before Nasserfar had resigned his fiduciary role. AX 49-50; 2RR 230-32. Appellants even forgot to remove Ameripro's address before they began using its proprietary forms. 2RR 96-98; AX 36-37. The district court acted within its discretion in rejecting Appellants' argument as not credible.

Appellants' argument is also legally incorrect. Misappropriation is not limited only to "use," but also occurs when there has been an "acquisition" <u>or</u> "disclosure <u>or</u> use" of confidential information through improper means, <u>each</u> of which is prohibited conduct. Tex. Civ. Prac. & Rem. § 134A.002(3). Appellants have not even challenged the evidence that they wrongfully acquired Ameripro's confidential information.

## V. The district court correctly found that Ameripro does not have an adequate legal remedy.

The district court also properly found based on the evidence that "a future award of damages would not fully or adequately compensate Ameripro," that the "full extent of injury to Ameripro" would be "very difficult to ascertain or quantify," and that "Ameripro does not have a legal remedy that would be

47

adequate in lieu of injunctive relief." CR 224.

Those findings are supported by the record. Ameripro's competitors misappropriated over 20,000 of its confidential records, ranging from its customer data to its pro formas, and used their fiduciary positions to solicit customers for a competitor in violation of common law duties and the contracts. 2RR 22, 85-85, 91-94, 96-99, 156-61, 164-72, 174, 177-78, 183-84, 203-05; 3RR 42, 53, 55-61, 127-28; CX1 at 15-16; AX 28-38, 58, 59-63, 78, 80. Ameripro's President testified that Ameripro could not trace and calculate the resulting damages, that the injury were "ongoing," and that Appellants used Ameripro's confidential information "specifically to open up a new location in direct competition with us." 2RR 101-03. And again, Ameripro presented evidence of multiple cat-and-mouse examples where Ameripro caught Appellants giving instructions on how to evade detection, destroying evidence, placing information on a local drive where Ameripro would not find it, and secretly soliciting and taking Ameripro's confidential data. AX 27, 43, 46, 49-50, 57; 2RR 155-56, 160-61, 167-72, 174, 182-83, 196-97, 217-21, 230-36.

By their nature, those are injuries the full extent of which would be difficult to ascertain or quantify (or fully uncover), and for which a future award would not be complete or adequate. In *Hill*, for example, this Court noted that the appellant "possessed confidential information belonging to" the appellee, and that "harm to

the trade secret owner may be presumed." 2011 WL 56061 at *5. *Hill* noted that

"*if*" the appellants "were to impermissibly use McLane's trade secrets" or disclose

them, "the resulting damages would be difficult to calculate," and that the "very

purpose of the injunction" is to prevent such violations from occurring. 2011 WL

56061 at *5. *See also Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593,

602 (Tex. App. – Amarillo 1995, no pet.) (employees took confidential

information and "began to resolicit the businesses," agreeing that a "legal remedy

is inadequate" and damage "cannot be easily calculated").

A.   **The district court found Ameripro has a likelihood of success on multiple tort theories for which injunction is the only effective relief, not just breach of contract**.

Moreover, this case is not limited to a simple breach of contract action:

Appellants' theft of thousands of confidential records, and using Ameripro's

existing fiduciaries to solicit customers and business for a competitor, sound under

multiple tort theories. As this Court noted in *Garth v. Staktek Corp.*, 876 S.W.2d

545 (Tex. App. – Austin 1994, writ dism'd w.o.j.), "injunctions against trade

secret violations may be necessary to provide meaningful legal protection to the

owners of intellectual property," and monetary damages may not sufficiently

protect "from unfair competition by those who improperly appropriate confidential

information." 876 S.W.2d at 550. *See also Flake v. EGL Eagle Global Logistics,*

*L.P.*, 2002 WL 31008136 *4 (Tex. App. – Houston [14[th] Dist.] Sept. 5, 2002, no

pet.) ("A legal remedy is inadequate if damages are difficult to calculate or their award may come too late. … Although any damages Eagle stands to suffer or has suffered are compensable through money damages, '[i]njunctive relief is property to prevent a party, that has appropriated another's trade secrets, from gaining unfair market advantage,'" and finding a temporary injunction "the only effective relief available"); *Frequent Flyer Depot, Inc. v. American Airlines, Inc.*, 281 S.W.3d 215, 228-29 (Tex. App. – Fort Worth 2009, pet. denied), *cert. denied*, 559 U.S. 1036 (2010) (a "remedy is not adequate simply because some of the proven damages are calculable," and a dollar value "may not easily be assigned" to business disruption, "loss of clientele," "office stability," "marketing techniques," and other intangible injuries).[29]

## B. Even in pure contract cases, findings of inadequate remedy will be upheld where, as here, some evidence supports it.

Even in cases where the claims are limited to breach of contract (unlike the instant case, where district court found likelihood of success on multiple theories), courts defer to the trial court's determination that damages will not fully

---

[29] *See also Hartwell's Office World, Inc. v. Systex Corp.*, 598 S.W.2d 636, 639 (Tex. Civ. App. – Houston [14th Dist.] 1980, writ ref'd n.r.e.) ("mere reimbursement of profits would not afford complete, final and equal relief because appellees would still be able to compete in the area in violation of the express agreement not to compete," finding denial of temporary injunction an abuse of discretion); *Salas v. Chris Christensen Sys., Inc.*, 2011 WL 4089999 *8 (Tex. App. – Waco Sept. 14, 2011, no pet.) (potential damages caused by "actions of appropriating and

compensate the claimant or would be difficult to measure.

For example, this Court in *Universal* noted that the only wrongful conduct alleged in that case was "breach of contract," but nevertheless upheld the trial court's conclusion that damages would be difficult to calculate and damages might not afford complete relief. 24 S.W.3d at 577-78 & n. 5. Similarly, in *Walling v. Metcalfe*, 863 S.W.2d 56 (Tex. 1993), the Texas Supreme Court reinstated a temporary injunction – despite the fact that the applicant's only cause of action was for breach of contract and did not ask for permanent injunctive relief. The Court rejected the court of appeals' conclusion that a "cause of action for money damages alone" was not sufficient to support an injunction, adding, "Simply because the applicant for a temporary injunction asks only for damages as ultimate relief does not guarantee that damages are completely adequate as a remedy." 863 S.W.2d at 57-58.

### C. Injunctive relief is consistent with Ameripro's claim for damages for Appellants' *past* conduct.

Ameripro's request for damages based on Appellants' past violations is consistent with the district court's findings of imminent irreparable harm and inadequate legal remedies if Appellants were not enjoined.

---

implementing" confidential information for the "benefit of…competitors in the future arguably are not complete and cannot be easily calculated; therefore, a legal remedy is inadequate").

51

In *Topheavy,* the appellant argued that "any potential harm … has already occurred," because 80,000 games with appellee's likeness were already in circulation. 2005 WL 1940159 *6. This Court noted that the appellee was "also seeking damages," but explained that "the mere fact that Doe has already been injured does not necessarily mean that further distribution of the game would not exacerbate the preexisting injury or create new injuries altogether," nor would the injury be any more ascertainable with a sufficient degree of certainty. An injunction to prevent "additional irreparable injury" was not an abuse of discretion. *Id*. So it is the case here.

The decisions Appellants cite are inapposite. In *Butnaru v. Ford Motor Co*., 84 S.W.3d 198 (Tex. 2002), the Texas Supreme Court *reinstated* a temporary injunction that had been dissolved on appeal, finding that although it was a contract action, the applicant desired a specific piece of property, and the district court did not abuse its discretion in finding no adequate legal remedy. 84 S.W.3d at 211. In *Reach Group, LLC v. Angelina Group*, 173 S.W.3d 834 (Tex. App. – Houston [14th Dist.] 2005, no pet.), *Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230 (Tex. App. – Houston [1st Dist.] 2003, no pet.), and *W.R. Grace & Co. v. Henson*, 2007 WL 2389547 (Tex. App. – Corpus Christi Aug. 23, 2007, no pet.), the courts addressed whether the trial courts abused their discretion when they *denied* a temporary injunction. Unlike the instant case, the applicant in

*Grace* admitted it "knew of no misuse of information" and there was "no evidence of wrongful acts." 2007 WL 2389547 *3. The applicant in *Reach* acknowledged that damages "were capable of precise measurement," and that its potential damages were "also capable of being calculated," and given those admissions the court did not abuse its discretion. 173 S.W.3d at 838. The court in *Cardinal* observed that it must view evidence in the light "most favorable" to the court's decision, not against it; the applicant admitted it "did not know whether [it] had suffered any economic damages," and that its sales had "doubled." 106 S.W.3d at 235-36. None of those decisions support that this Court should substitute its factual findings for the trial court's based on *this* record.

**D.    Appellants' argument, in addition to being baseless, is outside the hearing record and should be disregarded**.

Finally, Appellants improperly purport to rely on pleadings and discovery served *after* the Temporary Injunction, which were not part of the hearing record. App. Br. 46, 54. Ameripro's request for damages is consistent with the Temporary Injunction. Nevertheless, Appellants' arguments outside the record should not be considered. *Branch Banking & Trust Co. v. TCI Luna Ventures, LLC*, 2013 WL 1456651 *4 n. 4 (Tex. App. – Dallas Apr. 9, 2013, no pet.) (sale "occurred after" the temporary injunction and "Accordingly we do not consider TCI Luna's arguments that are outside the temporary injunction hearing record.").

**VI. The Temporary Injunction is not overly broad, and instead is narrowly tailored to protect against imminent irreparable harm**.

Appellants' argument that the Temporary Injunction is overly broad is without merit. It is narrowly tailored to protect against imminent irreparable harm.

Appellants argue that the injunction covers media in their possession, but the district court tailored the Temporary Injunction to "media that *contains or did contain Ameripro files or information*" — in other words, the information which the Temporary Injunction found Appellants had attempted to "permanently destroy" and had "taken from Ameripro's computer network and premises." CR 223-24. In addition to common law protection of Ameripro's confidential information, the Individual Appellants contractually agreed that Ameripro is the sole owner of those records, and that they would not retain any copies of that information. AX 11, 17-18. They not only retained copies of Ameripro's records, however, but gave them to a competitor. (That evidence is cited and quoted in detail at pp. 7-13 of the Statement of Facts.)

The district court's ruling that the original media should be held by Appellants' counsel is also reasonable and supported by the evidence. Appellants engaged in deliberate efforts to conceal which items stored on those media consisted of Ameripro records. For example, one of Nasserfar's electronic files was labeled "Nasserfar personal e-mail," but consisted instead of Ameripro

borrowers' credit reports and loan applications. 3RR 174-75. As cited above, Appellants also tried to conceal their thefts of information, and their solicitation efforts. Leaving aside Appellants' *prior* efforts to destroy Ameripro files, they destroyed Ameripro files stored on the electronic media *even after the district court issued a TRO compelling those files to be returned*. Appellants also initially denied that they possessed *any* Ameripro confidential records, 2RR 163, despite their subsequent return of over 20,000 such files after suit was filed, and despite evidence that Oak Mortgage used that media to analyze the stolen data. Finally, Appellants made the choice to store the confidential information they stole from Ameripro *on that media*. The district court was well within its discretion in requiring Appellants' counsel to keep possession of the media as Attorneys' Eyes Only.

The district court also narrowly tailored the injunction to three customers whom Appellants solicited in breach of contract and fiduciary duties. (The district court chose to exclude a fourth customer from the injunction. 3RR 209.) *Correa v. Houston Surg. Asst. Serv., Inc.*, 2013 WL 3958499 *12 (Tex. App. – Houston [14th Dist.] July 30, 2013, no pet.) (injunction was "specifically tailored to prevent appellants from usurping the competitive advantage derived from HSAS, Inc.'s confidential information," as it was "appropriately limited to specific hospitals" with whom "the appellants actually worked.").

55

Appellants argue that Oak Mortgage should not be restrained because there "is no contract or fiduciary relationship" between it and Ameripro. However, as discussed on pp. 35-37 above, Oak Mortgage's knowing participation in breaches of fiduciary duty and tortious interference makes it jointly liable.

Oak Mortgage's argument that its "officers and employees" should not be enjoined is also meritless. Rule 683 expressly states injunctions are binding on parties *and* "their officers, agents, servants, employees." *Miller*, 901 S.W.2d at 600 n. 2 (the "court was also permitted to extend the injunction to the employer's other employees," and the appellants argument that "only two acted inappropriately lack merit"). Moreover, it is Oak Mortgage's officers who encouraged Nasserfar, Task, and Gosnay to breach their fiduciary duties and contracts, who analyzed the stolen data, and who suggested how to evade detection. AX 27, 49, 56-57, 78. The injunction against Oak Mortgage would be ineffectual if the agents through whom it acts were free to violate the terms.

Finally, the district court acted within its discretion in preserving the status quo through trial, instead of providing for the injunction to end on January 16, 2015. The purpose of an injunction is to preserve the status quo pending a trial. The "status quo" is the "the last, actual, peaceable, noncontested status which *preceded* the pending controversy," *before* the activities "in violation of its agreements" began. *Frequent Flyer*, 281 S.W.3d at 222-23. Appellants are not

entitled to a credit on the non-solicitation period for the several months when they were actively violating it; those violations began before the fiduciaries left Ameripro, and continued at least four months afterward. As the court in *Sharma* stated:

> "It is well settled that injunctive relief 'must, of necessity, be full and complete so that those who have acted wrongfully and have breached their fiduciary relationship, as well as those who willfully and knowingly have aided them in doing so, will be effectively denied the benefits and profits flowing from the wrongdoing. ... Far from being an overbroad order that forbids lawful competition, the trial court's order is narrowly tailored to preserve the status quo by protecting the secrecy of Vinmar's trade secrets and remedying the violence to the confidential relationship through which the Rew appellants acquired those trade secrets."

231 S.W.3d at 429.

When the district court entered a temporary injunction to maintain the status quo, it specifically rejected imposing a January 15 cut-off, noting that Ameripro can "argue that since they have been not complying" with the provision, "it shouldn't run." 3RR 213-14. Preserving the status quo as it existed before the violations began was within the district court's equitable discretion. *Rimkus Consult. Group, Inc. v. Budinger*, 2001 WL 619067 *4 (Tex. App. – Houston [14th Dist.] June 7, 2001, no pet.) (rejecting argument that "because the original time for expiration of the covenant not to compete has expired, this court should decline to enforce it," noting it would "be inequitable to allow" the pendency of litigation "to

deprive [Rimkus] of the benefit of injunctive relief"); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003) ("the district court has the power under Texas law to craft an injunction that extends beyond the expiration of the non-solicitation covenant," and agreeing that courts in equity "may impose injunctions that last beyond a contract provision's expiration date").

Second, the injunction is not based solely on the non-solicitation clause, but also on the Individual Appellants' conduct in soliciting the customers for Oak Mortgage while they were still fiduciaries, as well as violations of non-use and confidentiality provisions in taking customer information which do not expire on January 15. *Matrix Network, Inc. v. Ginn*, 211 S.W.3d 944, 946-47 (Tex. App. – Dallas 2007, no pet.) (leaving aside non-solicitation provision, parties used confidential information to compete unfairly in violation of the non-use and non-disclosure provisions, and "In such circumstances, we cannot conclude the expiration of the non-compete clause … renders this matter moot"); *Garth*, 876 S.W.2d at 548 (by appropriating confidential information, appellant was able to use it to gain a market advantage, and therefore "injunctive relief beyond the date" the technology became public was "an appropriate remedy"); *Salas*, 2011 WL 4089999 at *8 ("Injunctive relief is also proper to prevent a party, which has appropriated another's trade secrets, from gaining an unfair market advantage.").

**PRAYER**

For the foregoing reasons, Ameripro Funding, Inc. respectfully prays that this Court affirm the district court's Temporary Injunction Order, and that Ameripro have such other and further relief to which it may be justly entitled.

Respectfully submitted,

/s/ Susan P. Burton
Susan P. Burton
State Bar No. 03479350
sburton@gdhm.com
Eric G. Behrens
State Bar No. 02050700
ebehrens@gdhm.com
GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
Telephone: (512) 480-5600
Facsimile: (512) 480-5862

ATTORNEYS FOR APPELLEE AMERIPRO FUNDING, INC.

**CERTIFICATE OF COMPLIANCE**

This motion complies with the type-volume limitations of Rule 9.4(i)(2)(B), Tex. R. App. P., because it contains no more than 14,228 words, excluding the parts of the brief exempted by Rule 9.4(i)(1), Tex. R. Civ. P.

This brief complies with the typeface requirements of Rule 9.4(e), Tex. R. Civ. P., because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman font in text, and twelve-point Times New Roman font in footnotes.

*/s/ Susan P. Burton*
Susan P. Burton

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2015, a true and correct copy of this Brief of Appellee Ameripro Funding Inc., was served *via* electronic service on the party as shown below:

Wm. Charles Bundren, Esq.
WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034

*/s/ Susan P. Burton*
Susan P. Burton

# APPENDIX
# TAB 1

**Filed in The District Court
of Travis County, Texas**

JUN 1 6 2015

At_____ *10:50* M.

**Velva L. Price, District Clerk**

CAUSE NO. D-1-GN-15-000785

| | | |
|---|---|---|
| OAK MORTGAGE GROUP, INC., MICHAEL H. NASSERFAR, MICHAEL E. TASK, and TYCORD R. GOSNAY, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs / Counter-Defendants, | § § | |
| V. | § § | OF TRAVIS COUNTY, TEXAS |
| AMERIPRO FUNDING, INC., | § § § | |
| Defendant / Counter-Plaintiff. | § | 345th JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION ORDER

Ameripro Funding, Inc.'s ("Ameripro") Application for Temporary Injunction, set forth in Defendant and Counter-Plaintiff Ameripro Funding, Inc.'s Counterclaim and Sworn Application for Temporary Injunction and Permanent Injunction, came on for hearing before the Court on May 26 and May 27, 2015. Based on the pleadings, the evidence submitted, and the argument of counsel, the Court finds that Ameripro is entitled to entry of a temporary injunction against Plaintiffs and Counter-Defendants Michael H. Nasserfar ("Nasserfar"), Michael E. Task ("Task"), Tycord R. Gosnay ("Gosnay"), and Oak Mortgage Group, Inc. ("Oak Mortgage") as set forth below.

The Court finds that, based upon the evidence, Ameripro has met its burden to establish that it has a probable right of recovery and likelihood of success on the merits on its claims for misappropriation of trade secrets and confidential and proprietary information, conversion, breach of fiduciary duty, tortious interference with contract, and breach of contract, in that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage have attempted to permanently destroy Ameripro documents and files, and have taken from Ameripro's computer network and premises confidential and proprietary information belonging to Ameripro (including but not



004074910



limited to Ameripro's pricing information, general ledgers, profit and loss statements, loan profitability reports, statements of income, customer and referral lists and contact information, builder preferences or builder contacts or cell phone numbers, pro formas, concession fees, borrower information, transaction details, templates, loan set-up sheets, e-mails exchanged using Ameripro servers, correspondence, and other information that had been stored on Ameripro's computer network or in Ameripro offices) (hereinafter "Ameripro Information").

The Court further finds, based upon the evidence, that Ameripro has met its burden to establish that Ameripro will suffer a probable, imminent, and irreparable injury until trial on the merits, absent entry of a temporary injunction, in that Ameripro has shown that the full extent of injury to Ameripro if this Order did not issue would be very difficult to ascertain or quantify, a future award of damages would not fully or adequately compensate Ameripro, Ameripro does not have a legal remedy that is adequate in lieu of injunctive relief, and even to the extent that a legal remedy might be available, its redress will be limited and inadequate. The Court further finds that the balancing of the equities as between Ameripro and Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage favors the issuance of this temporary injunction, and that this temporary injunction is necessary to preserve the status quo between the parties pending trial on the merits.

IT IS THEREFORE ORDERED that Counter-Defendants Nasserfar, Task, Gosnay, and Oak Mortgage, employees of Oak Mortgage, and other entities acting or purporting to act in participation or concert with them, are commanded forthwith to:

(i)      within three (3) days of this Order, provide to Roy Rector of R3 Digital Discovery (Ameripro's forensic computer expert) forensic images of all original source media that contains or did contain Ameripro files or information (including but

2

not limited to flash drives, disks, USB storage devices, external storage devices, hard drives, cell phones, and laptops) (hereinafter collectively the "Media") in the possession, custody, or control of Nasserfar, Task, and Gosnay (including in the possession, custody, or control of their attorneys and/or Lee Whitfield of Digital Discovery), including all bit by bit forensic copies or images, however and whenever made, including but not limited to, all such forensic images stored in any of the following formats: E01, L01, dd, s01, ad1 and/or gho. The forensic images of the Media may be reviewed and analyzed by Roy Rector, and by outside counsel of Ameripro at Graves Dougherty Hearon & Moody ("Graves Dougherty") as Attorneys' Eyes Only under the Agreed Protective Order, and Graves Dougherty may show forensic images to in-house counsel for Ameripro so long as the images relate to Ameripro. The Media from which the forensic images are made will be preserved and held by Counter-Defendants' attorney, Charles Bundren, as Attorneys' Eyes Only under the Agreed Protective Order. If the parties' counsel can agree upon which information contained in the Media belongs to the respective parties, without Court intervention, then the parties are authorized to return the other party's information to it or him. Ameripro will provide to Mr. Bundren forensic images of the three laptops that Counter-Defendants Nasserfar, Task, and Gosnay returned to Ameripro on January 15-16, 2015 (it was stated on the record that those forensic images were provided to Mr. Bundren on May 28, 2015 at the hearing).

(ii)     desist and refrain from, directly or indirectly, using any of the Ameripro Information, including but not limited to any of the Ameripro Information

3

225

contained on the Media, and from copying, purging, modifying, or destroying any Ameripro Information (except to make the forensic images for Roy Rector as set forth above in this Order).

(iii)    desist and refrain from, directly or indirectly, soliciting business from Brohn Homes, Seaholm Residences, and Clark Wilson Builders.

IT IS FURTHER ORDERED that Ameripro remove any reference to Michael Nasserfar (e.g., videos, likenesses) from the Ameripro website.

IT IS FURTHER ORDERED that the Parties mediate this case no later than sixty (60) days from the date of this Order. Such mediation shall take place in Austin, Travis County, Texas and shall be conducted by a licensed attorney agreed upon by the Parties. Costs of the mediation shall be shared equally by Counter-Defendants and Ameripro.

IT IS FURTHER ORDERED that this matter is set for trial on the merits on February 22, 2016, in the Travis County Courthouse, 1000 Guadalupe Street, Austin, Travis County, Texas 78701.

In accordance with Rule 684 of the Texas Rules of Civil Procedure, the Clerk shall issue such temporary injunction order upon Ameripro filing with the Court a bond executed by it and adequate sureties in the amount of $10,00.00, payable to Counter-Defendants, approved and conditioned as the law requires and such bond shall remain on file with the Court, as bond for this Temporary Injunction Order. The Clerk of the Court shall forthwith issue a temporary injunction in conformity with the law and the terms of this order.

SIGNED this _15_ day of ___June___, 2015 at _3_ : _15_ a.m. (p.m.).

_____
HON. GISELA D. TRIANA
JUDGE PRESIDING

4

APPROVED:

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.
401 Congress, Suite 2200
Austin, Texas 78701
(512) 480-5764/Fax (512) 536-9908

By: *Eric G. Behrens*
       Susan P. Burton
       State Bar No. 03479350
       sburton@gdhm.com
       Eric G. Behrens
       State Bar No. 02050700
       ebehrens@gdhm.com

ATTORNEYS FOR DEFENDANT
AMERIPRO FUNDING, INC.


APPROVED AS TO FORM:

WM. CHARLES BUNDREN & ASSOCIATES LAW GROUP, PLLC
2591 Dallas Parkway, Suite 300
(214) 808-3555/Fax (972) 624-5340

By: _____
       Wm. Charles Bundren
       State Bar No. 03343200
       Charles@bundrenlaw.net

ATTORNEYS FOR PLAINTIFFS  OAK MORTGAGE GROUP, INC.,
MICHAEL H. NASSERFAR, MICHAEL E. TASK AND TYCORD R. GOSNAY

5

227

# APPENDIX
# TAB 2

REPORTER'S RECORD
VOLUME 2 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-15-000785
APPELLATE COURT CAUSE NO. 03-15-00416-CV

OAK MORTGAGE GROUP, INC.,     ) IN THE DISTRICT COURT
MICHAEL H. NASSERFAR, MICHAEL  )
E. TASK, and TYCORD R.        )
GOSNAY,                      )
                        )
       Plaintiffs,     )
                        )
VS.                      ) TRAVIS COUNTY, TEXAS
                        )
                        )
AMERIPRO FUNDING, INC.,      )
                        )
                        )
       Defendant.      ) 345TH JUDICIAL DISTRICT

---------------------------------

TEMPORARY INJUNCTION

---------------------------------

On the 26th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gisela D. Triana, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

have any value to us.

We'd already began that process. We imaged all the devices. We'd already searched the devices to try to find anything that could conceivably be argued by AmeriPro as being something that they claim is their property, although we dispute that, and return it. And that's the reason on April the 27th we returned over 20,000 -- I think it's over 20,000 electronic files to them which they didn't even look at in their forensic expert's deposition.

After your order, we'd already imaged the -- imaged the drives. We began searching for and developing search criteria to find the electronic files. We copied, moved those electronic files by image from the devices over to a drive. So they were all returned, and I overnighted that to Ms. Burton on -- on May the 14th, two days after the order was entered. Then I received a letter complaining saying, "Oh, it doesn't have the metadata in it." Well, it does have the metadata in it, and metadata would identify that Mr. Nasserfar was the author. It would identify the date Mr. Nasserfar created a lot of those documents. It would also identify dates that they were revised. So we went back and we made another disc, and I sent that on May 19th, overnighted it again. So all of the electronic files that they had any concept of any argument at all that belonged to them, anything we could find that conceivably be something they would argue about, it's all

MS. BURTON: Thank you.

THE COURT: You're welcome.

CHAD OVERHAUSER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. BURTON:

Q. Mr. Overhauser, would you please tell the Court your full name.

A. Chad Michael Overhauser.

Q. Where are you employed?

A. AmeriPro Funding.

Q. Would you --

THE COURT: I'm sorry. Did you spell that for the court reporter?

THE WITNESS: I did not.

THE COURT: Would you spell that for the court reporter?

THE WITNESS: Last name?

THE COURT: Yes.

THE WITNESS: O-V-E-R-H-A-U-S-E-R.

THE COURT: Thank you.

Q. (BY MS. BURTON) What's your title at AmeriPro?

A. President.

Q. And what is the business of AmeriPro? What does AmeriPro do?

A. Residential mortgage loans.

Q. How long has AmeriPro been in business?

A. 13 years -- or 12 years. Sorry.

Q. Were you responsible for AmeriPro being started?

A. Yes.

Q. In what capacity?

A. I was the founder and president of the company.

Q. And where is it located?

A. 8300 North Mopac.

Q. Here in Austin?

A. In Austin, Texas.

Q. Has it always been an Austin business?

A. Yes.

Q. Any other offices other than in Austin?

A. Yes. We have an office -- oh, other than Austin?

Q. Yes, sir.

A. I'm sorry. Yes. We have offices in Dallas, Houston, Oklahoma, state of Colorado, Florida, state of Arizona, and state of California.

Q. Okay. And the corporate office is here in Austin?

A. Correct.

Q. You said you're the president of AmeriPro. Generally describe what you do on a day-to-day basis at AmeriPro.

A. I am in charge of the day-to-day operations of the company.

A. Yes, it does.

Q. Tell the Court -- I mean, you said AmeriPro is a residential mortgage company, but can you describe it any more? What would differentiate AmeriPro from other residential mortgage companies?

A. We're a residential mortgage lender, but we also operate as a mortgage banker, which is a coined phrase in the industry, meaning that we both go out and originate loans for customers and clients, we process the loans, we underwrite the loans, we close and fund them many times in our own name and in some cases we service the loans also.

Q. You're aware -- you know -- you know Mr. Nasserfar, Mr. Task, and Mr. Gosnay, correct?

A. Yes, I do.

Q. And when -- as president of AmeriPro, did you have some level of supervision or management over those -- those people?

A. I did.

Q. And how -- in what capacity of Mr. Nasserfar?

A. Mr. Nasserfar direct report -- reported to me.

Q. So you were his immediate supervisor?

A. I was Mr. Nasserfar's direct report's immediate supervisor.

Q. Who was his -- who was the immediate supervisor?

A. Larry Crisp.

Q.   The second -- you were the second in line?

A.   Yes, ma'am.

Q.   What about Mr. Task?

A.   Yes, same.

Q.   And Mr. Gosnay?

A.   Same.

Q.   So did you have general knowledge of what they for -- for AmeriPro, what they were supposed to be doing, that kind of thing?

A.   Yes.

Q.   What was Mr. Nasserfar's job title when he left AmeriPro?

A.   He was producing branch manager.

Q.   For what branch?

A.   For the Lakeway branch.

Q.   What about Mr. Task?

A.   He was the sales manager for the same branch.

Q.   And Mr. Gosnay?

A.   I believe he was a loan originator and loan services department, same branch.

Q.   And were there any other employees at that branch?

A.   Those were the only three employees at that location.

Q.   And is that -- where was that location?

A.   In the Hill Country Galleria.

Q.   And is that location still open and functioning as a

branch office of AmeriPro?

A.     No, it is not.

Q.     And why -- why not?

A.     There is no business coming from that branch so currently it is empty.

Q.     And when did that business go away?

A.     Immediately after they resigned, end of January.

Q.     So all clients, customers of that branch went basically to that -- the Nasserfar team?

MR. BUNDREN:  Objection, leading.

Q.     (BY MS. BURTON)  Where did the business go that was coming to the Lakeway branch when Mr. Nasserfar, Mr. Task, and Mr. Gosnay were there?

A.     Any business that was in the pipeline we transferred to the corporate office at AmeriPro and we -- they -- our business -- or new incoming business, I'm sorry, were -- weened off or slowed down very dramatically after that period of time.

Q.     Any plans to reopen the AmeriPro branch office there in Lakeway?

A.     No, there is not.

Q.     And why was that branch -- when was that branch established?

A.     The branch was established around the beginning of 2014.

Q.     And why -- why did as you as president of Ameripo --

of AmeriPro decide to open that branch in Lakeway?

A.   Mr. Nasserfar had worked for the company out of the corporate office for a couple years, had expressed a -- a willingness and wanted to become a branch manager and looked at that location specifically due to the future growth opportunity off the 71 corridor and 620 corridor, and it was close to where he currently resides and thought it would be a great business opportunity so he approached me specifically about opening a branch out there.

Q.   And what was your response or your reaction?

A.   I thought that the business opportunity made sense, it's a big growth corridor for the general Austin area, and we wanted to support Michael in his professional growth.

Q.   And describe what type of time or effort AmeriPro put into opening that branch.

A.   The lease negotiations took several months.  During that time we put Mr. Nasserfar and Mr. Task in an executive suite in that same general vicinity and the lease negotiations were finalized and I believe the office -- that -- the new permanent office opened in August of 2014, so I would say from beginning to end the better part of 10 months to 12 months.

Q.   It was 10 months to 12 months to get that branch office opened in Lakeway?

A.   From the beginning of contract negotiation to when the new permanent location opened, yes.

Q. What other efforts did AmeriPro have to undergo to open that branch office?

A. We had to invest a tremendous amount of money in building out the branch office for tenant improvements. We had furnitures, fixtures, equipment, licensing requirements, everything that is required to get a new location started.

Q. And how involved was -- was Mr. Nasserfar with those activities?

A. He was involved as necessary for his position. We wanted him to remain focused on originating new loans. So he -- we kept him informed of what was going on during the process. He was informed of -- he was a part of the floor-plan decision, some of the furniture that we purchased or decided to reuse from a different office. So he was involved in the space and it's creation.

Q. Was there -- would you -- was there a general business plan for that branch or a model that -- you've talked about a little bit about why it was open, but was there some sort of plan or strategic goal?

A. Yeah. So Michael and his team had a significant amount of origination business that was a great stepping-off point to open up a location. We believed in the general geography around that office, that it would continue to allow them to grow. The plan was for him to go and recruit and add new originators to that location and to continue to grow as a

business from a -- a personal referral perspective and a builder perspective.

Q. And he was going to -- going to be and became the branch manager, correct?

A. Correct.

Q. And was he always an AmeriPro employee? Regardless of being a branch manager at a separate branch, was he an Ameripo -- AmeriPro employee?

A. Yes.

Q. Did that -- did that ever change?

A. No.

Q. What was the primary source -- what turned out to be the primary source of business for that branch?

A. The primary source of business for that branch was builder loans or -- they solicited builders and developers for -- to use them for their clients.

Q. And so it opened in August of 2014, correct?

A. Yes, the new -- the permanent location did, yes.

Q. And then Mr. Nasserfar and Task and Gosnay left in January 2015; is that right?

A. Correct.

Q. Was that branch -- was it successful? Was it looking like it was going to be successful?

A. We thought for the first year of opening a new location that it was doing well for its first year opening.

It's a -- it's a big -- it's a big effort to open a new location. It's a big financial investment from a long-term perspective and a short-term perspective, and we felt like it was going -- doing well in 2014 especially considering where the industry had gone.

Q. Do you know what the term "preferred lender" means?

A. Yes.

Q. And was -- what does that mean in general?

A. In general, builders or other corporate customers will have strategic partnerships with lenders and they will be called "preferred lenders" because of the level of trust and their operating system and how they do business.

Q. And was AmeriPro, specifically the -- Mr. Nasserfar's -- the branch Mr. Nasserfar ran, was that a preferred lender for any builders?

A. Yes, it was.

Q. Which builders?

A. Centerra Homes, Brohn Homes, Seaholm Condominium project, and I can't remember specifically, but there were others in the past, too.

Q. And again, the first -- is that a relationship that AmeriPro fostered, the -- the preferred lender relationship?

A. Yes.

Q. And in what way?

A. We met with the owners or operators of those

companies. Typically, we built a communication platform and a process around that. Michael was involved in that. It was a partnership for all parties that were involved, which would include Michael and his team and the corporate office and the operations team, to make those relationships successful.

Q. When you say "Michael," are you talking about Michael Nasserfar?

A. I'm sorry. Michael Nasserfar and Michael Task.

Q. And Michael Task?

A. Yes.

Q. Is AmeriPro still a preferred lender for any of those builders that you mentioned?

A. We are still on -- a preferred lender on the Web site with Seaholm, I believe, but not for Brohn Homes or Centerra.

Q. And is Oak Mortgage, to your knowledge, a preferred lender for Seaholm?

A. To my understanding they are now.

Q. And what about -- is Oak Mortgage a preferred lender for Centerra?

A. To my knowledge, they are, yes.

Q. And are they a preferred lender for Brohn?

A. To my knowledge, they are, yes.

Q. And prior to Mr. Nasserfar -- I'm going to call them the Nasserfar team. If I say that you'll understand that's Mr. Task, Mr. Gosnay, Mr. Nasserfar?

A. Yes.

Q. Prior to the Nasserfar team -- prior to the Nasserfar team leaving, was Oak Mortgage a preferred lender for any of those entities you named?

A. Not to my knowledge.

Q. Okay. Turn your attention to the resignation of the Nasserfar team and events that followed. So can you just describe to the Court, how did you find out that the Nasserfar team had resigned or was resigning?

A. I was in the HR office on January 15th and got notified that Mr. Gosnay -- we had received a package from Mr. Gosnay that contained his computer, his key, and a letter. Then correspondingly, the HR office reached out, I believe, to both Mr. Nasserfar and/or Mr. Task and so did their immediate supervisor, Larry Crisp.

Q. Okay. Would you look at Exhibit, in your notebook there, 2, 3, and 4. Are those the resignation letters of Mr. Nasserfar, Task, and Gosnay?

A. You said 2, 3 and 4?

Q. Yes.

A. Yes, they are.

Q. And let's start with Mr. Gosnay. What date is on his letter, which is Exhibit 4?

A. January 15th.

Q. And Mr. Task, what date did he resign?

A. January 16th.

Q. What date did Mr. Nasserfar resign?

A. January 16th.

Q. Did you personally reach out to any of those individuals?

A. I called Mr. Nasserfar on the evening of the 15th.

Q. And what -- did you get to talk to him or...

A. I left a voice mail. I also sent him a text right after that phone call. I have not spoken to Mr. Nasserfar.

Q. To your knowledge, did Mr. Nasserfar call anyone else back from AmeriPro?

A. Not that I'm aware of.

Q. How about Mr. Task or Mr. Gosnay?

A. Not that I am aware of.

Q. And why were you calling Mr. Nasserfar on the 15th of January?

A. Because as of the evening of the 15th, his direct supervisor, Mr. Crisp, had not heard back from Mr. Task or Mr. Nasserfar and the HR department had not heard back from either of them.

Q. So you --

A. And we were wondering what was going on on the evening of the 15th.

Q. Did you have any prior notice that the three of them were resigning and leaving that branch office?

A.   No.

Q.   You see in those letters, Exhibits 2, 3, and 4, they state they're returning certain things, correct?

A.   In 2 and 3 -- in 2 and 3.  4 does not --

Q.   That's right.  Mr. Gosnay --

A.   -- specifically say anything.

Q.   Sorry.  But 2 -- Exhibit 2 and 3 Mr. Nasserfar and Mr. Task listed certain items that they are returning, correct?

A.   Yes.

Q.   Are you aware that -- and that list just -- just to summarize, basically it's their laptop and their keys and their card -- access cards, that kind of thing?

A.   Yes.

Q.   Did they return anything else other than the items stated in those letters, Exhibit 2 and 3?

A.   Not that I am aware of.

Q.   Are you aware of them ever returning any hard copies, any paper copies of anything at the time of their resignation?

A.   No.

Q.   Did they ever return any property or any information prior to -- prior to AmeriPro filing the counterclaims against them?

A.   No.

Q.   Okay.  At the time they resigned, were there loans that they were all working on?

A. Yes.

Q. Were -- were each of these persons, Nasserfar, Task, and Gosnay, loan originators?

A. At the time I believe so, yes.

Q. And would that mean that they all had loans they were responsible for to work and to make sure got processed?

A. Yes.

Q. So when they left there were loans that were in existence that were still being processed?

A. Yes.

Q. Did they make any effort to transition those loans or make sure they were taken care of?

A. Not that I'm aware of.

Q. What -- how did this affect those loans in process? What did AmeriPro have to do after the resignation?

A. We tried to take the -- what we believe was the existing pipelines of loans in process, put it with loan originators at our corporate office, and reach out and contact those customers, more specifically the -- starting with the ones that had closing dates that were the soonest and working our way back.

Q. Describe what effect that had on the business of AmeriPro. What -- what effect did those resignations have?

A. We -- that -- because we did not have any assistance in the transition, the transition was difficult. You know,

trying to communicate with borrowers that amount of changeover in shift is always a -- a difficult time and our customer service level during that transition was not what I desired it to be because of that.

Q. Let me -- we're going to talk now about the various -- in a minute we're going to talk about the various employment agreements that these individuals signed at AmeriPro, but before we do that, I'm going to ask you after they resigned, after the Nasserfar team resigned, did AmeriPro take any action to try to remind them of their obligations?

A. Yes, I believe legal sent out a letter that reminded them of their contractual obligations.

Q. And would you look at Exhibit 6 and 7.

A. 6 and 7?

Q. Yes.

A. Okay.

Q. Do you recognize Exhibit 6?

A. It's a letter to Mr. Holden Thomas.

Q. Actually, let me start -- I'm sorry. Go back to Exhibit 5. Do you recognize Exhibit 5?

A. Yes. That's a letter to Mr. Nasserfar.

Q. Who's it from?

A. Ali Hedayatifar, general counsel, General Holdings.

Q. And what's the date?

A. January 19th.

regarding our legal rights.

MS. BURTON: Ask that Exhibit 6 be admitted.

MR. BUNDREN: No objection.

THE COURT: 6 will be admitted.

Q. (BY MS. BURTON) So this -- as of January 20th, did you know whether or not the Nasserfar team was working for Oak Mortgage?

A. I believe that's the day I found out, yes.

Q. And how did you find out?

A. I believe one of my employees came and told me that's where they had gone.

Q. And prior to the Nasserfar team -- Nasserfar team working or Oak -- prior to the Nasserfar team going to Oak Mortgage, did Oak Mortgage have an Austin -- Austin office that you were aware of?

A. I was not aware of an Austin office that they had.

Q. And is Oak Mortgage a competitor of AmeriPro?

A. Yes, it is.

Q. And are they in the same business?

A. Yes, they are.

Q. What did you find out about the presence of an Oak Mortgage office in Austin after January 20th, 2015?

A. I found out that Michael -- the Nasserfar team or the team as described earlier had moved to Oak Mortgage and that they were starting a branch location out in the same general

vicinity where our location was.

Q.   And did you find out where that actual office was?

A.   Later I did, yes.

Q.   Where?

A.   I believe at that point in time it was in the executive suites in the same complex as our office.

Q.   So same complex as the AmeriPro Lakeway office?

A.   Correct, yes.

Q.   And how far away, do you have any idea?

A.   I'd say it's probably a three-minute walk.  It's in the same general Hill Country Galleria shopping area.

Q.   Were you surprised about this -- these turn of events?

A.   Yes, I was.

Q.   Why?

A.   I thought that we were moving successfully into the new year.  We were looking forward to a great 2015.  I did not know that Michael and his team had a plan to leave the company.

Q.   Did Mr. Nasserfar, Mr. Task, and Mr. Gosnay sign various employment agreements while they -- while they worked at AmeriPro?

A.   Yes, they did.

        MS. BURTON:  And, Your Honor, these are employment agreements that I'm going to go through hopefully relatively quickly that we did attach to the bench brief.

ask for admission of Exhibit 8.

(Applicant's Exhibit Number 8 offered.)

THE COURT: Any objection?

MR. BUNDREN: Which exhibit?

THE COURT: 8.

MS. BURTON: It was not. That's why I am asking for it to be admitted.

MR. BUNDREN: Oh, okay. I don't see any objection for this purpose.

THE COURT: 8 will be admitted.

Q. (BY MS. BURTON) Mr. Overhauser, when did Mr. Nasserfar start working for AmeriPro, what year?

A. I believe it was 2011 or 2012. I would need to refer to the agreements to be specific.

Q. Go ahead.

A. Oh. 2011.

Q. So is it your understanding that as a condition of receiving access to AmeriPro's confidential information that Mr. Nasserfar had to sign that proprietary information agreement?

MR. BUNDREN: Objection, leading.

A. Yes.

Q. (BY MS. BURTON) And if you look at those employment agreements you referenced which -- why was he signing different employment agreements?

Q. No discussion about that at all?

A. Nope.

Q. Is it your testimony that AmeriPro does have confidential information?

A. Yes, it is.

Q. Describe what that is.

A. It would be our leads, prospects, loans in process, profit and loss, general ledger accounts, our vendors. It can contain forms and documents, processes. It contains the entirety of what we use to operate our business on a daily financial basis.

Q. Do you have any particular databases, AmeriPro -- does AmeriPro have databases in which it keeps confidential information?

A. Yes. We have our operating system which contains all of our borrower information, which would be confidential. We have our accounting system which contains all of our accounting data, vendors, payees, payors, et cetera. That would be confidential information.

Q. How are -- how are those databases protected by AmeriPro?

A. Every office location has a secure access physically and we've got -- you have to sign on to a network. Then you have another sign-on authentication into those respective systems.

Q.   And was -- did Mr. Nasserfar have access to the -- what are the names of the databases?

A.   Encompass is our operating system and Accounting for Mortgage Bankers or AMB is our accounting system.

Q.   Did Mr. Nasserfar have access to Encompass?

A.   Yes, he did.

Q.   Did he have access to AMB?

A.   Yes, he did.

Q.   Did Mr. Task have access to Encompass?

A.   Yes.

Q.   What about AMB?

A.   Not to my knowledge.

Q.   Who has access to AMB?

A.   Typically accounting -- our accounting system outside of corporate accounting department would be your executive level, so, for instance, myself, the head of sales, and then the branch manager at every branch location has access to accounting department --

Q.   And as a branch manager, they have access to -- to what, just their branch?

A.   They have access to all of the transactions for their cost center or their branch, yes.

Q.   Did -- does the Encompass database also contain borrower information?

A.   It does, yes.

Q. And how is that protected? Is that protected -- I'm sorry. How is that protected?

A. In the same manner. You have -- the physical location has security. You have to sign on to the network and then you have a separate username and password sign-on into Encompass.

Q. Let's turn back to the employment agreement for Mr. Nasserfar, Exhibit 11. Does it also contain a nonsolicitation provision?

A. Yes, it does.

Q. And that would be a nonsolicitation -- if you want to look at it, it's paragraph 5.

A. 5(e), I believe.

Q. And who does it prohibit solicitation of?

A. Customer, and 5(e)i, "customer, payor, or supplier," and then in 5(e)iii, "any Employee or consultant of the Company."

Q. And sticking with the nonsolicitive customer, how does -- as president of AmeriPro, how do you -- how does AmeriPro define "customer"?

A. Customer is anyone that does business with the company, the consumer themselves or anybody who's in a position to refer a potential customer.

Q. And who would be included in the referral sources?

A. Real estate agents, builders, CPAs, certified

financial planners, anybody that's in the industry that has an ability to refer business.

Q. And what -- is there anything that AmeriPro considers confidential when it comes to referral sources?

A. I'm sorry. Can you clarify?

Q. What kind of confidential information does AmeriPro keep or maintain about referral sources?

A. Oh. So you typically -- specifically as it relates to builders we keep a -- we have a process by which we handle their business and in some cases we have incentives for the clients, the consumers themselves.

Q. Explain that. What do you mean by "incentives"?

A. We will give a customer, i.e., what I mean by that is the end user who is securing a mortgage from us, a -- a lender credit or a financial benefit for the transaction.

Q. And how is that confidential?

A. Because it's something that we've agreed to do specifically for the referrals that come from a particular source.

Q. So, for instance, you might have a particular deal with Centerra Homes --

A. Uh-huh.

Q. -- and a different deal --

A. Yes.

Q. -- with Brohn Homes; is that correct?

A. Correct.

Q. And are you -- what do you -- you try to maintain the Centerra information confidential and not disclose it to other realtors?

A. Typically, yes.

Q. And you think -- is that something that you believe is standard in the industry?

A. Yes.

Q. Not -- I mean, the confidentiality is not -- it's not just AmeriPro, other mortgage companies would want that also?

A. Correct.

Q. What other type of information does AmeriPro compile as far as its relationships with referral sources that's considered confidential? Do you have relationships with title companies?

A. We do.

Q. And what -- what's the --

A. It would be considered, I would think, a customer list. So on every transaction the originator is required to put in the referral source so that we understand where our business is coming from so that we can properly manage that business today and in the future.

Q. Is that information about referral sources -- would that be valuable to a competitor?

A. Yes, it would be.

Q. Why?

A. Because they would know exactly who we had received business from, the amount of business, the type of business that we had been receiving from them.

Q. And is that information AmeriPro maintains somewhere?

A. Yes, it's maintained in our operating system.

Q. And that's Encompass?

A. In Encompass, yes.

Q. Which is protected and secure?

A. Correct.

Q. And if you look back at Exhibit 11, the provision -- is there a provision in there regarding ownership of leads and loans in process?

A. Yes, in 5(f).

Q. And what does that say?

A. It says, "The Employee acknowledges that all leads and loans and process are company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects and/or loans in process as of the date of his or her termination and agrees not to take any action to divert such loans to a competitor or away from the Company."

Q. Did Mr. Nasserfar comply with that provision?

A. No, he did not.

Q. And Mr. Task?

Q.   Well, to your knowledge, has he ever requested that from you?

A.   No.

Q.   Or anyone else at AmeriPro that you know of?

A.   Not to my knowledge, no.

Q.   Was his employment in good standing at the time he left AmeriPro?

A.   No, it was not.

Q.   Why not?

A.   Because he did not per his agreement turn over a list of leads or prospects or loans in process and he did not assist in helping them close, which I believe is defined in section 5(e) also or section 5(f) more specifically.

Q.   And I'll say one more thing on the employment agreement, Exhibit 11.  Is it -- what does -- what does it say about returning AmeriPro's confidential information?

A.   Sorry.  I need to read it.  Are you referring to --

Q.   Section 5.

A.   -- 5(f) specifically or 5(h) that says, "The Employee agrees upon the termination of his employment that he or she will immediately refrain from and discontinue making any representation of his employment with the Company"?

Q.   I'm asking you about what is -- what was Mr. Nasserfar's obligation about returning confidential information?

A. He needed to return it immediately.

Q. And did -- did he do so?

A. No.

Q. And then we've talked about Mr. Nasserfar's employment agreements. If you'll look at 13, 14, 15, 16, and 17, those are all Mr. Task's employment agreements.

MS. BURTON: They're all -- they're all already admitted, correct?

THE COURT: (Nods head affirmatively.)

Q. (BY MS. BURTON) So those are all Mr. Task's employment agreements, correct, Mr. Overhauser?

A. Yes.

Q. And would those contain the same or similar provisions as Mr. Nasserfar that we discussed earlier?

A. Yes, they would.

Q. What was Mr. Task's last position at AmeriPro before he resigned? I think that's 17.

A. Sales manager.

Q. At the AmeriPro Lakeway office?

A. Correct.

Q. And like Mr. Nasserfar, was he -- did he sign a new employment agreement every time he got a new position?

A. Yes.

Q. And if you look at Exhibit 14, can you identify that, please?

A. Exhibit 14 is a proprietary information agreement.

Q. And was it signed by Mr. Task?

A. Yes, it was.

Q. And what's the date on that?

A. March 11, 2011.

Q. And like Mr. Nasserfar, would he be required to sign that before he was given access to confidential information?

A. Yes.

Q. And was that one -- one of the many ways AmeriPro tried to protect its confidential information?

A. Yes.

Q. Are you aware of Mr. Task returning any documents, either paper or electronic, after he resigned and before this litigation?

A. No.

Q. If you look at 18 and 19, which have also been admitted, just -- are those Mr. Gosnay's employment agreements?

A. Yes.

Q. And was he -- what was Mr. Gosnay's title?

A. Loan officer.

Q. And when was he first employed?

A. May of 2014, it appears.

Q. And then if you'll look at Exhibit 20, can you identify that?

A. Confidential information and company property.

Q. And was that signed by Mr. Gosnay?

A. Yes, it was.

Q. Does that document contain a definition of "confidential information"?

A. Yes, it does.

Q. And does it also require Mr. Gosnay to return that information upon termination?

A. Yes, it does.

Q. And what does it say about whether he can keep any copies?

A. It says you cannot retain any copies.

Q. And you -- are you aware of Mr. Gosnay returning anything at the time he resigned, any paper documents, electronic files, anything like that?

A. No, I am not.

Q. We talked earlier about the provision regarding them -- the employees who leave providing AmeriPro with a list of loans in process. Do you recall that?

A. Yes.

Q. What's the reason -- why does AmeriPro require that in their agreements?

A. One of the reasons that we require it is to make a smooth transition for the current customers in the company's pipeline.

Q. Isn't it true that some of that -- that the

information would be in AmeriPro's computer database?

A. If a loan -- if the customer had made application with the company, it would be in the company's operating system, yes.

Q. So what would AmeriPro need in order to have a smooth transition?

A. We would need not only the information that is contained in the operating system but any conversations that may have happened with that customer that would not be contained in the operating system.

Q. So who would have knowledge of that?

A. The loan officer of -- that is on that particular file, the salesperson.

Q. And did you get -- get any of that information from the Nasserfar team, anything about conversations?

A. No.

Q. Did you get anything about the loans in process?

A. Not to my knowledge.

Q. Are you aware that Mr. Nasserfar and Mr. Task and Mr. Gosnay claim they're owed commission under that section, section 5(g)?

A. I am aware of that, yes.

Q. And why hasn't AmeriPro paid them their commissions?

A. Because they did not leave in good standing.

Q. And is that -- that what the agreement says, that

they have to be in good standing?

A. Correct.

Q. And why weren't they in good standing?

A. Because they did not turn over a list of leads, prospects, loans in process, or assist in the closing of those loans.

Q. In this litigation you're aware AmeriPro's made certain claims against Oak Mortgage and the Nasserfar team, correct?

A. Yes.

Q. What is basically the basis of the claims against Oak and those individuals?

A. The basis of the claim is that our information -- our confidential information was stolen. It was taken from us and used to compete directly against us in a new location in -- in the direct vicinity of our existing Lakeway office.

Q. What type of information have you learned that Nasserfar and -- the Nasserfar team took and --

A. To date --

Q. Yes.

A. -- I'm aware of, again, profit and loss statements for the branch location, detailed general ledger accounts for the branch location, funded list -- funded loan reports which contain the revenue and expenses associated to the loans alongside of other confidential information, a copy of the

company's master lease for the Lakeway location, a copy of the benefits division employee paid/company paid for health insurance and dental and life insurance benefits that the company has, and then more specifically, a general list of all the loans closed by the branch and what type of loan they were.

Q. And how have you learned that that information was taken?

A. Through the process of discovery.

Q. And would that type of information give a competitor a competitive advantage?

A. Yes, it would.

Q. And why?

A. Because in the establishment of a new location they would know exactly how much volume would be coming. They'd know how many loans are coming. They'd know what type of loans. They'd know what the average revenue to expect on a loan was, what the average expenses for a loan are and they'd know the expenses of the branch, i.e., telecom, copier. They would just know exactly what does it take to run the branch and have an expectation of how much revenue and volume is coming into the branch. They'd have a head start in starting a new location.

Q. Is that information that you had ever authorized Mr. Nasserfar or Mr. Task or Mr. Gosnay to give to anyone outside of AmeriPro?

A.    No, it's not.

Q.    Okay.  We've talked a little bit about the steps Americo take -- AmeriPro takes to protect its confidential information and you just talked about the -- the databases being password protected.  What else does AmeriPro do?

A.    So we have -- again, physical locations are secured.  We have a sign-on process to get into the domain or the -- the company's computer system, and then you have another authentication process, username and password, to get into both the loan origination system, Encompass and into the accounting system, the Accounting for Mortgage Bankers or AMB.

Q.    Do you have an employee handbook?

A.    Yes, we do.

Q.    Look at Exhibit 21.  Is that a correct copy -- a current copy of the AmeriPro employee handbook?

A.    It appears so, yes.

Q.    What's the date on it?  If there is a date.

A.    There's no date on this.

Q.    If you look at the bottom of the page -- look right -- it says, "Revised."

A.    It says -- where is it?  "Revised February" -- sorry.  It was on the next page.  "Revised February 1, 2014."

Q.    Okay.  Does this handbook contain a policy on confidential information?

A.    I believe it does, yes.

Q. Page 56?

A. Of Exhibit 21?

Q. Yes.

A. I'm sorry. You're referring to the actual page or the marker on the bottom right-hand corner?

Q. The actual page.

A. Okay.

Q. What is -- what's the policy called?

A. Confidential information and company property.

Q. Does that contain a definition of "confidential information"?

A. Yes, it does.

Q. Would that, based on your understanding, be generally accurate?

A. Generally, yes, it would be.

Q. And is it your understanding that Mr. Task and Mr. Nasserfar and Mr. Gosnay all received a copy of this handbook?

A. Yes.

Q. If you'll look at -- I think 21 is the handbook. Look at Exhibit 22.

MS. BURTON: Mr. Bundren, can we stipulate they received a copy of the handbook, Exhibits 22 and 23 and 24?

MR. BUNDREN: 21 was already produced.

MS. BURTON: Yeah. 22 and 23.

MR. BUNDREN: For purposes of this hearing, I don't have any objection.

THE COURT: Okay.

(Applicant's Exhibit Numbers 22, 23 offered.)

MS. BURTON: Move for admission of AmeriPro Exhibits 22 and 23.

THE COURT: 22 and 23 will be admitted.

Q. (BY MS. BURTON) All right. Mr. Overhauser, if you'll look at Exhibit 25, please. Do you have that in front of you?

A. I do.

Q. Can you identify that?

A. It appears to be text messages.

Q. Between who?

A. Jason, Michael, and Michael.

Q. Michael -- and this is a deposition exhibit for Mr. Nasserfar -- "Michael" and "Michael" being Task and Nasserfar?

A. I assume so, yes.

Q. If you look at the bottom of that page, do you see that screen shot of a document?

A. Yes.

Q. Well, first of all, can you see what -- what -- let me start that over.

If you look at that screen shot, what does that

appear to be?

A. A text message.

Q. And what's the screen shot? What's the document?

A. In the bottom right-hand -- bottom corner it is a -- it looks like a picture of a pipeline.

Q. What do you mean?

A. Closing report.

Q. Okay. Say -- explain what that is.

A. Michael kept an Excel document that had all of his projected closings with notes and statuses.

Q. So who does the document belong to?

A. The company.

Q. AmeriPro?

A. Correct.

Q. So what is this showing?

A. It's showing company information regarding its customers.

Q. All right. So are there customer/borrower names on there?

A. Yes.

Q. And is that confidential information?

A. It is.

Q. Is that something that's publicly available at this point in time?

A. No, it's not.

Q.   I mean, at the time this document is created?

A.   No, it's not.

Q.   Can you tell who that -- who is that document being given to?

A.   I assume it's someone named Jason.

Q.   Okay.  But you don't know who that is?

A.   I do not.

Q.   Okay.  If that was being given to a competitor, would that be in violation of Mr. Nasserfar's duties to AmeriPro?

A.   Yes, it would be.

Q.   Why are borrower names confidential?

A.   Because borrowers' information is protected by several rules or regulations in our industry.

Q.   And that's something you-all maintain?

A.   Correct.

Q.   If you look at Exhibit 26, you go to the spreadsheet that's included in that Exhibit, do you see that?

A.   Correct.

Q.   Does that appear to be the -- is that an internal AmeriPro document?

A.   Yes, it is.

Q.   And what is it?

A.   It's a pipeline report.

Q.   Does it appear to be the same pipeline report you just looked at in the text message?

part of that exhibit.

THE COURT:  All right.  25 and 26 will be withdrawn.

Q.  (BY MS. BURTON)  So, Mr. Overhauser, I refer you to Exhibit 27.

A.  I'm there.

Q.  Okay.  In November of 20 -- in November of 2014, was Mr. Task still employed by AmeriPro?

A.  Yes, he was.

Q.  And if you're -- you were -- do you recall seeing this document before, Exhibit 27?

A.  I do.

Q.  Okay.  And it's an e-mail, correct, from Jackson Thomas at Oak Mortgage to Michael Task?

A.  Yes.

Q.  And if you look and see what Mr. Thomas is asking Mr. Task to give him, is there anything in there that's AmeriPro's confidential information?

A.  Yes, there is.

Q.  What?

A.  The year-to-date profit and last year's profit and loss, product mix, staff members, more specifically their compensation, pricing information would all be confidential information of the company.

Q.  So Mr. Task, did he have any authority to give that

to Oak Mortgage?

A. No, he did not.

Q. Would that be in violation of the agreements he signed with AmeriPro?

A. Yes, it would.

Q. Does AmeriPro -- we talked about how AmeriPro maintains confidential information. Do they go -- does AmeriPro go to some expense to compile and maintain it?

A. Yes, absolutely we do.

Q. I mean, the databases you talked about?

A. Yeah. We -- we host our databases at both onsite and offsite locations. We have a multiple authentication process. We have a separate IT department. We have backup processes and procedures. So, yes, we go to lengths to maintain that information securely.

Q. I could go to Google and I could look up builders, correct?

A. Correct.

Q. So how does AmeriPro claim that its builder referral sources are confidential?

A. Because it's not publicly available.

Q. What's not publicly available?

A. The information in how we do business with a particular client as -- as a builder.

Q. You're not claiming the name of the builder's

confidential, correct?

A. No, I'm not.

Q. You're claiming the relationship or -- or the information relating to that referral source?

A. Correct.

Q. If Mr. Task gave Oak Mortgage what Mr. Thomas was asking for in this e-mail, which is Exhibit 27, would that give Oak a competitive advantage?

A. Yes, it would.

Q. Just pick one or two things, why would that give him a competitive advantage?

A. From a pricing perspective they would understand how our pricing compares to theirs in specific scenarios. If we were -- if that information was to be given to them, they would understand the cost of our location. Inside of the profit and loss statements they'd understand what does the cost of this location take -- what does it take to operate this location on a daily or monthly perspective. Product mix would also be part of a combination with profit and loss, understanding the revenue streams of the company and, more specifically, revenue streams by product.

Q. Is that information AmeriPro had taken time to develop and maintain?

A. Yes.

Q. Look at Exhibit 28. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. It is a general ledger account of branch 152180.

Q. Which is which branch?

A. It is the Lakeway location, the one that Michael ran.

Q. What's the date range?

A. From January 1st, 2014, through January 31st, 2014.

Q. And what is this used for by AmeriPro?

A. This is the detailed information that makes up the profit and loss statement.

Q. Is this confidential?

A. Yes, it is.

Q. And would this if given to a competitor give them an advantage?

A. Yes, it would.

Q. What does it show them?

A. It shows them the revenue and -- and expenses at a location in a specific format.

Q. And how did AmeriPro maintain the general ledger, how -- how is it protected?

A. Again, it is behind a multiple authentication process. So it's behind a secure physical door for the office, a secure login to the network, and another secure username and password login into the actual accounting system.

Q. Okay. Look at Exhibit 29. What is that?

A. Statement of income.

Q. For?

A. Branch location 152180 or Michael Nasserfar's branch location.

Q. What's the date range?

A. It says, "For period ending November 30th, 2014."

Q. And again, it's something that AmeriPro maintains is confidential?

A. Yes.

Q. And would there be any reason -- any legitimate reason why a AmeriPro employee would give this to a competitor?

A. No.

Q. And then if you look at Exhibit 30, what is that?

A. That's the funded loan report for, again, branch 152180.

Q. Time frame?

A. January 1st, 2014, through December 31st, 2014.

Q. And you say that these exhibits I've been referencing that there's a -- you know, the Bates -- you know what a Bates label is, right, the Oak Mortgage reference?

A. Yes. I'm sorry.

Q. So is it your understanding these were produced in discovery by Oak Mortgage?

A. Yes.

Q. Okay. Any reason -- any legitimate reason why Oak

Mortgage should have these exhibits like Exhibit 30?

A. No.

Q. What is on the funded loan report, Exhibit 30, that's confidential?

A. Borrower's name, the loan amount, all the revenue associated to the specific loan, and some of the expenses specifically related to it, coming up with a total loan/income number on the far right. None of that is publicly available.

Q. All right. Let's go over to Exhibit 36. Do you recognize that?

A. Yes, I do.

Q. What is that?

A. It's a letter -- it's an e-mail from Ty e-mailing to what appears to be his personal Gmail account with an attachment.

Q. What's the date?

A. January 13th, 2015.

Q. And what day did he resign?

A. January 15th --

Q. And this --

A. -- 2015.

Q. -- is Ty -- Ty Gosnay, correct?

A. Correct.

Q. What is his attachment to Exhibit 35, what is that?

A. Attachment to Exhibit 35?

Q.   Yeah, what you're -- the exhibit you're looking at.

A.   It says, "Community fees."

Q.   So what is that spreadsheet?

A.   And then the next page has communities for three builders and it outlines tax rates, HOA fees, and other information specifically to that community.  In addition, it also has contact information for each one of those communities.

Q.   So builder contact information?

A.   Yes, that's what it appears to be.

Q.   And is this an AmeriPro internal document?

A.   Yes, I believe so.

Q.   Is it something AmeriPro maintains is confidential?

A.   Yes.

Q.   And why is it confidential to AmeriPro?

A.   Because we aggregated this information on our time and effort.

Q.   Mr. Gosnay have -- did he have any authority to convey that to a competitor?

A.   No, he did not.

THE COURT:  Is this a good place to break for lunch?

MS. BURTON:  I probably can finish in --

THE COURT:  Go ahead.

MS. BURTON:  -- by 12, 15 minutes, maybe 10, if you want me to?

or --

MS. BURTON:  No.  I just want to ask him about them and then submit redacted --

THE COURT:  36 and 37?

MS. BURTON:  Yes.

THE COURT:  They've already been admitted.

MS. BURTON:  Okay.  You're right.

THE COURT:  So you can ask him about them.

MS. BURTON:  Okay.  Thanks.  Sorry.

Q.  (BY MS. BURTON)  So, Mr. Overhauser, Exhibit 36 and 37, would you look at those.

A.  Okay.

Q.  What are those?

A.  30 --

Q.  Let's start with 36.  What is 36?

A.  36 appears to be an e-mail from Ty Gosnay to himself with the attachment -- it says, "Mortgage letter Michael Nasserfar AmeriPro Funding doc -- ameriprofunding.doc."

Q.  And what's the date?

A.  January 13th, 2015.

Q.  Okay.  Look at the attachment, the actual letter, and can you identify that?

A.  Yes, that is our prequalification letter.

Q.  AmeriPro's?

A.  Correct.

Q. All right. And if you look at Exhibit 37, look at that letter.

A. Correct.

Q. What does that appear to be?

A. It appears to be a letter in the same format, different applicant.

Q. Well, whose -- whose letter -- whose letterhead's on that?

A. Oak Mortgage.

Q. Comparing 36 to 37, what does it appear to you as far as these letters?

A. Appears to be the same letter with a different -- a different company on the top and different borrower -- a different applicant.

Q. Was this, Exhibit 36, an AmeriPro form?

A. Yes.

Q. And did Mr. Nasserfar use it when he worked at AmeriPro?

A. Yes, I believe so.

Q. And what is 37?

A. It's the same form at Oak Mortgage.

Q. And what's the address at the bottom of each of those letters, or is it the same address?

A. The address is the same at the bottom of both letters.

Q. Is that an Oak Mortgage address or AmeriPro address?

A. I believe that was -- I believe that was our address, but I would need to look at leases to confirm.

Q. Meaning that the address was not changed from the --

A. Correct.

Q. -- AmeriPro letter to the Oak Mortgage letter?

A. Correct.

Q. Okay. Is this a -- Exhibit 36, the AmeriPro letter, was that something that was publicly available?

A. No, it would not be --

Q. How would --

A. -- not this specific letter.

Q. -- AmeriPro be harmed by using -- if -- if they're -- if Nasserfar's team contention is these are just forms, we can find them publicly, what's your response to that as far as how it harms AmeriPro?

A. If any form is adapted or changed for use at the company, then it becomes the company's confidential information.

Q. And how -- and how -- you said AmeriPro has been in business how long?

A. A little over 12 years.

Q. And over that time has AmeriPro developed forms?

A. Yes.

Q. And what else has it developed?

A. Forms, other documents related to the loan process, communication templates that would go to borrowers or real estate partners or other referral sources.

Q. And if a competitor was given access to that type of information, how it would it help them?

A. It just would accelerate the time for setting up a new location.

Q. Okay. And just turn to the nonsolicitation provision in the employment agreement and the contentions that have been made in this case.

A. Okay.

Q. I'm going to focus you specifically on Centerra Homes. What is your understanding of how Centerra Homes began -- became to be a customer at AmeriPro?

A. Michael introduced me to Tom Grant, who is the current owner or CEO of Centerra Homes.

Q. And at that time, did Mr. Nasserfar tell you that Mr. Grant was a prior customer of his?

A. No, he did not.

Q. What did he tell you about his relationship with Mr. Grant?

A. That he had met Mr. Grant, I believe, when they had worked -- when he worked at a -- a different company -- when Michael had worked at a different company.

Q. Did he say Mr. Grant was a customer of his at the

different company?

A. No.

Q. Just that he had a relationship?

A. Correct.

Q. So was it -- how did it come about that -- well, when Mr. -- when you met Mr. Grant was he then president of Centerra Homes?

A. I believe so, yes.

Q. And how did Centerra Homes -- Michael made the introduction, correct?

A. Michael made the introduction.

Q. And how did Centerra become a customer of AmeriPro?

A. Over the course of the following months both Michael, myself solicited Mr. Grant for him to bring his business to AmeriPro Funding from Centerra Homes.

Q. So did AmeriPro expend time, energy, and effort to do that?

A. Yes.

Q. When Mr. Nasserfar was soliciting Mr. Grant that time, was he an employee of AmeriPro?

A. Yes, he was.

Q. Was -- what about Brohn Homes, how did they come to be a customer of AmeriPro?

A. That one I believe Michael went out specifically, solicited them and earned their business during his employment

with the company.

Q. With AmeriPro?

A. Correct.

Q. And did you have any -- did he ever tell you that they were a customer of his before he came to AmeriPro?

A. No.

Q. Do you have knowledge as to when Centerra Homes was actually formed or began as a business?

A. I do not.

Q. All right. Let me ask you -- kind of summarize your testimony. Can you summarize to the Court the harm that AmeriPro has suffered due to the actions of Oak Mortgage and Mr. Task and Mr. Nasserfar and Mr. Gosnay?

A. Sure. Our information was taken from us, our confidential information. I believe that it was used specifically to open up a new location in direct competition with us in our vicinity. Since then, we have lost a tremendous amount of business from customers and clients for which we were doing business before, and in addition to that, we have a location that's no longer operating that we have an expense associated to.

Q. And have you been able to calculate with any certainty the damages that AmeriPro has suffered?

A. I cannot specifically calculate that now. I believe they're ongoing as we continue to discover new information.

Q. There's one customer I forgot to ask you about, Seaholm. Is that -- that's the condo project, correct?

A. Yes.

Q. Were they a customer of Mr. Nasserfar's prior to him coming to AmeriPro?

A. No, not that I know of.

Q. Was -- do you know when Seaholm was -- was founded?

A. I believe the project started at some point in the last couple of years and we were given an opportunity to become a preferred lender. Specifically Michael Task was working on that project.

Q. And that was while he was employed by AmeriPro?

A. Yes, it was.

Q. And do you have any knowledge of whether Mr. Task had a prior customer relationship with Seaholm before he -- well, he couldn't have because he -- did he have a prior customer relationship with Seaholm before he gan work -- began working for AmeriPro?

A. I don't believe so because the project started after his employment with the company.

Q. So while at AmeriPro is when AmeriPro became a preferred lender for Seaholm?

A. Correct.

MR. BUNDREN: Objection, leading.

THE COURT: Sustained.

THE WITNESS: I'm sorry. Should I have waited?

Q. (BY MS. BURTON) Anything else, Mr. Overhauser, you want to add about the damage or -- damages or harms suffered by AmeriPro in this case?

A. I would just say that they're -- they're ongoing as we continue to -- I mean, even the information we've just -- that's come to light in discovery was new information for us and that is significant and material to the company. Not only have we lost the opportunity for business, but we have also have a location that is no longer producing revenue that is just an expense that was specifically executed to have Michael -- Mr. Nasserfar run it with his team.

MS. BURTON: Thank you. Pass the witness.

THE COURT: I think this is a good time to break for lunch. You may step down. We'll start back up at 1:30. You-all are excused.

(Break taken from 11:56 a.m. to 1:43 p.m.)

THE COURT: Okay. You want to come on back?

(Witness takes the stand.)

MS. BURTON: Your Honor, I have one thing to do. I didn't offer an exhibit. I already --

THE COURT: Okay.

MS. BURTON: -- talked with Mr. Bundren. He said there was no objection. The -- Applicant's Exhibit 7.

MR. BUNDREN: No objection.

A. If that information was on that sheet they could.

Q. And you can't testify that it wasn't -- or it wasn't there, can you?

A. I didn't personally review the computer. I can testify to what was shown to me this morning.

Q. But you can't say based upon your -- you can't say under oath that that spreadsheet was not on his computer when you got his computer, can you?

A. I could not speak to that specifically, no.

MR. BUNDREN: Pass the witness.

THE COURT: Anything else, Ms. Burton?

REDIRECT-EXAMINATION

BY MS. BURTON:

Q. Mr. Overhauser, you were asked some questions about whether AmeriPro had written agreements with builders and realtors and referral sources and you said no; is that correct?

A. Yeah. I wanted to be very specific. We have some written agreements for rent with certain real estate agents or a marketing function with certain real estate agents. We do not have any with builders at this point.

Q. Do you have agreements with builders that are not in writing?

A. I need you to be a little bit more specific. I'm sorry.

Q. Well, do you have understandings about lender credits

and things like that?

A. Yes.

Q. Okay. But they're not in writing?

A. That is correct.

Q. But it -- is it your testimony that is an agreement that you have?

A. Yeah. We have an agreement specifically with builders on what we will give to their customers.

Q. Is that something that you make public to your competitors?

A. No.

Q. Is that something that you make publicly available -- do you make that publicly available?

A. Not to my knowledge.

Q. Is that something that AmeriPro uses in order to gain a competitive advantage?

A. Yes.

Q. You were also asked some questions about borrower information. Is there a law, a regulation that protects borrower information?

A. Yeah, Regulation P and Gramm-Leach-Bliley protect the consumer's information.

Q. All right. And just -- for instance, Mr. Bundren's questions were, Well, the title company has borrower information. How does the title company get that information?

A. They get it from us.

Q. And how does -- how -- how is it that you are able to give that to them?

A. We're required to to do the transaction.

Q. And does the borrower agree that you can give them that -- that information?

A. Correct.

Q. All right. So if a borrower -- in a typical scenario if I'm borrowing money for a house, of course the lender and the title company has to have certain information, correct?

A. Correct.

Q. If a borrower -- do you have any knowledge of the borrower -- AmeriPro borrow -- borrowers consenting to Mr. Nasserfar or Mr. Task downloading their information on a thumb drive?

A. No, I do not.

Q. And do borrowers typically consent to have their credit applications taken by ex-employees of AmeriPro?

A. No, not typically.

Q. Would that be a violation of the federal law?

A. Yes, it would be.

Q. All right. And what's the purposes of that regulation to your -- to your understanding as far as protecting borrower information?

A. The purpose is to protect the consumer's confidential

data.

Q.   Do you have any knowledge of any Ameripo -- AmeriPro borrower consenting to Mr. Task taking hard copies of documents with borrower information on them?

A.   I do not.

Q.   Are you aware that he returned to us in this litigation a box of documents that contained borrower information?

MR. BUNDREN:  Objection, leading.

THE COURT:  Sustained.

THE WITNESS:  So do I answer or not?

THE COURT:  No.

THE WITNESS:  Okay.

Q.   (BY MS. BURTON)  Are you -- do you have any knowledge of Mr. Task returning any paper copies of documents?

A.   Yes.

Q.   And what is your knowledge?

A.   That he returned a box of information that contained, I believe it was, financial statements and other documents.

Q.   Was this information that he would have gotten because he was an employee of AmeriPro?

A.   Correct.

(*Sotto voce* discussion.)

Q.   (BY MS. BURTON)  I think we talked earlier in your direct testimony about the steps AmeriPro takes to protect

Q.   You're currently the Austin area sales manager for Oak Mortgage, correct?

A.   Correct.

Q.   You resigned from AmeriPro on Friday, January 16, 2015, correct?

A.   Correct.

Q.   Up until the day you resigned, January 16th, you never told anyone at AmeriPro that you were leaving; is that correct?

A.   Correct.

Q.   The following Monday, January 19th, Oak Mortgage opened a new Austin office with you as one of its employees, correct?

A.   Correct.

Q.   Ever since you resigned from AmeriPro, you've kept copies of AmeriPro's confidential financial records, correct?

A.   I was told not to destroy anything, correct.

Q.   Different question:  I didn't ask you if you were asked to destroy or not.  You took, with you, copies of AmeriPro's confidential financial records, correct?

A.   A copy of records, correct.

Q.   You took them home in a box, correct?

A.   Correct.  I had hard copies and electronic copies, correct.

Q.   You've known the entire time since you resigned from

AmeriPro that you still had copies of its confidential records, correct?

A. I don't know if it was confidential, but I did give the information to my counsel.

Q. Have you ever testified that they are confidential records?

A. I may have in my deposition, but I don't know if that's accurate because I'm not an attorney to determine that.

Q. If you turn to Page 19 of that deposition transcript that I gave you.

Line 15, question: "You --

A. What page are you saying? I'm sorry.

Q. Page 19, Line 15.

A. Got it. Yes, sir.

Q. I asked you the question: "You've kept copies of AmeriPro financial records that are confidential. They're not public. Ever since you resigned from AmeriPro, correct?"

Answer: "That's correct."

Question: "And you knew you still had those AmeriPro financial records, those confidential records, ever since you've resigned, correct? It's not something you just forgot you had?"

Answer: "No, I had not forgotten."

Question: "You knew the entire time since you've left AmeriPro that you have had them, correct?"

Answer: "That's right."

Did I read that correctly?

A.   Yes, sir.

Q.   You didn't ask anyone's permission at AmeriPro to take this information home with you, did you?

A.   I did not.

Q.   You didn't even tell AmeriPro that you had taken its confidential records, did you?

A.   Again, I don't know if their definition of confidential is accurate, but I did not tell anybody.

Q.   Well, if you would turn to tab 28 in the exhibit notebooks.

(*Sotto voce* discussion.)

MR. BUNDREN:  Are you asking -- is that Exhibit 28?

MR. BEHRENS:  Yes.

Q.   (BY MR. BEHRENS)  Are you there?

A.   Yes.

Q.   Okay.  Exhibit 28 are AmeriPro's monthly general ledgers for the Lakeway branch where you worked, correct?

A.   Correct.

Q.   They're the ledgers for every month in 2014, correct?

A.   Is the entire month behind your -- I assume you're -- looks to be correct.

Q.   The day before -- the day before you resigned from

AmeriPro, you filled a bankers box with these monthly general ledgers and several other AmeriPro financial records to take with you, correct?

A. I made copies.

Q. You even took personnel records of other AmeriPro employees including how much salary they make, correct?

A. I'm unaware if I did, but it's possible.

Q. In the last few weeks you returned a bankers box of exhibits -- documents that you had at your house, right?

A. Correct.

Q. And one of those folders that you had in there is the salary of Julie Ann Curby, of Ms. Strange, their employment agreements; you took their personnel records home with you, didn't you?

A. I had copies, correct.

Q. And you had copies of personnel records of other employees of AmeriPro at your house even after you resigned from the company, correct?

A. I had copies of records.

Q. And you took those records -- you loaded the bankers box with those records the day before you resigned, correct?

A. I don't know if it was the day before but correct.

Q. When you resigned from AmeriPro, you knew that you had contract provisions that required you to return all property of AmeriPro including confidential information,

correct?

A. I knew from the letter that counsel sent me on January 20th reminding me.

Q. My question was different: You were aware that you had contract provisions that required you to return all property of AmeriPro including confidential information upon your termination, correct?

A. I'd have to look at the contract at this moment. But at the time, I don't know if I knew it verbatim or knew word for word what it said.

Q. Please turn to Page 141 of your deposition transcript.

A. Okay. 141?

Q. Yes.

A. Okay.

Q. Line 11.

Question: "You're aware that you had contract provisions that required you to return all property of AmeriPro including its confidential information upon termination, correct?"

You asked, "Upon termination or resignation?"

My question: "Termination of your employment voluntary or not?"

And your answer was, "Yes."

Did I read that correctly?

A.    Yes.

Q.    Question: "You had a requirement to return all such information, correct?"

Answer: "I have -- I understand that."

Question: "You gave your resignation through Federal Express on the 15th for delivery on the 16th, correct?"

Answer: "That's correct."

Question: "And after that, you did not return the information, you took it home, correct?"

Answer: "I did take it home."

Did I read that correctly?

A.    You did.

Q.    You chose not to comply with your contract provisions with AmeriPro and took its financial information and borrower list to your house instead, correct?

A.    I made copies.

MR. BUNDREN:  I'm going to object.  That's a multiple question, Your Honor.  Multiple questions, just break it down and be fine.

MR. BEHRENS:  I asked the same question in deposition, he said, "Yes."

THE COURT:  If you will break it down, that will be fine.

MR. BEHRENS:  You bet.

Q.    (BY MR. BEHRENS)  You chose not to comply with your

contract provision with AmeriPro, correct?

A. I don't know if I necessarily made a conscience decision to choose not to.

Q. If you turn to page 142 of your transcript.

Are you there?

A. I am.

Q. Line 8:

"And you knew you had it and chose not to return it, correct?"

Answer: "Once I was asked, I returned it through counsel and here it is."

Did I read that correctly?

A. You did.

Q. You did choose not to return information that you knew you had in your possession, correct?

A. Again, once I was asked, I returned it.

Q. Not to AmeriPro. You gave it to your attorney, correct?

A. Correct.

Q. Now, both you and Mr. Nasserfar intentionally took list of AmeriPro borrowers including their loan numbers and other financial information with you when you resigned from AmeriPro, correct?

A. Correct.

Q. Under federal regulations, you understood that

nonpublic personal information of consumers includes any list or grouping of consumer names that was derived from AmeriPro computers, correct?

A. I did not know that. I think that Reg P was initiated, enacted in June of 2014. So it's a fairly new statute and legislation.

Q. Could you turn to page 70 of your transcript? Are you there?

A. I am.

Q. Line 20:

Question: "Under federal regulations, you understand that nonpublic personal information includes any list or grouping of consumer's names derived from AmeriPro computers, correct?"

Answer: "That's my understanding."

Did I read that correctly?

A. Yes. Prior to that question, you had spoke about numerous occasions and that was my understanding at that point.

Q. Well, you're licensed, aren't you?

A. I am licensed, yes, sir.

Q. And one of the things that you had to take a test on was Regulation P and its requirements, correct?

A. No, sir.

Q. If I look on the website and see that Regulation P is one of the things listed as a test exam topic, your memory is

make sure those records were preserved, that nothing happened or they weren't destroyed at AmeriPro; is that correct?

A. That was correct.

Q. In your pleadings to this court you made exactly the opposite representation, didn't you? You represented to the Court first, "Nasserfar, Task, or Gosnay did not have confidential information or trade secrets of defendant when they left the employment of defendant." Do you see that?

A. I see that, yes.

Q. So instead of telling the Court, "Yes, Your Honor, I did take confidential information, but it's to protect myself in case of litigation." You told the Court, "Your Honor, I don't have anything at all," didn't you? That's what you say here.

A. Well, again, I think the language of confidential information was in dispute and I'm still not -- again, I'm not an attorney. So the legal piece of that, I'm not quite sure I can answer correctly.

Q. Well, you took general ledgers home with you, didn't you?

A. I did.

Q. And you agree that general ledgers are the confidential information of AmeriPro, correct?

A. Not public.

Q. I'm sorry?

A. Not public.

Q. Different question: You agree that general ledgers of AmeriPro are its confidential information, correct?

A. I would say as a whole, the data in there is confidential.

Q. Okay. Please turn to Exhibit -- or to Page 166 of your deposition. And on Page 166 -- I'm sorry. First turn to Page 162 and you see at Line 8 that we were talking about, the general ledger for AmeriPro for 2014, do you see that? Do you see that?

A. I see the highlighted area. You never told -- okay. Yes.

Q. And then the question: "This is information you obtained electronically on AmeriPro's computer network, correct?"

Answer: "Correct."

Do you see that?

A. Yes.

Q. And then turn to Page 166 while we are talking about that exhibit. Line 6:

"Did you understand that you were required to keep it confidential?"

Answer: "I didn't -- was I required to per the agreement? My understanding confidential information would have been information that AmeriPro provided me and this

information certainly, I guess, could fall into that category."

Question: "You knew you weren't allowed to just give it out to members of the public. It's internal financial information, correct?"

Answer: "Absolutely. Absolutely correct. I would never do that."

Question: "And you understood then that it was AmeriPro's confidential information that you have in these generally ledgers, correct?"

Answer: "I would agree."

Did I read that correctly?

A. You did.

Q. And that's information that you represented to the Court, you didn't have at all?

A. I'm sorry.

Q. You represented to the Court that you didn't take any confidential information when you left?

A. Well, again, the terminology is not necessarily my forte as far as the legal definitions of all these items.

Q. Were you confused about the fact that the personnel records of other employees including their salaries, did you think that was public and nonconfidential?

A. Again, that was records that I kept to show what expenses were supposed to be applied to our branch. So there were records I was keeping for my claim.

Q. So, for instance, you needed Ms. Strange's employment agreement for your claim; is that your testimony?

A. I had a copy of it. I don't necessarily -- necessarily know if I needed it, but I had a copy of it.

Q. You took it, didn't you?

A. I made a copy of it.

Q. You took a copy home with you, didn't you?

A. I had a copy at home.

Q. And you knew that her salary information, her employment agreement was her personal information, correct?

A. She's no longer an employee of the company -- wasn't an employee then at all.

Q. It was her private personnel information and her salary, correct?

A. It was private information that was shared with me as her supervisor.

Q. At AmeriPro?

A. AmeriPro, that's right.

Q. It's confidential personnel records, what someone makes, correct?

A. I would say that's correct.

Q. And you took it home with you?

A. I did.

Q. And that's part of the confidential information you represented to the Court you didn't have at all?

A.    Again, the definition of those items -- I wasn't clear on what confidential definitions we were talking about, information we were talking about.

Q.    So you were confused about whether you can take personnel records for other people home?

A.    I was confused what they were trying to identify, correct.

Q.    Okay.  Were you also confused about whether you could take home credit scores for consumers of AmeriPro?

A.    I wouldn't say confused.  I don't -- again, I made records of several items, several things.

Q.    You understand that a credit report that was submitted to AmeriPro by consumers, it list what bank accounts they have, doesn't it?

A.    No.  It lists the creditor account numbers that are truncated.

Q.    Did you --

A.    It doesn't leave bank account information on a credit report.

MR. BEHRENS:  Do you have a redacted copy of the credit report that you could pull up?  There we go.

Q.    (BY MR. BEHRENS)  The credit report lists what their credit was with various banks and other vendors with whom they had --

A.    Credit.

Q. Credit?

A. That's correct.

Q. That's not public information that you're free to disclose, is it?

A. No.

Q. It includes what their credit score is; you're not free to disclose that, are you?

A. I'm free to disclose it to the borrower.

Q. To the borrower?

A. That's correct.

Q. You are not permitted to take it home in a box as an employee of a competitor, are you?

A. I wasn't an employee of the competitor when I took the information and made copies. I made copies, again, to protect myself.

Q. The entire time you've been the Austin area sales manager for Oak Mortgage, you've had that information with you, correct?

A. Sealed in a box.

Q. That you had with you, correct?

A. Correct.

Q. And you also had their social security numbers with you, didn't you?

A. Correct.

Q. You understood that the social security number of a

borrower of AmeriPro is confidential information, didn't you?

A. I understand that.

Q. And you understand that federal regulation prohibits you from taking that information, don't you?

A. I do now, yes, sir.

Q. Well, and as a licensed loan originator, don't you feel like you needed to know what the federal regulations were at the time you took it?

A. Well, again, each -- the regulations are fluids changing constantly. So with respect to being up-to-date on every regulation, every statute, that's a challenge.

Q. Regardless of Regulation P, was there some reason you thought you were entitled to take social security numbers of borrowers home with you?

A. I wasn't entitled, no, sir.

Q. It's confidential information, not only of AmeriPro, but of those borrowers and you took it?

A. I made copies of those records.

Q. And by the way, Regulation P, you understand is a set of regulations to enforce the Gramm-Leach-Bliley Act, correct?

A. It's my understanding.

Q. In other words, it clarify -- it explains in more detail what Gramm-Leach-Bliley provides, correct?

A. That's my understanding.

Q. And Gramm-Leach-Bliley was enacted in 2000 before you

were even licensed, correct?

A. Again -- my understanding again with Reg P and the security that we're talking about or the, I guess, privacy of this information, I was not enacted or written, put in place until 2014.

Q. You knew that you were taking AmeriPro's information home for a purpose other than what AmeriPro had given you consent to have it for, right?

A. The purpose was to make copies and records to protect myself.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) You knew that you were taking AmeriPro information home with you for a purpose other than what AmeriPro had given you consent for, correct?

A. Correct.

Q. And the day before you resigned from AmeriPro, you also, in addition to this bankers box, downloaded on a thumb drive information about a AmeriPro borrowers and loans that hadn't even closed yet, correct?

A. Correct.

Q. And loans that haven't closed yet is not public information, is it?

A. No.

Q. And you understand that under Regulation P that's

nonpublic private financial information of those borrowers that you had in your possession, correct?

A. I had it in my possession.

Q. And you took it home too, correct?

A. Correct.

Q. You understand that was confidential information, not only of AmeriPro but those borrowers, correct?

A. I kept it confidential.

Q. You knew --

MR. BEHRENS: Objection, nonresponsive.

Q. (BY MR. BEHRENS) When you took it, you knew it was confidential information not only of AmeriPro, but of those individual borrowers, right?

A. When I copied it and kept it at my house, it was confidential.

Q. All of the information you took when you resigned relating to AmeriPro borrowers was information you obtained off of AmeriPro's computer system, correct?

A. Correct.

Q. You didn't obtain any of that information from public sources, did you?

A. No.

Q. And you understand that under Regulation P, even if information's available on a -- from a public source -- are you with me so far?

A.     I'm with you.

Q.     Under Regulation P, you derived that information from something a borrower submitted to the lender.  You're not allowed to take that.  It's protected too.

Do you understand that?

A.     I do now.

Q.     And so instead of going to public sources, you went to the one source that you're federally prohibited from going to, to take that information, correct?

A.     It was the only access of the information I had to protect myself with the data, correct?

Q.     Well, you've gone through this scenario where you say that some of this information is available publicly, correct?  But you didn't go to the public source.  You just took a computer copy that a federal regulation barred you from taking, right?

A.     You're talking-- I'm not understanding the question when you said, "We spoke about something before."

Q.     Bottom line, you didn't go to any public source to take any borrower information, did you?

A.     No.

Q.     You took it all off of AmeriPro's protected website and computer network, correct?

A.     From their network.

Q.     That you had to login to with a password to access,

correct?

A.   The data that I had probably was -- majority was saved on the C: drive of that laptop.

Q.   You are the one who saved AmeriPro documents on to the C: drive of your laptop, correct?

A.   Correct.

Q.   In other words, in order to move it over to the C: drive on your laptop, you had to first login to the AmeriPro network, correct?

A.   In certain instances.

Q.   And then you moved it to the C: drive on your laptop, right?

A.   In certain instances.

Q.   And the importance of the C: drive, the local drive, that way AmeriPro won't know what you're doing with the information that's on your local drive of your laptop, correct?

A.   No, sir.

Q.   It's not backed up onto AmeriPro's network if you have it on the local drive of your laptop, correct?

A.   Everything I ever had was backed up to AmeriPro networks, absolutely.

Q.   Is your testimony that if it's on the C: drive, the local drive, that it's backed up?

A.   If I had it on my C: drive, it would have been on the network, correct.

Q. Originally. But the copy that you made on the C: drive --

A. The copies.

Q. -- if you made edits, if you forwarded it --

A. If.

Q. -- to someone else --

A. If.

Q. -- AmeriPro wouldn't be able to tell if you sent it, for instance, to Oak Mortgage, would it?

A. They would not have been able to, I guess.

Q. So by having it on the local drive of your computer, you are able to send it any where you want without being detected, correct?

A. If I chose to, I believe.

Q. At no point until you produced documents in this litigation did you ever tell AmeriPro that you had taken any of its confidential financial information; is that correct?

A. Up until the time I was asked, no, sir.

Q. And in terms of the financial records of AmeriPro that you both printed in hardcopy form and downloaded -- or put into the C: drive and took a thumb drive of -- are you with me so far?

A. I'm with you.

Q. None of that information was available in a public source that you're aware of, correct?

A. Not that I'm aware of.

Q. You took it off of AmeriPro's computer network that you had to access through a password, correct?

A. Correct.

Q. And I had asked you earlier about general ledger. You knew that those were internal financial documents that you were contractually required to keep confidential, correct?

A. Well, I mean, there was never specific in the agreements of the general ledgers and, like, that. I just felt like that, that -- there was probably data with -- in there that could be identified as maybe possibly confidential.

Q. You understood -- the testimony we read from your deposition, you admitted earlier --

A. Again --

Q. You understood that you --

A. -- the definition is certainly not something that I'm privy to and when we were talking about what was confidential and not confidential.

Q. My question: "You understood that you were contractually required to keep that information confidential, correct?"

A. And I have.

Q. Other than taking it with you without permission from the owner of that information, correct?

A. Correct.

A.    I don't know if that's the only three on the website, but there's more than that in Austin.

Q.    My question though is:

In terms of who AmeriPro -- or Oak Mortgage says are its employees in Austin, it's the three of you that are listed on the website, correct?

A.    We are listed as the sales team, correct.

Q.    And all three you, the entirety of the Austin branch of Oak Mortgage, have copies of our confidential information, correct?

A.    No, sir.

Q.    You do, don't you?

A.    I don't.  Not any longer.

Q.    Mr. Nasserfar had thumb drives full of our spreadsheets that he has returned, correct?

A.    Again, I don't have Mr. Nasserfar's information.  I don't have copies of that information.

Q.    Is it your testimony that you and the vice president of Austin for Oak Mortgage have copies that Oak Mortgage doesn't?

A.    Yes, I do.  That's my testimony.

Q.    The day before you resigned from AmeriPro, you also took copies of its profit and loss reports off the computer system, correct?

A.    Correct.  I don't -- I'm not sure about that date, to

be honest with you. The day before, I don't believe so. I don't think I copied or downloaded anything the day before.

Q. No, Mr. Nasserfar is Oak Mortgage's vice president of Austin, correct?

A. That's correct. That's his current title.

Q. You're aware that Mr. Nasserfar has a hard drive on which he also downloaded AmeriPro confidential information, correct?

A. I'm aware that he has a hard drive. I don't know what he downloaded.

Q. If you turn, please, to Page 27 of your transcript.

Line 3: "Excluding anything Mr. Bundren told you, are you aware that Mr. Nasserfar had one or more USB devices with AmeriPro confidential information on it?"

Answer: "One, yes."

And then Line 12: "And you're aware that Mr. Nasserfar had that USB device in his possession as recently as this month, correct?"

Answer: "I do."

Did I read that correctly?

A. Yes. And I -- again, my answer is there just regarding, "Did I know he had a device?" I didn't know what was on the device.

Q. Well, the question was, "Did it have --

A. I understand what your question was here. I'm seeing

at any point in your employment, correct?

A. I delete all of my text messages every day as a regular habit.

MR. BEHRENS: Objection, nonresponsive.

THE COURT: Sustained.

Q. (BY MR. BEHRENS) Whatever your regular practice is, you actually knew of the prospective litigation with AmeriPro back on December 11, correct?

A. Because they had litigated and sued other previous employees, yes.

Q. So is that a yes? Okay.

And after that, you deleted every text message that existed before then, all the way through January 20, after you left the company, correct?

A. Yes.

Q. You didn't preserve any text messages that existed at any point before you started with Oak Mortgage, correct?

A. Never have, no, sir.

Q. And when -- when Oak Mortgage agreed to indemnify you, you continued to work in a fiduciary role for AmeriPro as its agent for another month, correct?

A. I didn't enter into any agreement with them until after I was employed. It was after my resignation, excuse me.

Q. After the December 11 conversation, you continued working as a fiduciary for AmeriPro for another month, correct?

A.   I did continue to work for AmeriPro for another month, yes.

Q.   So -- and you were also storing and taking AmeriPro's confidential information, you say, to use for this potential litigation while you're at the same time deleting these text messages, right?

A.   One had nothing to do with the other, but correct.

Q.   Well, one preserves the evidence and one destroys it, correct?

A.   I wasn't thinking in those terms.  I'm not an attorney.

Q.   You manually deleted the text messages?  You had to go through and --

A.   Yes.

Q.   -- and specifically delete them?

A.   Yes.  Yes.

Q.   And not only were you a fiduciary for AmeriPro, you were also the co-manager at the Lakeway branch for that full month, correct?

A.   Correct.

Q.   And in addition to AmeriPro's general ledgers, you also took copies of AmeriPro's internal pro forma after you resigned, correct?

A.   Correct.

Q.   And the pro forma, of course, gives a blueprint of

what AmeriPro's planning to do in the future with that branch, correct?

A. Correct, never came to fruition.

Q. You never once asked any of the consumers, whose information you took home with you, you didn't ask any of them for permission to take their financial nonpublic data home with you, did you?

A. I did not.

Q. You began working with AmeriPro in 2011, correct?

A. Correct.

Q. While you were still employed with AmeriPro, Oak Mortgage asked you about your referral sources at AmeriPro, correct?

A. I don't know if I recall that.

Q. If you turn to Page 206 of your -- never mind.

Your employment agreement with AmeriPro has a nonsolicitation clause, correct?

A. It does.

Q. And under your employment and contract with AmeriPro, you understand that you're not allowed to solicit business from anyone who became a referral source after you were employed at AmeriPro, correct?

A. Client, payor, supplier.

Q. My question was different.

Under your contract, as you understood it,

you're not allowed to solicit business from anyone who became a referral source after you were employed at AmeriPro, correct?

A. Well, a little confused about, again, the language in the agreement as well as the question because neither -- they are not both mentioned. You're talking about a referral source; the agreement talks about other, you know, labels and -- so it's hard to say, you know, where those labels are attached.

Q. So when I asked you in deposition about referral source, you thought referral source was something other than referral source?

A. No.

Q. Is that the confusion?

A. No. The confusion is what's in the agreement.

Q. If you turn to Page 112 of your transcript.

And you understand that the contract is memorializing your understanding with AmeriPro? That's what the contract is, the mutual meeting of the minds, correct?

A. Okay. If you say so.

Q. On Page 112, Line 22, "If you developed a relationship with a referral source after you began at AmeriPro, do you believe you can solicit to them?"

Answer: "Does that mean a new referral source after I started with AmeriPro?"

Question: "Yes."

Answer: "If it was a new referral source, I wouldn't solicit them. They can solicit me. They can call me, but I can't solicit them."

Question: "And you can't solicit them under the employment agreement as you understand them" -- "understood them, correct?"

Answer: "It's my understanding for 12 months."

Did I read that correctly?

A. You did.

Q. And turn also to Page 111, Line 23.

Question: "Who do you believe you can solicit business from?"

Answer: "Any client, customer, business referral, realtor source that I knew prior to AmeriPro Funding."

Did I read that correctly?

A. Yes.

Q. And those weren't my words. You actually volunteered that. The group of people you can't solicit to when you answered my question include "business referral and relator source that you knew," correct?

A. That's my words.

Q. Is it your testimony now that builders are -- were not AmeriPro clients?

A. I don't believe they are AmeriPro clients.

page, correct?

A. It was produced by AmeriPro Funding.

Q. Different question:

You put it on your LinkedIn page as a link?

A. I did, yes.

Q. And immediately after your deposition, you deleted this last page off your LinkedIn profile, didn't you?

A. I deleted this, yes, I did.

Q. And it was because it referred to them as your -- as clients of AmeriPro, isn't it?

A. No. I didn't want my namesake next to AmeriPro's anymore.

Q. Over one month before you resigned from AmeriPro, Oak Mortgage told you that you can solicit your book of business from AmeriPro, and you can solicit your past customer database, didn't they?

A. They may have made that inference, but doesn't mean I did as such.

Q. Turn with me to Page 56.

A. 56. Yes, sir.

Q. Do you see a series of checkmarks? Can you go four checkmarks down?

A. I see the checkmarks.

Q. At the end of the first line, it says, "You can maintain and solicit to your book of business and your builder

realtor relationships. You can maintain and solicit to your past database."

Do you see that?

A. I see it.

Q. And Oak Mortgage sent you this more than a month before you actually resigned from AmeriPro, correct?

A. It looks to be December 10th.

Q. So while you were still acting as a fiduciary for AmeriPro, you were having a discussion with its competitor about the extent to which you could solicit business for Oak Mortgage, didn't you?

A. I did not have that conversation directly, no, sir. This information was sent to me, but I did not have that conversation.

Q. By your current employer, correct?

A. Right. They sent this information to me, but I did not have that conversation.

Q. They're having this conversation in this e-mail, aren't they?

A. It's addressed to several people there, that's correct.

Q. And what Oak Mortgage, one of the parties in the lawsuit, whom we've sued, what it said is that you can solicit your book of business and your customer database, right?

A. That's what this says there. That's their opinion, I

guess, at that moment.

Q. So they weren't concerned about the differentiation between a borrower and a referal source. They said, "Solicit from everyone who is a customer."

A. I don't know what they were concerned about or what they were trying to differentiate at the time.

Q. That's what they wrote. That you can solicit your customers?

A. You would have to talk to the gentleman who wrote the document.

Q. I'm asking you to read what they wrote. They said: "You can solicit" --

A. I see what they wrote.

THE COURT: I need you-all to stop talking all over each other.

THE WITNESS: I see what they wrote but, again, I didn't write it.

Q. (BY MR. BEHRENS) And that's the very -- it's the very next day after this e-mail that you and Oak Mortgage had the discussion about Oak Mortgage indemnifying you in a lawsuit against AmeriPro, right?

A. The previous document that you showed earlier that's on the 11th?

Q. That's right.

A. Okay. Yes.

Q. And then you continued acting as a fiduciary for AmeriPro for a full month after having these discussions about solicitation of its clients for a competitor, right?

A. I still was employed at AmeriPro for a month, yes.

Q. You're also aware that under your contracts with AmeriPro, you're not allowed to solicit or hire anyone who worked at AmeriPro, correct?

THE COURT: Mr. Behrens, is this a good place to stop for a --

MR. BEHRENS: Yes, Your Honor.

THE COURT: Whew, wishful thinking for the afternoon for a break.

MR. BEHRENS: Oh, for a break, yes. Thanks.

THE COURT: You may step down.

We are going to take a 15-minute break. It is 3:25 p.m. So we will start at 3:40 p.m.

(Break taken from 3:24 p.m. to 4:04 p.m.)

THE COURT: Sorry for the delay. You-all may be seated.

MR. BEHRENS: Thank you.

THE COURT: Okay, Mr. Behrens, you may proceed.

MR. BEHRENS: Thank you, Your Honor.

Q. (BY MR. BEHRENS) Sir, please turn to Exhibit 57.

A. (Witness complies.)

Q. Are you there?

A.    I see the YouTube logo.  Can they -- thank you.

Q.    You wrote, "Thank you for the update and direction." That's what you wrote back, right?

A.    I see that, yes.

Q.    Other than to hide the fact that solicitation is occurring, you can't think of any reason to wait one month to go after the other person, do you?

A.    I don't know what other person we're referring to.

Q.    My question is different:

Other than to hide the fact that solicitation was occurring, you can't think of any reason why you were being given the direction to wait one month before going after the other person, correct?

A.    I don't think it was in that context.  I don't think that's correct.

Q.    Turn to Page 81 of the transcript, please.

A.    The transcript?

Q.    Yes.  Line 19.

A.    Slow down, please, sir.  81, did you say?

Q.    Yes.  Page 81, Line 19.

A.    Okay.

Q.    Question:

"Is there any business reason that you can think of about waiting one month before you go after the other person, other than to make it appear that it's not a

solicitation?"

Answer: "You'd have to ask him. No."

Question --

A. "You would have to ask him." Yes, that's correct.

Q. You can't think of any other reason?

A. Again, I don't know what the context or, again, you would have to ask Mr. -- you know, Mr. Thomas what he was referring to there.

Q. But you thanked him for that direction, correct?

A. I thanked him for the e-mail, yes.

Q. Turn to Exhibit 58, please, the very next tab. Exhibit 58 is a series of text messages between you, Mr. Nasserfar, and someone at Oak Mortgage, correct?

A. I don't know. It doesn't look like this is my text messages.

Q. Well -- and that's because you deleted yours, right?

A. Not only -- from looking at this, this does not look like mine. This is Mr. Nasserfar's.

Q. Do you see at the bottom it's produced by Oak Mortgage?

A. I see that, yes.

Q. Okay. On the very last page, the text at the top -- are you there?

A. Okay. The one that says "Group?"

Q. The very top text is from someone that you're not

quite honest with you. It's just a list of names that folks we get referrals from.

Q. So Mr. Nasserfar sent you a list of all these folks at builder clients, and you don't have any memory of why you're getting this?

A. I don't. No, sir.

Q. Okay. You never worked for any Brohn Homes account matters before you came to work at AmeriPro, correct?

A. Actually, yes, I did.

Q. Please turn to Page 188 of your transcript.

Line 13, question: "When do you contend that you had a relationship with borrowers at Brohn? When did that first arise?"

Answer: "I rarely worked on the Brohn account. I would say over the course of the two years that Michael Nasserfar and I were working together as a team. I may have worked with three or four Brohn borrowers maybe when Mr. Nasserfar was on vacation, something like that."

Question: "And when -- was it as early as 2011?"

Answer: "No, sir."

Question: "It was after that?"

Answer: "It would have been after that."

A. I worked with Brohn prior to my employment at AmeriPro, but it wasn't the Brohn account.

Q.   Exhibit 62.

A.   Okay.  And repeat the question?

Q.   That's an e-mail you sent while you were still an employee of AmeriPro discussing a meeting that you and Mr. Nasserfar had with JB Goodwin, correct?

A.   That e-mail, yes.

Q.   And so while the two of you were still with AmeriPro, you met with a potential referral source at JB Goodwin, correct?

A.   I met with a -- it looks like Judy Alloway.

Q.   My question:

It was a potential referral source, correct?

A.   It would have, I guess, been a potential referral source but that's -- again, most relators are potential referral sources.

Q.   And you and Mr. Nasserfar weren't meeting with JB Goodwin as a potential referral source for AmeriPro, though, were you?

A.   Just a general meeting.  There wasn't really any substance or agenda for that.  We networked and talked to relators on a daily basis.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. BEHRENS)  You and Mr. Nasserfar weren't meeting with JB Goodwin as a potential referral source for

AmeriPro, were you?

A. I wasn't meeting him for referral sources, no, sir, not with AmeriPro.

Q. You knew that you were about to start with Oak Mortgage, correct?

A. When the meeting occurred and I don't recall when the meeting was, but since -- this would be yesterday, so it would have been around January 14th. At that point, I knew that I was trying to get -- resign from AmeriPro, yes -- in the process of.

Q. Please turn to Page 178 of your transcript.

Line 23: "And so when you were trying to look to JB Goodwin" --

THE COURT: Hold on. Hold on.

MR. BUNDREN: Be just a second.

Thank you.

What's the line?

MR. BEHRENS: 178, Line 23.

MR. BUNDREN: Thanks.

Q. (BY MR. BEHRENS) "And so when you were trying to look to JB Goodwin as a potential referral source, it was for you at Oak Mortgage, correct?"

Answer: "I wouldn't say that 100 percent. Again, the meeting wasn't about any immediate business, any future business. It was just an introduction."

Question: "Were you talking to her about being a referral source for AmeriPro?"

Answer: "No."

Did I read that correctly?

A. You did read that correctly.

Q. In Line 10:

"Did you advise anyone at AmeriPro about this meeting that you had with JB Goodwin on January 14?"

Answer: "No."

Did I read that correctly?

A. You did read that correctly.

Q. You're aware that any of your contract provision that made any prospect something that you could not divert away from AmeriPro, correct?

A. I'm sorry, say that again?

Q. Yeah. Your contract required that you not divert any prospect away from AmeriPro, correct?

A. I'm not 100 percent positive that's what it states. But I didn't think at this particular instance was anything of the sort -- such going on.

Q. My question is:

Are you aware whether Paragraph 5(f) of your employment agreement --

A. Can I see that, sir?

Q. Sure.

created, Windows artifacts that are within that date range, anything that looks like it could provide a clue as to how that computer was being used in the -- in the last couple of days or whatever the time frame given is.

Q.    And the time frame given here was January 12th to January 15th, 2015?

A.    Correct.  Yes.

Q.    And was that your understanding is that -- that were the days -- the days right before Mr. Task resigned?

A.    That's correct.

Q.    So on Mr. Task's laptop, what were you able to determine based on that initial evaluation?

A.    I found through the Windows Registry examination that there was one drive, one USB hard drive, that was connected to this computer on the 15th and that was about 1:51 p.m., and then there were -- I think I produced 15 link files to show files that were being written to or created within that same time frame.

Q.    Okay.  Stop there.  What do you -- what's a link file that is written to or created?  What does that mean?

A.    Link file is a shortcut file.  If you use a Windows machine and you have the little icons on your desktop, that's a shortcut.  When -- when you open -- when you access a -- a Word document, a link -- Windows will create a link file in the recent documents folder and it just -- it tells Windows

everything it needs to know about that parent file. So I don't know if you've ever -- if you use Word and you -- you open Word the first time, you get a drop-down list of all the documents you have recently edited. That's where that comes from. Windows pulled that from a couple different places. But it's simply something that Windows does to track the file that you open so that the next time you open it will be a lot faster and you'll be happy with Microsoft.

Q. To backtrack a little bit, you saw that a USB device had been installed on January 15th?

A. Correct.

Q. All right. What is the recent activity, what does that mean to you?

A. To me it means -- means very little. I just -- I will produce those files and the link files that are created with that date range back for other people to look at, and then they'll look at the file names and they will know whether or not that was important or not.

Q. Are those link files noted in your report --

A. They are.

Q. -- Exhibit 43?

Where are they?

A. There should be an attachment. Yeah. The list of those link files is Exhibit 1. It's A -- APF 00028187.

Q. Okay. What else did you note in examining Mr. Task's

computer?

A. I noticed a series of folders that had been deleted.

Q. What date?

A. They -- the dates they were deleted is not absolutely known. We know that they were last written on January 15th, which would be the last activity that something occurred to these folders before they were deleted. That could very well be the deletion date.

Q. And what else about that, how many deletions or what -- if you look at your -- if you want to refer to your report.

A. Yes. The -- that's Exhibit 3 and it's APF 00028190 and there was a list of 62 folders that were deleted. What was -- what I noticed about this is where they reside. They reside off the root of C: and they appeared to be company information or a folder that contained company information. So the logical path in which they reside was C:\mtask-ameriprofunding-clients-2012. So I made this available to the reviewers with a note saying, "Look at this. It's not typical for corporate data to reside on the root of a C: drive because the IT people can't manage it." They can't back it up and -- and keep up with the company data. So that may be important and it may not be. The reviewer would know that.

Q. All right. So just so I understand that, what you're

saying is there were -- there was a lot of AmeriPro information on the local drive or the C: drive on the laptop?

A. Correct.

Q. All right. And that there was evidence of deletion of folders?

A. That's correct.

Q. Your report talks about folder content. What -- what are you saying about that?

A. Yeah, they -- because the folders are deleted, anything contained within those folders would also be deleted. So there were hundreds of files within these 62 folders that once the folders become deleted, they -- they, themselves, also are deleted from -- from the hard drive.

Q. So are you saying that someone had to intentionally delete folders and files?

A. Yeah, there's -- there's been a folder deletion. Somebody deleted the folders or something deleted these folders, correct.

Q. And how many files were deleted did you find?

A. 911 files.

Q. Did you look at Page 3 of your report under the heading "Deleted Files"?

A. Yes. That's what I am looking at now.

Q. All right. So the last paragraph, are you reaching some sort of at least preliminary conclusion about what you've

examined on the computer?

A. Yes.

Q. What is that?

A. Yeah. I just told someone to pay attention to this. It's -- it would be consistent with files being copied or archived and removed immediately prior to being deleted.

Q. Being removed to?

A. Well, if you have a USB device that's plugged in before a bunch of files that -- that get deleted, then that would be consistent with the activity of -- of copying files and deleting files.

Q. Is that what you saw here, the USB device was inserted and then short -- within minutes a bunch of file folders were deleted?

A. That's what I'm seeing, yeah. I'm just making people aware that, you know, look at this. It might be important.

Q. Now, you --

MS. BURTON: We would ask that Exhibit 43 be admitted, Your Honor.

MR. BUNDREN: It's already marked as --

MS. BURTON: Is it?

MR. BUNDREN: -- a deposition exhibit.

MS. BURTON: Okay. It's already admitted. Never mind.

MR. BUNDREN: I think it's, I believe, 153; is

what it was, and that's when I -- like I said, I was expecting to find forensic images, a production of forensic images, and when I started to review it, I found that it was actually some kind of e-discovery production. It contained a series of folders that appeared to be named after devices like computers and laptops and -- and e-mail accounts and then within those folders was what I would call a select production of files.

Q. And I think it was actually Exhibit 48, which is not 45 like I said; is that right? 48, is that what you are referring to?

A. I'm looking at 40 -- 48? Yes, that's -- yeah, it's 48.

Q. So --

A. That's correct.

Q. So tell me what does 48 represent again?

A. That's correct, yes.

Q. What does that represent, 48?

A. That is the -- the root structure of item 14 of that -- that USB device is what's on it.

Q. So, explain what -- on 48 it's got a list of certain things. What are those?

A. Yes. And when I looked at, I don't know what the control numbers are. I would say that COC-001 through 24 is some kind of internal control number for somebody. The naming convention when I see it explains to me that it is devices

belonging or used by certain people. For instance, COO -- or COC-001 would be an external hard drive used by Nasserfar, 002 would be a thumb drive used by Task and on down the line. So when I first saw this, it told me that it was some kind of selective production from those devices that was organized in these folders and put on the hard drive that we received.

Q.   Why do you say "selective production"?

A.   Because it's not the original device. It doesn't have the file system metadata or any other artifacts that a forensic examiner would need to authenticate the evidence.

Q.   Okay. So these were not forensic images?

A.   These are not forensic images.

Q.   So you say it doesn't have the metadata. What do you mean by that?

A.   The file system metadata is -- is what an examiner needs to determine authenticity that is specific to each device. It will be a master file table. It will be the unallocated clusters. It would be the file select. It will be the recycle bin artifacts for that device. It will be bitmaps. It will be all of those -- those things that are specific to a device like card catalogs and shelves are specific to a library.

Q.   So how does that hamper the investigation?

A.   I don't know -- I don't know where any of this data come from other than somebody named a folder and says it comes

deleted with system artifacts that show that folders were deleted, that -- actually, they were copied to this device on the 15th -- on May the 15th. They had to be deleted sometime after that date because they can't be deleted before they exist, that there -- there are items in the recycle bin, additional folders, that were actually placed in the recycle bin on the 19th and recycling in itself is a -- is, for all basic -- practical purposes, a deletion process and the unallocated clusters on this device are zeroed out. So normally when you find deleted artifacts like this or you find recycle bin artifacts, you can forensically recover them or at least -- at least fragments of them, but the unallocated clusters on this particular device contains nothing but zero values so -- which is indicative of -- of unallocated clusters being wiped, being basically sterile, contains no data.

Q. Would you look at Exhibit 50 -- I'm sorry, 49.

A. 49?

Q. Yes, sir.

A. Okay.

Q. Was that -- was that produced -- or made -- a copy made from what was produced by Oak Mortgage's screen shot?

A. Yeah. It appears to be a -- a property listed in Windows on a device -- on a file name p&lnasserfar.xlxs.

Q. And what -- and where does it -- based on your analysis, where did this come from, the document that it refers

to? Where was it found?

A. It was on -- it was on 14 or -- item 14 or item 17. I'm not sure which.

Q. All right. If you look at that, what does this "Last saved by" mean and -- what does that mean?

A. "Last saved" is -- this is document metadata. It's not file metadata, it's document metadata. It's embedded into the document itself. It's -- it's a part of that spreadsheet. "Last saved" would be a Microsoft element and what it's telling you is when this last pulled up in Excel and saved, the last -- it was last saved by Jackson Thomas. Where Microsoft gets that information is from user accounts. So I would say that this was on a computer with a user account named Jackson Thomas and it was last saved on -- on December 17th, 2014.

Q. What document is it referring to that was saved?

A. That's the p&lnasserfar spreadsheet.

Q. Do you know who Jackson Thomas is? Are you aware who Jackson Thomas is?

A. I have no idea.

Q. Okay. And then if you look at Exhibit 50, what is that indicating?

A. Well, this file -- this file -- we're actually looking at that folder because it's a folder name COC-018. It would be on item 17. And we're looking at the -- again, the -- the property that's displayed by Windows of the p&lnasserfar

spreadsheet.

Q. Let's compare 49 to 50 again. Is there something different that's been added on 50?

A. When -- yeah. When you look at that folder structure you're looking at -- on item 50 you're looking at the COC-18 [sic] Jackson Thomas computer folder. There's two files that reside in that folder. It's LO.docx and the p&lnasterfar -- which somebody misspelled Nasserfar looks like -- but p&lnasserfar.xlsx, and then when you look at item 50, you'll see we're -- we're looking at the COC-018 folder of item 17 and it has a -- a PDF of what looks like it's been created from the p&lnasterfar Excel spreadsheet, but the name is now spelled right in the PDF and the LO.docx file is missing and the thumbs.db file is the Windows artifact.

Q. All right. So if I understand correctly, 49 and 50, which one's for -- 49's from which device -- which --

A. 49 is -- will be the first one we -- let me see. 49 would be -- yeah, 49 would be the first hard drive we received, which would be item 14.

Q. All right. And 50 is from the second item we received?

A. Yes, and that would be item 17.

Q. Is it 17 or 19?

A. That is a good question. It may be 19.

Q. Okay. All right. So in other -- just to wrap this

up, so what does this tell you about what was happening in the production by Oak on these hard drives, the difference between these two exhibits?

A. Well, in the -- to start with I was expecting forensic images of the source media on both of these and it's not there. The first one is some kind of selective file production that's in folders that contain names that tend to identify devices and people. The second production ends up being almost the same data without the names that identify people and computers with some differences in files that exist and files that don't exist and containing system artifacts, system metadata, specifically master file table records that show that files -- or folders, rather, have been deleted from this device as well as folders being placed in the recycle bin, and we actually have the security identifier of that recycle bin so we can track that back to find out who did it if we had the devices or if we had the domain controller.

Q. Were you able to determine how many files were destroyed or deleted?

A. Ask that again.

Q. How many files were destroyed or deleted, were you able to determine that?

A. We were. Is it an exhibit? I don't remember off the top of my head.

Q. I don't know that it particularly --

A.    Yes, it looks like it's here.  It's going to be -- there's 142 lines in this spreadsheet.

MR. BUNDREN:  What exhibit is that?

Q.    (BY MS. BURTON)  Yeah.

MR. BUNDREN:  What exhibit are we --

Q.    (BY MS. BURTON)  What are you looking at, Roy?

A.    I'm looking at --

MR. GARCIA:  46.

Q.    (BY MS. BURTON)  Exhibit 46?

A.    Yeah.  That's -- that's item 46, correct.

Q.    Okay.  So tell us again what -- how many --

A.    So this is the list of all of the folders that were deleted from the second USB drive and you'll note that they were created on the 14th and last written on the 14th and are deleted.  So they -- they had to be deleted at the 14th.  But when you look at the list, you'll see there's a 142 total lines in the spreadsheet.  The first one doesn't -- the first three don't count.  No, the first two don't count because they're headers, so there would be 140 folders deleted from this USB hard drive.

Q.    This was which thumb drive?  Who -- who was -- whose name was on it?

A.    This would be --

MR. BUNDREN:  Objection, form, referring to a thumb drive.

Q.    (BY MS. BURTON)  Flash drive.

A.    Yeah.  Well, it's an external hard drive.  This will be the one that didn't have the folder that contained the names of the people and the computers.  It was the second one received.  It's the one I've been calling 17.

Q.    If you look on Exhibit 46 at the top, it says, "All folders resided in the COC-002 folder on the USB hard drive before they were deleted."  Is that correct?

A.    That's correct.

Q.    And that COC-002, does that refer back to -- so you can identify where it came from?

A.    Well, that's the folder that resides on this -- on this media and if you look at the -- item 14, the first media, you'll see that COC-002 is identified as the Task thumb drive.

Q.    Okay.  That's how they identified it when they produced it?

A.    That -- the first time, yes.

Q.    If you will look at Exhibit 47.

THE COURT:  Is this a good place to break?

MS. BURTON:  Sure.  Yes, Your Honor.

THE COURT:  I mean, if you've got a little bit more to just close out --

MS. BURTON:  Yeah.  I can close out with him and --

THE COURT:  That's fine.

MS. BURTON: -- and then I can be done.

THE COURT: Okay.

Q. (BY MS. BURTON) So, Mr. Rector, looking at Exhibit 47, that also refers to a COC number, correct?

A. Yes. That's the recycle bin on the second hard drive and those are basically active artifacts. They were moved into the recycle bin. They have not been deleted as far as the file system is concerned, as far as the MFT records reflect. So they could be -- if it -- if you have that hard drive and it -- and you -- you tried -- tried to restore it, if they were there, they would restore. What this shows -- reflects is the -- where they were -- resided before they were recycled and the date they recycled, and you'll see the original path. That COC -- or COC-001, all of these folders were deleted from that root or that parent folder.

Q. What did they name -- what did they -- what did they name the folder? If you look at COC-001.

A. Yeah. That's what it's named on this drive, but on the first drive they produced, it had -- they named and identified it as, yeah, "Nasserfar External Drive."

Q. So -- okay. So those were folders that were recycled off of that drive?

A. Yes. And back on 40 -- is it 47? Yeah. The recycle bin is associated to a domain user and that's that first line. You'll see that big long SID number. For short, you can just

# APPENDIX
# TAB 3

REPORTER'S RECORD
VOLUME 3 OF 4 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-15-000785
APPELLATE COURT CAUSE NO. 03-15-00416-CV

OAK MORTGAGE GROUP, INC.,        )   IN THE DISTRICT COURT
MICHAEL H. NASSERFAR, MICHAEL    )
E. TASK, and TYCORD R.           )
GOSNAY,                          )
                                 )
                                 )
            Plaintiffs,          )
                                 )
VS.                              )   TRAVIS COUNTY, TEXAS
                                 )
                                 )
AMERIPRO FUNDING, INC.,          )
                                 )
                                 )
                                 )
            Defendant.           )   345TH JUDICIAL DISTRICT

-------------------------------

TEMPORARY INJUNCTION

-------------------------------

On the 27th day of May, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gisela Triana, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

A.    I did.

Q.    Okay.

MR. BUNDREN:  Pass the witness.

THE COURT:  Anything else, Ms. Burton?

MS. BURTON:  No, Your Honor, we have no questions.

THE COURT:  Okay.  You may step down.  Thank you.  You may call your next witness.

MR. BEHRENS:  Your Honor, we call Michael Nasserfar as an adverse witness.

(Witness takes the stand.)

MR. BEHRENS:  And, Your Honor, while he is taking the stand, may I approach?

THE COURT:  Sure.

MR. BEHRENS:  Yesterday there was testimony that Regulation P was enacted in 2014.  We wanted the Court to take judicial notice from the federal register.  It was enacted in 2011.  It was in place the entire time that Mr. Task and Mr. Nasserfar were employed at AmeriPro.

THE COURT:  Okay.

Mr. Nasserfar, raise your right-hand.

(Witness sworn.)

THE COURT:  Do you-all want these notebooks up here with him?

MR. BEHRENS:  I'm sorry?

THE COURT: Do you want the notebooks up here with him?

MR. BEHRENS: Our notebooks, but not this large one --

THE COURT: Okay.

MR. BEHRENS: -- from opposing counsel.

THE COURT: I am just trying to get stuff away.

MR. BEHRENS: Yeah.

(*Sotto voce* discussion.)

MR. BEHRENS: And also, Your Honor, like yesterday we wanted to go ahead and give the witness and you copies.

THE COURT: That's fine.

MICHAEL NASSERFAR,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BEHRENS:

Q. Mr. Nasserfar, please state your name.

A. Michael Hooman Nasserfar.

(Court Reporter requests clarification.)

THE WITNESS: H-O-O-M-A-N.

Q. (BY MR. BEHRENS) You resigned from AmeriPro on Friday, January 16, 2015, correct?

A. Correct.

Q. The following Monday, January 19, Oak Mortgage opened

a new Austin office with you as its vice president of Austin, correct?

A. Correct. Opened?

Q. Yes. And in addition to being vice president you are also Oak Mortgage's branch manager for Austin, correct?

A. Correct.

Q. Until you, Mr. Task, and Mr. Gosnay started working at Oak Mortgage on January 19, Oak didn't have a Lakeway office, did it?

A. I couldn't answer that question. I don't know where the Austin office was. I know that several employees lived in Lakeway. I'm not sure.

Q. Could you turn to your deposition at Page 25?

A. Would that be in this book?

Q. Yes. The one I handed you.

It says, question: "So in the Austin area, at least, the only one that exist is the one you were running in Lakeway; is that correct?"

Answer: "Yes."

THE COURT: Hold on. He's not there yet.

MR. BEHRENS: Oh, I'm sorry.

MR. BUNDREN: One second. What page are you on?

MR. BEHRENS: Page 25.

THE WITNESS: Page 25. What line?

Q. (BY MR. BEHRENS) Line 14: "So in the Austin area,

at least, the only one that exists is the one that you were renting in Lakeway; is that correct?"

"Yes."

Question: "And to your knowledge, there was no -- well, you said there was no Lakeway office prior to you and Task and Gosnay going to work for Oak; is that correct?"

Answer: "Yes."

Did I read that correctly?

A. Yes, you read that correctly.

Q. When Tom Grant started Centerra Homes in 2009, you were working with First Continental, correct?

A. Correct.

Q. But Mr. Grant used a different person, Roan King to handle Centerra's lender business, correct?

A. Say that again?

Q. Tom Grant, when he started Centerra Homes, used a different person named Roan King to handle the lender business for Centerra, not you, correct?

A. I can't answer that. I don't know. He used several different people.

Q. My point is, he's using several different people other than you. You were handling the Guillen count -- account and he used someone else, correct?

A. No. I'm not familiar with that account.

Q. You were there when he testified, weren't you?

Q. (BY MR. BEHRENS) But again, in terms of the lender relationship with Centerra Homes that began when Mr. Grant approached you and had discussions with you and Chad Overhauser at AmeriPro, correct?

A. I think there's two unique things going on here. There's a lender relationship and a personal relationship and the two are pretty symbiotic.

I have a relationship with him personally, professionally and when he spoke to me, it wasn't that just all of a sudden out of the blue he decided to speak to me about me being at AmeriPro and working with him at Centerra.

Q. You did not handle the Centerra account until you were at AmeriPro, correct?

A. Correct.

Q. Let's talk about your time at AmeriPro.

You first became a manager at AmeriPro in December of 2012, correct?

A. I can't recall off the top of my head.

Q. Can you turn to Page 47 of your deposition.

A. Yes.

Q. Line 20.

A. You say 47?

Q. Page 47, yes.

A. Line 20.

Q. Question: "So you first -- would you agree you first

became a manager at AmeriPro in -- on December 1, 2012?"

Answer: "Correct."

Did I read that correctly?

A. You read that correctly.

Q. From that point in 2012 forward and till you resigned in 2015, you understood that you owed a fiduciary duty of loyalty to AmeriPro, correct?

A. I don't understand "fiduciary loyalty."

Q. Did you owe a duty of loyalty to AmeriPro during that entire time you were a manager?

A. I don't -- I --

Q. Turn to the very next page of your deposition, Page 48.

A. Okay.

Q. Line 9.

Question: "So when you became a manager at AmeriPro, did you believe you owed a duty of loyalty to AmeriPro?"

Answer: "Yes."

Did I read that correctly?

A. Correct. You read that correctly.

Q. You also understood that you owed a duty to devote your full-time attention to running the AmeriPro branch office, correct?

A. I believe I did so, correct.

Q. You understood that keeping borrower account numbers private was at the utmost importance under the law, correct?

A. Correct.

Q. You personally kept a copy of AmeriPro's confidential general ledgers even after you resigned from the company, correct?

A. I don't believe so. I would like to know what you're referring to.

Q. Turn to Page 130 of your deposition.

A. (Witness complies.)

Q. Sir, it's Page 130. You can't do it one page at a time to get there.

A. It's not a lot of pages at a time.

Q. Page 130, please, are you there?

A. Yes, sir.

Q. Question, Line 9: "And earlier we talked about this, and you testified that a general ledger would be confidential; is that correct?"

Answer: "A general ledger would be confidential information."

Then Line 19: "This came through your attorney pursuant to our request for production by AmeriPro. Did you provide it to your attorney?"

Answer: "Correct. I would have supplied this."

You had a copy of the general ledgers after you

resigned from AmeriPro, correct? That's how you were able to give it to your attorney?

A. I went on to say, in several different instances, I'm not sure of the 800 pages where it was produced whether via e-mail. There's several instances in this deposition.

Q. Were you testifying truthfully when you said, "Correct. I would have supplied this." Or were you being untruthful?

A. I was being truthful, sir. I'm just saying that this is a whole deposition. There's a different section in there where I stated there was 800 documents provided, and I don't know whether it would have been my supplying it or Michael Task or Ty Gosnay.

Q. You had a copy after you resigned from AmeriPro, that's how you were able to give it to your attorney, right?

A. I said in my deposition, I would like to see where it was housed and how it was given so I would know the exact location.

Q. Well, you didn't keep any copies of general ledgers because of any concerns about needing to protect yourself, did you?

A. There was a copy set that Michael Task had kept, and I didn't need to do a duplicate set for myself. I'm speaking on behalf of myself.

Q. Would you turn to Page 130 -- stay on 130 of your

deposition.

Line 23: "Why do you -- you still have a general ledger by branch which belongs to AmeriPro Funding in which you have testified as confidential?"

Answer: "I can't answer that. I don't know."

It's your testimony today that you did need it for protection?

A. Well, between Michael Task and I, we had maintained a lot of documents. He maintained it. I didn't have it. Your question was, "Did I produce it at one point to our attorney? And my response was, "I'd have to see where it was housed in order to know how that document was produced."

Q. You and Mr. Task gave an entire years worth of general ledgers, confidential general ledgers, to our competitor, Oak Mortgage, correct?

A. No. That's not correct.

Q. On Page 132, if you turn there, Line 12.

Question: "So your testimony is that either you or Mr. Task provided Exhibit 12, which is the general ledger by branch to Oak Mortgage?"

Answer: "Correct."

Did I read that correctly?

A. You did. Can I see Exhibit 12, please? So that I can actually see what we are talking about.

Q. I believe it's Exhibit 48 in the binder.

I'm sorry, 28.

And in the question, she actually identified it as the general ledger by branch, do you see that?

THE COURT:  Hold on.  He's looking for 28; is that what you said?

MR. BEHRENS:  Yes.

A.    This was not something I had in my possession.

Q.    (BY MR. BEHRENS)  The testimony on Page 132 was Exhibit 12 and that's the exhibit sticker on that exhibit, right?

A.    Correct.

Q.    And you answered "correct" when she asked you if you or Mr. Task gave it to Oak Mortgage, correct?

A.    Correct.

Q.    And the general ledgers provided you and Oak Mortgage a blueprint of all of AmeriPro's credits and debits for the entire year at that Lakeway branch, correct?

A.    This was not given to Oak Mortgage.

Q.    Despite your testimony, to the contrary in deposition?

A.    This was not given to Oak Mortgage.

Q.    So you're disputing what you said in deposition?

A.    This was not given to Oak Mortgage, sir.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Okay.  But you don't understand the

question. Your deposition said that, that was correct.

So are you changing your testimony?

THE WITNESS: At the time when I answered it, I answered it incorrectly.

Q. (BY MR. BEHRENS) So for at least three and a half months while you were still being paid to manage AmeriPro's branch office, you were negotiating with our competitor Oak Mortgage about getting a job there, correct?

A. What are the specific dates that you're referring to, please?

Q. If you turn to Page 23 of your deposition.

Line 12, question: "So at least three and a half months while you were still employed by AmeriPro, while you are still being paid by AmeriPro, you are negotiating with Oak about getting a job there?"

Answer: "Correct."

Did I read that correctly?

A. Correct.

Q. During that three and a half months, you systematically provided confidential information of AmeriPro to our competitor Oak Mortgage, correct?

A. Incorrect.

Q. Let's look at an example.

First, you received a job offer from Oak Mortgage by November 11, 2014; is that correct?

A. I don't recall off the top of my head. I'm sorry.

Q. Please open the exhibit notebook to tab 27. It's an e-mail that Oak Mortgage's senior vice president sent you on November 12, 2014.

A. In the deposition or in -- I'm sorry. I got confused.

Q. I said tab 27 of the notebook.

A. Sorry. I can get there fast. Sorry. Yes, sir.

Q. And the senior vice president wrote you that to make an upcoming meeting effective, "I will need some more information from you by the weekend." Do you see that?

A. Yes.

Q. And Oak Mortgage's list of things that he needed you to provide included AmeriPro's 2013 and 2014 profit and loss statements, correct?

A. That's what that e-mail states, correct.

Q. You knew that the competitor was asking for confidential information of AmeriPro, right?

A. It appears that they're asking for very specific items in their e-mail. I don't know if it's confidential or not. That's -- I'm not an attorney.

Q. If you turn to Page 125 of your deposition.

Are you there?

A. 126, 125, yes, sir.

Q. Line 17: "Was that something that you said earlier

that P&L was confidential information of AmeriPro, correct?"

Answer: "Correct."

Did I read that correctly?

A. You read that correctly.

Q. Exhibit 27 is an example of AmeriPro's competitor asking you for confidential information without AmeriPro's knowledge, correct?

A. Correct. They asked for information in that e-mail.

Q. Now, please open the exhibit notebook to tab 70.

Are you there?

A. Does it say "Offer Number 1" on top? Yes.

Q. Okay. On November 17, 2014, you gave a copy of the profitability report that's contained in this exhibit, correct?

A. I don't believe so.

Q. You were there when Holden Thomas, the designated representative of Oak Mortgage -- mortgage testified, weren't you?

A. Yes, I was.

Q. And on this very exhibit you heard him testify that you are the one who gave him that copy?

A. I gave him the report. I don't recall if this is the exact report.

Q. Well, this is the report he produced to us in that deposition --

MR. BUNDREN: Objection, form.

Q.   (BY MR. BEHRENS)  Correct?  You were there?

A.   I was there, and I don't remember off the top of my head.

Q.   You don't remember that this report was brought that day?

A.   No, sir, I don't remember.

Q.   You did give him a copy of a profitability report, didn't you?

A.   I don't remember the exact title of the report, but I gave them the report.

Q.   At that meeting, on November 17th, correct?

A.   Correct.  At that meeting I did give him the report.

Q.   And you heard him testify that he scanned it onto Oak Mortgage's computer, whatever you gave him that day, right?

A.   I would have to see the -- I don't remember off the top of my head exactly what he said during his deposition.

Q.   You provided -- whatever the report is that you -- will admit to have been provided that day, that was in direct response to Oak Mortgage asking you for the profit and loss statement of AmeriPro, correct?

A.   Correct.

Q.   The profitability report contains a list of borrowers of AmeriPro, the fees they pay and their account numbers, correct?

A.   Specific to what account number are you referring to?

could give out publicly?

A.    No.

Q.    It's confidential information, right?

A.    I -- I think we have a different understanding of confidential.

Q.    Well, under your understanding, you are free to give loan numbers and the names of borrowers of the financial institution you work with to some third party; is that your testimony?

A.    No, sir.

Q.    You developed what you called a "builder centric model" when you were employed at AmeriPro, correct?

A.    I continued to use a builder model that I knew prior coming to AmeriPro.

Q.    Turn to page -- or to tab 75 of the exhibit notebook.

In the middle paragraph -- are you there?

A.    Yes, sir.

Q.    You wrote, "The builder centric model I have developed here at AmeriPro," do you see that?  "The builder centric model I have developed here at AmeriPro," you wrote that, didn't you?

A.    I wrote that.  Prior to that, I put "I have been managing builder based mortgage platforms for the past 12 years for several local and national builders."

Q.    My question was about the builder centric model --

A.    I answered your question --

Q.    -- that you developed at AmeriPro.

THE COURT:  Guys, stop.  Stop.

THE WITNESS:  Yes.

THE COURT:  Do not talk over each other.  Stop.

THE WITNESS:  Sorry.

THE COURT:  I need you to wait for him to answer the question.  If you have an objection to his response, then I need you to make an objection.

MR. BEHRENS:  Yes, Your Honor.

THE COURT:  I need you to wait for him to finish the question before you answer.

THE WITNESS:  Yes.

THE COURT:  Okay.

Q.    (BY MR. BEHRENS)  You wrote that the builder centric model -- I'm not asking about the platform.  The builder centric model is something that you developed at AmeriPro, that's what you wrote, right?

A.    That's one sentence out of a paragraph that is being taken out of context.  I had been doing it for 12 years prior, to which, I defined prior to that sentence in order to be able to say I had history of doing this.  I didn't just start doing it at AmeriPro.

Q.    And you said that "The builder centric model I have developed here at AmeriPro is adding profitability, timely

closings, and assisting on making sales for our builder partners," did you write that?

A.   Yes.  I wrote that.

Q.   Was that a truthful statement that you were assisting your builders with their profits and timely closings and sales?

A.   I think I wrote it rather ambiguous and vague in regards to elicit a response from them; but to the extent I wrote that, yes, I wrote that.

Q.   My question is different:  Were you being truthful when you wrote it?

A.   Was I being truthful, yes.

Q.   Okay.  Turn to Exhibit 67.  That's your LinkedIn page as of March 25, 2015, correct?

Are you there?

A.   I'm on 67.  And what was your question?

Q.   That's your LinkedIn page as of March 25, 2015, correct?

A.   It appears to be.  This is a rather working document but I don't know --

Q.   Is that a yes?

A.   It says March 25th on there so...

Q.   As part of your work history at AmeriPro, you wrote on the second page, "Three plus years currently managing mortgage loans as the exclusive lender for three Texas-based builders at AmeriPro," do you see that?

A.   Yes, I see that.

Q.   And you're the author of that statement, aren't you?

A.   I don't recall if it was all my doing or if our marketing person at AmeriPro assisted and/or our -- I forget her compliance -- I forget her title, Rachel Fowler.  I had several people I had to check with before I put anything on there.

Q.   And then before you put anything on there, you're talking about your LinkedIn page?

A.   Correct.

Q.   But you are the one who put it on the LinkedIn page, right, that statement?

A.   Correct.

Q.   So what you represented to the public in Exhibit 67 is that you managed loans as "exclusive lender for three Texas-based builders," right?  Were you being truthful?

A.   Prior to that statement I also wrote seven years managing Meritage Homes Loans, Hammond, Legacy, Meritage.  Two years with Gehan Homes and I went on to say that I have been working three years with three Texas-based builders.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. BEHRENS)  Were you being truthful when you represented to the public that you had -- it was an exclusive lender for three Texas-based builders at AmeriPro?

A. I was being truthful, yes.

Q. And the three builders you were referring to were Centerra Homes, Brohn Homes, and Clark Wilson, correct?

A. I would have been referring to those three builders.

Q. I'm sorry?

A. I would have been referring to those three builders.

Q. After your deposition in this lawsuit, you went back to that LinkedIn page and deleted that statement, right?

A. I recently have changed my LinkedIn. I've done it several times.

Q. So that's a yes to my question, you deleted that reference after your deposition, right?

A. I have.

Q. Please turn to Page 70 or to tab 76.

This is printed from a USB device you provided in discovery, and it's a November 26, 2014 expense report you submitted to AmeriPro for payment, correct?

A. It appears to be.

Q. And one of the things you asked AmeriPro to pay you back for was taking representatives from Centerra, Brohn, and other clients to dinner and lunches, correct?

A. There's a couple on there for that, correct.

Q. Part of what AmeriPro paid you to do was to build goodwill with its builder customers, correct?

A. It wasn't in my employment agreement.

Q. But that's part of what you did as your job was to build goodwill with these customers, right?

A. I believe so.

Q. The second to the last reimbursement expense you submitted, it lists Tamela Taylor and that's now Tamela Taylor Thompson, right, at Centerra Homes?

A. I know her as Tamela Taylor, but, yes.

Q. And you met with her just three days after you got a job offer from Oak Mortgage, right?

A. I can't recall the specific dates other than this date that's on this document.

Q. And that's -- two days -- though you remember after you gave Oak Mortgage a copy of a profitability report on November 17, right?

A. I don't recall off the top of my head the specific dates.

Q. Now, in your contracts with AmeriPro, you agreed that leads and loans in-process are the property of AmeriPro, right?

A. Yes.

Q. And you contractually agreed to provide AmeriPro a written list of all open leads, business prospects, and/or loans in-process as of the date of your termination, correct?

A. Correct.

Q. And you did have loans still on process when you left AmeriPro, right?

deposition.

A. I'm on 157.

Q. I'm sorry. Page 156.

A. Okay. I can get there fast.

Q. Line 18: "You didn't tell anyone at AmeriPro that you were resigning prior to resigning; is that correct?"

A. Did you tell anyone at AmeriPro that -- no, I didn't tell anyone at AmeriPro I was resigning until I resigned.

Q. I'm trying to find the quote. I'll have to come back to it.

AmeriPro's president and general counsel did try to call you after you resigned, correct?

A. Yes. I had some phone calls from --

Q. And you didn't return any of them, did you?

A. I didn't. There was nothing in the message that said anything explicit that they needed. They were just calling.

Q. After you resigned you never contacted or returned calls to anyone at AmeriPro to help with the transition of any of the loans that were in-process; is that correct?

A. I e-mailed the HR department, and I didn't get a response back. I don't process or underwrite files. I'm not allowed to contact borrowers. I can't contact my processors. No one contacted me to help assist on any questions they had on these files.

Q. On Page 157, Line 9:

Question: "And did you either before or after you resigned contact somebody at AmeriPro to help with the transition of those loans?"

Your answer was "No," is that correct?

A.   That is correct.

Q.   And Chad Overhauser tried to contact you and you didn't return his calls, right?

A.   His message was indiscreet, did not ask for anything.

Q.   Well, you didn't call him back, right?

A.   I didn't feel a need to call him back.

Q.   Well, Ali Hedayatifar tried to call you and you didn't call him back, right?

A.   That is correct.  His message was not in regards to any loans in process or any questions he had about them.

Q.   And the president of Tenura Holdings, the parent company, tried to call you and you didn't call him back, either, correct?

A.   Kevin Klein's voicemail to me did not say anything about loans in processing.  So according to help in processing of loans or questions they had, there wasn't anything in voicemail.  I didn't receive any calls to help in processing of these loans.

MR. BEHRENS:  Objection, nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. BEHRENS)  However, even though you didn't

return those calls, you did contact the builders for whom AmeriPro had been the exclusive lender, and you told them you were leaving, right?

A.    I did.

Q.    And please turn to tab 77 of the notebook.

On December 23, 2014, you e-mailed Oak Mortgage personnel and Mr. Task that you were driving almost 200 miles and dropping in on --

THE COURT:  Hold on.  Hold on.  Hold on.

THE WITNESS:  I'm sorry, sir.  I don't have a 77 unless my counting is bad.

THE COURT:  There's two notebooks.

THE WITNESS:  It goes 76, 78.  77?

MR. BEHRENS:  The one that has 77 in it, right.

THE WITNESS:  This one does not -- this one -- again, my numb -- counting could be bad, but this only goes to 41 and this other just doesn't have a 77 in it.  So I apologize.

THE COURT:  You're saying it's missing it?

THE WITNESS:  I believe so, yes.  75 --

THE COURT:  Let me see if I've got it here.

THE WITNESS:  I'm sorry.

MR. BEHRENS:  May I approach the witness with a copy?

THE COURT:  Sure.

THE WITNESS: Thank you, sir.

MR. BEHRENS: You bet.

Q. (BY MR. BEHRENS) You e-mailed Oak Mortgage that you were driving almost 200 miles and dropping in on all builder contacts, correct?

A. Can I have a moment to read the e-mail, please?

Q. You bet.

A. Thank you very much.

Yes -- can you repeat your question? I've read it --

Q. Right.

A. -- and I think I can answer your question better now.

Q. Now, this is an e-mail not to AmeriPro management but to Oak Mortgage, right?

A. It appears to be, yes, sir.

Q. And you told Oak Mortgage, the competitor of the company you were working for, that you had driven almost 200 miles and were dropping in on all builder contacts, correct?

A. Correct.

Q. You were still under a duty of loyalty to AmeriPro at that time, correct?

A. Yes, sir.

Q. And you told Tom Grant, the president of Centerra Homes, on January 8 or 9 that you're resigning, correct?

A. I don't recall off the top of my head the specific

date.

Q. Well, a few days before you made that call, whatever the date was, Oak Mortgage sent you some scrips to use when you called AmeriPro clients, right?

A. I'm sorry. That insinuates I use some scripts?

Q. My question was: Did Oak Mortgage send you scripts to use when you called AmeriPro clients?

A. To my knowledge, no.

Q. Turn to, if you would, tab 78 of the notebook.

A. 75, 78.

Q. Are you there?

A. Yes, sir. Can I read this? I -- it seems a little long. April 17th, January 8th. I see an e-mail from Jackson to me on April 8th.

Q. Do you see one from Heather Moorman to you in the middle of the page?

A. January 6th, yes, I do. I see that.

Q. And she wrote "Attached you will find a copy of scripts to help you with your transition. These scripts will help you for the following scenarios. And the scenarios she included are relators of pipeline, all other realtors, borrowers in pipeline, all previous clients and database," correct?

A. Correct. That's what she states in her e-mail.

Q. And those scripts included highlighting the benefits,

that was highlighting the benefits of you going to Oak Mortgage, correct?

A. I wouldn't know. I didn't receive this e-mail from Heather, and I believe Jackson was reforwarding something to me. As I don't check my personal e-mail that often and it is a Google account or Gmail account, I believe this went into spam. I don't recall ever reading or seeing this e-mail.

Q. But Oak Mortgage, your new employer, was sending you scrips to use for borrowers in pipeline and relators in pipeline to highlight the benefits of you moving to a different company, right?

A. You would have to speak with Heather Moorman. I don't know why she sent that. I didn't use -- I don't use scripts. I don't need to use scripts. I have relationships with these people. I don't need to script anything.

Q. And I don't believe we got this copy from Heather Moorman. We got it from you, didn't we?

A. I don't know who provided this document.

Q. Turn, if you would, to Exhibit 58. That's a text message exchange between you and Tamela Thompson -- or formally Tamela Taylor of Centerra Homes on January 13; is that correct?

A. I can't tell who's texting between who there.

Q. If you turn to Page 204 of your deposition.

A. Line 15?

Q. Line 17: "But this was sent to you while you were

still at AmeriPro -- an AmeriPro -- AmeriPro employee, correct?"

Answer: "Yes."

A. In Line 16: "My Gmail gets a lot of junk mail. Prior to that, I just don't recall receiving it."

"But this was sent to while you were still at AmeriPro, an AmeriPro employee, correct?"

Answer to your question, "Yes."

Q. So you did get it, correct?

A. It made it to my Gmail. Not to my -- I didn't review it or see it. I believe it went to my junk mail.

Q. Well, you responded to her, didn't you?

A. I don't believe -- are we talking about -- what are we talking about right now? I'm sorry.

Q. Right now let's turn to Exhibit 58. That's the text message between you and Tamela Thompson at Centerra Homes, correct?

A. So are we talking about a Gmail or a text message? I'm sorry. I'm confused.

Q. Are you on Exhibit 58, first off?

A. Okay. So we're done with the Gmail?

Q. Exhibit 58. Are you there?

A. Yes. I have Exhibit 58 open, yes, sir.

Q. Tamela Taylor e-mailed or texted, "We've decided to stand down and not do anything until we see what happens on

that as a contact for AmeriPro on your last day at work?

A. I didn't have any intentions. I was asked to meet with somebody, and I took them up on their offer to meet. I didn't mention Oak Mortgage in that meeting.

Q. One last topic:

On December 11, 2014, you had a conversation with Oak Mortgage about it indemnifying you if AmeriPro were to sue you, correct?

A. I don't recall. I'd need to see where you're sourcing that from, please.

Q. And just to be sure, is it your testimony, your sworn testimony that you don't remember having such a conversation? I want to be clear on that.

A. Off the top of my head, I don't recall a specific date and this specific conversation.

Q. I -- okay. Did you have a conversation by which Oak Mortgage would agree to indemnify you if AmeriPro sued you?

A. Correct. There was.

Q. And it was in December 2014, when you had that conversation, correct?

A. I don't recall off the top of my head.

Q. Turn to tab 81.

A. Thank you. I was just --

Q. Second page.

A. Sorry. I'm there.

Q.   And on the second page, it says, "Per the phone conversation held on December 11, 2014," and then it goes on to discuss the indemnity below, correct?

A.   Correct.  It says that in the offer letter indemnity.

Q.   And that's your signature at the bottom of that page, correct?

A.   Yes, sir, that is my signature.

Q.   You did not have Brohn Homes as a customer prior to beginning at AmeriPro, did you?

A.   I wasn't working with Brohn Homes.  I was working with their sales agents and the referral sources of Brohn Homes --

Q.   My --

A.   -- Ryan, Robin, Matt and --

Q.   My question is about Brohn Homes.

          MR. BUNDREN:  Let him finish his answer, please.

          THE WITNESS:  I --

          THE COURT:  Hold on.  Hold on.  Hold on.

          He is saying to let him finish.

          Do you have an objection?

          MR. BEHRENS:  I do.  Objection, nonresponsive.

          THE COURT:  Sustained.

Q.   (BY MR. BEHRENS)  My question is about Brohn Homes. You did not have Brohn Homes as a customer before you began at AmeriPro, did you?

A. Defining customer is -- I can't answer your question without definition of customer.

Q. Were you the preferred -- I'm sorry. Were you the preferred lender for Brohn Homes before you began at AmeriPro? You were --

A. Of Brohn Homes, I assume we're still talking about?

Q. That was my question, yes.

A. I was not the preferred lender for Brohn Homes.

Q. And you were not for Seaholm, were you, before you began at AmeriPro, correct?

A. I was not the preferred lender for Seaholm prior to the AmeriPro, correct.

MR. BEHRENS: Pass the witness.

THE COURT: Let's take a break.

We are going to take our morning break and you can step down.

(Break taken from 10:29 a.m. to 10:58 a.m.)

THE COURT: You-all may be seated. You want to come back up.

Well, I should say, are you going to direct him?

MR. BUNDREN: I'll reserve.

THE COURT: Okay. Then go back. Sorry. I should have asked that. You may call your next witness.

MR. BEHRENS: We rest at this point, Your Honor.

THE COURT: Okay. Mr. Bundren, you may call

MR. BEHRENS: Just a few questions, Your Honor.

CROSS-EXAMINATION

BY MR. BEHRENS:

Q. Mr. Task, can you turn to Exhibit 73 which should be redacted. Let's see. Yes.

Can you explain why you needed the credit score for a borrower for your salary dispute and what their social security number is?

A. No. But I don't know if this was necessarily something that I was in possession of. I'm not sure. It says Michael Nasserfar requested the report.

Q. Well, we got the copy back from you-all.

A. Right.

Q. And you can't think of any reason related to a salary dispute that you or Mr. Nasserfar has to know the credit score for this borrower?

A. There is no reason.

Q. If you turn to Exhibit 74, is there any reason for you to know the monthly income for your borrower and their social security number for your salary dispute?

A. Not those specific items, no, sir.

Q. But you took it, you and Mr. Nasserfar took it anyway, right?

A. And gave it back. Don't have that anymore.

Q. You gave copies of that bankers box full of financial

information from AmeriPro to Mr. Gosnay to scan at Oak Mortgage's offices, correct?

A. We scanned them, correct.

Q. And also explain how you needed for your salary dispute why it is that Oak Mortgage has that copy of our profitability report on its computers?

A. I have no idea.

MR. BEHRENS: Okay. Pass the witness.

THE COURT: Anything else?

REDIRECT-EXAMINATION

BY MR. BUNDREN:

Q. Mr. Task, would you look at 31, please, Plaintiff's Exhibit 31. We will give it on the screen here.

I believe this is a letter to you dated January the 20th of 2015 from the general counsel, let me just pronounce it that way, of AmeriPro; is that right?

A. That's right.

Q. When you received this letter -- well, what did you understand this letter to be demanding that you do?

A. Well, it said --

MR. BEHRENS: Objection. The document speaks for itself and best evidence.

MR. BUNDREN: I am just asking him what he understood he was supposed to do after he received the letter.

THE COURT: With the letter?

name.

Q. That would require dissolving a contract by which AmeriPro purchased it from you, correct?

A. Is there a sale return option on there? Because if that's the case, I'd like for you to sell it back to me.

Q. You understand that AmeriPro takes the position that you were not in good standing with the company when you left?

A. Is that a question?

Q. You understand that, don't you?

A. If that's what you're telling me, I understand it.

Q. Is it your position that if AmeriPro didn't pay you what you thought you were entitled to, that you were free to give its internal confidential documents to a competitor?

A. That's not why I did what I did.

Q. I'm sorry?

A. I didn't give one because of the other.

Q. But you did give confidential information to Oak Mortgage? You gave, for instance, a loan profitability report, right?

A. I think there's a debate about what we feel is confidential, and that's for lawyers to decide. I don't agree with your definition of confidentiality.

Q. Okay. Would you turn to Exhibit 72.

In the upper right-hand corner of Exhibit 72, it says "Nasserfar personal e-mail," correct?

A.    Yes.

Q.    Correct?

A.    Nasserfar personal e-mail.

Q.    But instead of personal e-mail, you see that it has several borrower credit reports and loan applications in this file, correct, that you called your personal e-mail?

A.    I cannot tell what this is from.

Q.    If you go four lines down, it says "credit report," doesn't it?

A.    It does say that.  I can't tell you where this is housed or formed in order to tell you what the document is or where it exists.

Q.    Well, you produced it.  This is from your production back to us, a supposed Nasserfar personal e-mail?

A.    I don't --

Q.    And it instead consists of credit reports and loan applications, right?

A.    I don't have this documentation to tell where it's from or what its actual documentation shows.

Q.    But you have had it for the last five months, haven't you?

A.    No, sir, I have not.

Q.    You had it on a USB device, correct?

A.    I returned everything off the top of my head.

Q.    Okay.  You've testified that you've met Clark Wilson

A. Actually, as I stated, I closed the loan prior to meeting with him. And it was Blake Outlaw who had also helped in making the introduction along with another person named Chris Easter who is the sales agent.

Q. And --

A. And in doing so, closing that loan prior to, I asked for a meeting with Clark Wilson. After that meeting in August -- I don't remember the exact date. I just remember being hot and drinking coffee was probably not the best idea on that day, that he said, "Hey, man, I will work with you. That's fine."

So at that point, after meeting with Clark Wilson, I was a preferred lender in his eyes. He would start sending me business.

Q. When you had your meeting with Clark Wilson and then started getting business from Clark Wilson, you were at AmeriPro, correct?

A. Not in August of 2011.

Q. When you starting getting actual loan referrals from Mr. Wilson, were you at AmeriPro?

A. For the majority of the time I worked with Clark Wilson, is that your question? I could have received loans before I started AmeriPro from Clark. I don't recall.

Q. You don't recall if you received any loans before you started at AmeriPro, correct?

A.    That was four years ago.  I remember meeting with him, and that's what I recall off the top my head.

MR. BEHRENS:  I'll pass the witness.

THE COURT:  Anything else?

REDIRECT-EXAMINATION

BY MR. BUNDREN:

Q.    Just one point of clarification.

I want to be clear, Mr. Nasserfar.  At Centerra today, are there sales agents that are referring you business today?

MR. BEHRENS:  Objection, leading.

THE WITNESS:  Yes.

THE COURT:  Overruled.

THE WITNESS:  Yes.  At Centerra today, there are sales agents that refer me business.

Q.    (BY MR. BUNDREN)  And did you get referrals of business from those sales agents before you went to work at AmeriPro when you were somewhere else?

MR. BEHRENS:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.  They referred me borrowers prior to that as well.

THE COURT:  Can we find any questions that I haven't heard ten times already, possibly?  This is not the-last-one-who-speaks-wins.  I'm old, but I am not that

We don't want any of their files. We don't want any of their documents. We have tried to give them back three times, and they haven't even looked at them. We don't want them.

The Court has already ordered that Mr. Whitfield is going to provide to Mr. Rector the images. So what we would like to have the Court order is that AmeriPro review those images under AEO, as the Court has ordered, and identify the files that they contend exist on those images and then tell us what those are. And if we can reach agreement, they can have them. If we have some dispute about whether or not a file is their file or our file -- is it a personal file or not, then we can talk about that later. But tell us what files they think -- they are going to have the images. So what they ought to do is to tell us what files they claim are theirs.

If we agree, we can solve that problem and we can go about our business and prepare for trial. I think that's a great solution to solving that.

I don't want to be back in here being threatened again with a motion to show cause for contempt because we missed some file. Let them search the images and find the files they want and tell us, and then if we agree, we don't have a dispute.

All those files will be returned, if they haven't already been returned. So if there is any file still

just wanted to point that out to the Court.

And it says that in the event the contract is construed, it won't be construed against either parties of the drafter of the agreement. And the Supreme Court has gotten away from that any way with the four corners rule.

Instead of a -- this strict, like rigid, we are going to interpret it one -- against one side or the other. They said, "We're going to look at the four corners of the document and look at what the parties' intent was."

That's all I wanted to point out.

Thank you.

THE COURT: Okay. You're welcome. Okay. So the Court will rule as follows. The Court will grant the temporary injunction as follows:

First of all, I have already ordered and -- for Mr. Rector to have access to the forensic images of all of the respondents' devices and also for the respondents to have access to all forensic images of the respondents' computers that were left, the lab tops -- or I guess they were lab tops, or hard drives, of the computers that belong to the applicant.

I am enjoining respondents from using any of the information that was taken from the applicant. My understanding is that right now it -- all of that information is being held by respondents' counsel and it will stay that way as attorneys' eyes only and nothing will be done. If the

parties can agree once everybody has exchanged forensic images as to what belongs to what party, then I will allow you-all to go ahead and return what is the others as you-all see fit.

I am enjoining the respondents from soliciting business from Brohn Homes, from Seaholm -- the Seaholm condo project, and from Wilson Clark Homes; however, I am not enjoining the respondents from soliciting business from Centerra Homes.

The TRO by the respondents is denied without prejudice for the respondents to apply -- you know, have a hearing on a temporary injunction and bring evidence forward and argue it at that time. I have already ordered, but I will make sure that we are clear. Ordering the applicant to remove any reference to Mr. Nasserfar from the michaelnasserfar.com Web site.

MS. BURTON: I'm sorry, Judge, would you say that -- we agree that we would remove all its videos, likenesses, etcetera.

THE COURT: Any -- any reference to him from the Web site. Anything --

MS. BURTON: From the AmeriPro Web site?

THE COURT: Correct.

MR. BEHRENS: Yes.

MS. BURTON: Okay.

THE COURT: Anything else?

MR. BEHRENS: No, Your Honor.

THE COURT: I think as to the TI and I will just say this to maybe move the ball along and maybe prevent there from being a hearing on your TI. I don't think that it's a bad idea that maybe you-all agree to just -- not get rid of the ".com" but just not go anywhere. You know, put a little -- I have had cases where you just put "This Web site is under construction" and it just doesn't go anywhere. If that's something that you-all might want to agree to that might prevent them from coming back on a hearing as to that and then you-all can dispute -- you know, in trials, you know, the merits, who owns it and, you know, contractually whether he left in good standings or who breached the contract first or what happened.

As to the forms that he made at -- you know, you are welcome to come and argue that. I just don't see how any template that he made while he was working there is going to, on a temporary injunction, be given back to him, but, you know, you are welcome to try that.

I will tell you that I am not keeping this case. So you-all can go argue that in front of another judge, and I am not saying it won't be me. Like I told you-all last time, you had a 30 percent chance of getting me and you got me this time, but if you-all want to go ahead and set that for a hearing, you can do that.

Mr. Behrens, I will need you to draft this order and circulate it to Mr. Bundren for his approval. I will remind you-all of the other things that I had already order as to the forensic imaging those were attorneys' eyes only for Graves Dougherty as to personal information. Nothing wrong with sharing it with general counsel as to anything that's, you know, relevant to this litigation or to AmeriPro.

MR. BEHRENS: Yes, Your Honor --

MR. BUNDREN: Your Honor, we need to have a bond, I believe, and I think that bond needs to be significant if my clients are going to be enjoined from essentially working with respect to some of these -- what I will refer to as referral sources, but I understand the Court's ruling. So I think we need to have a pretty significant bond that is established by AmeriPro.

THE COURT: So what bond is it that you are asking?

MR. BUNDREN: Your Honor, I don't -- I haven't thought about that, but I was thinking a bond of couple hundred thousand dollars will probably be sufficient.

THE COURT: Mr. Behrens, what do you think is an appropriate bond?

MR. BEHRENS: One -- there -- no. There is no basis for that amount. For instance, because they have taken our ability to do business with them --

THE COURT: My question was a simple one.

MR. BEHRENS: Okay.

THE COURT: What do you think the appropriate bond should be? At least I thought it was a simple question.

MR. BEHRENS: $5,000, Your Honor.

THE COURT: I am going to set the bond at $10,000.

Anything else that I have not dealt with?

MR. BEHRENS: Yes, Your Honor. This is pure making sure we are in compliance with federal regulations. We went back and did redacted versions of -- that had borrower names on some of the exhibits. I don't think that should be controversial in terms how that would -- affects either side. It just makes sure that -- like, if there is a Mr. Jones, who had a loan, that Mr. Jones' name is not in the public record.

THE COURT: So what is that you are asking me to do?

MR. BEHRENS: I am asking -- Mr. Garcia has some redacted copies of certain exhibits and --

MR. GARCIA: 28, 30 --

MR. BEHRENS: I'm sorry.

MR. GARCIA: -- it's 28, 30, 36 and 37.

MR. BEHRENS: Yes, I'm sorry. It's -- we'd ask that the existing copies of Exhibits 28, 30, 36 and 37 be withdrawn and that the exact same exhibit be submitted in

redacted form that takes out the borrower names. So that if someone goes through the public record, they wouldn't be able to see a borrower and that really is to comply with a federal regulation that says "A list or grouping of borrowers should not be disclosed."

THE COURT: Do you have, Mr. Bundren, any objection to that?

MR. BUNDREN: I don't have any objection to substituting stuff out for redacts.

THE COURT: Okay.

MR. BUNDREN: Potentially that information.

THE COURT: Okay. So as to 28, 30, 36 and 37, if you will provide the redacted version with a signature okaying it from both sides if that is the redacted version, then we will go ahead and substitute it.

Is that going to be a problem?

(Off the record discussion.)

Okay. Let's go ahead and do that now.

MR. BUNDREN: One other question, Your Honor.

THE COURT: Yes, sir.

MR. BUNDREN: One other question on the injunction, Your Honor. The nonsolicitation provisions of this contract only apply for one year from the time they terminate and they expire after one year. While I can't say that I agree with the Court's injunction, I think that the injunction needs

to expire on the anniversary of their termination and that language needs to be in the order.

THE COURT: I think you-all need to get this settled before then. I am going to order you-all to mediation. So you-all can figure that out before the year is done. And I know I don't need to talk to you-all about this, but the language of the temporary injunction is going to be very specific as to what the contract says which is soliciting. You-all can argue about what that means from here till tomorrow. You-all can argue about whether the year was based starting, I guess on the 15th? Is that the date?

MR. BUNDREN: For -- for this --

THE COURT: January 15th. I am assuming that you-all can argue that since they have been not complying with that, but it shouldn't run, but I will let that argument be for another day. So I am not going to -- I am not going to add that language into my temporary injunction, but I am going to order you-all to mediation.

Anything else?

MR. BEHRENS: No, Your Honor.

MR. BUNDREN: Nothing else, Your Honor.

THE COURT: Can you-all take this stuff away from me, please.

Let me make sure so we are good with the exhibits. And actually, we're going to -- I'm going -- these

are the following exhibits that have been withdrawn. We have already substituted 28, 30, 36 and 37. 25 and 26 Applicant's, both are withdrawn. So I don't want those.

As to the respondents, I have got 28, 29, 20 through 25, and 70 through 75, and I am actually going to withdraw 26 as well. Those will all be withdrawn so we wouldn't have any problems with possible confidentiality issues.

Okay. Anything else from me?

You-all are excused.

(End of proceedings at 4:32 p.m.)

ACCEPTED
03-15-00416-CV
7413138
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/16/2015 2:02:25 PM
JEFFREY D. KYLE
CLERK

APPLICANT'S EXHIBIT NO. 2

January 16th 2015

ATTN:
Lora Gray
Tenura Holdings, Inc HR Administrator
8300 N. Mopac Expressway, Suite 200
Austin, TX 78759



I hereby terminate my employment with Ameripro Funding effective January 16th at 8am.

Enclosed:
HCG office - keys, card swipes, pager/charger
APF Stec office - keys and card swipes
APF issued laptop and charger

Thank you for the opportunity to have served many clients lending needs together and wish you well in your future endeavors.

Michael Nasserfar                    1/16/2015
Michael Nasserfar          Date

CONFIDENTIAL

Applicant's
Injunction Hearing
Exhibit 002

APF00000149

APPLICANT'S EXHIBIT NO. 3

January 16, 2015

Attn: Lora Gray

HR Administrator

Tenura Holdings

8300 N MOPAC, Ste. 200

Austin, TX 78759

RE: Resignation Letter

Dear Lora,

I hereby terminate my employment with AmeriPro Funding Inc., effective Friday, January 16, 2015 at 7:30AM CST. Enclosed is the company issued laptop, security pass keys for the Corporate Office and the Hill Country Galleria, and door keys for the same.

Please extend my gratitude and best wishes to all that assisted in my successful tenure at AmeriPro.

Sincerely,

 1/16/15

Michael Task                    Date

**EXHIBIT**
*81*
4-28-15

Applicant's
Injunction Hearing
Exhibit 003

CONFIDENTIAL

APF00000238

APPLICANT'S EXHIBIT NO. 4

1/15/2015

To Whom It May Concern,

Please accept this as my official notification of resignation from my position with AmeriPro Funding as of 1/15/15 at 5Pm. I appreciate the opportunity and all those that had a role in my tenure.

Respectfully,

Ty Gosnay

*Ty Gosnay*

Applicant's
Injunction Hearing
Exhibit 004

APF00028258

APPLICANT'S EXHIBIT NO. 7

# AMERIPRO FUNDING, INC.
# LOAN OFFICER AGREEMENT

This Loan Officer Agreement ("Agreement") is made and entered into this and between AmeriPro Funding, Inc., its subsidiaries, affiliates, successors and/or assigns (together "Company") and Michael H Nassertar ("Employee") (collectively referred to as the "Parties").

## 1. AGREEMENT OF AT-WILL EMPLOYMENT

EXCEPT FOR THE PROVISIONS RELATING TO THE PROTECTION OF COMPANY'S PROPRIETARY INFORMATION, CONFIDENTIALITY AGREEMENT AND NON-SOLICITATION AGREEMENTS WHICH CONTINUE BEYOND THE TERMINATION OF EMPLOYMENT, EITHER PARTY MAY TERMINATE THIS CONTRACT AT ANY TIME WITH OR WITHOUT NOTICE FOR ANY OR NO REASON. THERE IS NO GUARANTEE OF CONTINUED EMPLOYMENT AND THE COMPANY DOES NOT HAVE TERM EMPLOYMENT CONTRACTS, ORAL OR WRITTEN, EXPRESS OR IMPLIED.

## 2. SCOPE OF AUTHORITY

Employee acknowledges that he/she has no right or authority, express or implied, to bind or create any obligation on the part of Company, without the express written consent of an officer of the Company.

## 3. DUTIES

a) Employee shall be employed as a Loan Officer for Company. Employee's primary duties shall be to utilize his/her knowledge, training and experience to solicit, originate, sell and facilitate the processing and closing of loan products and financing of residential real estate transactions on behalf of the Company's customers.

b) Employee acknowledges, he/she does not and will not work more than 40 hours per week, unless additional hours are approved in advance and in writing by his/her Supervisor. These hours do not include lunch breaks or other daily breaks. Any overtime requests will be evaluated based upon the Loan Officer's productivity as only those Loan Officers with sufficient productivity justifying a departure from 40 maximum hours will be considered for approval. Loan Officer's past requests for overtime and evaluation of performance during such periods will, as applicable, be considered in determining whether overtime requests will be approved. Employee must at the end of each week submit a time sheet via the Company's payroll and timekeeping system, ExponentHR, that accurately reflects all hours worked. Failure to do so may result in a delay in payroll. Employee may not, for any reason, falsify a time sheet or submit an inaccurate time sheet as this document is used for payroll purposes

c) Employee understands that it will be his/her responsibility to develop referral sources and originate loans by customarily and regularly engaging with the public outside and away from Company's offices, or Employee's home office. In order to succeed, Employee must spend the vast majority of his/her work hours away from Company's offices or Employee's home office to develop and maintain the necessary contacts in order to ultimately originate loans.

d) Employee agrees to devote Employee's time, attention and energy to the position set forth above subject to the Company's direction and control. During Employee's

I

Applicant's
Injunction Hearing
Exhibit 007

employment with Company, Employee shall not enter into or continue any employment or render any service for compensation or remuneration to any person or entity, except Company, involved in the business of any real estate services related industry including but not limited to, banking, mortgage banking, or mortgage brokerage.

e) Employee will cooperate with periodic on-site audits and examinations to verify his/her compliance with Company's guidelines and operating requirements, and applicable federal, state, and local mortgage lending laws and regulations.

f) As applicable, Employee acknowledges that the duties set forth herein do not reflect any change in the manner of work in which Employee has been engaged for Company, and merely restates the duties, manner, and method of work that has previously existed between the parties since the inception of their employment relationship.

## 4. COMPANY RULES

Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Loan Officer has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

## 5. COMPENSATION TO EMPLOYEE

Company shall pay Employee compensation for services performed under this Agreement, as follows:

a) Base Pay. Company shall pay Employee an hourly wage equivalent to $ 7.25 _____, and overtime pay, if applicable, which shall together be a draw against any commission earned, as set forth below.

b) Subject to the terms and conditions set forth herein, Employee will receive a commission based on the schedule attached hereto as Exhibit A.

c) Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission calculated above. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions, provided that Employee is not and may not be held responsible for negative balances except to the extent that his/her commissions can be reduced. Under no circumstance, and at no time during or after employment, will Employee be

2

**CONFIDENTIAL**

APF00000207

required or expected to re-pay Company beyond and/or except as per the deductions from commission described herein.

d) The Company has an expectation that Employee will fund a minimum of two first lien loans per month or six first lien loans per rolling three month period. If this performance metric is not achieved the Company reserves the right to make appropriate adjustments to the commission schedule or terminate Employee's employment. Company may adjust Employee's commission and hourly wage at any time in Company's sole discretion.

e) It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision.

f) As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations.

g) In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, the Employee hereby agrees to allow the Company to withhold said charges from the Employee's next paycheck.

h) Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 60 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement.

## 6. LICENSURE

Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where s/he is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the National Mortgage Licensing System ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will

3

**CONFIDENTIAL**

**APF00000208**

Employee verifies that he/she does not hold a current and active Real Estate License.

## 7. NO EXISTING RESTRICTIVE COVENANTS
Employee verifies that no non-compete, non-solicitation or confidentiality agreements with any other company, person or entity are binding upon him/her as of the date this Agreement.

## 8. INDEMNIFICATION
To the extent permitted by applicable law or regulation, Employee hereby agrees to indemnify, hold harmless and defend Company, for any and all attorneys' fees, costs of settlement, judgments, or damages incurred by the Company as a result of any violation by Employee of any term or obligation under this Agreement.

## 9. RETURN OF RECORDS AND PAPERS
Employee agrees upon the cessation of his/her employment with Company for any reason whatsoever, to return to the President of Company, all Company equipment, including but not limited to computers or cell phones, and all records, copies of records, computer records, and papers and copies thereof, pertaining to any and all transactions handled by Employee while associated with Company.

## 10. DEATH/DISABILITY BENEFIT
In the event Employee dies and/or becomes disabled such that Employee cannot physically perform any gainful employment for a period of at least 180 days, Employee (and/or the Estate, as applicable) shall be entitled to payout of all loans in his/her pipeline upon the close of such loans, as if Employee supervised such loans to completion. Employee acknowledges that this benefit is in exchange for the execution of this Agreement and acceptance of the restrictive covenants set forth herein.

## 11. PIPELINES
Employee further acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

## 12. ALTERNATIVE DISPUTE RESOLUTION
The Parties agree that in the event of any dispute arising between them that arises out of the employment relationship and/or this Agreement, prior to initiating any charge, lawsuit, proceeding, or complaint with any administrative agency or court, the Party intending to

4

**CONFIDENTIAL**

**APF00000209**

initiate such a claim or proceeding, will at least ten (10) days prior to doing so, provide the other Party with a specific demand for monetary relief, as well as a calculation explaining the basis for said monetary demand, as well as a short and plain statement of the grounds upon which such demand is sought. Notwithstanding the foregoing, this provision does not prohibit a Party from immediately seeking injunctive relief limited to preventing irreparable harm.

## 13. SEVERABILITY

The Parties agree that to the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unreasonable, unlawful or unenforceable by a court of competent jurisdiction, then any such provision or portion thereof shall be deemed to be modified or redacted to the extent necessary in order that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by applicable law, and that it will not affect any other portion, or provision of this Agreement, and the Parties hereto do further agree that any court of competent jurisdiction shall, and the Parties hereto do hereby expressly authorize, request and empower any court of competent jurisdiction to enforce this Agreement, and any such provision or portion thereof to the fullest extent permitted by applicable law.

## 14. LEGAL FEES

Employee further agrees that Company shall be entitled to recover from Employee all legal fees and expenses Company incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

## 15. UNDERSTANDING OF PARTIES

This Agreement, in addition to the Proprietary Information, Confidentiality Agreement and Non-Disclosure Agreement, represents the entire agreement between the Parties and supersedes any and all prior agreements or understandings, oral or written between Employee and AmeriPro Funding. It is further agreed that this Agreement shall remain in full force and effect until superseded in writing, signed by all Parties. In the event of a company name change, this Agreement will continue to be fully enforceable.

## 16. VOLUNTARY AGREEMENT

Employee acknowledges that he/she has been given sufficient time and opportunity to review, consider, and obtain advice in connection with the execution of this Agreement, and that Employee has not been forced to sign this Agreement under duress.

## 17. CONSTRUCTION

This Agreement shall be governed and interpreted according to the laws of the State of Texas.

## 18. FORUM

The Parties agree that should any dispute arise out of the interpretation or operation of this Agreement, such matters shall be litigated in the United States District Court in Texas, or in the event subject-matter jurisdiction is lacking, in a Texas State Court of competent jurisdiction. Accordingly, by execution of this Agreement, the parties are consenting to personal jurisdiction in Texas limited to the operation or interpretation of this Agreement.

5

APF00000210

## 19. NON-WAIVER

A waiver or inaction by either Party of a breach of any provision of this Agreement shall not operate nor be construed as a waiver by either Party of any subsequent breach of the Agreement.

## 20. FULL AND COMPLETE AGREEMENT

This Agreement sets forth the entire understanding and agreement of the Parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof. No prior negotiations or drafts of this Agreement shall be used by either Party to construe the terms or to challenge the validity hereof. This Agreement may not be modified except in writing between all Parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein.

Voluntarily agreed to and executed this day of _____ , 20___:

_____
Employee

Michael H Nasserfar
_____
Print Name

**Accepted:**

AmeriPro Funding, Inc.

By:_____

6

**CONFIDENTIAL**

APF00000211

## EXHIBIT A

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion.

### Commission Schedule

**Effective for all loans locked on or after**    11/01/2011

| Unit range | | Applicable Comm Split | Commission Schedule | | |
|---|---|---|---|---|---|
| | | | BPS | Min $/unit | Max $/unit |
| | | | | | |
| 0 | 6 | 60.0% | 1.08% | $ 810 | $ 2,700 |
| 7 | 12 | 70.0% | 1.26% | $ 945 | $ 3,150 |
| 13 | - | 75.0% | 1.35% | $ 1,013 | $ 3,375 |

For your first 6 months of employment, you are guaranteed a minimum compensation of $5k per month. Any commissions would be in addition to this minimum compensation. However, should the commission payment exceed $7k in a month, the Company will be repaid its guaranty prior to further commissions being paid. Ex: $8k in commissions, $4k base, $12k commissions, $0 base, etc.

### Commission Pay Schedule

Semi-monthly: Commissions are paid on a semi-monthly basis. All loans that fund from the first through the 15th of the month will be paid on the last day of the month. All loans that fund from the 16th to the end of the month are paid on the 15th of the following month.


_____
Employee Signature

Michael H Nasserfar
_____
Employee Name


Date: ___1/5/12_____

_____
Branch Manager Signature

Chad Overhauser
_____
Branch Manager Name


Date: ___1/5/2012_____


**Accepted:**

AmeriPro Funding, Inc.

By: _____    Date: ___1/5/2012_____

7

## EXHIBIT B

**Loan Officer Disclosures**

*I hereby certify the following:*

I am a licensed real estate agent and hold a real estate sales license ☐Y ☑N

I have a current and valid originator license with the NMLS ☑Y ☐N


_____Loan Officer Signature

Michael H Nasserfar
_____Loan Officer Name


Date: _____1/5/12____

8

**CONFIDENTIAL**

**APF00000213**

APPLICANT'S EXHIBIT NO. 8

# PROPRIETARY INFORMATION AGREEMENT

The following confirms and memorializes the agreement ("Agreement") that Tenura Holdings, Inc. and/or any of its operating subsidiaries - AmeriPro Funding, AmeriFirst Insurance Agency, LLC, Private Label Realty, 1% Realty, Reliant Title and Global Home USA (the COMPANY) and I, _Michael Nasserfar_ ("Employee"), have concerning my employment with the Company in any capacity, and that is a material part of the consideration for my employment by the Company.

I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement of my employment with the Company. I will not violate any agreement with or rights of any third party or, except as expressly authorized by the Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment or otherwise on behalf of the Company. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

I agree that all business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term on my employment that relate to the Company or the business or demonstrably anticipated business of the Company or that are received by or for the Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, be obligated under this paragraph with respect to information I can document is or becomes readily publicly available with out restriction through no fault of mine. Upon termination of my employment, I will promptly return to the Company all items containing or embodying Proprietary Information (Including all copies), except that I may keep my personal copies of (I) my compensation records, and (II) this Agreement.

I agree that this Agreement is not an employment contract for any particular term and that I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. In addition, this Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of the Company, I have obligations to Company which are not set forth in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of the Company.

I agree that my obligations under paragraph 2 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraph 2 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

Any dispute in the meaning, effect or validity of the Agreement shall be resolved in accordance with the laws of the State of Texas without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable Texas law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. I also understand that any breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy, and thereof the Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

I HAVE READ THIS AGREEMENT CAREFULL AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND

Applicant's
Injunction Hearing
Exhibit 008

CONFIDENTIAL

APF00000220

FREELY, INDUPLICATE, WITH THE UNDERSTANDING THAT THE CORPORATION WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.

Dated this the 18th day of October, 2011.

_(signature)_
Employee Signature

Michael Nasserfar
Printed Name

Accepted and Agreed to:

Tenura Holdings, Inc.

_(signature)_

Kevin L. Klein
President

---

# CONFIDENTIALITY AGREEMENT

As part of my job responsibility with the Company I will become aware of personal, financial and business information related to the Company's clients and proprietary information related to business strategies, financial information and operations of the Company

During my employment at the company and the event of my termination for any reason whatsoever, I agree that I will not disclose and/or disseminate to any person, firm, or corporation or make personal use of any Confidential Information of the corporation and its clients.

Furthermore, in the event of my termination for any reason whatsoever, I hereby acknowledge that all clients of the Company and agree not to call, visit, or have any further contact in any form whatsoever with any of the clients. I recognize that if this agreement is violated in any way I am subject to legal action by the Company.

_(signature)_
Employee Signature

Michael Nasserfar
Printed Name

10/18/11
Date

_(signature)_

_(signature)_
Management Signature

_(signature)_
Printed Name

Date

**CONFIDENTIAL**

APF00000221

# NON-DISCLOSURE AGREEMENT

In connection with a proposed business relationship, the Company has allowed you (the individual or entity named below) access or may allow you access to business, technical or other information materials and/or ideas. ("Proprietary Information," which term shall include, without limitation, anything you learn or discover as a result of exposure to or analysis of any Proprietary Information).

In consideration if any disclosure and any negotiations concerning the proposed business relationship, you agree as follows:

1. You will hold in confidence and not possess or use (except to evaluate within the U.S.) the proposed business relationship or disclose any Proprietary Information, except information you can document: (a) is in the public domain through no fault of yours, (b) was properly disclosed to you by another person without restriction. You will not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Proprietary Information.

2. If you decide not to proceed with the proposed business relationship or if asked by the Company, you will promptly return all Proprietary Information and all copies, extract and other objects or items in which it may be contained or embodied.

3. You will promptly notify the Company of any unauthorized release or use of Proprietary Information.

4. You understand that this Agreement does not obligate the Company to disclose any information or negotiate or enter into any agreement or relationship. You will strictly abide by any and all instructions or restrictions provided by Company from time to time with respect to Proprietary Information of Company systems.

5. The terms of this Agreement will remain in effect with respect to any particular exceptions stated in Paragraph 1 above.

6. You acknowledge and agree that due to the unique nature of the Proprietary Information any breach of this agreement would cause irreparable harm to the Company. Damages are not an adequate remedy and the Company shall therefore be entitled to equitable relief in addition to all other remedies available at law.

7. Until one year after the later of the date of this Agreement or the last disclosure of Proprietary Information to you, you will not encourage or solicit any employee or consultant of the Company to leave the Company for any reason.

8. This Agreement is personal to you, is non-assignable by you, is governed by the Internal laws of the State of Texas and may be modified or waived only in writing. If any provision is found to be unenforceable, such provision will be limited or deleted to the minimum extent necessary so that the remaining terms remain in full force and effect. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover attorney's fees and costs.

9. Company's place of residence is 8300 N. Mopac, Suite 225, Austin, TX 78759.

Acknowledged and agreed on:

_____10/18/11_____
Date

_____M. ʃ~_____
Employee Signature

_____Michael Nassarfar_____
Printed Name

**CONFIDENTIAL**

APF00000222

APPLICANT'S EXHIBIT NO. 9



## EMPLOYMENT AGREEMENT
### Sales Team Manager

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of December 1, 2012 (the "Effective Date") by and between AmeriPro Funding, Inc., a Texas corporation (the "Company"), and Michael H. Nasserfar, an individual resident of the State of Texas (the "Employee").

### RECITALS:

A.      The Employee has experience in the business of residential mortgage lending (the "Business").

B.      The Company desires that the Employee serve as Sales Team Manager for the Company's team designated as 152015 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.      The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.      ACKNOWLEDGEMENTS

(a)      Effective April 1, 2011, Employee acknowledges that new compensation laws passed by the United States Federal Reserve prohibit Nasserfar from being paid based upon the profitability of Company and/or Team 152015 if Nasserfar originates any loans. _AAN_ Initial

(b)      The damages for violating these rules are 3 times the compensation paid, and may result in limitless rescission periods and liabilities for repurchase. _AAN_ Initial

(c)      In addition, laws pertaining to the origination of loans, if violated, could give rise to claims against the Company for unlawful steering. _AAN_ Initial  As defined herein, origination includes gaining, arranging, negotiating, or otherwise obtaining or assisting in obtaining an extension of consumer credit for another person. Employee agrees to take no action that could reasonable be considered to amount to origination as defined herein. _AAN_ Initial

2.      Position

(a)      At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

(b)      Position. Employee shall serve as the Sales Team Manager for the Company's team designated as 152015, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) remaining familiar with and ensuring that all loans originated by the Team are handled in accordance with the Company's policies,

Employment Agreement - Page 1

December 1, 2012

Applicant's Injunction Hearing Exhibit 009

CONFIDENTIAL

APF00000180

guidelines, quality control, applicable federal, state, and local laws, and investor guidelines; (ii) ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Company's discretion; (iii) informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Team operations; (iv) informing Company of all expenses on a timely basis in order to ensure prompt payment thereof and adhering to the Company's accountable expense reimbursement plan; (v) forwarding all fees, checks, deposits, etc. in the possession of Manager to Company's Corporate Headquarters in a timely manner; (vi) ensuring that all closed loan documents are stored in Company's document storage system and accessible to Company upon demand; (vii) hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Team profit and minimize risk; (viii) ensuring that all persons performing any services for the Company through the Team are Company employees, properly licensed and registered, as applicable, and are approved to start by Company and, as applicable approved by the Company to originate loans; (ix) ensuring that all employee activity including but not limited to hiring, firing, position change, pay changes, leaves of absence, etc., takes place in accordance with policy, practice, and appropriate corporate level pre-approval; (x) ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules; (xi) ensuring that all websites or other social media used by the Team or any Team Employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public; (xii) ensuring that any and all email communications on behalf of Company shall be sent from and directed through corporate email. Private email is not to be used for any official Company business; (xiii) ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan; (xiv) ensuring that all employees are performing duties consistent with their classification (i.e. exempt/non-exempt) and that the Company is advised of any inconsistencies respecting duties and classification; and (xv) ensuring that all timekeeping policies are followed and records maintained.

(c)     Notwithstanding any provision of this Agreement to the contrary, without the prior written consent of Company, Manager is not authorized on behalf of Company to (i) sell, lease, trade, exchange or otherwise dispose of any capital asset of the Company; (ii) grant a security interest in, hypothecate or otherwise encumber any asset of Company; (iii) incur any debt, sign any lease, or borrow money in the name of or on behalf of the Company;(iv) confess a judgment against the Company or settle or compromise in any manner any legal action, claim or litigation in the name of the Company brought by or against the Company, nor may Employee take any action in furtherance of any attempt to accomplish such actions without the Company's prior knowledge and consent; (v) implement material changes to the operation of the Team; (vi) open any bank, savings, credit, or investment account in the name of Company or any DBA, parent, subsidiary or affiliate thereof; (vii) deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Company; (viii) acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing; (ix) accept any funds or wire transfers intended or for the benefit or on behalf of the Company; (x) conduct any Realtor activities or hold an active Realtor license during the period of employment or permit or allow other loan officers of the Company to engage in such activities; (xi) pay any expenses for the team out of any personal funds, or pay or promise payment to any person for services associated with the origination or processing of loans, who is not an approved employee of the Company; (xii) issue or allow others to issue a commitment of financing without proper prior underwriting approval; (xiii) waive any commitment fees or fees for appraisals, credit reports, title policies, flood certifications or surveys; (xiv) undertake any financing or origination of loans in contravention of company policies, including but not limited to straw financing,

**CONFIDENTIAL**

**APF00000181**

flip financing, or the transfer of loans from or to Company without proper approval; (xv) deviate from approved compensation plans for any loan officers or other employees; (xvi) encourage or permit loan officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that the borrower is able to repay the loan; (xvii) encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture; (xviii) use the Company's name except in furtherance of his/her duties on behalf of the Company; (xix) supply Company information or comment to the media without express approval. Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement, Manager shall cease using the Company's name or any semblance thereof.

(d)  Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook and Company Loan Officer Compensation & Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Loan Officer has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

3.  Compensation.

(a)  Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule. The Employee will also be eligible to receive bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be schedule by mutual agreement of the Company and Employee.

4.  Representations.

(a)  The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b)  The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

December 1, 2012

**CONFIDENTIAL**

**APF00000182**

5.     <u>Assignment; Binding Agreement.</u> This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

6.     <u>Confidentiality; Ownership of Works.</u>

(a)     The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b)     The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "**Confidential Information**"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this <u>Section 6</u> may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

(c)     For purposes of this <u>Section 6</u>, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d)     During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

**CONFIDENTIAL**

**APF00000183**

(e)     For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)     solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii)     solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii)     recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv)     otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 6(e)(i) and 6(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f)     Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

(h)     The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site,

CONFIDENTIAL

APF00000184

including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

        (i)    The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 6 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

        (j)    The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

        (k)    If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 6 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 6 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

    7.    Non-Disparagement. The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

    8.    Indemnification. Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 4(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

    9.    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

**CONFIDENTIAL**                                  **APF00000185**

If to Company:
AmeriPro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759


If to the Employee:
Michael H. Nasserfar
4109 Hookbilled Kite
Austin, Texas 78738-6571


10. **Entire Agreement.** This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, he/she does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

11. **Waivers and Amendments.** This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

12. **Governing Law.** This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof.

13. **Submission to Jurisdiction; Consent to Service of Process.** Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

14. **Assignment.** This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale of all or substantially all of the Company's assets, without the Employee's

Employment Agreement - Page 7

December 1, 2012

**CONFIDENTIAL**

**APF00000186**

consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

15. <u>Withholding</u>. All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

16. <u>Facsimile Execution and Delivery</u>. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

17. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

18. <u>Severability</u>. If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

19. <u>Interpretation</u>. The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

*[signature page follows]*

**CONFIDENTIAL**

APF00000187

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
Chad Overhauser, President

EMPLOYEE:

_____
Michael H. Nasserfar

CONFIDENTIAL

APF00000188

## EXHIBIT A

### Revenue Bonus Schedule
### Sales Team Manager, Texas

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion. Any changes must be made in writing and will apply to customers that have not already completed a loan application, as defined by the Company. Any such loan that does not fund within 30 days of a compensation change will be subject to the new compensation plan.

1) A percentage of revenue for the team (as defined below) less the cost of compensation paid to team staff members, and other allowable costs as listed below. Team Revenue to be split as follows:

   - Michael Nasserfar    50%    _AN_ Initial
   - Michael Task    50%    _UT_ Initial

| Monthly Team Revenue | Bonus Eligibility |
|---|---|
| $0-$20,000 | 60% |
| $20,001 – 49,999 | 70% |
| $50,000+ | 75% |

Team Costs – Effective June 1, 2013
   - Commissions paid to Loan Officer(s) assigned to Team 152015
   - $5,000 per month for Marketing Sales Agreement with Centerra Homes
   - $4,000 per month for administrative fees
   - $4,416 per month for other staff compensation
   - $90 per file

*Team Revenue* – defined as the sum of Origination, Discount, LO Comp Plan, Net Buy Price, All Lender Credits, Escrow Waiver, and Lock Extension Fee. Please note Lender Credits are typically negative.

## Bonus Pay Schedule
Semi-monthly: Bonuses are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*
-Loans where AmeriPro Funding, Inc. is the creditor: funding date
-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

## Guidelines
a) Employee is eligible to participate in Corporate sponsored incentive programs, such as the Secondary Marketing Incentive.

   __X__ Yes _____ No

Employment Agreement – Exhibit

December 1, 2012

**CONFIDENTIAL**

APF00000189

Sales Team Manager authorizes approved incentives to be distributed as follows:

| Team Member | Secondary Marketing Bonus | Incentive Unit Awards as % of Team Award |
|---|---|---|
| Michael Nasserfar | 50% | 50% |
| Michael Task | 50% | 50% |
| Gladys (Fay) Strange | N/A | N/A |

- Michael Nasserfar _____ Initial
- Michael Task _____ Initial


_____
Michael H. Nasserfar

_____ 11/30/12 _____
Date


Employment Agreement – Exhibit

December 1, 2012

**CONFIDENTIAL**

**APF00000190**

APPLICANT'S EXHIBIT NO. 10



EXHIBIT
5
4-24-15 kv

## EMPLOYMENT AGREEMENT
### Sales Manager

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of November 1, 2013, (the "Effective Date") by and between Ameripro Funding, Inc., a Texas corporation (the "Company"), and Michael H. Nasserfar, an individual resident of the State of Texas (the "Employee").

### RECITALS:

A.  The Employee has experience in the business of residential mortgage lending (the "Business").

B.  The Company desires that the Employee serve as Sales Manager for the Company's branch designated as Branch #152010 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.  The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.  Position

    (a)  At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

    (b)  Position. Employee shall serve as the Sales Manager for the Company's branch designated as Branch #152010, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) manages small group of Retail Loan Officers and Production Assistants to meet goals as defined by AmeriPro Funding Management team; (ii) ensure staff receives proper training to achieve goals; (iii) understand real estate appraisals, title reports and real estate transactions; (v) marketing and sales strategies for new and existing referral sources; (iv) represent AmeriPro Funding at appropriate conventions and conferences to promote the companies value proposition and reinforce relationships with key customers; (vi) keep informed on market and competitor developments; (vii) comply with all disclosure requirements and timeframes.

    (c)  Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook and Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Employee has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

November 1, 2013

Applicant's
Injunction Hearing
Exhibit 010

CONFIDENTIAL

APF00000166

(d)     Licensure. Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

2.     Compensation.

(a)     Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule, which will be a draw against commissions and other compensation earned as set forth below. The Employee will also be eligible to receive commissions/bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions. It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision. As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations. In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A. Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 30 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be scheduled by mutual agreement of the Company and Employee.

Employment Agreement - Page 2                    November 1, 2013

CONFIDENTIAL

APF00000167

3. Representations.

(a) The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b) The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

4. Assignment; Binding Agreement. This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

5. Confidentiality; Ownership of Works.

(a) The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b) The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "**Confidential Information**"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 5 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

(c) For purposes of this Section 5, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d) During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall

CONFIDENTIAL

APF00000168

promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

(e) For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i) solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii) solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii) recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv) otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f) Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g) The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

CONFIDENTIAL

APF00000169

(h)    The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i)    The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 5 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j)    The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k)    If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 5 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 5 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

6.    Non-Disparagement.    The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

7.    Indemnification.    Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 3(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

8.    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

Employment Agreement - Page 5                                        November 1, 2013

**CONFIDENTIAL**                                        **APF00000170**

If to Company:
Ameripro Funding, Inc.
Attn: Lora Gray
8300 N. McPac Expressway, Suite 120
Austin, Texas 78759

If to the Employee:
Michael H. Nasserfar
4109 Hookbilled Kite
Austin, Texas 78738

9.    Entire Agreement. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, s/he does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

10.    Waivers and Amendments. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11.    Governing Law. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

12.    Submission to Jurisdiction; Consent to Service of Process. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

13.    Assignment. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale

CONFIDENTIAL                                        APF00000171

of all or substantially all of the Company's assets, without the Employee's consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

14.     Withholding.  All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

15.     Facsimile Execution and Delivery. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

16.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

17.     Severability.  If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

18.     Interpretation.  The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

CONFIDENTIAL

APF00000172

19.    Effective Date. After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.
a Texas corporation

By: _____
Larry Crisp, Regional Sales Manager – TX, OK

EMPLOYEE:

_____
Michael H. Nasserfar

Employment Agreement - Page 8                                   November 1, 2013

**CONFIDENTIAL**

APF00000173

## EXHIBIT A

### Commission & Bonus Schedule
### Sales Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation-** Allocable Revenues for the entire Nasserfar & Task Team (152015) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

   Effective for all loans funded on or after: <u>November 1, 2013</u>

   | Loan Volume | Basis Points |
   |---|---|
   | $0 - $1,437,473 | 0 |
   | $1,437,474 - $2,874,944 | 21.7 |
   | $2,874,945 - $5M | 53 |
   | $5,000,001 - $7.5M | 65 |
   | $7.5M - $10M | 71 |

2) **Commission/Bonus Pay Schedule**

   Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

   *Payroll Eligibility Date:*
   -Loans where AmeriPro Funding, Inc. is the creditor: funding date
   -Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

3) **Guidelines**
   a) Should the Nasserfar & Task Team (152015) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i. 70% to Michael H. Nasserfar
      ii. 30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__ Yes _____ No

*[signature page follows]*

**CONFIDENTIAL**

**APF00000174**

## EXHIBIT B

**Production Manager Disclosures**

*I hereby certify the following:*

I am a licensed real estate agent and hold a real estate sales license ✓ Y ___ N

I have a current and valid originator license with the NMLS ✓ Y ___ N


_____
Employee Signature

Michael Nasserfar
Employee Name

Date: 11/26/13

**CONFIDENTIAL**

**APF00000175**

_____  
Employee Signature

_____  
Branch Manager Signature

Michael Nasserfar  
Employee Name

Thomas R. Therrell  
Branch Manager Name

Date: 11/18/13

Date: 11-18-13

Accepted: AmeriPro Funding, Inc.

By: _____

Date: 1-15-13

Employment Agreement—Exhibit

November 1, 2013

**CONFIDENTIAL**

<u>EXHIBIT A</u>

Commission & Bonus Schedule
Sales Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation-** Allocable Revenues for the entire Nasserfar & Task Team (152015) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

<u>Effective for all loans funded on or after: November 1, 2013</u>

| Loan Volume | Basis Points |
|---|---|
| $0 - $1,437,473 | 0 |
| $1,437,474 - $2,874,944 | 21, 7  M.N. |
| $2,874,945 - $5M | 53 |
| $5,000,001 - $7.5M | 65 |
| $7.5M - $10M | 71 |

2) **Commission/Bonus Pay Schedule**
Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*
-Loans where AmeriPro Funding, Inc. is the creditor: funding date
-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

3) **Guidelines**
a) Should the Nasserfar & Task Team (152015) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
    i.   70% to Michael H. Nasserfar
    ii.  30% to Michael E. Task

b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

__X__Yes _____No

*[signature page follows]*

**CONFIDENTIAL**

_____
Employee Signature

_____
Branch Manager Signature

_____
Employee Name

_____
Branch Manager Name

Date: ___11/18/13___

Date: ___11-18-13___

Accepted: AmeriPro Funding, Inc.

By: _____ Date: ___11-18-13___

Employment Agreement– Exhibit

November 1, 2013

**CONFIDENTIAL**

**APF00000178**

APPLICANT'S EXHIBIT NO. 11



EXHIBIT

6

4-24-15 KW

# EMPLOYMENT AGREEMENT
Producing Branch Manager – Commission Off-Set

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of January 1, 2014, (the "Effective Date") by and between Ameripro Funding, Inc., a Texas corporation (the "Company"), and Michael H. Nasserfar, an individual resident of the State of Texas (the "Employee").

## RECITALS:

A.     The Employee has experience in the business of residential mortgage lending (the "Business").

B.     The Company desires that the Employee serve as Producing Branch Manager for the Company's branch designated as Branch #152180 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.     The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.     Position

(a)     At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

(b)     Position. Employee shall serve as the Producing Branch Manager for the Company's branch designated as Branch #152180, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) remaining familiar with and ensuring that all loans originated by the Branch are handled in accordance with the Company's policies, guidelines, quality control, applicable federal, state, and local laws, and investor guidelines; (ii) ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Company's discretion; (iii) informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Branch operations;     (iv) informing Company of all expenses on a timely basis in order to ensure prompt payment thereof and adhering to the Company's accountable expense reimbursement plan ; (v) forwarding all fees, checks, deposits, etc. in the possession of Manager to Company's Corporate Headquarters in a timely manner; (vi) ensuring that all closed loan documents are stored in Company's document storage system and accessible to Company upon demand; (vii) hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Branch profit and minimize risk; (viii) ensuring that all persons performing any services for the Company through the Branch are Company employees, properly licensed and registered, as applicable, and are approved to start by Company and, as applicable approved by the Company to originate loans; (ix) ensuring that all employee activity including but not limited to hiring, firing, position change, pay changes, leaves of absence, etc., takes place in accordance with policy, practice, and appropriate corporate level pre-approval; (x) ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules; (xi) ensuring that all websites or other social media used by the Branch or any Branch

January 1, 2014

Applicant's Injunction Hearing Exhibit 011

CONFIDENTIAL     APF00000152

Employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public; (xii) ensuring that any and all email communications on behalf of Company shall be sent from and directed through corporate email. Private email is not to be used for any official Company business; (xiii) ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan; (xiv) ensuring that all employees are performing duties consistent with their classification (i.e. exempt/nonexempt) and that the Company is advised of any inconsistencies respecting duties and classification; and (xv) ensuring that all timekeeping policies are followed and records maintained; (xvi) ensuring all up-to-date local, state, and federally required employment posters are prominently displayed in a common area accessible by all employees; (xvii) ensuring all required HUD, state, federal, and Agency licenses/certifications are displayed in the branch lobby as prescribed by law; (xviii) ensuring there are signs displaying the branch name at all entry points and the hours of operation must be posted per state law; (xix) ensuring the office must be for the sole use of the Company and may not share space/signage with any other business; (xx) ensuring all phone and fax lines must be listed in the name of the Company and the branch (AmeriPro Funding, Inc., Branch #) and must be answered and displayed accordingly; and (xxi) ensuring there is always a staff of at least two employees and be open during normal business hours. All branches are subject to an annual onsite inspection, with or without notice, to ensure compliance with all applicable regulations.

(c)    Notwithstanding any provision of this Agreement to the contrary, without the prior written consent of Company, Manager is not authorized on behalf of Company to (i) sell, lease, trade, exchange or otherwise dispose of any capital asset of the Company; (ii) grant a security interest in, hypothecate or otherwise encumber any asset of Company; (iii) incur any debt, sign any lease, or borrow money in the name of or on behalf of the Company;(iv) confess a judgment against the Company or settle or compromise in any manner any legal action, claim or litigation in the name of the Company brought by or against the Company, nor may Employee take any action in furtherance of any attempt to accomplish such actions without the Company's prior knowledge and consent; (v) implement material changes to the operation of the Branch; (vi) open any bank, savings, credit, or investment account in the name of Company or any DBA, parent, subsidiary or affiliate thereof; (vii) deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Company; (viii) acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing; (ix) accept any funds or wire transfers intended or for the benefit or on behalf of the Company; (x) conduct any Realtor activities or hold an active Realtor license during the period of employment or permit or allow other loan officers of the Company to engage in such activities; (xi) pay any expenses for the branch out of any personal funds, or pay or promise payment to any person for services associated with the origination or processing of loans, who is not an approved employee of the Company; (xii) issue or allow others to issue a commitment of financing without proper prior underwriting approval; (xiii) waive any commitment fees or fees for appraisals, credit reports, title policies, flood certifications or surveys; (xiv) undertake any financing or origination of loans in contravention of company policies, including but not limited to straw financing, flip financing, or the transfer of loans from or to Company without proper approval; (xv) deviate from approved compensation plans for any loan officers or other employees; (xvi) encourage or permit loan officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that the borrower is able to repay the loan; (xvii)    encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture; (xviii) use the Company's name except in furtherance of his/her duties on behalf of the Company; (xix) supply Company information or comment to the media without express approval. Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement, Manager shall cease using the Company's name or any semblance thereof.

(d)    Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating

Employment Agreement - Page 2                                    January 1, 2014

CONFIDENTIAL                                    APF00000153

Subsidiaries Employee Handbook and Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Employee has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

(e) _Licensure._ Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.
b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

2. _Compensation._

(a) Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule, which will be a draw against commissions and other compensation earned as set forth below. The Employee will also be eligible to receive commissions/bonuses in accordance with _Exhibit A_ attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions. It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision. As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations. In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A. Employee agrees that in the event he/she believes there is any error in

**CONFIDENTIAL**                                                              APF00000154

connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 30 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be scheduled by mutual agreement of the Company and Employee.

3.    Representations.

(a)    The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b)    The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

4.    Assignment; Binding Agreement.  This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

5.    Confidentiality; Ownership of Works.

(a)    The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b)    The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company; the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "Confidential Information"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 5 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

CONFIDENTIAL                                                                                          APF00000155

(c)     For purposes of this Section 5, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d)     During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

(e)     For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)     solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii)     solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii)     recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv)     otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f)     Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours

**CONFIDENTIAL**                                                    **APF00000156**

or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

(h)     The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal-website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i)     The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 5 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j)     The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k)     If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 5 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 5 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

6.     Non-Disparagement.  The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

CONFIDENTIAL

APF00000157

7.      Indemnification. Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 3(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

8.      Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Company:
Ameripro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759

If to the Employee:
Michael H. Nasserfar
4109 Hookbilled Kite
Austin, TX 78738-6571

9.      Entire Agreement. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, s/he does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

10.      Waivers and Amendments. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11.      Governing Law. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

12.      Submission to Jurisdiction; Consent to Service of Process. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas

Employment Agreement - Page 7                                        January 1, 2014

**CONFIDENTIAL**                                        **APF00000158**

and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

13. Assignment. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale of all or substantially all of the Company's assets, without the Employee's consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

14. Withholding. All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

15. Facsimile Execution and Delivery. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

16. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

17. Severability. If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

18. Interpretation. The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in

**CONFIDENTIAL**

**APF00000159**

the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

19. Effective Date. After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
Larry Crisp, Regional Sales Manager – TX, OK

EMPLOYEE:

_____
Michael H. Nasserfar

**CONFIDENTIAL**

APF00000160

## EXHIBIT A

### Commission & Bonus Schedule
### Producing Branch Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation** – Allocable Revenues for the entire Lakeway Branch (152180) (BPS x volume from commission schedule below) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

**Effective for all loans funded on or after:** __January 1, 2014__

| Loan Volume | Basis Points |
|---|---|
| $0 - $1,437,473 | 0 |
| $1,437,474 - $2,874,944 | 21.7 |
| $2,874,945 - $5M | 53 |
| $5,000,001 - $7.5M | 65 |
| $7.5M - $10M | 71 |

The above mentioned commission schedule:
-does not apply to any loan that contains borrower paid compensation
-applies only to first lien closed end forward transactions unless otherwise approved by the Company in writing

*Commission Pay Schedule*:
Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*
-Loans where AmeriPro Funding, Inc. is the creditor: funding date
-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

**CONFIDENTIAL**

**APF00000161**

2) <u>Guidelines</u>
   a) Should the Lakeway Branch (152180) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i.   70% to Michael H. Nasserfar
      ii.  30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__Yes _____No


_____
Michael H. Nasserfar

Date: ___2/27/14___

**CONFIDENTIAL**

**APF00000162**

APPLICANT'S EXHIBIT NO. 13

## AMERIPRO FUNDING, INC.
## LOAN OFFICER AGREEMENT

This Loan Officer Agreement ("Agreement") is made and entered into by and between AmeriPro Funding, Inc., its subsidiaries, affiliates, successors and/or assigns (together "Company") and Michael Task ("Employee") (collectively referred to as the "Parties").

### 1. AGREEMENT OF AT-WILL EMPLOYMENT
EXCEPT FOR THE PROVISIONS RELATING TO THE PROTECTION OF COMPANY'S PROPRIETARY INFORMATION, CONFIDENTIALITY AGREEMENT AND NON-SOLICITATIONAGREEMENTS WHICH CONTINUE BEYOND THE TERMINATION OF EMPLOYMENT, EITHER PARTY MAY TERMINATE THIS CONTRACT AT ANY TIME WITH OR WITHOUT NOTICE FOR ANY OR NO REASON. THERE IS NO GUARANTEE OF CONTINUED EMPLOYMENT AND THE COMPANY DOES NOT HAVE TERM EMPLOYMENT CONTRACTS, ORAL OR WRITTEN, EXPRESS OR IMPLIED.

### 2. SCOPE OF AUTHORITY
Employee acknowledges that he/she has no right or authority, express or implied, to bind or create any obligation on the part of Company, without the express written consent of an officer of the Company.

### 3. DUTIES
a) Employee shall be employed as a Loan Officer for Company. Employee's primary duties shall be to utilize his/her knowledge, training and experience to solicit, originate, sell and facilitate the processing and closing of loan products and financing of residential real estate transactions on behalf of the Company's customers.

b) Employee acknowledges, he/she does not and will not work more than 40 hours per week, unless additional hours are approved in advance and in writing by his/her Supervisor. These hours do not include lunch breaks or other daily breaks. Any overtime requests will be evaluated based upon the Loan Officer's productivity as only those Loan Officers with sufficient productivity justifying a departure from 40 maximum hours will be considered for approval. Loan Officer's past requests for overtime and evaluation of performance during such periods will, as applicable, be considered in determining whether overtime requests will be approved. Employee must at the end of each week submit a time sheet via the Company's payroll and timekeeping system, ExponentHR, that accurately reflects all hours worked. Failure to do so may result in a delay in payroll. Employee may not, for any reason, falsify a time sheet or submit an inaccurate time sheet as this document is used for payroll purposes

c) Employee understands that it will be his/her responsibility to develop referral sources and originate loans by customarily and regularly engaging with the public outside and away from Company's offices, or Employee's home office. In order to succeed, Employee must spend the vast majority of his/her work hours away from Company's offices or Employee's home office to develop and maintain the necessary contacts in order to ultimately originate loans.

d) Employee agrees to devote Employee's time, attention and energy to the position set forth above subject to the Company's direction and control. During Employee's



EXHIBIT __59__
WIT: Overhausen
DATE: 4.27.15
Micheal A. Johnson, CSR, CRR

**CONFIDENTIAL**

Applicant's Injunction Hearing Exhibit 013

APF00000303

employment with Company, Employee shall not enter into or continue any employment or render any service for compensation or remuneration to any person or entity, except Company, involved in the business of any real estate services related industry including but not limited to, banking, mortgage banking, or mortgage brokerage.

e) Employee will cooperate with periodic on-site audits and examinations to verify his/her compliance with Company's guidelines and operating requirements, and applicable federal, state, and local mortgage lending laws and regulations.

f) As applicable, Employee acknowledges that the duties set forth herein do not reflect any change in the manner of work in which Employee has been engaged for Company, and merely restates the duties, manner, and method of work that has previously existed between the parties since the inception of their employment relationship.

## 4. COMPANY RULES

Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook. Employee may not at any point in time personally accept any compensation, fees, or monies directly from a consumer. Any monies collected directly from a consumer must be made payable to the Company. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Loan Officer has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

## 5. COMPENSATION TO EMPLOYEE

Company shall pay Employee compensation for services performed under this Agreement, as follows:

a) Base Pay. Company shall pay Employee an hourly wage equivalent to minimum wage which as of this date is $7.25, and overtime pay, if applicable, which shall together be a draw against any commission earned, as set forth below.

b) Subject to the terms and conditions set forth herein, Employee will receive a commission based on the schedule attached hereto as Exhibit A.

c) Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission calculated above. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions, provided that Employee is not and may not be held responsible for

**CONFIDENTIAL**

negative balances except to the extent that his/her commissions can be reduced. Under no circumstance, and at no time during or after employment, will Employee be required or expected to re-pay Company beyond and/or except as per the deductions from commission described herein.

d) The Company has an expectation that Employee will fund a minimum of two first lien loans per month or six first lien loans per rolling three month period. If this performance metric is not achieved the Company reserves the right to make appropriate adjustments to the commission schedule or terminate Employee's employment. Company may adjust Employee's commission and hourly wage at any time in Company's sole discretion.

e) It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision.

f) As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations.

g) In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, the Employee hereby agrees to allow the Company to withhold said charges from the Employee's next paycheck.

h) Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 60 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement.

## 7. LICENSURE

Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where s/he is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the National Mortgage Licensing System ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

**CONFIDENTIAL**

b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of thirty days to produce verification of current licensure. If, after thirty days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

## 8. NO EXISTING RESTRICTIVE COVENANTS
Employee verifies that no non-compete, non-solicitation or confidentiality agreements with any other company, person or entity are binding upon him/her as of the date this Agreement.

## 9. INDEMNIFICATION
To the extent permitted by applicable law or regulation, Employee hereby agrees to indemnify, hold harmless and defend Company, for any and all attorneys' fees, costs of settlement, judgments, or damages incurred by the Company as a result of any violation by Employee of any term or obligation under this Agreement.

## 10. RETURN OF RECORDS AND PAPERS
Employee agrees upon the cessation of his/her employment with Company for any reason whatsoever, to return to the President of Company, all Company equipment, including but not limited to computers or cell phones, and all records, copies of records, computer records, and papers and copies thereof, pertaining to any and all transactions handled by Employee while associated with Company.

## 11. DEATH/DISABILITY BENEFIT
In the event Employee dies and/or becomes disabled such that Employee cannot physically perform any gainful employment for a period of at least 180 days, Employee (and/or the Estate, as applicable) shall be entitled to payout of all loans in his/her pipeline upon the close of such loans, as if Employee supervised such loans to completion. Employee acknowledges that this benefit is in exchange for the execution of this Agreement and acceptance of the restrictive covenants set forth herein.

## 12. PIPELINES
Employee further acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

## 13. ALTERNATIVE DISPUTE RESOLUTION

The Parties agree that in the event of any dispute arising between them that arises out of the employment relationship and/or this Agreement, prior to initiating any charge, lawsuit, proceeding, or complaint with any administrative agency or court, the Party intending to initiate such a claim or proceeding, will at least ten (10) days prior to doing so, provide the other Party with a specific demand for monetary relief, as well as a calculation explaining the basis for said monetary demand, as well as a short and plain statement of the grounds upon which such demand is sought. Notwithstanding the foregoing, this provision does not prohibit a Party from immediately seeking injunctive relief limited to preventing irreparable harm.

## 14. SEVERABILITY

The Parties agree that to the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unreasonable, unlawful or unenforceable by a court of competent jurisdiction, then any such provision or portion thereof shall be deemed to be modified or redacted to the extent necessary in order that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by applicable law, and that it will not affect any other portion, or provision of this Agreement, and the Parties hereto do further agree that any court of competent jurisdiction shall, and the Parties hereto do hereby expressly authorize, request and empower any court of competent jurisdiction to enforce this Agreement, and any such provision or portion thereof to the fullest extent permitted by applicable law.

## 15. LEGAL FEES

Employee further agrees that Company shall be entitled to recover from Employee all legal fees and expenses Company incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

## 16. UNDERSTANDING OF PARTIES

This Agreement, in addition to the Proprietary Information, Confidentiality Agreement and Non-Disclosure Agreement, represents the entire agreement between the Parties and supersedes any and all prior agreements or understandings, oral or written between Employee and AmeriPro Funding. It is further agreed that this Agreement shall remain in full force and effect until superseded in writing, signed by all Parties. In the event of a company name change, this Agreement will continue to be fully enforceable.

## 17. VOLUNTARY AGREEMENT

Employee acknowledges that he/she has been given sufficient time and opportunity to review, consider, and obtain advice in connection with the execution of this Agreement, and that Employee has not been forced to sign this Agreement under duress.

## 18. CONSTRUCTION

This Agreement shall be governed and interpreted according to the laws of the State of Texas.

## 19. FORUM

The Parties agree that should any dispute arise out of the interpretation or operation of this Agreement, such matters shall be litigated in the United States District Court in Texas, or in the event subject-matter jurisdiction is lacking, in a Texas State Court of competent

**APF00000307**

jurisdiction. Accordingly, by execution of this Agreement, the parties are consenting to personal jurisdiction in Texas limited to the operation or interpretation of this Agreement.

## 20. NON-WAIVER

A waiver or inaction by either Party of a breach of any provision of this Agreement shall not operate nor be construed as a waiver by either Party of any subsequent breach of the Agreement.

## 21. FULL AND COMPLETE AGREEMENT

This Agreement sets forth the entire understanding and agreement of the Parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof. No prior negotiations or drafts of this Agreement shall be used by either Party to construe the terms or to challenge the validity hereof. This Agreement may not be modified except in writing between all Parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein.

Voluntarily agreed to and executed this day of May 11 , 2011:

_____
Employee

MICHAEL TASK
Print Name

Accepted:

AmeriPro Funding, Inc.

By: _____

# EXHIBIT A

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion.

## Commission Schedule- Effective for all Loan applications on or after April 6, 2011

| Unit Range | | Commision Schedule | | |
|---|---|---|---|---|
| | | BPS | Min $/Unit | Max $/Unit |
| 0 | 1 | 72 | $ 540 | $ 1,800 |
| 2 | 6 | 108 | $ 810 | $ 2,700 |
| 7 | 12 | 126 | $ 945 | $ 3,150 |
| 13 | - | 135 | $ 1,013 | $ 3,375 |

*see MEMO DATED 5/6/11 Choosing Option #2 No CAPS*

## Commission Pay Schedule

Semi-monthly: Commissions are paid on a semi-monthly basis. All loans that fund from the first through the 15th of the month will be paid on the last day of the month. All loans that fund from the 16th to the end of the month are paid on the 15th of the following month.

_____
Employee Signature

Michael Task
_____
Employee Name

Date: 5/11/11

_____
Branch Manager Signature

William Jackson
_____
Branch Manager Name

Date: 5/18/2011

**Accepted:**

AmeriPro Funding, Inc.

By: _____     Date: 6/1/2011

**CONFIDENTIAL**

APF00000309

**Michael Task**

| | |
|---|---|
| **From:** | Will Jackson |
| **Sent:** | Friday, May 06, 2011 5:25 PM |
| **To:** | Will Jackson |
| **Cc:** | Chad Overhauser |
| **Subject:** | Company Memo-Loan Offer Compensation |
| **Attachments:** | image002.emz |



**To:** All Corporate Loan Officers

**From:** Will Jackson

**Date:** 5/6/2011

**Re:** Loan Officer Compensation

We have received a fair amount of feedback regarding loan officer compensation. With this feedback in mind, making adjustments to help meet your needs.

Effective May 1st, 2011, the low tier is being eliminated (0 - 1 loan, 72 basis points, 40%). It will be rolled into th second tier. The new tiers are as follow:

| Unit range | | Applicable Comm Split | Commission Schedule | | | BPS | Floor $ | CAPS |
|---|---|---|---|---|---|---|---|---|
| | | | BPS | Min $/unit | Max $/unit | 180% | 3350 | 4500 |
| 0 | 6 | 60.0% | 1.08% | $ 818 | $ 2700 | | | |
| 7 | 12 | 70.0% | 1.25% | $ 945 | $ 3150 | | | |
| 13 | - | 75.0% | 1.35% | $ 1013 | $ 3375 | | | |

Effective May 16th, 2011, there will be two compensation plan options with regard to revenue caps.

**Option 1:** The current caps and floors.

**Note:** We are seeking feedback on what the cap should be on this option. We understand there some who would like to keep a cap so as to remain competitive on larger loans, but believe the should be higher than the current $4,500. A good way to think about this is to ask how large of can be sold at 180 basis points and set the cap at that point. Please send this feedback to me di in an email.

**Option 2:** No caps and no floors.

The no cap plan will make rates less competitive as the loan amount increases. For example, can 180 points be sold on a $500,000 loan?

5/11/2011

**CONFIDENTIAL**

APF00000310

Thank you for your feedback, we appreciate it. If you elect option 2, please respond by Wednesday 5/11/2011.

Sincerely,

Will Jackson, Corporate Branch Manager

Ameripro Funding Inc

5/11/2011

APF00000311



## Loan Officer Compensation Plan
## Austin

### NET FUNDING

$0 - $20,000            .60

$20,001 +              .70

Loan Officers are expected to generate average weighted revenue of 1.80 percent on monthly conforming production.

FEES:
- $475 Processing fee per loan (Brokered and Banked loans)
- $750 Underwriting/Administration Fee per loan (Banked only loans)
- Brokered Loan Fee- There is a .25% charge for any brokered loan. The charge is incurred prior to the commission split.

  *fees subject to change

***The Broker Charge is only incurred on loans that are able to be delivered through the in-house lending channel. The Broker Charge shall not exceed the sum of $1,000. The Charge is NOT incurred on loans that can not be funded through AmeriPro Funding's banking division.***

AmeriPro Funding will pay for voice mail and standard business cards for each loan officer.

Loan Officers will provide their out of office computers, marketing and cell phones.

Employee benefits will be provided to all full-time, commissioned employees as outlined in the Employee Handbook. Coverage begins on the first day of the first month following 60 days of continuous employment. Loan Officer's authorize all employee portion deductions from their earnings when enrolling in the programs.

The Loan Officer is expected to participate in Company meetings and functions.

All loan fundings from the first of the month to the 15th will be paid on the last day of the month.

All loan fundings from the 16th to the end of the month are paid on the 15th of the following month.

The Loan Officer will pay all outstanding debts owed to AmeriPro Funding. As long as the Loan Officer leaves in good standing and is available to help with the closings and participate in the process when requested then compensation will be paid for all pending closings that close within 30 days of release.

APF00000312

**CONFIDENTIAL**

- In recognition of the privileged nature of the information that employee will have access to, employee agrees, as part of his/her fiduciary duties to AmeriPro Funding, to protect and safeguard employer's proprietary, confidential, and other information.

- Act at all times for the benefit of AmeriPro Funding its business, its interests, and its reputation.

**Commission Addendum:**

You will receive a 70% commission rate on all loan fundings for the first 90 days of employment.

I hereby acknowledge acceptance of the above terms and conditions.

MICHAEL TASK
Print Name

_Michael Task_    2/13/11
Signature       Date

**CONFIDENTIAL**

APF00000313

**EXHIBIT B**

**Loan Officer Disclosures**

*I hereby certify the following:*

I am not a licensed real estate agent and do not hold a real estate sales license ___✓ Y ___N

I have a current and valid originator license with the NMLS ___✓ Y _____N

_____ Loan Officer Signature

MICHAEL TASK _____ Loan Officer Name

Date: 5/11/11

**CONFIDENTIAL**

APF00000314

APPLICANT'S EXHIBIT NO. 14

# PROPRIETARY INFORMATION AGREEMENT

The following confirms and memorializes the agreement ("Agreement") that Tenura Holdings, Inc. and/or any of its operating subsidiaries - AmeriPro Funding, AmeriFirst Insurance Agency, LLC, Private Label Realty, 1% Realty, Reliant Title and Global Home USA (the COMPANY) and I, Michael Task ("Employee"), have concerning my employment with the Company in any capacity, and that is a material part of the consideration for my employment by the Company.

I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict with this Agreement of my employment with the Company. I will not violate any agreement with or rights of any third party or, except as expressly authorized by the Company in writing hereafter, use or disclose my own or any third party's confidential information or intellectual property when acting within the scope of my employment or otherwise on behalf of the Company. Further, I have not retained anything containing any confidential information of a prior employer or other third party, whether or not created by me.

I agree that all business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term on my employment that relate to the Company or the business or demonstrably anticipated business of the Company or that are received by or for the Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, be obligated under this paragraph with respect to information I can document is or becomes readily publicly available with out restriction through no fault of mine. Upon termination of my employment, I will promptly return to the Company all items containing or embodying Proprietary Information (Including all copies), except that I may keep my personal copies of (I) my compensation records, and (II) this Agreement.

I agree that this Agreement is not an employment contract for any particular term and that I have the right to resign and the Company has the right to terminate my employment at will, at any time, for any or no reason, with or without cause. In addition, this Agreement does not purport to set forth all of the terms and conditions of my employment, and, as an employee of the Company, I have obligations to Company which are not set forth in this Agreement. However, the terms of this Agreement govern over any inconsistent terms and can only be changed by a subsequent written agreement signed by the President of the Company.

I agree that my obligations under paragraph 2 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part, and that the Company is entitled to communicate my obligations under this Agreement to any future employer or potential employer of mine. My obligations under paragraph 2 also shall be binding upon my heirs, executors, assigns, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

Any dispute in the meaning, effect or validity of the Agreement shall be resolved in accordance with the laws of the State of Texas without regard to the conflict of laws provisions thereof. I further agree that if one or more provisions of this Agreement are held to be illegal or unenforceable under applicable Texas law, such illegal or unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required so that this Agreement shall otherwise remain in full force and effect and enforceable in accordance with its terms. I also understand that any breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy, and thereof the Company will be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond.

I HAVE READ THIS AGREEMENT CAREFULL AND I UNDERSTAND AND ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION. NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT. I SIGN THIS AGREEMENT VOLUNTARILY AND



EXHIBIT
106
4-28-15 KW

Applicant's Injunction Hearing Exhibit 014

CONFIDENTIAL

APF00000292

FREELY, INDUPLICATE, WITH THE UNDERSTANDING THAT THE CORPORATION WILL RETAIN ONE COUNTERPART AND THE OTHER COUNTERPART WILL BE RETAINED BY ME.

Dated this the 11 day of MARCH, 2011.

_____
Employee Signature

MICHAEL TASK
Printed Name

Accepted and Agreed to:

Tenura Holdings, Inc.

_____
Kevin L. Klein
President

---

# CONFIDENTIALITY AGREEMENT

As part of my job responsibility with the Company I will become aware of personal, financial and business information related to the Company's clients and proprietary information related to business strategies, financial information and operations of the Company

During my employment at the company and the event of my termination for any reason whatsoever, I agree that I will not disclose and/or disseminate to any person, firm, or corporation or make personal use of any Confidential Information of the corporation and its clients.

Furthermore, in the event of my termination for any reason whatsoever, I hereby acknowledge that all clients of the Company and agree not to call, visit, or have any further contact in any form whatsoever with any of the clients. I recognize that if this agreement is violated in any way I am subject to legal action by the Company.

_____
Employee Signature

MICHAEL TASK
Printed Name

3/8/11
_____
Date

_____
Management Signature

_____
Printed Name

_____
Date

                                       Revised Aug. 2010

**CONFIDENTIAL**

APF00000293

# NON-DISCLOSURE AGREEMENT

In connection with a proposed business relationship, the Company has allowed you (the individual or entity named below) access or may allow you access to business, technical or other information materials and/or ideas. ("Proprietary Information," which term shall include, without limitation, anything you learn or discover as a result of exposure to or analysis of any Proprietary Information).

In consideration if any disclosure and any negotiations concerning the proposed business relationship, you agree as follows:

1.  You will hold in confidence and not possess or use (except to evaluate within the U.S.) the proposed business relationship or disclose any Proprietary Information, except information you can document: (a) is in the public domain through no fault of yours, (b) was properly disclosed to you by another person without restriction. You will not reverse engineer or attempt to derive the composition or underlying information, structure or ideas of any Proprietary Information.
2.  If you decide not to proceed with the proposed business relationship or if asked by the Company, you will promptly return all Proprietary Information and all copies, extract and other objects or items in which it may be contained or embodied.
3.  You will promptly notify the Company of any unauthorized release or use of Proprietary Information.
4.  You understand that this Agreement does not obligate the Company to disclose any information or negotiate or enter into any agreement or relationship. You will strictly abide by any and all instructions or restrictions provided by Company from time to time with respect to Proprietary Information of Company systems.
5.  The terms of this Agreement will remain in effect with respect to any particular exceptions stated in Paragraph 1 above.
6.  You acknowledge and agree that due to the unique nature of the Proprietary Information any breach of this agreement would cause irreparable harm to the Company. Damages are not an adequate remedy and the Company shall therefore be entitled to equitable relief in addition to all other remedies available at law.
7.  Until one year after the later of the date of this Agreement or the last disclosure of Proprietary Information to you, you will not encourage or solicit any employee or consultant of the Company to leave the Company for any reason.
8.  This Agreement is personal to you, is non-assignable by you, is governed by the Internal laws of the State of Texas and may be modified or waived only in writing. If any provision is found to be unenforceable, such provision will be limited or deleted to the minimum extent necessary so that the remaining terms remain in full force and effect. The prevailing party in any dispute or legal action regarding the subject matter of this Agreement shall be entitled to recover attorney's fees and costs.
9.  Company's place of residence is 8300 N. Mopac, Suite 225, Austin, TX 78759.

Acknowledged and agreed on:

_3/8/11_
Date

_Michael_ _U_
Employee Signature

MICHAEL TASIC
Printed Name

**CONFIDENTIAL**

APF00000294

APPLICANT'S EXHIBIT NO. 15

# EMPLOYMENT AGREEMENT
## Sales Team Manager

This EMPLOYMENT AGREEMENT (this "Agreement") is made as of December 1, 2012 (the "Effective Date") by and between AmeriPro Funding, Inc., a Texas corporation (the "Company"), and Michael E. Task, an individual resident of the State of Texas (the "Employee").

## RECITALS:

A.     The Employee has experience in the business of residential mortgage lending (the "Business").

B.     The Company desires that the Employee serve as Sales Team Manager for the Company's team designated as 152015 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.     The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.     ACKNOWLEDGEMENTS

(a)     Effective April 1, 2011, Employee acknowledges that new compensation laws passed by the United States Federal Reserve prohibit Task from being paid based upon the profitability of Company and/or Team 152015 if Task originates any loans.  ___ Initial

(b)     The damages for violating these rules are 3 times the compensation paid, and may result in limitless rescission periods and liabilities for repurchase. ___ Initial

(c)     In addition, laws pertaining to the origination of loans, if violated, could give rise to claims against the Company for unlawful steering. ___ Initial  As defined herein, origination includes gaining, arranging, negotiating, or otherwise obtaining or assisting in obtaining an extension of consumer credit for another person.  Employee agrees to take no action that could reasonable be considered to amount to origination as defined herein. ___ Initial

2.     Position

(a)     At-Will Employment.  Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

(b)     Position.  Employee shall serve as the Sales Team Manager for the Company's team designated as 152015, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) remaining familiar with and ensuring that all loans originated by the Team are handled in accordance with the Company's policies,

Employment Agreement - Page 1

EXHIBIT __57__
WIT: Overhausen
DATE: 4.27.15
Micheal A. Johnson, CSR, CRR

November 1, 2012

CONFIDENTIAL

Applicant's Injunction Hearing Exhibit 015

APF00000268

guidelines, quality control, applicable federal, state, and local laws, and investor guidelines; (ii) ensuring that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Company's discretion; (iii) informing the Company immediately of any and all events, incidents, occurrences, complaints, lawsuits, investigations, findings, or good faith concerns of illegal, improper, or unethical or other material information or matters concerning the Company and/or Team operations; (iv) informing Company of all expenses on a timely basis in order to ensure prompt payment thereof and adhering to the Company's accountable expense reimbursement plan; (v) forwarding all fees, checks, deposits, etc. in the possession of Manager to Company's Corporate Headquarters in a timely manner; (vi) ensuring that all closed loan documents are stored in Company's document storage system and accessible to Company upon demand; (vii) hiring, developing, maintaining, training and supervising a sales force of loan originators and support staff to maximize Team profit and minimize risk; (viii) ensuring that all persons performing any services for the Company through the Team are Company employees, properly licensed and registered, as applicable, and are approved to start by Company and, as applicable approved by the Company to originate loans; (ix) ensuring that all employee activity including but not limited to hiring, firing, position change, pay changes, leaves of absence, etc., takes place in accordance with policy, practice, and appropriate corporate level pre-approval; (x) ensuring that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules; (xi) ensuring that all websites or other social media used by the Team or any Team Employee that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public; (xii) ensuring that any and all email communications on behalf of Company shall be sent from and directed through corporate email. Private email is not to be used for any official Company business; (xiii) ensuring that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are only advised to close loans if there is a good faith basis to believe that the borrower will be able to re-pay the loan; (xiv) ensuring that all employees are performing duties consistent with their classification (i.e. exempt/non-exempt) and that the Company is advised of any inconsistencies respecting duties and classification; and (xv) ensuring that all timekeeping policies are followed and records maintained.

(c) Notwithstanding any provision of this Agreement to the contrary, without the prior written consent of Company, Manager is not authorized on behalf of Company to (i) sell, lease, trade, exchange or otherwise dispose of any capital asset of the Company; (ii) grant a security interest in, hypothecate or otherwise encumber any asset of Company; (iii) incur any debt, sign any lease, or borrow money in the name of or on behalf of the Company;(iv) confess a judgment against the Company or settle or compromise in any manner any legal action, claim or litigation in the name of the Company brought by or against the Company, nor may Employee take any action in furtherance of any attempt to accomplish such actions without the Company's prior knowledge and consent; (v) implement material changes to the operation of the Team; (vi) open any bank, savings, credit, or investment account in the name of Company or any DBA, parent, subsidiary or affiliate thereof; (vii) deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Company; (viii) acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing; (ix) accept any funds or wire transfers intended or for the benefit or on behalf of the Company; (x) conduct any Realtor activities or hold an active Realtor license during the period of employment or permit or allow other loan officers of the Company to engage in such activities; (xi) pay any expenses for the team out of any personal funds, or pay or promise payment to any person for services associated with the origination or processing of loans, who is not an approved employee of the Company; (xii) issue or allow others to issue a commitment of financing without proper prior underwriting approval; (xiii) waive any commitment fees or fees for appraisals, credit reports, title policies, flood certifications or surveys; (xiv) undertake any financing or origination of loans in contravention of company policies, including but not limited to straw financing,

**CONFIDENTIAL**                                                                **APF00000269**

flip financing, or the transfer of loans from or to Company without proper approval; (xv) deviate from approved compensation plans for any loan officers or other employees; (xvi) encourage or permit loan officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that the borrower is able to repay the loan; (xvii)    encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture; (xviii) use the Company's name except in furtherance of his/her duties on behalf of the Company; (xix) supply Company information or comment to the media without express approval. Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement. Manager shall cease using the Company's name or any semblance thereof.

(d)    Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook and Company Loan Officer Compensation & Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Loan Officer has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

3.    Compensation.

(a)    Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule. The Employee will also be eligible to receive bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be schedule by mutual agreement of the Company and Employee.

4.    Representations.

(a)    The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b)    The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

**CONFIDENTIAL**                                                          **APF00000270**

5.    Assignment: Binding Agreement. This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

6.    Confidentiality; Ownership of Works.

(a)    The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b)    The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "**Confidential Information**"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 6 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

(c)    For purposes of this Section 6, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d)    During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

**CONFIDENTIAL**                                    **APF00000271**

(e)     For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)     solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii)    solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii)   recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv)    otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 6(e)(i) and 6(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f)     Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "**Works**"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

(h)     The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site,

**CONFIDENTIAL**                                                   **APF00000272**

including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i)     The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 6 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j)     The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k)     If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 6 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 6 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

7.     Non-Disparagement. The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

8.     Indemnification. Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 4(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

9.     Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

**CONFIDENTIAL**                                                        **APF00000273**

If to Company:
AmeriPro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759


If to the Employee:
Michael E. Task
9009 FM 620 N, Apt. 1003
Austin, Texas 78726-4212


10.     Entire Agreement. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, he/she does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

11.     Waivers and Amendments. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

12.     Governing Law. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof.

13.     Submission to Jurisdiction; Consent to Service of Process. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

14.     Assignment. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale of all or substantially all of the Company's assets, without the Employee's

**CONFIDENTIAL**                                                                    **APF00000274**

consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

15.     Withholding.  All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

16.     Facsimile Execution and Delivery.  A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

17.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

18.     Severability.  If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

19.     Interpretation.  The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

*[signature page follows]*

**CONFIDENTIAL**                                                                 **APF00000275**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
Chad Overhauser, President

EMPLOYEE:

_____
Michael E. Task

CONFIDENTIAL                                    APF00000276

## EXHIBIT A

### Revenue Bonus Schedule
### Sales Team Manager, Texas

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion. Any changes must be made in writing and will apply to customers that have not already completed a loan application, as defined by the Company. Any such loan that does not fund within 30 days of a compensation change will be subject to the new compensation plan.

1) A percentage of revenue for the team (as defined below) less the cost of compensation paid to team staff members, and other allowable costs as listed below. Team Revenue to be split as follows:

- Michael Task        50%    _____ Initial
- Michael Nasserfar   50%    _____ Initial

| Monthly Team Revenue | Bonus Eligibility |
| --- | --- |
| $0-$20,000 | 60% |
| $20,001 – 49,999 | 70% |
| $50,000+ | 75% |

Team Costs – Effective June 1, 2013
- Commissions paid to Loan Officer(s) assigned to Team 152015
- $5,000 per month for Marketing Sales Agreement with Centerra Homes
- $4,000 per month for administrative fees
- $4,416 per month for other staff compensation
- $90 per file

*Team Revenue* – defined as the sum of Origination, Discount, LO Comp Plan, Net Buy Price, All Lender Credits, Escrow Waiver, and Lock Extension Fee. Please note Lender Credits are typically negative.

### Bonus Pay Schedule
Semi-monthly: Bonuses are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*
-Loans where AmeriPro Funding, Inc. is the creditor: funding date
-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

### Guidelines
a) Employee is eligible to participate in Corporate sponsored incentive programs, such as the Secondary Marketing Incentive.

    X  Yes _____ No

Employment Agreement – Exhibit                                      November 1, 2012

**CONFIDENTIAL**                                      **APF00000277**

Sales Team Manager authorizes approved incentives to be distributed as follows:

| Team Member | Secondary Marketing Bonus | Incentive Unit Awards as % of Team Award |
|---|---|---|
| Michael Task | 50% | 50% |
| Michael Nasserfar | 50% | 50% |
| Gladys (Fay) Strange | N/A | N/A |

- Michael Task _____ Initial
- Michael Nasserfar _____ Initial

_____    ____11/30/12____
Michael E. Task                      Date

Employment Agreement – Exhibit                    November 1, 2012

**CONFIDENTIAL**                    **APF00000278**

APPLICANT'S EXHIBIT NO. 16

## EMPLOYMENT AGREEMENT
### Sales Manager

This EMPLOYMENT AGREEMENT (this "**Agreement**") is made as of November 1, 2013, (the "**Effective Date**") by and between Ameripro Funding, Inc., a Texas corporation (the "**Company**"), and Michael E. Task, an individual resident of the State of Texas (the "**Employee**").

### RECITALS:

A.      The Employee has experience in the business of residential mortgage lending (the "**Business**").

B.      The Company desires that the Employee serve as Sales Manager for the Company's branch designated as Branch #152010 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C.      The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.      Position

        (a)     At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

        (b)     Position. Employee shall serve as the Sales Manager for the Company's branch designated as Branch #152010, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) manages small group of Retail Loan Officers and Production Assistants to meet goals as defined by AmeriPro Funding Management team; (ii) ensure staff receives proper training to achieve goals; (iii) understand real estate appraisals, title reports and real estate transactions; (v) marketing and sales strategies for new and existing referral sources; (iv) represent AmeriPro Funding at appropriate conventions and conferences to promote the companies value proposition and reinforce relationships with key customers; (vi) keep informed on market and competitor developments; (vii) comply with all disclosure requirements and timeframes.

        (c)     Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook and Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Employee has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

Employment Agreement - Page 1                                    November 1, 2013

CONFIDENTIAL



EXHIBIT

105

4-28-15  KW

Applicant's
Injunction Hearing
Exhibit 016

APF00000251

(d)     Licensure. Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

2.     Compensation.

(a)     Compensation: Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule, which will be a draw against commissions and other compensation earned as set forth below. The Employee will also be eligible to receive commissions/bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions. It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision. As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations. In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A. Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 30 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be scheduled by mutual agreement of the Company and Employee.

CONFIDENTIAL                                                                APF00000252

3. Representations.

(a) The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b) The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

4. Assignment; Binding Agreement. This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

5. Confidentiality; Ownership of Works.

(a) The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b) The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "**Confidential Information**"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 5 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

(c) For purposes of this Section 5, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d) During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body: provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall

Employment Agreement - Page 3                                        November 1, 2013

**CONFIDENTIAL**

APF00000253

promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

(e)     For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i)     solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii)     solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii)     recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv)     otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f)     Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g)     The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

CONFIDENTIAL

APF00000254

(h)     The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i)     The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 5 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j)     The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k)     If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 5 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 5 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

6.     Non-Disparagement.   The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

7.     Indemnification.  Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 3(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

8.     Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

Employment Agreement - Page 5                                   November 1, 2013

**CONFIDENTIAL**

**APF00000255**

If to Company:
Ameripro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759


If to the Employee:
Michael E. Task
9550 Savannah Ridge Drive
Unit 32
Austin, Texas 78726


9.    Entire Agreement. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, s/he does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

10.    Waivers and Amendments. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11.    Governing Law. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

12.    Submission to Jurisdiction; Consent to Service of Process. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

13.    Assignment. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale

Employment Agreement - Page 6                                     November 1, 2013


**CONFIDENTIAL**                                     APF00000256

of all or substantially all of the Company's assets, without the Employee's consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

14. Withholding. All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

15. Facsimile Execution and Delivery. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

16. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

17. Severability. If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

18. Interpretation. The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

CONFIDENTIAL                                                    APF00000257

19.    Effective Date. After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
    Larry Crisp, Regional Sales Manager – TX, OK

EMPLOYEE:

_____
Michael E. Task

CONFIDENTIAL                                                                          APF00000258

## EXHIBIT A

### Commission & Bonus Schedule
### Sales Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation-** Allocable Revenues for the entire Nasserfar & Task Team (152015) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

**Effective for all loans funded on or after: November 1, 2013**

| Loan Volume | Basis Points |
|---|---|
| S0 - $1,437,473 | 0 |
| $1,437,474 - $2,874,944 | 9.3 |
| $2,874,945 - $5M | 23 |
| $5,000,001 - $7.5M | 28 |
| $7.5M - $10M | 30 |

2) **Commission/Bonus Pay Schedule**
Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

*Payroll Eligibility Date:*
-Loans where AmeriPro Funding, Inc. is the creditor: funding date
-Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

3) **Guidelines**
   a) Should the Nasserfar & Task Team (152015) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i. 70% to Michael H. Nasserfar
      ii. 30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__ Yes _____ No

*[signature page follows]*

Employment Agreement– Exhibit                    November 1, 2013

**CONFIDENTIAL**                    APF00000259

_Michael E. Task_
Employee Signature

_Michael E. Task_
Employee Name

Date: 11/26/13

_Thomas L. Therrell_
Branch Manager Signature

_Thomas L. Therrell_
Branch Manager Name

Date: 11-26-13


Accepted: AmeriPro Funding, Inc.

By: _____ Date: 12-2-13

**CONFIDENTIAL**

**APF00000260**

## EXHIBIT B

**Production Manager Disclosures**

*I hereby certify the following:*

I am a licensed real estate agent and hold a real estate sales license ___Y __N

I have a current and valid originator license with the NMLS __Y ___N

_____
Employee Signature

MICHAEL E. TASK
Employee Name

Date: 11/26/13

**CONFIDENTIAL**

**APF00000261**

## EXHIBIT A

### Commission & Bonus Schedule
### Sales Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation-** Allocable Revenues for the entire Nasserfar & Task Team (152015) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

   **Effective for all loans funded on or after: November 1, 2013**

   | Loan Volume | Basis Points |
   |---|---|
   | $0 - $1,437,473 | 0 |
   | $1,437,474 - $2,874,944 | 9, 3 |
   | $2,874,945 - $5M | 23 |
   | $5,000,001 - $7.5M | 28 |
   | $7.5M - $10M | 30 |

2) **Commission/Bonus Pay Schedule**
   Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

   > *Payroll Eligibility Date:*
   > -Loans where AmeriPro Funding, Inc. is the creditor: funding date
   > -Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

3) **Guidelines**
   a) Should the Nasserfar & Task Team (152015) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i.  70% to Michael H. Nasserfar
      ii. 30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__Yes _____No

*[signature page follows]*

Employment Agreement– Exhibit                                          November 1, 2013

**CONFIDENTIAL**                                                **APF00000262**

_Michael R._
Employee Signature

_Thomas L. Threadgill_
Branch Manager Signature

MICHAEL TASK
Employee Name

_Thomas L. Threadgill_
Branch Manager Name

Date: 11/18/13

Date: 11-19-13

Accepted: AmeriPro Funding, Inc.

By: _____  Date: 11-13-13

**CONFIDENTIAL**

**APF00000263**

APPLICANT'S EXHIBIT NO. 17

# EMPLOYMENT AGREEMENT
Sales Manager

This EMPLOYMENT AGREEMENT (this "**Agreement**") is made as of January 1, 2014, (the "**Effective Date**") by and between Ameripro Funding, Inc., a Texas corporation (the "**Company**"), and Michael E. Task, an individual resident of the State of Texas (the "**Employee**").

## RECITALS:

A. The Employee has experience in the business of residential mortgage lending (the "**Business**").

B. The Company desires that the Employee serve as Sales Manager for the Company's branch designated as Branch #152180 and the Employee desires to hold such position under the terms and conditions of this Agreement.

C. The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

1.    Position

    (a)    At-Will Employment. Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

    (b)    Position. Employee shall serve as the Sales Manager for the Company's branch designated as Branch #152180, with such duties and responsibilities as the Company shall determine. Employee shall devote his full time and attention during normal business hours to the business and affairs of the Company. Employee's duties shall include but not be limited to: (i) manages small group of Retail Loan Officers and Production Assistants to meet goals as defined by AmeriPro Funding Management team; (ii) ensure staff receives proper training to achieve goals; (iii) understand real estate appraisals, title reports and real estate transactions; (v) marketing and sales strategies for new and existing referral sources; (iv) represent AmeriPro Funding at appropriate conventions and conferences to promote the companies value proposition and reinforce relationships with key customers; (vi) keep informed on market and competitor developments; (vii) comply with all disclosure requirements and timeframes.

    (c)    Company Rules. Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook and Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Employee has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which s/he becomes aware, in violation of the above, to the President of the Company.

January 1, 2014

EXHIBIT __58__
WIT: Overhausen
DATE: 4.27.15
Micheal A. Johnson, CSR, CRR

Applicant's
Injunction Hearing
Exhibit 017

CONFIDENTIAL

APF00000239

(d)  Licensure. Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

b) Failure to Maintain Licensure — Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

2.  Compensation.

(a)  Compensation; Benefits. The Employee shall receive cash compensation of $2,000.00 per month as his/her salary to be paid on a semi-monthly basis in accordance with the Company's regular pay day schedule, which will be a draw against commissions and other compensation earned as set forth below. The Employee will also be eligible to receive commissions/bonuses in accordance with Exhibit A attached hereto; provided, that, the Company may amend this Agreement from time to time to provide Employee with an adjusted base annual salary and adjusted periodic bonuses as it may deem advisable in its sole discretion. Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions. It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision. As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations. In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A. Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 30 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement. Employee agrees and acknowledges that the Company is under no obligation to provide Employee with benefits, including, but not limited to, health insurance; provided, that Employee will be entitled to any benefits the Company makes available to its employees in the ordinary course of business. Employee shall be entitled to receive vacation and sick time per the Company's employee handbook. Such vacation time to be scheduled by mutual agreement of the Company and Employee.

**CONFIDENTIAL**

**APF00000240**

3. Representations.

(a) The Company represents and warrants that this Agreement has been authorized by all necessary corporate action of the Company and is a valid and binding agreement of the Company enforceable in accordance with its terms.

(b) The Employee represents and warrants that he/she is not a party to any agreement or instrument that would prevent him/her from entering into or performing his/her duties in any way under this Agreement.

4. Assignment; Binding Agreement. This Agreement is a personal contract and the rights and interests of the Employee hereunder may not be sold, transferred, assigned, pledged, encumbered, or hypothecated by him/her, except as otherwise expressly permitted by the provisions of this Agreement. This Agreement shall inure to the benefit of and be enforceable by the Employee and his/her personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees. If the Employee should die while any amount would still be payable to him/her hereunder had the Employee continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to his devisee, legatee or other designee or, if there is no such designee, to his/her estate.

5. Confidentiality; Ownership of Works.

(a) The Company agrees that upon or prior to the commencement of Employee's employment, the Company will provide, or has provided, Employee with Confidential Information (as defined below). In exchange, Employee agrees not to disclose such Confidential Information other than as permitted in this Agreement and to use the Confidential Information solely for the Company's benefit.

(b) The Employee acknowledges that: (i) the Business is intensely competitive and that the Employee's employment by the Company will require that the Employee have access to and knowledge of confidential information of the Company, including, but not limited to, the identity of the Company's employees, customers, payors or suppliers, with whom the Company has dealt, the kinds of services provided by the Company, the manner in which such services are performed or offered to be performed, pricing information and other contractual terms, information concerning the creation, acquisition or disposition of products and services, creative ideas and concepts, including financial systems, computer software applications and other programs, research data, personnel information and other trade secrets (collectively, the "**Confidential Information**"); (ii) the direct or indirect disclosure of any such Confidential Information would place the Company at a competitive disadvantage and would do damage, monetary or otherwise, to the Company's business; and (iii) the engaging by the Employee in any of the activities prohibited by this Section 5 may constitute improper appropriation and/or use of such Confidential Information. The Employee expressly acknowledges the trade secret status of the Confidential Information and that the Confidential Information constitutes a protectable business interest of the Company.

(c) For purposes of this Section 5, the Company shall be construed to include the Company and its parents and subsidiaries engaged in the Business, including any divisions managed by the Employee.

(d) During the Employee's employment with the Company, and at all times after the termination of the Employee's employment, the Employee shall not, directly or indirectly, whether individually, as a director, stockholder, owner, partner, employee, principal or agent of any business, or in any other capacity, make known, disclose, furnish, make available or utilize any of the Confidential Information, other than in the proper performance of the duties contemplated herein, or as expressly permitted herein, or as required by a court of competent jurisdiction or other administrative or legislative body; provided that, prior to disclosing any of the Confidential Information as required by a court or other administrative or legislative body, the Employee shall

**CONFIDENTIAL**

**APF00000241**

promptly notify the Company so that the Company may seek a protective order or other appropriate remedy. The Employee agrees to return all documents or other materials containing Confidential Information, including all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks or in any other manner to the Company at any time upon request by the Company and immediately upon the termination of his employment for any reason.

(e) For a period of one year following the termination of the Employee's employment with the Company, the Employee agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(i) solicit from any customer, payor or supplier doing business with the Company as of the Employee's termination, business of the same or of a similar nature to the business of the Company with such customer, payor or supplier;

(ii) solicit from any known customer, payor or supplier of the Company business of the same or of a similar nature to that which has been the subject of a known written or oral bid, offer or proposal by the Company, or of substantial preparation with a view to making such a bid, proposal or offer, within six months prior to the Employee's termination;

(iii) recruit or solicit the employment or services of, or hire, any person who was known to be employed by, or a consultant of, the Company upon termination of the Employee's employment, or within six months prior thereto; or

(iv) otherwise knowingly interfere with the business of the Company.

Notwithstanding anything to the contrary contained in the foregoing, the prohibition contained in Section 5(e)(i) and 5(e)(ii) shall not apply to any customer of Employee that existed prior to employment with the Company, provided the customer and their loan is not being serviced by the Company.

(f) Employee acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

(g) The Employee will make full and prompt disclosure to the Company of all inventions, improvements, formulas, data, programs, processes, ideas, concepts, discoveries, methods, developments, software, and works of authorship, whether or not copyrightable, trademarkable or patentable, which are created, made, conceived or reduced to practice by the Employee, either alone, under his/her direction or jointly with others during the period of his/her employment with the Company, whether or not during normal working hours or on the premises of the Company, which (i) relate to the actual or anticipated business, activities or research of the Company, or (ii) result from or are suggested by work performed by the Employee for the Company, or (iii) result, to any extent, from use of the Company's premises or property (all of which are collectively referred to in this Agreement as "Works"). All Works shall be considered "WORK MADE FOR HIRE" and shall be the sole property of the Company, and, to the extent that the Company is not already considered the owner as a matter of law of any Works created, made, conceived or reduced to practice by the Employee prior to the Effective Date, to the extent not previously assigned to the Company, the Employee hereby assigns to the Company, without further compensation, all his/her right, title and interest in and to such Works and any and all related intellectual property rights (including, but not limited to, patents, patent applications, copyrights, copyright applications, and trademarks) in the United States and elsewhere.

January 1, 2014

**CONFIDENTIAL**                                                                **APF00000242**

(h) The Employee agrees, upon the termination of his employment, that s/he will immediately refrain from and discontinue making any representation to any other person or entity that s/he is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that s/he is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

(i) The Employee acknowledges that the services to be rendered by him/her to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a breach or threatened breach by him/her of any of the provisions contained in this Section 5 will cause the Company irreparable injury. The Employee therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary, preliminary and permanent injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond-or security, enjoining or restraining the Employee from any such violation or threatened violations.

(j) The Employee further acknowledges and agrees that due to the uniqueness of his/her services and confidential nature of the information s/he will possess, the covenants set forth herein are reasonable and necessary for the protection of the business and goodwill of the Company.

(k) If a court of competent jurisdiction determines that any term, covenant, or provision of this Section 5 is invalid or unenforceable for any reason (including without limitation unenforceability due to overbreadth, vagueness, or unreasonableness of duration, scope of activity, or geographic area), then this Section 5 shall be deemed divisible, with all other terms, covenants, and provisions remaining in full force and effect, and the invalid terms, covenants, or provisions shall be deemed automatically reformed and amended to include only such terms, covenants, and provisions (including terms, covenants, and provisions relating to the duration, scope of activity, and geographic area to which this Agreement applies) as the court determines are valid and enforceable, and the provisions of this Agreement as so amended shall be valid and binding upon Employee and the Company as though the unenforceable portion or provision had never been included in this Agreement.

6. Non-Disparagement. The Employee agrees that s/he will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

7. Indemnification. Subject to and as permitted by the regulations promulgated by and/or pursuant to HUD, FHA, RESPA and as allowed by any federal, state or local law or ordinance, Employee shall indemnify, defend and hold harmless the Company from and against any and all losses, claims and liabilities resulting from Employee's material breach of this Agreement (including, without limitation, a misrepresentation under Section 3(b)) or any liabilities of the Employee which arose prior to the date of this Agreement.

8. Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or one business day following mailing by overnight delivery service or upon receipt or refusal if mailed by certified mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

January 1, 2014

**CONFIDENTIAL**                                                                                 **APF00000243**

If to Company:
Ameripro Funding, Inc.
Attn: Lora Gray
8300 N. MoPac Expressway, Suite 120
Austin, Texas 78759

If to the Employee:
Michael E. Task
9550 Savannah Ridge Drive
Unit 32
Austin, Texas 78726

9. <u>Entire Agreement</u>. This Agreement contains all the understandings between the parties hereto pertaining to the matters referred to herein, and supersedes any other undertakings and agreements, whether oral or in writing, previously entered into by them with respect thereto. The Employee represents that, in executing this Agreement, s/he does not rely and has not relied upon any representation or statement not set forth herein made by the Company with regard to the subject matter or effect of this Agreement or otherwise. However, this Agreement does not supersede the Company's rights under any other agreement between the Employee and the Company that (i) protects the Company's proprietary information or intellectual property, or (ii) prohibits Employee from competing with the Company or soliciting the Company's employees, customers, payors or suppliers; rather all such rights of the Company under any such agreements shall be in addition to the rights granted in this Agreement.

10. <u>Waivers and Amendments</u>. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

11. <u>Governing Law</u>. This Agreement shall be governed by, enforced under and construed in accordance with the laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule thereof. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

12. <u>Submission to Jurisdiction; Consent to Service of Process</u>. Each of the parties hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of Texas and of the United States, in each case located in Travis County, Texas, for any litigation arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any litigation relating thereto except in such courts). Each of the parties hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any litigation arising out of this Agreement or the transactions contemplated hereby in the courts of the State of Texas or of the United States, in each case located in Travis County, Texas, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such litigation brought in any such court has been brought in an inconvenient forum.

13. <u>Assignment</u>. This Agreement, and the parties' respective rights and obligations under this Agreement, may not be assigned by any party without the prior written consent of the other party, except that the Company may assign this Agreement to any of its subsidiaries or affiliates or to any successor by merger or sale

**CONFIDENTIAL**

**APF00000244**

of all or substantially all of the Company's assets, without the Employee's consent provided that the assignment does not diminish any of the Employee's benefits, rights or obligations hereunder.

14. Withholding. All payments to the Employee under this Agreement shall be reduced by all applicable withholding required by federal, state or local law.

15. Facsimile Execution and Delivery. A facsimile, electronic mail/PDF or other reproduction of this Agreement may be executed by one or more parties hereto, and an executed copy of this Agreement may be delivered by one or more parties hereto by facsimile, electronic mail/PDF or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute an original of this Agreement as well as any facsimile, electronic mail/PDF or other reproduction hereof.

16. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original-and all of which together shall constitute one and the same instrument.

17. Severability. If any provision of this Agreement is held by final judgment of a court of competent jurisdiction to be invalid, illegal or unenforceable, the invalid, illegal or unenforceable provision shall be severed from the remainder of this Agreement, and the remainder of this Agreement shall be enforced. In addition, the invalid, illegal or unenforceable provision shall be deemed to be automatically modified, and, as so modified, to be included in this Agreement, such modification being made to the minimum extent necessary to render the provision valid, legal and enforceable. Notwithstanding the foregoing, however, if the severed or modified provision concerns all or a portion of the essential consideration to be delivered under this Agreement by one party to the other, the remaining provisions of this Agreement shall also be modified to the extent necessary to adjust equitably the parties' respective rights and obligations hereunder.

18. Interpretation. The words "hereof," "hereto," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Article references are to this Agreement unless otherwise specified. Whenever the words "include," "included" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The descriptive headings herein are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement. In this Agreement all references to "$" are to United States dollars. All terms defined in this Agreement shall have the defined meanings when used in any document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Personal pronouns shall be construed as though of the gender and number required by the context, and the singular shall include the plural and the plural the singular as may be required by the context. The parties hereto agree that no party shall be deemed to be the drafter of this Agreement and that in the event this Agreement is ever construed by a court of law or equity, such court shall not construe this Agreement or any provision hereof against either party as the drafter of the Agreement.

CONFIDENTIAL

APF00000245

19.    Effective Date. After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the Effective Date.

COMPANY:

AMERIPRO FUNDING, INC.,
a Texas corporation

By: _____
        Larry Crisp, Regional Sales Manager – TX, OK

EMPLOYEE:

_____
Michael E. Task

CONFIDENTIAL                                                          APF00000246

## EXHIBIT A

### Commission & Bonus Schedule
### Sales Manager, Texas

In addition to the base compensation described in the Employment Agreement you are entitled to receive the following:

1) **Commission Calculation-** Allocable Revenues for the entire Lakeway Branch (152180) (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission.

**Effective for all loans funded on or after: January 1, 2014**

| Loan Volume | Basis Points |
|---|---|
| $0 - $1,437,473 | 0 |
| $1,437,474 - $2,874,944 | 9.3 |
| $2,874,945 - $5M | 23 |
| $5,000,001 - $7.5M | 28 |
| $7.5M - $10M | 30 |

2) **Commission/Bonus Pay Schedule**
Semi-monthly: Commissions are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

> *Payroll Eligibility Date:*
> -Loans where AmeriPro Funding, Inc. is the creditor: funding date
> -Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

3) **Guidelines**
   a) Should the Lakeway Branch (152180) be eligible to receive a Secondary Marketing Incentive bonus, such bonus will be paid accordingly:
      i.   70% to Michael H. Nasserfar
      ii.  30% to Michael E. Task

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   __X__Yes _____No

*[signature page follows]*

Employment Agreement— Exhibit                                    January 1, 2014

**CONFIDENTIAL**

**APF00000247**

_Michael To_
Employee Signature

_M. N o_
Branch Manager Signature

_MICHAEL TASK_
Employee Name

_Michael Nasserfor_
Branch Manager Name

Date: _2/27/14_

Date: _2/27/14_

Accepted: AmeriPro Funding, Inc.

By: _____

Date: _2-27/14_

**CONFIDENTIAL**

**APF00000248**

## EXHIBIT B

**Production Manager Disclosures**

*I hereby certify the following:*

I am a licensed real estate agent and hold a real estate sales license ___ Y _H_ N

I have a current and valid originator license with the NMLS _H_ Y ___ N


_Michael Z_
Employee Signature

_Michael Task_
Employee Name

Date: _2/27/14_

**CONFIDENTIAL**

**APF00000249**

APPLICANT'S EXHIBIT NO. 18

## AMERIPRO FUNDING, INC.
### Loan Officer Agreement

This Loan Officer Agreement ("Agreement") is made and entered into this and between AmeriPro Funding, Inc., its subsidiaries, affiliates, successors and/or assigns (together "Company") and Tycord R. Gosnay ("Employee") (collectively referred to as the "Parties").

### RECITALS:

    A.    The Employee has experience in the business of residential mortgage lending (the "Business").

    B.    The Company desires that the Employee serve as Loan Officer for the Company's branch designated as 152180 and the Employee desires to hold such position under the terms and conditions of this Agreement.

    C.    The parties desire to enter into this Agreement setting forth the terms and conditions of the employment relationship of the Employee with the Company.

NOW, THEREFORE, the parties agree as follows:

### 1. Position
**At-Will Employment.** Employee understands and acknowledges that his/her employment with the Company is for an unspecified duration and constitutes "at-will" employment. Subject to the terms of this Agreement, Employee acknowledges that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or Employee, with or without notice.

### 2. Scope of Authority
Employee acknowledges that he/she has no right or authority, express or implied, to bind or create any obligation on the part of Company, without the express written consent of an officer of the Company.

### 3. Duties
a) Employee shall be employed as a Loan Officer for Company. Employee's primary duties shall be to utilize his/her knowledge, training and experience to solicit, originate, sell and facilitate the processing and closing of loan products and financing of residential real estate transactions on behalf of the Company's customers.

b) Employee acknowledges, he/she does not and will not work more than 40 hours per week, unless additional hours are approved in advance and in writing by his/her Supervisor. Any overtime requests will be evaluated based upon the Loan Officer's productivity as only those Loan Officers with sufficient productivity justifying a departure from 40 maximum hours will be considered for approval. Loan Officer's past requests for overtime and evaluation of performance during such periods will, as applicable, be considered in determining whether overtime requests will be approved. Employee must at the end of each week submit a time sheet via the Company's payroll and timekeeping system, ExponentHR, which accurately reflects all hours worked. Failure to do so may result in a delay in payroll. Employee may not, for any reason, falsify a time sheet or submit an inaccurate time sheet as this document is used for payroll purposes. In addition, all work for your job with AmeriPro Funding must be considered compensable and reported as work time, even if it is worked outside the office or at home.

c) Employee understands that it will be his/her responsibility to develop referral sources and originate loans by customarily and regularly engaging with the public outside and away from Company's offices, or Employee's home office. In order to succeed, Employee must spend the vast majority of



EXHIBIT
35
4-24-15 KW

Applicant's
Injunction Hearing
Exhibit 018

CONFIDENTIAL

APF00000339

his/her work hours away from Company's offices or Employee's home office to develop and maintain the necessary contacts in order to ultimately originate loans.

d) Employee agrees to devote Employee's time, attention and energy to the position set forth above subject to the Company's direction and control. During Employee's employment with Company, Employee shall not enter into or continue any employment or render any service for compensation or remuneration to any person or entity, except Company, involved in the business of any real estate services related industry including but not limited to, banking, mortgage banking, or mortgage brokerage.

e) Employee will cooperate with periodic on-site audits and examinations to verify his/her compliance with Company's guidelines and operating requirements, and applicable federal, state, and local mortgage lending laws and regulations.

f) As applicable, Employee acknowledges that the duties set forth herein do not reflect any change in the manner of work in which Employee has been engaged for Company, and merely restates the duties, manner, and method of work that has previously existed between the parties since the inception of their employment relationship.

### 4. Company Rules

Employee will remain familiar with and adhere to all Company policies, standards and requirements published or otherwise disseminated by the Company as well as all applicable federal, state, and local laws and regulations, including the Tenura Holdings, Inc. and Operating Subsidiaries Employee Handbook, Company Loan Officer Compensation and Brokered Loan Policies. Employee is responsible for abiding by all lending laws and may not mislead, alter, falsify or fraudulently change any documentation or commit fraud in any manner with relation to any loan file at any stage of the loan process. Employee may not steer customers to loans in order to increase or maximize personal compensation. Employee may not encourage any customer to enter into a loan unless Loan Officer has a good faith belief that the customer has the ability to repay the loan. Employee may not assist a customer in closing a loan if Employee has sufficient reason to believe the customer has provided materially false information in connection with the mortgage application. Employee shall immediately report any conduct of which he/she becomes aware, in violation of the above, to the President of the Company.

### 5. Compensation to Employee

Company shall pay Employee compensation for services performed under this Agreement, as follows:

a) Base Pay. Company shall pay Employee an hourly wage of $7.25 (the "Base Pay"). In the event Employee works beyond 40 hours, he/she shall be entitled to additional pay in the amount of 1.5 times the regular rate for all overtime hours (hours over 40) worked in a week. The regular rate is calculated by dividing the total hours worked during the applicable pay week by the total amount of compensation attributable to such pay period.

b) Subject to the terms and conditions set forth herein, Employee will receive a commission based on the schedule attached hereto as Exhibit A.

c) Commissions are calculated by deducting the Base Pay paid during the current pay period, from the aggregate commission calculated above. In the event that Employee's Base Pay for the applicable period exceeds the commission, any negative balance will be carried over and reduced in the calculation of future commissions, provided that Employee is not and may not be held responsible for negative balances except to the extent that his/her commissions can be reduced. Under no circumstance, and at no time during or after employment, will Employee be required or expected to re-pay Company beyond and/or except as per the deductions from commission described herein. Further, no additional overtime pay, or pay for designated company holidays, earned vacation, sick or other approved paid time off will be subtracted in calculating commission.

d) The Company has an expectation that Employee will fund a minimum of two first lien loans per month or six first lien loans per rolling three month period. If this performance metric is not achieved

CONFIDENTIAL

APF00000340

the Company reserves the right to make appropriate adjustments to the commission schedule or terminate Employee's employment. Company may adjust Employee's commission and hourly wage at any time in Company's sole discretion.

e) It is understood that Employee is not entitled to commission simply for procuring a loan. No commission is earned, accrued, or payable to Employee unless and until the loan has closed and funded under the Employee's supervision.

f) As defined herein, a loan is not closed unless and until the loan has gone through closing, all monies have funded, any rescission period has expired, and all proper documentation has been filed in connection with the loan, and in accordance with applicable federal, state, and local mortgage lending laws and regulations.

g) In the event that Employee fails to obtain reimbursement for the Company on expenses on loans that do not close, or the commissions are recaptured per the Company's Secondary Marketing Policy Manual, such company (or borrower) expenses reduce the Employee's gross commission as stated in Exhibit A.

h) Employee agrees that in the event he/she believes there is any error in connection with the calculation of his/her commission, he/she will raise any such disagreement in writing with the Company, within 60 days of payment of the commission. Failure to do so acknowledges agreement with the amount of the commissions paid. Employee agrees that upon the execution of this Agreement, there are no disputes pertaining to compensation with Company and that Employee has received all pay and compensation due to him/her as of the date of the execution of this Agreement.

### 6. Licensure

Employer requires that Employee holds a mortgage loan originator license as required by the SAFE Act and the applicable state in which he/she desires to do business. Employee may only originate loans in the state where he/she is licensed and Employee and/or his/her branch are physically located, unless otherwise approved by management in writing. Please contact the Company for a list of approved states. Employee is required to be licensed and agrees to complete all necessary steps within the Nationwide Mortgage Licensing System & Registry ("NMLS") to associate with the Company.

a) Maintenance of Current Licensure - It is Employee's responsibility to renew and keep all required registration, licensing and training obligations continuously current. It is Employee's responsibility to provide documentation of license renewal at the time of renewal and as required and requested by the Company. Employee must be current with licensure to originate loans.

b) Failure to Maintain Licensure – Should Employee fail to renew his/her license or if Company is unable to verify that Employee holds a current license, then Employee will not be allowed to originate loans and may be placed on unpaid suspension and/or be subject to immediate termination. Employee will have a maximum of 30 days to produce verification of current licensure. If, after 30 days, Employee has not produced verification of current licensure and Company is unable to obtain NMLS verification, he/she will be terminated for failure to meet minimum requirements of the position. Employee is not entitled to commission on any loan originated at any time when Employee was not properly licensed.

Employee verifies that he/she does not hold a current and active Real Estate License.

### 7. No Existing Restrictive Covenants

Employee verifies that no non-compete, non-solicitation or confidentiality agreements with any other company, person or entity are binding upon him/her as of the date this Agreement.

**CONFIDENTIAL**

APF00000341

## 8. Indemnification

To the extent permitted by applicable law or regulation, Employee hereby agrees to indemnify, hold harmless and defend Company, for any and all attorneys' fees, costs of settlement, judgments, or damages incurred by the Company as a result of any violation by Employee of any term or obligation under this Agreement.

## 9. Return of Records and Papers

Employee agrees upon the cessation of his/her employment with Company for any reason whatsoever, to return to the President of Company, all Company equipment, including but not limited to computers or cell phones, and all records, copies of records, computer records, and papers and copies thereof, pertaining to any and all transactions handled by Employee while associated with Company.

## 10. Employment Representation

Employee further agrees, upon the termination of his employment, that he/she will immediately refrain from and discontinue making any representation to any other person or entity that he/she is an employee of the Company. In addition, the Employee agrees to immediately delete any statements or representations that he/she is an employee of the Company from any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting. Employee acknowledges that making such representations or failing to correct such information on any social media site constitutes a false, material statement of fact that is detrimental to the Company's legitimate business interests.

## 11. Death/Disability Benefit

In the event Employee dies and/or becomes disabled such that Employee cannot physically perform any gainful employment for a period of at least 180 days, Employee (and/or the Estate, as applicable) shall be entitled to payout of all loans in his/her pipeline upon the close of such loans, as if Employee supervised such loans to completion. Employee acknowledges that this benefit is in exchange for the execution of this Agreement and acceptance of the restrictive covenants set forth herein.

## 12. Pipelines

Employee further acknowledges that all leads and loans in process are Company's property. Employee agrees to provide upon termination a written account of any and all open leads, business prospects, and/or loans in process as of the date of his/her termination, and agrees not to take any action to divert such loans to a competitor or away from Company. Provided the Employee terminates in good standing and is available to help with and participate in the closing process when requested, he/she will be eligible for compensation on pending loans that close within 30 days of termination.

## 13. Non-Disparagement

The Employee agrees that he/she will not make false, defamatory, or disparaging statements or representations about the Company to any other person or entity, including without limitation, to any customers or suppliers of the Company or any of their representatives, whether such statements or representations are in person, in writing, or on any social media site, including but not limited to any web log or blog, journal or diary, personal website, social networking or affinity website, web bulletin board or a chat room, video or wiki posting, personal newsletter or other Internet posting.

## 14. Alternative Dispute Resolution

The Parties agree that in the event of any dispute arising between them that arises out of the employment relationship and/or this Agreement, prior to initiating any charge, lawsuit, proceeding, or complaint with any administrative agency or court, the Party intending to initiate such a claim or proceeding, will at least

May 1, 2014

**CONFIDENTIAL**

APF00000342

ten (10) days prior to doing so, provide the other Party with a specific demand for monetary relief, as well as a calculation explaining the basis for said monetary demand, as well as a short and plain statement of the grounds upon which such demand is sought. Notwithstanding the foregoing, this provision does not prohibit a Party from immediately seeking injunctive relief limited to preventing irreparable harm.

### 15. Arbitration/Governing Law/Consent to Jurisdiction

In the event that the parties cannot resolve a dispute by the ADR provisions contained herein, any dispute between the parties concerning the wages, hours, working conditions, terms, rights, responsibilities or obligations between them or arising out of their employment relationship shall be resolved through binding arbitration with JAMS in accordance with JAMS rules applicable to employment claims. Such arbitration may not be joined with or join or include any claims by any persons not party to this Agreement. The parties will share equally in the cost of such Arbitration, and, except as otherwise set forth herein, be responsible for their own attorneys' fees, provided that if the Arbitration is brought pursuant to any statutory claim for which attorneys fees were expressly recoverable, the Arbitrator shall award such attorneys' fees and costs consistent with the statute at issue. Nothing herein shall preclude a party from seeking temporary injunctive relief in a court of competent jurisdiction to prevent irreparable harm, pending any ruling obtained through Arbitration. Further, nothing herein shall preclude or limit Employee from filing any complaint or charge with a State, Federal, or County agency. In the event Employee wishes to opt out of this section, in which case Employer will not be bound by this provision, Employee may do so by striking this paragraph in ink and initialing here: _____.

### 16. Severability

The Parties agree that to the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unreasonable, unlawful or unenforceable by a court of competent jurisdiction, then any such provision or portion thereof shall be deemed to be modified or redacted to the extent necessary in order that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by applicable law, and that it will not affect any other portion, or provision of this Agreement, and the Parties hereto do further agree that any court of competent jurisdiction shall, and the Parties hereto do hereby expressly authorize, request and empower any court of competent jurisdiction to enforce this Agreement, and any such provision or portion thereof to the fullest extent permitted by applicable law.

### 17. Legal Fees

Employee further agrees that Company shall be entitled to recover from Employee all legal fees and expenses Company incurred in investigating and enforcing the covenants contained herein, including fees and expenses incurred prior to filing suit.

### 18. Understanding of Parties

This Agreement, in addition to the Employment, Confidential Information and Invention Assignment Agreement, represents the entire agreement between the Parties and supersedes any and all prior agreements or understandings, oral or written between Employee and AmeriPro Funding. It is further agreed that this Agreement shall remain in full force and effect until superseded in writing, signed by all Parties. In the event of a company name change, this Agreement will continue to be fully enforceable.

### 19. Voluntary Agreement

Employee acknowledges that he/she has been given sufficient time and opportunity to review, consider, and obtain advice in connection with the execution of this Agreement, and that Employee has not been forced to sign this Agreement under duress.

CONFIDENTIAL

APF00000343

### 20. Construction

This Agreement shall be governed and interpreted according to the laws of the State of Texas. This Agreement shall be construed as if both Parties had equal say in its drafting, and thus shall not be construed against the drafter.

### 21. Forum

The Parties agree that should any dispute arise out of the interpretation or operation of this Agreement, such matters shall be heard in Travis County, Texas. Accordingly, by execution of this Agreement, the parties are consenting to personal jurisdiction in Texas limited to the operation or interpretation of this Agreement.

### 22. Non-Waiver

A waiver or inaction by either Party of a breach of any provision of this Agreement shall not operate nor be construed as a waiver by either Party of any subsequent breach of the Agreement.

### 23. Full and Complete Agreement

This Agreement sets forth the entire understanding and agreement of the Parties hereto and fully supersedes any and all prior or contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof. No prior negotiations or drafts of this Agreement shall be used by either Party to construe the terms or to challenge the validity hereof. This Agreement may not be modified except in writing between all Parties hereto. No oral promises, assurances, agreements, or understandings either prior or subsequent to the execution of this Agreement are binding or may be relied upon except and unless incorporated herein or incorporated by written modification as permitted herein.

### 24. Effective Date

After this Agreement is signed by both Parties, this Agreement shall become effective upon Employee and Company establishing a relationship and sponsorship on the NMLS ("NMLS Affiliation"). If the NMLS Affiliation occurs prior to the execution of this Agreement, the effective date hereunder shall be the date both Parties have executed this Agreement.

Voluntarily agreed to and executed this day of _May 15_, 20_14_:

_____
Employee Signature

_Ty Gosnay_
Employee Name

Accepted: AmeriPro Funding, Inc.

By:_____    Date:_____

**CONFIDENTIAL**

APF00000344

## EXHIBIT A

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion.

1) **Commission Calculation-** Allocable Revenues (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission

   Effective for all loans funded on or after ___May 1, 2014___

   - Employee generated lead: 70 bps
   - Company generated lead: 20 bps

   The above mentioned commission schedule:
   - does not apply to any loan that contains borrower paid compensation
   - applies only to first lien closed end forward transactions unless otherwise approved by the Company in writing

2) **Bonus Eligibility** _____ Yes __X__ No

   All bonuses must be in the form of set dollar per file or bps per loan.

   $/file _____                          bps/loan _____

3) **Commission/Bonus Pay Schedule**
   Semi-monthly: Commissions/bonuses are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

   > *Payroll Eligibility Date:*
   > -Loans where AmeriPro Funding, Inc. is the creditor: funding date
   > -Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

4) **Guidelines**
   a) Employee is eligible to participate in Corporate sponsored Loan Officer incentive programs, such as the Secondary Marketing Incentive.

   _____ Yes __X__ No

Loan Officer Agreement - Page 7                          May 1, 2014

**CONFIDENTIAL**

APF00000345

b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

_____ Yes __X__ No

_Ty Gosnay_
Employee Signature

_Ty Gosnay_
Employee Name

Date: __5/15/14__

_M. _____
Branch Manager Signature

_Michael Nasserfar_
Branch Manager Name

Date: __5/15/14__

Accepted: AmeriPro Funding, Inc.

By:_____ Date:_____

CONFIDENTIAL

APF00000346

EXHIBIT B

Loan Officer Disclosures

*I hereby certify the following:*

I am a licensed real estate agent and hold a real estate sales license _X_ Y ___ N

I have a current and valid originator license with the NMLS _X_ Y ___ N


_____
Employee Signature

_____Ty G-0shay_____
Employee Name

Date: ___5/15/14___

May 1, 2014

CONFIDENTIAL

APF00000347

APPLICANT'S EXHIBIT NO. 19

## Employment Agreement Amendment

This Employment Agreement Amendment ("Amendment") by and between AmeriPro Funding, Inc. ("Company") and Tycord R. Gosnay ("Employee") is effective this 1ˢᵗ day of May, 2014 ("Effective Date") and shall modify and amend the prior Exhibit A (including any amendments thereto) ("Compensation Exhibit") attached to the certain employment agreement between Company and Employee, originally dated May 1, 2014 ("Employment Agreement").

### WITNESSETH:

WHEREAS, on May 1, 2014, Company and Employee entered into an Employment Agreement;

WHEREAS, Company and Employee mutually agree to amend the terms of Employee's compensation payments as set forth in the Compensation Exhibit;

WHEREAS, all other terms and conditions not specifically deleted, amended, or added hereunder shall remain in full force and effect. Nothing contained herein shall be construed as amending or modifying the terms of the Employment Agreement (other than the Compensation Exhibit).

NOW, THEREFORE, in consideration of the foregoing promises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Compensation Exhibit as follows:

1. New Compensation Terms- The entire Compensation Exhibit is replaced and superseded by the attached First Amended Exhibit A, which is incorporated herein by reference.

2. At-Will Employment- Company and Employee agree that nothing herein shall change or modify Employee's at-will employment status with Company.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the Effective Date set forth hereinabove.

BY SIGNING THIS AMENDMENT EMPLOYEE ACKNOWLEDGES THAT HE/SHE HAS READ AND UNDERSTANDS THE TERMS HEREIN (INCLUDING ALL ATTACHMENTS) AND AGREES TO BE BOUND HEREBY.

COMPANY:                                              EMPLOYEE:

AmeriPro Funding, Inc.
a Texas corporation

By: _____            _____
Larry Crisp                                               Tycord R. Gosnay

**EXHIBIT**
36
4-24-15 KW

Page 1 of 3

Applicant's
Injunction Hearing
Exhibit 019

CONFIDENTIAL

APF00000334

## FIRST AMENDED EXHIBIT A

Employee shall be provided with the following compensation arrangement until modification by Company in its sole discretion.

1) **Commission Calculation-** Allocable Revenues (BPS x volume from commission schedule below) *less* Commission Offset Balance *less* Uncollected Fees *less* Approved Business Expense (in accordance with the Company's accountable expense reimbursement plan) *equals* Gross Earned Commission

   Effective for all loans funded on or after: <u>May 1, 2014</u>

   - Employee generated lead: 70 bps
   - Company generated lead: 20 bps

   The above mentioned commission schedule:

   -does not apply to any loan that contains borrower paid compensation

   -applies only to first lien closed end forward transactions unless otherwise approved by the Company in writing

2) **Bonus Eligibility** __X__ Yes ____ No

   You shall be eligible to receive a bonus of 20 bps per file in which you act as the Loan Officer Assistant/Production Assistant. Payment shall be made on or around the 15th of the month for the prior month's production.

3) **Commission/Bonus Pay Schedule**

   Semi-monthly: Commissions/bonuses are paid on a semi-monthly basis. All loans with a Payroll Eligible Date from the 1st through the 15th of the month will be paid on the last day of the month. All loans with a Payroll Eligible Date from the 16th to the end of the month are paid on the 15th of the following month.

   *Payroll Eligibility Date:*
   -Loans where AmeriPro Funding, Inc. is the creditor: funding date
   -Loans where AmeriPro Funding, Inc. is the broker: the day following completion of loan check by Quality Control and Compliance

4) **Guidelines**
   a) Employee is eligible to participate in Corporate sponsored Loan Officer incentive programs, such as the Secondary Marketing Incentive.

   ____ Yes __X__ No

   b) Employee is allowed to broker loans through Company approved channels (provided he/she resides in a Non-Producing or Retail designated branch).

   ____ Yes __X__ No

*[signature page following]*

**CONFIDENTIAL**

APF00000335

_(Employee Signature)_
Employee Signature

_(Branch Manager Signature)_
Branch Manager Signature

_Ty Gosnay_
Employee Name

_Michael Noorf____
Branch Manager Name

Date: _7/29/14_

Date: _7/29/14_

Accepted: AmeriPro Funding, Inc.

By: _____ Date: _8/5/14_

**CONFIDENTIAL**

APF00000336

APPLICANT'S EXHIBIT NO. 21



# EMPLOYEE HANDBOOK

## Tenura Holdings, Inc.
## Tenura Operating Subsidiaries

An Equal Opportunity Employer

**A Manual of
Employee Benefits and
Human Resources Policies**



EXHIBIT ___70___
WIT: _Overhausen_
DATE: _4.27.15_
Micheal A. Johnson, CSR, CRR

    

Applicant's
Injunction Hearing
Exhibit 021

CONFIDENTIAL

APF00000002

**Introduction** .................................................................................................4
    Receipt of Company Employee Handbook.........................................4
    Purpose .................................................................................................5
    At Will Employment .............................................................................5
    Mission Statement ...............................................................................6

**Employment Policies**...................................................................................7
    Equal Employment Opportunity and Affirmative Action......................7
    I-9 Immigration Reform Policy...........................................................7
    Regulatory Compliance Policy ...........................................................8

**Workplace Conduct** ....................................................................................9
    Ethics Policy.........................................................................................9
    Respectful Workplace Policy............................................................10
    Sexual Harassment Policy................................................................11
    Drug-Free Workplace Policy ............................................................12
    Violence-Free Workplace..................................................................14
    Standards of Conduct .......................................................................15
    Customer Relations...........................................................................16
    Complaint Policy................................................................................17
    Whistle Blower...................................................................................18
    Disciplinary Procedure......................................................................19

**Employee Benefits** ....................................................................................20
    Employer-Offered Benefits ...............................................................20
    COBRA Benefits................................................................................21

**Time Away From Work**...............................................................................22
    Vacation Policy .................................................................................22
    Sick Pay Policy..................................................................................24
    Paid Holidays.....................................................................................26
    Bereavement Leave ..........................................................................27
    Jury Duty and Witness Leave...........................................................27
    Time-Off to Vote...............................................................................28

**Family and Medical Leave** .......................................................................29

**Other Leaves of Absences**.......................................................................34
    Unpaid Medical Leave .......................................................................34
    Benefit Continuation..........................................................................34
    Military Leave ....................................................................................35
    Pregnancy Disability Leave (California Employees)...........................35
    Paid Family Leave Insurance Program (California Employees)............37

**Performance Reviews**...............................................................................38
    Orientation Period..............................................................................38
    Performance Reviews .......................................................................38

**Compensation and Work Schedule** .........................................................39
    Pay Increases....................................................................................39

**CONFIDENTIAL**            **APF00000003**

Commissions .......................................................................39
Time Keeping .....................................................................39
Overtime for Non-Exempt Employees .................................39
Payroll/Pay Periods ..........................................................40
Direct Deposit ...................................................................40
Mandatory Payroll Deductions ..........................................40
Elective Payroll Deductions ...............................................40
Errors in Pay ....................................................................41
Hours of Operation ...........................................................41

## Information & Office Security ...............................42

Emergency Action Plan ......................................................42
Use of Communication Systems and Office Equipment...........44
Social Media and Blogging .................................................48
Recording Devices Prohibited ............................................52

## General Practices .................................................53

Americans with Disabilities Act (ADA)/ADA Amendments Act (ADAAA)53
Attendance Policy..............................................................53
Background Checks & References.......................................54
Classifications of Employment ..........................................55
Confidential Information and Company Property...................56
Conflicts of Interest..........................................................57
Community Fund-Raising Policy .........................................57
Corporate Credit Card.......................................................58
Driving While on Company Business....................................59
Employee Loan Policy.........................................................60
Employee Records.............................................................60
Employment of Relatives....................................................61
Gratuities and Gifts ..........................................................62
Grievance Procedure .........................................................62
HIPAA Privacy Policy ..........................................................63
Inclement Weather............................................................63
Internal Placement Policy...................................................64
Lactation (Expressing Breast Milk) Break............................65
Personal Appearance.........................................................66
Phone Calls and Personal Business.....................................67
Religious Accommodation Policy .........................................68
Reporting Injuries & Illnesses ...........................................69
Requests for References ....................................................69
Safety Rules.....................................................................70
Security – Facilities Access and Visitors ............................71
Solicitations, Distributions & Use of Bulletin Boards...........72
Smoke-Free Environment...................................................73
Social Events ...................................................................73
Termination Procedures ....................................................74
Worker's Compensation Insurance .....................................76

CONFIDENTIAL

APF00000004

# Introduction

## Receipt of Company Employee Handbook

This employment guide ("Employee Handbook" or "Manual") is a compilation of human resources policies, practices and procedures currently in effect at Tenura Holdings, Inc. ("Tenura") and its respective subsidiaries including AmeriPro Funding, Inc., Reliant Title Agency, LLC, Privatus, LLC, and AmeriFirst Insurance Agency, LLC ("Operating Subsidiaries") (the Operating Subsidiaries and Tenura shall collectively be referred to as the "Company"). The Company is an equal opportunity employer.

This Manual is designed to introduce employees to the organization, familiarize you with Company policies and benefits as they pertain to you as an employee, provide general guidelines on work rules, disciplinary procedures and other issues related to your employment, and to help answer many of the questions that may arise in connection with your employment.

This Manual and any other provisions contained herein do not constitute a guarantee of employment or an employment contract, express or implied. Your employment is "at-will" which means it may be terminated for any reason, with or without cause, and with or without notice. Only the President of Tenura or other authorized representative(s) of the Company has the authority to enter into a signed written agreement guaranteeing employment for a specific term. This Manual is intended solely to describe the present policies and working conditions at the Company. This Manual does not purport to include every conceivable situation; it is merely meant as a guideline, and unless laws prescribe otherwise, common sense shall prevail. Of course, Federal, state, and/or local laws will take precedence over Company policies, where applicable.

Human Resources Policies are applied at the discretion of the Company who reserves the right to change, withdraw, apply, or amend any of our policies or benefits, including those covered in this Manual, at any time. The Company may notify you of such changes via email, posting on the Company's Intranet, Portal or Website, or via a printed memo, notice, amendment to or reprinting of this Manual, but may, in its discretion make such changes at any time, with or without notice and without a written revision of this Manual.

By signing below, you acknowledge that you have received a copy of the Company's Employee Handbook, and understand that it is your responsibility to read and comply with the policies contained therein and any revisions made to it. Furthermore, you acknowledge that you are employed "at-will" and that this Manual is neither a contract of employment nor a legal document. Unless otherwise noted, information in this manual supersedes all previous communications, other than the Employment Agreement on the addressed topics.

_____    _____
Signature                                     Date

_____
Please print your full name

*Please sign and date one copy of this notice and return it to Human Resources.*
*Retain a second copy for your reference.*

**CONFIDENTIAL**                    **APF00000005**

## Purpose

The purpose of this handbook is to outline human resources policies and procedures to be used in the daily operation of Tenura and Operating Subsidiaries. These written policies should increase understanding, provide a guide for personal decisions and help to assure uniformity throughout the Company. This handbook is intended to be comprehensive; however, issues will undoubtedly arise which are not addressed herein. These issues will be addressed on an individual basis by management. As the Company grows, the need may arise to make changes to this handbook. The Company expressly reserves the right to revise, supplement or rescind any policy, procedure or benefit described in this handbook in its sole and absolute discretion. Any such changes will be communicated to all employees. Additionally, in some cases, an Operating Subsidiary may issue an approved supplement to this handbook where operations may slightly differ.

## At Will Employment

Unless otherwise expressly provided for in a legal contract, authorized and signed by the President of the Company, all employees of the Company are employees "at will," which means that the employment of such employees may be terminated at any time, for any or no reason, either by the employee or by the Company. Nothing contained in this handbook is intended to alter the "at will" nature of any employee's relationship with the Company or to require that the Company have reason or "just cause" or to otherwise restrict the Company's right to terminate any employee at any time for any or no reason.

**CONFIDENTIAL**

**APF00000006**

## Mission Statement

All members of the Tenura team are guided and motivated by our mission which is our foundation and differentiates us from other organizations. All Company team members should strive toward this mission in all that they do.

*An Outstanding Customer Experience*. Our goal is to bring efficiency and effectiveness to the home buying and selling process. We endeavor to provide our customers a truly exemplary experience by bundling the brokerage, mortgage, title, insurance and warranty transactions together as one. This bundle will guarantee the customer an exceptional experience.

*Empowering the Individual*. We believe in the free market and the potential of the individual. We endeavor to provide our agents, loan officers, employees and associates with unlimited potential to build strong customer relationships by providing exceptional service and value. Empowering the individual to use their God given abilities, talents and creativity with a truly effective set of services will create real value for the individual, the customer and the Company.

*An Environment of Care*. We aim to create a working environment that encourages the respect, and well-being of others. We desire to assist and support each other daily in ways that truly instill motivation; to give of ourselves so that others may continue the gift of giving by instituting an environment of compassion and care for all. This will be our greatest asset.

**CONFIDENTIAL**

APF00000007

# Employment Policies

## Equal Employment Opportunity and Affirmative Action

The Company provides equal employment opportunities to all employees and applicants and is committed to a diverse workforce. We value all employees' talents and support an environment that is inclusive and respectful. We are strongly committed to this policy and believe in the concept and spirit of the law. All personnel actions are administered without regard to race, color, religion, gender, sexual orientation, national origin, age, disability, genetic information, marital status, amnesty, or status as a covered veteran in accordance with applicable federal, state and local laws. In addition, the Company complies with applicable state and local laws governing nondiscrimination in employment in every location in which the Company has facilities. This policy applies to all terms and conditions of employment, including, but not limited to, recruiting, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, compensation and training, participation in social and recreational programs and other employment related programs. Employees and applicants will not be subjected to harassment, intimidation, threats, retaliation, coercion or discrimination because they have exercised any right protected by law.

We believe in and practice equal opportunity. The Employee Relations Manager serves as our Equal Opportunity Coordinator and has overall responsibility for assuring compliance with this policy. All employees are responsible for supporting the concept of equal opportunity and diversity and assisting our Company in meeting its objectives.

## I-9 Immigration Reform Policy

The Company complies with the Immigration Reform and Control Act of 1986 and all state and local laws requiring the use of E-Verify by employing only United States citizens and non-citizens who are authorized to work in the United States. All employees are asked on their first day of employment to provide original documents verifying the right to work in the United States and to sign a verification form required by federal law (INS Form I-9). If an individual cannot verify his/her right to work within three days of hire, the Company must terminate his/her employment.

**CONFIDENTIAL**

**APF00000008**

## Regulatory Compliance Policy

The Company operates in the real estate, mortgage, insurance, and settlement service provider industries. As such, it is essential that every employee understand and comply with all applicable state and federal laws and regulations. Such required compliance also includes strict adherence to rules and guidelines of applicable investors, government-sponsored enterprises, and underwriters.

Given the Company's commitment to this regard, each subsidiary will provide regular information and updates in their respective area of compliance. Failure to adhere to such requirements or licensing and compliance issues in general, will be grounds for disciplinary action up to and including termination. Regulatory compliance questions should be directed to your immediate supervisor.

**CONFIDENTIAL**

APF00000009

# Workplace Conduct

## Ethics Policy

The Company conducts its business fairly, impartially, in an ethical and proper manner, and in compliance with all laws and regulations.

The Company is committed to conducting its business with integrity underlying all relationships, including those with citizens, customers, suppliers and communities, and among employees. The highest standards of ethical business conduct are required of Tenura and Operating Subsidiaries employees in performance of their responsibilities. Employees will not engage in conduct or activity on behalf of Tenura and Operating Subsidiaries that may raise questions as to the Company's honesty, impartiality or reputation or otherwise cause embarrassment to the Company. In the course of their job performance, employees will avoid any action, whether or not specifically prohibited in the personnel policies, which might result in or reasonably be expected to create an appearance of:

- Using public office or public position for private gain.
- Giving preferential treatment to any person or entity.
- Losing impartiality.
- Adversely affecting the confidence of the public in the integrity of the Company.

Every employee has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this policy. Issues, concerns, questions, or suspected violations of ethical business conduct should be reported to your supervisor or Human Resources Department. Human Resources will then perform an investigation of the reported issues. Retaliation against employees who use these reporting mechanisms to raise genuine concerns will not be tolerated.

The Human Resources Department is responsible for providing policy guidance and assisting employees in complying with the Company's expectations of ethical business conduct and uncompromising values. This policy constitutes the standards of ethical business conduct required of all employees. Managers are responsible for supporting their implementation and monitoring compliance.

**CONFIDENTIAL**

**APF00000010**

## Respectful Workplace Policy

The Company is committed to a work environment in which all individuals are treated with respect and dignity. The Company believes that all employees are entitled to work in an environment free from harassment, bullying, intimidation and coercion, allowing each employee to reach his or her full potential. The Company prohibits any form of harassment based on race, color, religion, gender, sexual orientation, national origin, age, genetic information, marital status, disability, or veteran status or other characteristic or activity protected by federal, state or local law. The Company will not tolerate any such discrimination or harassment. Such conduct is prohibited in any form at the workplace, at work-related functions, or outside of work if it affects the workplace. This policy applies to harassment by any Company employees, including co-workers, supervisors, managers and executives, as well as any non-employees present in the Company's workplace or interacting with the Company's employees in connection with their work including clients, customers, guests, vendors, and persons doing business with Tenura and/or Operating Subsidiaries. Such prohibited harassment can arise from a broad range of physical or verbal behavior, which may include, but is not limited to, the following:

- Unwelcome sexual flirtation, advances, or propositions;
- Verbal comments related to an individual's race, color, religion, gender, sexual orientation, national origin, age, genetic information, marital status, disability, or veteran status;
- Explicit or degrading verbal comments about another individual or his/her appearance;
- The display of sexually suggestive pictures, objects, or statements in any workplace location including transmission or display via computer;
- Any sexually offensive or abusive physical conduct; and
- The taking of or the refusal to take any personnel action based on an employee's submission to or rejection of sexual overtures.

Additionally, the Company considers verbal slandering, ridiculing that is hurtful or humiliating, non-verbal threatening gestures, glances which can convey threatening messages, or excluding or disregarding a person in work-related activities as examples of workplace bullying, which will not be tolerated.

As outlined below, the Company takes seriously any harassment or bullying claim and specifically prohibits any supervisor or any other Company employee from unlawful action that could affect the terms or conditions of any employee's employment with the Company.

Upon employment, each new employee will receive a copy and sign an acknowledgement of receipt of the Company's written Harassment Policy. If at any time the Harassment Policy is modified or amended, an updated version of the policy will be distributed to each Company employee.

**CONFIDENTIAL**

**APF00000011**

## Sexual Harassment Policy

Sexual harassment is a specific form of illegal harassment that requires more explanation. The Company bases its definition of sexual harassment on information provided by the Equal Employment Opportunity Commission (EEOC). According to EEOC guidelines, sexual harassment includes, but is not necessarily limited to, unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

- Submission to or rejection of such conduct explicitly or implicitly affects an individual's employment;
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or
- Such conduct unreasonably interferes with an individual's work performance or creates an intimidating, hostile or offensive work environment.
- Sexual harassment can occur in a variety of circumstances, including but not limited to, the following:
- The victim as well as the harasser may be a woman or man. The victim does not have to be of the opposite sex.
- The harasser can be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employee.
- The victim does not have to be the person harassed but could be anyone affected by the offensive conduct.
- Unlawful sexual harassment may occur without economic injury to or discharge of the victim.
- The harasser's conduct must be unwelcome.

If you believe that you are being subjected to workplace harassment, you should:

1. Tell the harasser that his or her actions are not welcome and they must stop, if you feel comfortable enough to do so.

2. Report the incident immediately to your supervisor/manager or the Human Resources Department.

3. Report any additional incidents or retaliation that may occur to one of the above resources.

Any reported incident will be investigated immediately and thoroughly. Complaints and actions taken to resolve complaints will be handled as confidentially as possible, given the Company's obligation to investigate and act upon reports of such harassment. Appropriate actions will be taken by the Company to stop and remedy any and all such conduct, including interim measures during a period of investigation.

Retaliation of any kind or discriminating against an employee who reports a suspected incident of harassment or who cooperates in an investigation is prohibited. An

**CONFIDENTIAL**

**APF00000012**

employee who violates this policy or retaliates against an employee in any way will be subject to disciplinary action up to and including immediate termination.

The Company prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy, or for assisting in the complaint investigation. Therefore, if, in response to an employee's report of suspected employment discrimination, a supervisor or other employee retaliates or threatens to retaliate against the employee or his or her job, the affected employee should promptly report the incident(s) to his or her supervisor, to the Human Resources Department and/or to any other member of management. However, if, after investigating any complaint of unlawful discrimination or harassment, the Company determines that an employee intentionally provided false information regarding the complaint, disciplinary action may be taken against the one who gave the false information.

The Company welcomes any questions or comments from employees regarding the Harassment Policy outlined above.

## Drug-Free Workplace Policy

We recognize alcohol and drug abuse as potential health, safety and security problems. It is expected that all employees will assist in maintaining a work environment free from the effects of alcohol, drugs or other intoxicating substances. Compliance with this substance abuse policy is made a condition of employment with Tenura and Operating Subsidiaries.

To promote this goal, you may be asked to participate in random drug and/or alcohol testing. This will include all existing employees and new hires.

Employees are prohibited from the following when reporting for work, while on the job, on Company or customer premises or surrounding areas, or in any vehicle used for Company business:

- The unlawful use, possession, transportation, manufacture, sale, dispensation or other distribution of an illegal or controlled substance or drug paraphernalia; additionally, the Company prohibits the use of marijuana for medicinal purpose or recreation;
- The unauthorized use, possession, transportation, manufacture, sale, dispensation or other distribution of alcohol;
- Being under the influence of alcohol or having a detectable amount of an illegal or controlled substance in the blood or urine ("controlled substance" means a drug or other substance as defined in applicable federal laws on drug abuse prevention);
- Performance of duties while taking prescribed medications that are adversely affecting the employee's ability to safely and effectively perform their job duties, or puts at risk the Company's reputation; and
- Refusing to participate in random or "for cause" drug and / or alcohol testing.

**CONFIDENTIAL**

**APF00000013**

Any employee violating these prohibitions will be subject to disciplinary action up to and including termination.

Any employee convicted under any criminal drug statute for a violation occurring while on the job, on Company or customer premises, or in any vehicle used for Company business must notify the Company no later than five days after such a conviction. A conviction includes any finding of guilt or plea of no contest and/or imposition of a fine, jail sentence, or other penalty.

Drug and alcohol testing will be carried out in compliance with any applicable state and federal laws and regulations. It is our intent to work with those who have alcohol/drug dependency problems, provided they seek help. We urge you to seek referrals for counseling and treatment promptly.

In order to ensure the safety of the work force and workplace, we reserve the right, for cause, to:

- Search any vehicle brought onto or parked on our property.
- Search personal containers (packages, purses, briefcases, lunch boxes, etc.) brought onto our property or into our building. Employees taking a prescribed medication must carry it in the container labeled by a licensed pharmacist or be prepared to produce it if asked.
- Request you to submit a blood, breath, hair and/or urine sample for determining use of drugs and/or alcohol.

As used here, the term "cause" shall include, by way of example, but not as a limitation, an accident, near accident, irrational behavior, poor performance or workmanship and other evidence of alcohol and drug use that is deemed reliable.

CONFIDENTIAL

APF00000014

# Violence-Free Workplace

It is Tenura and Operating Subsidiaries policy to provide a workplace that is safe and free from all threatening and intimidating conduct. Therefore, the Company will not tolerate violence or threats of violence of any form in the workplace, at work-related functions, or outside of work if it affects the workplace. This policy applies to all Company employees, clients, customers, guests, vendors, partners, and persons doing business with Tenura and Operating Subsidiaries.

It will be a violation of this policy for any individual to engage in any conduct, verbal or physical, which intimidates, endangers, or creates the perception of intent to harm persons or property. Examples include but are not limited to:

- Physical assaults or threats of physical assault, whether made in person or by other means (i.e., in writing, by phone, fax, e-mail, or text).
- Verbal conduct that is intimidating and has the purpose or effect of threatening the health or safety of a co-worker.
- Possession of firearms or any other lethal weapon on Company property, in a vehicle being used on Company business, at a work-related function, or unlawful possession in any Company owned or leased parking facility.
- Any other conduct or acts which management believes represents an imminent or potential danger to work place safety/security.

Additionally, the Company strictly prohibits the use, sale purchase, transfer, or possession by its employees of any illegal gun or other weapon. The Company strictly prohibits employees from bringing any guns, licensed or unlicensed, or weapons onto any Company premises or into any Company facility. In order to promote a safe, productive, and efficient workplace, the Company reserves the right to inspect employees, as well as any articles and property in their possession, to detect guns or other weapons.

Anyone with questions or complaints about workplace behaviors which fall under this policy may discuss them with a supervisor or Human Resources. Tenura and Operating Subsidiaries will promptly and thoroughly investigate any reported occurrences or threats of violence. Violations of this policy will result in disciplinary action, up to and including immediate termination of employment. Where such actions involve non-employees, the Company will take action appropriate for the circumstances. Where appropriate and/or necessary, the Company will also take whatever legal actions are available and necessary to stop the conduct and protect Tenura and Operating Subsidiaries employees and property. If you have reason to believe that events in your personal life could result in acts of violence occurring at work, you are strongly urged to confidentially discuss the issue with Human Resources so that a prevention plan can be developed.

**CONFIDENTIAL**

**APF00000015**

# Standards of Conduct

To ensure an orderly and efficient workplace, Tenura and Operating Subsidiaries expect its employees to comply with the Company's standards of conduct that protect the interests and safety of employees and the Company. While it is not possible to list every type of behavior that is unacceptable in the workplace, the following are examples of behavior that may result in disciplinary action up to and including termination of employment. (Nothing in this policy is meant to alter the "at will" nature of any employee's employment with the Company or require that Company have just cause or reason for any termination.)

- Refusal or failure to follow directives from a supervisor, manager, or Company officer.
- Breach of confidentiality relating to employer, employee, and customer, or provider information.
- Altering, damaging, or destroying Company property or records, or another employee's property.
- Illegal or dishonest activities, theft or gross misconduct.
- Providing false or misleading information to any Company representative or on any Company records including the employment application, benefit forms, time cards, expense reimbursement forms, etc.
- Fighting, bullying, or engaging in disorderly conduct on Company's or customer's premises.
- Violations of any of the Company's employment policies including, but not limited to, confidentiality, security, solicitation, insider trading, conflict of interest, and standards of conduct.
- Conduct or performance issues of a serious nature such as sleeping during business hours.
- Failure of a drug or alcohol test.
- Discourtesy to a customer, provider, or the general public resulting in a complaint or loss of good will and reputation.
- Possession of weapons or dangerous firearms in the workplace.
- Unauthorized or inappropriate use of Company equipment including telephones or computers.

Any employee charged, indicted, and/or convicted of a crime of moral turpitude, any financial crime, or one involving the real estate, mortgage, insurance, or settlement service provider industries (whether felony, misdemeanor, or otherwise) must report such charge, indictment, and/or conviction to Company immediately.

CONFIDENTIAL

APF00000016

## Customer Relations

The Company strives to consistently provide customers with a product and service that is of exceptional quality and value.

In order to realize our commitment to excellent customer service, we expect the following from each of our employees:

- Provide courteous service in a prompt and efficient manner.

- Establish and maintain positive relationships with customers by gaining their trust and respect through professional, honest interaction.

- Handle complaints quickly and professionally. Never argue with a customer. If you are unable to resolve the complaint to the customer's satisfaction, review the situation with your supervisor.

- Communicate with customers in a professional manner whether in person, over the phone, or via e-mail.

Always remember that you are the Company to our customers and our reputation and the customer's perception of the Company is attributed to each employee.

While the Company does not seek to interfere with the off-duty and personal conduct of its employees, certain types of off-duty conduct may interfere with the Company's legitimate business interests. For this reason, employees are expected to conduct their personal affairs in a manner that does not adversely affect Tenura and Operating Subsidiaries or their own integrity, reputation, or credibility. Illegal or immoral off-duty conduct on the part of an employee that adversely affects the Company's legitimate business interests or the employee's ability to perform his or her job will not be tolerated. Disciplinary action can be taken up to and including termination.

CONFIDENTIAL

APF00000017

## Complaint Policy

The Company expects all employees to create an atmosphere free of discrimination and harassment and respect the rights of their co-workers. It is the shared obligation of all employees to report any and all incidents of suspected employment discrimination or harassment.

In the event an employee experiences or witnesses any job-related discrimination or harassment based on race, color, religion, gender, sexual orientation, national origin, age, disability, genetic information, marital status, amnesty, or status as a covered veteran in accordance with applicable federal, state and local laws or believe they have been treated in an unlawful, discriminatory manner or have been unlawfully harassed, promptly report the incident to your supervisor, the Human Resources Department and/or to any other member of management. Once made aware of your complaint, Tenura and Operating Subsidiaries is committed to commence an immediate, thorough investigation of the allegations. If an employee believes that a reported claim is not being timely or adequately addressed, the employee should bring his or her concerns to the attention of an alternate member of management. Complaints will be kept confidential to the maximum extent as possible.

If, at the completion of an investigation, the Company determines that an employee is guilty of discriminatory or harassing behavior, appropriate disciplinary action up to and including termination of employment will be taken against the offending employee.

The Company prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy, or for assisting in the complaint investigation. Therefore, if, in response to an employee's report of suspected employment discrimination or participation in an investigation, a supervisor or other employee retaliates or threatens to retaliate against the employee or his or her job, the affected employee should promptly report the incident(s) to his or her supervisor, to the Human Resources Department and/or to any other member of management. However, if, after investigating any complaint of unlawful discrimination or harassment, the Company determines that an employee intentionally provided false information regarding the complaint, disciplinary action may be taken against the one who gave the false information.

**CONFIDENTIAL**

**APF00000018**

## Whistle Blower

A whistleblower as defined by this policy is an employee of Tenura or Operating Subsidiaries who reports an activity that he/she considers to be illegal or dishonest to one or more of the parties specified in this Policy. The whistleblower is not responsible for investigating the activity or for determining fault or corrective measures; appropriate management officials are charged with these responsibilities.

Examples of illegal or dishonest activities are violations of federal, state or local laws; billing for services not performed or for goods not delivered; and other fraudulent financial reporting.

If an employee has knowledge of or a concern of illegal or dishonest fraudulent activity, the employee is to contact his/her immediate supervisor or Human Resources Department. The employee must exercise sound judgment to avoid baseless allegations. An employee who intentionally files a false report of wrongdoing will be subject to discipline up to and including termination.

Whistleblower protections are provided in two important areas -- confidentiality and against retaliation. Insofar as possible, the confidentiality of the whistleblower will be maintained. However, identity may have to be disclosed to conduct a thorough investigation, to comply with the law and to provide accused individuals their legal rights of defense. The Company will not retaliate against a whistleblower. This includes, but is not limited to, protection from retaliation in the form of an adverse employment action such as termination, compensation decreases, or poor work assignments and threats of physical harm. Any whistleblower who believes he/she is being retaliated against must contact the Human Resources Department immediately. The right of a whistleblower for protection against retaliation does not include immunity for any personal wrongdoing that is alleged and investigated.

All reports of illegal and dishonest activities will be promptly submitted to the Human Resources Department who is responsible for investigating and coordinating corrective action.

Employees with any questions regarding this policy should contact the Human Resources Department.

CONFIDENTIAL

APF00000019

## Disciplinary Procedure

The Company reserves the right to address any inappropriate workplace behavior or unsatisfactory performance on a case by case basis, depending on the circumstances as it shall determine to be appropriate in its sole discretion. Nothing in this Disciplinary Procedure Policy is meant to alter the "at will" nature of the employee's relationship with the Company or to require just cause or reason for any termination.

Disciplinary actions may entail verbal, written, final warnings, suspension, or termination. All of these actions may not be followed in some instances. The Company reserves the right to exercise discretion and take any disciplinary action it considers appropriate, including termination, at any time. If you are disciplined in writing, copies of your warnings are placed in your personnel file.

Any repeated or new violation of any Company standard of conduct or other inappropriate behavior in or affecting the workplace while an employee is on probation will result in termination.

CONFIDENTIAL

APF00000020

# Employee Benefits

The following benefits are offered by Tenura and Operating Subsidiaries in an effort to improve the quality of life for our employees. The Company reserves the right to cancel, modify or amend these benefits at any time without prior notice to the employees. These benefits are only provided to full-time, regular (as opposed to temporary) employees. For the purpose of these benefits, full-time employees are defined as those employees who work a minimum of thirty-five (35) hours per week.

In order to record employee benefits, a continuous service date shall be maintained. If an employee is rehired after separation, the rehire date will be considered the new continuous service date.

## Employer-Offered Benefits

The Company provides each full-time employee access to a suite of benefits including but not limited to health, dental, vision, life and disability insurance. Additionally, the Company offers a Health Saving Account alongside its high deductible healthcare offerings and a 401k retirement plan. Company offerings will be reviewed with employees upon hire, during annual enrollment periods, and throughout the year as appropriate.

Coverage begins on the first day of the first month following 60 days of continuous employment. Employees who do not enroll during the new hire window will not be eligible to enroll until the annual open enrollment period.

Because the Company is concerned with the health and welfare of all employees and in accordance with the Affordable Care Act, the Company agrees to pay a portion of the premiums for the employee's health insurance coverage. A schedule of benefits and associated premiums is available from the Human Resources Department upon request.

As a result of termination, reduction in work hours, injury or illness or in the event that an employee is on a military, jury duty or other leave of absence, an employee may be eligible to continue the Company's group coverage by paying a monthly premium.

**Employees are urged to consult the insurance summary plan description for details of the plan benefits. The plan document controls payment of any benefits.**

Group insurance is an employee benefit in which an employee is not required to enroll. There will be no increase in wages if an employee waives coverage. For inquiries, contact the Human Resources Department.

**CONFIDENTIAL**

**APF00000021**

## COBRA Benefits

The Company complies with the federal law, Consolidated Omnibus Budget Reconciliation Act of 1985, P.L. 99 272, later amendments, otherwise known as COBRA. Covered employees and their dependents that lose insurance coverage for any of the following reasons are eligible to continue their coverage through COBRA: termination, reduction in working hours, divorce or legal separation, death of the employee, eligibility for Medicare or loss of dependent child status under the insurance plan. All administrative rules and processes as well as changes in plan benefits and premiums apply to those on continuation coverage.

In the event of divorce or legal separation, or the loss of dependent child status under the plan, a covered employee or dependent must notify the Human Resources Department within 60 days to maintain the right to continue coverage. At that time, Human Resources will provide enrollment materials to the employee or covered dependent within 14 days of that notification.

The covered employee or dependent has 60 days to elect continuation of coverage from either the date that coverage would ordinarily have ended under the plan by reason of a qualifying event or the date of notification, whichever comes later. Election of continuation of coverage is established by completing and returning enrollment materials to Human Resources.

COBRA premiums must be submitted as required and the first premium will be due within 45 days of the date of election. Subsequent premiums must be received within the terms set forth by the provider. Failure to make timely payments will result in termination of coverage without notice.

Continuation of COBRA coverage will end for any of the following reasons: the Company discontinues its insurance plan, the premium payment is not made in a timely fashion, and the person who elected continuation of coverage becomes covered under another insurance plan or Medicare. Continuation coverage will end after 18 months if the qualifying event was termination or reduction in hours, unless the qualified beneficiary is disabled at the time of termination or reduction in hours, in which case coverage may extend to 29 months. Continuation coverage will otherwise end after 36 months.

CONFIDENTIAL

APF00000022

# Time Away From Work

## Vacation Policy

Vacation time off with pay is available to regular full-time and part-time employees. The amount of eligible paid vacation time that you receive each year increases with the length of your employment as shown in the following schedule. Beginning with each new anniversary year, you may begin to schedule your annual allotment per the table below. Regular full-time employees earn vacation time off with pay at the rate listed in the following schedule. Part-time employees who regularly work 20-35 hours per week earn at a rate of 50% of the rate listed in the following schedule.

| Length of Eligible Service | Eligible Vacation Hours Each Year |
|---|---|
| 1-4 years | 80 (10 days) |
| 5-9 years | 120 (15 days) |
| 10+ years | 160 (20 days) |

## Vacation Eligibility Earning

After you have attained 90 days of continuous service, without extension of orientation period, you may schedule vacation. Requests to take vacation time should be made to your direct supervisor via the Company's HR and Payroll system of record as early as possible, but not less than two weeks in advance of the first day of the requested time off, to facilitate covering your workload during your absence. Exempt employees may take vacation in one-half or full-day increments; non-exempt employees may take vacation in increments of 30 minutes. If you are requesting five days or greater consecutively, the request should be made 30 days in advance of the first day of the requested time off. Generally speaking, vacation time off requests should be made for time that has been previously accrued. Employees are discouraged from taking extended vacations at the end of the calendar month due to the nature of the industry and workload at that time. Your vacation request will be evaluated and subject to approval depending upon staffing needs and other business requirements at the time.

Vacation should be taken in the same anniversary year as earned and unused vacation will be forfeited. No carryover of vacation time to a following year is permitted, unless it is at the request of management, when an employee has had to reschedule for urgent personal reasons, such as sickness or disability, or when an employee is planning for an upcoming extended FMLA, military or other approved leave. In such case, no more than five days of vacation may be carried over into a new calendar year. An employee requesting carryover must complete a Request to Carryover Vacation Form. Vacation carryover requires the approval of your supervisor and Human Resources. Upon

**CONFIDENTIAL**

**APF00000023**

approval, the carryover amount will be reflected in the Company's HR and Payroll system of record.

## Example of vacation eligibility calculation:

**Employee start date: 5/19/13**
**Vacation hours accrued per month: 6.67** (prorate 10 work days/12 months)
**Vacation time must be taken by: 5/18/14**

Vacation time off is paid at your base pay rate at the time of vacation. It does not include overtime or any special forms of compensation such as incentives, commissions, bonuses or shift differentials. Vacation time will be accrued per payroll cycle at the rate corresponding with your service anniversary year. Per the Company's FMLA and Other Leave Policies, vacation time shall not accrue during unpaid extended leave.

## Vacation Accrual Limit (California Employees & Approved Carryover Requests)

Employees in California and those who are approved for vacation carryover will not earn any additional vacation once they have reached their annual accrual limit, until they use all or a portion of their earned vacation. The annual accrual limit is equivalent to the maximum number of vacation days an employee is entitled to earn during a given calendar year, based on the employee's length of service.

## Example of vacation accrual limit:

Employee has three years of service. Thus, according to the vacation eligibility calculation, employee may earn up to 10 days of vacation during the anniversary year (annual accrual limit).

Employee has carried over five vacation days from the previous anniversary year. Employee begins earning his/her current anniversary year's vacation but takes no vacation time off during the year. Once Employee earns 10 vacation days this anniversary year, he/she will have reached his/her annual accrual limit of 15 days (five-day carryover plus 10 days accrued during the current year). Thus, Employee will not accrue any additional vacation time until he/she uses his/her earned vacation and reduces the number of days in his/her "vacation bank" to below 15 (her annual accrual limit).

NOTE: The above policy is not designed to penalize employees but to encourage them to use their earned vacation for purposes of rest, relaxation and rejuvenation.

**CONFIDENTIAL**

**APF00000024**

## Payment of Vacation upon Termination

You will be paid for all accrued and unused vacation time upon resignation, separation, or retirement from the Company. However, in the event of a voluntary termination of employment, no payment may be made unless the employee gives at least a two-week notice, unless otherwise required by law. Additionally, any employee terminated for cause will not be paid unused vacation time or any other paid benefit, unless otherwise required by law. All vacation taken but not yet accrued, irrespective of the separation reason, will be deducted from your final paycheck.

## Sick Pay Policy

The Company offers sick pay benefits to allow paid time off for illness, physician appointments, or injury. If you are unable to report for work because of illness or for any other reason, please call your supervisor no later than your scheduled start time. Explain the reason for the absence and tell him/her when you expect to return to work. If you are unable to return to work on the expected day, you should call your supervisor as soon as possible on that day to inform him/her of the status of your return. If your supervisor is unavailable, contact Human Resources. Sick time is offered to encourage employees who may have contagious illnesses to take time to rest and recover. The Company's policy is for any employee who feels like they may be contagious not to come into the work environment. Per the Company's attendance policy, if you are absent for three or more consecutive workdays, a statement from a physician may be required before you will be permitted to return to work.

## Sick Time Eligibility Earning

Beginning on the first of the month following 30 days of continuous employment with the organization, all regular full-time and part-time employees who regularly work 20-35 hours per week are eligible to accrue sick pay for dental/health appointments and/or absences due to illness or injury to you, your dependents, or your ill parent. For regular full-time employees, this sick pay accrues at the rate of 1.6667 hours (.8333 hours for regular part-time employees) per pay period through December 31. Beginning January 1, you are allowed sick pay to a maximum of forty hours (five days) per calendar year. (Eligible part-time employees accrue at a rate of twenty hours (two and one half days) per calendar year.) These days are accrued pro-rata based on the actual percentage of the calendar year you work. Sick pay may not be carried over from year to year. Time taken for health care purposes for yourself or your dependent's visit to the doctor, dentist, etc. will be counted as sick leave. Exempt employees may take sick time in one-half or full-day increments; non-exempt employees may take sick time in increments of 30 minutes. If the appointment takes less than half of a day, the option of sick pay may be used or that amount of time may be made up during that work week if the work schedule permits and your supervisor approves.

**CONFIDENTIAL**

**APF00000025**

## Abuse of Sick Leave

Regular attendance is crucial to the success of this and any other business. Paid sick leave is provided as a financial buffer for employees who are too injured or ill to work, not as additional time off for employees who are well. Employees should be prepared to furnish a doctor's note or similar evidence of inability to work if the supervisor requests one. Abuse of sick leave is grounds for discipline, up to and including discharge.

## Extended Leave

Employees who have used up their available paid sick leave and remain unable to report for work may be eligible for unpaid family and medical leave (FMLA leave), or other unpaid leave and must substitute all accrued unused paid vacation, floating holidays and any other paid time off before continuing leave on an unpaid basis. Eligibility for health care benefits continues during FMLA and other unpaid leave. Per the Company's FMLA and Other Leave Policies, sick time shall not accrue during unpaid extended leave.

## Payment of Sick Pay upon Termination

Sick leave is a benefit provided to you in the event you need to take time off because of your health or for any personal reason. It is not merely additional paid vacation, thus no pay is provided for unused sick leave at the end of employment. Accrued and unused sick pay is not payable upon termination. Any sick pay taken but not yet accrued will be deducted from your final paycheck.

**CONFIDENTIAL**

**APF00000026**

## Paid Holidays

All regular full-time employees will be eligible for paid holidays as listed below. If any of these holidays should fall on a weekend, the preceding Friday or the following Monday will be designated by the Company as the holiday. At the start of each year, a holiday schedule will be made available to all employees.

New Year's Day

Presidents' Day

Good Friday

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas (Two days: Christmas Day and the preceding or following workday as designated by the Company.)

Two floating holidays (To be used for special events or occasions and/or in support of the Religious Accommodation or Community Fund-Raising Policy.)

*Employees in their first year of employment will be eligible for floating holidays as follows:

| Hire Date | Floating Holiday Eligibility |
|---|---|
| On or before April 30th | 2 days |
| May 1st – September 30th | 1 day |
| October 1st – December 31st | 0 days |

Employees may be permitted to work through one of these holidays and take the time off on another day with prior approval from his or her supervisor. If an employee is requested to work on a holiday, the employee will be paid his regular rate of pay plus eight (8) hours of holiday pay. Every effort will be made by the Company to reasonably accommodate any employee's religious beliefs through the substitution of one or more of the foregoing holidays for an employee's religious holidays.

Part-time employees who regularly work 20-35 hours per week will be eligible for holiday pay for their regular scheduled shift, if the designated holiday falls on the employee's regular scheduled workday. If the holiday does not fall on the regular scheduled workday, the employee will not be eligible for holiday pay. Part-time employees earn floating holidays at one-half the full-time rate.

CONFIDENTIAL

APF00000027

## Bereavement Leave

The Company recognizes that when an employee's immediate family member dies, time off is often necessary for bereavement. In such cases, requests for time off will be granted with pay, in the Company's discretion, for up to three days. This paid time off will be considered bereavement and not vacation time. With respect to this policy, immediate family is defined as the following: mother, father, spouse, son, daughter, sister, brother, mother-in-law, father-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law, stepchild, stepbrother, stepsister, half-brother, half-sister, stepparent, grandparent, legal guardian or domestic partner.

Employees may be asked to provide verification of death, such as a copy of the obituary or a copy of the funeral program.

## Jury Duty and Witness Leave

It is every citizen's civic duty to serve on jury duty when called. As a result, the Company agrees to pay the net difference between an employee's regular pay and the amount paid by the court for a period of up to five days during the time that the employee is called to active jury duty. The employee must provide a copy of his or her jury duty orders and pay stub to his or her supervisor in order to receive pay for this time off. After the five days of paid jury duty leave, employees on jury duty will be on leave without pay, unless the employee elects to use accrued paid time off.

Additionally, the Company allows employee's responding to a subpoena, court order or witness duty with unpaid leave time, consistent with specific state and local requirements.

CONFIDENTIAL

APF00000028

## Time-Off to Vote

The Company encourages all employees to vote. It is the policy of Tenura and Operating Subsidiaries to comply with all state election law requirements with respect to providing employees, where necessary, with time off to vote.

If an employee has three (3) consecutive hours either between the opening of the polls in his or her community and the beginning of the workday or between the end of the workday and the closing of the polls, the employee will be deemed to have sufficient time outside his or her normal working hours within which to vote.

If an employee has less than three (3) consecutive hours, he or she may take off as much working time as will, when added to his or her voting time outside normal working hours, enable such employee to vote.

For non-exempt employees, however, not more than two (2) hours of working time taken shall be paid, and such time shall be taken only at the beginning or end of the employee's workday as designated by the employee's supervisor.

Employees requiring working time off to vote will be required to notify the Company not more than 10 or less than two (2) working days before the day of election when time off to vote will be required.

**CONFIDENTIAL**                                                                      **APF00000029**

# Family and Medical Leave

Many of our employees are entitled to an unpaid leave of absence for up to twelve or twenty-six weeks in a rolling twelve-month period (depending on the reason for leave) under the federal Family and Medical Leave Act (FMLA). In addition, the Company complies with all state laws and regulations regarding family and medical leave, as applicable. Please see a member of the Human Resources Department if you have a specific question about state-specific leave or leave under this policy.

## Eligibility

To be eligible for FMLA leave, you must have been employed by the Company for at least 12 months (which may be non-consecutive). In addition, in the 12 months immediately preceding the beginning of the leave, you must have worked at least 1,250 hours.

## Types of Leave Available

## Basic Family and Medical Leave:

Basic Family and Medical Leave may be taken for the following reasons:

- Birth of a child or to bond or care for a newborn child
- For the placement with an employee of a child for adoption or foster care or to bond or care for the newly placed child
- For the serious health condition of the employee (which includes serious medical conditions related to pregnancy)
- For the serious health condition of the employee's family member (*i.e.*, child, parent or spouse) (which includes prenatal and postpartum serious health conditions)

Leave granted due to the birth or care of a newborn or adoption or foster placement of a child must be taken in full consecutive weeks and must be completed within 12 months of the birth, adoption or foster placement.

Leave granted due to the serious health condition of the employee or family member may be taken consecutively, intermittently or on a reduced leave (part-time) schedule in certain circumstances and subject to certain restrictions under the law. As business permits, leave may be taken on a reduced leave (part-time) schedule upon Supervisor and Human Resources approval.

Eligible employees are entitled to take a total of 12 weeks of unpaid Basic Family and Medical Leave in a rolling 12 month period, measured backward from the date an employee uses any FMLA leave.

**CONFIDENTIAL**

**APF00000030**

## Military Exigency Leave:

Employees may request leave in certain situations when an employee's spouse, child or parent is a covered military member on active military duty or has been notified of an impending call or order to active military duty in a foreign country. Military exigency leave may be taken for short-notice deployments, military events and related activities, childcare and school activities, to make financial and legal arrangements, to attend certain types of counseling, for rest and recuperation, post-deployment activities and certain other activities.

Eligible employees may take a total of 12 weeks of unpaid Military Exigency Leave in a rolling 12 month period, measured backward from the date an employee uses any FMLA leave.

Military Exigency Leave may be taken consecutively, intermittently or on a reduced leave (part-time) schedule in certain circumstances and subject to certain restrictions under the law.

## Military Caregiver Leave:

Employees may request leave to care for the serious health condition of a covered servicemember, as defined by law, who is the employee's spouse, child, parent or "next of kin."

Eligible employees may take a total of 26 weeks of unpaid Military Caregiver Leave in a rolling 12 month period, measured backward from the date an employee uses any FMLA leave.

Military Caregiver Leave may be taken consecutively, intermittently or on a reduced leave (part-time) schedule in certain circumstances and subject to certain restrictions under the law.

## Intermittent and Reduced Schedule Leave

Intermittent and/or reduced schedule leave will be permitted only when it is medically necessary or for a qualifying exigency, as explained above.

Intermittent and reduced schedule leave must be scheduled with minimal disruption to an employee's job. To the extent an employee or employee's family member has control, medical appointments and treatments related to an employee's or family member's serious health condition should be scheduled outside of working hours or at such times that allow for a minimal amount of time away from work.

**CONFIDENTIAL**

**APF00000031**

If you request intermittent or reduced schedule leave that is foreseeable based on planned medical treatment for your own or your family member's serious health condition or for Military Caregiver Leave, you may be required to transfer temporarily to an available alternative position offered by the Company for which you are qualified and which better accommodates recurring periods of leave than your regular employment position. You will be entitled to equivalent pay and benefits, but will not necessarily be assigned the same duties in the alternative position.

## Spouses:

Spouses employed by the Company are jointly entitled to a combined total of 12 weeks of Basic Family and Medical Leave and Military Exigency Leave and 26 weeks of Military Caregiver Leave.

## Notifying the Company of the Need for Family and Medical Leave

When the need for leave is foreseeable, eligible employees must provide 30 days advance written notice of the need for leave, or as soon as practicable if the need for leave is not known 30 days in advance, to the Human Resources Department.

When the need for leave is unforeseeable, the employee must provide notice to the Human Resources Department as soon as practicable under the circumstances. The Company requests that you give verbal notice as soon as possible (or that your representative give notice if you are incapacitated), and the request form should be completed as soon as practicable.

If you are requesting Military Exigency Leave, you must provide notice as soon as practicable under the circumstances.

Failure to provide adequate notice may result in a delay or denial of the leave.

It is your responsibility to notify your manager and Human Resources Department of absences that may be covered by FMLA.

Where applicable, you must provide requested certifications supporting the need for leave (medical certifications are described in more detail below). The failure to provide requested certifications or to provide complete certifications may result in the delay or denial of leave. This means that the absence may be unexcused for purposes of the Company's attendance policy. To the extent permitted by the FMLA, the Company may require periodic re-certification of the need for leave.

CONFIDENTIAL

APF00000032

## Medical Certification Process

In addition to an application and request for leave, an employee who takes leave for the employee's own serious health condition or to care for a family member with a serious health condition must submit to the Human Resources Department written medical certification of the need for such leave from the applicable health care provider within 15 calendar days of the Company's request. Failure to provide the certification in a timely manner may result in a delay of leave. Failure to provide a complete and sufficient certification may result in the delay or denial of leave.

In certain circumstances, the Company may require you to obtain a second and possibly a third medical opinion at the Company's expense.

Subject to certain requirements, the Company may require you to provide periodic re-certification.

Employees who request Military Caregiver leave must also submit to the Human Resources Department written medical certification of the need for such leave and supporting the employee's eligibility for the leave. In certain circumstances, the Company may require a second or third medical opinion, at the Company's expense, and may require periodic re-certification.

## Substituting Paid Leave for Unpaid Leave

An employee taking family and medical leave due to the employee's own serious health condition must substitute all accrued unused sick leave, paid vacation, floating holidays and any other paid time off before continuing leave on an unpaid basis.

An employee taking leave for reasons other than an employee's own serious health condition must exhaust all accrued unused paid vacation, floating holidays and any other paid time off, other than accrued sick leave, before continuing leave on an unpaid basis.

An employee is not required to substitute paid time off for an absence covered under workers' compensation.

Paid leave time will run concurrently with an employee's unpaid FMLA entitlement. That is, available paid time off does not extend the maximum amount of FMLA leave available under this policy.

**CONFIDENTIAL**

**APF00000033**

## Benefit Continuation During Leave

The Company will maintain group health insurance coverage and other employment benefits (such as group life insurance, short-term disability, HSA) for you while on FMLA leave whenever such insurance was provided to you before the leave was taken and on the same terms as if you had continued to work. You will be required to pay your regular employee portion of insurance premiums and should remit payment to the Human Resources Department at the following address:

Tenura Holdings, Inc., 8300 N. Mopac, #220, Austin, TX 78759

In some instances, the Company may recover premiums it paid to maintain health insurance coverage for an employee who fails to return to work from FMLA leave.

Benefits that are accumulated based upon hours worked shall not accumulate during the period of unpaid FMLA leave except that the period of time an employee is on FMLA leave will be treated as continued service for purposes of participating in a retirement plan. Absences due to unpaid leave will not be counted as time worked for the purpose of seniority or computing vacation or sick leave.

## Returning to Work

Certain "key employees" may not be eligible to be restored to the same or an equivalent position after FMLA leave if doing so would cause substantial and grievous economic injury to the operations of the Company. The Company will notify such employees of their "key employee" status and the conditions under which job restoration will be denied, if applicable.

If the reason for FMLA leave is for your own serious health condition, you will be required to present a Fitness-For-Duty certification immediately upon return to work.

If you wish to return to work before the scheduled expiration of an FMLA leave, you must notify the Company of the changing circumstances as soon as possible but no later than two working days prior to your desired return date.

An employee who fails to return to work immediately after the expiration of the leave period will be considered to have voluntarily terminated his/her employment.

In the event an employee's position with the Company is affected by a decision or event not related to the employee's leave of absence, e.g., job elimination due to a reduction in force, the employee will be affected to the same extent as if he was not on leave.

*This policy provides an introduction to the rights and provisions of the federal FMLA. Questions you may have about this law should be directed to Human Resources.*

**CONFIDENTIAL**                                                         APF00000034

## Other Leaves of Absences

If you do not qualify for FMLA, you may be eligible for another leave as outlined in this Manual, depending on your circumstances. Except where mandated by law, we cannot guarantee that benefits will continue or that your position will remain open in your absence.

### Unpaid Medical Leave

If an employee is unable to perform his or her job duties as a result of illness, injury or other medical disability for more than five consecutive workdays, and the employee has exhausted all of his or her available vacation and sick leave, the Company may, in its sole discretion, provide the employee with unpaid medical leave of up to eight (8) weeks. To be eligible for Unpaid Medical Leave, you must be employed by the Company for at least six (6) months. Any medical leave of absence must be requested in writing, supported by a note from a healthcare provider and approved by the employee's manager and Human Resources. Except where mandated by law, we cannot guarantee that benefits will continue or that your position will remain open in your absence.

### Benefit Continuation

The same health care benefits coverage provided to an employee on the day prior to taking leave will be maintained for the leave period up to 8 weeks or as required by law, provided the employee continues to pay any required contribution for benefits. Employees who are on leave are responsible for making their periodic payment of the required contribution Tenura Holdings, Inc. at the following address:

8300 N. Mopac, #220, Austin, TX 78759

In some instances, the Company may recover premiums it paid to maintain health insurance coverage for an employee who fails to return to work from leave of absence. Benefits that are accumulated based upon hours worked shall not accumulate during the period of leave of absence.

Benefits that are accumulated based upon hours worked shall not accumulate during the period of unpaid leave except that the period of time an employee is on leave will be treated as continued service for purposes of participating in a retirement plan. Absences due to unpaid leave will not be counted as time worked for the purpose of seniority or computing vacation or sick leave.

**CONFIDENTIAL**

**APF00000035**

## Military Leave

Tenura and Operating Subsidiaries will grant a military leave of absence from work for employees serving in the U.S. uniformed services in accordance with the Uniformed Service Employment and Reemployment Rights Act (USERRA). Employees must provide to the Human Resources Department advance notice of upcoming military service unless military necessity prevents advance notice or it is otherwise unreasonable.

Employees will receive full pay for a two-week training assignment or shorter absence. Employees will not be paid for military leave beyond two weeks. Employees may use any available accrued paid time off, such as vacation or sick days, to help pay for the leave. As such, employees are entitled to rights and benefits that are not determined by seniority, which are generally provided by us to employees having similar seniority, status, and pay who are on furlough or leave of absence including the right to return to the same position held prior to the leave or to positions with equivalent seniority, pay and benefits.

However, if you "knowingly" provide a written notice of intent not to return to employment with us after your service in the uniformed services, the preceding described rights and benefits do not apply.

## Pregnancy Disability Leave (California Employees)

### Leave Available

The Company will grant eligible employees, who reside or routinely work in California, whose pregnancy renders them unable to perform the essential functions of their job, who have severe morning sickness or who must take time off for pregnancy-related medical conditions an unpaid leave of absence (PDL).

Eligible employees are entitled to take a total of four months of leave for each pregnancy.

Leave is granted for the actual period of disability.

PDL may be taken consecutively, intermittently or on a reduced leave (part-time) schedule in certain circumstances and subject to certain restrictions under the law.

### Requests for PDL

When the need for leave is foreseeable, eligible employees must provide 30 days advance written notice of the need for leave, or as soon as practicable if the need for leave is not known 30 days in advance, to the Human Resources Department.

When the need for leave is unforeseeable, the employee must provide notice to the Human Resources Department as soon as practicable under the circumstances. The

CONFIDENTIAL

APF00000036

Company requests that you give verbal notice as soon as possible (or that your representative give notice if you are incapacitated), and the request form should be completed as soon as practicable.

The Company may require you to provide written certification from a licensed health care practitioner verifying the date on which you became (or are expected to become) disabled due to pregnancy, the probable duration of the disability and your expected date of return to work.

## Transfer to Less Strenuous Position

In addition, upon your request you may be granted a transfer to a less strenuous position or less strenuous duties or to a reduced-schedule position, if such transfer can be reasonably accommodated by the Company. In such situations, pay treatment will be in accordance with the Internal Placement Policy and other internal pay practices. The Company may require you to provide a licensed health care provider's written certification that such a transfer is medically advisable.

## Disability Benefits and Substitution of Paid Leave

As in the case of all employees who are unable to work due to a temporary disability, employees on PDL may apply for state disability benefits.

In addition, you must substitute all accrued unused sick leave before continuing leave on an unpaid basis. At your option, you may substitute other paid time off before continuing leave on an unpaid basis. Paid leave time will run concurrently with an employee's unpaid PDL entitlement. That is, available paid time off does not extend the maximum amount of PDL leave available under this policy.

## Return from PDL

Employees returning from PDL will generally be returned to their former positions or to an equivalent position, to the extent required by law.

You will be required to present a Fitness-For-Duty certification immediately upon return to work.

**CONFIDENTIAL**                                                      APF00000037

## Paid Family Leave Insurance Program (California Employees)

The Paid Family Leave Insurance Program ("PFL") provides California employees with up to six weeks of partial wage-replacement benefits if they take time off work to care for a seriously ill child, spouse, parent or domestic partner, grandparent, grandchild, sibling or parent-in-law, or to bond with a minor child within one year of the birth or placement of the child in connection with foster care or adoption.

The PFL fund does not create a new leave of absence for employees, nor does it require the Company to compensate employees, hold jobs open for employees, or continue employees' benefits during a PFL-covered leave, unless the Company is otherwise obligated to do so pursuant to internal policies or other state or federal laws.

PFL benefits must be taken concurrently with leave under the FMLA.

Prior to receiving PFL benefits, employees must fulfill a seven-day waiting period, and must use up to two weeks of accrued vacation time toward the six-week wage-replacement benefit. Employees with available paid vacation time will be able to use such vacation time during the initial seven-day waiting period.

For PFL-covered events that are foreseeable, you must provide the Human Resources Department with at least 30 days' advance notice of your request for PFL benefits. For events that are not foreseeable, you must notify the Human Resources Department as soon as you learn that PFL benefits will be requested.

An employee may not receive PFL benefits if he or she is also eligible for or already receiving State Disability Insurance, Unemployment Compensation Insurance, or Workers' Compensation. If an employee is receiving paid sick leave provided by the Company during time taken off of work for one of the above-covered reasons, their PFL benefits will be reduced by the amount of sick leave wages received and, depending on the amount of sick leave wages received and the employee's weekly PFL benefit amount, the employee may be ineligible for PFL benefits.

**Error! Unknown document property name.**

# Performance Reviews

## Orientation Period

For all employees hired by Tenura and Operating Subsidiaries, the first 90 days of employment are considered to be an orientation and trial period. During this time, the employee will undergo training and orientation as directed by the employee's supervisor. The employee's supervisor will also monitor the employee's performance.

During the first 90 days of employment, as a new employee, you are encouraged and expected to ask questions concerning your job responsibilities, and determine if you are satisfied with the position. If your job performance is found to be unsatisfactory by your supervisor at any time during the first 90 days of employment, your employment may be terminated. The completion of this period does not create anything other than an "at-will" relationship.

Employment is "at will" both during and after the orientation period.

## Performance Reviews

Tenura and Operating Subsidiaries is committed to providing you with feedback both formal and informal, about your performance on the job. Managers are responsible for on-going performance feedback. In addition, your manager may formally discuss and document your performance on a regular basis (generally on an annual basis). In some departments, an initial performance review may be conducted within three to six months after an employee begins a new job. Please contact your supervisor or Human Resources if you feel that an evaluation is due to you or would be helpful to you.

Your performance appraisal discussion will include a review of your strengths, identify any areas needing improvement, and goals and objectives that need to be achieved. Specific performance problems may be addressed outside the performance appraisal cycle through either informal discussions or formal disciplinary action.

Formal performance feedback becomes a permanent part of your personnel file.

**CONFIDENTIAL**

APF00000039

# Compensation and Work Schedule

## Pay Increases

Pay increases may be awarded on a case by case basis and are at the sole and absolute discretion of the Company. The Company does not provide cost-of-living or service time pay increases.

## Commissions

Commissions are offered at the option and in the discretion of the Company, and are not guaranteed. All commission eligible employees will receive a Commission Plan Document that governs the earning and payout of such commissions.

## Time Keeping

Each non-exempt employee will be expected to log hours worked and absences (paid and unpaid) in the Company's HR and Payroll system of record. Exempt employees are responsible for logging paid leave absences only.

Each supervising manager is responsible for reviewing and approving time clock entries for all hourly personnel under his/her supervision. The time clock entries are used for payroll records that must be maintained accurately at all times.

Any discrepancies should be resolved between the employee and supervising manager prior to submittal.

## Overtime for Non-Exempt Employees

At times, employees will be asked to work overtime to complete necessary work tasks. The Company shall compensate all hourly, non-exempt employees at the rates set by, and consistent with, federal law and the law of the state in which the employee works. Generally, the Company pays non-exempt employees time and one-half for all hours worked in excess of 40 hours each workweek consistent with federal law under the FLSA. For employees that work in states that have overtime laws that differ from the FLSA, the Company complies with these laws as well as federal law. In California, non-exempt employees are paid time and one-half for all hours worked in excess of eight hours in a day.

The employee's supervisor will notify the employee as early as possible regarding his/her scheduling needs. Overtime must be determined and approved as necessary in advance by your supervisor. Reported unauthorized overtime will be subject to disciplinary action up to and including termination.

**CONFIDENTIAL**

APF00000040

According to the federal Fair Labor Standards Act (FLSA), only actual hours worked are considered for purposes of calculating overtime. In other words, vacation time, sick time, holiday time or any other time for which you are compensated but do not actually perform work are not considered as hours worked in a workweek.

## Payroll/Pay Periods

Pay Dates fall on the 15th and end of month. If the Pay Date falls on a weekend or holiday, employees will be paid on the last business day preceding that Pay Date. The payroll workweek for Tenura and Operating Subsidiaries employees is defined as beginning on Saturday at 12:01 a.m. and ending on the following Friday at 12:00 Midnight. Typically, a full-time, non-exempt employee is required to work a total of forty (40) hours within this designated workweek.

If you are absent on pay day and someone else is to pick up your check, it will not be released without a signed, handwritten note from you authorizing the named person to pick it up. The person designated to pick up your check will be asked to produce identification satisfactory to management; otherwise your check will not be released. Any deviations from this procedure must have prior approval from an officer of the Company.

## Direct Deposit

As a convenience to employees, direct deposit is available for all or part of net pay. Payroll may be direct deposited to one or more bank accounts if the employee provides the appropriate routing and account numbers. Direct deposit will be made available to employees upon their date of hire. Although direct deposit is not required, it is recommended as a safe and efficient way to receive payroll funds.

## Mandatory Payroll Deductions

Mandatory payroll deductions for the employee portion of payroll taxes will include FICA (Social Security and Medicare), Federal Income Tax Withholding and State Income Tax Withholding. Additionally, the Company will honor garnishments of an employee's wages as a court or other legal judgment may require, including child support.

## Elective Payroll Deductions

Any payroll deductions other than those required by law, including employee portion health and welfare benefits, will require a signed authorization by the employee. This signed authorization will be kept in the payroll files with a copy in the employee's personnel file.

**CONFIDENTIAL**

**APF00000041**

## Errors in Pay

Every effort will be made to ensure that paychecks are accurate. However, if an employee has reason to believe that an error has been made, he or she is required to notify his/her supervisor or the Human Resource Department as soon as the error is discovered. If it is determined that an error has been made, the adjustment will be made in the employee's next paycheck (or as soon as possible).

## Hours of Operation

The Company has adopted the following hours of operation: 8:30 AM to 5:30 PM, Monday through Friday. Non-exempt employees are expected to work eight (8) hours per day and take a one-hour unpaid lunch break each day during these operating hours, as close to the middle portion of the day as possible. (The Company reserves the right to modify employees starting and ending times and the number of hours worked.) Supervisory approval is required for any changes in this schedule. Work missed during these hours of operation may be made up at some other time during the same workweek (see section titled "Payroll" for the definition of "workweek"), with permission from the employee's supervisor. Employees may leave the premises during their designated lunch break, but it is important to return to work on time at the end of the break. Employees will be completely relieved of duties and may not perform any work during the lunch break. However, if an employee's lunch break is interrupted and the employee performs any work during his or her lunch break, the Company will compensate the employee for the time worked. Similarly, if an employee misses his or her lunch break due to work obligations, the Company will compensate the employee for the missed break.

It is the responsibility of the employee to immediately report an interrupted or missed lunch break to his or her supervisor. Employees may not voluntarily skip or "work through" a lunch break without prior permission from their supervisor.

According to the federal Fair Labor Standards Act (FLSA), only actual hours worked are considered for purposes of calculating overtime. In other words, vacation time, sick time, holiday time or any other time for which you are compensated but do not actually perform work are not considered as  hours worked in a workweek.

**CONFIDENTIAL**

**APF00000042**

## Non-Exempt Employee Rest Periods (California Employees)

Non-exempt employees are allowed two ten minute rest periods in an eight-hour workday for which they are compensated. These rest periods must be taken as near as possible to the middle of each four-hour work period as it is practical. They may not be combined or added with meal periods to extend the meal period, be taken at the beginning of the day in order to arrive late, or be taken at the end of the day in order to leave early.

No additional breaks may be taken for the purpose of using tobacco or similar products. If an employee needs to take an extra break, he or she will need to clock out.

## Information & Office Security

### Emergency Action Plan

At Tenura and Operating Subsidiaries, we strive to proactively protect the health and safety of all our employees. We recognize that our people drive our business. As our most critical resource, employees are safeguarded through training, provision of appropriate work surroundings, and procedures that foster protection of health and safety. No duty, no matter what its perceived result, is more important than employee health and safety.

#### Personnel Functions

**Emergency Coordinator**: At the Company's corporate office, the Head of Operations will serve as the Emergency Coordinator. Each non-corporate facility will have a designated facility and/or Floor Leader. Respective responsibilities will include: updating the emergency action plan when necessary, coordinating internal responses and external agencies, verifying that the proper postings are visible in every work area, ensuring that all employees are properly trained in how to respond to an emergency, taking roll call at the safe area to verify that all employees are present, and talking with public officials and the media.

**Deputy Coordinator:** Each facility will also have a Deputy Coordinator or back-up to the Floor Leader. The Receptionist will serve as the Deputy Coordinator at the corporate office. He/she will serve as Coordinator in the Emergency Coordinator's absence. He/she will also assist in coordinating internal responses and external agencies, such as the fire department and medical services. He/she will be responsible for calling 911 to alert outside agencies of the emergency.

#### Facilities, Equipment, Supplies

The following information is applicable to 8300 N. Mopac, #225, Austin, TX 78759 (corresponding information for other locations are maintained at the respective

**CONFIDENTIAL**                                                                                    **APF00000043**

facilities).

**Communication Center:** If an emergency arises, a communication center will need to be established for the purpose of notifying family members and communicating with outside agencies.

**Safe Area:** The safe area will be designated as the far end of the rear parking lot. All employees should report to this safe area for roll call. If circumstances are so severe that this location is not out of the range of danger, the alternate safe area is designated as: The first floor of the parking garage.

**Firefighting Equipment:** Fire extinguishers are located in the front beside the photocopy machine and in the kitchen. In the event of an incipient fire, the Emergency Coordinator will be responsible for using the fire extinguisher to control the flames. In the Emergency Coordinator's absence, the Deputy Coordinator will assume this responsibility. Other employees should assist as appropriate.

There are no Fire Alarm pull stations in the building. In case of a fire that cannot be brought under control quickly and safely, call 911.

## Emergency Escape Route

In the case of a fire, employees should exit the Tenura and Operating Subsidiaries office space through the main door or the nearest exit. Employees will exit the building and proceed to the end of the parking lot. Employees are to remain at this safe area until the Emergency Coordinator or Deputy Coordinator completes the roll call.

In the case of a tornado, employees should exit the Company office space through the main door and proceed down the hall. Employees will evacuate to a rest room or other available interior room without windows on the ground floor, and should sit along the wall and cover their heads. The Emergency Coordinator or Deputy Coordinator will call roll to verify that all employees are present.

Each work area will post the emergency escape route, designated safe area, location of the fire extinguishers, names and telephone numbers of person(s) to contact in the event of an emergency, and the location of the written emergency action plan for employees to review.

## Parking

An adequate parking area is provided for employees. Employees may park in any space that is not marked reserved. Please cooperate by not blocking any gate, door, driveway, or the dock of the shipping and receiving area. The Company assumes no responsibility for an employee's vehicle or the contents of the vehicle while on Company property.

**CONFIDENTIAL**

APF00000044

# Use of Communication Systems and Office Equipment

It is the intent of the Company to provide the communication systems necessary for the conduct of its business. Employees are expected to adhere to proper use of all communication systems. These include but are not limited to the Telephone, Electronic Mail (E-Mail), Video-Based Communication, Facsimile, Internet, Corporate Intranet, Voice Mail, Computer Terminals, Modems and Systems Software. Employees are permitted use of Company property and must comply with Company policies and procedures regarding its use.

## Policy Statement

The use of Tenura and Operating Subsidiaries automation systems is for Company business and for authorized purposes only. Brief and occasional personal use of the electronic mail system or the Internet is acceptable as long as it is not excessive or inappropriate, occurs during personal time (lunch or other breaks), and does not result in expense to the Company.

Use is defined as "excessive" if it interferes with normal job functions, responsiveness, or the ability to perform daily job activities. Electronic communication should not be used to solicit or sell products or services that are unrelated to the Company's business; distract, intimidate, or harass coworkers or third parties; or disrupt the workplace.

Use of Company computers, networks, and Internet access is a privilege granted by management and may be revoked at any time for inappropriate conduct carried out on such systems, including, but not limited to:

- Sending chain letters or participating in any way in the creation or transmission of unsolicited commercial e-mail ("spam") that is unrelated to legitimate Company purposes;
- Engaging in private or personal business activities, including excessive use of instant messaging and chat rooms (see below);
- Misrepresenting oneself or the Company;
- Violating the laws and regulations of the United States or any other nation or any state, city, province, or other local jurisdiction in any way;
- Engaging in unlawful or malicious activities;
- Deliberately propagating any virus, worm, Trojan horse, trap-door program code, or other code or file designed to disrupt, disable, impair, or otherwise harm either the Company's networks or systems or those of any other individual or entity;

CONFIDENTIAL

APF00000045

- Using abusive, profane, threatening, racist, sexist, or otherwise objectionable language in either public or private messages;
- Sending, receiving, or accessing pornographic materials;
- Becoming involved in partisan politics;
- Causing congestion, disruption, disablement, alteration, or impairment of Company networks or systems;
- Maintaining, organizing, or participating in non-work-related Web logs ("blogs"), Web journals, "chat rooms", or private/personal/instant messaging;
- Failing to log off any secure, controlled-access computer or other form of electronic data system to which you are assigned, if you leave such computer or system unattended;
- Using recreational games; and/or
- Defeating or attempting to defeat security restrictions on Company systems and applications.

Using Company automation systems to access, create, view, transmit, or receive racist, sexist, threatening, or otherwise objectionable or illegal material is strictly prohibited. "Material" is defined as any visual, textual, or auditory entity. Such material violates the Company anti-harassment policies and is subject to disciplinary action. The Company's electronic mail system, Internet access, and computer systems must not be used to violate the laws and regulations of the United States or any other nation or any state, city, province, or other local jurisdiction in any way.

Use of Company resources for illegal activity can lead to disciplinary action, up to and including dismissal and criminal prosecution. The Company will comply with reasonable requests from law enforcement and regulatory agencies for logs, diaries, archives, or files on individual Internet activities, e-mail use, and/or computer use.

Unless specifically granted in this policy, any non-business use of the Company's automation systems is expressly forbidden.

If you violate these policies, you could be subject to disciplinary action, up to and including immediate termination.

## Ownership and Access of Electronic Mail, Video-Based Communication, Internet Access, and Computer Files

The Company owns the rights to all data and files in any computer, network, or other information system used in the Company. The Company also reserves the right to monitor electronic mail messages (including personal/private/instant messaging systems) and their content, as well as any and all use of the Internet and of computer equipment used to create, view, or access e-mail and Internet content. Employees

CONFIDENTIAL

APF00000046

must be aware that the electronic mail messages and video-based communications sent, received and transmitted using Company equipment are not private and are subject to viewing, downloading, inspection, release, and archiving by Company officials at all times. The Company has the right to inspect any and all files stored in private areas of the network or on individual computers or storage media in order to assure compliance with policy and state and federal laws. No employee may access another employee's computer, computer files, or electronic mail messages without prior authorization from either the employee or an appropriate Company official.

The Company has licensed the use of certain commercial software application programs for business purposes. Third parties retain the ownership and distribution rights to such software. No employee may create, use, or distribute copies of such software that are not in compliance with the license agreements for the software. Violation of this policy can lead to disciplinary action, up to and including dismissal.

## Confidentiality of Electronic Mail and Video-Based Communications

As noted above, electronic mail is subject at all times to monitoring, and the release of specific information is subject to applicable state and federal laws and Company rules, policies, and procedures on confidentiality. Existing rules, policies, and procedures governing the sharing of confidential information also apply to the sharing of information via commercial software. Since there is the possibility that any message could be shared with or without your permission or knowledge, the best rule to follow in the use of electronic mail for non-work-related information is to decide if you would post the information on the office bulletin board with your signature.

It is a violation of Company policy for any employee, including system administrators and supervisors, to access electronic mail and computer systems files to satisfy curiosity about the affairs of others. Employees found to have engaged in such activities will be subject to disciplinary action.

## Electronic Mail Tampering

Electronic mail messages received should not be altered without the sender's permission; nor should electronic mail be altered and forwarded to another user and/or unauthorized attachments be placed on another's electronic mail message.

## Policy Statement for Internet/Intranet Browser(s)

The Internet is to be used to further the Company's mission, to provide effective service of the highest quality to the Company's customers and staff, and to support other direct job-related purposes. Supervisors should work with employees to determine the appropriateness of using the Internet for professional activities and

**CONFIDENTIAL**

**APF00000047**

career development. The various modes of Internet/Intranet access are Company resources and are provided as business tools to employees who may use them for research, professional development, and work-related communications. Limited personal use of Internet resources is a special exception to the general prohibition against the personal use of computer equipment and software.

Employees are individually liable for any and all damages incurred as a result of violating Company security policy, copyright, and licensing agreements.

All Company policies and procedures apply to employees' conduct on the Internet, especially, but not exclusively, relating to: intellectual property, confidentiality, Company information dissemination, standards of conduct, misuse of Company resources, anti-harassment, and information and data security.

## Personal Electronic Equipment

The Company prohibits the use or possession in the workplace of any type of digital camera, video camera, or other form of image-recording device without the express permission of the Company and of each person whose image is recorded. Employees with such devices should leave them at home unless expressly permitted by the Company to do otherwise. This provision does not apply to designated Company personnel who must use such devices in connection with their positions of employment. Additionally, the use of a camera phone or cell phone camera is strictly prohibited.

Employees should not bring personal computers to the workplace or connect them to Company electronic systems unless expressly permitted to do so by the Company. Any employee bringing a personal computing device or image recording device onto Company premises thereby gives permission to the Company to inspect the personal computer or image recording device at any time with personnel of the Company's choosing and to analyze any files, other data, or data storage media that may be within or connectable to the personal computer or image recording device in question. Employees who do not wish such inspections to be done on their personal computers or imaging devices should not bring such items to work at all.

Violation of this policy, or failure to permit an inspection of any device covered by this policy, shall result in disciplinary action, up to and possibly including immediate termination of employment. In addition, the employee may face both civil and criminal liability from the Company or from individuals whose rights are harmed by the violation.

CONFIDENTIAL

APF00000048

# Social Media and Blogging

## Personal Use of Social Media

At Tenura and Operating Subsidiaries, we understand that social media can be a fun and rewarding way to share your life and opinions with family, friends and co-workers around the world. However, use of social media also presents certain risks and carries with it certain responsibilities. To assist you in making responsible decisions about your personal use of social media, we have established these guidelines for appropriate use of social media.

**This policy applies to all employees of the Company in their personal, non-work related use of social media.** For employment or work-related use of social media, please see the Tenura Holdings Social Media and Blogging Policy: Employee Business Use of Social Media.

## Guidelines

In the rapidly expanding world of electronic communication, *social media* can mean many things. *Social media* includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else's web log or blog, journal or diary, personal web site, social networking or affinity web site, web bulletin board or a chat room, whether or not associated or affiliated with the Company, as well as any other form of electronic communication. The same principles and guidelines found in Company policies apply to your activities online. Ultimately, you are solely responsible for what you post online. Before creating online content, consider some of the risks and rewards that are involved. Keep in mind that any of your conduct that adversely affects your job performance, the performance of fellow employees, team members, partners or otherwise adversely affects customers, suppliers, people who work on behalf of the Company or the Company's legitimate business interests may result in disciplinary action up to and including termination.

**Know and follow the rules:** Carefully read these guidelines, the Company's Equal Employment Opportunity and Affirmative Action, Ethics, Workplace Harassment and Sexual Harassment, and Information and Office Security Policies, and ensure your postings are consistent with these policies. Inappropriate postings that may include discriminatory remarks, harassment, and threats of violence or similar inappropriate or unlawful conduct will not be tolerated and may subject you to disciplinary action up to and including termination.

**Be respectful:** Always be fair and courteous to fellow employees, team members, partners, customers, suppliers or people who work on behalf of Tenura or Operating Subsidiaries. Also, keep in mind that you are more likely to resolve work-related complaints by speaking directly with your co-workers, Supervisor or Human Resources Representative than by posting complaints to a social media outlet. Nevertheless, if you decide to post complaints or criticism, avoid using statements, photographs, video or

**CONFIDENTIAL**

APF00000049

audio that reasonably could be viewed as malicious, obscene, threatening or intimidating, that disparage fellow employees, team members, partners, customers or suppliers, or that might constitute harassment or bullying. Examples of such conduct might include offensive posts meant to intentionally harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, religion or any other status protected by law or company policy.

**Be honest and accurate:** Make sure you are always honest and accurate when posting information or news, and if you make a mistake, correct it quickly. Be open about any previous posts you have altered. Remember that the Internet archives almost everything; therefore, even deleted postings can be searched. Never post any information or rumors that you know to be false about the Company, fellow employees, team members, partners, customers, suppliers, or people working on behalf of the Company or competitors.

**Post only appropriate and respectful content**

- Maintain the confidentiality of Company trade secrets and private or confidential information. Trade secrets may include information regarding the development of systems, processes, products, know-how and technology. Do not post internal reports, policies, procedures or other internal business-related confidential communications.

- Respect financial disclosure laws. It is illegal to communicate or give a "tip" on inside information to others so that they may buy or sell stocks or securities.

- Do not create a link from your blog, website or other social networking site to a Company website without identifying yourself as a Tenura or Operating Subsidiaries employee or team member.

- Express only your personal opinions. Never represent yourself as a spokesperson for Tenura or Operating Subsidiaries. If the Company is a subject of the content you are creating, be clear and open about the fact that you are an employee and make it clear that your views do not represent those of the Company, fellow employees, team members, partners, customers, suppliers or people working on behalf of Tenura or Operating Subsidiaries. If you do publish a blog or post online related to the work you do or subjects associated with the Company, make it clear that you are not speaking on behalf of the Company. It is best to include a disclaimer such as "The postings on this site are my own and do not necessarily reflect the views of Tenura/Operating Subsidiary."

**Using social media at work:** Refrain from using social media while on work time or on equipment we provide, unless it is work-related as authorized by your manager or consistent with the Communication Systems and Office Equipment Policy. Do not use Tenura or Operating Subsidiary email addresses to register on social networks, blogs or other online tools utilized for personal use.

**Retaliation is prohibited:** The Company prohibits taking negative action against any employee or team member for reporting a possible deviation from this policy or for

CONFIDENTIAL

APF00000050

cooperating in an investigation. Any employee or team member who retaliates against another employee or team member for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including termination.

**Media contacts:** Employees should not speak to the media on the Company's behalf without contacting Tenura or Operating Subsidiaries respective Executive Office. All media inquiries should be directed to them.

**For more information:** If you have questions or need further guidance, please contact your Human Resources Representative.

## Employee Business Use of Social Media

At Tenura and Operating Subsidiaries ("the Company"), we understand that using social media in an employment context can be a valuable tool for employees in the solicitation of business for the Company. However, use of social media as an employee on behalf of Tenura and Operating Subsidiaries presents certain risks to the Company. To assist you in your use of social media as a business tool, we have established these guidelines for appropriate work-related use of social media. **This policy only applies to your Company-authorized business use of social media (i.e. using social media on behalf of Tenura Holdings and Operating Subsidiaries). This policy does not apply to your personal use of social media.** For guidelines regarding your personal use of social media, please see the Tenura Holdings Social Media and Blogging Policy: Personal Use of Social Media.

The Company is developing social media and blogging guidelines and mandatory classes for Company-authorized use of social media and blogging sites. Note that this policy pertains to direct and indirect solicitation of business for the Company related to social media and blogging sites.

**Authorized Social Media and Blogging:** The goal of authorized blogging is to become a part of the industry conversation and promote web-based sharing of ideas and exchange of information. Authorized blogging is used to convey information about Company products and services, promote and raise awareness of the Company's brand, search for potential new markets, communicate with employees and customers to brainstorm, issue or respond to breaking news or negative publicity, and discuss corporate, business-unit and department-specific activities and events. When blogging or using other forms of web-based forums on behalf of the Company, the Company must ensure that use of these communications maintains brand identity, integrity, reputation, and regulatory standards while minimizing actual or potential legal risks. Mandatory social media and blogging classes must be completed annually to qualify for authorized status.

**Speaking on Behalf of the Company:** Unless specifically instructed or authorized, employees are not authorized to speak on behalf of the Company.

**CONFIDENTIAL**

**APF00000051**

**Reporting of Social Media Used for Solicitation:** Employees must inform compliance and marketing of any active social media or blogging sites used for solicitation of Company business. Social media and blogging sites include but are not limited to Facebook, Twitter, LinkedIn, Google+ and Active Rain.

**Mortgage and Real Estate Blogging Moratorium:** Beginning on December 15, 2013, the Company has placed a temporary moratorium on employees starting or maintaining a blog or social media site directly related to mortgage or real estate related activities.

**Legal Compliance:** Federal regulations limit what actions the Company and its employees may take in the use of social media to solicit business. Employees must, at all times, comply with the Mortgage Acts and Practices Advertising Rule and Regulation N, which govern deceptive acts and practices in the advertising of mortgage loan products and prohibit misrepresentation in any commercial communication concerning terms of a mortgage loan product. Employees must also comply with the Gramm-Leach Bliley Act and Regulation P, which govern consumer privacy, the treatment of nonpublic information about consumers by financial institutions, and the sharing of nonpublic personal information with unaffiliated third parties. *Respect financial disclosure laws*; it is illegal to communicate or give a "tip" on inside information to others so that they may buy or sell stocks or securities.

**Confidentiality:** Maintain the confidentiality of Company trade secrets and private or confidential information. Trade secrets may include information regarding the development of systems, process, products, know-how and technology. Do not post internal reports, policies, procedures or other business-related confidential communications. Do not post Employer secret, confidential, or attorney-client privileged information. Keep client information confidential as required by applicable federal law.

**Copyrights and Intellectual Property:** Respect all copyrights and other intellectual property laws. It is critical that employees show proper respect for laws governing copyright, fair use of copyrighted materials owned by others, trademarks and other intellectual property, including the Company's own copyrights, trademarks and brands.

If a site exists for Company business purposes and the employee is posting on behalf of the Company, it must immediately reflect the following:

Company Name and NMLS ID #: 131699

Loan Originator Name, title and NMLS ID #

Branch address

Equal Opportunity Lender logo or language

"Regulated by the Division of Real Estate." - *Applicable to Colorado licensees*

**Media Contacts:** Associates should not speak to the media on the Company's behalf without contacting the Corporate Affairs Department. All media inquiries should be directed to Corporate Affairs.

**CONFIDENTIAL**

**APF00000052**

If you have any questions relating to this policy, ask your supervisor, the director of compliance, or the director of marketing.

## Recording Devices Prohibited

The Company prohibits the use of any recording device on Company property and/or during working hours unless specifically permitted by the Company. The Company prohibits the use of picture phones or any other camera or device that may capture visual images without the Company's prior written permission. The use of picture phones or other recording of visual images is specifically prohibited in locker rooms, restrooms, or any other area where members of the public or coworkers would enjoy a reasonable expectation of privacy and in any areas in which sensitive or closely guarded corporate or business materials are used or housed. Any employee found in violation of this policy will be subject to discipline up to, and including, termination of employment and may also be subject to prosecution to the fullest extent permitted under the law.

## Media Inquiries

It is the policy of the Company to respond to news media questions and inquiries effectively, accurately, and on a timely basis. Every effort should be made to meet media deadlines and to ensure that all information released is accurate. To help provide a consistent, clear and accurate response to media inquiries the Company has designated the Chief Administration Officer to speak on the organization's behalf. No one other than this individual (with the exceptions noted below) should represent the Company's position to the media.

## Exceptions

When inquires require a detailed technical explanation, a spokesperson may be designed to address a particular issue. That spokesperson will usually be a senior staff person or outside expert who is qualified to speak on the Company's behalf on the issue in question.

## Procedure

All media inquiries, whether verbal or written, are to be directed to the Executive Assistant who will evaluate the request and direct it to the appropriate person. Inquiries from the media are given high priority and should be responded to as quickly and efficiently as possible.

**CONFIDENTIAL**

APF00000053

## General Practices

### Americans with Disabilities Act (ADA)/ADA Amendments Act (ADAAA)

The Company supports the Americans with Disabilities Act (ADA) and the Americans with Disabilities Amendments Act (ADAAA) which prohibit discrimination against applicants and qualified individuals with disabilities on the basis of a disability, and require an employer to provide, when needed, reasonable accommodations for individuals with disabilities, unless it would create an undue hardship or a direct threat to workplace safety. A reasonable accommodation is any change in the work environment or in the way a job is performed that enables a person with a disability to enjoy equal employment opportunities.

If you require an accommodation you must inform your supervisor or Human Resources that there is a need for an adjustment or change at work for a reason related to a medical condition, and complete an Employee Request for Accommodation Form to the Human Resources Department. We will respond promptly and to the best of our ability to accommodate the needs of all employees.

### Attendance Policy

The Company is able to secure work based upon our estimates of performance and our history of reliability. Therefore, the Company expects all employees to assume diligent responsibility for their attendance and promptness. Continued dependability, quality and pride of service are factors over which each individual employee has a great deal of influence. If you are absent and cannot perform your duties on time, or if you produce substandard work, then we all pay the price by losing the confidence of the customer.

The work schedule is constructed around the maximum working hours and capabilities of the staff. It is extremely important that you be punctual in your arrival for work at the beginning of the workday or shift to which you are assigned. If you know that you will be absent or late arriving for work, notify your supervisor personally no later than one hour before you scheduled start time. In the event of a disabling sickness or accident while performing your duties, notify your supervisor immediately.

If you are absent for three or more consecutive workdays, a statement from a physician may be required before you will be permitted to return to work. In such instances, the Company also reserves the right to require you to submit to an examination by a physician designated by the Company at its discretion.

Unscheduled, unplanned or excessive absenteeism or tardiness may be grounds for disciplinary action, up to and including termination. If you are absent for three or more consecutive business days and fail to properly report your absences, this will be

**CONFIDENTIAL**

**APF00000054**

considered a resignation of your position and you will be terminated for abandonment of your job.

## Background Checks & References

To ensure that individuals who join Tenura and Operating Subsidiaries are well-qualified and have a strong potential to be productive and successful, it is Company policy to check the employment history and references of the selected applicant prior to extending a job offer.

Additionally, the Company conducts background checks on all job candidates post-job offer. The Company may also use a third party administrator to conduct the background check. The type of information that may be collected is as follows: criminal background check, employment history, education, credit and professional or personal references.

This information may also be sought out during reassignment or promotional periods.

The Company conducts background checks in compliance with the federal and state statutes of the Fair Credit Reporting Act. The employee will receive a copy of the report and a description of his/her rights under the Act.

**CONFIDENTIAL**

**APF00000055**

## Classifications of Employment

For purposes of salary administration and eligibility for overtime payments as determined by the Federal Labor Standards Act (FLSA), and employment benefits, the Company classifies its employees as follows:

- Non-exempt Employees – Employees whose positions do not meet the FLSA exemption standards are paid overtime. Employees classified as non-exempt generally work in non-supervisory, non-professional or non-administrative capacities. Overtime work, however, is prohibited without specific supervisor authorization.

- Exempt Employees – Employees who are not required to be paid minimum wage and overtime, in accordance with applicable federal wage and hour laws for work performed beyond 40 hours in a workweek. Executives, supervisory, professional, sales or administrative employees whose positions meet FLSA standards are typically exempt.

- Full-time Regular Employees – Employees hired to work the Company's normal, full time, 35 hour or more workweek on a regular basis. Such employees may be "exempt" or "non-exempt" as defined above.

- Part-time Regular Employees – Employees hired to work fewer than 35 hours per week on a regular basis. Such employees may be "exempt" or "non-exempt" as defined above.

- Temporary Employees – Employees engaged to work full time or part time on the Company's payroll with the understanding that their employment will be terminated no later than upon completion of a specific assignment. (Note that a temporary employee may be offered, and may accept, a new temporary assignment with the Company and thus still retain temporary status.) Such employees may be "exempt" or "non-exempt" as defined above. (Note that employees hired from temporary employment agencies for specific assignments are employees of the respective agency and not of the Company.)

- Independent Contractors – Consultants, freelancers or independent contractors are not employees of the Company. The distinction between employees and independent contractors is important because employees may be entitled to participate in the Company's benefits programs, while independent contractors are not. In addition, the Company is not required to withhold income taxes, withhold and pay Social Security and Medicare taxes, or pay unemployment tax on payments made to an independent contractor.

**CONFIDENTIAL**

**APF00000056**

# Confidential Information and Company Property

During your employment by the Tenura and Operating Subsidiaries, you may have access to confidential and proprietary data which is not known by competitors or within the real estate and lending business generally. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to, data relating to the Company's marketing and servicing programs, procedures and techniques; the criteria and formula used by the Company in pricing its products and services; the structure and pricing of special packages that the Company has negotiated; lists of customers and prospects; the identity, authority, and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; sensitive details concerning the structure, conditions, and extent of their existing products and services; contract expiration dates; commission rates; service arrangements; proprietary software, Web applications and analysis tools; and other data showing the particularized requirements and preferences of the accounts. This Confidential Information constitutes a valuable asset of the Company, developed over a long period of time and at substantial expense.

To protect the Company's interest in this valuable asset, you must (a) not use any such Confidential Information for your personal benefit or for the benefit of any person or entity other than the Company, and (b) use your best efforts to limit access to such Confidential Information to those who have a need to know it for the business purposes of the Company. In addition, you should minimize those occasions on which you take documents, computer disks, or a laptop containing such Confidential Information outside the office. On those occasions where it is necessary, consistent with the best interests of the Company and doing your job effectively, to take documents, a computer disk, or a laptop containing Confidential Information outside the office, all appropriate precautionary and security measures should be taken to protect the confidentiality of the information.

During the course of your employment with the Company, you will be provided and/or will generate correspondence, memoranda, literature, reports, summaries, manuals, proposals, contracts, customer lists, prospect lists, and other documents and data concerning the business of the Company. Any and all such records and data, whether maintained in hard copy or on a computer disk, computer hard drive, computer tape, or other medium is the property of the Company, regardless of whether it is or contains Confidential Information. Upon termination of your employment at the Company, you are required to return all such records to the Company and may not retain any copy of any such records or make any notes regarding any such records. We reserve the right to search for such information and property in personal items while on Company premises such as vehicles, purses, briefcases, etc.

CONFIDENTIAL

APF00000057

## Conflicts of Interest

All employees have a duty to further the Company's aims and goals, and to work on behalf of its best interest. Employees should not place themselves in a position where the employee's actions or personal interests may be in conflict with those of the Company. Examples include soliciting or profiting from the Company's client/prospect base or other Company asset for personal gain, acting on behalf of the Company in servicing or obtaining a client and limiting the best solution for the client/prospect for personal financial gain, personal or romantic involvement with a competitor, supplier or subordinate employee of the Company, which may impair an employee's ability to exercise good judgment on behalf of the Company, and acting as director, officer, employee, or otherwise for any business or institution with which the Company has a competitive or significant business relationship without the written approval of the President.

Employees should immediately and fully disclose any situation or position (including outside employment by the employee or any member of the employee's immediate household) the relevant circumstances to his/her immediate supervisor, or any other appropriate supervisor, any situation or position which may create a conflict of interest with the Company. If an actual or potential conflict is determined, the employer may take precautionary action as appropriate according to the circumstances. Failure to disclose facts will result in disciplinary action, including possible termination. Additionally, any activity deemed to be a conflict of interest will result in disciplinary action, up to and including termination.

## Community Fund-Raising Policy

In the spirit of the Company mission to provide an environment of care, the Company recognizes its responsibility to promote certain fund-raising campaigns conducted for the benefit of the general public and our community. It also recognizes the right of the individual to voluntarily contribute to such campaigns according to his or her desires and financial abilities. From time to time, the Company will announce campaign opportunities in which all employees may participate. Employees may be requested to dedicate Company-time to such events or may be asked for voluntary participation outside of normal business hours. Additionally, the Company may offer the opportunity for financial donations via voluntary payroll deductions. It is expected that employees will adopt a sincere and energetic approach to support and participate in such programs and in furthering our environment of care mission, however, the Company realizes the personal and voluntary aspect of all fund-raising efforts.

All fund-raising requests received are to be referred to the Human Resources Department for approval.

**CONFIDENTIAL**                                                                    **APF00000058**

## Corporate Credit Card

Employees of the Company may be eligible for a corporate credit card in cases where the employee must travel frequently in the course of his/her duties, purchase significant volumes of goods and services for use by the employer, or incur other regular frequent business expenses of a kind appropriately paid by credit card.

The corporate credit card cannot be used to obtain cash advances, bank checks, traveler's checks, or electronic cash transfers for expenses other than those incurred by the assigned employee named on the card, or for personal expenses. Misuses of the card will result in cancellation of the card and withdrawal of corporate credit card privileges and disciplinary action up to and including termination. If the card is used for an employee's personal expenses, the employer reserves the right to recover these monies from the employee cardholder. Cardholders will be required to sign a declaration authorizing the Company to recover, from their salary or other compensation, any amount incorrectly claimed.

Each card will be limited to a maximum credit limit appropriate to the role of the employee. Increases to the established maximum may be made on a case-by-case basis by the President or Chief Administration Officer.

Corporate credit card expenditures must be reconciled and submitted with original receipts to the Accounting/Finance Department within 10 business days of the statement date. Cardholders who have not reconciled and submitted their monthly expenditure within this period will be asked to reconcile and submit their monthly expenditure immediately. Continued or repeated non-conformance to this policy will result in cancellation of the card and such other actions as appropriate.

Lost or stolen cards must be reported immediately to the Controller.

CONFIDENTIAL

APF00000059

# Driving While on Company Business

Driver inattention is a factor in a majority of motor vehicle accidents. We are not only concerned about your welfare as a Company employee, but also the welfare of others who could be put in harm's way by inattentive driving. As a driver, your first responsibility is to pay attention to the road. When driving on Company business, or driving while conducting business on behalf of the Company in any other manner, the following applies:

## Cellular Phone Use

Cell phone use while driving is a common, often harmful, distraction. We are concerned about your safety as well as the safety of others. For this reason, the use of cell phones while driving is strongly discouraged. Do not accept or place calls unless it is an emergency, meaning the call cannot wait until you safely pull off the road or arrive at your destination. If you must use your cell phone while driving, please use good judgment: keep the call short, use a hands-free device if available, get to know your phone and its features, and suspend conversations during hazardous driving conditions (rain, snow, ice, fog, glare, heavy traffic, etc.). Texting while driving is absolutely prohibited. Of course, Federal, state, and/or local laws will take precedence over Tenura and Operating Subsidiaries policies, where applicable.

## Obey the Law

The Company is not responsible for any moving traffic violations, parking tickets, or any other city ordinances or state/federal laws regarding your driving habits and operation/care of your personal motor vehicle. Any tickets issued are the employee's responsibility, even if the ticket is issued while conducting business for the Company.

### Other Safe Driving Precautions:

- Use better judgment when road conditions are poor. Limit or avoid driving when rain or snow threatens your safety.

- Make an effort to avoid distractions such as eating, applying makeup, paying too much attention to your radio/CD player, or other distracting behavior.

- Do not drive if your ability to drive safely is impaired by the influence of medications.

- Laptop computers should never be used at any time while driving.

- If using a vehicle not your own (rental or otherwise), be sure to properly adjust the mirrors and familiarize yourself with the vehicle's controls before operating.

**CONFIDENTIAL**

APF00000060

- Be concerned for your coworkers' safety. Ask them to call you back at a safer time if they call you while driving.

- As a business against drunk driving, be responsible when entertaining clients. Abide by the law and use a designated driver.

- Employees who drive for Company business must have a current, valid driver's license.

- Employees involved in an automobile accident during the course of conducting Company business must immediately undergo a drug test.

## Employee Loan Policy

Employees will be allowed to utilize the Company for the purchase or refinance of personal properties. Each employee loan must be processed and underwritten by the Senior Management of the Company. No employee will be allowed to personally process their own loan. The Company's standard fees will be charged on all transactions. Pricing should be approved by management prior to the loan being locked.

## Employee Records

The Company endeavors to comply with all applicable laws with respect to the collection of information from job applicants and employees. Information kept in your file may contain any or all of the following: job application, job description, resume, records of participation in training events, salary history, records of disciplinary action and documents related to employee performance reviews, coaching, and mentoring.

Access to employee records is strictly limited to management and administrative personnel who have a legitimate business need to view the records. Personnel records are kept highly confidential, and are not available to anyone outside of the Company unless release is to an authorized governmental agency, or is required by law. An employee may view his/her own employee records by requesting an appointment through the Human Resource Department. Personnel files are the property of the Company.

**CONFIDENTIAL**

**APF00000061**

## Employment of Relatives

Members of your immediate family will be considered for employment on the basis of their qualifications. Your immediate family may not be hired as an employee or contractor, however, if it would:

- create a direct supervisor/subordinate relationship with a family member,
- have the potential for creating an adverse impact on work performance, or
- create either an actual conflict of interest or the appearance of a conflict of interest.

This policy must also be considered when hiring, assigning, or promoting an employee.

If a circumstance arises that results in a direct supervisory relationship between immediate family or close personal relatives (e.g., marriage, reduction-in-force, reorganization, priority placement), one of the relatives may be reassigned to an appropriate vacancy. When no other suitable arrangement is available, the two employees will be permitted to determine which employee will resign. If the employees are unable to come to a mutual determination, the organization will decide in its sole discretion who will remain employed. During the period that a direct supervisory relationship exists between immediate family or close personal relatives, the supervisory relative will not be involved in any personnel action involving his/her relative. Typical first-level supervisory responsibilities will be referred to the next higher level in the supervisory chain.

For purposes of this policy, your immediate family includes: mother, father, spouse, son, daughter, sister, brother, mother-in-law, father-in-law, sister-in-law, brother-in-law, son-in-law, daughter-in-law, stepchild, stepbrother, stepsister, half brother, half sister, stepparent, grandparent, legal guardian or domestic partner. This policy also applies to close personal relatives such as uncle, aunt, first cousin, nephew, and niece.

Questions should be directed to your supervisor.

CONFIDENTIAL

APF00000062

## Gratuities and Gifts

No employee shall solicit or accept for personal use, or for the use of others, any gift, favor, loan, gratuity, reward, promise of future employment, or any other thing of monetary value that might influence, or appear to influence, the judgment or conduct of the employee in the performance of their job.

Employees can accept occasional unsolicited courtesy gifts or favors (such as business lunches, tickets to sporting events or cultural events, holiday baskets, flowers, etc.) so long as the gifts or favors have a market value under $25.00, are customary in the industry, and do not influence or appear to influence the judgment or conduct of the employee. Please discuss any exceptions to this amount with your supervisor.

Employees are not to give, offer, or promise directly or indirectly anything of value to any representative of a customer, a potential customer, a vendor or potential vendor, financial institution or potential financial institution with whom the Company has or may have a business relationship. Any offer of promise of bribe, kickback or similar consideration of any kind is strictly prohibited.

## Grievance Procedure

Any employee who has a grievance resulting from a work-related condition or incident is encouraged to discuss the grievance with his/her supervisor or Human Resources. The grievance should be resolved at this level whenever possible. If a satisfactory resolution is not obtained, the employee may address the issue with another level of management. Management will document the grievance and any action taken to resolve the matter.

CONFIDENTIAL

APF00000063

## HIPAA Privacy Policy

The Company maintains health care and related plans that are subject to HIPAA requirements. Thus, the Company abides by HIPAA privacy and security provisions with respect to protected health information (PHI) maintained by the Company.

HIPAA regulations will be followed in administrative activities undertaken by assigned personnel when they involve PHI in any of the following circumstances: health information privacy, health information security and health information electronic transmission.

The Company will consider any breaches in the privacy and confidentiality of handling of PHI to be serious, and disciplinary action will be taken in accordance with our code of conduct.

The Company has designated its Human Resources Administrator as HIPAA compliance officer (HCO), and questions regarding policy provisions should be addressed to the HCO. This policy is supplemented by new operating procedures issued by the HCO and will be effective immediately. Company records that are governed by this policy will be maintained for a period of no less than six years, and when the maximum retention period has passed, the records will be subject to the Company's policy for completed record destruction.

## Inclement Weather

The Company places very high priority on the safety and welfare of all employees. Therefore, it is Company policy to give each employee the authority to determine his or her own comfort level regarding travel during inclement weather. If an employee feels that it is unsafe to travel to work, he or she should call his or her supervisor regarding the concern. If an employee misses time from work due to inclement weather, that time will be deducted from his or her accrued vacation time. If the Company determines that weather conditions are too severe for anyone to travel, the office may be closed. In the case of severe weather, employees should call 512-279-1166 for notification of any office closing due to inclement weather before traveling to work. In the case of an office closing, no time will be deducted from accrued time off.

**CONFIDENTIAL**

**APF00000064**

## Internal Placement Policy

The Company encourages offering regular full-time employees with opportunities for career development and advancement via internal job placement. In general, positions that become available and approved for hire are posted internally. Recruitment for a position may occur internally and externally simultaneously. It is intended that the job placement process will be used as often as practicable as a means of filling vacant positions.

Employees are responsible for evaluating their career interests and goals. To be eligible for transfer, the applicant must be a regular full-time employee of the Company and have been in their current role for a minimum of twelve months of continuous service. Qualifications, performance (not on a performance improvement plan and have a satisfactory rating on the current performance review) and ability will be considered in the selection process. If an employee desires to be considered for an available opening, s/he must complete an Internal Transfer Request Form and obtain his/her supervisor's signature. It is recognized that in some circumstances it may be preferable to transfer an employee to a position to which s/he is better suited than to insist upon satisfactory performance in one position before permitting transfer to another. Meeting minimum requirements does not necessarily guarantee an interview.

The hiring manager, in conjunction with HR, identifies the candidates that are eligible and qualified for the position, arranges and conducts interviews, and selects the candidate best suited for the position. All hiring decisions are made without regard race, color, religion, gender, sexual orientation, national origin, age, disability, genetic information, marital status, amnesty, or status as a covered veteran in accordance with applicable federal, state and local laws. In addition, the Company complies with applicable state and local laws governing nondiscrimination in employment in every location in which the Company has facilities.

Managers should understand and encourage employee's career development goals that are consistent with Company goals. If an internal candidate is selected for the position, the hiring manager, in conjunction with Human Resources, determines the starting salary to be offered. Managers work together to identify a suitable transfer date ensuring a minimal negative impact on the business. A reasonable period of time is typically two to three weeks.

CONFIDENTIAL

APF00000065

## Lactation (Expressing Breast Milk) Break

Tenura and Operating Subsidiaries will provide reasonable break times (not to exceed thirty minutes) for an employee to express breast milk for her nursing child for one year after the child's birth. The Company will also provide a place, other than the Company restroom, that is shielded from view and free from intrusion from co-workers and the public, which may be used by an employee to express breast milk. Employees may also opt to express breast milk in their own private office shielded from view, but may not do so in a public place, including unenclosed cubicles. As with any break, unauthorized use or abuse of the time off or time clock reporting will result in disciplinary action.

Employees should bring cooler packs to store expressed breast milk. If a designated refrigerator/freezer is provided, employees shall provide their own containers, clearly labeled with name and date. Those using a designated refrigerator for this purpose are responsible for keeping it clean.

Staff members are expected to provide an atmosphere of support for breastfeeding mothers. Retaliatory conduct or disrespectful communications with regard to lactating employees will not be tolerated. To the extent an applicable state law provides greater protections for lactating mothers, the state law will apply.

An employee who intends to express milk during work hours must give HR and her supervisor advance notice of her intention to do so in order to allow the Company adequate time to make the preparations necessary for compliance.

CONFIDENTIAL

APF00000066

# Personal Appearance

Your pride in both yourself and as a representative of our organization is reflected in your appearance and image you create. We feel our business image is important and request that our employees maintain standards of dress and appearance appropriate to the organization as a whole and your individual position responsibilities. Dress, grooming, personal cleanliness, and professional behavior standards contribute to the professional image we present to our customers and visitors. Therefore, while performing duties for our organization, employees are expected to dress in attire appropriate to the business environment and to behave in a professional and businesslike manner at all times to best represent our business.

**Guidelines:**

- Due to the nature of our business and our continuous client contact, the employees at Tenura and Operating Subsidiaries are expected to dress in a "Business Appropriate" dress style.

- Employees may dress according to the requirements of their position; however our beliefs regarding business appropriate dress is that business is always first. This means that employees should keep their day's schedule in mind. We recognize that different levels of dress may be appropriate for different occasions. As a general rule, when meeting with clients, prospects, or outside visitors, traditional business attire should always be worn except where it doesn't make good business sense.

- All employees should judge their business attire for meetings and contacts outside of the office by the type of function that will be attended. Also, on occasion there may be a specific business reason to require that all employees dress in traditional business attire. In such instance this will be communicated to employees in advance and they will be required to dress accordingly.

- Our business appearance and image is important to us. However, we respect individual preference and choice in dress and appearance. We are confident that employees will use their best judgment in following our dress and attire guidelines. We ask that at all times employees make certain that their appearance is well groomed and clean and that clothing is appropriate, neat, clean, and well-fitting. While relaxed business attire is acceptable within the stated guidelines, we want to be sure our environment does not jeopardize professionalism and productivity.

If an employee is unclear about our dress and appearance guidelines, they are encouraged to consult with their supervisor and/or our Human Resources Department. If an employee reports to work in questionable attire or appearance, a notification and/or discussion will occur with the employee to advise and counsel them regarding the inappropriateness of the attire. Depending upon the circumstance the employee may

**CONFIDENTIAL**

**APF00000067**

also be sent home and directed to return to work in proper attire. Any work time lost will be expected to be made up by the employee. Continued or frequent departures from these guidelines will not be permitted and employees who appear for work inappropriately dressed or groomed may be disciplined up to and including termination.

## Phone Calls and Personal Business

During business hours, you are requested to keep personal business to an absolute minimum. If you need to leave the worksite to conduct personal business, you must first obtain permission from your immediate supervisor. This will allow him/her to make modifications to the work schedule if necessary and will keep him/her aware of your activities during the day. Personal visits of friends and family members to the worksite are discouraged.

## Business Phone Calls

A great majority of our business is conducted over the phone making our telephone techniques extremely important. A friendly but businesslike telephone manner should always be projected. When you are away from your work area, make a habit of forwarding your phone to the appropriate extension.

## Personal Phone Calls

We recognize that periodically, personal phone calls must be made or be received during the business hours. Such calls should be held at a minimum so that they do not interfere with the workflow. No long distance or toll calls such as directory assistance, other than Company business calls are to be made from Company telephones. If it is absolutely necessary that you make a toll call from work, you must charge it to your personal calling card or home number. Telephone records are subject to periodic review by management.

## Business Cellular Phones

The Company may issue a cellular phone to certain employees for business use. All employees are required to be professional and conscientious at all times when using Company phones. In the event a Company-issued cellular phone is lost or broken while in the possession of the employee, the financial burden of its replacement lies solely with the employee. In some cases, the Company may replace the phone with a like product at the employee's expense, or it may require the employee to replace the phone with a like product. All Company-issued cellular phones must be returned at the time of termination.

CONFIDENTIAL

APF00000068

## Personal Cellular Phone Calls

While at work employees are expected to exercise the same discretion in using personal cellular phones as is expected for the use of Tenura and Operating Subsidiaries phones. Personal calls during the work hours, regardless of the phones use, can interfere with employee productivity and be distracting to others. Employees are therefore asked to make personal calls during breaks and lunch period and to ensure that friends and family members are aware of the department's policy. The Company will not be liable for the loss of personal cellular phones brought into the workplace.

## Religious Accommodation Policy

The Company respects the religious beliefs and practices of all employees and will make, upon request, an accommodation for such observances when a reasonable accommodation is available that does not create an undue hardship on the Company's business.

An employee whose religious beliefs or practices conflicts with his/her job, work schedule, or with the Company's policy or practice on dress and appearance, or with other aspects of employment and who seeks an religious accommodation must submit a written request for the accommodation to his/her immediate supervisor or the Human Resources Department. The written request will include the type of religious conflict that exists and the employee's suggested accommodation.

The immediate supervisor will evaluate the request considering whether a work conflict exists due to a sincerely held religious belief or practice and whether an accommodation is available which is reasonable and which would not create an undue hardship on the Company's business. An accommodation may be a change in job, using paid leave or leave without pay, allowing an exception to the dress and appearance code which does not impact safety or uniform requirements, or for other aspects of employment.

The supervisor and/or Human Resources and employee will meet to discuss the request and decision on an accommodation. If the employee accepts the proposed religious accommodation, the supervisor will implement the decision. If the employee rejects the proposed accommodation, he/she may appeal following the Company's general grievance policy and procedure.

CONFIDENTIAL

APF00000069

# Reporting Injuries & Illnesses

The Company strives to establish and maintain a comfortable and safe working environment. We often take safety for granted in an office environment. Though we may not be exposed to the same degree of risk as a typical manufacturing firm or healthcare facility, we should still recognize that safety risks are present and take steps to reduce the risk for injury or illness. Safety is everyone's responsibility at Tenura and Operating Subsidiaries.

## Procedures

- All work-related injuries and illnesses should be reported immediately to your supervisor or the Human Resources Department, even if you are not sure whether it is truly work-related. Even small, insignificant injuries, left untreated can result in more serious conditions.

- Your supervisor (or a designated alternate) will complete an Accident Report. When injuries are reported immediately, accidents can quickly be investigated and corrective action taken to prevent another injury.

If you see any potential hazards that need attention, notify the Human Resources Department immediately.

# Requests for References

It is the policy of Tenura and Operating Subsidiaries to provide, in response to any request for references or employment history, only the dates of employment and position held by the employee. Any additional information will be released only as required by law or court order upon receipt of a legally acceptable release signed by the employee. All inquiries regarding employment history must be routed through the Human Resources Department.

CONFIDENTIAL

APF00000070

## Safety Rules

It is the policy of Tenura and Operating Subsidiaries to be in compliance with the laws, rules and regulations concerning the safe practices as published by federal, state and local health and safety laws including, but not limited to, the Occupational Safety and Health Act (OSHA). The Company wants to ensure that our employees remain safe and injury-free when accidents are preventable. We expect our employees to refrain from horseplay, careless behavior and negligent actions. It is the Company's policy to maintain a safe and secure working environment for all employees and clients.

While working, employees must observe safety precautions for their safety and the safety of others. All work areas must be kept clean and free from clutter and debris. Any hazards or potentially dangerous conditions must be corrected immediately or reported to a supervisor.

Vehicles and equipment are to be operated by those authorized as a result of their knowledge, training, and experience. Before operating equipment for the first time, employees must have the approval of their supervisor.

If the employee's assignment involves the use of hazardous or toxic materials, all laws, rules, and regulations concerning their safe handling and disposal as published by the Company and governmental agencies having jurisdiction over such matters must be complied with. Consult your supervisor for full details, including Material Safety Data Sheets, container labeling, and training including information regarding exposure to and handling of such materials.

The employee's job may have additional safety guidelines that are established for their protection and the protection of others. If so, the employee will be required to know and follow them carefully. All work-related injuries and illnesses, regardless of the extent or nature, unsafe working conditions, and the need for maintenance or repair of vehicles or equipment must be immediately reported to management. Additionally, employees will be required to undergo a drug test immediately following the accident. Employees concerned about the possible safety of a work act should report concerns to their supervisor prior to performing that task.

Employees who fail to comply with this procedure are subject to disciplinary consequences.

CONFIDENTIAL

APF00000071

## Security – Facilities Access and Visitors

At Tenura and Operating Subsidiaries we want to ensure a safe and secure working environment. Our corporate office is located in a building that is equipped with personalized key card access. These key cards allow the security Company to limit access to the building and to monitor when a particular employee enters and exits the building during off hours. Security measures are in place at all other facilities.

Although the security measures in place are extensive, no environment is 100% secure. It is the employee's responsibility to take whatever precautions necessary to protect his or her personal property. An employee's personal property is not the Company's responsibility if damaged, lost or stolen. The Company's insurance does not cover any items that do not belong to the Company.

All visitors are to be escorted by authorized personnel to ensure proper client confidentiality. Please do not allow visitors to roam the premises unattended.

CONFIDENTIAL

APF00000072

## Solicitations, Distributions & Use of Bulletin Boards

The Company believes that the workplace is not an appropriate place for employees to be subjected to solicitations or materials that do not pertain to Company business. To implement this policy, the Company has adopted the following guidelines:

- Employees may not solicit other employees for membership, contributions, funds, or other purposes during the employee's working time, or at any other time if the solicitation interferes with other employees who are scheduled to work.
- Employees may not distribute literature (other than Company information) during working time or in working areas for any purpose.
- Employees may not use work e-mail or voicemail, or other resources, as a means to solicit or distribute non-work related materials. Activities that disrupt work hours or operations will not be allowed to continue.
- Persons who are not employed by the Company may not solicit or distribute literature on Company property at any time for any purpose.

Working time includes the working time of both the employee doing the soliciting and/or distributing and the employee to whom the soliciting and/or distributing is directed. Working time does not include break periods and/or meal periods.

In some instances, the collection of money for presents, flowers, parties, donations, or for cases of particular hardship can be considered appropriate. In these exceptional cases, such collections may be permitted with the approval of management. All such approved solicitations should be made outside of working time.

The only exception to the above is that the Company may authorize the solicitation of funds for recognized and established charities which benefit the general community.

Failure to comply with this policy may result in disciplinary action up to and including termination of employment.

**CONFIDENTIAL**

APF00000073

# Smoke-Free Environment

As the Company is committed to protecting and enhancing indoor air quality and the health and well-being of every employee and client, a smoke free environment has been established. Smoking, and the use of any tobacco product is not permitted at any time in Company work areas, including offices, hallways, meeting rooms, break rooms, restrooms, stairs, Company vehicles, and all other enclosed facilities, or in Company vehicles or customer or client areas. For purposes of this policy, smoking is defined as the use of tobacco products through pipes, cigars, cigarettes, and the use of e-cigarettes regardless of whether they contain tobacco.

Smoking is only permitted outdoors, away from public entrances, pathways, walkways, or other areas that may conflict with the Company's clean air commitment. The Company is in no way legally responsible for making designated areas available to smokers, but has allowed smoking outside to accommodate employees who choose to do so.

Smokers should be considerate of coworkers, customers, and members of the public and help to maintain cleanliness by depositing cigarettes in appropriate containers and staying far enough away from doors so that smoke does not blow into the building.

Employees who smoke must observe the same guidelines as non-smokers for the frequency and length of break periods.

Failure to comply with the Company's smoking policy may result in disciplinary action and or additional consequences as deemed appropriate by Company management.

# Social Events

In order to foster cooperation and teamwork among employees, the Company will occasionally plan "social" events. Examples of such events include softball games, cookouts, or a day at the water park. All "social" events are optional and are not considered a condition of employment. As a result, employees are expected to participate at their own risk and may be asked to sign a liability waiver releasing the Company from any responsibility for injury. "Social" events will be conducted based on available time and financial resources and are therefore not guaranteed.

CONFIDENTIAL

APF00000074

# Termination Procedures

## Resignation Notice

While we hope our employees will be happy and want to remain employed with the Company, there will be times when an employee will choose to voluntarily terminate employment. In such cases, a written letter of resignation will be required. As a courtesy to the Company and other employees, a minimum two-week notice is requested. An employee's termination date should correspond with his/her last day worked. Vacation, holidays, and other paid leave cannot be used to extend employment.

## Return of Company Property

When an employee terminates employment, either voluntarily or involuntarily, all property belonging to the Company must be returned before he or she leaves the office on the last day of employment. Items which must be returned include: documentation regarding confidential, technical and business information, lists of the Company's clients, software, hardware and books purchased by the Company, corporate calling card, corporate credit card, cell phone purchased by the Company, the Employee Handbook and office keys or access cards. A checklist will be made available to the employee to aid in gathering all items to be returned. Failure to return Company property upon termination may result in the delay or withholding of the employee's final paycheck. The employee will be responsible for any lost or damaged items.

## Pay on Termination

Employees whose employment is terminated voluntarily will receive their regular salary for all days worked in the final payroll period as well as any applicable commissions on the Company's next regular payday following the termination. You will be paid for all accrued and unused vacation time upon resignation, separation, or retirement from the Company. However, in the event of a voluntary termination of employment, no payment may be made unless the employee gives at least a two-week notice, unless otherwise required by law. Additionally, any employee terminated for cause will not be paid unused vacation time or any other paid benefit, unless otherwise required by law. Accrued, unused sick pay is not payable at the time of termination. Additionally, all vacation and or sick pay taken, but not yet accrued will be deducted from your final paycheck.

Employees whose employment is terminated involuntarily will receive their regular salary for all days worked in accordance with federal and state requirements.

**CONFIDENTIAL**

APF00000075

## Cancellation of Company Paid Benefits

Employee's insurance coverage will continue until the end of the calendar month after termination of employment. This should allow ample time for the employee to obtain alternate coverage. At the time of an employee's termination, the employee will have the option to continue coverage through his/her group plan for an additional 18 months after termination of employment (see COBRA Benefits).

Any Company paid benefits such as cellular phone service will be discontinued immediately.

## Exit Interview

Within the first month following termination of employment, former employees may be asked to complete an exit interview. The purpose of this interview is to determine ways in which the Company may improve Employer/Employee relations. Responses to the questions in this exit interview will be kept strictly confidential and will not affect future employment opportunities with Tenura and Operating Subsidiaries.

CONFIDENTIAL

APF00000076

# Worker's Compensation Insurance

Employees of Tenura and Operating Subsidiaries are covered by Worker's Compensation Insurance.

Employees are entitled to benefits if, while carrying out activities for the benefit of their employer, they suffer an injury by accident. All injuries must "arise out of and in the course and scope of" the covered employment to be compensated. With respect to occupational disease, the employee will be entitled to benefits for disability due to a condition to which the employment significantly contributed.

If an employee is off work due to an injury on the job that is covered by Workers Compensation, the employee may use available sick leave or accrued vacation time to cover the difference between his/her gross wages and what is paid by Worker's Compensation until the sick leave is expended. If the employee does not wish to use sick leave, the Company will not cover the difference in wages.

In order that we may file for benefits in a timely manner, you must report any work related injury to your supervisor immediately. To obtain benefits, an employee or his representative must give the Company written notice of any work-related injury within 30 days of the incident. In the case of occupational disease, the employee must give notice to the Company within 30 days of being advised by a competent medical authority that he or she has the occupational disease. Claim forms can be obtained from the Human Resource Department upon request.

Employees returning to work must provide proof of rehabilitation or treatment from a licensed physician and verification that they are able to complete all job-related tasks. In the event that the employee cannot complete some of the tasks as ordered by the physician, the Company will modify his/her job load as business allows. Once a physician has verified that the employee can resume all job-related tasks, he/she will no longer receive workers compensation benefits.

CONFIDENTIAL

APF00000077

APPLICANT'S EXHIBIT NO. 22

SUBJECT: Employee Handbook

| | |
|---|---|
| Name: | 04520 - Nasserfar, Michael H. |
| Date Received: | 02/28/2014 9:30 AM |
| Message Type: | Custom Company Notification |
| Message Status: | Acknowledged - 03/06/2014 2:31 PM |
| Email Delivery Status: | 02/28/2014 9:31 AM (to work email) |

Close Window
Print Message
Resend Email

CONTENTS:
Acknowledged by Nasserfar, Michael H. on 03/06/2014 2:31 PM

In order to stay current, competitive and to align with our growth and expansion efforts, we recently updated a number of our employment policies. At Tenura, our culture plays a significant role in policy development and maintenance. All members of the Tenura team are guided and motivated by our mission which is our foundation and differentiates us from other organizations. Many of our updates are to ensure tools, resources and our workplace is consistent with our mission - one that is respectful, safe and free from all threatening and intimidating conduct. As employees and owners of the Company, it is important that all staff understand the policies and their role in that regard. Below is an overview of the updates:

- **Vacation Policy:** You asked for it in our Employee survey and we listened! Our vacation policy now allows for exempt staff to request time in 1/2 day increments and non-exempt staff in 30 minute increments. Additionally, **on an exception basis**, you may request up to 5 days of vacation carryover per year. The types of exceptions that will be considered include sickness or disability, when an employee is planning for an upcoming extended FMLA, military or other approved leave, when an employee has had to reschedule for urgent personal reasons, or when it is at the request of management
- **Sick Pay:** Similar to vacation, exempt staff can request time in 1/2 day increments and non-exempt in 30 minute increments
- **Drug-Free Workplace:** Requires that prescribed medicines be in a container labeled by a pharmacist to the employee. Also, the use and effects of marijuana in the workplace, including when used for medicinal purposes, is prohibited irrespective of any state laws.
- **Standards of Conduct:** Requires that any employee charged, indicted, and/or convicted of certain crimes (moral turpitude, financial crime, industry related) must immediately report such to the Company
- **Smoke-Free Workplace:** Clarifies that smoking includes cigars, cigarettes, and e-cigarettes, with or without tobacco
- **Social Media & Blogging:** Separates **personal use** and **business use** guidelines of acceptable standards, therefore requires detailed attention and review thereof
- **New Policies:** Payroll & Pay Periods Policy; Media Inquiries Policy; Internal Placement Policy
- Other policies updated: Respectful Workplace, Employer-Offered Benefits, FMLA & leave time specific to California employees, Lactation Policy, Time-off to Vote, Overtime & Timekeeping, ADA/ADAAA, Termination Procedures, Workers Compensation

Please take time to read in detail and become familiar with the new policies. All staff will be required to acknowledge receipt and understanding of the new policies no later than February 28, 2014. All policies are effective February 1, 2014; click here for the new Employee Handbook.

Should you have any questions about the new policies or the acknowledgement process, please contact HR Support.

Applicant's
Injunction Hearing
Exhibit 022

APF00028247

APPLICANT'S EXHIBIT NO. 23

SUBJECT: Employee Handbook

Name: 04520 - Task, Michael E.
Date Received: 02/11/2014 4:30 PM
Message Type: Custom Company Notification
Message Status: Acknowledged - 02/16/2014 7:32 AM
Email Delivery Status: 02/11/2014 4:30 PM (to work email)

Close Window
Print Message
Resend Email

CONTENTS:
Acknowledged by Task, Michael E. on 02/16/2014 7:32 AM

In order to stay current, competitive and to align with our growth and expansion efforts, we recently updated a number of our employment policies. At Tenura, our culture plays a significant role in policy development and maintenance. All members of the Tenura team are guided and motivated by our mission which is our foundation and differentiates us from other organizations. Many of our updates are to ensure tools, resources and our workplace is consistent with our mission - one that is respectful, safe and free from all threatening and intimidating conduct. As employees and owners of the Company, it is important that all staff understand the policies and their role in that regard. Below is an overview of the updates:

- **Vacation Policy**: You asked for it in our Employee survey and we listened! Our vacation policy now allows for exempt staff to request time in 1/2 day increments and non-exempt staff in 30 minute increments. Additionally, **on an exception basis**, you may request up to 5 days of vacation carryover per year. The types of exceptions that will be considered include sickness or disability, when an employee is planning for an upcoming extended FMLA, military or other approved leave, when an employee has had to reschedule for urgent personal reasons, or when it is at the request of management
- **Sick Pay**: Similar to vacation, exempt staff can request time in 1/2 day increments and non-exempt in 30 minute increments
- **Drug-Free Workplace**: Requires that prescribed medicines be in a container labeled by a pharmacist to the employee. Also, the use and effects of marijuana in the workplace, including when used for medicinal purposes, is prohibited irrespective of any state laws.
- **Standards of Conduct**: Requires that any employee charged, indicted, and/or convicted of certain crimes (moral turpitude, financial crime, industry related) must immediately report such to the Company
- **Smoke-Free Workplace**: Clarifies that smoking includes cigars, cigarettes, and e-cigarettes, with or without tobacco
- **Social Media & Blogging**: Separates **personal use** and **business use** guidelines of acceptable standards, therefore requires detailed attention and review thereof
- **New Policies**: Payroll & Pay Periods Policy; Media Inquiries Policy; Internal Placement Policy
- Other policies updated: Respectful Workplace, Employer-Offered Benefits, FMLA & leave time specific to California employees, Lactation Policy, Time-off to Vote, Overtime & Timekeeping, ADA/ADAAA, Termination Procedures, Workers Compensation

Please take time to read in detail and become familiar with the new policies. All staff will be required to acknowledge receipt and understanding of the new policies no later than February 28, 2014. All policies are effective February 1, 2014; click here for the new Employee Handbook.

Should you have any questions about the new policies or the acknowledgement process, please contact HR Support.

Applicant's
Injunction Hearing
Exhibit 023

APF00028248

APPLICANT'S EXHIBIT NO. 24

## Introduction

### Receipt of Company Employee Handbook

This employment guide ("Employee Handbook" or "Manual") is a compilation of human resources policies, practices and procedures currently in effect at Tenura Holdings, Inc. ("Tenura") and its respective subsidiaries including AmeriPro Funding, Inc., Reliant Title Agency, LLC, Privatus, LLC, and AmeriFirst Insurance Agency, LLC ("Operating Subsidiaries") (the Operating Subsidiaries and Tenura shall collectively be referred to as the "Company"). The Company is an equal opportunity employer.

This Manual is designed to introduce employees to the organization, familiarize you with Company policies and benefits as they pertain to you as an employee, provide general guidelines on work rules, disciplinary procedures and other issues related to your employment, and to help answer many of the questions that may arise in connection with your employment.

This Manual and any other provisions contained herein do not constitute a guarantee of employment or an employment contract, express or implied. Your employment is "at-will" which means it may be terminated for any reason, with or without cause, and with or without notice. Only the President of Tenura or other authorized representative(s) of the Company has the authority to enter into a signed written agreement guaranteeing employment for a specific term. This Manual is intended solely to describe the present policies and working conditions at the Company. This Manual does not purport to include every conceivable situation; it is merely meant as a guideline, and unless laws prescribe otherwise, common sense shall prevail. Of course, Federal, state, and/or local laws will take precedence over Company policies, where applicable.

Human Resources Policies are applied at the discretion of the Company who reserves the right to change, withdraw, apply, or amend any of our policies or benefits, including those covered in this Manual, at any time. The Company may notify you of such changes via email, posting on the Company's Intranet, Portal or Website, or via a printed memo, notice, amendment to or reprinting of this Manual, but may, in its discretion make such changes at any time, with or without notice and without a written revision of this Manual.

By signing below, you acknowledge that you have received a copy of the Company's Employee Handbook, and understand that it is your responsibility to read and comply with the policies contained therein and any revisions made to it. Furthermore, you acknowledge that you are employed "at-will" and that this Manual is neither a contract of employment nor a legal document. Unless otherwise noted, information in this manual supersedes all previous communications, other than the Employment Agreement on the addressed topics.

*Ty Gosnay*
_____
Signature

2/19/2014
_____
Date

Tycord R Gosnay
_____
Please print your full name

*Please sign and date one copy of this notice and return it to Human Resources.*
*Retain a second copy for your reference.*

CONFIDENTIAL: Revised February 1, 2014



EXHIBIT
38
4-24-15 kw

Applicant's
Injunction Hearing
Exhibit 024

CONFIDENTIAL

APF00000360

APPLICANT'S EXHIBIT NO. 27

Due Diligence

 Jackson Thomas <jackson.thomas@oakmortgagegroup.com>          11/12/14
to Michael, bcc: holden.thomas, bcc: jason.sherman

Michael,

Now that we are this far along, I want to make sure we complete some important parts of the due diligence. I believe Jason spoke to most of the questions you sent over last week, but the attached document should be a good additional resource for your Due Diligence.

In order to ensure we are ready to have an effective meeting on Monday, I will need some more information from you. Can you review the list of items below and get these back to us by the weekend?

- **Year To Date P&L and Last Year's P&L.** Jason mentioned you may not have an up-to-date version. The most important thing is knowing what your monthly expenses are so anything you can do to specify those details would be appreciated.
- **Product Mix:** Can you send us a breakdown of units and volume (Purchase vs Refi and Conventional / Gov't / Jumbo)
- **Staff Members:** Names, Titles, Compensation, and whether or not you intend to bring them with you. Do you anticipate needing any additional staff?
- **Employment Agreement:** I know you mentioned in your last email that you cannot send this. However, your copy of your Employment Agreement is your property. I have been advised that you are not breaking any legal or ethical codes by sending it to us. Our goal in reviewing this is to make sure that we think through all implications of this change. We can only do that by reviewing the details in your EA.
- **Recent Paystub and Last Year's W2**
- **Pricing:** Can you send me 3 scenarios / deals you are working on now. This way I can compare it to our pricing.
- **Comp Agreement:** Do you have any documentation on your comp plan. You

PS - Jason mentioned you have another LO that you work with. Will he be able to come to Dallas on Monday? It would be great to meet him if possible.



Applicant's Injunction Hearing Exhibit 027

APPLICANT'S EXHIBIT NO. 28

EXHIBIT
12
4-24-15 KW
depobook.com

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000467

APPLICANT'S
INJUNCTION
HEARING
EXH 028 REDACTED

JAN -14

## General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 1/1/2014 to 1/31/2014

| Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|

| GL/Desc/Vendor | Transaction Description |
|---|---|

**55110-152180** — Commission Expense - Loan

| | Date |
|---|---|
| 1-15-14 | 01/15/14 |
| 1-16-14 | 01/16/14 |
| 1-23-14 | 01/23/14 |
| 1-23-14 | 01/23/14 |
| 1-31-14 | 01/31/14 |
| | 01/31/14 |
| 2/15 | Total JE: |
| | Total for |

**55111-152180** — Commission Offset

| | Date |
|---|---|
| 1-15-14 | 01/15/14 |
| 1-16-14 | 01/16/14 |
| | Total JE: |
| | Total for |

**60100-152180** — Salary And Wages

| | Date |
|---|---|
| 1-15-14 | 01/15/14 |
| 1-31-14 | 01/31/14 |
| 2/15 | 01/31/14 |
| | Total JE: |



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank DB Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|
| 60450-152180 | Bonus - Employee | 2/15 | | Total for | .00 | | | |
| | | | | 01/31/14 | | | | |
| | | | | Total JE: | | | | |
| 61000-152180 | Rent Expense | 14503330 | 3292 | Total for | .00 | | | |
| | | | | 01/01/14 | | | | 525.00 |
| | | | | Total | | | | |
| | | | | Total for | .00 | | | |
| 62310-152180 | Health Insurance | | | 01/15/14 | | | | |
| | | | | 01/15/14 | | | | |
| | | | | 01/31/14 | | | | |
| | | | | 01/31/14 | | | | |
| | | | | 01/31/14 | | | | |
| | | | | 01/31/14 | | | | |
| | | | | 01/31/14 | | | | |
| | | | | Total JE: | | | | |
| | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000468



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | 00 | | | |
| | | 1-15-14 | | | | | 01/15/14 | | | | |
| | | 1-15-14 | | | | | 01/15/14 | | | | |
| | | 1-16-14 | | | | | 01/16/14 | | | | |
| | | 1-23-14 | | | | | 01/23/14 | | | | |
| | | 1-23-14 | | | | | 01/23/14 | | | | |
| | | 1-31-14 | | | | | 01/31/14 | | | | |
| | | 2/15 | | | | | 01/31/14 | | | | |
| | | 2/15 | | | | | 01/31/14 | | | | |
| | | | | | | | Total JE | | | | |
| | | | | | | | Total for | | | | |
| 70100-152180 | Advertising & Marketing | | | | | | 01/01/14 | .00 | | | |
| | | | | | | | Total JE | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | Report | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000469





# General Ledger by Branch

Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 2/1/2014 to 2/28/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | .00 | | | |
| | | | | | | | 02/13/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/18/14 | | | | |
| | | | | | | | 02/21/14 | | | | |
| | | | | | | | 02/25/14 | | | | |
| | | | | | | | 02/27/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | Total JE: | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | | .00 | | | |
| | | | | | | | 02/13/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | Total JE: | | | | | | | | .00 | .00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000470



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41860-152180 | Brokered Loan Fee Income | | | | | | | | | | |
| | | | | | | | Total for | .00 | | | 550.00 |
| | | | | | | | 02/07/14 | | | 3,075.00 | |
| | | | | | | | Total JE: | | .00 | 3,075.00 | |
| 42300-152180 | Premium Discount - Lo | | | | | | | | | | |
| | | | | | | | Total for | .00 | | | -3,075.00 |
| | | | | | | | 02/03/14 | | | 4,500.00 | |
| | | | | | | | 02/03/14 | | | 4,500.00 | |
| | | | | | | | 02/11/14 | | | 3,560.75 | |
| | | | | | | | 02/12/14 | | | 4,500.00 | |
| | | | | | | | 02/13/14 | | | 3,472.05 | |
| | | | | | | | 02/14/14 | | | 3,609.29 | |
| | | | | | | | 02/14/14 | | | 3,499.38 | |
| | | | | | | | 02/14/14 | | | 3,471.63 | |
| | | | | | | | 02/18/14 | | | 1,890.00 | |
| | | | | | | | 02/21/14 | | | 4,417.50 | |
| | | | | | | | 02/24/14 | | | 4,989.51 | |
| | | | | | | | 02/24/14 | | | 2,227.50 | |
| | | | | | | | 02/25/14 | | | 4,500.00 | |
| | | | | | | | 02/25/14 | | | 6,255.00 | |
| | | | | | | | 02/26/14 | | | 4,500.00 | |
| | | | | | | | 02/26/14 | | | 1,440.00 | |
| | | | | | | | 02/26/14 | | | 1,452.50 | |
| | | | | | | | 02/26/14 | | | 3,717.86 | |

42301-152180

Premium Discount - Branch

GL/Desc/Vendor

Transaction Description

Invoice Number

| GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|
| | | | | 02/27/14 | | | | |
| | | | | 02/27/14 | | | | |
| | | | | 02/28/14 | | | | |
| | | | | 02/28/14 | | | | |
| | | | | 02/28/14 | | | | |

Total JE:

Total for

02/03/14
02/03/14
02/11/14
02/12/14
02/12/14
02/13/14
02/13/14
02/14/14
02/14/14
02/14/14
02/14/14
02/18/14
02/18/14
02/21/14
02/21/14
02/24/14

.00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000473



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DR | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | | | | | | | | | | | |
| Pair-Off Allocation | | | | | | | | | | | |
| | | | | | | | 02/24/14 | | | | |
| | | | | | | | 02/25/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/27/14 | | | | |
| | | | | | | | 02/27/14 | | | | |
| | | | | | | | 02/27/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| | | | | | | 02/03/14 | | .00 | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000474



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | Lender Credits - Gfc Cures | | | | | | 02/11/14 | .00 | | | |
| | | | | | | | 02/12/14 | | | | |
| | | | | | | | 02/13/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/24/14 | | | | |
| | | | | | | | 02/25/14 | | | | |
| | | | | | | | 02/25/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/26/14 | | | | |
| | | | | | | | 02/27/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | 02/18/14 | | | | |
| | | | | | | | 02/24/14 | | | | |
| | | | | | | Total JE: | | .00 | | | |
| | | | | | | Total for | | | | | |
| 55110-152180 | Commission Expense - Loan | 2-14-14 | | | | | 02/14/14 | | | | |



GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

55111-152180 Commission Offset
2/15
2-28-
3-15
02/14/14
02/28/14
02/28/14
Total JE:
Total for .00

55280-152180 Underwriting Fees
3-15
2-28-14
02/28/14
Total JE:
Total for .00
02/28/14
Total JE:
Total for

55350-152180 Verification Fees
02/01/14
02/11/14
02/28/14
Total
Total for .00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000476



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55551-152180 | Appraisal Expense - | | | | | | 02/28/14 | .00 | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 55600-152180 | Credit Report Expense | | | | | | 02/25/14 | .00 | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 60100-152180 | Salary And Wages | 2-14-14 | | | | | 02/14/14 | | | | |
| | | 2-14-14 | | | | | 02/14/14 | | | | |
| | | 2/15 | | | | | 02/14/14 | | | | |
| | | 2-28-14 | | | | | 02/28/14 | | | | |
| | | 3-15 | | | | | 02/28/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 60450-152180 | Bonus - Employee | 2-14-14 | | | | | 02/14/14 | | | | |
| | | 2/15 | | | | | 02/14/14 | | | | |
| | | 3-15 | | | | | 02/28/14 | | | | |
| | | | | | | Total JE: | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000477

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000478

| GL/Descr/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 Rent Expense | | 145033397 | | | | | 02/01/14 | | | | |
| | | 303792 | | | | | 02/20/14 | | | | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | | | | |
| 61300-152180 Office Supplies & Expense | | | | | | | 02/01/14 | | | | |
| | | | | | | | 02/20/14 | | .00 | .00 | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | | | | |
| 61390-152180 Couriers & Shipping | | 26833 | | | | | 02/28/14 | | | | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | .00 | .00 | | |
| 62310-152180 Health Insurance | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |
| | | | | | | | 02/14/14 | | | | |



68501-152180  Corporate Per File Fees

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Reg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | .00 | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |
| | | | | | | | 02/28/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000480

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000481





# General Ledger by Branch
**Company: Ameripro Funding, Inc.**
**Branch: 152180 (Nasserfar)**
GLs from 10000 to 99995
From 3/1/2014 to 3/31/2014

| GL/Descr/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | | | | |
| | | | | | | | 03/04/14 | | | | |
| | | | | | | | 03/12/14 | | | | |
| | | | | | | | 03/14/14 | | | | |
| | | | | | | | 03/18/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | Total JE: | | | | | | | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 41370-152180 | Processing Fees | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 41380-152180 | Branch Admin Fee | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 41860-152180 | Brokered Loan Fee Income | | | | | | | | | | |
| | Total for | | | | | | | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000482



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 Premium Discount - Lo | | | | | | | | | | | |
| | | | | | | | 03/20/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 03/04/14 | | | | |
| | | | | | | | 03/05/14 | | | | |
| | | | | | | | 03/12/14 | | | | |
| | | | | | | | 03/14/14 | | | | |
| | | | | | | | 03/18/14 | | | | |
| | | | | | | | 03/26/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 42301-152180 Premium Discount - Branch | | | | | | | | | | | |
| | | | | | | | 03/04/14 | | | | |
| | | | | | | | 03/05/14 | | | | |
| | | | | | | | 03/12/14 | | | | |
| | | | | | | | 03/12/14 | | | | |
| | | | | | | | 03/14/14 | | | | |
| | | | | | | | 03/14/14 | | | | |
| | | | | | | | 03/18/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000483



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | | | | | |
| | | | | | | | 03/18/14 | | | | |
| | | | | | | | 03/26/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 03/04/14 | | | | |
| | | | | | | | 03/05/14 | | | | |
| | | | | | | | 03/18/14 | | | | |
| | | | | | | | 03/26/14 | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | | | | |
| | | | | | | | 03/04/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000484



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55110-152180 | Commission Expense - | | | | | | | | | | |
| | | | | | | | 03/15/14 | | | | |
| | | | | | | | 03/15/14 | | | | |
| | | | | | | | 03/18/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55111-152180 | Commission Offset | | | | | | | | | | |
| | 3-15-14 | | | | | | 03/15/14 | | | | |
| | 3-15- | | | | | | 03/15/14 | | | | |
| | 3-31-14 | | | | | | 03/31/14 | | | | |
| | 4/15 | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55280-152180 | Underwriting Fees | | | | | | | | | | |
| | | INV14-2692475 | 3292 | | | | 03/25/14 | | | | |
| | | | | | | | Total | | | .00 | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000485



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | Verification Fees | 1528051 | 3292 | | | | 03/1/14 | | | | |
| | | INCTXVM106428 | 3292 | | | | 03/31/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55551-152180 | Appraisal Expense - | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | 1640875 | 3292 | | | | 03/11/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | 03/27/14 | | | | |
| | | | | | | | 03/31/14 | | | | .00 |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 03/15/14 | | | | |
| | | | | | | | 03/15/14 | | | | |
| | | | | | | | 03/28/14 | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000486

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000487

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | | 3-15-14 | | | | | 03/15/14 | | | | |
| | | 3-15 | | | | | 03/31/14 | | | | |
| | | 4/15 | | | | | 03/31/14 | | | | |
| | | 4/15 | | | | | 03/15/14 | | | | |
| | | 4-15 | | | | | 03/31/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 61000-152180 | Rent Expense | 14503507 | 3292 | | | | 03/01/14 | | | | |
| | | | | | | Total | | | | | |
| | | | 3292 | | | | 03/03/14 | | | | |
| | | | | | | Total | | | | | |
| 61300-152180 | Office Supplies & Expense | | | | | | | | | | |
| | | | | | | Total for | | | | | |
| 61380-152180 | Couriers & Shipping | | | | | | | | | | |
| | | | | | | Total for | | | | | |



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|



62310-152180 Health Insurance

| | | Date |
|---|---|---|
| | | 03/15/14 |
| | | 03/15/14 |
| | | 03/15/14 |
| | | 03/15/14 |
| | | 03/31/14 |
| | | 03/31/14 |
| | | 03/31/14 |
| | | 03/31/14 |
| | Total JE: | 03/31/14 |
| | Total for | |

64100-152180 Payroll Tax Expense

| | Date |
|---|---|
| 3-15-14 | 03/15/14 |
| 3-15 F | 03/15/14 |
| 3-15 F | 03/15/14 |
| 3-18-1 | 03/18/14 |
| 3-31- | 03/31/14 |
| 4/15 O | 03/31/14 |
| 4/15 | 03/31/14 |
| 4-15 | 03/31/14 |
| Total JE: | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000488



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |
| | | | | | | | 03/31/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000489





OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000491

# General Ledger by Branch

Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 4/1/2014 to 4/30/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|

41355-152180 — Application Fee Income

04/17/14

Total JE:

41357-152180 — Credit Report Fee Income

Total for

41370-152180 — Processing Fees

Total for

41380-152180 — Branch Admin Fee

Total for

41860-152180 — Brokered Loan Fee Income

Total for

42300-152180 — Premium Discount - Lo

Total for



42301-152180 Premium Discount - Branch

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 04/17/14 | | | | |
| | | | | | | | 04/17/14 | | | | |
| | | | | | | | 04/18/14 | | | | |
| | | | | | | | 04/21/14 | | | | |
| | | | | | | | 04/21/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| | | | | Total JE: | | | | | | | |
| | | | | Total for | | | | | | | |

| | | | | | | | 04/17/14 | | | | |
| | | | | | | | 04/17/14 | | | | |
| | | | | | | | 04/18/14 | | | | |
| | | | | | | | 04/18/14 | | | | |
| | | | | | | | 04/21/14 | | | | |
| | | | | | | | 04/21/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| Total JE: | | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000492

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | Total for | | | | |
| 52426-152180 | Lender Credits - Gfk Cures | | | | | | 04/17/14 | | | | |
| | | | | | | | 04/21/14 | | | | |
| | | | | | | | 04/25/14 | | | | |
| | | | | | | | Total JE: | | | | |
| 52427-152180 | Lender Credit - | | | | | | Total for | | | | |
| 55110-152180 | Commission Expense | 4-15-14 | | | | | 04/15/14 | | | | |
| | 4/15 | | | | | | 04/15/14 | | | | |
| | 5-15 | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 Commission Offset | | | | | | | | | |
| | 4-15-14 | | | | 04/15/14 | | | | |
| | 4/15 | | | | 04/15/14 | | | | |
| | 5-15 | | | | 04/30/14 | | | | |
| | | | | | Total JE: | | | | |
| 55280-152180 Underwriting Fees | | 04242014 | 3292 | | 04/24/14 | | | | |
| | | | | | Total | | | | |
| | | | | | Total for | | | | |
| 55350-152180 Verification Fees | | 1560001 3292 | | | 04/11/14 | | | | |
| | | INCTXVM106696 3292 | | | 04/30/14 | | | | |
| | | | | | Total | | | | |
| | | | | | Total for | | | | |
| 55600-152180 Credit Report Expense | | | | | 04/26/14 | | | | |
| | | | | | 04/26/14 | | | | |
| | | | | | Total JE: | | | | |
| | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000494

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55700-152180 | Late / Penalty | 305247 | 3292 | | | | 04/01/14 | | | | |
| | | | | | | | Total | .00 | | | |
| | | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 04/15/14 | | | | |
| | 4-15-14 | | | | | | 04/15/14 | | | | |
| | 4/15 | | | | | | 04/30/14 | | | | |
| | 4-30- | | | | | | 04/30/14 | | | | |
| | 5/15 | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 | Bonus - Employee | | | | | | 04/15/14 | | | | |
| | 4-15-14 | | | | | | 04/15/14 | | | | |
| | 4/15 | | | | | | 04/15/14 | | | | |
| | 4-15 | | | | | | 04/17/14 | | | | |
| | 4-17-14 | | | | | | 04/30/14 | | | | |
| | 5-15 PR | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 61000-152180 | Rent Expense | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000495

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61300-152180 | Office Supplies & Expense | 14503579 | 3292 | | | | 04/01/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| | | 3052247 | 3292 | | | | 04/01/14 | | | | |
| | | 307976 | 3292 | | | | 04/18/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 61380-152180 | Couriers & Shipping | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 62310-152180 | Health Insurance | | | | | | 04/01/14 | | | | |
| | | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/15/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| | | | | | | | 04/30/14 | | | | |
| | | | | | | | Total JE: | | | .00 | |
| | | | | | | | Total for | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000496





68502-152180

Corporate Fees

GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

04/30/14

Total JE:

Total for

Total JE:

.00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000498

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000499

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 70100-152180 | Advertising & Marketing | | | | | | | | | | |
| | | 20140401 | 3292 | | | | 04/01/14 | | | | |
| | | 2014 MAY | 3292 | | | | 04/25/14 | | | | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | | | | |
| | | | | | | Report | | | | | |



MRY '14

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL.Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/12/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/27/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | 05/20/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 41370-152180 | Processing Fees | | | | | | Total for | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000500

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000501

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41380-152180 | Branch Admin Fee | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 41860-152180 | Brokered Loan Fee Income |  | | | 120489 | JE | 05/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 42300-152180 | Premium Discount - Lo | | | | | | 05/01/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/09/14 | | | | |
| | | | | | | | 05/12/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/19/14 | | | | |
| | | | | | | | 05/20/14 | | | | |
| | | | | | | | 05/20/14 | | | | |
| | | | | | | | 05/21/14 | | | | |
| | | | | | | | 05/22/14 | | | | |
| | | | | | | | 05/23/14 | | | | |

42301-152180

Premium Discount - Branch

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/27/14 | | | | |
| | | | | | | | 05/28/14 | | | | |
| | | | | | | | 05/29/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 05/01/14 | | | | |
| | | | | | | | 05/01/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/05/14 | | | | |
| | | | | | | | 05/06/14 | | | | |
| | | | | | | | 05/09/14 | | | | |
| | | | | | | | 05/12/14 | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000502

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | | | | | | | | | | | |
| Pair-Off Allocation | | | | | | | | | | | |
| | | | | | | | 05/12/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/19/14 | | | | |
| | | | | | | | 05/19/14 | | | | |
| | | | | | | | 05/20/14 | | | | |
| | | | | | | | 05/20/14 | | | | |
| | | | | | | | 05/21/14 | | | | |
| | | | | | | | 05/22/14 | | | | |
| | | | | | | | 05/22/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/23/14 | | | | |
| | | | | | | | 05/27/14 | | | | |
| | | | | | | | 05/28/14 | | | | |
| | | | | | | | 05/29/14 | | | | |
| | | | | | | | 05/29/14 | | | | |
| | Total JE: | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| | Total for | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000503



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000504



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000505

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | | | | | | | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 05/26/14 | | | | |
| | | | | | | | Total JE: | | | | |
| 55700-152180 | Late / Penalty | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | | | | | |
| | | 5-15-14 | | | | | 05/15/14 | | | | |
| | | 5/15 | | | | | 05/15/14 | | | | |
| | | 5-30-14 | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | 6-15 | | | | | 05/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | | 5-15-14 | | | | | 05/15/14 | | | | |
| | | 5-15 | | | | | 05/15/14 | | | | |
| | | 6-15 | | | | | 05/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000506



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 Rent Expense | | 2014 MAY | 3292 | | | | 05/01/14 | | | | |
| | | | | | | | Total | | | | |
| 61300-152180 Office Supplies & Expense | | | | | | | Total for | | | | |
| 61380-152180 Couriers & Shipping | | | | | | | Total for | | | | |
| 62310-152180 Health Insurance | | | | | | | 05/01/14 | | | | |
| | | | | | | | 05/01/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | Total JE: | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000507



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/15/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 66000-152180 | Computer Expense | | | | | | | | | | |
| | | | | | | | 05/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | | | | | | | 05/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |

.00



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000509



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DD | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| | | | | | | | 05/30/14 | | | | |
| Total JE: | | | | | | | | | | | |
| Total for | | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000510



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68502-152180 | Corporate Fees - Neo | | | | | | | | | | |
| 70100-152180 | Advertising & Marketing | | | | | | | | | | |
| | | 2014 MAY | 3292 | | | | 05/01/14 | | | | |
| | | 20140501 | 3292 | | | | 05/01/14 | | | | |
| | | 2155 | 3292 | | | | 05/01/14 | | | | |
| | | 2988 | 3292 | | | | 05/09/14 | | | | |
| | | 20140519 | 3292 | | | | 05/19/14 | | | | |
| | | 2719 | 3292 | | | | 05/19/14 | | | | |
| | | 3079 | 3292 | | | | 05/28/14 | | | | |
| | | 2733 | 3292 | | | | 05/28/14 | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | Report | | | | |

Total for 500.00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000511



# General Ledger by Branch

**Company: Ameripro Funding, Inc.**
**Branch: 152180 (Nasserfar)**
GLs from 10000 to 99995
From 6/1/2014 to 6/30/2014



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | 06/12/14 | | | | |
| | | | | | | | 06/24/14 | | | | |
| | | | | | | | 06/26/14 | | | | |
| | | | | | | | 06/27/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | Total for | | | | |
| 41370-152180 | Processing Fees | | | | | | Total for | | | | |
| 41380-152180 | Branch Admin Fee | | | | | | Total for | | | | |
| 41860-152180 | Brokered Loan Fee Income | | | | | | Total for | | | | |



| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | | | | | | | | | | |
| | | | | | | | 05/01/14 | | | | |
| | | | | | | | 06/10/14 | | | | |
| | | | | | | | 06/13/14 | | | | |
| | | | | | Total JE: | | | | | | |
| | | | | | Total for | | | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 05/12/14 | | | | |
| | | | | | | | 06/13/14 | | | | |
| | | | | | | | 06/23/14 | | | | |
| | | | | | | | 06/23/14 | | | | |
| | | | | | | | 06/24/14 | | | | |
| | | | | | | | 06/26/14 | | | | |
| | | | | | | | 06/27/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | Total JE: | | | | | | |
| | | | | | Total for | | | | | | |
| 42301-152180 | Premium Discount - Branch | | | | | | | | | | |
| | | | | | | | 05/02/14 | | | | |
| | | | | | | | 06/02/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000513



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | | | | | | | | | | | |
| 42400-152180 | Pair-Off Allocation | | | | | | | | | | |
| Lender Credits - Gfe Cures | | | | | | | | | | | |

Date column (redacted rows):
06/30/14
06/30/14
06/30/14
06/30/14
06/30/14
06/30/14
06/27/14
06/27/14
06/26/14
06/24/14
06/23/14
06/23/14
06/13/14
06/13/14
06/12/14
06/12/14

Total JE:

Total for

Total for

06/24/14
06/23/14
06/12/14

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000514





| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55280-152180 | Underwriting Fees | INV14-2721866 | 3292 | | | | 06/24/14 | | | | |
| | | | | | | | Total for | | | | |
| 55350-152180 | Verification Fees | 1601187 | 3292 | | | | 06/11/14 | | | | |
| | | INCTXVM1107243 | 3292 | | | | 06/30/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | | | | | | 06/25/14 | | | | |
| | | | | | | | 06/25/14 | | | | |
| | | | | | | | Total JE | | | | |
| | | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000516



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000517



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61300-152180 | Office Supplies & Expense | 310469 | 3292 | | | | 06/01/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 61380-152180 | Couriers & Shipping | | | | | | Total for | | | | |
| 62310-152180 | Health Insurance | | | | | | | | | | |
| | June 2014 | 20140601 | 3292 | | | | 06/01/14 | | | | |
| | | | | | | | 06/01/14 | | | | |
| | | | | | | | 06/15/14 | | | | |
| | | | | | | | 06/15/14 | | | | |
| | | | | | | | 06/15/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | 06/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000518



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | | | | |
| | 6-15/14 | | | | | | 06/15/14 | | | | |
| | 6-15 SM | | | | | | 06/15/14 | | | | |
| | 6-15 | | | | | | 06/15/14 | | | | |
| | 6-30-14 | | | | | | 06/30/14 | | | | |
| | 7-15 | | | | | | 06/30/14 | | | | |
| | 7/15 | | | | | | 06/30/14 | | | | |
| | Total JE: | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 65600-152180 | Meals And Entertainment | | | | | | | | | | |
| | | 20140604 | AJE | | | | 06/10/14 | | | | |
| | Total | | | | | | | | | | .00 |
| | Total for | | | | | | | | | | |
| 66000-152180 | Computer Expense | | | | | | | | | | |
| | Total for | | | | | | | | | | |
| 67100-152180 | Seminar And Training | | | | | | | | | | |
| | | 20140604 | AJE | | | | 06/10/14 | | | | |
| | Total | | | | | | | | | | .00 |
| | Total for | | | | | | | | | | |
| 68500-152180 | Corporate Allocation | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000519



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000520





*July '14*

# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 7/1/2014 to 7/31/2014



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | | | | |
| | | | | | | | 07/01/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 41370-152180 | Processing Fees | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 41380-152180 | Branch Admin Fee | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 41860-152180 | Brokered Loan Fee Income | | | | | | | | | | |
| | | | | | | | 07/09/14 | | | | |
| | | | | | | | 07/09/14 | | | | |
| | | | | | | | Total JE: | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000522



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | 07/09/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | .00 | .00 | | |
| 42300-152180 | Premium Discount - Lo | | | | | | 07/01/14 | | | | |
| | | | | | | | 07/07/14 | | | | |
| | | | | | | | 07/11/14 | | | | |
| | | | | | | | 07/16/14 | | | | |
| | | | | | | | 07/18/14 | | | | |
| | | | | | | | 07/23/14 | | | | |
| | | | | | | | 07/24/14 | | | | |
| | | | | | | | 07/25/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 42301-152180 | Premium Discount - Branch | | | | | | 07/01/14 | | | | |
| | | | | | | | 07/07/14 | | | | |
| | | | | | | | 07/11/14 | | | | |

-29,878.21

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000523



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 07/1/14 | | | | |
| | | | | | | | 07/16/14 | | | | |
| | | | | | | | 07/16/14 | | | | |
| | | | | | | | 07/18/14 | | | | |
| | | | | | | | 07/23/14 | | | | |
| | | | | | | | 07/24/14 | | | | |
| | | | | | | | 07/25/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| 42400-152180 Pair-Off Allocation | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | .00 | | | |
| 52426-152180 Lender Credits - Gfe Cures | | | | | | | 07/07/14 | | | | |
| | | | | | | | 07/16/14 | | | | |
| | | | | | | | 07/23/14 | | | | |
| | | | | | | | 07/24/14 | | | | |
| | | | | | | | 07/25/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | Total for | | | | | |
| | | | | | | Total JE: | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000524

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000525



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DU | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 55110-152180 | Commission Expense | | | | | | 07/15/14 | | | | |
| | 7-15-14 | | | | | | 07/15/14 | | | | |
| | 7/15 PR | | | | | | 07/31/14 | | | | |
| | 7-31-14 | | | | | | 07/31/14 | | | | |
| | 8-15 | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55111-152180 | Commission Offset | | | | | | | | | | |
| | 7-15-14 | | | | | | 07/15/14 | | | | |
| | 7-15-14 | | | | | | 07/15/14 | | | | |
| | 7/15 | | | | | | 07/15/14 | | | | |
| | 7-31-14 | | | | | | 07/31/14 | | | | |
| | 8-15 | | | | | | 07/31/14 | | | | |
| | | | | | | | Total JE: | | | | |



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55280-152180 | Underwriting Fees | INV14-2731711 | 3292 | | | | 07/25/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55350-152180 | Verification Fees | 1606907 | | | | | 07/08/14 | | | | |
| | | INCTXVM107527 | 3292 | | | | 07/31/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | | | | | | 07/25/14 | | | | |
| | | | | | | | Total JE: | .00 | | | |
| | | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 07/15/14 | | | | |
| | | | | | | | 07/15/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000526



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 Bonus - Employee | 7-15 ▮ | | | | | | 07/15/14 | | | | |
| | 7-31- ▮ | | | | | | 07/31/14 | | | | |
| | 8-15 ▮ | | | | | | 07/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 Bonus - Employee | 7-15-14 ▮ | | | | | | 07/15/14 | | | | |
| | 7-15-14 ▮ | | | | | | 07/15/14 | | | | |
| | 7/15 ▮ | | | | | | 07/15/14 | | | | |
| | 8-15 ▮ | | | | | | 07/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 61000-152180 Rent Expense | | 14503924 | 3292 | | | | 07/01/14 | | | | |
| | | | | | | | Total | | | | |
| 61100-152180 License And Permits | | | | | | | Total for | | | | |
| 61300-152180 Office Supplies & Expense | | | | | | | Total for | | | | |





Aug 14

# General Ledger by Branch

Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 8/1/2014 to 8/31/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 Application Fee Income | | | | | | | 08/04/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 41357-152180 Credit Report Fee Income | | | | | | | Total for | | | | |
| 41370-152180 Processing Fees | | | | | | | Total for | | | | |
| 41380-152180 Branch Admin Fee | | | | | | | Total for | | | | |
| 41860-152180 Brokered Loan Fee Income | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000403

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | | | | | |
| 42300-152180 | Premium Discount - Lo | | | | | | Total for | | | | |
| | | | | | | | 08/04/14 | | | | |
| | | | | | | | 08/06/14 | | | | |
| | | | | | | | 08/07/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/14/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/18/14 | | | | |
| | | | | | | | 08/18/14 | | | | |
| | | | | | | | 08/27/14 | | | | |
| | | | | | | | 08/28/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | Total JE: | | | | | | |
| | | | | | Total for | | | | | | |
| 42301-152180 | Premium Discount - | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000404



GL/Desc/Vendor    Transaction Description    Invoice Number    GL Bank    DB    Ref    JR    Date    Beg Bal    Debit    Credit    End Bal

Total for

Total JE:

08/29/14
08/29/14
08/29/14
08/29/14
08/29/14
08/28/14
08/28/14
08/27/14
08/18/14
08/18/14
08/18/14
08/18/14
08/15/14
08/14/14
08/08/14
08/08/14
08/08/14
08/08/14
08/08/14
08/07/14
08/07/14
08/06/14
08/04/14

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000405





| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55110-152180 | Commission Expense | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 55111-152180 | Commission Offset | 8-15 | | | | | 08/15/14 | | | | |
| | | 8-15 | | | | | 08/29/14 | | | | |
| | | 8-29 | | | | | 08/29/14 | | | | |
| | | 9-15 | | | | | | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 55280-152180 | Underwriting Fees | INV14-2741777  3292 | | | | | 08/25/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000407



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | Verification Fees | 164131 | 3292 | | | | 08/08/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | | | | | | 08/25/14 | | | | |
| | | | | | | | 08/25/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | 20140805 | 3292 | | | | 08/05/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | 8-15 | | | | | 08/15/14 | | | | |
| | | 8-15 | | | | | 08/29/14 | | | | |
| | | 8-29 | | | | | 08/29/14 | | | | |
| | | 9-15 | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000408



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | 8-15 | | | | | | 08/15/14 | | | | |
| | 8-15 | | | | | | 08/15/14 | | | | |
| | 9-15 | | | | | | 08/29/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 61000-152180 | Rent Expense | | | | | | | | | | |
| | | | | | | | 08/01/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 61100-152180 | License And Permits | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 61300-152180 | Office Supplies & Expense | | | | | | | | | | |
| | | 315073 | 3292 | | | | 08/01/14 | | | | |
| | | 4013213-0 | 3292 | | | | 08/11/14 | | | | |
| | | 4013949-0 | 3292 | | | | 08/12/14 | | | | |
| | | | | | | | Total | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000409



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61380-152180 | Couriers & Shipping | | | | | | Total for | | | | |
| 61900-152180 | Dues And Subscriptions | | | | 120535GE | | Total JE: 08/01/14 | .00 | | | |
| | | | | | | | Total for | | | | |
| 62200-152180 | Utilities | 20140812 | 3292 | | | | 08/12/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62210-152180 | Internet Service | | 3292 | | | | 08/01/14 | | | | |
| | | | | | | | 08/19/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62250-152180 | Telephone | 20140805 | 3292 | | | | 08/05/14 | | | | |
| | | | | | | | Total for | .00 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000410

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|

62310-152180    Health Insurance



08/01/14
08/01/14
08/15/14
08/15/14
08/15/14
08/29/14
08/29/14
08/29/14
Total JE:
Total for

Total

63100-152180    Depreciation Expense
08/31/14
08/31/14
Total JE:
Total for        .00

64100-152180    Payroll Tax Expense        22,118.78

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000411



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8-15 | | | | | | 08/15/14 | | | | |
| | 8-15 | | | | | | 08/15/14 | | | | |
| | 8-15 | | | | | | 08/15/14 | | | | |
| | 8-29 | | | | | | 08/29/14 | | | | |
| | 9-15 | | | | | | 08/29/14 | | | | |
| | 9-15 | | | | | | 08/29/14 | | | | |
| | | | | | | | Total JE: | | | | |
| 65600-152180 Meals And Entertainment | | | | | | | Total for | | | | |
| 66000-152180 Computer Expense | | | | | | | Total for | | | | |
| 67100-152180 Seminar And Training | | | | | | | Total for | | | | |
| 68500-152180 Corporate Allocation | | | | | | | 08/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000412



68501-152180

Corporate Per File Fees

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 08/04/14 | | | | |
| | | | | | | | 08/04/14 | | | | |
| | | | | | | | 08/06/14 | | | | |
| | | | | | | | 08/06/14 | | | | |
| | | | | | | | 08/07/14 | | | | |
| | | | | | | | 08/07/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/08/14 | | | | |
| | | | | | | | 08/14/14 | | | | |
| | | | | | | | 08/14/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/15/14 | | | | |
| | | | | | | | 08/18/14 | | | | |
| | | | | | | | 08/18/14 | | | | |
| | | | | | | | 08/18/14 | | | | |
| | | | | | | | 08/27/14 | | | | |
| | | | | | | | 08/27/14 | | | | |
| | | | | | | | 08/28/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000413



| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 08/28/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | 08/29/14 | | | | |
| | | | | | | | Total JE: | | | | |
| 68502-152180 Corporate Fees - Neo | | | | | | | Total for | | | | |
| | | | | | | | Total for | | | | |
| | | 3479 | 3292 | | | | 08/01/14 | | | | |
| | | 20140801 | 3292 | | | | 08/26/14 | | | | |
| | | | | | | | Total | | | | |
| 70100-152180 Advertising & Marketing | | | | | | | Total for | | | | |
| | | | | | | | Report | | | | |



# General Ledger by Branch

**Company: Ameripro Funding, Inc.**
**Branch: 152180 (Nasserfar)**
GLs from 10000 to 99995
From 09/1/2014 to 09/30/2014



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|

41100-152180  Origination Fees

Total for

41355-152180  Application Fee Income

09/15/14

Total JE:

41357-152180  Credit Report Fee Income

Total for

41380-152180  Branch Admin Fee

Total for

41860-152180  Brokered Loan Fee Income

09/12/14

09/26/14

Total JE:   .00

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | Total for | | | | |
| 42300-152180 | Premium Discount - Lo | | | | | | 09/05/14 | | | | |
| | | | | | | | 09/11/14 | | | | |
| | | | | | | | 09/12/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/26/14 | | | | |
| | | | | | | | 09/29/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | Total JE: | | .00 | | |
| | | | | | | | Total for | | | | |
| 42301-152180 | Premium Discount - Branch | | | | | | 09/05/14 | | | | |
| | | | | | | | 09/11/14 | | | | |
| | | | | | | | 09/12/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000416



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/26/14 | | | | |
| | | | | | | | 09/26/14 | | | | |
| | | | | | | | 09/29/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | 09/05/14 | | | | |
| | | | | | | | 09/11/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/29/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000417



GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

52427-152180  Lender Credit -   09/15/14

Total JE:

Total for

52450-152180  Origination Errors Expense

Total for

55110-152180  Commission Expense  9-15-14  09/15/14
9-15  09/15/14
9-30-14  09/30/14
10-15 S  09/30/14

Total JE:

Total for

55111-152180  Commission  9-15-  09/15/14
9-15  09/15/14
9-30-  09/30/14
10-15  09/30/14

Total JE:

Total for

.00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000418



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55280-152180 | Underwriting Fees | INV14-2751554 | 3292 | | | | 09/15/14 | | | | |
| | | | | | | | Total for | | | | |
| 55350-152180 | Verification Fees | INCTXVM107816 | 3292 | | | | 09/01/14 | | | | |
| | | I662613 | 3292 | | | | 09/08/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | | | | | | 09/25/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | 9-15-14 | | | | | 09/15/14 | | | | |
| | | 9-15 | | | | | 09/30/14 | | | | |
| | | 9-30-14 | | | | | 09/30/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000419

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000420





| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61380-152180 | | 20140828A | AJE | | | | 09/05/14 | | | | |
| Couriers & Shipping | | | | | | Total for | | | | | |
| 61600-152180 | | 316619 | 3292 | | | | 09/01/14 | | | | |
| Postage | | | | | | Total | | | .00 | | |
| | | | | | | Total for | | | | | |
| 61700-152180 | | | 3292 | | | | 09/19/14 | | | | |
| Bank Charges | | | | | | Total | | | .00 | | |
| | | | | | | Total for | | | | | |
| 61900-152180 | | | | | | Total for | | | | | |
| 62150-152180 | | | | | | Total JE: | | | .00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000421

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000422



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62200-152180 | Utilities | 201408 1328 | 3292 | | | | 09/11/14 | | | | |
| | | | | | | | Total for | | | | |
| 62210-152180 | Internet Service | | 3292 | | | | 09/19/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62250-152180 | Telephone | | | | | | Total for | | | | |
| 62310-152180 | Health Insurance | | | | | | 09/01/14 | | | | |
| | | | | | | | 09/01/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/30/14 | | | | |

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | | | | |
| | | 20140901 | 3292 | | | | 09/30/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | 09/01/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | .00 | |
| | 9-15- | | | | | AJE | 09/15/14 | | | | |
| | 9-15 C | | | | | AJE | 09/15/14 | | | | |
| | 9-15 V | | | | | AJE | 09/30/14 | | | | |
| | 9-30- | | | | | AJE | 09/30/14 | | | | |
| | 10-15 | | | | | AJE | 09/30/14 | | | | |
| | 10-15 | | | | | AJE | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 65600-152180 | Meals And Entertainment | | | | | AJE | 09/05/14 | | | | |
| | | | | | | AJE | 09/05/14 | | | | |
| | | | | | | AJE | 09/05/14 | | | | |
| | | | | | | AJE | 09/05/14 | | | | |
| | | | | | | AJE | 09/05/14 | | | | |
| | | | | | | AJE | 09/05/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000423



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 66000-152180 Computer Expense | ███████ | ███████ | AJE | | ███ | | 09/05/14 | | ███ | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | AJE | | | | 09/05/14 | | | | |
| | | | | | | | Total | | ███ | .00 | |
| 67100-152180 Seminar And Training | | | | | | | Total for | | ███ | | |
| 68500-152180 Corporate Allocation | ███████ | | | | ███ | | Total for | | ███ | ███ | |
| | | | | | | | Total for | | ███ | ███ | |
| | | | | | | | 09/30/14 | 65,712.86 | ███ | ███ | |
| | | | | | | | Total JE: | | ███ | | |
| | | | | | | | Total for | | ███ | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000424



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68501-152180 | Corporate Per File Fees | | | | | | 09/05/14 | | | | |
| | | | | | | | 09/11/14 | | | | |
| | | | | | | | 09/12/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/15/14 | | | | |
| | | | | | | | 09/26/14 | | | | |
| | | | | | | | 09/29/14 | | | | |
| | | | | | | | 09/30/14 | | | | |
| | | | | | | | Total JE: | | | .00 | |
| | | | | Total for | | | | | | | |
| 68502-152180 | Corporate Fees - Neo | | | | | | | | | | |
| | | | | Total for | | | | | | | |
| 70100-152180 | Advertising & Marketing | 20140901 | 3525 | | | | | | | | |
| | | 3292 | | | | | 09/01/14 | | | | |
| | | | | | | | 09/02/14 | | | | |
| | | | | Total | | | | | | .00 | |
| | | | | Total for | | | | | | | |
| | | | | Report | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000425





# General Ledger by Branch
**Company: Ameripro Funding, Inc.**
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 10/1/2014 to 10/31/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Reg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41100-152180 | Origination Fees | | | | | | Total for | | | | |
| 41355-152180 | Application Fee Income | | | | | | 10/21/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | Total for | | | | |
| 41380-152180 | Branch Admin Fee | | | | | | Total for | | | | |
| 41860-152180 | Brokered Loan Fee Income | 1521801908I | | | | | 10/15/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000426



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 42300-152180 | Premium Discount - Lo | | | | | | 10/06/14 | | | | |
| | | | | | | | 10/09/14 | | | | |
| | | | | | | | 10/10/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/21/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/28/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 42301-152180 | Premium Discount - Branch | | | | | | 10/06/14 | | | | |
| | | | | | | | 10/09/14 | | | | |
| | | | | | | | 10/10/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000427

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000428



| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 10/10/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/21/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/28/14 | | | | |
| | | | | | | | 10/28/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |

Pair-Off Allocation
42400-152180

Total for

Lender Credits - Gfe Cures
52426-152180

Total for

10/06/14

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - 10% Cure | | | | | | 10/09/14 | | | | |
| | | | | | | | 10/21/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/24/14 | | | | |
| | | | | | | | 10/28/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/30/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 52450-152180 | Origination Errors Expense | | | | | | 10/05/14 | | | | |
| | | | | | | | 10/09/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55110-152180 | Commission Expense - Loan | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | Total for | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000429



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 | Commission Offset | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55280-152180 | Underwriting Fees | INV14-2760828 | 3292 | | | | 10/15/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55350-152180 | Verification Fees | INCTXVM108109 | 3292 | | | | 10/01/14 | | | | |
| | | 1660983 | 3292 | | | | 10/01/14 | | | | |
| | | 1669083 | 3292 | | | | 10/08/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000430



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | | | | | | 10/25/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 | Bonus - Employee | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000431



| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 | Rent Expense | | | | | | | | | |
| | Oct 2014 | 201410 6072 | 3292 | 1205630 | | 10/31/14 | | | | |
| | | | | | Total JE: | 10/01/14 | | | | |
| | | | | | Total | | | | | |
| | | | | | Total for | | | | | |
| 61100-152180 | License And Permits | | | | Total for | | | | | |
| 61300-152180 | Office Supplies & Expense | | | | Total for | | | | | |
| 61380-152180 | Couriers & Shipping | | | | Total for | | | | | |
| 61600-152180 | Postage | | | | Total for | | | | | |
| 61700-152180 | Bank Charges | | | | Total for | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000432

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61900-152180 | Dues And Subscriptions | | | | | | Total for | | | | |
| 62150-152180 | Repair And Maintenance | | | | | | 10/17/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 62200-152180 | Utilities | 2586679965768 | 3292 | | | | 10/10/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62210-152180 | Internet Service | 6876156209 | 3292 | | | | 10/19/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62250-152180 | Telephone | 201410 2025 | 3292 | | | | 10/05/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000433



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 Health Insurance | | | | | | | | | | | |
| CONTINENTAL | | 20141001 | 3292 | | | | 10/01/14 | | | | |
| | | | | | | | 10/01/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | Total JE: | 10/01/14 | | | | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | | | | |
| 63100-152180 Depreciation Expense | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | | |
| 64100-152180 Payroll Tax Expense | | | | | | | 10/15/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000434

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL.Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 Meals And Entertainment | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/15/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 65000-152180 Computer Expense | | | | | | | Total for | | | | |
| 67100-152180 Seminar And Training | | | | | | | Total for | | | | |
| 68500-152180 Corporate Allocation | | | | | | | 10/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 68501-152180 Corporate Per File Fees | | | | | | | Total for | 19,650.00 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000435



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|

70100-152180

68502-152180

Advertising & Marketing

Corporate Fees - Neo

3798

3292

10/08/14

10/06/14
10/09/14
10/10/14
10/15/14
10/21/14
10/24/14
10/24/14
10/28/14
10/30/14
10/30/14
10/31/14
10/31/14
10/31/14

Total JE:

Total for

Total for

Total for

Total

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000436

GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

Report

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000437





Nov 1, 14

## General Ledger by Branch
**Company:** Ameripro Funding, Inc.
**Branch:** 152180 (Nasserfar)
GLs from 10000 to 99995
From 11/1/2014 to 11/30/2014

| Invoice Number | GL Bank | DB | Ref | JR | Date | Transaction Description | GL/Desc/Vendor | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 41100-152180 Origination Fees | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 41355-152180 Application Fee Income | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 41357-152180 Credit Report Fee Income | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 41380-152180 Branch Admin Fee | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 41860-152180 Brokered Loan Fee Income | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 41880-152180 Misc Production Income | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000439

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo |  | | | | | 11/13/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/17/14 | | | | |
| | | | | | | | 11/17/14 | | | | |
| | | | | | | | 11/18/14 | | | | |
| | | | | | | | 11/18/14 | | | | |
| | | | | | | | 11/19/14 | | | | |
| | | | | | | | 11/21/14 | | | | |
| | | | | | | | 11/25/14 | | | | |
| | | | | | | Total JE: | | | | | |
| 42301-152180 | Premium Discount - Branch | | | | | | 11/13/14 | | | | |
| | | | | | | | 11/13/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/17/14 | | | | |
| | | | | | | | 11/17/14 | | | | |
| | | | | | | | 11/18/14 | | | | |
| | | | | | | | 11/18/14 | | | | |
| | | | | | | Total for | | | | | |



GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

42400-152180 Pair-Off Allocation

11/19/14
11/21/14
11/25/14
Total JE:
Total for

52426-152180 Lender Credits - Gfe Cures

11/13/14
11/14/14
11/14/14
11/17/14
11/17/14
11/18/14
11/18/14
11/19/14
11/21/14
11/25/14
Total JE:
Total for

52427-152180 Lender Credit -

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000440

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52450-152180 | Origination Errors Expense | | | | | | 11/13/14 | | | | |
| | | | | | | | 11/18/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55110-152180 | Commission Expense - Loan | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55111-152180 | Commission Offset | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55280-152180 | Underwriting Fees | INV14-2770407 | 3292 | | | | 11/15/14 | | | | |
| | | | | | | | Total | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000441

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | Verification Fees | INCTXVMI08403 3292 | | | | | 11/01/14 | | | | |
| | | 1660983 3292 | | | | | 11/03/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55600-152180 | Credit Report Expense | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/28/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 | Bonus - Employee | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000442



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total JE: | | | | |
| 61000-152180 Rent Expense | | 2014116072 | 3292 | | 34636 PE | | 11/01/14 | | | | |
| | | | | | | Total | | | | | |
| | | | | | | Total for | | | | | |
| 61100-152180 License And Permits | | | | | | Total for | | | | | |
| 61300-152180 Office Supplies & Expense | | | | | | Total for | | | | | |
| 61380-152180 Couriers & Shipping | | | | | | Total for | | | | | |
| 61600-152180 Postage | | | | | | Total for | | | | | |
| 61700-152180 Bank Charges | | 25866730555 | 3292 | | | Total for | 11/10/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000443

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61900-152180 | Dues And Subscriptions | | | | | | Total | | | | |
| 62150-152180 | Repair And Maintenance | | | | | | Total for | | | | |
| 62200-152180 | Utilities | 2586673055554 | 3292 | | | | 11/10/14 | | | | |
| | | 2586679655768 | 3292 | | | | 11/13/14 | | | | |
| | | 2586679655768 | 3292 | | | | 11/13/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62210-152180 | Internet Service | 3605926209 | 3292 | | | | 11/19/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62250-152180 | Telephone | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000444



| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 Health Insurance | | | | | | | Total for | | | | |
| | | | | | | | 11/01/14 | | | | |
| | | | | | | | 11/01/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/14/14 | | | | |
| | | | | | | | 11/28/14 | | | | |
| | | | | | | | 11/28/14 | | | | |
| | | | | | | | 11/28/14 | | | | |
| | | | | | | | 11/28/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | 201411 INS | 3292 | | | | 11/01/14 | | | | |
| | | | | | | | Total | | | | |
| 63100-152180 Depreciation Expense | | | | | | | Total for | | | | |
| 64100-152180 Payroll Tax Expense | | | | | | | Total for | | | | |
| | | | | | | | 11/14/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000445



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL | Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 Meals And Entertainment | | | | | | | | 11/14/14 | | | | |
| | | | | | | | | 11/14/14 | | | | |
| | | | | | | | | 11/28/14 | | | | |
| | | | | | | | | Total JE: | | | | |
| | | | | | | | | Total for | | | | |
| 66000-152180 Computer Expense | | | | | | | | Total for | | | | |
| 67100-152180 Seminar And Training | | | | | | | | Total for | | | | |
| 68500-152180 Corporate Allocation | | | | | | | | 11/30/14 | | | | |
| | | | | | | | | Total JE: | | | | |
| | | | | | | | | Total for | | | | |
| 68501-152180 Corporate Per File Fees | | 15218020112 | | | | | | 11/13/14 | | | | |
| | | 15218014701 | | | | | | 11/14/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000446

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68502-152180 Corporate Fees - Neo | | | | | | | | | | | |
| 70100-152180 Advertising & Marketing | | | | | | | | | | | |

Dates: 1/14/14, 1/17/14, 1/17/14, 1/18/14, 1/18/14, 1/19/14, 1/21/14, 1/25/14

Total JE:

Total for

Total for

Total for

Total for

Report

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000447



# General Ledger by Branch
**Company: Ameripro Funding, Inc.**
**Branch: 152180 (Nasserfar)**
GLs from 10000 to 99995
**From 12/1/2014 to 12/31/2014**

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|



41100-152180  Origination Fees

Total for

41355-152180  Application Fee Income

Total for

41357-152180  Credit Report Fee Income

Total for

41380-152180  Branch Admin Fee

Total for

41860-152180  Brokered Loan Fee Income

Total for

41880-152180  Misc Production Income

Total for



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | | | | | | 12/02/14 | | | | |
| | | | | | | | 12/05/14 | | | | |
| | | | | | | | 12/10/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/18/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/31/14 | | | | |
| | Total JE: | | | | | | | | | | |
| | Total for | | | | | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000455

42301-152180

Premium Discount - Branch

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 12/02/14 | | | | |
| | | | | | | | 12/05/14 | | | | |
| | | | | | | | 12/10/14 | | | | |
| | | | | | | | 12/10/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/18/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000456

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|

42400-152180  Pair-Off Allocation

52426-152180  Lender Credits - Gfc Cures

Total JE:

Total for

Total for

12/30/14
12/30/14
12/30/14
12/30/14
12/30/14
12/30/14
12/31/14
12/31/14

12/22/14
12/19/14
12/19/14
12/19/14
12/19/14
12/19/14
12/18/14
12/15/14
12/10/14
12/05/14
12/02/14

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000457

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| | | █████ | | █████ | | 12/22/14 | | █████ | | |
| | | | | | | 12/23/14 | | | | |
| | | | | | | 12/23/14 | | | | |
| | | | | | | 12/30/14 | | | | |
| | | | | | | 12/30/14 | | | | |
| | | | | | | 12/30/14 | | | | |
| | | | | | | 12/30/14 | | | | |
| | | | | | | 12/31/14 | | | | |
| | | | | | | Total JE: | | | | |
| 52427-152180 Lender Credit - 10% Cure | | | | | | Total for | | | | |
| | █████ | | | █████ | | 12/18/14 | █████ | █████ | █████ | █████ |
| | | | | | | Total JE: | | | | |
| 52450-152180 Origination Errors Expense | | | | | | Total for | | | | |
| | | | | | | Total for | | | | |
| 55110-152180 Commission Expense - Loan | █████ | | | █████ | | 12/04/14 | █████ | █████ | █████ | █████ |
| | | | | | | 12/15/14 | | | | |
| | | | | | | 12/15/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000458



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 | Commission Offset | | | | | | 12/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| | | | | | | | 12/04/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 55280-152180 | Underwriting Fees | INV14-2779926 3292 | | | | | 12/01/14 | | | | |
| | | 20141201 3292 | | | | | 12/01/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 55350-152180 | Verification Fees | INCTXVM1108710 3292 | | | | | 12/31/14 | | | | |
| | | INCTXVM109017 | | | | | 12/31/14 | | | | |
| | | | | | | | 12/01/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000459



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | | | | | | Total for | | | | |
| 55700-152180 | Late / Penalty | | | | | | Total for | | | | |
| 60100-152180 | Salary And Wages | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 60450-152180 | Bonus - Employee | | | | | | 12/15/14 | | | | |
| | | 120582JE | | | | | 12/15/14 | | | | |
| | | 120582JE | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 61000-152180 | Rent Expense | | | | | | 12/31/14 | | | | |
| | | 12120JE | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000460



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000461



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62150-152180 | Repair And Maintenance | | | | | | Total for | | | | |
| 62200-152180 | Utilities | 258664094441 | 3292 | | | | 12/10/14 | | | | |
| | | | | | | | Total | | | | |
| 62210-152180 | Internet Service | | | | | | Total for | | | | |
| 62250-152180 | Telephone | | | | | | Total for | | | | |
| 62310-152180 | Health Insurance | | | | 1205819E | | 12/01/14 | | | | |
| | | | | | 1205864E | | 12/01/14 | | | | |
| | | | | | 1205864E | | 12/01/14 | | | | |
| | | | | | 1205822E | | 12/15/14 | | | | |
| | | | | | 1205822E | | 12/15/14 | | | | |
| | | | | | 1205822E | | 12/15/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000462

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000463





| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | Dr | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 | Meals And Entertainment | | | | | | | | | | |
| | | 20141126 | AJE | | | | 12/08/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 66000-152180 | Computer Expense | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 67100-152180 | Seminar And Training | | | | | | | | | | |
| | | | | | | | Total for | | | | |
| 68500-152180 | Corporate Allocation | | | | | | | 12/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | Total for | | | | |
| 68501-152180 | Corporate Per File Fees | | | | | | | 12/02/14 | | | | |
| | | | | | | | 12/05/14 | | | | |
| | | | | | | | 12/10/14 | | | | |
| | | | | | | | 12/15/14 | | | | |
| | | | | | | | 12/18/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000464

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/19/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/22/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/23/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/30/14 | | | | |
| | | | | | | | 12/31/14 | | | | |
| | Total JE | | | | | | | | | | |
| 68502-152180 Corporate Fees - Neo | | 20141126 | AJE | | 825 | PE | 12/08/14 | | | | |
| | Total for | | | | | | | | | | |
| 70100-152180 Advertising & Marketing | | | | | | | | | | | |
| | Total for | | | | | | | | | | |

GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DR | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal

Total

Total for

Report

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000466

APPLICANT'S EXHIBIT NO. 29

## Statement of Income
Month and Year To Date
Ameripro Funding, Inc.
For the period ending: 11/30/2014
By Branch
152180 (Nasserfar)

NOVEMBER



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000450

| | | MTD | YTD |
|---|---|---|---|
| Income | | | |
| 41100-152180 | Origination fees | .00 | 4,194.11 |
| Total Origination fees | | .00 | 4,194.11 |
| 41355-152180 | Application fee income | .00 | 5,100.00 |
| Total Application fees | | .00 | 5,100.00 |
| 41357-152180 | Credit report fee income | .00 | 230.94 |
| 55600-152180 | Credit report expense | .00 | 14,839.56 |
| Total Credit reports | | .00 | 15,070.50 |
| 41380-152180 | Branch admin fee | .00 | -550.00 |
| Total Branch administration fees | | .00 | -550.00 |
| 41860-152180 | Brokered loan fee income | .00 | 34,590.56 |
| Total Brokered loan fees | | .00 | 34,590.56 |
| 41880-152180 | Misc production income | .00 | 125.00 |
| Total Other fees | | .00 | 125.00 |
| 42301-152180 | Premium discount - branch + YSP | 22,351.60 | 331,289.33 |
| Total Premium discount - branch | | 22,351.60 | 331,289.33 |
| 42300-152180 | Premium discount - lo | 45,510.41 | 663,400.63 |
| Total Premium discount - lo comp | | 45,510.41 | 663,400.63 |
| 42400-152180 | Pair-off allocation | .00 | 1,771.51 |
| Total Pair-off allocation | | .00 | 1,771.51 |
| 68502-152180 | Corporate fees - neo | .00 | -500.00 |
| Total Corporate neo fees | | .00 | -500.00 |

EXHIBIT 11 4-24-15 KN
depobook.com

Applicant's
Injunction Hearing
Exhibit 029

|  |  | MTD | YTD |
|---|---|---:|---:|
| Total Income |  | 67,862.01 | 1,039,652.08 |
| Expense |  |  |  |
| 52426-152180 | Lender credits - gfe cures | 23,078.37 | 161,563.50 |
| 52427-152180 | Lender credit - 10% cure | 41.80 | 4,024.87 |
| Total Lender/broker credits |  | 23,120.17 | 165,588.37 |
| 52450-152180 | Origination errors expense | .00 | 74.00 |
| Total Origination errors |  | .00 | 74.00 |
| 55110-152180 | Commission expense - loan officers | .00 | 352,325.77 |
| Total Commission expense - loan officers |  | .00 | 352,325.77 |
| 55111-152180 | Commission offset | .00 | -48,693.40 |
| Total Commission offset |  | .00 | -48,693.40 |
| 55280-152180 | Underwriting fees | 741.63 | 9,061.97 |
| Total Underwriting fees |  | 741.63 | 9,061.97 |
| 55350-152180 | Verification fees | 847.89 | 15,757.93 |
| Total Verification fees |  | 847.89 | 15,757.93 |
| 55700-152180 | Late / penalty | .00 | 25.92 |
| Total Late fees and penalties |  | .00 | 25.92 |
| 60100-152180 | Salary and wages | 8,280.06 | 96,338.98 |
| Total Salary and wages |  | 8,280.06 | 96,338.98 |
| 60450-152180 | Bonus - employee | .00 | 54,369.21 |
| Total Employee bonus |  | .00 | 54,369.21 |
| 61000-152180 | Rent expense | 2,012.59 | 33,990.34 |
| Total Rent expense |  | 2,012.59 | 33,990.34 |
| 61100-152180 | License and permits | .00 | 100.00 |
| Total License and permits |  | .00 | 100.00 |
| 61300-152180 | Office supplies & expense | .00 | 1,155.46 |
| Total Office supplies & expense |  | .00 | 1,155.46 |
| 61600-152180 | Postage | .00 | 5.32 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000451

|  | MTD | YTD |
|---|---|---|
| Total Postage | .00 | 5.32 |
| 61380-152180    Couriers & shipping | .00 | 54.25 |
| Total Couriers & shipping | .00 | 54.25 |
| 61700-152180    Bank charges | 12.47 | 18.40 |
| Total Bank charges | 12.47 | 18.40 |
| 61900-152180    Dues and subscriptions | .00 | 149.50 |
| Total Dues and subscriptions | .00 | 149.50 |
| 62150-152180    Repair and maintenance | .00 | 34.92 |
| Total Repair and maintenance | .00 | 34.92 |
| 62200-152180    Utilities | 197.98 | 1,794.33 |
| Total Utilities | 197.98 | 1,794.33 |
| 62210-152180    Internet service | 971.83 | 4,871.53 |
| Total Internet service | 971.83 | 4,871.53 |
| 62250-152180    Telephone | .00 | 200.34 |
| Total Telephone | .00 | 200.34 |
| 62310-152180    Health insurance | 1,290.60 | 12,365.01 |
| Total Life and health insurance | 1,290.60 | 12,365.01 |
| 63100-152180    Depreciation expense | .00 | 1,884.65 |
| Total Depreciation expense | .00 | 1,884.65 |
| 64100-152180    Payroll tax expense | -1,388.50 | 24,173.97 |
| Total Payroll tax expense | -1,388.50 | 24,173.97 |
| 65600-152180    Meals and entertainment | .00 | 1,707.21 |
| Total Meals and entertainment | .00 | 1,707.21 |
| 66000-152180    Computer expense | .00 | 29.22 |
| Total Computer expense | .00 | 29.22 |
| 67100-152180    Seminar and training | .00 | 348.00 |
| Total Seminar and training | .00 | 348.00 |
| 70100-152180    Advertising & marketiing expense | .00 | 142,838.85 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000452

|                                             | MTD       | YTD        |
|---------------------------------------------|-----------|------------|
| Total Advertising & marketing expense       | .00       | 142,838.85 |
| 68501-152180    Corporate per file fees     | 1,500.00  | 23,250.00  |
| Total Corporate per file fees               | 1,500.00  | 23,250.00  |
| 68500-152180    Corporate allocation expense | 3,744.71 | 78,007.49  |
| Total Corporate allocation - volume based   | 3,744.71  | 78,007.49  |
|                                             |           |            |
| Total Expenses                              | 41,331.43 | 986,667.10 |
| Net Income (loss)                           | 26,530.58 | 52,984.98  |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000453

APPLICANT'S EXHIBIT NO. 30

EXHIBIT
13
4-24-15
depobook.com

# Funded Loan Report

Ameripro Funding, Inc.
For FundingDate between 1/1/2014 and 12/31/2014
Branch: 152180 (Nasserfar)
Template: Branch Income by loan

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| CONFIDENTIAL | 152180 | | | 01/23/2014 | | | | $ | | $ |
| | 152180 | | | 01/24/2014 | | | | | | |
| | 152180 | | | 01/29/2014 | | | | | | |
| | 152180 | | | 02/03/2014 | | | | | | |
| | 152180 | | | 01/14/2014 | | | | | | |
| | 152180 | | | 01/31/2014 | | | | | | |
| | 152180 | | | 02/03/2014 | | | | | | |
| | 152180 | | | 05/01/2014 | | | | | | |
| | 152180 | | | 02/19/2014 | | | | | | |
| | 152180 | | | 02/13/2014 | | | | | | |
| | 152180 | | | 02/28/2014 | | | | | | |
| | 152180 | | | 02/28/2014 | | | | | | |
| | 152180 | | | 02/25/2014 | | | | | | |
| | 152180 | | | 03/07/2014 | | | | | | |
| | 152180 | | | 08/18/2014 | | | | | | |
| | 152180 | | | 08/08/2014 | | | | | | |
| | 152180 | | | 09/12/2014 | | | | | | |
| | 152180 | | | 08/29/2014 | | | | | | |
| | 152180 | | | 05/30/2014 | | | | | | |
| | 152180 | | | 07/31/2014 | | | | | | |
| | 152180 | | | 12/02/2014 | | | | | | |
| | 152180 | | | 12/23/2014 | | | | | | |

APPLICANT'S INJUNCTION HEARING—
EXH030
redacted
INJU



| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| $- | $- | 13.50 20.18 39.13 $- | | $- | $- | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000365



CONFIDENTIAL





| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| | 152180 | | | 09/29/2014 | | | | | | |
| | 152180 | | | 07/24/2014 | | | | | | |
| | 152180 | | | 02/11/2014 | | | | | | |
| | 152180 | | | 08/07/2014 | | | | | | |
| | 152180 | | | 09/15/2014 | | | | | | |
| | 152180 | | | 07/23/2014 | | | | | | |
| | 152180 | | | 02/24/2014 | | | | | | |
| | 152180 | | | 10/28/2014 | | | | | | |
| | 152180 | | | 12/10/2014 | | | | | | |
| | 152180 | | | 09/27/2014 | | | | | | |
| | 152180 | | | 03/25/2014 | | | | | | |
| | 152180 | | | 12/15/2014 | | | | | | |
| | 152180 | | | 04/25/2014 | | | | | | |
| | 152180 | | | 05/19/2014 | | | | | | |
| | 152180 | | | 02/28/2014 | | | | | | |
| | 152180 | | | 12/30/2014 | | | | | | |
| | 152180 | | | 03/27/2014 | | | | | | |
| | 152180 | | | 03/31/2014 | | | | | | |
| | 152180 | | | 02/21/2014 | | | | | | |
| | 152180 | | | 06/27/2014 | | | | | | |
| | 152180 | | | 05/28/2014 | | | | | | |
| | 152180 | | | 03/21/2014 | | | | | | |
| | 152180 | | | 12/23/2014 | | | | | | |
| | 152180 | | | 11/18/2014 | | | | | | |
| | 152180 | | | 11/19/2014 | | | | | | |
| | 152180 | | | 12/30/2014 | | | | | | |
| | 152180 | | | 12/30/2014 | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000368



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000369

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| | 152180 | | | 04/18/2014 | | | | | | |
| | 152180 | | | 12/19/2014 | | | | | | |
| | 152180 | | | 10/10/2014 | | | | | | |
| | 152180 | | | 12/31/2014 | | | | | | |
| | 152180 | | | 11/14/2014 | | | | | | |
| | 152180 | | | 06/12/2014 | | | | | | |
| | 152180 | | | 12/30/2014 | | | | | | |
| | 152180 | | | 05/02/2014 | | | | | | |
| | 152180 | | | 05/23/2014 | | | | | | |
| | 152180 | | | 10/30/2014 | | | | | | |
| | 152180 | | | 02/27/2014 | | | | | | |
| | 152180 | | | 07/15/2014 | | | | | | |
| | 152180 | | | 05/23/2014 | | | | | | |
| | 152180 | | | 10/31/2014 | | | | | | |
| | 152180 | | | 04/17/2014 | | | | | | |
| | 152180 | | | 10/31/2014 | | | | | | |
| | 152180 | | | 05/20/2014 | | | | | | |
| | 152180 | | | 11/21/2014 | | | | | | |
| | 152180 | | | 04/02/2014 | | | | | | |
| | 152180 | | | 05/12/2014 | | | | | | |
| | 152180 | | | 02/26/2014 | | | | | | |
| | 152180 | | | 09/20/2014 | | | | | | |
| | 152180 | | | 05/23/2014 | | | | | | |
| | 152180 | | | 09/14/2014 | | | | | | |
| | 152180 | | | 12/19/2014 | | | | | | |
| | 152180 | | | 09/30/2014 | | | | | | |
| | 152180 | | | 02/28/2014 | | | | | | |
| | 152180 | | | 03/05/2014 | | | | | | |



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000370



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000371



| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|
| | 152180 | | | 04/25/2014 | | | | | |
| | 152180 | | | 09/15/2014 | | | | | |
| | 152180 | | | 09/15/2014 | | | | | |
| | 152180 | | | 08/08/2014 | | | | | |
| | 152180 | | | 09/28/2014 | | | | | |
| | 152180 | | | 11/18/2014 | | | | | |
| | 152180 | | | 08/08/2014 | | | | | |
| | 152180 | | | 09/29/2014 | | | | | |
| | 152180 | | | 05/22/2014 | | | | | |
| | 152180 | | | 07/31/2014 | | | | | |
| | 152180 | | | 04/17/2014 | | | | | |
| | 152180 | | | 12/19/2014 | | | | | |
| | 152180 | | | 05/22/2014 | | | | | |
| | 152180 | | | 12/19/2014 | | | | | |
| | 152180 | | | 06/26/2014 | | | | | |
| | 152180 | | | 03/27/2014 | | | | | |
| | 152180 | | | 12/22/2014 | | | | | |
| | 152180 | | | 05/30/2014 | | | | | |
| | 152180 | | | 08/02/2014 | | | | | |
| | 152180 | | | 02/27/2014 | | | | | |
| | 152180 | | | 10/21/2014 | | | | | |
| | 152180 | | | 02/25/2014 | | | | | |
| | 152180 | | | 05/29/2014 | | | | | |
| | 152180 | | | 02/10/2014 | | | | | |
| | 152180 | | | 10/30/2014 | | | | | |
| | 152180 | | | 02/14/2014 | | | | | |
| | 152180 | | | 11/13/2014 | | | | | |
| | 152180 | | | 05/06/2014 | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000373





| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| | 152180 | | | 03/04/2014 | | | | | | |
| | 152180 | | | 02/14/2014 | | | | | | |
| | 152180 | | | 02/26/2014 | | | | | | |
| | 152180 | | | 04/28/2014 | | | | | | |
| | 152180 | | | 12/23/2014 | | | | | | |
| | 152180 | | | 05/09/2014 | | | | | | |
| | 152180 | | | 08/29/2014 | | | | | | |
| | 152180 | | | 02/12/2014 | | | | | | |
| | 152180 | | | 11/14/2014 | | | | | | |
| | 152180 | | | 12/19/2014 | | | | | | |
| | 152180 | | | 03/04/2014 | | | | | | |
| | 152180 | | | 09/30/2014 | | | | | | |
| | 152180 | | | 12/19/2014 | | | | | | |
| | 152180 | | | 09/30/2014 | | | | | | |
| | 152180 | | | 09/09/2014 | | | | | | |
| | 152180 | | | 07/11/2014 | | | | | | |
| | 152180 | | | 07/07/2014 | | | | | | |
| | 152180 | | | 11/17/2014 | | | | | | |
| | 152180 | | | 05/02/2014 | | | | | | |
| | 152180 | | | 03/14/2014 | | | | | | |
| | 152180 | | | 03/18/2014 | | | | | | |
| | 152180 | | | 12/11/2014 | | | | | | |
| | 152180 | | | 09/12/2014 | | | | | | |
| | 152180 | | | 05/15/2014 | | | | | | |
| | 152180 | | | 05/24/2014 | | | | | | |
| | 152180 | | | 09/30/2014 | | | | | | |
| | 152180 | | | 10/24/2014 | | | | | | |
| | 152180 | | | 12/19/2014 | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000374





| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| | 152180 | | | 05/05/2014 | | | | | | |
| | 152180 | | | 05/27/2014 | | | | | | |
| | 152180 | | | 09/11/2014 | | | | | | |
| | 152180 | | | 09/15/2014 | | | | | | |
| | 152180 | | | 09/23/2014 | | | | | | |
| | 152180 | | | 09/26/2014 | | | | | | |
| | 152180 | | | 03/28/2014 | | | | | | |
| | 152180 | | | 03/28/2014 | | | | | | |
| | 152180 | | | 05/06/2014 | | | | | | |
| | 152180 | | | 12/22/2014 | | | | | | |
| | 152180 | | | 10/31/2014 | | | | | | |
| | 152180 | | | 08/06/2014 | | | | | | |
| | 152180 | | | 04/29/2014 | | | | | | |
| | 152180 | | | 02/24/2014 | | | | | | |
| | 152180 | | | 05/21/2014 | | | | | | |
| | 152180 | | | 04/21/2014 | | | | | | |
| | 152180 | | | 07/03/2014 | | | | | | |
| | 152180 | | | 05/14/2014 | | | | | | |
| | 152180 | | | 04/04/2014 | | | | | | |
| | 152180 | | | 04/23/2014 | | | | | | |
| | 152180 | | | 05/20/2014 | | | | | | |
| | 152180 | | | 03/27/2014 | | | | | | |
| | 152180 | | | 05/22/2014 | | | | | | |
| | 152180 | | | 05/05/2014 | | | | | | |
| | 152180 | | | 05/14/2014 | | | | | | |
| | 152180 | | | 01/09/2014 | | | | | | |
| | 152180 | | | 04/21/2014 | | | | | | |
| | 152180 | | | 06/13/2014 | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000376



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000377



| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| ███ | 152180 | ███ | ███ | 05/30/2014 | ███ | | ███ | | ███ | |
| ███ | 152180 | ███ | ███ | 04/30/2014 | ███ | | ███ | | ███ | |
| ███ | 152180 | ███ | ███ | 02/28/2014 | ███ | | ███ | | ███ | |
| ███ | 152180 | ███ | ███ | 06/10/2014 | ███ | | ███ | | ███ | |
| ███ | 152180 | ███ | ███ | 08/08/2014 | ███ | | ███ | | ███ | |
| | | | | | $52,791,698 | | $4,194.11 | $0.00 | $5,100.00 | $0.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000378

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000379



General Ledger By Branch
Company Name: (APF) Ameripro Funding, Inc.
From: 10000
To: 99995

For Branch: 152180 (Nasserfar)

From: 1/1/2014
To: 5/31/2014

| G/L Number | G/L Desc / Vendor | Invoice Numb | Bank | Db | Ref # | JR | Date | Beg Bal | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | | 0 | | |
| | | | | | | | 2/13/2014 | | | | |
| | | | | | | | 2/14/2014 | | | | |
| | | | | | | | 2/14/2014 | | | | |
| | | | | | | | 2/18/2014 | | | | |
| | | | | | | | 2/21/2014 | | | | |
| | | | | | | | 2/25/2014 | | | | |
| | | | | | | | 2/27/2014 | | | | |
| | | | | | | | 2/28/2014 | | | | |
| | | | | | | | 2/28/2014 | | | | |
| | | | | | | | 3/4/2014 | | | | |
| | | | | | | | 3/12/2014 | | | | |
| | | | | | | | 3/14/2014 | | | | |
| | | | | | | | 3/18/2014 | | | | |
| | | | | | | | 3/27/2014 | | | | |
| | | | | | | | 4/17/2014 | | | | |
| | | | | | | | 5/2/2014 | | | | |
| | | | | | | | 5/2/2014 | | | | |
| | | | | | | | 5/5/2014 | | | | |
| | | | | | | | 5/5/2014 | | | | |
| | | | | | | | 5/12/2014 | | | | |
| | | | | | | | 5/15/2014 | | | | |
| | | | | | | | 5/27/2014 | | | | |
| | | | Total JE: | | | | | | | 0 | |
| | | | Total for 41355-152180 : | | | | | | | | |
| 41357-152180 | Credit Report Fee Income | | | | | | | | 0 | | |
| | | | | | | | 2/13/2014 | | | | |
| | | | | | | | 2/14/2014 | | | | |
| | | | | | | | 2/14/2014 | | | | |
| | | | | | | | 2/26/2014 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000380



41370-152180  Processing Fees

41380-152180  Branch Admin Fee

2/26/2014
2/28/2014
2/28/2014
5/20/2014
5/23/2014

Total JE:  0

Total for 41357-152180 :  0

2/11/2014
2/12/2014
2/13/2014
2/14/2014
2/14/2014
2/18/2014
2/21/2014
2/24/2014
2/25/2014
2/25/2014
2/26/2014
2/26/2014
2/27/2014
2/28/2014
2/28/2014
2/28/2014

Total JE:  0

Total for 41370-152180 :  0

2/24/2014

Total JE:  550

Total for 41380-152180 :  550

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000381

41860-152180  Brokered Loan Fee Income

42300-152180  Premium Discount - Lo

Total JE:

Total for

2/7/2014
3/20/2014

2/3/2014
2/3/2014
2/11/2014
2/12/2014
2/13/2014
2/14/2014
2/14/2014
2/14/2014
2/18/2014
2/21/2014
2/24/2014
2/24/2014
2/25/2014
2/25/2014
2/26/2014
2/26/2014
2/26/2014
2/26/2014
2/27/2014
2/27/2014
2/28/2014
2/28/2014
2/28/2014
3/4/2014
3/5/2014
3/12/2014
3/14/2014
3/18/2014
3/26/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000382

3/27/2014
3/27/2014
3/27/2014
3/31/2014
4/17/2014
4/17/2014
4/18/2014
4/21/2014
4/21/2014
4/25/2014
4/25/2014
4/30/2014
5/1/2014
5/2/2014
5/2/2014
5/5/2014
5/5/2014
5/6/2014
5/6/2014
5/6/2014
5/9/2014
5/12/2014
5/15/2014
5/19/2014
5/20/2014
5/20/2014
5/21/2014
5/22/2014
5/23/2014
5/23/2014
5/23/2014
5/23/2014
5/27/2014
5/28/2014

Total JE:

Total for 42300-152180 :

-247,481.45

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000383

42301-152180   Premium Discount - Branch

0

2/3/2014
2/3/2014
2/3/2014
2/11/2014
2/12/2014
2/12/2014
2/13/2014
2/13/2014
2/14/2014
2/14/2014
2/14/2014
2/14/2014
2/18/2014
2/18/2014
2/21/2014
2/21/2014
2/24/2014
2/24/2014
2/25/2014
2/25/2014
2/26/2014
2/26/2014
2/26/2014
2/26/2014
2/26/2014
2/27/2014
2/27/2014
2/27/2014
2/28/2014
2/28/2014
2/28/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000384



2/28/2014
2/28/2014
3/4/2014
3/5/2014
3/12/2014
3/12/2014
3/14/2014
3/14/2014
3/18/2014
3/18/2014
3/26/2014
3/27/2014
3/27/2014
3/31/2014
3/31/2014
4/17/2014
4/17/2014
4/18/2014
4/18/2014
4/21/2014
4/21/2014
4/21/2014
4/25/2014
4/25/2014
4/25/2014
4/25/2014
4/30/2014
4/30/2014
5/2/2014
5/2/2014
5/2/2014
5/2/2014
5/5/2014
5/5/2014
5/5/2014
5/5/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000385



5/6/2014
5/6/2014
5/6/2014
5/6/2014
5/6/2014
5/9/2014
5/12/2014
5/12/2014
5/15/2014
5/19/2014
5/20/2014
5/20/2014
5/20/2014
5/21/2014
5/22/2014
5/23/2014
5/23/2014
5/23/2014
5/23/2014
5/23/2014
5/27/2014
5/28/2014

Total JE:

Total for 42301-152180 :

2/3/2014

Total JE:

Total for 42400-152180 :

2/11/2014

0

0

42400-152180   Pair-Off Allocation

52426-152180   Lender Credits - Gfe Cures

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000386

2/12/2014
2/14/2014
2/14/2014
2/24/2014
2/25/2014
2/25/2014
2/26/2014
2/26/2014
2/26/2014
2/27/2014
2/28/2014
3/4/2014
3/5/2014
3/18/2014
3/26/2014
3/27/2014
3/31/2014
4/17/2014
4/17/2014
4/21/2014
4/25/2014
5/1/2014
5/2/2014
5/2/2014
5/6/2014
5/6/2014
5/9/2014
5/15/2014
5/20/2014
5/21/2014
5/23/2014
5/23/2014
5/27/2014
5/28/2014

0

Total JE:

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000387

130,798.96

Total for 55110-152180 :

1/15/2014
1/16/2014
2/28/2014
2/28/2014
3/15/2014
3/15/2014
3/31/2014
3/31/2014
4/15/2014
4/15/2014
4/30/2014
5/2/2014
5/15/2014
5/15/2014

Total JE:

Total for

Total JE:

2/28/2014

3/25/2014

4/24/2014

Total PE:

Total for

2/1/2014
2/11/2014
2/28/2014
3/11/2014
3/31/2014
4/11/2014

55111-152180   Commission Offset

55280-152180   Underwriting Fees

55350-152180   Verification Fees

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000388



ELLIE MAE

INCTXVM106696   3292

55551-152180  Appraisal Expense - Impounded

Total PE:  4/30/2014

Total for 55350-152180 :

2/28/2014
3/31/2014
Total JE:

55600-152180  Credit Report Expense

Total for

2/25/2014
3/27/2014
3/27/2014
3/31/2014
4/26/2014
4/26/2014
Total JE:

3/11/2014
Total PE:
Total for

J0-152180  Late / Penalty

4/1/2014
Total PE:
Total for

60100-152180  Salary And Wages

1/15/2014
1/31/2014
1/31/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000389



2/14/2014
2/14/2014
2/14/2014
2/28/2014
2/28/2014
3/15/2014
3/15/2014
3/28/2014
3/31/2014
3/31/2014
4/15/2014
4/15/2014
4/30/2014
4/30/2014
5/15/2014
5/15/2014

Total JE:

Total for

1/31/2014
2/14/2014
2/14/2014
2/28/2014
3/15/2014
3/15/2014
3/31/2014
3/31/2014
4/15/2014
4/15/2014
4/15/2014
4/17/2014
4/30/2014
5/15/2014
5/15/2014

60450-152180  Bonus - Employee

0

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000390



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000391



62310-152180  Health Insurance

Total PE:

Total for

2/28/2014

0

0

1/15/2014
1/15/2014
1/31/2014
1/31/2014
1/31/2014
1/31/2014
1/31/2014
2/14/2014
2/14/2014
2/14/2014
2/14/2014
2/14/2014
2/14/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
3/15/2014
3/15/2014
3/15/2014
3/15/2014
3/15/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
4/1/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000392



4/15/2014
4/15/2014
4/15/2014
4/15/2014
4/30/2014
4/30/2014
4/30/2014
5/1/2014
5/1/2014
5/15/2014
5/15/2014
5/15/2014
5/15/2014

Total

Total for

0

1/15/2014
1/15/2014
1/16/2014
1/23/2014
1/31/2014
1/31/2014
1/31/2014
2/14/2014
2/14/2014
2/14/2014
2/28/2014
2/28/2014
2/28/2014
3/15/2014
3/15/2014
3/15/2014
3/18/2014

64100-152180  Payroll Tax Expense

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000393



3/31/2014
3/31/2014
3/31/2014
3/31/2014
4/15/2014
4/15/2014
4/15/2014
4/17/2014
4/30/2014
4/30/2014
4/30/2014
5/2/2014
5/15/2014
5/15/2014
5/15/2014
5/15/2014

Total JE:

Total for

0

2/28/2014
3/31/2014
4/30/2014

Total JE:

0

2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014

Total for

0

68500-152180   Corporate Allocation Expense

68501-152180   Corporate Per File Fees

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000394



2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
2/28/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000395



3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
3/31/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000396



68502-152180 Corporate Fees

70100-152180 Advertising & Marketing Expense

4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
4/30/2014
Total JE:
Total for

0
0

4/30/2014
Total JE:
Total for

0

1/1/2014
2/1/2014
2/19/2014
3/1/2014
4/1/2014
4/25/2014
5/1/2014
5/1/2014
5/9/2014
5/19/2014
Total JE:

0

Total PE:
Total for
Report Total:

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000397



Total for

2/18/2014
2/24/2014
3/4/2014
5/1/2014

Total JE:

Total for

1/15/2014
1/16/2014
1/23/2014
1/23/2014
1/31/2014
1/31/2014
2/14/2014
2/14/2014
2/28/2014
2/28/2014
3/15/2014
3/15/2014
3/18/2014
3/31/2014
3/31/2014
4/15/2014
4/15/2014
4/15/2014
4/15/2014
4/30/2014
5/2/2014
5/15/2014
5/15/2014

Total JE:

52427-152180  Lender Credit -

.0-152180  Commission Expense -

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000398



| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | Total JE: | | | | |
| | | | | | | | 07/01/14 | | | | |
| | | | | | | | Total | | | | |
| 61380-152180 Couriers & Shipping | | | | | | | Total for | | | | |
| 62200-152180 Utilities | | | | | | | 07/14/14 | | | | |
| | | | | | | | Total | | | | |
| | | | | | | | Total for | | | | |
| 62310-152180 Health Insurance | | | | | | | 07/01/14 | | | | |
| | | | | | | | 07/15/14 | | | | |
| | | | | | | | 07/15/14 | | | | |
| | | | | | | | 07/15/14 | | | | |
| | | | | | | | 07/15/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | Total for | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000399



GL/Desc/Vendor    Transaction Description    Invoice Number    GL Bank    DB    Ref    JR    Date    Beg Bal    Debit    Credit    End Bal

64100-152180

Payroll Tax Expense

07/01/14    Total JE:

Total

Total for

07/15/14
07/15/14
07/15/14
07/15/14
07/31/14
07/31/14
07/31/14    Total JE:

Total for

65600-152180    Total for

66000-152180    Total for

67100-152180    Total for

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000400

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000401

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| |  | | | | | | 07/31/14 | | | | |
| | | | | | | Total JE: | | | | | |
| | | | | | | Total for | | | | .00 | |
| | | | | | | Total for | | | | | 348.00 |
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |
| | | | | | | | 07/31/14 | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000402





# Funded Loan Report

**Ameripro Funding, Inc.**

For FundingDate between 11/1/2014 and 11/30/2014

Branch: 152180 (Nasserfar)

Template: Branch Income by loan

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 11/25/2014 | | | $. | $. | | |
| | | | | 11/17/2014 | | | | | | |
| | | | | 11/18/2014 | | | | | | |
| | | | | 11/19/2014 | | | | | | |
| | | | | 11/14/2014 | | | | | | |
| | | | | 11/21/2014 | | | | | | |
| | | | | 11/18/2014 | | | | | | |
| | | | | 11/13/2014 | | | | | | |
| | | | | 11/14/2014 | | | | | | |
| | | | | 11/17/2014 | | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000448

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000449



APPLICANT'S EXHIBIT NO. 31

EXHIBIT
14
4-24-15 KW

Applicant's
Injunction Hearing
Exhibit 031

Funded Loan Report
Ameripro Funding, Inc.
For FundingDate between 1/1/2014 and 12/31/2014
Branch: 152180 (Nasserfar)

Template: Branch Income by loan

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees | Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ACEVEDO\| PHILLIP | 152180 | FAY STRANGE | 15201006323 | 1/25/2014 | 228,969 | | $- | $- | $- | $- | $- | $- | $- | $- | $- | | $- | 343.45 | 4,121.44 | 4,464.89 |
| DUCAT\| WILLIAM | 152180 | FAY STRANGE | 15201005298 | 3/24/2014 | 274,411 | | 2,744.11 | - | - | - | - | - | 38.13 | -3.13 | - | | - | 411.61 | 4,939.40 | 8,190.12 |
| GIANDANA\| RICHARD | 152180 | FAY STRANGE | 15201005368 | 2/29/2014 | 250,029 | | - | - | - | - | - | - | - | -1,422.67 | - | | - | 375.04 | 4,500.00 | 3,452.37 |
| PALLADINO\| ANDREA | 152180 | FAY STRANGE | 15201005079 | 3/3/2014 | 357,159 | | - | - | - | - | - | - | - | - | - | | - | 1,785.80 | 4,500.00 | 6,285.80 |
| RUNGE\| LOUIS | 152180 | FAY STRANGE | 15201006154 | 1/14/2014 | 287,920 | | - | - | - | - | - | - | - | - | - | | - | 431.88 | 4,500.00 | 4,931.88 |
| SEGURA\| RAYMOND | 152180 | FAY STRANGE | 15201006541 | 1/31/2014 | 175,491 | | - | - | - | - | - | - | - | -28.08 | - | | - | 263.24 | 3,158.84 | 3,394.00 |
| THOMAS\| VICTOR | 152180 | FAY STRANGE | 15201005736 | 2/3/2014 | 286,246 | | - | - | - | - | - | - | - | - | - | | - | 3,163.02 | 4,500.00 | 7,663.02 |
| CAMERON\| CHRISTOPHER | 152180 | JOAN WILSON | 15218015177 | 5/1/2014 | 310,000 | | - | - | - | - | - | - | - | -1,955.90 | - | | - | - | 6,200.00 | 4,244.10 |
| FURGERSON\| BRITTNEY | 152180 | KIMBERLY JONES | 15200000951 | 2/16/2014 | 126,000 | | - | - | 100.00 | - | - | - | - | -43.00 | - | | - | 1,184.40 | 1,890.00 | 3,131.40 |
| HAYGOOD\| LANE | 152180 | KIMBERLY JONES | 15218013719 | 2/13/2014 | 281,470 | | - | - | 200.00 | - | - | - | 20.18 | - | - | | - | 3,062.35 | 3,472.05 | 6,754.58 |
| HONG\| WOOKYOUNG | 152180 | KIMBERLY JONES | 15201009068 | 2/28/2014 | 97,500 | | - | - | - | - | - | - | - | -250.00 | - | | - | 1,245.08 | 1,462.50 | 2,457.58 |
| LEE\| WOOJIN | 152180 | KIMBERLY JONES | 15201006112 | 2/28/2014 | 96,000 | | - | - | - | - | - | - | 13.56 | -250.00 | - | | - | 903.36 | 1,440.00 | 2,106.92 |
| MOKHTAR\| MOHAMED | 152180 | KIMBERLY JONES | 15201005580 | 2/25/2014 | 417,000 | | - | - | 100.00 | - | - | - | - | -390.26 | - | | - | 2,085.00 | 6,255.00 | 8,089.72 |
| PAREDES\| MARIA | 152180 | KIMBERLY JONES | 15201006058 | 3/7/2014 | 88,000 | | - | - | - | - | - | - | - | - | - | | - | 440.00 | 1,320.00 | 1,760.00 |
| BOONE\| THOMAS | 152180 | MICHAEL E TASK | 15218016067 | 8/18/2014 | 400,000 | | - | - | - | - | - | - | - | -1,823.40 | - | | - | 2,544.00 | 6,000.00 | 6,720.60 |
| BROOKS\| TIMOTHY | 152180 | MICHAEL E TASK | 15218016048 | 8/8/2014 | 245,100 | | - | - | - | - | - | - | - | -762.20 | - | | - | 1,225.50 | 3,676.50 | 4,139.74 |
| BUSTAMANTE\| MARK | 152180 | MICHAEL E TASK | 15218018956 | 9/12/2014 | 97,435 | | - | - | - | - | - | - | - | - | - | | 1,449.35 | - | - | 1,449.95 |
| CAPLAN\| MARSHALL | 152180 | MICHAEL E TASK | 15218018407 | 8/29/2014 | 187,423 | | - | - | - | - | - | - | - | -1,500.00 | - | | - | 2,453.37 | 2,811.35 | 3,764.72 |
| CHEANEY\| CHRIS | 152180 | MICHAEL E TASK | 15218016929 | 6/30/2014 | 254,600 | | - | - | - | - | - | - | - | -540.74 | - | | - | 1,273.00 | 3,819.00 | 4,551.26 |
| CRAWFORD\| CHARLES | 152180 | MICHAEL E TASK | 15218017096 | 7/31/2014 | 261,000 | | - | - | - | - | - | - | - | -1,607.40 | - | | - | 2,607.39 | 3,915.00 | 4,914.99 |
| D'AUTREMONT\| MATTHIAS | 152180 | MICHAEL E TASK | 15218020752 | 12/2/2014 | 144,000 | | - | - | - | - | - | - | - | -507.20 | - | | - | 720.00 | 2,160.00 | 2,372.80 |
| D'AUTREMONT\| MATTHIAS | 152180 | MICHAEL E TASK | 15218021322 | 12/23/2014 | 156,000 | | - | - | - | - | - | - | - | -1,000.00 | - | | - | 1,464.84 | 2,340.00 | 2,804.84 |
| DAUTREMONT\| MATTHIAS | 152180 | MICHAEL E TASK | 15218019738 | 10/31/2014 | 355,920 | | - | - | - | - | - | - | - | -27.00 | - | | - | 1,468.77 | 2,338.80 | 3,780.57 |
| DEMPSEY\| BARBARA | 152180 | MICHAEL E TASK | 15218017096 | 6/23/2014 | 390,000 | | - | - | - | - | - | - | - | - | - | | - | 1,950.00 | 5,850.00 | 7,800.00 |
| FELTNER\| BRUCE | 152180 | MICHAEL E TASK | 15218018719 | 9/5/2014 | 270,000 | | - | - | - | - | - | - | - | -688.50 | - | | - | 1,350.00 | 4,050.00 | 4,711.50 |
| FOREMAN\| MELISSA | 152180 | MICHAEL E TASK | 15218018563 | 10/15/2014 | 145,000 | | - | - | - | - | - | - | - | - | - | | - | 1,004.85 | 2,175.00 | 3,179.85 |
| FOSSAS\| DAVID | 152180 | MICHAEL E TASK | 15218018010 | 10/9/2014 | 256,350 | | - | - | - | - | - | - | - | -3,218.75 | - | | - | 1,781.25 | 5,843.75 | 3,906.25 |
| GENCHEVA\| DANIELA | 152180 | MICHAEL E TASK | 15218017117 | 6/13/2014 | 109,300 | | - | - | - | - | - | - | - | - | - | | 1,507.00 | - | - | 1,507.00 |
| GHEZZI\| CHRISTINA | 152180 | MICHAEL E TASK | 15218020912 | 12/5/2014 | 342,000 | | - | - | - | - | - | - | - | -1,405.62 | - | | - | 1,710.00 | 5,130.00 | 5,434.38 |
| GONSOULIN\| SCOTT | 152180 | MICHAEL E TASK | 15218020916 | 12/30/2014 | 322,700 | | - | - | - | - | - | - | - | - | - | | - | 1,813.50 | 4,840.50 | 6,454.00 |
| HAZY\| MICHAEL | 152180 | MICHAEL E TASK | 15218017054 | 4/30/2014 | 250,000 | | - | - | - | - | - | - | - | - | - | | - | 2,012.50 | 3,750.00 | 5,762.50 |
| HEINE\| KYLE | 152180 | MICHAEL E TASK | 15218013081 | 10/15/2014 | 140,800 | | - | - | - | - | - | - | - | - | - | | 1,683.00 | - | - | 1,683.00 |
| KINCL\| JOHN | 152180 | MICHAEL E TASK | 15218020217 | 11/25/2014 | 320,000 | | - | - | - | - | - | - | - | -67.28 | - | | - | 1,500.00 | 4,800.00 | 6,332.80 |
| MACEJ\| SHONDA | 152180 | MICHAEL E TASK | 15218019693 | 9/26/2014 | 80,000 | | - | - | - | - | - | - | - | - | - | | 1,380.00 | - | - | 1,380.00 |
| SCHOONOVER\| CELIA | 152180 | MICHAEL E TASK | 15200000920 | 8/18/2014 | 216,600 | | - | - | - | - | - | - | - | - | - | | - | 2,276.47 | 3,249.00 | 5,525.47 |
| SHAW\| JAYSON | 152180 | MICHAEL E TASK | 15218017635 | 7/25/2014 | 417,000 | | - | - | - | - | - | - | - | -2,831.12 | - | | - | 2,085.00 | 6,255.00 | 5,408.88 |
| SHEPHERD\| TRICIA | 152180 | MICHAEL E TASK | 15201013555 | 8/15/2014 | 312,975 | | - | - | - | - | - | - | - | -1,145.49 | - | | - | 3,564.86 | 4,694.63 | 5,114.02 |
| THOMAS\| TERESA | 152180 | MICHAEL E TASK | 15218017920 | 7/18/2014 | 417,000 | | - | - | - | - | - | - | - | - | - | | - | 2,085.00 | 6,255.00 | 8,340.00 |
| WADE\| NATHAN | 152180 | MICHAEL E TASK | 15218019148 | 10/8/2014 | 230,000 | | - | - | - | - | - | - | - | -454.48 | - | | - | 1,050.00 | 3,150.00 | 3,745.52 |
| ABERRA\| GETNET | 152180 | MICHAEL NASSERFAR | 15218021203 | 12/31/2014 | 286,551 | | - | - | - | - | - | - | - | -2,500.00 | - | | - | 1,656.29 | 4,328.26 | 3,484.55 |
| ADAMS\| ALFRED | 152180 | MICHAEL NASSERFAR | 15201005739 | 2/14/2014 | 231,442 | | - | - | - | - | - | - | - | - | - | | - | 2,307.48 | 3,471.63 | 5,779.11 |
| ALAMGARI\| NAGENDER | 152180 | MICHAEL NASSERFAR | 15201005018 | 5/1/2014 | 417,000 | | - | - | - | - | - | - | - | -1,844.90 | - | | - | 3,607.05 | 6,255.00 | 7,917.15 |
| ASENCIO\| VERONICA | 152180 | MICHAEL NASSERFAR | 15218014297 | 7/1/2014 | 234,560 | | - | - | 100.00 | - | - | - | - | - | - | | - | 1,428.47 | 3,518.40 | 5,046.87 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000036

| Name | | | Account | Date | Amount | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVERY] MARK | 152180 | MICHAEL NASSERFAR | 15201005779 | 3/12/2014 | 301,260 | | | | | | | | |
| RAILEY] JOHN | 152180 | MICHAEL NASSERFAR | 15218014561 | 5/6/2014 | 263,150 | 200.00 | | | | | | | |
| BAKER] GARY | 152180 | MICHAEL NASSERFAR | 15218016989 | 7/11/2014 | 101,160 | | | -2,000.00 | | 5,384.68 | 4,518.90 | 9,903.58 |
| BALDERAS] RAYMOND | 152180 | MICHAEL NASSERFAR | 15218015896 | 11/17/2014 | 211,641 | | | | | 2,915.71 | 4,500.00 | 5,415.71 |
| BARICUATRO] MARICA | 152180 | MICHAEL NASSERFAR | 15201006030 | 5/23/2014 | 314,524 | | | -2,500.00 | | 662.60 | 1,517.40 | 2,180.00 |
| BARRAS] JEREMY | 152180 | MICHAEL NASSERFAR | 15218019949 | 10/24/2014 | 263,945 | | | -3,826.00 | | 3,540.75 | 3,174.62 | 4,215.37 |
| BEARD] JESSE | 152180 | MICHAEL NASSERFAR | 15218014644 | 3/26/2014 | 200,000 | | | -2,787.70 | | 1,673.27 | 4,500.00 | 7,347.27 |
| BENAVIDES] ISAAC | 152180 | MICHAEL NASSERFAR | 15218015090 | 8/29/2014 | 417,000 | | | -1,066.00 | | 1,919.73 | 3,959.18 | 2,491.21 |
| BENEDETTI] BRETT | 152180 | MICHAEL NASSERFAR | 15218017863 | 7/24/2014 | 193,500 | | | -1,793.96 | | 1,000.00 | 3,000.00 | 2,934.00 |
| BENTLEY] BARTON | 152180 | MICHAEL NASSERFAR | 15201004961 | 2/11/2014 | 237,383 | | | -265.10 | | 2,045.00 | 6,255.00 | 4,546.10 |
| BENTLEY] JEREMIAH | 152180 | MICHAEL NASSERFAR | 15218017406 | 8/7/2014 | 248,000 | | | -99.70 | | 967.50 | 2,952.50 | 3,604.90 |
| BLANTON] WHITNEY | 152180 | MICHAEL NASSERFAR | 15218018452 | 9/19/2014 | 417,000 | | | | | 1,186.92 | 3,560.75 | 4,647.97 |
| BLOK] JUSTIN | 152180 | MICHAEL NASSERFAR | 15200008870 | 7/23/2014 | 417,000 | | | | | 1,376.40 | 3,720.00 | 5,096.40 |
| BOLLAMPALLY] SIRISHA | 152180 | MICHAEL NASSERFAR | 15201003565 | 2/24/2014 | 332,834 | | | -1,843.14 | | 4,349.31 | 6,255.00 | 10,604.31 |
| BOLLING] KATHRYN | 152180 | MICHAEL NASSERFAR | 15218016104 | 10/28/2014 | 233,603 | | | -1,182.00 | | 2,045.00 | 6,255.00 | 6,496.86 |
| BOTKIN] CHRISTINA | 152180 | MICHAEL NASSERFAR | 15218020287 | 12/10/2014 | 319,670 | | | -2,500.00 | | 1,663.17 | 4,989.51 | 5,470.68 |
| BOX] JACLYN | 152180 | MICHAEL NASSERFAR | 15200000734 | 2/28/2014 | 179,550 | | | -4,500.00 | | 1,471.70 | 3,504.05 | 2,475.75 |
| BRANCH] DAVID | 152180 | MICHAEL NASSERFAR | 15218015548 | 5/19/2014 | 332,463 | 200.00 | 19.03 | | | 2,029.90 | 4,795.05 | 2,324.95 |
| BRAZEMER] CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15201006331 | 4/25/2014 | 202,070 | | | | | 897.75 | 2,603.25 | 3,810.03 |
| BROCKWAY] JOANNE | 152180 | MICHAEL NASSERFAR | 15218017298 | 12/15/2014 | 251,280 | | | -323.26 | | 8,341.50 | 4,500.00 | 12,841.50 |
| BROWN] ERICA | 152180 | MICHAEL NASSERFAR | 15201059220 | 3/25/2014 | 245,658 | | | -2,500.00 | | 1,010.35 | 3,031.05 | 5,718.14 |
| BUCKNER] FREDERICK | 152180 | MICHAEL NASSERFAR | 15218018130 | 8/27/2014 | 227,000 | | | | | 3,947.71 | 3,769.21 | 5,236.92 |
| BUTALA] JAY | 152180 | MICHAEL NASSERFAR | 15218018130 | 12/30/2014 | 200,000 | | | -402.31 | | 3,616.09 | 3,684.87 | 7,300.96 |
| BYTHEWOOD] BENJIMAN | 152180 | MICHAEL NASSERFAR | 15218014968 | 4/25/2014 | 124,800 | | | -2,500.00 | | 1,135.00 | 3,405.00 | 4,137.69 |
| CALLAWAY] DANIEL | 152180 | MICHAEL NASSERFAR | 15218014296 | 3/31/2014 | 417,000 | | | | | 1,648.00 | 3,000.00 | 2,146.00 |
| CALVERT] MEREDITH | 152180 | MICHAEL NASSERFAR | 15218014371 | 3/27/2014 | 417,000 | | | -1,665.40 | | 239.62 | 2,246.40 | 2,486.02 |
| CANTU] EFREN | 152180 | MICHAEL NASSERFAR | 15200000685 | 6/27/2014 | 395,132 | 500.00 | | -783.96 | | 1,602.88 | 6,255.00 | 8,192.48 |
| CANTU] PATRICIA | 152180 | MICHAEL NASSERFAR | 15300001019 | 2/21/2014 | 234,500 | 200.00 | | -200.00 | | 2,045.00 | 6,255.00 | 7,656.04 |
| CARMICHAEL] ALLISON | 152180 | MICHAEL NASSERFAR | 15201006307 | 5/28/2014 | 203,974 | 200.00 | | | | 5,263.16 | 5,926.98 | 11,190.14 |
| CARMICHAEL] DANIEL | 152180 | MICHAEL NASSERFAR | 15201005882 | 3/31/2014 | 191,973 | | | -200.00 | | 1,728.72 | 4,417.50 | 6,546.22 |
| CARTER] MATTHEW | 152180 | MICHAEL NASSERFAR | 15218016057 | 12/29/2014 | 100,000 | | | | | 305.96 | 3,671.53 | 3,777.49 |
| CHAMBERS] PAMELA | 152180 | MICHAEL NASSERFAR | 15218016892 | 11/18/2014 | 261,742 | | | -2,500.00 | | 1,839.11 | 2,879.60 | 4,718.71 |
| CHAO] MAYRA | 152180 | MICHAEL NASSERFAR | 15218016896 | 11/19/2014 | 218,538 | | | -3,677.84 | | 719.00 | 1,500.00 | -291.00 |
| CHASTAIN] GREG | 152180 | MICHAEL NASSERFAR | 15218017829 | 12/30/2014 | 298,581 | | | -2,500.00 | | 392.61 | 4,500.00 | 1,214.77 |
| CHRISTMAN] RICHARD | 152180 | MICHAEL NASSERFAR | 15218021463 | 12/30/2014 | 356,250 | | | -3,222.57 | | 1,346.19 | 3,278.07 | 2,124.26 |
| CRAIG] TIMOTHY | 152180 | MICHAEL NASSERFAR | 15201006269 | 4/18/2014 | 301,750 | | | -2,500.00 | | 1,492.91 | 4,478.72 | 2,749.06 |
| CROSS] KYLE | 152180 | MICHAEL NASSERFAR | 15218014852 | 12/19/2014 | 353,932 | | | | | 2,269.31 | 5,343.75 | 5,113.06 |
| CUTBIRTH] PRESTON | 152180 | MICHAEL NASSERFAR | 15218019569 | 10/10/2014 | 192,000 | | | -323.90 | | 6,538.92 | 4,500.00 | 11,038.92 |
| DEWALD] WESLEY | 152180 | MICHAEL NASSERFAR | 15218017259 | 12/31/2014 | 281,408 | | | | | 1,779.66 | 5,329.96 | 6,794.74 |
| DIMBERO] EDWARD | 152180 | MICHAEL NASSERFAR | 15200000641 | 6/12/2014 | 218,801 | | | -2,500.00 | | 1,305.60 | 2,880.00 | 4,185.60 |
| DITOMMASO] JAMES | 152180 | MICHAEL NASSERFAR | 15218014701 | 11/14/2014 | 417,000 | 200.00 | | -2,225.90 | | 2,645.24 | 4,221.12 | 4,366.36 |
| ERNST] JAMES | 152180 | MICHAEL NASSERFAR | 15218017582 | 12/30/2014 | 356,370 | | | -200.00 | | 6,004.80 | 6,255.00 | 10,038.90 |
| FOLTZ] ANGELA | 152180 | MICHAEL NASSERFAR | 15200000782 | 5/2/2014 | 281,666 | 200.00 | | -3,273.32 | | 3,446.11 | 3,282.02 | 6,728.13 |
| FORREST] JAMES | 152180 | MICHAEL NASSERFAR | 15201006405 | 5/23/2014 | 284,139 | | | -6,506.39 | | 4,454.63 | 5,345.55 | 6,526.86 |
| GAINES] AMOS | 152180 | MICHAEL NASSERFAR | 15218018474 | 10/30/2014 | 328,563 | | 17.51 | | | 4,209.77 | 4,500.00 | 2,483.38 |
| GARDINER] JOSEPH | 152180 | MICHAEL NASSERFAR | 15201005792 | 2/27/2014 | 280,603 | | | -2,500.00 | | 5,481.03 | 4,282.07 | 9,763.61 |
| GARWOOD] MINDY | 152180 | MICHAEL NASSERFAR | 15218017405 | 7/16/2014 | 284,800 | | | -200.00 | | 4,154.05 | 4,925.75 | 6,579.80 |
| GLADNEY] BURNETT | 152180 | MICHAEL NASSERFAR | 15201005508 | 5/23/2014 | 197,303 | | | -1,148.40 | | 1,678.78 | 4,209.05 | 5,487.83 |
| GOINS] MICHAEL | 152180 | MICHAEL NASSERFAR | 15218018164 | 10/31/2014 | 295,621 | | | -655.77 | | 1,893.92 | 4,272.00 | 5,017.52 |
| GRAY] CYNTHIA | 152180 | MICHAEL NASSERFAR | 15218015003 | 4/17/2014 | 380,000 | | | -1,184.90 | | 295.95 | 3,551.45 | 3,191.63 |
| GREENE] CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15218015318 | 10/31/2014 | 381,809 | | | -1,484.77 | | 443.43 | 4,500.00 | 3,754.53 |
| GREEN] BRIAN | 152180 | MICHAEL NASSERFAR | 15201005280 | 5/20/2014 | 417,000 | | | -1,185.40 | | 1,900.00 | 5,700.00 | 6,115.33 |
| HARRIS] KRISTAL | 152180 | MICHAEL NASSERFAR | 15218020471 | 11/21/2014 | 270,244 | | 20.18 | -2,101.90 | | 7,082.55 | 5,727.14 | 11,624.29 |
| HERNANDEZ] MARISSA | 152180 | MICHAEL NASSERFAR | 15201005997 | 4/2/2014 | 328,579 | | | -3,384.26 | | 2,685.00 | 6,255.00 | 6,258.28 |
| | | | | | | | | -1,610.04 | | 1,351.22 | 4,053.66 | 7,720.62 |
| | | | | | | | | | | 1,642.90 | 4,929.89 | 4,961.55 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000037

| Name | | | Loan # | Date | Amount | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HERNANDEZ| OTTO | 152180 | MICHAEL NASSERFAR | 15218014375 | 5/12/2014 | 310,880 | | | | | | | | | | | | | | | |
| HOBBS| MATTHEW | 152180 | MICHAEL NASSERFAR | 15201006465 | 2/26/2014 | 292,471 | | 100.00 | | | | | | | 6,062.16 | 4,663.20 | 10,825.36 | | | |
| HUCKABA| SETH | 152180 | MICHAEL NASSERFAR | 15201006416 | 6/20/2014 | 244,725 | | | | 17.51 | -81.98 | | | | 438.71 | 4,500.00 | 4,874.24 | | | |
| HULBERT| COLLIN | 152180 | MICHAEL NASSERFAR | 15201006074 | 5/23/2014 | 252,012 | | | | | -378.85 | | | | 1,223.63 | 3,670.88 | 4,515.86 | | | |
| HUNT| CHARLES | 152180 | MICHAEL NASSERFAR | 15218017332 | 12/19/2014 | 284,769 | | | | | | | | | 1,260.06 | 3,780.18 | 3,040.24 | | | |
| JOLY| DAINA | 152180 | MICHAEL NASSERFAR | 15218016240 | 8/14/2014 | 398,187 | | | | | -2,935.50 | | | | 1,423.85 | 4,271.54 | 2,699.89 | | | |
| JOYNER| ROGDELL | 152180 | MICHAEL NASSERFAR | 15201006285 | 6/30/2014 | 284,047 | | | | | -1,322.40 | | | | 1,990.94 | 5,972.81 | 6,641.35 | | | |
| KASTAK| WILLIAM | 152180 | MICHAEL NASSERFAR | 15201003599 | 2/28/2014 | 417,000 | | | | | -200.00 | | | | 3,809.07 | 4,260.71 | 7,869.78 | | | |
| KIMPEL| THOMAS | 152180 | MICHAEL NASSERFAR | 15201006870 | 3/5/2014 | 240,138 | | | | 13.56 | -2,572.90 | | | | 4,820.52 | 6,255.00 | 8,516.18 | | | |
| KIM| MCKINLEY | 152180 | MICHAEL NASSERFAR | 15201006070 | 4/25/2014 | 329,267 | | | | | -302.57 | | | | 1,200.69 | 3,602.07 | 4,500.19 | | | |
| KING| ROCKWELL | 152180 | MICHAEL NASSERFAR | 15218014204 | 9/15/2014 | 374,261 | | 100.00 | | | -5,597.54 | | | | 6,970.58 | 4,500.00 | 5,873.04 | | | |
| KRAHENBUHL| CHRISTIAN | 152180 | MICHAEL NASSERFAR | 15218018659 | 9/15/2014 | 188,000 | | | | | -2,282.99 | | | | 3,871.31 | 5,613.92 | 5,902.24 | | | |
| LAFRANCE| KEVIN | 152180 | MICHAEL NASSERFAR | 15218014654 | 8/8/2014 | 243,692 | | | | | -1,064.08 | | | | 282.00 | 3,384.00 | 2,601.92 | | | |
| LAIS| ERIC | 152180 | MICHAEL NASSERFAR | 15218015137 | 8/28/2014 | 216,000 | | | | | -1,191.65 | | | | 3,046.15 | 3,655.38 | 5,509.88 | | | |
| LANTHEA| KURT | 152180 | MICHAEL NASSERFAR | 15201005903 | 11/18/2014 | 417,000 | | | | | | | | | 1,831.68 | 3,240.00 | 3,071.68 | | | |
| LANTRIP| LAURA | 152180 | MICHAEL NASSERFAR | 15201006589 | 8/8/2014 | 300,000 | | 200.00 | | | -2,537.80 | | | | 3,232.60 | 6,255.00 | 6,969.80 | | | |
| LAUGHLIN| AARON | 152180 | MICHAEL NASSERFAR | 15218014829 | 9/29/2014 | 247,333 | | | | | -1,610.40 | | | | 2,970.00 | 4,500.00 | 6,059.60 | | | |
| LEE| PAUL | 152180 | MICHAEL NASSERFAR | 15201006356 | 5/23/2014 | 256,196 | | | | | -155.98 | | | | 1,236.17 | 3,708.50 | 4,808.69 | | | |
| LIESMAN| MATTHEW | 152180 | MICHAEL NASSERFAR | 15218017843 | 7/31/2014 | 250,376 | | | | | -200.00 | | | | 1,657.59 | 3,842.94 | 5,500.53 | | | |
| LILJEGREN| JENNIFER | 152180 | MICHAEL NASSERFAR | 15200000720 | 4/17/2014 | 264,000 | | 200.00 | | | -1,029.05 | | | | 3,129.70 | 3,755.64 | 5,856.29 | | | |
| LITTLE| KRISTINA | 152180 | MICHAEL NASSERFAR | 15218020380 | 12/18/2014 | 399,920 | | | | | -132.00 | | | | 1,920.00 | 3,990.00 | 5,348.00 | | | |
| LOZANO| TIMOTHY | 152180 | MICHAEL NASSERFAR | 15201006525 | 5/22/2014 | 145,000 | 1,450.00 | | | | -600.00 | | | | 1,999.60 | 5,998.80 | 7,398.40 | | | |
| LUTOSTANSKI| NICHOLAS | 152180 | MICHAEL NASSERFAR | 15219020106 | 12/18/2014 | 230,547 | | | | | -1,693.40 | | | | 725.00 | 2,175.00 | 2,650.60 | | | |
| MATTINSLY| LLOYD | 152180 | MICHAEL NASSERFAR | 15200000934 | 6/26/2014 | 206,161 | | 200.00 | | | -2,932.94 | | | | 1,151.74 | 3,455.22 | 1,614.02 | | | |
| MCCASKILL| GREGORY | 152180 | MICHAEL NASSERFAR | 15218014416 | 3/27/2014 | 234,000 | | | | | -171.11 | | | | 1,030.81 | 3,092.42 | 4,152.12 | | | |
| METCALF| RUSSELL | 152180 | MICHAEL NASSERFAR | 15218020292 | 12/22/2014 | 205,000 | | | | | | | | | 1,174.00 | 3,522.00 | 4,696.00 | | | |
| MOLANDER| MATT | 152180 | MICHAEL NASSERFAR | 15200000904 | 6/30/2014 | 408,902 | | 100.00 | | | -2,500.00 | | | | 1,025.00 | 3,075.00 | 1,600.00 | | | |
| MOSSMAN| FRANCES | 152180 | MICHAEL NASSERFAR | 15218015561 | 6/2/2014 | 322,413 | | | | | -1,709.64 | | | | 2,041.51 | 6,124.53 | 6,556.40 | | | |
| MUCK| PAUL | 152180 | MICHAEL NASSERFAR | 15218014157 | 2/27/2014 | 251,363 | | 100.00 | | | | | | | 1,508.89 | 4,500.00 | 6,008.89 | | | |
| MYERS| AMANDA | 152180 | MICHAEL NASSERFAR | 15218014041 | 10/21/2014 | 387,917 | | 100.00 | | | | | | | 4,265.63 | 3,770.45 | 8,136.08 | | | |
| MYERS| ROBERT | 152180 | MICHAEL NASSERFAR | 15201005568 | 2/25/2014 | 372,339 | | | | | -4,175.90 | | | | 1,939.59 | 3,818.76 | 3,682.55 | | | |
| NELSON| WILLIAM | 152180 | MICHAEL NASSERFAR | 15218015773 | 5/29/2014 | 329,440 | | | | | -85.64 | | | | 1,861.70 | 4,500.00 | 6,278.06 | | | |
| NEWTON| WHITNEY | 152180 | MICHAEL NASSERFAR | 15200000719 | 2/10/2014 | 260,000 | | | | | | | | | 2,095.24 | 4,941.60 | 7,036.84 | | | |
| NGO| HIEP | 152180 | MICHAEL NASSERFAR | 15218015719 | 10/30/2014 | 230,000 | | | | | | | 3,075.00 | | - | - | 3,075.00 | | | |
| NGUYEN| LINH | 152180 | MICHAEL NASSERFAR | 15200000804 | 2/14/2014 | 233,292 | | 200.00 | | | -2,673.80 | | | | 1,100.00 | 3,900.00 | 1,726.20 | | | |
| NGUYEN| TUONG | 152180 | MICHAEL NASSERFAR | 15218020112 | 11/13/2014 | 358,006 | | | | 45.66 | -323.64 | | | | 3,499.38 | 3,499.38 | 6,920.78 | | | |
| O'NEAL| JANET | 152180 | MICHAEL NASSERFAR | 15201006051 | 5/6/2014 | 305,782 | | | | | -2,504.00 | | | | 2,255.44 | 5,370.09 | 5,121.53 | | | |
| O'NEAL| JANET | 152180 | MICHAEL NASSERFAR | 15218014314 | 3/4/2014 | 142,500 | | 100.00 | | | -168.18 | | | | 458.67 | 4,500.00 | 4,790.49 | | | |
| OSBORNE| LAWRENCE | 152180 | MICHAEL NASSERFAR | 15201006560 | 2/14/2014 | 240,419 | | 200.00 | | | -999.00 | | | | 213.75 | 2,565.00 | 2,179.75 | | | |
| OSTER| SETH | 152180 | MICHAEL NASSERFAR | 15201006198 | 4/28/2014 | 290,403 | | | | 12.04 | -87.74 | | | | 3,995.62 | 3,609.29 | 7,629.23 | | | |
| OTTO| DANIEL | 152180 | MICHAEL NASSERFAR | 15215011538 | 3/24/2014 | 247,857 | | | | | | | | | 4,620.31 | 4,356.05 | 8,976.36 | | | |
| PEN| MATTHEW | 152180 | MICHAEL NASSERFAR | 15218017240 | 12/23/2014 | 245,000 | | | | | -1,019.40 | | | | 3,333.68 | 3,717.86 | 6,032.14 | | | |
| PHI| HUNG | 152180 | MICHAEL NASSERFAR | 15219015741 | 5/9/2014 | 106,000 | | | | | -2,900.00 | | | | 1,308.30 | 3,675.00 | 2,483.30 | | | |
| PICANSO| ROBIN | 152180 | MICHAEL NASSERFAR | 15218018247 | 8/29/2014 | 417,000 | | | | | -241.50 | | | | 151.50 | 1,818.00 | 1,728.11 | | | |
| RAJNA| PRADHAN | 152180 | MICHAEL NASSERFAR | 15201004201 | 2/12/2014 | 280,000 | | | | | -1,697.40 | | | | 3,753.00 | 6,255.00 | 8,310.60 | | | |
| RAPISANO| CYNTHIA | 152180 | MICHAEL NASSERFAR | 15218017759 | 11/14/2014 | 298,798 | | | | | -1,936.40 | | | | 1,425.20 | 4,500.00 | 3,888.80 | | | |
| RAY| DARRELL | 152180 | MICHAEL NASSERFAR | 15218021174 | 12/19/2014 | 193,775 | | | | | -3,049.73 | | | | 1,493.89 | 4,481.97 | 2,924.17 | | | |
| RAY| GERRY | 152180 | MICHAEL NASSERFAR | 15218014042 | 8/4/2014 | 308,582 | | 100.00 | | | | | | | 3,724.56 | 2,906.63 | 6,630.99 | | | |
| RIEDER| MARK | 152180 | MICHAEL NASSERFAR | 15218016547 | 6/30/2014 | 417,000 | | | | | -506.07 | | | | 1,542.91 | 4,628.73 | 5,765.57 | | | |
| RIVERS| CLAY | 152180 | MICHAEL NASSERFAR | 15218017333 | 12/19/2014 | 275,752 | | | | | -2,183.04 | | | | 625.50 | 4,500.00 | 2,942.46 | | | |
| RYAN| MARCUS | 152180 | MICHAEL NASSERFAR | 15201006384 | 9/30/2014 | 217,000 | | | | | -3,132.82 | | | | 1,398.76 | 4,196.28 | 2,482.42 | | | |
| SCHALCHLIN| SCOTT | 152180 | MICHAEL NASSERFAR | 15200000780 | 8/8/2014 | 244,003 | | 200.00 | | | -1,865.40 | | | | 1,090.07 | 3,255.00 | 3,279.67 | | | |
| SHARP| JAMES | 152180 | MICHAEL NASSERFAR | 15201006250 | 7/11/2014 | 903,602 | | | | | -392.84 | | | | 3,050.04 | 3,660.05 | 6,517.25 | | | |
| SHEARN| KELLY | 152180 | MICHAEL NASSERFAR | 15201006540 | 7/7/2014 | 282,043 | | | | | -5,665.58 | | | | 4,518.01 | 13,554.08 | 12,406.46 | | | |
| | | | | | | | | | | | -1,762.53 | | | | 1,410.23 | 4,230.68 | 3,878.38 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000038

| Name | | Officer | Loan # | Date | Amount | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHEFFIELD| AUSTIN | 152180 | MICHAEL NASSERFAR | 15218019900 | 11/17/2014 | 222,800 | | | | | | | | | | | | | | | | | |
| SHOENFELT| ADAM | 152180 | MICHAEL NASSERFAR | 15218014208 | 5/2/2014 | 181,600 | | | | | | | | -873.28 | | | | | 1,114.00 | 3,342.00 | 3,582.62 |
| SHUPE| JAMES | 152180 | MICHAEL NASSERFAR | 15201006582 | 3/14/2014 | 168,016 | | 100.00 | | | | | | -1,500.00 | | | | | 1,868.66 | 3,268.80 | 3,737.46 |
| SILVA| TIFFANY | 152180 | MICHAEL NASSERFAR | 15200006668 | 3/18/2014 | 358,267 | | 100.00 | | | | | | | | | | | 2,826.37 | 2,520.54 | 5,446.91 |
| SOUMAN| ARISTOTLE | 152180 | MICHAEL NASSERFAR | 15201005054 | 12/11/2014 | 417,000 | | 200.00 | | | | | | -2,000.00 | | | | | 1,796.20 | 5,074.01 | 5,070.21 |
| SOUCY| LEE | 152180 | MICHAEL NASSERFAR | 15218019228 | 9/12/2014 | 319,500 | | | | | | | | | | | | | | | |
| STEVENS| GLEN | 152180 | MICHAEL NASSERFAR | 15201006588 | 5/15/2014 | 316,358 | | 200.00 | | | | | | | | | | | 2,722.14 | 4,792.50 | 7,514.64 |
| STORY| ADAM | 152180 | MICHAEL NASSERFAR | 15200001073 | 6/24/2014 | 288,279 | | 100.00 | | | | | | -543.12 | | | | | 474.54 | 4,500.00 | 4,611.42 |
| STRICKLAND| WILLIAM | 152180 | MICHAEL NASSERFAR | 15218016788 | 6/30/2014 | 462,000 | | | | | | | | -1,655.25 | | | | | 1,441.40 | 4,324.19 | 4,210.34 |
| SUTPHEN| CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15218015253 | 10/24/2014 | 312,012 | | | | | | | | -7,841.50 | | | | | 693.00 | 4,500.00 | -2,648.50 |
| TAYLOR CARTER| LORINDA | 152180 | MICHAEL NASSERFAR | 15218017106 | 12/19/2014 | 280,306 | | | | | | | | -8,740.44 | | | | | 1,360.11 | 4,680.93 | -2,500.00 |
| TINSLEY| LAWRENCE | 152180 | MICHAEL NASSERFAR | 15200000950 | 3/5/2014 | 164,000 | | 200.00 | | | | | | -2,500.00 | | | | | 2,976.85 | 4,204.59 | 4,681.44 |
| TUCCIARONE| CAROLYNN | 152180 | MICHAEL NASSERFAR | 15201006482 | 5/27/2014 | 118,000 | | 200.00 | | | | | | | | | | | 2,842.12 | 2,460.00 | 5,502.12 |
| VALDEZ| ALFREDO | 152180 | MICHAEL NASSERFAR | 15218014569 | 9/11/2014 | 195,024 | | | | | | | | -3,000.00 | | | | | 550.00 | 1,650.00 | -600.00 |
| VASQUEZ| BRANDON | 152180 | MICHAEL NASSERFAR | 15218014614 | 9/15/2014 | 369,323 | | | | | | | | -423.20 | | | | | 975.12 | 2,925.36 | 3,477.28 |
| WARNER| JESSE | 152180 | MICHAEL NASSERFAR | 15218016787 | 6/23/2014 | 269,699 | | | | | | | | -913.07 | | | | | 1,846.62 | 5,539.85 | 6,471.40 |
| WHITE| JOHN | 152180 | MICHAEL NASSERFAR | 15218014883 | 9/26/2014 | 292,988 | | | | | | | | -1,818.19 | | | | | 1,348.50 | 4,045.49 | 3,575.80 |
| WILLIAMS| TERRIN | 152180 | MICHAEL NASSERFAR | 15201005715 | 5/28/2014 | 302,706 | | | | | | | | | | | | | 2,135.74 | 4,394.52 | 6,530.26 |
| WOLFER| JOSHUA | 152180 | MICHAEL NASSERFAR | 15201005950 | 3/28/2014 | 315,766 | | | | | | | | | | | | | 5,261.04 | 4,540.59 | 9,801.63 |
| WOLFSHOHL| SAM | 152180 | MICHAEL NASSERFAR | 15201006191 | 5/6/2014 | 215,594 | | | | | | | | | | | | | 2,374.56 | 4,736.49 | 7,111.05 |
| WOODRUFF| STEVEN | 152180 | MICHAEL NASSERFAR | 15218016213 | 12/22/2014 | 309,833 | | | | | | | | | | | | | 332.01 | 3,880.69 | 4,212.70 |
| WRIGHT| THERESA | 152180 | MICHAEL NASSERFAR | 15218030226 | 10/31/2014 | 159,920 | | | | | | | | -3,237.40 | | | | | 1,549.17 | 4,647.49 | 2,859.26 |
| BASHAM| TIMOTHY | 152180 | MICHAEL TASK | 15218016869 | 8/8/2014 | 71,500 | | | | | | | | | | | | | 1,119.44 | 2,398.80 | 3,518.24 |
| CASH| PAUL | 152180 | MICHAEL TASK | 15201006505 | 4/29/2014 | 293,600 | | | | | | | | -2,726.26 | | | | | 357.50 | 1,072.50 | 1,430.00 |
| COBB| FRANK | 152180 | MICHAEL TASK | 15218013778 | 2/24/2014 | 248,500 | | | | | | -550.00 | | -74.25 | | | | | 1,468.00 | 4,404.00 | 3,145.74 |
| COBB| TOM | 152180 | MICHAEL TASK | 15218015491 | 5/21/2014 | 217,920 | | | | | | | | -274.58 | | | | | 742.50 | 2,227.50 | 2,345.75 |
| COHEN| ELIETTE | 152180 | MICHAEL TASK | 15218014921 | 4/21/2014 | 322,500 | | | | | | | | | | | | | 1,089.60 | 3,268.80 | 4,083.82 |
| COKER| RONALD | 152180 | MICHAEL TASK | 15218014758 | 7/9/2014 | 281,334 | | | | | | | | | | | | | 2,141.40 | 4,837.50 | 6,978.90 |
| FROELICH| JOHN | 152180 | MICHAEL TASK | 15218015971 | 5/14/2014 | 840,000 | | | | | | | | | | | 12,376.21 | | | | 12,376.21 |
| HACKNEY| CLINTON | 152180 | MICHAEL TASK | 15218013692 | 4/4/2014 | 400,000 | | | | | | | | | | | 3,400.00 | | | | 3,400.00 |
| HATT| DANIEL | 152180 | MICHAEL TASK | 15201009974 | 4/29/2014 | 277,285 | | | | | | | | | | | 4,475.00 | | | | 4,475.00 |
| HRTNYK| TREVOR | 152180 | MICHAEL TASK | 15218015270 | 5/20/2014 | 318,750 | | | | | | | | -2,076.40 | | | | | 4,281.28 | 4,159.24 | 6,364.16 |
| KELLY, JR| WILLIAM | 152180 | MICHAEL TASK | 15201005484 | 3/27/2014 | 255,200 | | | | | | | | | | | | | 2,393.81 | 4,781.25 | 7,175.06 |
| LAMHA| TONY | 152180 | MICHAEL TASK | 15218015065 | 5/22/2014 | 200,000 | | | | | | | | | | | | | 1,276.00 | 3,828.00 | 5,104.00 |
| LEE| R. | 152180 | MICHAEL TASK | 15201006549 | 5/6/2014 | 106,172 | | 200.00 | | | | | | | | | | | 2,110.00 | 3,000.00 | 5,310.00 |
| LIM| JIN WOO | 152180 | MICHAEL TASK | 15201006057 | 5/14/2014 | 91,350 | | | | | | | 13.56 | | | | | | 803.72 | 1,592.58 | 2,596.30 |
| MAULDIN| HEATHER | 152180 | MICHAEL TASK | 15201006450 | 3/3/2014 | 209,000 | | | | | | | | -500.00 | | | | | 549.01 | 1,370.25 | 1,932.82 |
| RHINEHART| BROOKS | 152180 | MICHAEL TASK | 15201004721 | 4/21/2014 | 291,750 | | | | | | | | -242.15 | | | | | 313.50 | 3,762.00 | 3,575.50 |
| RIXBY| EMILY | 152180 | MICHAEL TASK | 15218016454 | 6/13/2014 | 140,160 | | | | | | | | | | | | | 1,458.75 | 4,376.25 | 5,592.85 |
| ROMANYK| ANDREW | 152180 | MICHAEL TASK | 15218015886 | 5/30/2014 | 224,250 | | | | | | | | | | | | | 2,447.19 | 2,102.40 | 4,549.59 |
| SEYMOUR| ADAM | 152180 | MICHAEL TASK | 15201004685 | 4/30/2014 | 218,367 | | | | | | | | | | | 2,717.50 | | | | 2,717.50 |
| WARREN| EMILY | 152180 | MICHAEL TASK | 15200000868 | 2/28/2014 | 293,400 | | 100.00 | | | | | | | | | | | 2,801.65 | 3,275.51 | 6,077.16 |
| WILSON| TAYLOR | 152180 | MICHAEL TASK | 15218015596 | 6/10/2014 | 252,396 | | | | | | | | | | | 2,327.50 | | 2,402.95 | 4,401.00 | 6,903.95 |
| MATTHEWS| CHRISTOPHER | 152180 | TY GOSNAY | 15218017793 | 8/8/2014 | 213,750 | | | | | | | | -288.46 | | | | | 1,068.75 | 3,306.25 | 3,984.54 |
| | | | | | 52,791,598 | 4,394.11 | 0.00 | 5,100.00 | 0.00 | 0.00 | -550.00 | 230.94 | -215,279.44 | 0.00 | 0.00 | 34,590.56 | 376,015.95 | 756,422.32 | $60,724.44 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000039

Statement of Income
Multi Month
Ameripro Funding, Inc.
For the Period From 1/1/2014 to 8/31/2014
By Branch
152180 (Nasserfar)

| Income | | January 2014 | February 2014 | March 2014 | April 2014 | May 2014 | June 2014 | July 2014 | August 2014 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application fee income | $0.00 | $1,400.00 | $700.00 | $200.00 | $1,200.00 | $800.00 | $100.00 | $500.00 | |
| Total Application fees | | $0.00 | $1,400.00 | $700.00 | $200.00 | $1,200.00 | $800.00 | $100.00 | $500.00 | $4,900.00 |
| 7-152180 | Credit report fee income | $0.00 | $141.56 | $0.00 | $0.00 | $37.69 | $0.00 | $0.00 | $0.00 | $17? |
| Total Credit reports | | $0.00 | $141.56 | $0.00 | $0.00 | $37.69 | $0.00 | $0.00 | $0.00 | $179.25 |
| 41370-152180 | Processing fees | $0.00 | $8,020.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,020.00 |
| Total Processing fees | | $0.00 | $8,020.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,020.00 |
| 41380-152180 | Branch admin fee | $0.00 | ($550.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($550.00) |
| Total Branch administration fees | | $0.00 | ($550.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | ($550.00) |
| 41860-152180 | Brokered loan fee income | $0.00 | $3,075.00 | $4,475.00 | $0.00 | $2,717.50 | $7,234.50 | $12,376.21 | $0.00 | $29,878.21 |
| Total Brokered loan fees | | $0.00 | $3,075.00 | $4,475.00 | $0.00 | $2,717.50 | $7,234.50 | $12,376.21 | $0.00 | $29,878.21 |
| 41880-152180 | Misc production income | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $125.00 | $0.00 | $125.00 |
| Total Other fees | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $125.00 | $0.00 | $125.00 |
| 42301-152180 | Premium discount - branch | $0.00 | $49,377.72 | $20,359.57 | $23,370.92 | $51,487.33 | $25,081.57 | $18,354.81 | $34,271.59 | $222,303.51 |
| Total Premium discount - branch | | $0.00 | $49,377.72 | $20,359.57 | $23,370.92 | $51,487.33 | $25,081.57 | $18,354.81 | $34,271.59 | $222,303.51 |
| 42300-152180 | Premium discount - lo | $0.00 | $87,841.72 | $41,140.52 | $33,395.66 | $90,100.15 | $55,817.03 | $42,876.62 | $70,002.20 | $421,173.90 |
| Total Premium discount - lo comp | | $0.00 | $87,841.72 | $41,140.52 | $33,395.66 | $90,100.15 | $55,817.03 | $42,876.62 | $70,002.20 | $421,173.90 |
| 42400-152180 | Pair-off allocation | $0.00 | $1,771.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,771.51 |
| Total Pair-off allocation | | $0.00 | $1,771.51 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,771.51 |
| 68502-152180 | Corporate fees - neo | $0.00 | $0.00 | $0.00 | ($500.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($500.00) |
| Corporate neo fees | | $0.00 | $0.00 | $0.00 | ($500.00) | $0.00 | $0.00 | $0.00 | $0.00 | ($500.0) |
| Total Income | | $0.00 | $151,077.51 | $66,675.09 | $56,466.58 | $145,542.67 | $88,933.10 | $73,832.64 | $104,773.79 | $687,301.5o |

| Lender Credits | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | Lender credits - gfe cures | $0.00 | $8,439.68 | $6,444.93 | $7,456.46 | $22,982.23 | $16,319.47 | $10,586.74 | $14,419.58 | $86,649.09 |
| 52427-152180 | Lender credit - 10% cure | $0.00 | $117.25 | $72.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17.00 | $206.25 |
| Total Lender/broker credits | | $0.00 | $8,556.93 | $6,516.93 | $7,456.46 | $22,982.23 | $16,319.47 | $10,586.74 | $14,436.58 | $86,855.34 |

Gross Revnues - Lender Credits
$600,446.04

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000040

| Expense's | | JAN | FEB | MARCH | APRIL | MAY | JUNE | JULY | AUGUST | |
|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | Lender credits - gfe cures | $0.00 | $8,439.68 | $6,444.93 | $7,456.46 | $22,982.23 | $16,319.47 | $10,586.74 | $14,419.58 | $86,649.09 |
| 52427-152180 | Lender credit - 10% cure | $0.00 | $117.25 | $72.00 | $0.00 | $0.00 | $0.00 | $0.00 | $17.00 | $206.25 |
| Total Lender/broker credits | | $0.00 | $8,556.93 | $6,516.93 | $7,456.46 | $22,982.23 | $16,319.47 | $10,586.74 | $14,436.58 | $86,855.34 |
| 55110-152180 | Commission expense - loan officers | $547.57 | $65,903.43 | $31,312.71 | $29,635.25 | $68,546.97 | $36,702.57 | $30,729.66 | $36,964.06 | $300,342.22 |
| Total Commission expense - loan officers | | $547.57 | $65,903.43 | $31,312.71 | $29,635.25 | $68,546.97 | $36,702.57 | $30,729.66 | $36,964.06 | $300,342.22 |
| 55111-152180 | Commission offset | $0.00 | ($10,298.80) | ($2,039.60) | ($5,815.40) | ($5,689.80) | ($5,218.00) | ($3,815.40) | ($5,496.25) | ($38,373.25) |
| Total Commission offset | | $0.00 | ($10,298.80) | ($2,039.60) | ($5,815.40) | ($5,689.80) | ($5,218.00) | ($3,815.40) | ($5,496.25) | ($38,373.25) |
| ( )-152180 | Underwriting fees | $0.00 | $1,494.08 | $941.92 | $1,006.88 | $925.69 | $682.08 | $812.00 | $649.60 | $6,512. |
| Total Underwriting fees | | $0.00 | $1,494.08 | $941.92 | $1,006.88 | $925.69 | $682.08 | $812.00 | $649.60 | $6,512. |
| 55350-152180 | Verification fees | $0.00 | $2,091.16 | $2,228.45 | $2,211.17 | $1,462.91 | $2,243.64 | $1,694.35 | $317.78 | $12,249.46 |
| Total Verification fees | | $0.00 | $2,091.16 | $2,228.45 | $2,211.17 | $1,462.91 | $2,243.64 | $1,694.35 | $317.78 | $12,249.46 |
| 55551-152180 | Appraisal expense - impounded | $0.00 | $150.00 | ($150.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Appraisal fees | | $0.00 | $150.00 | ($150.00) | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 55600-152180 | Credit report expense | $0.00 | $142.26 | $2,594.01 | $1,531.19 | $1,275.15 | $1,303.03 | $1,393.94 | $1,915.57 | $10,155.15 |
| Total Credit reports | | $0.00 | $142.26 | $2,594.01 | $1,531.19 | $1,275.15 | $1,303.03 | $1,393.94 | $1,915.57 | $10,155.15 |
| 55700-152180 | Late / penalty | $0.00 | $0.00 | $0.00 | $20.01 | $0.00 | $0.00 | $0.00 | $5.91 | $25.92 |
| Total Late fees and penalties | | $0.00 | $0.00 | $0.00 | $20.01 | $0.00 | $0.00 | $0.00 | $5.91 | $25.92 |
| 60100-152180 | Salary and wages | $13,549.42 | $14,545.05 | $15,286.39 | $17,194.42 | $6,976.02 | $8,918.00 | $9,092.02 | $8,418.00 | $93,979.32 |
| Total Salary and wages | | $13,549.42 | $14,545.05 | $15,286.39 | $17,194.42 | $6,976.02 | $8,918.00 | $9,092.02 | $8,418.00 | $93,979.32 |
| 60450-152180 | Bonus - employee | $525.00 | $4,185.00 | $2,330.00 | $1,670.00 | $13,116.16 | $8,563.11 | $6,422.95 | $7,535.32 | $44,347.54 |
| Total Employee bonus | | $525.00 | $4,185.00 | $2,330.00 | $1,670.00 | $13,116.16 | $8,563.11 | $6,422.95 | $7,535.32 | $44,347.54 |
| 61000-152180 | Rent expense | $2,740.78 | $2,453.28 | $140.78 | $2,140.78 | $2,140.78 | $2,140.78 | $2,140.78 | $4,260.81 | $18,158.77 |
| Total Rent expense | | $2,740.78 | $2,453.28 | $140.78 | $2,140.78 | $2,140.78 | $2,140.78 | $2,140.78 | $4,260.81 | $18,158.77 |
| 61100-152180 | License and permits | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $100.00 | $0.00 | $0.00 | $100.00 |
| Total License and permits | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $100.00 | $0.00 | $0.00 | $100.00 |
| ( )-152180 | Office supplies & expense | $0.00 | $135.34 | $0.00 | $128.01 | $0.00 | $80.04 | $192.95 | $462.15 | $998. |
| Total Office supplies & expense | | $0.00 | $135.34 | $0.00 | $128.01 | $0.00 | $80.04 | $192.95 | $462.15 | $998.49 |
| 61380-152180 | Couriers & shipping | $0.00 | $54.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $54.25 |
| Total Couriers & shipping | | $0.00 | $54.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $54.25 |
| 61900-152180 | Dues and subscriptions | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total Dues and subscriptions | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 62200-152180 | Utilities | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $149.50 | $149.50 |
| Total Utilities | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $149.50 | $149.50 |
| 62210-152180 | Internet service | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $600.19 | $357.20 | $957.39 |
| Total Internet service | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $600.19 | $357.20 | $957.39 |
| 62250-152180 | Telephone | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,862.24 | $2,862.24 |
| Total Telephone | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $2,862.24 | $2,862.24 |
| 62310-152180 | Health insurance | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $78.81 | $78.81 |
| Total Life and health insurance | | ($626.48) | ($993.17) | ($1,627.02) | ($368.39) | ($1,100.20) | $1,150.98 | $1,266.49 | $1,240.63 | ($1,057.16) |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000041

| Account | Description | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| §3100-152180 | Depreciation expense | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,176.37 | $1,176.37 |
| Total Depreciation expense | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,176.37 | $1,176.37 |
| 64100-152180 | Payroll tax expense | $1,916.48 | $5,981.28 | $3,665.27 | $3,202.78 | $4,289.73 | $1,784.12 | $1,279.12 | $2,162.56 | $24,281.34 |
| Total Payroll tax expense | | $1,916.48 | $5,981.28 | $3,665.27 | $3,202.78 | $4,289.73 | $1,784.12 | $1,279.12 | $2,162.56 | $24,281.34 |
| 65600-152180 | Meals and entertainment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $19.00 | $0.00 | $0.00 | $19.00 |
| Total Meals and entertainment | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $19.00 | $0.00 | $0.00 | $19.00 |
| 66000-152180 | Computer expense | $0.00 | $0.00 | $0.00 | $0.00 | $29.22 | $0.00 | $0.00 | $0.00 | $29.22 |
| Total Computer expense | | $0.00 | $0.00 | $0.00 | $0.00 | $29.22 | $0.00 | $0.00 | $0.00 | $29.22 |
| 67100-152180 | Seminar and training | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $348.00 | $0.00 | $0.00 | $348.00 |
| Total Seminar and training | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $348.00 | $0.00 | $0.00 | $348.00 |
| 70100-152180 | Advertising & marketing expense | $15,000.00 | $17,660.00 | $15,000.00 | $0.00 | $30,555.05 | $18,475.79 | $15,400.00 | $15,256.55 | $127,347.39 |
| Total Advertising & marketing expense | | $15,000.00 | $17,660.00 | $15,000.00 | $0.00 | $30,555.05 | $18,475.79 | $15,400.00 | $15,256.55 | $127,347.39 |
| '-152180 | Corporate per file fees  *$150/file* | $0.00 | $2,700.00 | $2,100.00 | $1,950.00 | $3,900.00 | $2,100.00 | $1,650.00 | $2,550.00 | $16,950. |
| Total Corporate per file fees | | $0.00 | $2,700.00 | $2,100.00 | $1,950.00 | $3,900.00 | $2,100.00 | $1,650.00 | $2,550.00 | $16,950. |
| 68500-152180 | Corporate allocation expense  *25 bp / 12.5 bp* | $0.00 | $12,839.95 | $9,645.76 | $10,060.93 | $8,341.59 | $6,133.65 | $5,054.22 | $5,833.52 | $57,909.62 |
| Total Corporate allocation - volume based | | $0.00 | $12,839.95 | $9,645.76 | $10,060.93 | $8,341.59 | $6,133.65 | $5,054.22 | $5,833.52 | $57,909.62 |
| Total Expense | | $33,652.77 | $127,600.04 | $87,945.60 | $72,024.09 | $157,751.50 | $101,846.26 | $84,500.01 | $101,136.91 | $766,457.18 |

| Grand Total | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ($33,652.77) | $23,477.47 | ($21,270.51) | ($15,557.51) | ($12,208.83) | ($12,913.16) | ($10,667.37) | $3,636.88 | ($79,155.80) |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000042

APPLICANT'S EXHIBIT NO. 32

| January | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (180bp) | Orig Fee | Disc | YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mauldin | 209,000 | 5.250 | 95.000 | Conv | 1/9/2014 | 99.805 | $3,762 | $0 | $407.55 | $0.00 | $500.00 | $3,262.00 | $0.00 | $3,262.00 |
| 2 | Ducat | 274,411 | 4.500 | 90.00 | Conv | 1/24/2014 | 99.420 | $4,939 | $2,744 | $1,591.58 | $0.00 | $3.13 | $7,680.38 | $0.00 | $7,680.38 |
| 3 | Giandana | 250,029 | 4.625 | 80.00 | Conv | 1/29/2014 | 99.181 | $4,501 | $0 | $2,047.74 | $0.00 | $1,422.67 | $3,077.85 | $0.00 | $3,077.85 |
| 4 | Runge | 287,920 | 4.875 | 80.00 | Conv | 1/14/2014 | 99.831 | $5,183 | $0 | $486.58 | $0.00 | $0.00 | $5,182.56 | $0.00 | $5,182.56 |
| 5 | Acevedo | 228,969 | 5.125 | 95.00 | Conv | 1/23/2014 | 99.978 | $4,121 | $0 | $50.37 | $0.00 | $0.00 | $4,121.44 | $0.00 | $4,121.44 |
| 6 | Segura Jr. | 175,491 | 5.250 | 90.00 | Conv | 1/31/2014 | 99.984 | $3,159 | $0 | $28.08 | $0.00 | $0.00 | $3,158.84 | $0.00 | $3,158.84 |
| Totals | | 1,425,820 | | | | | | $25,664.76 | $2,744.11 | $4,611.91 | $0.00 | $1,925.80 | $26,483.07 | $0.00 | $26,483.07 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000730

Applicant's
Injunction Hearing
Exhibit 032

28,408



EXHIBIT
88
4-2015 KW

| February | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Disc | YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Palladino | 357,159 | 4.375 | 101.76 | USDA | 2/3/2014 | | $4,500 | $0 | $0.00 | $1,771.51 | $0.00 | $6,271.51 | $0.00 | $6,271.51 |
| 2 | Thomas | 286,246 | 4.375 | 100.00 | VA | 2/3/2014 | | $4,500 | $0 | $0.00 | $1,731.79 | $0.00 | $6,231.79 | $0.00 | $6,231.79 |
| 3 | Newton | 260,000 | 3.500 | 64.67 | Portfolio | 2/10/2014 | | $3,075 | $0 | $0.00 | $0.00 | $0.00 | $3,075.00 | $0.00 | $3,075.00 |
| 4 | Bentley | 237,383 | 4.500 | 78.50 | Conv | 2/11/2014 | | $3,561 | $0 | $0.00 | $0.00 | $99.70 | $3,461.05 | $1,186.92 | $4,647.96 |
| 5 | Pradhan | 280,000 | 3.625 | 43.70 | Conv | 2/12/2014 | | $4,500 | $0 | $0.00 | $1,005.20 | $1,936.40 | $3,568.80 | $0.00 | $3,568.80 |
| 6 | Haygood | 231,470 | 4.250 | 95.00 | FHA | 2/13/2014 | | $3,472 | $0 | $0.00 | $168.97 | $0.00 | $3,641.02 | $2,893.38 | $6,534.40 |
| 7 | Adams | 231,442 | 4.625 | 80.00 | Conv | 2/14/2014 | | $3,472 | $0 | $0.00 | $1,150.27 | $0.00 | $4,621.90 | $1,157.21 | $5,779.11 |
| 8 | Nguyen | 233,292 | 4.250 | 80.00 | FHA | 2/14/2014 | | $3,499 | $0 | $0.00 | $0.00 | $323.61 | $3,175.74 | $2,916.15 | $6,091.89 |
| 9 | Osborne | 240,619 | 4.750 | 100.00 | VA | 2/14/2014 | | $3,609 | $0 | $0.00 | $887.88 | $87.74 | $4,409.43 | $3,007.74 | $7,417.17 |
| 10 | Furgerson | 126,000 | 4.750 | 80.00 | Conv | 2/18/2014 | | $1,890 | $0 | $0.00 | $554.40 | $0.00 | $2,444.40 | $630.00 | $3,074.40 |
| 11 | Cantu | 294,500 | 4.875 | 95.00 | Conv | 2/21/2014 | | $4,418 | $0 | $0.00 | $256.22 | $0.00 | $4,673.72 | $1,472.50 | $6,146.22 |
| 12 | Bollampally | 332,634 | 4.500 | 95.00 | Conv | 2/24/2014 | | $4,990 | $0 | $0.00 | $0.00 | $1,182.00 | $3,807.51 | $1,663.17 | $5,470.68 |
| 13 | Cobb | 148,500 | 3.375 | 61.24 | Conv | 2/24/2014 | | $2,278 | $0 | $0.00 | $0.00 | $75.24 | $2,152.26 | $742.50 | $2,894.76 |
| 14 | Myers | 372,339 | 4.375 | 100.00 | VA | 2/25/2014 | | $4,500 | $0 | $0.00 | $0.00 | $85.64 | $4,414.36 | $0.00 | $4,414.36 |
| 15 | Mokhtar | 417,000 | 5.125 | 77.66 | Conv | 2/25/2014 | | $6,255 | $0 | $0.00 | $0.00 | $350.28 | $5,904.72 | $2,085.00 | $7,989.72 |
| 16 | Hobbs | 292,471 | 5.125 | 80.00 | Conv | 2/26/2014 | | $4,500 | $0 | $0.00 | $0.00 | $81.98 | $4,418.02 | $0.00 | $4,418.02 |
| 17 | Otto | 247,857 | 4.750 | 80.00 | Conv | 2/26/2014 | | $3,718 | $0 | $0.00 | $2,094.39 | $1,019.40 | $4,792.85 | $1,239.29 | $6,032.13 |
| 18 | Gardinier | 280,603 | 4.500 | 80.00 | Conv | 2/27/2014 | | $4,209 | $0 | $0.00 | $75.76 | $200.00 | $4,084.81 | $1,403.02 | $5,487.82 |
| 19 | Muck | 251,363 | 4.250 | 96.50 | FHA | 2/27/2014 | | $3,770 | $0 | $0.00 | $1,123.59 | $0.00 | $4,894.04 | $3,142.04 | $8,036.08 |
| 20 | Kastak | 417,000 | 4.625 | 47.99 | Conv | 2/28/2014 | | $6,255 | $0 | $0.00 | $2,735.52 | $2,572.90 | $6,417.62 | $2,085.00 | $8,502.62 |
| 21 | Warren | 293,400 | 5.125 | 90.00 | Conv | 2/28/2014 | | $4,401 | $0 | $0.00 | $935.95 | $0.00 | $5,336.95 | $1,467.00 | $6,803.95 |
| 22 | Box | 179,550 | 4.500 | 95.00 | Conv | 2/28/2014 | | $2,693 | $0 | $0.00 | $0.00 | $0.00 | $2,693.25 | $897.75 | $3,591.00 |
| 23 | Hong | 97,500 | 3.625 | 70.91 | Conv | 2/28/2014 | | $1,463 | $0 | $0.00 | $757.58 | $250.00 | $1,970.08 | $487.50 | $2,457.58 |
| 24 | Lee | 96,000 | 3.625 | 80.00 | Conv | 2/28/2014 | | $1,440 | $0 | -$0.00 | $423.36 | $250.00 | $1,613.36 | $480.00 | $2,093.36 |
| Totals | | 6,204,328 | | | | | | $90,917 | $0 | $0 | $15,672.39 | $8,514.92 | $98,074.16 | $28,956.15 | $127,030.31 |

| | | | |
|---|---|---|---|
| 1 | FURGERSON | y | 126,000 KJ |
| 2 | HAYGOOD | y | 231,470 KJ |
| 3 | MOKHTAR | y | 417,000 KJ |
| 4 | BENTLEY | y | 237,383 MN |
| 5 | BOLLAMPALLY | y | 332,634 MN |
| 6 | BOX | y | 179,550 MN |
| 7 | CANTU | y | 294,500 MN |
| 8 | GARDINIER | y | 280,603 MN |
| 9 | HOBBS | y | 292,471 MN |
| 10 | KASTAK | y | 417,000 MN |
| 11 | MUCK | y | 251,363 MN |
| 12 | MYERS | y | 372,339 MN |
| 13 | NEWTON | y | 260,000 MN |
| 14 | NGUYEN | y | 233,292 MN |
| 15 | OSBORNE | y | 240,619 MN |
| 16 | OTTO | y | 247,857 MN |
| 17 | RAJINA, PRADHAN | y | 280,000 MN |
| 18 | COBB | y | 148,500 MT |
| 19 | WARREN | y | 293,400 MT |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000731

175,544

| March | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Disc | Overage YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | O'Neal | 142,500 | | | Conv | 3/4/2014 | | $2,138 | $0.00 | $0.00 | $0.00 | $699.00 | $1,438.50 | $712.50 | $2,151.00 |
| 2 | Kimpel | 240,138 | | | Conv | 3/5/2014 | | $3,602 | $0.00 | $0.00 | $0.00 | $302.57 | $3,299.50 | $1,200.69 | $4,500.19 |
| 3 | Paredes | 88,000 | | | Conv | 3/7/2014 | | $1,320 | $0.00 | $0.00 | $0.00 | $0.00 | $1,320.00 | $440.00 | $1,760.00 |
| 4 | Avery | 301,260 | | | VA | 3/12/2014 | | $4,519 | $0.00 | $0.00 | $1,418.93 | $0.00 | $5,937.83 | $3,765.75 | $9,703.58 |
| 5 | Shupe | 168,036 | | | VA | 3/14/2014 | | $2,521 | $0.00 | $0.00 | $725.92 | $0.00 | $3,246.46 | $2,100.45 | $5,346.91 |
| 6 | Silva | 338,267 | | | Conv | 3/18/2014 | | $5,074 | $0.00 | $0.00 | $104.86 | $2,000.00 | $3,178.87 | $1,691.34 | $4,870.20 |
| 7 | Hackney | 400,000 | | | Portfolio | 3/20/2014 | | $4,000 | $0.00 | $0.00 | $0.00 | $0.00 | $4,000.00 | $0.00 | $4,000.00 |
| 8 | Carmichael | 191,973 | | | Conv | 3/21/2014 | | $2,880 | $0.00 | $0.00 | $879.24 | $0.00 | $3,758.84 | $959.87 | $4,718.70 |
| 9 | Brown | 245,658 | | | VA | 3/25/2014 | | $3,685 | $0.00 | $0.00 | $545.36 | $0.00 | $4,230.23 | $3,070.73 | $7,300.96 |
| 10 | Beard | 200,000 | | | Conv | 3/26/2014 | | $3,000 | $0.00 | $0.00 | $0.00 | $1,066.00 | $1,934.00 | $1,000.00 | $2,934.00 |
| 11 | Calvert | 417,000 | | | Conv | 3/27/2014 | | $6,255 | $0.00 | $0.00 | $0.00 | $783.96 | $5,471.04 | $2,085.00 | $7,556.04 |
| 12 | McCaskill | 234,800 | | | Conv | 3/27/2014 | | $3,522 | $0.00 | $0.00 | $0.00 | $0.00 | $3,522.00 | $1,174.00 | $4,696.00 |
| 13 | Kelly, Jr | 255,200 | | | Conv | 3/27/2014 | | $3,828 | $0.00 | $0.00 | $0.00 | $0.00 | $3,828.00 | $1,276.00 | $5,104.00 |
| 14 | Williams | 302,706 | | | VA | 3/28/2014 | | $4,541 | $0.00 | $0.00 | $1,477.21 | $0.00 | $6,017.80 | $3,783.83 | $9,801.63 |
| 15 | Wolfer | 315,766 | | | Conv | 3/28/2014 | | $4,736 | $0.00 | $0.00 | $795.73 | $0.00 | $5,532.22 | $1,578.83 | $7,111.05 |
| 16 | Callaway | 417,000 | | | Conv | 3/31/2014 | | $6,255 | $0.00 | $0.00 | $1,517.88 | $1,665.40 | $6,107.48 | $2,085.00 | $8,192.48 |
| Totals | | 4,258,304 | | | | | | $61,875 | | | $7,465.13 | $6,516.93 | $62,822.76 | $26,923.97 | $89,746.73 |

| 1 | PAREDES | 88,000 y |
|---|---|---|
| 2 | AVERY | 301,260 y |
| 3 | BEARD | 200,000 y |
| 4 | BROWN | 245,658 y |
| 5 | CALLAWAY | 417,000 y |
| 6 | CALVERT | 417,000 y |
| 7 | CARMICHAEL | 191,973 y |
| 8 | KIMPEL | 240,138 y |
| 9 | MCCASKILL | 234,800 y |
| 10 | O'NEAL | 142,500 y |
| 11 | SHUPE | 168,036 y |
| 12 | SILVA | 338,267 y |
| 13 | WILLIAMS | 302,706 y |
| 14 | WOLFER | 315,766 y |
| 15 | KELLY, JR | 255,200 y |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000732

| April | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | oss Fee (15 | Orig Fee | Discount | Overage YSP | Less Credits | Net Fee | Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Hernandez | 328,579 | | | Conv | 4/3/2014 | | $4,929 | $0 | $0 | $0.00 | $1,610.04 | $3,318.65 | $1,642.90 | $4,961.54 |
| 2 | Oster | 290,403 | | | FHA | 4/28/2014 | | $4,356 | $0 | $0 | $990.27 | $0.00 | $5,346.32 | $3,630.04 | $8,976.35 |
| 3 | Kim | 329,267 | | | Conv | 4/25/2014 | | $4,500 | $0 | $0 | $6,476.68 | $5,597.54 | $5,379.14 | $0.00 | $5,379.14 |
| 4 | Bythewood | 124,800 | | | Conv | 4/25/2014 | | $1,872 | $0 | $0 | $52.42 | $0.00 | $1,924.42 | $624.00 | $2,548.42 |
| 5 | Gray | 380,000 | | | Conv | 4/17/2014 | | $5,700 | $0 | $0 | $0.00 | $1,484.77 | $4,215.23 | $1,900.00 | $6,115.23 |
| 6 | Craig | 301,750 | | | FHA | 4/21/2014 | | $4,500 | $0 | $0 | $3,898.61 | $0.00 | $8,398.61 | $0.00 | $8,398.61 |
| 7 | Liljegren | 264,000 | | | Conv | 4/17/2014 | | $3,960 | $0 | $0 | $0.00 | $132.00 | $3,828.00 | $1,320.00 | $5,148.00 |
| 8 | Brazener | 202,070 | | | Conv | 4/25/2014 | | $3,031 | $0 | $0 | $0.00 | $322.26 | $2,708.79 | $1,010.35 | $3,719.14 |
| 9 | Cohen | 322,500 | | | Conv | 4/21/2014 | | $4,838 | $0 | $0 | $528.90 | $0.00 | $5,366.40 | $1,612.50 | $6,978.90 |
| 10 | Seymour | 218,367 | | | USDA | 5/1/2014 | | $3,276 | $0 | $0 | $72.05 | $0.00 | $3,347.57 | $2,729.59 | $6,077.15 |
| 11 | Hatt | 277,285 | | | FHA | 4/23/2014 | | $4,159 | $0 | $0 | $815.22 | $2,076.40 | $2,898.10 | $3,466.06 | $6,364.16 |
| 12 | Cash | 293,600 | | | Conv | 4/29/2014 | | $4,404 | $0 | $0 | $0.00 | $2,726.26 | $1,677.74 | $1,468.00 | $3,145.74 |
| 13 | Rhinehart | 291,750 | | | Conv | 4/21/2014 | | $4,376 | $0 | $0 | $0.00 | $242.15 | $4,134.10 | $1,458.75 | $5,592.85 |
| Totals | | 3,624,371 | | | | | | $53,900 | $0 | $0 | $12,834.16 | $14,191.42 | $52,543.05 | $20,862.18 | $73,405.23 |

1 BRAZENER
2 BYTHEWOOD
3 CRAIG
4 GRAY
5 HERNANDEZ
6 KIM
7 LILJEGREN
8 OSTER
9 CASH
10 COHEN
11 HACKNEY
12 HATT
13 RHINEHART
14 SEYMOUR

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000733

87,596

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000734

| | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Discount | Overage YSP | Loss Credits | Net Fee | Branch Margin Conv 55bp Govt 125bp | Total Net Fee | Expected Branch Rev Total | Branch Margin Variance | LPR 10-14 Total Rev | N-4 Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Wolfshohl - locked 4/17 | 218,984 | | | Conv | 8/8/2014 | | $3,234 | $0 | $0 | $8.63 | $0.00 | $1,749.53 | $693.90 | $3,736.43 | $4,320.89 | $584.07 | $4,212.70 | $107.83 |
| 2 | Alangad | 417,000 | | | Conv | 5/1/2014 | | $6,255 | $0 | $0 | 1,522.05 | $1,944.50 | $5,032.15 | $2,885.00 | $7,917.15 | | | | |
| 3 | O'Neal - locked 4/28 | 305,782 | | | Conv | 5/1/2014 | | $4,588 | $0 | $0 | $0.00 | $168.10 | $5,031.82 | $458.67 | $4,789.49 | $5,640.73 | $1,070.24 | $4,790.49 | $1,070.24 |
| 4 | Bisley - locked 4/17 | 263,580 | | | Conv | 6/1/2014 | | $4,588 | $0 | $0 | $250.58 | $2,000.00 | $5,024.94 | $894.73 | $8,418.71 | $4,338.73 | $921.02 | $5,418.70 | $921.93 |
| 5 | Tinsley Jr. | 164,000 | | | VA | 5/9/2014 | | $2,460 | $0 | $0 | $732.12 | $0.00 | $3,252.17 | $2,059.00 | $5,522.12 | | | | |
| 6 | Phil | 101,000 | | | Conv | 5/9/2014 | | $1,515 | $0 | $0 | $0.00 | $241.35 | $1,273.61 | $131.597 | $1,423.11 | $1,778.61 | $253.50 | $1,728.11 | $50.50 |
| 7 | Hernandez | 310,000 | | | Conv | 6/13/2014 | | $4,661 | $0 | $0 | $0.00 | $1,530.51 | $3,051.16 | $1,524.40 | $4,607.56 | | | | |
| 8 | Shoenfelt | 181,600 | | | Conv | 5/6/2014 | | $2,724 | $0 | $0 | $1,594.76 | $1,500.00 | $2,819.22 | $272.40 | $3,092.66 | $3,718.26 | $635.60 | $3,037.48 | $190.50 |
| 9 | Stevens | 318,358 | | | Conv | 5/15/2014 | | $4,588 | $0 | $0 | $0.00 | $263.12 | $3,935.84 | $474.84 | $4,411.42 | $5,618.67 | $1,307.25 | $4,411.42 | $1,197.25 |
| 10 | Foltz | 281,846 | | | Conv | 5/9/2014 | | $4,588 | $0 | $0 | $1,862.37 | $5,564.79 | $1,808.88 | $432.58 | $2,283.38 | $3,269.21 | $985.83 | $2,283.38 | $985.83 |
| 11 | Lee | 104,172 | | | Conv | 6/4/2014 | | $1,523 | $0 | $0 | $372.86 | $0.00 | $1,865.44 | $530.85 | $1,396.38 | | | | |
| 12 | Lim | 91,350 | | | Conv | 6/14/2014 | | $1,370 | $0 | $0 | $92.26 | $0.00 | $1,462.51 | $496.75 | $1,959.26 | | | | |
| 13 | Lozano | 321,843 | | | | | | | | | | | | | | | | | |
| 14 | Branch | | | | VA | 5/19/2014 | | $6,900 | $0 | $0 | $5,412.45 | $0.00 | $9,912.45 | $2,909.03 | $12,841.58 | $13,925.48 | $1,113.90 | $12,841.80 | $1,113.89 |
| 15 | Hrynyk | 318,750 | | | Conv | 5/20/2014 | | $3,281 | $0 | $0 | $90.66 | $0.00 | $5,581.85 | $1,593.75 | $7,175.60 | | | | |
| 16 | Cobb | 217,920 | | | Conv | 5/20/2014 | | $3,269 | $0 | $0 | $0.00 | $726.54 | $2,994.72 | $1,089.64 | $4,081.87 | | | | |
| 17 | Green | 417,000 | | | Conv | 5/20/2014 | | $6,255 | $0 | $0 | $0.00 | $7,101.90 | $4,153.10 | $2,085.00 | $6,238.10 | | | | |
| 18 | Lee | 256,156 | | | Conv | 5/22/2014 | | $3,841 | $0 | $0 | 336.51 | $200.60 | $4,019.55 | $1,280.98 | $5,300.53 | | | | |
| 19 | Lozano | 145,000 | | | Conv | 5/22/2014 | | $2,175 | $1,453 | $0 | $0.00 | $1,699.43 | $1,925.60 | $725.00 | $2,650.50 | | | | |
| 20 | Lamm | 200,000 | | | Conv | 5/22/2014 | | $3,000 | $0 | $0 | $1,110.00 | $0.00 | $4,110.00 | $1,000.00 | $5,110.00 | | | | |
| 21 | Gladney | 147,989 | | | Conv | 5/23/2014 | | $2,060 | $0 | $0 | $0.00 | $455.77 | $2,303.78 | $295.98 | $2,599.73 | $3,290.39 | $690.67 | $3,161.63 | $93.08 |
| 22 | Baricuatro | 314,524 | | | Conv | 5/23/2014 | | $4,500 | $0 | $0 | $1,791.48 | $3,42660 | $2,878.48 | $471.79 | $2,347.57 | $3,448.10 | $1,100.63 | $2,347.27 | $1,100.63 |
| 23 | Hulbert | 252,012 | | | Conv | 5/23/2014 | | $3,780 | $0 | $0 | $0.00 | $3.00 | $3,780.18 | $1,263.06 | $5,045.24 | | | | |
| 24 | Forrest | 279,252 | | | FHA | 5/23/2014 | | $4,189 | $0 | $0 | $1,929.30 | $3.00 | $5,118.08 | $13,492.65 | $3,608.73 | | | | |
| 25 | Tuccianone | 130,000 | | | Conv | 5/27/2014 | | $1,650 | $0 | $0 | $0.00 | $3,300.00 | $1,350.00 | $550.00 | $600.00 | | | | |
| 26 | Carmichael | 203,974 | | | Conv | 5/28/2014 | | $3,060 | $0 | $0 | $0.00 | $500.00 | $2,829.61 | $309.96 | $3,188.97 | $3,875.48 | $713.51 | $3,777.49 | $101.99 |
| 27 | Nelson | 322,440 | | | Conv | 5/29/2014 | | $4,847 | $0 | $0 | $498.04 | $0.00 | $5,369.64 | $1,547.24 | $7,076.84 | | | | |
| Totals | | 6,892,016 | | | | | | $109,834 | | | $21,870.99 | $29,491.67 | $97,762.57 | $28,050.24 | $129,813.61 | $61,593.67 | $8,376.80 | $45,437.16 | $12,864.42 |

1 ALANGAD  
2 BAILEY  
3 BARICUATRO  
4 BRANCH  
5 CARMICHAEL  
6 FOLTZ  
7 FORREST  
8 GLADNE  
9 GREEN  
10 HERNANDEZ  
11 HULBERT  
12 LEE  
13 LOZANO  
14 NELSON  

15 O'NEAL  
16 PHI  
17 SHOENFELT  
18 STEVENS  
19 TINGLEY  
20 TUCCIANONE  
21 WOLFSHOHL  
22 COBB  
23 FROELICH  
24 HRYNYK  
25 LAMM  
26 LEE  
27 LIM  
28 ROMANYK

| May | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Discount | Overage YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Wolfshohl | 215,594 | | | Conv | 5/8/2014 | | $3,231 | $0 | $0 | $1.62 | $0.00 | $3,242.53 | $1,077.97 | $4,320.50 |
| 2 | Alamgari | 417,000 | | | Conv | 5/1/2014 | | $6,255 | $0 | $0 | 1,522.05 | $1,914.90 | $5,832.15 | $2,085.00 | $7,917.15 |
| 3 | O'Neal | 309,782 | | | Conv | 5/1/2014 | | $4,500 | $0 | $0 | $0.00 | $158.18 | $4,331.82 | $0.00 | $4,331.82 |
| 4 | Bailey | 293,150 | | | Conv | 5/7/2014 | | $4,500 | $0 | $0 | $2,520.98 | $2,090.00 | $5,070.98 | $0.00 | $5,070.98 |
| 5 | Tinsley Jr. | 184,000 | | | VA | 5/6/2014 | | $2,460 | $0 | $0 | $792.12 | $0.00 | $3,252.12 | $2,050.00 | $5,302.12 |
| 6 | Phi | 101,000 | | | Conv | 5/9/2014 | | $1,515 | $0 | $0 | $0.00 | $241.39 | $1,273.61 | $505.00 | $1,778.61 |
| 7 | Hernandez | 310,880 | | | Conv | 6/12/2014 | | $4,663 | $0 | $0 | $0.00 | $1,610.04 | $3,053.16 | $1,554.40 | $4,607.56 |
| 8 | Shoenfelt | 181,600 | | | Conv | 5/2/2014 | | $2,724 | $0 | $0 | $1,596.26 | $1,500.00 | $2,820.26 | $908.00 | $3,728.26 |
| 9 | Stevens | 316,958 | | | Conv | 5/15/2014 | | $4,500 | $0 | $0 | $0.00 | $563.12 | $3,936.88 | $0.00 | $3,936.88 |
| 10 | Foltz | 281,666 | | | Conv | 5/5/2014 | | $4,500 | $0 | $0 | $3,067.27 | $6,596.33 | $1,860.81 | $0.00 | $1,860.68 |
| 11 | LEE | 106,172 | | | Conv | 5/6/2014 | | $1,593 | $0 | $0 | $272.86 | $0.00 | $1,865.44 | $530.86 | $2,396.30 |
| 12 | Lim | 91,350 | | | Conv | 5/14/2014 | | $1,370 | $0 | $0 | $92.26 | $0.00 | $1,462.51 | $456.75 | $1,919.26 |
| 13 | FROELICH | 340,000 | | | Portfolio | 5/14/2014 | | $3,400 | $0 | $0 | $0.00 | $0.00 | $3,400.00 | $0.00 | $3,400.00 |
| 14 | Branch | 321,843 | | | VA | 5/19/2014 | | $4,500 | $0 | $0 | $5,342.45 | $0.00 | $9,842.45 | $0.00 | $9,842.45 |
| 15 | Hrynyk | 318,750 | | | Conv | 5/20/2014 | | $4,781 | $0 | $0 | $800.60 | $0.00 | $5,581.85 | $1,593.75 | $7,175.60 |
| 16 | Cobb | 217,920 | | | Conv | 5/20/2014 | | $3,269 | $0 | $0 | $0.00 | $274.53 | $2,994.22 | $1,089.60 | $4,083.82 |
| 17 | Green | 417,000 | | | Conv | 5/20/2014 | | $6,255 | $0 | $0 | $0.00 | $2,101.90 | $4,153.10 | $2,085.00 | $6,238.10 |
| 18 | Lee | 256,196 | | | Conv | 5/22/2014 | | $3,843 | $0 | $0 | 376.61 | $720.00 | $4,019.55 | $1,280.98 | $5,300.53 |
| 19 | Lozano | 145,000 | | | Conv | 5/22/2014 | | $2,175 | $1,450 | $0 | $0.00 | $1,659.40 | $1,925.63 | $725.00 | $2,650.60 |
| 20 | Lamm | 200,000 | | | Conv | 5/23/2014 | | $3,000 | $0 | $0 | $1,110.00 | $0.00 | $4,110.00 | $1,000.00 | $5,110.00 |
| 21 | Gladney | 197,303 | | | Conv | 5/23/2014 | | $2,960 | $0 | $0 | $0.00 | $655.77 | $2,303.78 | $986.52 | $3,293.29 |
| 22 | Baricuatro | 314,524 | | | Conv | 5/23/2014 | | $4,500 | $0 | $0 | $0.00 | $0.00 | $4,500.00 | $0.00 | $4,500.00 |
| 23 | Hulbert | 252,012 | | | Conv | 5/23/2014 | | $3,780 | $0 | $0 | $0.00 | $0.00 | $3,780.18 | $1,260.06 | $5,040.24 |
| 24 | Forrest | 279,252 | | | FHA | 5/23/2014 | | $4,189 | $0 | $0 | $1,929.30 | $0.00 | $6,118.03 | $3,490.65 | $9,608.73 |
| 25 | TUCCIARONE | 110,000 | | | Conv | 5/27/2014 | | $1,650 | $0 | $0 | $0.00 | $3,000.00 | -$1,350.00 | $550.00 | -$800.00 |
| 26 | Carmichael | 203,974 | | | Conv | 5/28/2014 | | $3,060 | $0 | $0 | $0.00 | $200.00 | $2,859.61 | $1,019.87 | $3,879.48 |
| 27 | Nelson | 329,440 | | | Conv | 5/29/2014 | | $4,947 | $0 | $0 | $448.04 | $0.00 | $5,369.64 | $1,647.20 | $7,036.84 |
| 28 | Romanyk | 224,250 | | | Portfolio | 5/30/2014 | | $2,718 | $0 | $0 | $0.00 | $0.00 | $2,717.50 | $0.00 | $2,717.50 |
| Totals | | 6,882,016 | | | | | | $100,834 | | | $20,679.42 | $22,665.67 | $100,297.89 | $25,896.61 | $126,194.50 |

1 ALAMGARI
2 BAILEY
3 BARICUATRO
4 BRANCH
5 CARMICHAEL
6 FOLTZ
7 FORREST
8 GLADNE
9 GREEN
10 HERNANDEZJ
11 HULBERT
12 LEE
13 LOZANO
14 NELSON

15 O'NEAL
16 PHI
17 SHOENFELT
18 STEVENS
19 TINSLEYJ
20 TUCCIARONE
21 WOLFSHOHL
22 COBB
23 FROELICH
24 HRYNYK
25 LAMM
26 LEE
27 LIM
28 ROMANYK

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000735

148,859

| June | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Discount | Overage YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Mossman | 322,413 | | | Conv | 8/2/2014 | | $4,500 | $0.00 | $0.00 | $1,025.27 | $0.00 | $5,525.27 | $0.00 | $5,525.27 |
| 2 | Wilson | 252,398 | | | Portfolio | 6/8/2014 | | $2,368 | $0.00 | $0 | $0.00 | $0.00 | $2,367.99 | $0.00 | $2,367.99 |
| 3 | Gencheva | 103,200 | | | Portfolio | 6/9/2014 | | $1,507 | $0.00 | $0 | $0.00 | $0.00 | $1,507.00 | $0.00 | $1,507.00 |
| 4 | DiTommaso | 218,801 | | | VA | 6/12/2014 | | $3,282 | $0.00 | $0 | $711.10 | $200.00 | $3,793.12 | $2,735.01 | $6,528.13 |
| 5 | Rigby | 140,180 | | | FHA | 6/13/2014 | | $2,102 | $0.00 | $0 | $1,220.79 | $0.00 | $3,323.19 | $1,752.00 | $5,075.19 |
| 6 | Huckaba | 244,725 | | | Conv | 6/20/2014 | | $3,671 | $0.00 | $0 | $0.00 | $378.65 | $3,292.23 | $1,223.63 | $4,515.85 |
| 7 | Warner | 269,699 | | | Conv | 6/23/2014 | | $4,045 | $0.00 | $0 | $0.00 | $1,818.19 | $2,227.30 | $1,348.50 | $3,575.79 |
| 8 | Dempsey | 300,000 | | | Conv | 6/23/2014 | | $5,850 | $0.00 | $0 | $0.00 | $0.00 | $5,850.00 | $1,950.00 | $7,800.00 |
| 9 | Story | 288,279 | | | Conv | 6/24/2014 | | $4,324 | $0.00 | $0 | $0.00 | $1,655.25 | $2,668.94 | $1,441.40 | $4,110.33 |
| 10 | Mattingly | 206,101 | | | Conv | 6/26/2014 | | $3,092 | $0.00 | $0 | $0.00 | $171.11 | $2,921.31 | $1,030.81 | $3,952.11 |
| 11 | Calvillo | 395,132 | | | VA | 6/27/2014 | | $5,927 | $0.00 | $0 | $324.01 | $200.00 | $6,050.99 | $1,975.66 | $8,026.65 |
| 12 | Cheaney | 254,600 | | | Conv | 6/27/2014 | | $3,819 | $0.00 | $0 | $0.00 | $540.74 | $3,278.26 | $1,273.00 | $4,551.26 |
| 13 | Hazy | 250,000 | | | Conv | 6/30/2014 | | $3,750 | $0.00 | $0 | $762.50 | $0.00 | $4,512.50 | $1,250.00 | $5,762.50 |
| 14 | Molander | 408,302 | | | Conv | 6/30/2014 | | $6,125 | $0.00 | $0 | $0.00 | $1,709.64 | $4,414.89 | $2,041.51 | $6,456.40 |
| 15 | Strickland | 462,000 | | | Conv | 6/30/2014 | | $4,500 | $0.00 | $0 | $0.00 | $7,841.50 | -$3,341.50 | $0.00 | -$3,341.50 |
| 16 | Joyner | 284,047 | | | VA | 6/30/2014 | | $4,261 | $0.00 | $0 | $258.48 | $200.00 | $4,319.19 | $3,550.59 | $7,869.77 |
| 17 | Rieder | 417,000 | | | Conv | 6/30/2014 | | $4,500 | $0.00 | $0 | $0.00 | $2,183.04 | $2,316.96 | $0.00 | $2,316.96 |
| Totals | | 4,906,917 | | | | | | $67,624 | | | $4,302.15 | $16,898.12 | $55,027.61 | $21,572.09 | $76,599.70 |

1 CHEANEY
2 DEMPSEY
3 GENCHEVA
4 HAZY
5 CALVILLO
6 DITOMMASO
7 HUCKABA
8 JOYNER
9 MATTINGLY
10 MOLANDER
11 MOSSMAN
12 RIEDER
13 STORY
14 STRICKLAND
15 WARNER
16 RIGBY
17 WILSON

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000736

July

| | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Discount | Overage YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Asencio | 234,580 | | | Conv | 7/1/2014 | | $3,518 | $0.00 | $0 | $255.67 | $0.00 | $3,774.07 | $1,172.80 | $4,946.87 |
| 2 | Shearn | 282,045 | | | Conv | 7/7/2014 | | $4,231 | $0.00 | $0 | $0.00 | $1,762.53 | $2,468.15 | $1,410.23 | $3,878.37 |
| 3 | Coker | 281,334 | | | FHA HECM | 7/9/2014 | | $0 | $0.00 | $0 | $12,816.21 | $0.00 | $12,816.21 | $0.00 | $12,816.21 |
| 4 | Baker | 101,160 | | | Conv | 7/11/2014 | | $1,517 | $0.00 | $0 | $156.60 | $0.00 | $1,674.20 | $505.80 | $2,180.00 |
| 5 | Sharp Jr | 903,602 | | | JUMBO | 7/11/2014 | | $13,554 | $0.00 | $0 | $0.00 | $5,665.58 | $7,888.45 | $4,518.01 | $12,406.46 |
| 6 | Garwood | 284,803 | | | Conv | 7/16/2014 | | $4,272 | $0.00 | $0 | $469.97 | $1,148.40 | $3,593.52 | $1,424.00 | $5,017.52 |
| 7 | Thomas | 417,000 | | | Conv | 7/18/2014 | | $6,255 | $0.00 | $0 | $0.00 | $0.00 | $6,255.00 | $2,085.00 | $8,340.00 |
| 8 | Blok | 417,000 | | | Conv | 7/23/2014 | | $6,255 | $0.00 | $0 | $0.00 | $1,834.14 | $4,420.86 | $2,085.00 | $6,505.86 |
| 9 | Benedetti | 193,600 | | | Conv | 7/24/2014 | | $2,903 | $0.00 | $0 | $0.00 | $785.10 | $2,637.40 | $967.50 | $3,604.90 |
| 10 | Shaw | 417,000 | | | Conv | 7/25/2014 | | $6,255 | $0.00 | $0 | $0.00 | $2,931.12 | $3,323.88 | $2,085.00 | $5,408.88 |
| 11 | Liesman | 250,376 | | | FHA | 7/31/2014 | | $3,756 | $0.00 | $0 | $0.00 | $1,029.05 | $2,726.59 | $3,129.70 | $5,856.29 |
| 12 | Crawford | 261,000 | | | Conv | 7/31/2014 | | $3,915 | $0.00 | $0 | $1,302.39 | $1,807.40 | $3,609.99 | $1,305.00 | $4,914.99 |
| Totals | | 4,043,377 | | | | | | $56,431 | | | | $16,243.32 | $55,188.32 | $20,688.04 | $75,876.35 |

1 CRAWFORD
2 SHAW
3 THOMAS
4 ASENCIO
5 BAKER
6 BENEDETTI
7 BLOK
8 GARWOOD
9 LIESMAN
10 SHARP
11 SHEARN
12 COKER

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000737

92, 119

| August | Name | Loan Amount | Rate | CLTV | Loan Type | Close Date | Lock Price | Gross Fee (150) | Orig Fee | Discount | Overage YSP | Less Credits | Net Fee | Branch Margin Conv 50bp Govt 125bp | Total Net Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 Ray | 308,582 | | | Conv | 8/4/2014 | | $4,629 | $0.00 | $0 | $0.00 | $506.07 | $4,122.66 | $1,542.91 | $5,665.57 |
| | 2 Basham | 71,500 | | | Conv | 8/6/2014 | | $1,073 | $0.00 | $0 | $0.00 | $0.00 | $1,072.50 | $357.50 | $1,430.00 |
| | 3 Bentley | 248,000 | | | Conv | 8/7/2014 | | $3,720 | $0.00 | $0 | $136.40 | $0.00 | $3,856.40 | $1,240.00 | $5,096.40 |
| | 4 LaFrance | 243,692 | | | VA | 8/7/2014 | | $3,655 | $0.00 | $0 | $0.00 | $1,191.65 | $2,463.73 | $3,046.15 | $5,509.88 |
| | 5 Lantrip | 300,000 | | | Conv | 8/8/2014 | | $4,500 | $0.00 | $0 | $1,470.00 | $1,610.40 | $4,359.60 | $1,500.00 | $5,859.60 |
| | 6 Schalchlin | 244,003 | | | FHA | 8/8/2014 | | $3,660 | $0.00 | $0 | $0.00 | $392.84 | $3,267.21 | $3,050.04 | $6,317.24 |
| | 7 Brooks | 245,100 | | | Conv | 8/8/2014 | | $3,677 | $0.00 | $0 | $0.00 | $762.26 | $2,914.24 | $1,225.50 | $4,139.74 |
| | 8 Matthews | 213,750 | | | Conv | 8/8/2014 | | $3,206 | $0.00 | $0 | $0.00 | $288.46 | $2,917.79 | $1,068.75 | $3,986.54 |
| | 9 Joly | 398,187 | | | Conv | 8/14/2014 | | $5,973 | $0.00 | $0 | $0.00 | $1,322.40 | $4,650.41 | $1,990.91 | $6,641.34 |
| | 10 Shepherd | 312,975 | | | Conv | 8/15/2014 | | $4,695 | $0.00 | $0 | $0.00 | $1,145.49 | $3,549.14 | $1,564.88 | $5,114.01 |
| | 11 Schoonover | 216,600 | | | Conv | 8/18/2014 | | $3,249 | $0.00 | $0 | $1,193.47 | $0.00 | $4,442.47 | $1,083.00 | $5,525.47 |
| | 12 Boone | 400,000 | | | Conv | 8/18/2014 | | $6,000 | $0.00 | $0 | $544.00 | $1,823.40 | $4,720.60 | $2,000.00 | $6,720.60 |
| | 13 Buckner | 227,000 | | | Conv | 8/27/2014 | | $3,405 | $0.00 | $0 | $0.00 | $402.31 | $3,002.69 | $1,135.00 | $4,137.69 |
| | 14 Lais | 216,000 | | | Conv | 8/28/2014 | | $3,240 | $0.00 | $0 | $0.00 | $0.00 | $3,240.00 | $1,080.00 | $4,320.00 |
| | 15 Caplan | 187,423 | | | FHA | 8/29/2014 | | $2,811 | $0.00 | $0 | $110.53 | $1,500.00 | $1,421.93 | $2,342.79 | $3,764.71 |
| | 16 Picanso | 417,000 | | | Conv | 8/29/2014 | | $6,255 | $0.00 | $0 | $1,668.00 | $1,697.40 | $6,225.60 | $2,085.00 | $8,310.60 |
| | 17 Benavides III | 417,000 | | | Conv | 8/29/2014 | | $6,255 | $0.00 | $0 | $0.00 | $0.00 | $4,461.10 | $2,085.00 | $6,546.10 |
| Totals | | 4,666,812 | | | | | | $70,002 | | | | $14,436.58 | $60,688.05 | $28,397.45 | $89,085.50 |

1 BOONE
2 BROOKS
3 CAPLAN
4 SCHOONOVER
5 SHEPHERD
6 BENAVIDES
7 BENTLEY
8 BUCKNER
9 JOLY
10 LAFRANCE
11 LAIS
12 LANTRIP
13 PICANSO
14 RAY
15 SCHALCHLIN
16 BASHAM
17 MATTHEWS

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000738

103,521

APPLICANT'S EXHIBIT NO. 33

# Statement of Income
Year To Date
Ameripro Funding, Inc.
For the period ending: 8/31/2014
By Branch
152180 (Nasserfar)

*"RECONCILED"*
*AMB*

YTD

Income

| | | |
|---|---|---|
| 41100-152180 | Origination fees | 4,194.11 |
| Total Origination fees | | 4,194.11 |
| 41355-152180 | Application fee income | 4,900.00 |
| Total Application fees | | 4,900.00 |
| 41357-152180 | Credit report fee income | 230.94 |
| 55600-152180 | Credit report expense | 10,155.15 |
| Total Credit reports | | 10,386.09 |
| 41380-152180 | Branch admin fee | -550.00 |
| Total Branch administration fees | | -550.00 |
| 41860-152180 | Brokered loan fee income | 29,878.21 |
| Total Brokered loan fees | | 29,878.21 |
| 41880-152180 | Misc production income | 125.00 |
| Total Other fees | | 125.00 |
| 42301-152180 | Premium discount - branch | 263,478.18 |
| Total Premium discount - branch | | 263,478.18 |
| 42300-152180 | Premium discount - lo | 519,270.01 |
| Total Premium discount - lo comp | | 519,270.01 |
| 42400-152180 | Pair-off allocation | 1,771.51 |
| Total Pair-off allocation | | 1,771.51 |
| 68502-152180 | Corporate fees - neo | -500.00 |
| Total Corporate neo fees | | |

*Same* (handwritten)
*Expense or interest was $0* (handwritten)
*Same* (handwritten)
*Same* (handwritten)
*Same* (handwritten)
*Was 222,303* (handwritten)
*was 421,173* (handwritten)
*same* (handwritten)
*same ✓ previously expensed* (handwritten)

Applicant's
Injunction Hearing
Exhibit 033

EXHIBIT
89
4-28-15 KW

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000708

|  |  | YTD |
| --- | --- | --- |
| Total Income |  | 822,797.96 |

Expense

| 52426-152180 | Lender credits - gfe cures | 104,871.27 |
| 52427-152180 | Lender credit - 10% cure | 773.44 |
| Total Lender/broker credits | | 105,644.71 |

*was 86,649 206*

| 52450-152180 | Origination errors expense | 74.00 |
| Total Origination errors | | 74.00 |

| 55110-152180 | Commission expense - loan officers | 300,342.22 |
| Total Commission expense - loan officers | | 300,342.22 |

*same*

| 55111-152180 | Commission offset | -38,373.25 |
| Total Commission offset | | -38,373.25 |

*same*

| 55280-152180 | Underwriting fees | 6,512.25 |
| Total Underwriting fees | | 6,512.25 |

*same*

| 55350-152180 | Verification fees | 12,249.46 |
| Total Verification fees | | 12,249.46 |

*TRV* *same*

| 55700-152180 | Late / penalty | 25.92 |
| Total Late fees and penalties | | 25.92 |

*same*

| 60100-152180 | Salary and wages | 74,619.53 |
| Total Salary and wages | | 74,619.53 |

*was 93,979*

| 60450-152180 | Bonus - employee | 40,497.54 |
| Total Employee bonus | | 40,497.54 |

*was 44,437*

| 61000-152180 | Rent expense | 18,158.77 |
| Total Rent expense | | 18,158.77 |

*same*

| 61100-152180 | License and permits | 100.00 |
| Total License and permits | | 100.00 |

*same*

| 61300-152180 | Office supplies & expense | 998.49 |
| Total Office supplies & expense | | 998.49 |

*same*

| 61380-152180 | Couriers & shipping | 54.25 |

*same*

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000709

|  |  | YTD |
|---|---|---|
| Total Couriers & shipping |  | 54.25 |
| 61900-152180 | Dues and subscriptions | 149.50 |
| Total Dues and subscriptions |  | 149.50 |
| 62200-152180 | Utilities | 957.39 |
| Total Utilities |  | 957.39 |
| 62210-152180 | Internet service | 2,862.24 |
| Total Internet service |  | 2,862.24 |
| 62250-152180 | Telephone | 78.81 |
| Total Telephone |  | 78.81 |
| 62310-152180 | Health insurance | -1,057.16 |
| Total Life and health insurance |  | -1,057.16 |
| 64100-152180 | Payroll tax expense | 24,281.34 |
| Total Payroll tax expense |  | 24,281.34 |
| 65600-152180 | Meals and entertainment | 19.00 |
| Total Meals and entertainment |  | 19.00 |
| 66000-152180 | Computer expense | 29.22 |
| Total Computer expense |  | 29.22 |
| 67100-152180 | Seminar and training | 348.00 |
| Total Seminar and training |  | 348.00 |
| 70100-152180 | Advertising & marketiing expense | 127,347.39 |
| Total Advertising & marketing expense |  | 127,347.39 |
| 68501-152180 | Corporate per file fees | 18,150.00 |
| Total Corporate per file fees |  | 18,150.00 |
| 68500-152180 | Corporate allocation expense | 65,712.86 |
| Total Corporate allocation - volume based |  | 65,712.86 |
| Total Expenses |  | 769,937.63 |
| Net Income (loss) |  | 52,860.33 |

*Handwritten annotations:* same ✓ (Total Couriers & shipping); same ✓ (Dues and subscriptions); same ✓ (Utilities); same ✓ (Internet service); same ✓ (Telephone); same ✓ (Health insurance); Same? less payroll (Payroll tax expense); Same ✓ (Advertising & marketing); was 16,950 (Corporate per file fees); Δ .125 #6.24M; was 57,909.62 (Corporate allocation expense)

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000710

APPLICANT'S EXHIBIT NO. 34

# Statement of Income Report

**Branch: 152180 (Nasserfar)**
For the period ending: 8/31/2014

| FinStmtGroup | | MTD | YTD |
|---|---|---:|---:|
| Income | | | |
| 41355-152180 | Application fee income | 500.00 | 4,900.00 |
| Total Application fees | | 500.00 | 4,900.00 |
| 41357-152180 | Credit report fee income | .00 | 179.25 |
| 55600-152180 | Credit report expense | .00 | 8,239.58 |
| Total Credit reports | | .00 | 8,418.83 |
| 41370-152180 | Processing fees | .00 | 8,020.00 |
| Total Processing fees | | .00 | 8,020.00 |
| 41380-152180 | Branch admin fee | .00 | -550.00 |
| Total Branch administration fees | | .00 | -550.00 |
| 41860-152180 | Brokered loan fee income | .00 | 29,878.21 |
| Total Brokered loan fees | | .00 | 29,878.21 |
| 41880-152180 | Misc production income | .00 | 125.00 |
| Total Other fees | | .00 | 125.00 |
| 42301-152180 | Premium discount - branch | 34,271.59 | 222,303.51 |
| Total Premium discount - branch | | 34,271.59 | 222,303.51 |
| 42300-152180 | Premium discount - lo | 70,002.20 | 421,173.90 |
| Total Premium discount - lo comp | | 70,002.20 | 421,173.90 |
| 42400-152180 | Pair-off allocation | .00 | 1,771.51 |
| Total Pair-off allocation | | .00 | 1,771.51 |
| 68502-152180 | Corporate fees - neo | .00 | -500.00 |
| Total Corporate neo fees | | .00 | -500.00 |
| Total Income | | 104,773.79 | 687,301.38 |
| Expense | | | |

Applicant's
Injunction Hearing
Exhibit 034

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000836



EXHIBIT
90
4-28-15 kw

| FinStmtGroup | | MTD | YTD |
|---|---|---|---|
| 52426-152180 | Lender credits - gfe cures | 14,419.58 | 86,649.09 |
| 52427-152180 | Lender credit - 10% cure | 17.00 | 206.25 |
| Total Lender/broker credits | | 14,436.58 | 86,855.34 |
| 55110-152180 | Commission expense - loan officers | 9,512.21 | 272,890.37 |
| Total Commission expense - loan officers | | 9,512.21 | 272,890.37 |
| 55111-152180 | Commission offset | -3,496.25 | -36,373.25 |
| Total Commission offset | | -3,496.25 | -36,373.25 |
| 55280-152180 | Underwriting fees (DU ?) | 649.60 | 6,512.25 |
| Total Underwriting fees | | 649.60 | 6,512.25 |
| 55350-152180 | Verification fees   TRV's | 317.78 | 12,249.46 |
| Total Verification fees | | 317.78 | 12,249.46 |
| 55700-152180 | Late / penalty | 5.91 | 25.92 |
| Total Late fees and penalties | | 5.91 | 25.92 |
| 60100-152180 | Salary and wages | 7,838.00 | 93,399.32 |
| Total Salary and wages | | 7,838.00 | 93,399.32 |
| 60450-152180 | Bonus - employee | .00 | 36,812.22 |
| Total Employee bonus | | .00 | 36,812.22 |
| 61000-152180 | Rent expense | .00 | 13,897.96 |
| Total Rent expense | | .00 | 13,897.96 |
| 61100-152180 | License and permits | .00 | 100.00 |
| Total License and permits | | .00 | 100.00 |
| 61300-152180 | Office supplies & expense | 462.15 | 998.49 |
| Total Office supplies & expense | | 462.15 | 998.49 |
| 61380-152180 | Couriers & shipping | .00 | 54.25 |
| Total Couriers & shipping | | .00 | 54.25 |
| 61900-152180 | Dues and subscriptions | 149.50 | 149.50 |
| Total Dues and subscriptions | | 149.50 | 149.50 |
| 62200-152180 | Utilities | 357.20 | 957.39 |

*Handwritten note (right margin):* Total Gross Income − Credits = $600,446 (Net Gross Income)

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000837

| FinStmtGroup | | MTD | YTD |
|---|---|---|---|
| Total Utilities | | 357.20 | 957.39 |
| 62210-152180 | Internet service | 2,862.24 | 2,862.24 |
| Total Internet service | | 2,862.24 | 2,862.24 |
| 62250-152180 | Telephone | 78.81 | 78.81 |
| Total Telephone | | 78.81 | 78.81 |
| 62310-152180 | Health insurance | 1,202.77 | -1,095.02 |
| Total Life and health insurance | | 1,202.77 | -1,095.02 |
| 53100-152180 | Depreciation expense | 1,176.37 | 1,176.37 |
| Total Depreciation expense | | 1,176.37 | 1,176.37 |
| 64100-152180 | Payroll tax expense | -405.33 | 21,713.45 |
| Total Payroll tax expense | | -405.33 | 21,713.45 |
| 65600-152180 | Meals and entertainment | .00 | 19.00 |
| Total Meals and entertainment | | .00 | 19.00 |
| 66000-152180 | Computer expense | .00 | 29.22 |
| Total Computer expense | | .00 | 29.22 |
| 67100-152180 | Seminar and training | .00 | 348.00 |
| Total Seminar and training | | .00 | 348.00 |
| 70100-152180 | Advertising & marketiing expense | 15,000.00 | 127,090.84 |
| Total Advertising & marketing expense | | 15,000.00 | 127,090.84 |
| 68501-152180 | Corporate per file fees | 2,550.00 | 16,950.00 |
| Total Corporate per file fees | | 2,550.00 | 16,950.00 |
| 68500-152180 | Corporate allocation expense | 5,833.52 | 57,909.62 |
| Total Corporate allocation - volume based | | 5,833.52 | 57,909.62 |
| Total Expenses | | 58,531.06 | 723,851.33 |
| Net Income (loss) | | 46,242.73 | -36,549.95 |

*Handwritten notes:*

$7090.84 (?)

— 113 files    $150/file

— (.25 / .125)

16,950
+57,909
—————
$74,859

113 × $1400 ⇒ $58,200

$233,059

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000838

APPLICANT'S EXHIBIT NO. 35

| From: | Ty Gosnay </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C992B2F4F3FC4C0BB040256E13E0FE8C-TY GOSNAY> |
|---|---|
| Sent: | Tuesday, January 13, 2015 3:32 PM |
| To: | tgosnay@gmail.com |
| Subject: | community fees |
| Attach: | Community Fees.xlsx |

Ty Gosnay
AmeriPro Funding Inc.
12800 Hill Country Boulevard, Suite G-116
Austin, TX 78738
Cell: 512.914-0546
Fax: 512.233.5853
Email: tgosnay@ameriprofunding.com
Apply Now: http://tgosnay.ameriprofunding.com
NMLS #997663



Company #131699

**Your Dedicated Lending Team**
Julie Curby – Client Coordinator – JCurby@AmeriProFunding.com
Amber Cortese – Senior Loan Processor – ACortese@AmeriProFunding.com

Confidentiality Notice: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of the information does not control the method of transmittal or service providers and assumes no duty or obligation for the security, receipt, or third party interception of this transmission.



EXHIBIT
39
4-24-15 kw

Applicant's
Injunction Hearing
Exhibit 035

CONFIDENTIAL

APF00026477

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | **COMMUNITY INFORMATION** | | | | |
| 2 | **COMMUNITY** | **TAX RATE** | **HOA FEES/Mo** | **HOA One-Time Fee** | **Rough Hollow Lakeway Marina Dues - Mandatory** |
| 3 | **Centerra** | | | | |
| 4 | Rancho Sienna - Centerra Georgetown - Dan 78628   512-689-7007 | $2.98/$100 | $35 | | |
| 5 | Falcon Pointe - Centerra - Kristy Dees 78660   931-217-4870 | $3.03/$100 | $57 | | |
| 6 | Teravista - Centerra - Bob Ellenbogen 78664   512-914-8788 | $2.98/$100 | $47 | | |
| 7 | The Enclave - Rough Hollow - Centerra 78734 Greg   512-417-7373 | $3.07/$100 | $107.50 | | |
| 8 | The Overlook - Rough Hollow - Centerra 78734 Greg | $3.07/$100 | $107.50 | $215 | $75 Monthly |
| 9 | Whitestone Oaks - Centerra 78613 Amy Wills   512-695-3525 | $2.61/$100 | $44 | $215 | 62.50 Monthly |
| 10 | Siena - Round Rock - Andrew Gomez   512-293-3987 | $3.279029/$100 | $21 | | |
| 11 | **Brohn** | | | | |
| 12 | Whitestone Oaks - Brohn 78613 - Dave Joiner   512-940-7646 | $2.55/$100 | $44 | | |
| 13 | Bellamy Cedar Park - Brohn 78613 - Boris   512-626-8473 | $2.5/$100 | $150 | | |
| 14 | Commons at Rowe   Anne Ford   512-554-5198 | $3.16/$100 | $40 | | |
| 15 | Dave Barnes - 512-470-2615 | | | | |
| 16 | Serene Hills - Lakeway - Dave  78669 | $2.8/100 | $63 | | |
| 17 | Reagan's Overlook - Leander   Cristy 512-947-8379 | $2.76/100 | 41.66 per month | | |
| 18 | Rim Rock - Boris Shorter - 78619 | 2.9145/$100 | 400/annually | | |
| 19 | **Clark Wilson** | | | | |
| 20 | Georgetown Village - CW - Chris Not a PUD 78633 | $2.32/$100 | $33.00 | | |
| 21 | Whispering Hollow - CW - Chris - Buda 78610 | 2.96 | 31.66 | | |
| 22 | Star Ranch - CW - Debra Christ - Hutto 78634 | 2.96 | 32 | 250 | |
| 23 | **Builder - Title Office** | **Contribution to Contract** | **Title Office** | | |
| 24 | **Centerra** | $3000 to Closing | Gracy Title, 8015 North Shoal Creek Blvd., Suite #114, Austin, TX 78757, Amanda DeMitri, Escrow Officer, 512-322-8734, marisa.demitri@prospertitle.com | | |

CONFIDENTIAL

APF00026478

| | F | G | H |
|---|---|---|---|
| | | | |
| | **ADDRESS** | **Transfer Fee** | **Working Capital** |
| | | | |
| | 104 Adorno Lane Georgetown, TX 78628 | $175 | $500 |
| | 18205 Crimson Apple Way  Pflugerville 78660 | $400 | |
| | 4932 scenic Lake drive  Round Rock 78626 | $400 | $176.58 |
| | 102 Aruba Court 78734  Lakeway 78734 | | |
| | Austin 78734 | | |
| | Cedar Park 78613 | $312.95 | $240 |
| | 8520 Riminy Cove  Hutto 78665 | | |
| | | | |
| | | | |
| | | | |
| | pflugerville 78660 | | |
| | | | |
| | | $425 | $180 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

CONFIDENTIAL

APF00026479

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 25 | **Brohn - show all of OTP on Fee Sheet - Must Wire Funds for Closing** | 1/2 of OTP | Platinum Title, 6836 Bee Caves, Ste 225, Austin, TX 78756, Connie Lincoln, Escrow Officer, 512-732-0801, connie@platinumtitlepartners.com | | |
| 26 | **Clark Wilson** | $5000 + OTP | Independence Title, 901 S. Mopac Bld 2, Ste 570, Austin, TX 78746 -Jodie Wilkinson, Escrow Officer, 512-329-5299c jwilkinson@independencetitle.com | | |

**CONFIDENTIAL**

**APF00026480**

APPLICANT'S EXHIBIT NO. 36

**From:** Ty Gosnay </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C992B2F4F3FC4C0BB040256E13E0FE8C-TY GOSNAY>

**Sent:** Tuesday, January 13, 2015 3:30 PM

**To:** tgosnay@gmail.com

**Subject:** Mort letter

**Attach:** Mortgage Letter - Michael Nasserfar Ameripro Funding.doc

Ty Gosnay
AmeriPro Funding Inc.
12800 Hill Country Boulevard, Suite G-116
Austin, TX 78738
Cell: 512.914-0546
Fax: 512.233.5853
Email: tgosnay@ameriprofunding.com
Apply Now: http://tgosnay.ameriprofunding.com
NMLS #997663



Company #131699

**Your Dedicated Lending Team**
Julie Curby – Client Coordinator – JCurby@AmeriProFunding.com
Amber Cortese – Senior Loan Processor – ACortese@AmeriProFunding.com

Confidentiality Notice: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of the information does not control the method of transmittal or service providers and assumes no duty or obligation for the security, receipt, or third party interception of this transmission.



**EXHIBIT**
40
4-24-15 KW

Applicant's
Injunction Hearing
Exhibit 036

**CONFIDENTIAL**

APF00026483



# Michael Nasserfar Team

4/10/14

Applicant: ████████ REDACTED ████████          Property Address: TBD

It is a pleasure to inform you that after review of your signed application and credit report information, you have been **Pre-Qualified** for:

Purchase Price: $380,000                    Loan Amount: $304,000
Qualifying Interest Rate of: 4.500%         Term of: 360 months
Maximum Loan – to- Value Ratio: 80%         Type and Description: Conventional

Mortgage Banker received a signed application for the Loan from the Prospective Applicant.
Mortgage Banker reviewed the Prospective Applicant's credit report.
Mortgage Banker reviewed the Prospective Applicant's credit score.
Mortgage Banker reviewed the following additional items:

The Prospective Applicant has provided the Mortgage Banker with the following information about the Prospective Applicant:

Income
Available cash for down payment and payment of closing costs
Debts
Other Assets

Based on the information that the Prospective Applicant has provided to the Mortgage Banker, as described above, the Mortgage Banker has determined that the Prospective Applicant is eligible and qualified to meet the financial requirements of the Loan.

This is not an approval for loan. Approval of the Loan requires:

a. Verification of the information provided
b. Verification of financial status and credit report to remain substantially the same until the Loan closes
c. Collateral for the Loan (subject property) to satisfy the lender's requirements (example: appraisal, title, survey, condition and insurance)
d. The Loan type and terms, as described, to remain available in the market
e. The Prospective Applicant to execute loan documents the lender requires
f. The following additional items: Selling home to qualify

*Michael Nasserfar*

Michael Nasserfar
Mortgage Banker #209485

12600 Hill Country Blvd, Suite R-275  Austin, TX 78738
Ph: (512) 583-5791 E Fax (512) 233-5853
Email: mnasserfar@ameriprofunding.com website: www.michaelnasserfar.com

CONFIDENTIAL

APF00026484

APPLICANT'S EXHIBIT NO. 37



## Michael Nasserfar Team

1/23/15

**Applicant:** ███████  **Property Address:** TBD

It is a pleasure to inform you that after review of your signed application and credit report information, you have been **Pre-Qualified** for:

| | |
|---|---|
| Purchase Price: $320,000 | Loan Amount: $304,000 |
| Qualifying Interest Rate of: 4.00% | Term of: 360 months |
| Maximum Loan – to- Value Ratio: 95% | Type and Description: Conventional |

Mortgage Banker *has not* received a signed application for the Loan from the Prospective Applicant.
Mortgage Banker *has* reviewed the Prospective Applicant's credit report.
Mortgage Banker *has* reviewed the Prospective Applicant's credit score.
Mortgage Banker *has* reviewed the following additional items:

The Prospective Applicant has provided the Mortgage Banker with the following information about the Prospective Applicant:

Income
Available cash for down payment and payment of closing costs
Debts
Other Assets

Based on the information that the Prospective Applicant has provided to the Mortgage Banker, as described above, the Mortgage Banker has determined that the Prospective Applicant is eligible and qualified to meet the financial requirements of the Loan.

This is not an approval for loan. Approval of the Loan requires:

a. Verification of the information provided
b. Verification of financial status and credit report to remain substantially the same until the Loan closes
c. Collateral for the Loan (subject property) to satisfy the lender's requirements (example: appraisal, title, survey, condition and insurance)
d. The Loan type and terms, as described, to remain available in the market
e. The Prospective Applicant to execute loan documents the lender requires
f. The following additional items: Selling home to qualify

Michael Nasserfar
Mortgage Banker #209485

Applicant's
Injunction Hearing
Exhibit 037



EXHIBIT

122

4·30·15 KW

12600 Hill Country Blvd, Suite R-275  Austin, TX 78738
Ph: (512) 797-8916
Email: michaeln@oakmortgagegroup.com  website: www.michaelloan.com

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000739

APPLICANT'S EXHIBIT NO. 38

**From:** Ty Gosnay </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C992B2F4F3FC4C0BB040256E13E0FE8C-TY GOSNAY>

**Sent:** Tuesday, January 13, 2015 3:32 PM

**To:** tgosnay@gmail.com

**Subject:** rates template

**Attach:** Rates Email Template.xlsx

Ty Gosnay
AmeriPro Funding Inc.
12800 Hill Country Boulevard, Suite G-116
Austin, TX 78738
Cell: 512.914.0546
Fax: 512.233.5853
Email: tgosnay@ameriprofunding.com
Apply Now: http://tgosnay.ameriprofunding.com
NMLS #997663



Company #131699

**Your Dedicated Lending Team**
Julie Curby – Client Coordinator – JCurby@AmeriProFunding.com
Amber Cortese – Senior Loan Processor – ACortese@AmeriProFunding.com

Confidentiality Notice: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of the information does not control the method of transmittal or service providers and assumes no duty or obligation for the security, receipt, or third party interception of this transmission.

**EXHIBIT**
48
4-24-15 kw

Applicant's
Injunction Hearing
Exhibit 038

CONFIDENTIAL

APF00026475

|  | Rate | APR |
|---|---|---|
| 30 year Conventional with 20% Down Payment | 4.250 | 4.343 |
| 15 year Conventional with 20% Down Payment | 3.375 | 3.527 |
| 30 year FHA with 3.5% Down Payment | 4.000 | 5.579 |
| 30 year VA with 0% Down Payment | 4.000 | 4.258 |

Notice: For informational purposes only; not intended for redistribution. This is not a commitment to lend or extend credit. Information on interest rates is subject to change without notice. All loans are subject to approval. Additional restrictions may apply. It is assumed unless otherwise noted that closing costs are paid out of pocket; this is a primary residence and a single family home; minimum credit score is 740 with the sales price based on $250,000.
Interest rates provided are based on 4/15/2015 and good for 1 day Assuming 15 days of prepaid interest Financing options provided by Michael Nasserfar, Ameripro Funding. Please call 512-583-5724 for more information. Interest rates are subject to change without notice. This information is provided to assist the real estate professional and is not an offer to extend credit as defined by Regulation Z.





CONFIDENTIAL

APF00026476

APPLICANT'S EXHIBIT NO. 43

| From: | Roy D. Rector <roy@r3forensics.com> |
|---|---|
| Sent: | Wednesday, April 22, 2015 4:37 PM |
| To: | 'Behrens, Eric' <EBehrens@gdhm.com> |
| Subject: | RE: Here's my e-mail address |
| Attach: | R3-150415 Task Computer - Examaination Notes and Exhibits.zip |

Eric,

Attached is the preliminary notes and supporting exhibits regarding the Task computer. Note that it is "notes" and not a final product.

Feel free to call my cell if you have questions.

Thanks,

Roy



**R³ Digital Forensics**

**Roy D. Rector**
1803 West Avenue
Austin, TX 78701
Office: (512) 895-9555
Cell: (512) 203-0021
roy@r3forensics.com
www.r3forensics.com

EXHIBIT **153**
WIT: R Rector
DATE: 5-1-15
Heidi Morrison, CSR, RPR

**From:** Behrens, Eric [mailto:EBehrens@gdhm.com]
**Sent:** Wednesday, April 22, 2015 3:56 PM
**To:** roy@r3forensics.com
**Subject:** Here's my e-mail address

Thanks, Roy.

Eric G. Behrens
512.480.5662 (direct phone)
512.480.5862 (direct fax)



**GRAVES DOUGHERTY HEARON & MOODY**

401 Congress Avenue, Suite 2200
Austin, Texas 78701
Phone: 512.480.5600
www.gdhm.com

This electronic communication (including any attached document) may contain privileged and/or confidential information. If you are not an intended recipient of this communication, please be advised that any disclosure, dissemination, distribution, copying, or other use of this communication or any attached document is strictly prohibited. If you have received this communication in error, please notify the sender immediately by reply e-mail and promptly destroy all electronic and printed copies of this communication and any attached document.

Applicant's
Injunction Hearing
Exhibit 043

APF00028186



1803 West Avenue
Austin, Texas 78701
(512) 895-9555
www.r3forensics.com
Investigation Co. License #
A15320

**R3-150414 AmeriPro Examination Notes – "Task" Computer (R3-0646)**

- OS: Windows 7 Pro
    - Installed: 01/15/13 11:21 AM
    - Last shutdown: 01/26/15 1:58 PM
    - Shadow Volumes (Restore Points):

- User Accounts (not including default Windows accounts), examination focused on the "mtask" account:
    - Created: 01/16/13 2:47 PM
    - Type: Domain

- USB Device installed on January 15, 2015
    - Manufacturer: Hagiwara
    - Name: Hagiwara Mass Storage Device
    - Serial #: 00505801000000A
    - Assigned Drive letter: F
    - Installation Date: January 15, 2015 at 1:51 PM

- Recent Activity
    - Mtask Recent Documents Folders
        - 15 LNK files total (Office and Windows Recent Docs Folders)
            - created or last written on 01/15/15
            - Provides an idea of what files were being used on this date
        - *See Exhibit-1: Link File_ Recent Activity on January 15, 2015.pdf*
        - *See Exhibit 2: Link File_ Recent Activity on January 15, 2015 - Parent File Information*
        - Note: Link files provided clues about a sampling of the activity (on a selected day) regarding files that are accessed or opened with Windows Explorer or Microsoft office. Exhibit 1 and 2 provide insight on files that were access and/or opened, but does not provide any information regarding the copying of deleting of files.

APF00028235

- Folders Deleted on January 15, 2015
  - There are 62 deleted folders from the logical path of:
    - C:\MTask - AmeriPro Funding\Clients\2012\
      - Note: this is an unusual location (in a corporate environment) for company data to resided, due IT not being able to back it up. It may be necessary to consults with AmeriPro IT about this folder location for additional information that could be helpful.
      - Folder naming scheme appears to be the last names of 2012 AmeriPro clients.
    - *See Exhibit-3: Folders Deleted on January 15, 2015.pdf*
  - These folders were created on (copied to) this hard drive on 12/17/14 from 03:03:21 PM to 03:24:22 PM in a time frame of 21 minutes.
    - Indicates copying from an unknown source
      - Time frame indicative of network traffic speed
  - The folders were last written on 01/15/15 2:36:56 PM – 2:37:13 PM, in a time frame of 17 seconds
    - Folders were active folders (not deleted) prior to this date and time
    - Folders are now deleted and do not reside on this hard drive as active files
    - The 17 second last written time frame indicates the last entry for these folder prior to deletion, and is most likely the time they were deleted.
  - Folder Content:
      - When the 62 folders were deleted, their content was also deleted; therefore, 911 files were also deleted on 01/15/15.
        - See Exhibit-4 Content of Folders Deleted on January 15, 2015.xlsx for a list of these deleted files.

2

APF00028236

**Preliminary Observations**

**USB Storage Devices**

On January 15, 2015 at 1:51 PM, a Hagiwara USB mass storage device was connected to this computer and assigned the drive letter F. There are no recoverable file system artifacts that provide information about the contents of this storage device, or if files have been copied to or from it, but that is not an indication that files were not copied to the devices. Typically, Windows file system artifacts are created when a file residing on portable media is accessed or opened, but Windows does not create artifacts regarding a "cut and copy" or "copy and paste" of files to removable media. If this Hagiwara USB removable storage device was produced for analysis, forensic examination could confirm the serial number and contents.

**Deleted Files**

Sixty two deleted folders are recoverable from the logical path of: C:\ MTask - AmeriPro Funding\Clients\2012\. The last written date and time stamps of the folders reflect 01/15/15 in a 17 second time frame from 2:36:56 PM to 2:37:13 PM; therefore, the folder were active folder at this time, and this time reflects the last activity at or prior to the time of deleted.

Content of the folders consists of 911 files (accumulatively). All content of a folders was deleted when the each of the parent folders were delete. Many of not most of the files may be recoverable if content needs to be reviewed.

Considering the 62 folders containing "old" files were accessed on 01/15/2015 just minutes after a USB mass storage device was connected to this computer, and these folders and all their content is now deleted -- this activity is typical of files being copied/archived to removable media prior to files being deleted.

3

APF00028237

Exhibit-1

**Recent Activity - Link Files**
January 15, 2015

| Name | File Created | Last Written | Full Path |
|---|---|---|---|
| | | | C:\Users\mtask\AppData\Roaming\Microsoft\ |
| M2 Team.lnk | 01/13/15 05:22:19PM | 01/15/15 02:39:18PM | Windows\Recent\ |
| Meriil Snapshot - Wire Out.lnk | 01/15/15 10:55:56AM | 01/15/15 10:55:56AM | Windows\Recent\ |
| Meriil Snapshot - Wire Out.LNK | 01/15/15 10:56:17AM | 01/15/15 10:56:17AM | Office\Recent\ |
| Merill Snapshot - Wire Out.lnk | 01/15/15 10:54:18AM | 01/15/15 10:55:31AM | Windows\Recent\ |
| Nagra.lnk | 01/09/15 04:14:21PM | 01/15/15 11:26:07AM | Windows\Recent\ |
| Oliver ID.lnk | 01/15/15 09:41:46AM | 01/15/15 09:41:46AM | Windows\Recent\ |
| Prosperity Bank Submission - GoddardNagra.lnk | 01/13/15 06:50:56PM | 01/15/15 11:26:07AM | Windows\Recent\ |
| Prosperity Bank Submission - GoddardNagra.LNK | 01/13/15 06:52:13PM | 01/15/15 11:26:07AM | Office\Recent\ |
| Rate Lock Info.lnk | 01/15/15 11:09:54AM | 01/15/15 11:09:54AM | Windows\Recent\ |
| Ross.lnk | 01/15/15 10:08:44AM | 01/15/15 11:09:54AM | Windows\Recent\ |
| Sprouse.lnk | 01/13/15 03:04:21PM | 01/15/15 09:41:46AM | Windows\Recent\ |
| Task_Michael - Sales Manager Agreement - Jan '14.lnk | 01/15/15 02:39:18PM | 01/15/15 02:39:18PM | Windows\Recent\ |
| USAA Snapshots (2).lnk | 01/15/15 10:10:29AM | 01/15/15 10:18:44AM | Windows\Recent\ |
| USAA Snapshots.lnk | 01/15/15 10:08:44AM | 01/15/15 10:08:44AM | Windows\Recent\ |
| USAA Snapshots.LNK | 01/15/15 10:10:59AM | 01/15/15 10:18:44AM | Office\Recent\ |

APF00028187

Exhibit-3

**Deleted Folders**

January 15, 2015

| Name | Folder Created | Folder Written | Full Path |
|---|---|---|---|
| 360 Condo Deals | 12/17/14 03:03:21PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Abdulkader | 12/17/14 03:03:21PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Adler | 12/17/14 03:03:34PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Arnold | 12/17/14 03:03:36PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Aslan | 12/17/14 03:03:43PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Barnette | 12/17/14 03:03:44PM | 01/15/15 02:36:56PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Baroch - Davis | 12/17/14 03:03:44PM | 01/15/15 02:37:02PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bartosh | 12/17/14 03:04:08PM | 01/15/15 02:37:02PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Batra | 12/17/14 03:04:10PM | 01/15/15 02:37:02PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Battle | 12/17/14 03:04:23PM | 01/15/15 02:37:02PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bauman | 12/17/14 03:07:56PM | 01/15/15 02:37:04PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bean | 12/17/14 03:08:05PM | 01/15/15 02:37:04PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bell | 12/17/14 03:08:18PM | 01/15/15 02:37:04PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Benavides | 12/17/14 03:08:20PM | 01/15/15 02:37:04PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bergeron | 12/17/14 03:08:21PM | 01/15/15 02:37:04PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Berzsenyi | 12/17/14 03:08:53PM | 01/15/15 02:37:08PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bollinger | 12/17/14 03:09:18PM | 01/15/15 02:37:08PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Boone-Murray | 12/17/14 03:09:38PM | 01/15/15 02:37:08PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Bouillion | 12/17/14 03:10:14PM | 01/15/15 02:37:08PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Brish | 12/17/14 03:13:06PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Brown | 12/17/14 03:13:34PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Buchel-Pilant | 12/17/14 03:13:34PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Burns-Huck | 12/17/14 03:13:57PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| BWatson | 12/17/14 03:14:00PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Camargo | 12/17/14 03:14:00PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Caplan | 12/17/14 03:14:47PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Castillo | 12/17/14 03:14:53PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Cavanaugh | 12/17/14 03:14:56PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Chambliss | 12/17/14 03:15:01PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Chen | 12/17/14 03:15:16PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| CJones | 12/17/14 03:15:17PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| CMueller | 12/17/14 03:15:17PM | 12/17/14 03:15:17PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Coonan | 12/17/14 03:15:19PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |

APF00028190

Exhibit-3

**Deleted Folders**

January 15, 2015

| Name | Folder Created | Folder Written | Full Path |
|---|---|---|---|
| Copulos | 12/17/14 03:15:21PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Cronig | 12/17/14 03:15:21PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Cummings | 12/17/14 03:16:01PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Damvar | 12/17/14 03:16:02PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Davidson | 12/17/14 03:16:05PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Dimery | 12/17/14 03:16:13PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Doggett | 12/17/14 03:16:41PM | 01/15/15 02:37:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Duhon | 12/17/14 03:16:44PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Edwards | 12/17/14 03:16:46PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Eggelston | 12/17/14 03:17:12PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Eggelston-Dillenburg | 12/17/14 03:17:12PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Elder-West | 12/17/14 03:17:36PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Entin | 12/17/14 03:18:04PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Falbo | 12/17/14 03:19:03PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Fisher | 12/17/14 03:19:03PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Fossas | 12/17/14 03:19:21PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Foster | 12/17/14 03:19:40PM | 12/17/14 03:19:40PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Friedman | 12/17/14 03:19:41PM | 01/15/15 02:37:11PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Funk | 12/17/14 03:20:25PM | 01/15/15 02:37:12PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Garrett | 12/17/14 03:20:26PM | 01/15/15 02:37:12PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Garrido | 12/17/14 03:22:08PM | 01/15/15 02:37:12PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Gibson | 12/17/14 03:22:08PM | 01/15/15 02:37:12PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Gilbert | 12/17/14 03:22:09PM | 01/15/15 02:37:12PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Glasgow-Braman | 12/17/14 03:22:57PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Gregory | 12/17/14 03:23:29PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Groener | 12/17/14 03:23:33PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| GSmith | 12/17/14 03:23:36PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Guizar | 12/17/14 03:23:51PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Gunderson | 12/17/14 03:23:53PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Guss | 12/17/14 03:23:53PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Habib | 12/17/14 03:24:21PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Hansen | 12/17/14 03:24:22PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| Harrier | 12/17/14 03:24:22PM | 01/15/15 02:37:13PM | C:\MTask - AmeriPro Funding\Clients\2012 |

APF00028191

Exhibit-3

**Deleted Folders**
January 15, 2015

| Name | Folder Created | Folder Written | Full Path |
|---|---|---|---|
| Hogan | 12/17/14 03:25:57PM | 12/17/14 03:25:58PM | C:\MTask - AmeriPro Funding\Clients\2012 |
| KSmith | 12/17/14 03:28:40PM | 12/17/14 03:30:10PM | C:\MTask - AmeriPro Funding\Clients\2012 |

APF00028192

# mtask Link Files

1) C:\Users\mtask\AppData\Roaming\Microsoft\Office\Recent\Prosperity Bank Submission - GoddardNagra.LNK
| | |
|---|---|
| Link File: | **Prosperity Bank Submission - GoddardNagra.LNK** |
| Created Date: | 01/13/15 06:50:57PM |
| Last Written Date: | 01/13/15 06:50:57PM |
| Last Accessed Date: | 01/13/15 06:50:57PM |
| Base Path: | C:\MTask - AmeriPro Funding\Clients\Nagra\Prosperity Bank Submission - GoddardNagra.pdf |

2) C:\Users\mtask\AppData\Roaming\Microsoft\Office\Recent\USAA Snapshots.LNK
| | |
|---|---|
| Link File: | **USAA Snapshots.LNK** |
| Created Date: | 01/15/15 10:10:29AM |
| Last Written Date: | 01/15/15 10:10:29AM |
| Last Accessed Date: | 01/15/15 10:10:29AM |
| Base Path: | C:\MTask - AmeriPro Funding\Clients\Ross\USAA Snapshots.pdf |

3) C:\Users\mtask\AppData\Roaming\Microsoft\Office\Recent\Meriil Snapshot - Wire Out.LNK
| | |
|---|---|
| Link File: | **Meriil Snapshot - Wire Out.LNK** |
| Created Date: | 01/15/15 10:55:56AM |
| Last Written Date: | 01/15/15 10:55:57AM |
| Last Accessed Date: | 01/15/15 10:55:56AM |
| Base Path: | C:\MTask - AmeriPro Funding\Clients\Ross\Meriil Snapshot - Wire Out.pdf |

4) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Task_Michael - Sales Manager Agreement - Jan '14.lnk
| | |
|---|---|
| Link File: | **Task_Michael - Sales Manager Agreement - Jan '14.lnk** |
| Created Date: | 11/13/14 05:21:58PM |
| Last Written Date: | 11/13/14 05:21:58PM |
| Last Accessed Date: | 11/13/14 05:21:58PM |
| Base Path: | C:\MTask - AmeriPro Funding\M2 Team\Task_Michael - Sales Manager Agreement - Jan '14.pdf |

5) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Nagra.lnk
| | |
|---|---|
| Link File: | **Nagra.lnk** |
| Created Date: | 01/09/15 04:13:43PM |
| Last Written Date: | 01/13/15 06:50:57PM |
| Last Accessed Date: | 01/13/15 06:50:57PM |
| Base Path: | C:\MTask - AmeriPro Funding\Clients\Nagra |

6) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Merill Snapshot - Wire Out.lnk
| | |
|---|---|
| Link File: | **Merill Snapshot - Wire Out.lnk** |
| Created Date: | 01/15/15 10:54:18AM |
| Last Written Date: | 01/15/15 10:54:18AM |
| Last Accessed Date: | 01/15/15 10:54:18AM |
| Base Path: | C:\MTask - AmeriPro Funding\Clients\Ross\Merill Snapshot - Wire Out.png |

7) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\M2 Team.lnk
| | |
|---|---|
| Link File: | **M2 Team.lnk** |
| Created Date: | 01/12/14 03:55:12PM |
| Last Written Date: | 01/11/15 05:34:41PM |
| Last Accessed Date: | 01/11/15 05:34:41PM |
| Base Path: | C:\MTask - AmeriPro Funding\M2 Team |

APF00028188

# mtask Link Files

8) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Prosperity Bank Submission - GoddardNagra.lnk
Link File:           **Prosperity Bank Submission – GoddardNagra.lnk**
Created Date:        01/13/15 06:50:57PM
Last Written Date:   01/13/15 06:50:57PM
Last Accessed Date:  01/13/15 06:50:57PM
Base Path:           C:\MTask - AmeriPro Funding\Clients\Nagra\Prosperity Bank Submission - GoddardNagra.pdf


9) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Ross.lnk
Link File:           **Ross.lnk**
Created Date:        06/16/14 07:31:14PM
Last Written Date:   01/15/15 11:09:52AM
Last Accessed Date:  01/15/15 11:09:52AM
Base Path:           C:\MTask - AmeriPro Funding\Clients\Ross


10) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Oliver ID.lnk
Link File:           **Oliver ID.lnk**
Created Date:
Last Written Date:
Last Accessed Date:
Base Path:           C:\MTask - AmeriPro Funding\Clients\Sprouse\Oliver ID.pdf


11) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\USAA Snapshots.lnk
Link File:           **USAA Snapshots.lnk**
Created Date:
Last Written Date:
Last Accessed Date:
Base Path:           C:\MTask - AmeriPro Funding\Clients\Ross\USAA Snapshots.png


12) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Meriil Snapshot - Wire Out.lnk
Link File:           **Meriil Snapshot – Wire Out.lnk**
Created Date:
Last Written Date:
Last Accessed Date:
Base Path:           C:\MTask - AmeriPro Funding\Clients\Ross\Meriil Snapshot - Wire Out.pdf


13) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\USAA Snapshots (2).lnk
Link File:           **USAA Snapshots (2).lnk**
Created Date:        01/15/15 10:10:29AM
Last Written Date:   01/15/15 10:10:29AM
Last Accessed Date:  01/15/15 10:10:29AM
Base Path:           C:\MTask - AmeriPro Funding\Clients\Ross\USAA Snapshots.pdf


14) C:\Users\mtask\AppData\Roaming\Microsoft\Windows\Recent\Rate Lock Info.lnk
Link File:           **Rate Lock Info.lnk**
Created Date:        01/15/15 11:09:52AM
Last Written Date:   01/15/15 11:08:50AM
Last Accessed Date:  01/15/15 11:09:52AM
Base Path:           C:\MTask - AmeriPro Funding\Clients\Ross\Rate Lock Info.pdf


APF00028189

APPLICANT'S EXHIBIT NO. 46

| | A | B | C | D |
|---|---|---|---|---|
| 1 | All folders resided in the COC-002 folder of this USB hard drive before the were deleted. | | | |
| 2 | Name | File Created | Last Written | Is Deleted |
| 3 | AMB Loan Funded Report Jan-Aug printed 10-30-14_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 4 | AMB Profit & Loss Jan-Aug_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 5 | APF Accounting System Loan Details '14 | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 6 | April Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 7 | Aug Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 8 | Cornerstone Condos | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 9 | Corp Reporting of Branch Income 10-30-14 | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 10 | Feb Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 11 | February Loan Details | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 12 | Friedman | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 13 | Frignoca | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 14 | Froelich | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 15 | Fu | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 16 | Gencheva | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 17 | Generation Mortgage - RM | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 18 | Gheezi | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 19 | Goodman | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 20 | GPeterson | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 21 | Greene | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 22 | Halsell | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 23 | Hargis | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 24 | Hartmann | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 25 | Hatt-Tinguely | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 26 | Hazy | 05/14/15 01:52:26PM | 05/14/15 01:52:44PM | Yes |
| 27 | HCG Lease Terms | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 28 | Heine | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 29 | Holm | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 30 | HR Items | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 31 | Hrynyk | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 32 | Ingate | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 33 | Jang | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 34 | Jimmy Ray Smith | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 35 | Jones Todd | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 36 | June Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 37 | Kaddour | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 38 | Kagan | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 39 | Karp | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 40 | Kelly | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 41 | Khazen | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 42 | Kincl | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 43 | Knipp | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 44 | Lamm | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 45 | Lantrip | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 46 | Leatherbury-Berrios | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 47 | Lender Specific Info | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 48 | Levy | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 49 | Lewis | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 50 | Librach | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 51 | Lim | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 52 | Lowry | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 53 | Lucas | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 54 | Lueb | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 55 | M Olesch Client | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 56 | M2 Team | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 57 | Mace | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 58 | Mahajan | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 59 | March Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 60 | Marketing Fliers | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 61 | Master Fee Worksheets | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 62 | May Loans_files | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 63 | Maywald | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 64 | McCann | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 65 | McClelland | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 66 | McGinty | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 67 | McIver | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 68 | Minkum-Zhang | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 69 | Monthly Pipeline Details | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 70 | Newton | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 71 | NMLS | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 72 | Nogueira | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 73 | Oancea | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 74 | OHea | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 75 | Overton | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 76 | Pall | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |

Applicant's
Injunction Hearing
Exhibit 046

APF00028272

| | A | B | C | D |
|---|---|---|---|---|
| 77 | Paredes | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 78 | Perez | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 79 | Peterson | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 80 | Petro | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 81 | Pittman | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 82 | Pitts | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 83 | Pizzitola | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 84 | Preferred Lender Proposal | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 85 | Prosperity Bank | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 86 | Pyka | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 87 | Rabin | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 88 | Rao | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 89 | Reconciled P&L, Loans, Branch Margins | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 90 | Reed | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 91 | Reis | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 92 | Resource Desk Info - Guidelines | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 93 | Resumes | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 94 | Rhinehart | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 95 | Rigby | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 96 | Romanyk | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 97 | Ross | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 98 | Runnells | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 99 | Salinas L | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 100 | Schoonover | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 101 | Schwartz | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 102 | Scotia Western Housing LLC | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 103 | Seaholm Residences | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 104 | Sendera - Barton Creek Condo Conversion | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 105 | Seymour | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 106 | Shaw | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 107 | Sheiner | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 108 | Shepherd | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 109 | Shin | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 110 | Souza | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 111 | Starr - client | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 112 | Starr James | 05/14/15 01:52:26PM | 05/14/15 01:52:45PM | Yes |
| 113 | Stoltz | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 114 | Tallwood Condos | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 115 | Tamez | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 116 | Tang-Lee | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 117 | Templates & Forms | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 118 | Teresa Thomas | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 119 | Thomas D | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 120 | Thornton City Homes South | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 121 | Tierney | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 122 | Tilotta | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 123 | Tinajero | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 124 | Tobias | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 125 | Trinity Mills | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 126 | Turker | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 127 | Ulman | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 128 | UW Guidelines - Condos | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 129 | Uy | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 130 | Varnam-Teter | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 131 | Vershaw | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 132 | Vick | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 133 | Wade | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 134 | Warren | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 135 | Weeks | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 136 | Wiewall | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 137 | Williams | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 138 | Willow Brook Townhomes | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 139 | Wilson | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 140 | Wu | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 141 | Wusterhausen | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |
| 142 | Wyllie | 05/14/15 01:52:26PM | 05/14/15 01:52:46PM | Yes |

APF00028273

APPLICANT'S EXHIBIT NO. 48

Name

📁 $RECYCLE.BIN

📁 COC-001_Nasserfar_External Drive

📁 COC-002_Task_Thumbdrive

📁 COC-008_Gosnay_Laptop

📁 COC-010_Nasserfar_Laptop

📁 COC-011_Nasserfar_Thumbdrive

📁 COC-013_Nasserfar Thumbdrive

📁 COC-018_Jackson Thomas_Computer

📁 COC-019_Task_Personal Email

📁 COC-021_Nasserfar_Personal Email

📁 COC-024_Gosnay_Personal Email

📁 System Volume Information

Applicant's
Injunction Hearing
Exhibit 048

APPLICANT'S EXHIBIT NO. 49



| Name | Date modified | Type |
|------|---------------|------|
| 📄 LO.docx | 12/24/2014 1:28 PM | Microsoft Word Document |
| 📄 P&L Nastafar.xlsx | 12/17/2014 3:46 PM | Microsoft Excel Worksheet |

**P&L Nastafar.xlsx Properties**  ☒

General | Security | **Details** | Previous Versions

| Property | Value |
|----------|-------|
| **Description** | |
| Title | |
| Subject | Image |
| Tags | |
| Categories | |
| Comments | |
| **Origin** | |
| Authors | |
| Last saved by | Jackson Thomas |
| Revision number | |
| Version number | |
| Program name | Microsoft Excel |
| Company | |
| Manager | |
| Content created | 12/17/2014 9:44 AM |
| Date last saved | 12/17/2014 3:46 PM |
| Last printed | |
| **Content** | |

Remove Properties and Personal Information

OK | Cancel | Apply

Applicant's
Injunction Hearing
Exhibit 049

APPLICANT'S EXHIBIT NO. 50



| Name | Date modified | Type |
|------|---------------|------|
| P&L Nasserfar.pdf | 12/17/2014 3:44 PM | PDFPlus Document |
| P&L Nastafar.xlsx | 12/17/2014 3:46 PM | Microsoft Excel Worksheet |
| Thumbs.db | 5/20/2015 4:06 PM | Data Base File |

### P&L Nastafar.xlsx Properties

General | Security | **Details** | Previous Versions

| Property | Value |
|----------|-------|
| **Description** | |
| Title | |
| Subject | Image |
| Tags | |
| Categories | |
| Comments | |
| **Origin** | |
| Authors | |
| Last saved by | Jackson Thomas |
| Revision number | |
| Version number | |
| Program name | Microsoft Excel |
| Company | |
| Manager | |
| Content created | 12/17/2014 9:44 AM |
| Date last saved | 12/17/2014 3:46 PM |
| Last printed | |
| **Content** | |

Remove Properties and Personal Information

OK | Cancel | Apply

Applicant's Injunction Hearing Exhibit 050

APPLICANT'S EXHIBIT NO. 53

# OFFER PACKAGE

## Amaze Yourself. Amaze The World.

*A job at Oak Mortgage is unlike any other you've had. You'll be challenged. You'll be inspired. And you'll be proud. Because whatever your job is here, you'll be part of something big. Our purpose is to surprise our customers by instilling trust, peace of mind, and attention to the details that matter to them through a boutique-quality experience.*

**Compensation:**

- **Loan Officer Commissions – <u>Medalist 1000.</u>** See Addendum B: Personal Production Commission Schedule
- **Marketing Signing Bonus: <u>$65,000.</u>** See Addendum C: Oak Marketing Platform.
- **Draw: <u>$15,000 / month for 4 months</u>.** See Offer Letter Addendum A.
- **Employee Benefits Package:** See Addendum D & Welcome Kit for further details on Medical, Dental, Vision, Life, Disability, 401k benefit offerings.

**OFFER ACCEPTANCE:**

I, MICHAEL TASK and _____ N/A _____ (Print Employee Name) understand the above job descriptions and agree to comply with, and be subject, to its conditions. I understand that the Company reserves the right to delegate, remove, expand or change any and all responsibilities listed above and will inform me of any such change. In addition to meeting the job duties listed above, I agree to abide by the Company policies contained in the employee handbook. I acknowledge that I can fulfill the above duties with or without reasonable accommodation.

**CONDITIONS OF OFFER OF EMPLOYMENT** - All candidates must successfully pass and provide the following:
- An active NMLS license
- Passing a Criminal Background Check & Employment History Verification
- Providing Verification of Sales Production Numbers
    - Current Year and Previous Year Loan Production and P&L documentation
    - Previous Year's W2 and a recent paystub
    - 

| | |
|---|---|
| *Michael Task* 1/19/15 | *[signature]* 1/19/15 |
| Michael Task          Date | J Holden Thomas, CEO          Date |
| | 1/19/15 |
| | Jason Sherman, CMO          Date |
| | *Jackson Thomas* 1/19/15 |
| | Jackson Thomas, SVP          Date |

**EXHIBIT**
**9**
4-28-15 KW
depobook.com

Applicant's Injunction Hearing Exhibit 053

OAK

# Offer Letter Addendum A

Per the phone conversation held on December 11, 2014, Oak Mortgage Group, "Oak" and Michael Task, "Michael" agree to the following:

## Legal Support & Protection:

Oak agrees to provide Michael with legal support and protection ("Legal Support and Protection") in the event a law suit is filed against Michael by Michael's previous employer, AmeriPro Funding Inc. (Company License 0921843) by covering the cost of Michael's legal fees associated with defending the law suit filed by Ameripro. This Legal Support & Protection is contingent on Michael abiding by the terms of Michael's Employment Agreement with Ameripro. This Legal Support & Protection will cover Michael during his tenure as an employee of Oak and after employment at Oak, unless Michael is terminated for cause as defined in Section 9 of Oak's Employment Agreement. If Michael resigns or terminates his employment with Oak, this Legal Support & Protection will terminate with no further obligation by Oak.

## Guaranteed Draw for the First 4 Months:

For the first 4 months, you will receive a guaranteed monthly earnings in the amount of $15,000 paid monthly. This will give you a floor in earnings each month. Any amount of compensation not covered by commissions on loan fundings will be supplemented by this guaranteed compensation. If you are terminated or resign within the first 12 months, the draw must be repaid.

## Condo Commitment & Strategy:

Oak is committed to a vision for delivering world-class customer experience for the condominium market. We want Michael Task to be one of the key people to help with the execution of this vision in Austin. Oak will provide Michael with the full support and weight of the company in the key deliverables for Fannie Direct approval, a competitive product and pricing mix, and sufficient correspondent and broker outlets for loans.

_Michael Task_  1/19/15
Michael Task                          Date

J. Holden Thomas, CEO               Date

Jason Sherman, CMO                  Date

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000771

# 2015
# MORTGAGE BANKER
# COMMISSION SCHEDULE

## PAYMENT OF BENEFITS

All employees of Oak Mortgage Group designated as Mortgage Banker will participate in the Plan as of their employment date, or date of eligibility as otherwise determined. In addition to the terms of this individual compensation agreement, your compensation as a Mortgage Banker at Oak Mortgage is also governed by the Consumer Financial Protection Bureau 2013 Loan Originator Rule finalized in October 2013 and dated November 8, 2013, and any subsequent revisions to that rule. In accordance with that rule, you are eligible for commission compensation as outlined below. Your commission will be calculated by multiplying the basis points listed below times the dollar amount of all loans funded during the commission period. The basis points used to calculate the commission will be determined by the number of transactions (defined as unique addresses) funded in said commission period. $1455 in origination fees are required to be collected on each loan. No commission will be paid on employee mortgage loans. Loans may not be transferred between Mortgage Bankers. The Company reserves the right to modify your compensation at any time at its sole discretion.

## LOAN OFFICER COMPENSATION PLAN

Commissions Earned. For loans sourced through the Loan Officer's own efforts, the Loan Officer will be paid in accordance with **Medalist 1000 Compensation Schedule** outlined in the table below. You may choose from the following 8 compensation plans. Please circle a Bronze, Silver, Gold, or Platinum and the associated volume or unit plan.

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000772



Monthly Payout Plan

| | Volume Plan | Payout BPS | Units Plan | Payout BPS |
|---|---|---|---|---|
| **Bronze** | <600k | 100 | 1 - 3 | 100 |
| | 600k + | 115 | 4 - 5 | 115 |
| | 900k + | 130 | 6+ | 130 |
| **Silver** | <900k | 105 | 1 - 4 | 105 |
| | 900k+ | 130 | 5 - 6 | 130 |
| | 1.2M+ | 135 | 7+ | 135 |
| **Gold** | <1.2M | 110 | 1 - 5 | 110 |
| | 1.2M+ | 125 | 6 - 7 | 125 |
| | 1.6M+ | 140 | 8+ | 140 |
| **Platinum** | <1.6M+ | 115 | 1 - 6 | 115 |
| | 1.6M+ | 130 | 7 - 8 | 130 |
| | 2.0M+ | 145 | 9+ | 145 |

## Notes:

Payouts apply to self-generated business only. No tier-bonus is paid on Corporate sourced business.

Originator can change plan once a month for first three months. After that, it may only be changed every 3 months by providing notice to the sales manager.

Shortages have to be approved on a case by case basis by the production manager

| Minimum Production Requirement: | 12 units funded every quarter |
|---|---|

After 2 quarters of below MPR, you are at risk for termination

## JUMBO LOANS ; BROKERED LOANS ; SECOND LIENS

A jumbo mortgage is a home loan with an amount that exceeds conforming loan limits imposed by Fannie Mae and Freddie Mac. The limit is currently $417,000 in most parts of the United States and is subject to change over time. For jumbo loans, the Austin branch has chosen for **no commission caps** to apply. The secondary department will set up the **Medalist 1000** plan to reflect this decision.

Mortgage Bankers may only transact brokered loans with vendors on the Company's approved list, and those loans must be locked by the Company's secondary department. Commission is **50 bps**.

In the event a participant leaves the employment of OAK Mortgage Group, Inc., commissions will be paid on loans that *close and fund within 30 days* of the employee's *last day worked*.

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000773

Addendum D



---

## Amaze Yourself. Amaze The World.

*A job at Oak Mortgage is unlike any other you've had. You'll be challenged. You'll be inspired. And you'll be proud. Because whatever your job is here, you'll be part of something big. Our purpose is to surprise our customers by instilling trust, peace of mind, and attention to the details that matter to them through a boutique-quality experience.*

---

**Oak Mortgage views its employees as our greatest asset and thus is committed to offering a Best in Class benefits package to its employees. Oak has entered into a strategic co-employment partnership with Zogg Benefits, Inc. to manage its employee's payroll, benefits, and HR needs.**

Oak's Benefit Offering includes:
- Medical: 3 Plans through UHC
- Dental: 1 Plan through UHC
- Vision: 1 plan through VSP
- 401k: Transamerica
- Company Paid Life: MetLife
- Company Paid Long Term Disability: MetLife
- FSA and HSA Accounts

Below are some key bullet points on the Benefits Package:
- Oak pays 100% of the Employee Only Rate for the Bronze Medical Plan. Employees can then choose to "buy up" to the Silver or Gold Plan and they can choose to add their spouses and / or children. Oak pays 100% of the premiums for Life Insurance and Long Term Disability.
- The Employee Portion of the rates and a Summary of the Benefits offered for each plan can be found in the attached Employee Benefits Summary

Here are the key contacts for each department. Feel free to contact us if you have any questions and we will be happy to help!

- Denise Davis (Payroll Dept) – 214-849-1970
- Kimberly Harper (Benefits Dept) – 214-849-1969
- Cheryl Hughes (HR Dept) – 214-849-1964

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000774

APPLICANT'S EXHIBIT NO. 55

Home    Profile    Connections    Jobs    Interests

≡ ▾ Search for people, jobs, companies, and more...    🔍  Advanced    ✉    ⚑    +👤

Business Services    Try Premium for free

Follow MCC on LinkedIn! - Don't miss out! Follow the premiere resource for In-house counsel today! | **Read More »**



## Michael Task, NMLS 314948    2nd

Austin Area Sales Manager - RMLO at Oak Mortgage Group

Austin, Texas Area · Financial Services

| | |
|---|---|
| Previous | AmeriPro Funding Inc., Barton Hills Mortgage, Task Metro Mortgage |
| Education | Texas A&M University |

| Connect | Send Michael InMail ▾ | **287** connections |

Background

 **Summary**

With an extensive background in the mortgage and title insurance industries, including 20 years of mortgage finance experience, Michael Task has served the needs and exceeded the expectations of Austin real estate professionals for more than a decade. Based on a need for a knowledgeable lender, a focus was put on learning the specifics of mortgage lending on condominiums - becoming a condo financing expert by all accounts.

Throughout my career I have found that if I can provide a high level of service and industry knowledge, combined with offering competitive comprehensive loan products, success will follow. My personal business has grown over the years from refferals and long term relationships by forging out a reputation of doing what I say I will do - simple as that. In an industry where many of my competitors are short sighted, I work within the philosophy of being honest and fair, coupled with superior knowledge to retain clients for years.

Condominium Expert - Developers, call me for assistance in getting your projects approved for individual financing. Fannie Mae, VA and FHA Project Approvals

Specialties: Condominium Mortgage Financing - new construction, conversions, non-warrantable condos. Construction loans - customs homes.

Meet Michael Task. Austin Area Sales Mana...

 **Experience**

**Austin Area Sales Manager - RMLO**
Oak Mortgage Group
January 2015 – Present (3 months) | Austin, Texas Area





Applicant's
Injunction Hearing
Exhibit 055

**EXHIBIT**
107
4-28-15  KW

CONFIDENTIAL

APF00000320

Shaking up the mortgage industry in Texas at...

≡ Search for people, jobs, companies, and more...

Home   Profile   Connections   Jobs   Interests

### RMLO / Sales Manager
AmeriPro Funding Inc.
December 2012 – January 2015 (2 years 2 months) | Austin, TX

> 2 honors and awards

Condo Project List and Bio                2014 Austin Urban Lifestyle Guide advertise...

### Mortgage Banker / RMLO
AmeriPro Funding
April 2011 – December 2012 (1 year 9 months) | Austin, Texas Area

> 2 honors and awards

### Mortgage Broker
Barton Hills Mortgage
July 2010 – March 2011 (9 months) | Austin, TX

Mortgage Brokerage. Provides professional and personalized service for clients needing residential and commerical mortgage financing. Over 15 years of experience in the mortgage industry, including 10 in Austin, TX.

▾ 5 recommendations, including:

**Denise Bodman**
Real Estate Professional at Realty Austin

Michael is well educated in the lending industry and teaches his clients, colleagues and industry professionals while... View

**Kevin Burns**
Real Estate + Interiors for the Austin Urb...

Simply put, Mike does what he says he is going to do, is extremely experienced in the loan industry and considers each... View

3 more recommendations

### Owner / Mortgage Broker
Task Metro Mortgage
April 2006 – June 2010 (4 years 3 months) | Austin, Texas Area

### Mortgage Financing Specialist / Loan Officer
Presidential Mortgage Co
October 2000 – March 2006 (5 years 6 months) | Austin, Texas Area

### Co-Founder / Principal
Community Title Co
June 1997 – February 2000 (2 years 9 months) | Ellicott City, Maryland

Title Insurance Co that catered to real estate and mortgage companies in Maryland.

### VP - Sales
Investors Mortgage Company
June 1994 – February 2000 (5 years 9 months)

Managed three offices with 30+ loan officers for a regional mortgage company that was licensed in Maryland, Virginia, Pennsylvania, North Carolina, Delaware, Washington DC, and Florida.

 Courses

 Next search result
Michael A. S. Guth, Ph.D., J.D. ▶HEOR & Medical Publishing | Epidemiology | ...

>

https://www.linkedin.com/profile/view?id=18863314&authType=NAME_SEARCH&auth... 3/25/2015

CONFIDENTIAL

**Texas A&M University**

- Atmospheric Thermodynamics
- Atmospheric Dynamics
- AeroSpace Engineering

### Honors & Awards

**2011 President's Club - Top Loan Officer Award**
AmeriPro Funding
February 2012

**2012 President's Club - Top Loan Officer Award**
AmeriPro Funding
February 2013

**2013 Platinum Producers Club Award Recipient**
AmeriPro Funding Inc
February 2014

Recognized as one of the "Top 10" producers in the company for the calendar year 2013.

**2013 President's Club - Top Loan Officer Award**
AmeriPro Funding
February 2014

### Skills

Top Skills



| 25 | Mortgage Lending |
| 15 | Loans |
| 11 | Real Estate |
| 9 | First Time Home Buyers |
| 7 | Residential Homes |
| 6 | Condos |
| 6 | Loan Origination |
| 5 | Finance |
| 4 | Construction Loans |
| 4 | Mortgage Banking |

Michael also knows about...

| 2 | Residential Mortgages | 2 | FHA financing | 1 | Commercial Real Estate | Jumbo |

Mortgage Industry     Mortgage     Home

### Education

**Texas A&M University**

Next search result
Michael A. S. Guth, Ph.D.,
J.D. ► HEOR & Medical
Publishing | Epidemiology |

CONFIDENTIAL                                                                    APF00000322

Bachelor's Degree, Meteorology
1987 – 1990

≡ ▾   Search for people, jobs, companies, and more...       🔍   Advanced          ✉   🏳   👤⁺

Home   BS - Meteorology   Connections   Jobs   Interests                    Business Services   Try Premium for free

Activities and Societies: Texas A&M Student Chapter AMS - Treasurer

› 4 courses

**The University of Texas at Austin**
Bachelor of Science (B.S.), Atmospheric Sciences and Meteorology
1985 – 1987

Activities and Societies: Student Chapter American Meteorological Society

✋   Volunteer Experience & Causes

**Volunteer**
Cedar Park Youth League
February 2011 – August 2013 (2 years 7 months)

**Causes Michael cares about:**

- Arts and Culture
- Children
- Disaster and Humanitarian Relief
- Economic Empowerment
- Education
- Environment
- Politics
- Poverty Alleviation
- Science and Technology

Recommendations

Received (5) ▾      Given (4)

**Mortgage Broker**
Barton Hills Mortgage



**Denise Bodman**
Real Estate Professional at Realty Austin

❝ Michael is well educated in the lending industry and teaches his clients, colleagues and industry professionals while simultaneously finding the right loan programs. Michael assisted me with some of the most difficult closings during an economic crisis and did it with poise, service and confidence. Michael worked long and hard hours to ensure my clients received the best ... more

December 14, 2009, Denise was Michael's client



**Kevin Burns**
Real Estate + Interiors for the Austin Urban Lifestyle

❝ Simply put, Mike does what he says he is going to do, is extremely experienced in the loan industry and considers each client as a long term relationship. Always a pleasure to work with.

May 9, 2008, Kevin was Michael's client



**Mark Johnson**
Independent Insurance Adjuster

❝ Mike was extremely helpful and knowledgeable when helping me in a refinance of my mortgage. He was very prompt and answered all my questions in a professional and trustworthy manner. I highly recommend Mike for any refinance needs.

April 23, 2008, Mark was Michael's client

**Blake Taylor**
Owner, Taylor Real Estate | Partner, Solar Capital Group LLC



Next search result
Michael A. S. Guth, Ph.D.,
J.D. ▶ HEOR & Medical
Publishing | Epidemiology |
›

**CONFIDENTIAL**                                                          **APF00000323**




&#x275D;&#x275D; Mike takes great care of our clients. He is highly knowledgeable, dependable and honest. I feel satisfied knowing that we can refer clients to Mike for help with their mortgages, and he will take care of them from pre-qual to closing.

April 23, 2008, Blake was Michael's client



**Stuart Hart**
Music Executive/Composer

&#x275D;&#x275D; I worked with Mike for several years in the mortgage industry! Mike was a hard working honest guy! At the time, I had about 80 employees, and Mike was one of my head managers. He managed a staff of 23 loan officers, and he handled his job like he was running his own busines.. I highly recommend him! He was a thinker and innovator, always coming up with ideas to help... **more**

April 23, 2008, Stuart managed Michael at Barton Hills Mortgage

Help Center  About  Careers  Advertising  Talent Solutions  Sales Solutions  Small Business  Mobile  Language  **Upgrade Your Account**

LinkedIn Corporation © 2015  User Agreement  Privacy Policy  Ad Choices  Community Guidelines  Cookie Policy  Copyright Policy  Send Feedback



Next search result
**Michael A. S. Guth, Ph.D., J.D.** ►HEOR & Medical Publishing | Epidemiology |

>

**CONFIDENTIAL**

APF00000324



2014 Austin Urban Lifestyle Guide advertisement

# Your Condo Mortgage Specialist.

Ownership without the headaches is what you want.
Financing without the hassles is what we deliver.

"Our #1 priority is satisfied clients. We're an Austin-based company with a dedicated team serving the condo community. Connect with me today to start the hassle free application process."

**Seaholm Residences**

Preferred Lender

**Michael Task**
Residential Mortgage
Loan Originator
NMLS 314948
512.350.3660
www.AskTask.com

**AmeriPro**
FUNDING

8300 N. MOPAC Expy. • Suite 120 • Austin, TX • 78757

This is not a commitment to lend or an offer to extend credit. All loans are subject to qualification and approval. Not all borrowers will qualify. Other terms and conditions may apply. AmeriPro Funding, Inc. Company NMLS #131699

**CONFIDENTIAL**

APF00000325



**Condo Project List and Bio**

## Michael Task | NMLS # 314948
Residential Mortgage Loan Originator

### Recent Projects

Over the past decade the condominium market has blossomed in Austin and across the country. Austin has proven to have a sustained demand for these properties whether new construction, or condo conversion. Based on the need for a knowledgeable lender a focus was put on learning the specifics of mortgage lending on condominiums, whether new construction, a condo conversion, or non warrantable condos. Below is a list of projects that we have obtained either project approval or financing for some of our clients.

| | | |
|---|---|---|
| *Flats on Wilson, Austin* | New construction, 62 units | project approval obtained, developer preferred lender |
| *1100 Trinity Mills, Dallas* | New construction, 150 units | project approval obtained, developer preferred lender |
| *Denizen Condos 04, Austin* | New construction, 119 units | financing provided |
| *360 Condominiums, Austin* | New Construction, 430 units | financing provided, developer preferred lender |
| *Milago Condominiums, Austin* | New construction, 240 units | financing provided |
| *Spring Condo, Austin* | New Construction, 249 units | financing provided |
| *The Shore, Austin* | New Construction, 192 units | project approval renewal obtained, financing provided |
| *The W Residences, Austin* | New Construction, 159 units | financing provided |
| *Alxante Townhome Condos, Austin* | Condo conversion, 154 units | project approval obtained, developer preferred lender |
| *Austin City Lofts, Austin* | New construction, 82 units | project approval obtained, developer preferred lender |

**CONFIDENTIAL**

APF00000326

APPLICANT'S EXHIBIT NO. 56

Oak Mortgage | Next Steps | Legal Review Call Tomorrow @ 930


EXHIBIT
8
4-24-15 KW

 Jackson Thomas <jackson.thomas@oakmortgagegroup.com>
to mtask, Michael, Holden, Jason

12/10/14

Michael and Michael,

I wanted to follow up from our conversation on Monday. I want to reiterate again that excitement is building about the shared strategy and vision for what can be done in the Austin market! I sense we are getting closer and closer. We have a red hot condo opportunity to capitalize on. We have several candidates we are considering, but we want you so we must make a decision ASAP. Here is a recap of what I took away from our call and the 7 keys areas for this decision **Tomorrow's call at 930** we will address the last two items on your list.

✓ **Competitive Pricing to Grow Your Business**

✓ **Shared Vision & Values for Future Growth**

✓ **Operational Team You Can Trust to Grow Your Business**

✓ **Employment Agreement Reviewed. See below.** Our legal team reviewed your employment agreement. You can maintain and solicit to your book of business and your builder/realtor relationships. You can maintain and solicit to your past customer database.

✓ **Condo Programs & Outlets** - We are committed to being the best of the best in the condo space. I've sent you a quick overview of the products and outlets we have for condos.

o Branch Cost Detail Questions

o Compensation & Transition Detail Questions

Please feel free to reach out to me if you have any questions. We look forward to your decision and hope you choose to join us on this epic journey to Base 1.0!

| | |
|---|---|
| 1. | Employee can terminate his employment with Company at any time without notice. **You can terminate his employment at any time without prior written notice to the Company.** |
| 2. | For **1 years after termination of employment**, Employee agrees that he will not [directly or indirectly] do any |
| | 5(e)(i) solicit business [of a similar nature] from any customer, payor, supplier doing business with theCompan **Customer should mean a borrower who has submitted an application, the loan is in process or theloan** **Payor means a person who is makes payment on a promissory note so it would mean a borrowermakin** **Supplier means a party that supplies goods and services which would not include realtors andbuilders** |
| | 5(e)(ii) solicit business from any known customer, payor, supplier of the Company subject of a knownwritten o **This group of Customers of the Company is limited to group who are subject of a knownwritten or ora** **approvals, GFEs, applications.** |
| | 5(e)(iii) recruit or solicit the employment or services or hire any person who was known to be employee orcons |
| | 5(e)(iv) knowingly interfere with the business of the Company |
| 3. | However, **these restrictions shall not apply to any customer of Employee that existed prior to hisemplo** |
| 4. | Company's property includes all leads and loans in process. |
| 5. | Employee is eligible to receive compensation on pending loans that close within 30 days of termination if he t |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000090

Applicant's
Injunction Hearing
Exhibit 056



**Jackson Thomas, MBA**
**SVP of Sales Production | Oak Mortgage Group**
O: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com

*Oak Mortgage Group has recently been featured in:*
*Wall Street Journal, Dallas Business Journal, Bloomberg, Entrepreneur Magazine, CNN Money, National Mortgage Professionals Magazine, and Scottsman Guide. Additionally, Oak was named on Inc Magazine's 2014 list of Fastest-Growing Companies in America*

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000091



# MICHAEL NASSERFAR
## OFFER PACKAGE FOR EMPLOYMENT

**Title:** Vice President of Austin (RMLO)
**Department:** Sales
**Reports To:** SVP of Sales

---

## Amaze Yourself. Amaze The World.

*A job at Oak Mortgage is unlike any other you've had. You'll be challenged. You'll be inspired. And you'll be proud. Because whatever your job is here, you'll be part of something big. Our purpose is to surprise our customers by instilling trust, peace of mind, and attention to the details that matter to them through a boutique-quality experience.*

**Prime Directive:**

Regardless of your position, your principal function is to help this Company find, serve and keep profitable customers by driving Oak's purpose statement. Our vision for you and the Austin VP role is to build the Austin district to $250MM in annual loan volume by 2017 through personal production and recruiting loan officers who meet the Oak A Player metrics.

**Compensation:**

- **Loan Officer Commissions** - See Addendum A: Personal Production Commission Schedule
- **Branch Manager Commissions:** See Addendum B: Branch Manager Commission and Bonus Schedule
- **Employee Benefits Package:** See Addendum D & Welcome Kit for further details on Medical, Dental, Vision, Life, Disability, 401k benefit offerings.

**Job Summary:**

Your VP role is comprised of two primary functions: Branch Manager and Loan Originator for the Austin district.

As Branch Manager, you will recruit, manage, and develop your team of goal-oriented Loan Officers and the sales functions associated with that. Your primary responsibility is producing and leading a mortgage team toward achieving corporate sales goals. As a Loan Officer, you are responsible for originating investment quality loans by selling firm's loan products and services to meet the needs of its client base. It also includes being responsible for the overall customer interaction and interface with all parties involved on each individual loan that is originated from application to closing, including but not limited to: counseling and pre-qualifying potential borrowers; taking or reviewing applications received for complete and accurate; obtaining all necessary support documents along with the appropriate fee and lock-in information; overseeing the loan process by monitoring loan status and ensuring conformity with terms; assisting in collecting additional documents and promptly communicating loan status to all interested parties, and obtaining loan documentation after closing, as directed by management.



**Responsibilities:**

- Manage day to day operations and branch personnel in all aspects of loan process from origination to closing.
- Monitor and manage daily production activity to ensure a high level of operational efficiency and profitability.
- Continually cultivate new business through the ongoing development of current and new realtor, builder, and referral relationships.
- Recruit, mentor, and develop a successful sales team capable of consistently meeting monthly production goals.
- Establish and manage branch budget effectively to ensure branch growth and profitability.
- Maintain a high level of integrity and customer service throughout branch consistent with the Gold Star brand name.
- Sources, develops and structures mortgage financing requests for new and existing customers.
- Negotiates terms, structures loan financing based on risk considerations and presents credits for approval to appropriate levels of authority as required.
- Utilizes in-house programs to meet customers' credit needs
- Assists customers with inquiries and information requests, and resolves complaints relating to loan products and services offered.
- Performs additional duties as required.

**Pre-requisites:**
- Minimum 7 years of lending experience and documented annual production in the 40M – 80M range.
- Excellent working knowledge of standard loan products in the industry, various state guidelines and strong familiarity with underwriting standards.

**Skills:**
- Ability to calculate figures and amounts such as discounts, interest, commissions, proportions, percentages, area, circumference and volume.
- Strong interpersonal-communication and business-relationship skills.
- Detail oriented with strong organizational and follow-through skills.
- Excellent analytical, written and verbal communication skills.

**Education:**
- Bachelor's degree in finance, business, or economics preferred but not required

**CONDITIONS OF OFFER OF EMPLOYMENT -** All candidates must successfully pass and provide the following:
- o An NMLS license
- o Criminal Background Check & Employment History Verification
- o Verification of Sales Production Numbers
  - o Previous Year Loan Production Information (Units, Volume, Purchase vs Refi, Loan Type)
  - o Previous Year's W2 and a recent paystub

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000093





## OFFER ACCEPTANCE:

I, _____ (Print Employee Name) understand the above job description and agree to comply with, and be subject, to its conditions. I understand that the Company reserves the right to delegate, remove, expand or change any and all responsibilities listed above and will inform me of any such change. In addition to meeting the job duties listed above, I agree to abide by the Company policies contained in the employee handbook. I acknowledge that I can fulfill the above duties with or without reasonable accommodation.

_____         _____
Employee Signature       Date        J. Holden Thomas, CEO      Date

                                                   _____
                                                   Jason Sherman, CMO      Date

                                                   _____
                                                   Jackson Thomas, SVP      Date

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000094

APPLICANT'S EXHIBIT NO. 57

Jackson Thomas <jackson.thomas@oakmortgagegroup.com>
to Michael

Jan 8

Sounds good. I'll call you before I leave today. I'm forming a document with details and logistics



**Jackson Thomas, MBA**
**SVP of Sales Production | Oak Mortgage Group**
D: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com

*Oak Mortgage Group has recently been featured in:*
*Wall Street Journal, Dallas Business Journal, Bloomberg, Entrepreneur Magazine, CNN Money, National Mortgage Professionals Magazine, and Scottsman Guide. Additionally, Oak was named on Inc Magazine's 2014 list of Fastest-Growing Companies in America*





On Thu, Jan 8, 2015 at 11:20 AM, Michael Task <mtask@att.net> wrote:
Thank you for the updates and direction

Looking forward to chatting later this afternoon

Michael Task
Sent from my iPhone

On Jan 8, 2015, at 10:39 AM, Jackson Thomas <jackson.thomas@oakmortgagegroup.com> wrote:

Michael

I wanted to catch you up on a few things that Nass and I discussed on Saturday. I'll call you later today so we can add more color to this and answer questions

**Signing Agreements**
Do not sign offer letter or EA until after you resign with Ameripro.

**Resignation**
You need to Resign in writing via certified mail / courier & email
You should not be seen again in the office. No communication with anyone at Ameripro. It only sets up a situation to create threats and confrontation that could lead to litigation.
Make sure you give notice in exactly accordance to the terms of the Ameripro EA.
No disparagement. We cannot say anything bad about Ameripro. We just need to disappear. Give them no reason to go after You

**Keys, card swipes, laptops** - mail / courier with your resignation
**January Closings** - include language saying you will cooperate as needed to ensure smooth and successful closings.

**Office situation.**
Need to be prepared to move into an Oak office.
We cannot plan on staying in Ameripro's office. There should be no communication with anyone at Ameripro bc it only sets up a situation to create threats and confrontation that could lead to litigation.
It needs to be a clean break. Wait at least 1 month before you approach the conversation. Let emotions calm down first

**Handling Ty.**
Just have Ty resign PRIOR to the Michael's.
As long as he resigns before we are ok
TALK TO NO-ONE! If someone asks, say nothing. "It's a personal matter and I'd rather not say." Give a non-answer. "I'm not doing anything. Just looking around. Looking for a new opportunity." Be ambiguous.
Texas is at will state.
Let's have Ty resign this week and start at Oak.
Put off any exit interview.
Wait 1 month before you go after the other person.



**Jackson Thomas, MBA**
**SVP of Sales Production | Oak Mortgage Group**
O: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com

*Oak Mortgage Group has recently been featured in:*
*Wall Street Journal, Dallas Business Journal, Bloomberg, Entrepreneur Magazine, CNN Money, National Mortgage Professionals Magazine, and Scottsman Guide. Additionally, Oak was named on Inc Magazine's 2014 list of Fastest-Growing Companies in America*



Applicant's
Injunction Hearing
Exhibit 057

**EXHIBIT**
**85**
4-28-15 KW

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000134

APPLICANT'S EXHIBIT NO. 58

I'll write it up that way, I just wanted to make sure we were on the same page

I know, I'll adjust if when needed based on how my production goes and tasks as it flows to my p&L
If I need to add more staff I will adjust based on how the numbers look

Cool.

Tue, Jan 13, 5.23 PM



< Messages　　Tamela　　Contact

We've decided to stand down and not do anything until we see what happens on Monday once they receive your notice.

Got it. Will keep you updated as it progresses. Let me know anything that comes to mind that I can help with

Send

Applicant's
Injunction Hearing
Exhibit 058

**EXHIBIT**
86
4-28-15 kw
depobook.com

Fri, Jan 16, 3:38 PM

 M　　Send

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000568


March for Life Event at the Dallas Convention center and I ran into some old family friends. They were all talking about the shark tank story

So glad to hear that and so glad to have a man of you character and competence in the family

Again, Herb says in any situation...you must not say anything. Give non-answers and just that you've resigned and you can't talk about it at this time. It only compromises the person you are sharing with. You protect them by not giving them any details. We need to stick with this plan for at least one week to let the dust and emotion settle

 M    Send

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000569


and this is the 52nd anniversary of his "I have a dream speech" and you did 52mm last year. I saw this quote and thought it worth sharing. You are doing a great job standing strong in the transition! "Vision gives purpose to pain"



No such thing as coincidents my friend! What an honor to start on a special day. Strong

 M

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000570

Send

How many on the rush order just for me coming?

> Our design team takes a week but we can outsource to Office Depot on a rush order. I thought we would do around 100 on rush and then the other 1000 would arrive in a week or two

> I can do 300 on rush if you want

Perfect

> I just need to confirm with Office Depot. Do you want me to have them couriered to you or to Senterra?

Well.... I'll be there tomorrow so I need to coordinate with ty to distribute as there are a bunch of Centerra and Brohn

 M    OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000571      Send

Homes communities to distribute to.

It would be a big project to coordinate all the locations to be sent to

> Ok. So I will have them delivered to the Austin branch and we will have Ty (and possibly others) help with the coordination of delivery

Cool!

> Do you want your business card to list your title as 1) VP of Austin 2) Loan Officer OR 3) Vice President - RMLO

#3

1 keeps me too pegged to only austin

 M

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000572

Send

To: Michael , Michael

> I just heard. Can we chat tomorrow?

> What is the appropriate response? Can I reply to him "I can't call you but you can call me."

Michael Task

> Hmm... I guess Just ask him to please call me

You

Is it a borrower? Say, "just give me a call tomorrow afternoon."

we can prep at 11.

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000573

iMessage

APPLICANT'S EXHIBIT NO. 59

| | |
|---|---|
| **From:** | Michael Nasserfar <mnasserfar@ameriprofunding.com> |
| **Sent:** | Thursday, December 18, 2014 5:04 PM |
| **To:** | Michael Task <mtask@ameriprofunding.com> |
| **Subject:** | Centerra |

Centerra
Tom
Terri
Gene
Sylvia

Lynn
Tamela

Kristy
Bob
Dan
Amy
Andrew
Greg
Amanda
Lesli

Brohn
Adam
Aaron
Greg
Donna
Boris
Anne
Rich

Lisa
Dana
Julie
Ty

Outlaw
Blake
Kevin
Charlie
Grant
Layman
Leah
Paula

Burns
Brick key
Brickley
Deacon
Olesh

Applicant's
Injunction Hearing
Exhibit 059

EXHIBIT
99
4-2015 KW

**CONFIDENTIAL**

APF00020851

Schley
Boris
Byron davis
Star
Bob Roberts
Landon
Allen
Carter
Carter

Michael Nasserfar
AmeriPro Funding Inc.
Branch Manager, NMLS #209485
12800 Hill Country Boulevard, Suite G-116
Austin, TX 78738
Direct: 512.583.5791
Cell: 512.797.8916
Fax: 512.233.5853
Email: MNasserfar@AmeriProFunding.com
www.MichaelNasserfar.com

Company #131699

*2013 Texas Star Awards Mortgage Industry Professional of the Year*

### Your Dedicated Lending Team
Julie Curby – Client Coordinator –JCurby@AmeriProFunding.com
Dana McGrath – Senior Loan Processor – DMcGrath@AmeriProFunding.com
Lisa Brown – Senior Loan Processor –LBrown@AmeriProFunding.com

**Confidentiality Notice**: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of the information does not control the method of transmittal or service providers and assumes no duty or obligation for the security, receipt, or third party interception of this transmission.

APPLICANT'S EXHIBIT NO. 60



mail.google.com

/images/downloads/raci_r_web3... | Michael Nasserfar OFFER | Vice President... | Oak Mortgage Group - Calendar | Vue sous cet angle, cette église aurait p...

from:(base1.0@oakmortgagegroup.com) to:(michaelnasserfar@gmail.cor  🔍  +Jason

Move to Inbox    More    12 of 17   <   >

MPOSE

6,393)

**Jason Sherman** <base1.0@oakmortgagegroup.com>    12/12/14

to Jackson, Michael, Holden, Jason

Michael,

Huge congrats. I am excited for our future in building something truly great! I look forward to talking later today.

Jason

Sent from my iPhone

On Dec 11, 2014, at 4:54 PM, Jackson Thomas <jackson.thomas@oakmortgagegroup.com> wrote:

Michael,

Thanks for making time today to talk. I've attached your OFFER LETTER which includes the revisions we discussed today.

We are very excited about you joining the team! In order to for us to secure your role in the Aspen Heights condominium project, we must know your decision on the offer this week. We do not underestimate how big of a life decision this is for you and take that very seriously. Please feel free to send me any questions and we look forward to discussing your transition and onboarding details. You're going to love working with the Oak team!

Progress,

**Jackson Thomas, MBA**
SVP of Sales Production | Oak Mortgage Group
O: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com

Holden Thomas
O OAK
Show details

2 more

Applicant's Injunction Hearing Exhibit 060

**EXHIBIT**
12/
4-30-15 KW

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000345

APPLICANT'S EXHIBIT NO. 61

| From: | Michael Task </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E0993569551D482E8C1273B50E830E58-MTASK> |
|---|---|
| Sent: | Wednesday, January 14, 2015 5:51 PM |
| To: | Ryan Fetgatter <rfetgatter@myaspenheights.com> |
| Bcc: | mnasserfar@ameriprofunding.com |
| Subject: | RE: Preferred Lending - The Independent |
| Attach: | Task_Condo_2015 revised.pdf |

Good Afternoon Ryan –

On behalf of myself and my team – I would like to thank you and the entire Aspen Heights/Constructive Ventures Team for the opportunity to participate in the preliminary discussions on the financing options available to the perspective buyers and as our team being chosen to be a preferred lender on the project.

My experience in the mortgage/real estate/title business (with an emphasis on condo financing ) eclipses 20+years, 14 of those here in Austin. I've attached a brief bio that highlights the condo projects I have worked on locally over the years.

With respect to scheduling a meeting - this week is pretty hectic – I am available for a phone call late tomorrow – Jan 15th - any time after 3:30PM – and can be available face to face meeting this coming Monday, Jan 19th. Please let me know what works best for all parties involved.

Looking forward to meeting you as well –

Best Regards,

*Michael Task*
*AmeriPro Funding, Inc.*
*RMLO, Sales Manager*
*NMLS# 314948*
*512-350-3660 Direct*
*512-857-1402 Fax*
*mtask@ameriprofunding.com*
*www.MichaelTask.com*

*Hill Country Galleria Branch*
*12800 Hill Country Boulevard, Suite G-116*
*Austin, TX 78738*

*Corp*
*8300 N MOPAC, Suite 120*
*Austin, TX 78759*

**Project Lender for the Seaholm Residences**



*2013 Platinum Producer Club Award Recipient*
*2013, 2012 & 2011 President's Club Award Recipient*
*Top Loan Officer Award*

**Your Dedicated Lending Team**

**CONFIDENTIAL**



EXHIBIT
87
4-28-15 KW

Applicant's
Injunction Hearing
Exhibit 061

APF00026618

Ty Gosnay - Production Manager – TGosnay@Ameriprofunding.com
Julie Curby – Client Coordinator – JCurby@AmeriProFunding.com
Dana McGrath – Sr. Processor – DMcGrath@AmeriProFunding.com
Lisa Brown – Sr. Processor – LBrown@AmeriProFunding.com
**Company NMLS# 131699**



**TOP 100** MORTGAGE COMPANIES #**1** COMPANY IN AUSTIN
In America 2012

Confidentiality Notice: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of this information does not control the method of transmittal or service providers and assumes no duty or obligation for the security, receipt, or third party interception of this transmission.

**From:** Ryan Fetgatter [mailto:rfetgatter@myaspenheights.com]
**Sent:** Wednesday, January 14, 2015 10:30 AM
**To:** Michael Task
**Subject:** Preferred Lending - The Independent

Hi Michael:

Aspen Heights and Constructive Ventures are developing a 365 unit high rise condo tower at 3rd and West in Austin, to be known as The Independent.

Your contact information was passed along to us as a recommended contact to make as we begin to flesh out our list of preferred lenders for the project. To orient you schedule-wise, we plan on beginning our reservations process in April, with contracts to follow this Summer.

I would love the opportunity to visit with you in the coming weeks to discuss your company, your approach to customer service, and the project itself. Please let me know a few time slots that you have available and we can put something on the books. You can reach me by email or cell below.

Look forward to meeting you!

Thanks,
Ryan
--

**Ryan Fetgatter | Vice President of Development**
Aspen Heights | Austin
Office: 512-583-9000 | Mobile: 512-970-6068
**ASPEN**HEIGHTS

**CONFIDENTIAL**

## Michael Task | NMLS # 314948
Sales Manager/Residential Mortgage Loan Originator



### Recent Projects

Over the past decade the condominium market has blossomed in Austin and across the country. Austin has proven to have a sustained demand for these properties, whether new construction, or condo conversion. Based on the need for a knowledgeable lender, a focus was put on learning the specifics of mortgage lending on condominiums, whether new construction, a condo conversion, or non-warrantable condos. Below is a list of projects that we have obtained either project approval or financing for some of our clients:

| | | |
|---|---|---|
| | Seaholm Residences, Austin<br>30 Story New construction, 280 units | project lender |
| | Flats on Wilson, Austin<br>New construction, 62units | project approval obtained<br>project lender |
| | Denizen Condos 04, Austin<br>New construction, 119 units | financing provided |
| | 360 Condominiums, Austin<br>New Construction, 430 units | financing provided |
| | Milago Condominiums, Austin<br>New construction, 240 units | financing provided |
| | Spring Condo, Austin<br>New Construction, 249 units | financing provided |
| | The Shore, Austin<br>New Construction, 192 units | project approval renewal obtained<br>financing provided |
| | The W Residences, Austin<br>New Construction, 159 units | financing provided |
| | Alicante Townhome Condos, Austin<br>Condo conversion, 154 units | project approval obtained<br>project lender |
| | Austin City Lofts, Austin<br>New construction, 82 units | project approval obtained<br>project lender |
| | Brown Building, Austin<br>Condo conversion, 90 units | project approval obtained<br>project lender |

With an extensive background in the mortgage and title insurance industries, including nineteen years of mortgage financing experience, Michael Task has served the needs and exceeded the expectations of Austin real estate professionals for more than a decade. Michael and his team's extensive mortgage financing background provide an edge on the competition by having the knowledge to easily navigate clients through the ever changing mortgage industry landscape without any delays. Their goal is to counsel clients about current mortgage products to determine which best suit their short term and long term financial goals.

12800 Hill Country Blvd, Ste G-116, Austin, TX 78738| Corp. NMLS #131699
PH: 512.350.3660 | F: 512.857.1402 | email: mtask@ameriprofunding.com
www.MichaelTask.com



CONFIDENTIAL

APF00026620

APPLICANT'S EXHIBIT NO. 62

| From: | mtask@ameriprofunding.com |
|---|---|
| Sent: | Thursday, January 15, 2015 3:33 PM |
| To: | mtask@att.net |
| Subject: | Fwd: Great meeting you! |

Best -

Michael Task
RMLO, Sales Manager
NMLS 314948
Ameripro Funding, Inc
8300 N MOPAC, Ste 100
Austin,TX 78759
NMLS 131699
mtask@ameriprofunding.com
Desk: 512.583.5051
Cell:  512.350.3660
Fax:  512.857.1402
www.MichaelTask.com

Preferred Lender for the Seaholm Residences

Begin forwarded message:

> **From:** <jalloway@jbgoodwin.com>
> **Date:** January 15, 2015 at 3:30:38 PM CST
> **To:** <mnasserfar@ameriprofunding.com>, <mtask@ameriprofunding.com>
> **Cc:** "'Ben Goodwin, Branch Manager, Premier Nationwide Lending'" <bgoodwin@pnlending.com>
> **Subject: Great meeting you!**

Michael & Task:

It was great meeting the two of you yesterday. Very impressive!

I am happy to visit with you about how the Relocation Department can assist your business.

Have a great week!

*Judy Alloway*

Judy Alloway, CRP
Certified Relocation Professional
Corporate Relocation Director
JBGoodwin REALTORS
512-502-7895
jalloway@jbgoodwin.com

CONFIDENTIAL
This communication (including any attachments) contains privileged or confidential information intended for a specific individual and purpose, and is protected by law. Thank you.

12-922-3003
Check out our NEW website...
www.JBGoodwin.com


EXHIBIT
95
4-28-15 KW

Applicant's
Injunction Hearing
Exhibit 062

CONFIDENTIAL

APF00026771

APPLICANT'S EXHIBIT NO. 63

## Re: Celebrate    Inbox   x   Boomerang-Returned   x

**Michael Nasserfar** <michaelnasserfar@gmail.com>             12/23/14
to Michael, Jason, me, Holden

Guys.....what a day!!!! Excited about all that has transpired.

Sorry for the late reply but I'm just now getting caught up. Jackson you've been extremely accommodating sir. Thank you all for working with me through my busiest month of the year both in production and personally.

I'm still in full blown work mode for December closings and dropping in on all builder contacts which meant almost 200 miles of driving around today and tomorrow the same thing. Let's see where I'm at by end of day for any happy hour plans.

If not tomorrow it will be very soon that we will be toasting to a very exciting and momentous future ahead of us gentlemen!!!!

Coram Deo!
Michael

On Monday, December 22, 2014, Michael Task <mtask@att.net> wrote:
I'm in for a celebration / happy hour. Let's firm up a place and time tomorrow.

  Michael Task
  Sent from my iPhone

  > On Dec 22, 2014, at 6:19 PM, Jason Sherman <base1.0@oakmortgagegroup.com> wrote:
  >
  > Jackson just filled me in on the good news! Can we meet tomorrow for happy hour to celebrate?
  >
  > Jason
  >
  > Sent from my iPhone

---

**Jason Sherman** <base1.0@oakmortgagegroup.com>             12/23/14
to Michael, Michael, me, Holden

Sounds great! I can meet at 4:30 if you guys are available.

Sent from my iPhone

---

 **Jackson Thomas** <jackson.thomas@oakmortgagegroup.com>        12/23/14
to Michael, Michael, Jason, Holden

What a day indeed! A huge congrats, celebration, and cheers are in order!

CONGRATS on a 6MM / month and a strong finish to the year!
CELEBRATION to all the work put in to serve all those clients, referral partners!
CHEERS to this next chapter, to this next year, and to changing the mortgage industry for the better!

Carpe Aeternitatem!

**Jackson Thomas, MBA**
**SVP of Sales Production | Oak Mortgage Group**
O: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com



Applicant's Injunction Hearing Exhibit 063

EXHIBIT
9ⱁ
4-28+5 KW

**Oak Mortgage Group has recently been featured in:**
Wall Street Journal, Dallas Business Journal, Bloomberg, Entrepreneur Magazine, CNN Money, National Mortgage Professionals Magazine, and Scottsman Guide. Additionally, Oak was named on Inc Magazine's 2014 list of Fastest-Growing Companies in America

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000109

APPLICANT'S EXHIBIT NO. 67

≡ ▾   Search for people, jobs, companies, and more...   🔍 Advanced      ✉' ⚑ +👤

Beat Your Competition - Better website. Better visibility. Don't lose out to your competitors. | Read More »



**Michael Nasserfar**
Vice President - RMLO at Oak Mortgage Group

Austin, Texas Area | Financial Services

| Previous | AmeriPro Funding, First Continental Mortgage, Prestige Lending Services |
| Education | University of Texas |

[ Connect ]  [ Send Michael InMail ] ▾

500+
connections

Contact Info

www.linkedin.com/in/michaelnasserfarien

Background&Nasserfar

Websites    Company Website
      My Mortgage Blog
            Summary

With over 15 years of experience in the mortgage industry, I love learning more everyday to better serve my clients. My favorite thing about working in this industry is being allowed the opportunity to match their short and long-term personal goals of the home purchase with payment and equity objectives to create a perfect mortgage solution.

Experience

**Vice President - RMLO**
Oak Mortgage Group
January 2015 – Present (3 months) | Austin, TX



Oak Mortgage is a residential mortgage company based in Dallas with offices in Austin and Waco. We began in 2005 as a response to the decline in responsible lending and wanted to create a new banking model that was consumer and employee-focused.

We don't want the "m" word to scare people and are on a mission to flip the culture surrounding finance institutions and mortgage lending on its head. Our vision is to greatly improve the customer experience, build trust and have a people-centered philosophy where the customer's needs, their families and their goals are ultimately the central focus. To get a feel for our brand, check out our Facebook Page.

In addition, Oak has a one-of-a-kind program to help people in Africa and Central America escape poverty. Through an international partner, we distribute microloans to help people start their own business and provide for their families. Not only does a portion of every loan fund this, but we take trips each year with employees, customers, and realtors who have helped in the process. Our initiative is called Oak for the Oppressed (OFTO) and you can learn more about it here. We have plans to expand OFTO in 2015

Finally, Oak Mortgage has a dynamic company culture where employees are engaged, motivated and have a common passion to help people. This focused culture is the centerpiece to our strategy of changing the way people are treated in the mortgage industry. Our internal culture is something we pride ourselves in as we believe investing in people is the key to a successful business.

EXHIBIT
20
4-24-15 KW

Applicant's
Injunction Hearing
Exhibit 067

https://www.linkedin.com/in/michaelnasserfar                      3/25/2015

CONFIDENTIAL                                                        APF00000227

≡ ˅ Search for people, jobs, companies, and more...

Shaking up the mortgage industry in Texas at...

### Branch Manager - RMLO
AmeriPro Funding
January 2014 – January 2015 (1 year 1 month) | texas



Assisted with clients lending needs & partnered with Realtors, builder partners and other referral groups to create a seamless & successful mortgage process. I have a specialized and concentrated focus on managing our branch for high volume sales & fundings, product delivery, training, and new business development. We manage a true builder division that starts with assisting on making new sales through the funding of the loan so clients get their keys the day of closing as promised.

Proven track record to manage mortgages for high volume builder business:
- 7 years managing Meritage Homes mortgage loans (Hammonds/Legacy/Meritage/Monterey Homes)
- 2 years managing Gehan Homes mortgage loans
- 3+ years currently managing mortgage loans as the exclusive lender for 3 Texas based builders at Ameripro each with over 200 units of production a year

Personal recipient of multiple builder industry specific awards for:
- 2013 STAR Award Recipient for State of Texas Mortgage Professional of the Year
- 2013 Finalist for Austin MAX Awards Mortgage Professional of the Year (Home Builders Association)
- 2008 Recipient for Austin MAX Awards Mortgage Professional of the Year(Home Builders Association)
- Numerous MAX & STAR awards nominations over the last 13+ years

### Sales Team Manager
AmeriPro Funding, Inc.
November 2011 – December 2013 (2 years 2 months) | texas



- Assisted with clients lending needs & partner with builders, realtors, and other referral groups to make a seamless & successful mortgage process.

- 2013 Texas Association of Builders Mortgage Professional of the Year Award Recipient

- 2013 Austin Home Builders Association Mortgage Professional of the Year Award Finalist

### Branch Manager - Vice President
First Continental Mortgage
January 2003 – October 2011 (8 years 10 months)



- Overseeing the daily mortgage operations
- Ensuring an average of 20-25 monthly mortgage closings for our ABA partners
- Forecasting monthly and quarterly closings with builder partners and our lending Team
- Mortgage and sales training courses conducted for new onsite sales consultants
- Public Relations and Marketing support at events for business partners
- Continuously achieve over 90% customer satisfaction for the last 8 years
- Increasing capture ratio from 50% to current average of 85%

### Loan Officer
Prestige Lending Services
February 2003 – February 2009 (6 years 1 month)

˅ 1 recommendation

Kim Dolson Gustafson
VP/TX & Southwest Region-Sr. Mortgage Banking Officer at BNY Mellon NMLSR: 404870

Michael is very professional, business oriented and personal. He cares about the quality of relationships he develops and the people he works with both as clients and business partners. View

### Loan Officer
Milestone Mortgage
January 2001 – January 2003 (2 years 1 month)

- Created "Clients for Life" monthly mailings to over 20,000 clients for branch
- Managed all aspects of loan origination for Senior Partner of Company
- Increased profitability while maintaining high levels of customer satisfaction
- Implemented new company standard for database management and marketing efforts
- Trained new loan officers in loan programs, mortgage software and business development

https://www.linkedin.com/in/michaelnasserfar

3/25/2015

CONFIDENTIAL

APF00000228



≡ ▾   Search for people, jobs, companies, and more...   Q   Advanced

**People Similar to Michael**

**Bryan Brush** 3ʳᵈ
Divisional Vice President Bay Equity Home L...
Connect

🌐 Languages

**Spanish**                    **Persian**

📐 Skills

Top Skills

| 99+ | Mortgage Lending |
| 75 | Mortgage Banking |
| 68 | Loan Origination |
| 42 | Referrals |
| 31 | VA loans |
| 31 | USDA |
| 29 | FHA financing |
| 28 | Investment Properties |
| 26 | Sales |
| 25 | Mortgage Marketing |

Michael also knows about...

| 22 FHA | 21 Residential Mortgages | 16 New Home Sales | 16 Refinance |

16 Marketing    15 Sellers    14 First Time Home Buyers

11 New Business Development    9 Certified Mortgage...    9 Loans    8 Real Estate

7 New Homes    7 Business Development    7 VA Loans    7 FHA Financing

See 18+

🎓 Education

**University of Texas**
Bachelor of Science, Communication & Business
1997 – 2001

Final

🎖 Honors & Awards

**STAR Award**
Texas Mortgage Professionals

Recommendations                    Received (1) ▾

**Loan Officer**

People also viewed
Ty Gosnay Mortgage Loan
Officer at Oak Mortgage Group   ›

https://www.linkedin.com/in/michaelnasserfar

3/25/2015

**CONFIDENTIAL**

**APF00000229**

Prestige Lending Services ☰ ▾ Search for people, jobs, companies, and more...  🔍 Advanced   ✉ ⚑ ➕

**Kim Dolson Gustafson**
VP/TX & Southwest Region-Sr. Mortgage Banking Officer at BNY Mellon NMLSR: 404870

❝ Michael is very professional, business oriented and personal. He cares about the quality of relationships he develops and the people he works with both as clients and business partners.

January 20, 2009, Kim was with another company when working with Michael at Prestige Lending Services

Connections

Shared (2)

Jim Jordan (NMLS#271630)  1▪
Mortgage Planner, Fairway Independent...

Bob Roberts  1▪
Senior Vice President at Gracy Title

Groups

Strategic Real Estate...
2,364 members
Join

Austin Building Prof...
229 members
Join

Christian Real Estate...
385 members
Join

MBa
Mortgage Bankers A....
53,591 members
Join

New Homes Professi...
10,358 members
Join

New Home Sales
8,539 members
Join

Mortgage Net Branch...
2,395 members
Join

See 4 more

Following

## Influencers

Tony Robbins
Chairman at Anthony...
Follow

Dave Kerpen
Founder & CEO,...
Follow

Suze Orman
Television host,...
Follow

## News

Big Ideas & Innovation
9,723,187 followers
Follow

Technology
7,407,075 followers
Follow

Banking & Finance
2,306,199 followers
Follow

Real Estate
171,548 followers
Follow



People also viewed
**Ty Gosnay** Mortgage Loan
Officer at Oak Mortgage Group  ›

https://www.linkedin.com/in/michaelnasserfar

3/25/2015

**CONFIDENTIAL**

APF00000230



## Companies

Search for people, jobs, companies, and more...

Advanced

**Realty Austin**
Real Estate
Follow

**Gehan Homes**
Construction
Follow

**Aspen Heights**
Real Estate
Follow

**JBGoodwin REALTO...**
Real Estate
Follow



**Amelia Bullock Realt...**
Real Estate
Follow

**Meritage Homes**
Construction
Follow

**The Ibis Network**
Marketing and
Advertising
Follow

See 27 more

## Schools

**The University of Tex...**
Austin, Texas Area
Following

Help Center   About   Careers   Advertising   Talent Solutions   Sales Solutions   Small Business   Mobile   Language   Upgrade Your Account

LinkedIn Corporation © 2015   User Agreement   Privacy Policy   Ad Choices   Community Guidelines   Cookie Policy   Copyright Policy   Send Feedback



People also viewed
**Ty Gosnay** Mortgage Loan
Officer at Oak Mortgage Group

https://www.linkedin.com/in/michaelnasserfar

3/25/2015

**CONFIDENTIAL**

**APF00000231**

APPLICANT'S EXHIBIT NO. 69

- AV Vaghela – NMLS #220899
- Nikki Vaghela – NMLS #220914
- Will Gray - NMLS #314845
- Robert Mason - NMLS #585082
- Sam Elder – NMLS #480350

Loan Partners

- Margo Gamble – Loan Partner II
- Alicia Holsinger – Loan Partner II
- Nicole Flores – Loan Partner II
- Shelby Krasovec – Loan Partner I



Waco Branch

- Jeff Bradburn - NMLS #313379
- John Snider - NMLS #286728
- Chuck Jones - NMLS #824633
- Mark Bower - NMLS #442240
- Robbie Hetland - NMLS #997269
- Tara Lewis - NMLS #907586
- Angie Coleman - NMLS# 1262986
- Michelle Leatherwood - Office Manager
- Haley Griffin - Marketing Assistant

Austin Branch

- Michael Nasserfar – VP of Austin – NMLS #209485
- Michael Task – Austin Sales Manager – NMLS #314948
- Ty Gosnay – Mortgage Banker – NMLS #997663



Applicant's
Injunction Hearing
Exhibit 069



EXHIBIT
116
4-30-15 KW

APPLICANT'S EXHIBIT NO. 70



OFFER #1

November 11, 2014

Dear Michael and Michael,

We are excited by the prospect of you joining our team at        As such we would like to propose an offer to you.

Offer Summary:

- Personal Production:
  - Up to $3.5 million – 110 bps.
  - $3.5 - $5.49 million – 120 bps.
  - $5.5 million and up – 130 bps.
  - 15 bps over-ride on branch loan officers.
-     to pay branch rent.
-     to pay of in-branch processor.
-     to pay up to $40,000/yr for a branch originators assistant.
- Four month guarantee of $45,000 per month, divided between Michael Task and Michael Nasserfar in a proportion agreed upon.

Key Benefits:

- We have a strong and consistent company culture.      has been named one of the Best Places to Work by the *Austin Business Journal* four years running.
- Operations excellence: underwriting turn-times averaging less than 48 hours, instructions to title 2-3 days before closing and prior to CTC, our latest net promoter scores of 67%, and all facets of the loan process locally housed.
- Competitive rates: demonstrated by Optimal Blue reporting versus our competitors.
- In-house local marketing: quick professional personalized support, data base marketing, and       participation for our originators.
- Simple transparent compensation plan
- Reduced time spent on administrative activities

We look forward to continuing our conversations together.

Regards,


Area Manager

**Applicant's Injunction Hearing Exhibit 070**

**EXHIBIT**
113
4-30-15 kw
depobook.com

OAK MORTGAGE ET AL 4.29.15 D-1-GN-15-785 000885

## Mortgage Banker Compensation Agreement for Nasserfar/Task Team

We are pleased to confirm the terms of your team's employment with '
The offer of employment extended to you is as follows:

| | |
|---|---|
| Position: | Producing Branch Management Team |
| Location: | Austin |
| Manager: | |
| Effective Date: | 12.01.2014 |

### Commission

In addition to the terms of this individual compensation agreement, your compensation as a Mortgage Banker at        is also governed by the Consumer Financial Protection Bureau 2013 Loan Originator Rule finalized in October 2013 and dated November 8, 2013, and any subsequent revisions to that rule. In accordance with that rule, you are eligible for commission compensation as outlined below:

| Transaction Amounts Per Month | Basis Points |
|---|---|
| Up to $3.49 million | 110 |
| $3.5 - $5.49 million | 120 |
| $5.5 million + | 130 |

Your commission will be calculated by multiplying the basis points listed above times the dollar amount of all loans funded during the commission period. The basis points used to calculate the commission will be determined by the number of transactions (defined as unique addresses) funded in said commission period.       closing fees are required to be collected on each loan.

Being a part of the       comes with certain high expectations. You will be joining a community of high-performing originators who want to be surrounded with a powerful peer group. As such, we and your colleagues expect a certain level of performance once you are established here. This means that we expect you to produce at least 4 units per month in the first month after you have completed 120 days of service and each month thereafter.

No commission will be paid on employee mortgage loans.

Loans may not be transferred between Mortgage Bankers.

The Company reserves the right to modify your compensation at any time at its sole discretion.

### Brokered Loans; Other Loans; Second Liens

Mortgage Bankers may only transact brokered loans with vendors on the Company's approved list, and those loans must be locked by the Company's secondary department.

OAK MORTGAGE ET AL 4.29.15 D-1-GN-15-785 000886

# Addendum to Compensation Agreement for Nasserfar/Task Team

Effective date: 12.01.2014

This agreement applies to Michael Nasserfar and Michael Task as a team. All amounts below are cumulative for the team.

In addition to the terms and conditions laid forth in the Compensation agreement, this addendum will serve as an explanation of special incentives or pay arrangements as part of your employment with

You will be paid the greater of your earned commissions, or the following incentives:

| Month | Incentive | Minimum Requirement | Payment Date |
|---|---|---|---|
| December | $22,500 | None | 12/15/14 |
| | $22,500 | None | 12/31/14 |
| January | $22,500 | None | 01/15/15 |
| | $22,500 | None | 01/31/15 |
| February | $22,500 | 4 loans closed by 01.31.15 | 02/15/15 |
| | $22,500 | Cumulative of 8 loans closed by 02.15.15 | 02/28/15 |
| March | $22,500 | Cumulative of 14 loans closed by 02.28.15 | 03/15/15 |
| | $22,500 | Cumulative of 20 loans closed by 03.15.15 | 03/31/15 |

The incentives will not be prorated and will be paid only if the minimum requirements are met in full and only in the amounts and on the dates specified above.

In the event of any questions or disputes regarding incentives or their minimum requirements, all final decisions will be made by the VP of Finance.

If you terminate your employment with Sente prior to 12.01.15, your team agrees to pay 100% of the Incentive paid, as described above (to the extent Incentive was unearned), within 10 days of the team's last day. This agreement is not severable and cannot be divided among team members.

You will also receive:
- 15 bps on the production of your team
- _____ mailings and marketing to your contacts at no cost to you for first 4 months
- A dedicated production assistant paid by _____ up to $40,000 annual salary

OAK MORTGAGE ET AL 4.29.15 D-1-GN-15-785 000887

# Loan Profitability Report

Group By: Closed Loans Funded Date: Between 1/1/2014 and 11/12/2014

| Branch | Loan Officer | Loan # | Borrower Last Name | Loan Type | Loan Amount | Origination | Branch Margin | Branch Compensation | YSP | Total Revenue % | LC - Interest Rate | LC - Cost to Cure | LC - HUD1 Page 1 | Total Lender Credit % | Total Revenue | Revenue % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 152010 | Fay Strange | 15201005079 | Palladino | FarmersHomeA | 357,159.00 | 0.00 | 1,785.80 | 4,500.00 | 1,771.51 | 2.26% | 0.00 | 0.00 | 0.00 | 0.00% | 8,057.30 | 2.26 % |
| | | 15201005716 | Thomas | VA | 286,246.00 | 0.00 | 1,431.23 | 4,500.00 | 1,731.79 | 2.68% | 0.00 | 0.00 | 0.00 | 0.00% | 7,663.02 | 2.68 % |
| | | 15201005298 | Ducat | Conventional | 274,411.00 | 2,744.11 | 411.62 | 4,939.40 | 0.00 | 2.95% | 0.00 | 3.13 | 0.00 | 0.00% | 8,092.00 | 2.95 % |
| | | 15201005368 | Glandana | Conventional | 250,029.00 | 0.00 | 375.04 | 4,500.00 | 0.00 | 1.95% | 0.00 | 0.00 | 1,422.67 | 0.57% | 3,452.37 | 1.38 % |
| | | 15201006134 | Runge | Conventional | 287,920.00 | 0.00 | 431.88 | 4,500.00 | 0.00 | 1.71% | 0.00 | 0.00 | 0.00 | 0.00% | 4,931.88 | 1.71 % |
| | | 15201006323 | Acevedo | Conventional | 228,969.00 | 0.00 | 343.45 | 4,121.44 | 0.00 | 1.95% | 0.00 | 0.00 | 0.00 | 0.00% | 4,464.89 | 1.95 % |
| | | 15201006541 | Segura Jr. | Conventional | 175,491.00 | 0.00 | 263.24 | 3,158.84 | 0.00 | 1.95% | 0.00 | 0.00 | 28.08 | 0.02% | 3,394.00 | 1.93 % |
| | Loan Officer Total | | | | 1,860,225.00 | 2,744.11 | 5,042.26 | 30,219.68 | 3,503.30 | 2.23% | 0.00 | 3.13 | 1,450.75 | 0.08% | 40,055.46 | 2.15 % |
| | Kimberly Jones | 15201006088 | Hong | Conventional | 97,500.00 | 0.00 | 487.50 | 1,462.50 | 757.58 | 2.78% | 0.00 | 0.00 | 250.00 | 0.26% | 2,457.58 | 2.52 % |
| | | 15201006112 | Lee | Conventional | 96,000.00 | 0.00 | 480.00 | 1,440.00 | 423.36 | 2.44% | 0.00 | 0.00 | 250.00 | 0.26% | 2,093.36 | 2.18 % |
| | | 15201006058 | Paredes | Conventional | 88,000.00 | 0.00 | 440.00 | 1,320.00 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 1,760.00 | 2.00 % |
| | Loan Officer Total | | | | 281,500.00 | 0.00 | 1,407.50 | 4,222.50 | 1,180.94 | 2.42% | 0.00 | 0.00 | 500.00 | 0.18% | 6,310.94 | 2.24 % |
| | Michael Nasserfar | 15201005739 | Adams | Conventional | 231,442.00 | 0.00 | 1,157.21 | 3,471.63 | 1,150.27 | 2.50% | 0.00 | 0.00 | 0.00 | 0.00% | 5,779.11 | 1.71 % |
| | Loan Officer Total | | | | 231,442.00 | 0.00 | 1,157.21 | 3,471.63 | 1,150.27 | 2.50% | 0.00 | 0.00 | 0.00 | 0.00% | 5,779.11 | 2.50 % |
| | Michael Task | 15201006450 | Mauldin | Conventional | 209,000.00 | 0.00 | 313.50 | 3,762.00 | 0.00 | 1.95% | 0.00 | 0.00 | 500.00 | 0.24% | 3,575.50 | 1.71 % |
| | Loan Officer Total | | | | 209,000.00 | 0.00 | 313.50 | 3,762.00 | 0.00 | 1.95% | 0.00 | 0.00 | 500.00 | 0.24% | 3,575.50 | 1.71 % |
| | Total Branch Total | | | | 2,582,167.00 | 2,744.11 | 7,920.47 | 41,675.81 | 5,834.50 | 2.25% | 0.00 | 3.13 | 2,450.75 | 0.10% | 55,721.00 | 2.16 % |
| 152180 | Joan Wilson | 15218015177 | Cameron | Conventional | 310,000.00 | 0.00 | 0.00 | 6,200.00 | 0.00 | 2.00% | 0.00 | 429.00 | 1,526.90 | 0.63% | 4,244.10 | 1.37 % |
| | Loan Officer Total | | | | 310,000.00 | 0.00 | 0.00 | 6,200.00 | 0.00 | 2.00% | 0.00 | 429.00 | 1,526.90 | 0.63% | 4,244.10 | 1.37 % |
| | Kimberly Jones | 15218013719 | Haygood | FHA | 231,470.00 | 0.00 | 2,893.38 | 3,472.05 | 168.97 | 2.82% | 0.00 | 0.00 | 0.00 | 0.00% | 6,534.40 | 2.82 % |
| | | 15200000851 | Furgerson | Conventional | 126,000.00 | 0.00 | 630.00 | 1,890.00 | 554.40 | 2.44% | 0.00 | 43.00 | 0.00 | 0.03% | 3,031.40 | 2.41 % |
| | | 15201006580 | Mokhtar | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 350.28 | 0.08% | 7,989.72 | 1.92 % |
| | Loan Officer Total | | | | 774,470.00 | 0.00 | 5,608.38 | 11,617.05 | 723.37 | 2.32% | 0.00 | 43.00 | 350.28 | 0.05% | 17,555.52 | 2.27 % |
| | Michael E Task | 15200000920 | Schoonover | Conventional | 216,600.00 | 0.00 | 1,083.00 | 3,249.00 | 1,193.47 | 2.55% | 0.00 | 0.00 | 0.00 | 0.00% | 5,525.47 | 2.55 % |
| | | 15201013555 | Shepherd | Conventional | 312,975.00 | 0.00 | 1,564.88 | 4,694.63 | 0.00 | 2.00% | 0.00 | 0.00 | 1,145.49 | 0.37% | 5,114.02 | 1.63 % |
| | | 15218017054 | Hazy | Conventional | 250,000.00 | 0.00 | 1,250.00 | 3,750.00 | 762.50 | 2.31% | 0.00 | 0.00 | 0.00 | 0.00% | 5,762.50 | 2.31 % |
| | | 15218017058 | Dempsey | Conventional | 390,000.00 | 0.00 | 1,950.00 | 5,850.00 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 7,800.00 | 2.00 % |
| | | 15218016929 | Cheaney | Conventional | 254,600.00 | 0.00 | 1,273.00 | 3,819.00 | 0.00 | 2.00% | 0.00 | 0.00 | 540.74 | 0.21% | 4,551.26 | 1.79 % |
| | | 15218017835 | Shaw | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 2,931.12 | 0.70% | 5,408.88 | 1.30 % |
| | | 15218017920 | Thomas | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 8,340.00 | 2.00 % |
| | | 15218017996 | Crawford Sr | Conventional | 261,000.00 | 0.00 | 1,305.00 | 3,915.00 | 1,302.39 | 2.50% | 0.00 | 0.00 | 1,607.40 | 0.62% | 4,914.99 | 1.88 % |
| | | 15218018010 | Fossas | Conventional | 356,250.00 | 0.00 | 1,781.25 | 5,343.75 | 0.00 | 2.00% | 0.00 | 2,778.75 | 440.00 | 0.90% | 3,906.25 | 1.10 % |
| | | 15218018048 | Brooks | Conventional | 245,100.00 | 0.00 | 1,225.50 | 3,676.50 | 0.00 | 2.00% | 0.00 | 0.00 | 762.26 | 0.31% | 4,139.74 | 1.69 % |
| | | 15218018067 | Boone | Conventional | 400,000.00 | 0.00 | 2,000.00 | 6,000.00 | 544.00 | 2.14% | 0.00 | 0.00 | 1,823.40 | 0.46% | 6,720.60 | 1.68 % |
| | | 15218018407 | Caplan | FHA | 187,423.00 | 0.00 | 2,342.79 | 2,811.35 | 110.58 | 2.81% | 0.00 | 0.00 | 1,500.00 | 0.80% | 3,764.72 | 2.01 % |
| | | 15218018719 | Feltner | Conventional | 270,000.00 | 0.00 | 1,350.00 | 4,050.00 | 0.00 | 2.00% | 0.00 | 0.00 | 688.50 | 0.26% | 4,711.50 | 1.75 % |
| | | 15218019148 | Wade | Conventional | 210,000.00 | 0.00 | 1,050.00 | 3,150.00 | 0.00 | 2.00% | 0.00 | 378.88 | 75.60 | 0.22% | 3,745.52 | 1.78 % |
| | | 15218018563 | Foreman | Conventional | 145,000.00 | 0.00 | 725.00 | 2,175.00 | 279.85 | 2.19% | 0.00 | 0.00 | 0.00 | 0.00% | 3,179.85 | 2.19 % |
| | | 15218019738 | Dautremont | Conventional | 155,920.00 | 0.00 | 779.60 | 2,338.80 | 689.17 | 2.44% | 0.00 | 27.00 | 0.00 | 0.02% | 3,780.57 | 2.42 % |
| | Loan Officer Total | | | | 4,488,868.00 | 0.00 | 23,850.01 | 67,333.03 | 4,881.95 | 2.14% | 0.00 | 3,184.63 | 11,514.51 | 0.33% | 81,365.85 | 1.81 % |
| | Michael Nasserfar | 15218019949 | Barras | Conventional | 263,945.00 | 0.00 | 1,319.73 | 3,959.18 | 0.00 | 2.00% | 0.00 | 0.00 | 2,787.70 | 1.06% | 2,491.21 | 0.94 % |
| | | 15218020226 | Wright | Conventional | 159,920.00 | 0.00 | 799.60 | 2,398.80 | 319.84 | 2.20% | 0.00 | 0.00 | 0.00 | 0.00% | 3,518.24 | 2.20 % |
| | | 15218018659 | Krahenbuhl | Conventional | 188,000.00 | 0.00 | 282.00 | 3,384.00 | 0.00 | 1.95% | 0.00 | 0.00 | 1,064.08 | 0.57% | 2,601.92 | 1.38 % |
| | | 15218019228 | Soucy | Conventional | 319,500.00 | 0.00 | 1,597.50 | 4,792.50 | 1,124.64 | 2.35% | 0.00 | 0.00 | 0.00 | 0.00% | 7,514.64 | 2.35 % |
| | | 15218019569 | Cutbirth | Conventional | 192,000.00 | 0.00 | 960.00 | 2,880.00 | 345.60 | 2.18% | 0.00 | 0.00 | 0.00 | 0.00% | 4,185.60 | 2.18 % |
| | | 15200000841 | DiTommaso | VA | 218,801.00 | 0.00 | 2,735.01 | 3,282.02 | 711.10 | 3.08% | 0.00 | 0.00 | 200.00 | 0.09% | 6,528.14 | 2.98 % |
| | | 15218018412 | Buckner | Conventional | 227,000.00 | 0.00 | 1,135.00 | 3,405.00 | 0.00 | 2.00% | 0.00 | 0.00 | 402.31 | 0.18% | 4,137.69 | 1.82 % |
| | | 15218018452 | Blanton | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 2,264.31 | 2.54% | 0.00 | 0.00 | 0.00 | 0.00% | 10,604.31 | 2.54 % |
| | | 15218018474 | Gaines Jr. | VA | 328,383.00 | 0.00 | 4,104.79 | 4,925.75 | 49.26 | 2.77% | 0.00 | 0.00 | 2,500.00 | 0.76% | 6,579.79 | 2.00 % |
| | | 15218018164 | Goins | Conventional | 295,621.00 | 0.00 | 443.43 | 4,500.00 | 0.00 | 1.67% | 0.00 | 0.00 | 1,184.90 | 0.40% | 3,758.53 | 1.27 % |

OAK MORTGAGE ... 000890

| Loan ID | Name | Type | Amount | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15218018267 | Picanso | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 1,668.00 | 2.40% | 0.00 | 0.00 | 1,697.40 | 0.41% | 8,310.60 | 1.99 % |
| 15218017863 | Benedetti | Conventional | 193,500.00 | 0.00 | 967.50 | 2,902.50 | 0.00 | 2.00% | 0.00 | 0.00 | 265.10 | 0.14% | 3,604.90 | 1.86 % |
| 15218017883 | Liesman | FHA | 250,376.00 | 0.00 | 3,129.70 | 3,755.64 | 0.00 | 2.75% | 0.00 | 0.00 | 1,029.05 | 0.41% | 5,856.29 | 2.34 % |
| 15218016989 | Baker | Conventional | 101,160.00 | 0.00 | 505.80 | 1,517.40 | 156.80 | 2.16% | 0.00 | 0.00 | 0.00 | 0.00% | 2,180.00 | 2.16 % |
| 15218017405 | Garwood | Conventional | 284,800.00 | 0.00 | 1,424.00 | 4,272.00 | 469.92 | 2.17% | 0.00 | 0.00 | 1,148.40 | 0.40% | 5,017.52 | 1.76 % |
| 15218017406 | Bentley | Conventional | 248,000.00 | 0.00 | 1,240.00 | 3,720.00 | 136.40 | 2.05% | 0.00 | 0.00 | 0.00 | 0.00% | 5,096.40 | 2.05 % |
| 15218014829 | Laughlin | Conventional | 247,233.00 | 0.00 | 1,236.17 | 3,708.50 | 0.00 | 2.00% | 0.00 | 0.00 | 135.98 | 0.06% | 4,808.69 | 1.95 % |
| 15218014883 | White II | Conventional | 292,968.00 | 0.00 | 1,464.84 | 4,394.52 | 670.90 | 2.23% | 0.00 | 0.00 | 0.00 | 0.00% | 6,530.26 | 2.23 % |
| 15200000870 | Blok | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 1,843.14 | 0.44% | 6,496.86 | 1.56 % |
| 15200000904 | Molander | Conventional | 408,302.00 | 0.00 | 2,041.51 | 6,124.53 | 0.00 | 2.00% | 0.00 | 0.00 | 1,709.64 | 0.42% | 6,456.40 | 1.58 % |
| 15218014968 | Bythewood | Conventional | 124,800.00 | 0.00 | 187.20 | 2,246.40 | 52.42 | 1.99% | 0.00 | 0.00 | 0.00 | 0.00% | 2,486.02 | 1.99 % |
| 15218015003 | Gray | Conventional | 380,000.00 | 0.00 | 1,900.00 | 5,700.00 | 0.00 | 2.00% | 0.00 | 0.00 | 1,484.77 | 0.39% | 6,115.23 | 1.61 % |
| 15201006560 | Osborne | VA | 240,619.00 | 0.00 | 3,007.74 | 3,609.29 | 887.88 | 3.12% | 0.00 | 0.00 | 87.74 | 0.04% | 7,417.17 | 3.08 % |
| 15200000780 | Schalchlin | FHA | 244,003.00 | 0.00 | 3,050.04 | 3,660.05 | 0.00 | 2.75% | 0.00 | 0.00 | 392.84 | 0.16% | 6,317.25 | 2.59 % |
| 15200000782 | Foltz | Conventional | 281,666.00 | 0.00 | 422.50 | 4,500.00 | 3,867.27 | 3.12% | 0.00 | 0.00 | 6,506.39 | 2.31% | 2,283.38 | 0.81 % |
| 15200000804 | Nguyen | FHA | 233,292.00 | 0.00 | 3,499.38 | 3,499.38 | 0.00 | 3.00% | 0.00 | 0.00 | 323.64 | 0.14% | 6,675.12 | 2.86 % |
| 15218015253 | Sutphen | Conventional | 312,022.00 | 0.00 | 1,560.11 | 4,680.33 | 0.00 | 2.00% | 0.00 | 0.00 | 8,740.44 | 2.80% | -2,500.00 | -0.80 % |
| 15218015080 | Benavides III | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 1,793.90 | 0.43% | 6,546.10 | 1.57 % |
| 15218015137 | Lals | Conventional | 216,000.00 | 0.00 | 1,080.00 | 3,240.00 | 751.68 | 2.35% | 0.00 | 0.00 | 0.00 | 0.00% | 5,071.68 | 2.35 % |
| 15218015318 | Greene | VA | 381,809.00 | 0.00 | 4,772.61 | 5,727.14 | 2,309.94 | 3.36% | 0.00 | 0.00 | 1,185.40 | 0.31% | 11,624.30 | 3.04 % |
| 15218016787 | Warner | Conventional | 269,699.00 | 0.00 | 1,348.50 | 4,045.49 | 0.00 | 2.00% | 0.00 | 0.00 | 1,818.19 | 0.67% | 3,575.80 | 1.33 % |
| 15218016788 | Strickland | VA | 462,000.00 | 0.00 | 693.00 | 4,500.00 | 0.00 | 1.70% | 0.00 | 0.00 | 7,841.50 | 1.70% | -2,648.50 | -0.57 % |
| 15218015548 | Branch | Conventional | 332,463.00 | 0.00 | 2,909.05 | 4,500.00 | 5,432.45 | 3.86% | 0.00 | 0.00 | 0.00 | 0.00% | 12,841.50 | 3.86 % |
| 15218015561 | Mossman | Conventional | 322,413.00 | 0.00 | 483.62 | 4,500.00 | 1,025.27 | 1.86% | 0.00 | 0.00 | 0.00 | 0.00% | 6,008.89 | 1.86 % |
| 15218015719 | Ngo | Conventional | 220,000.00 | 0.00 | 1,100.00 | 3,300.00 | 0.00 | 2.00% | 0.00 | 0.00 | 2,673.80 | 1.22% | 1,726.20 | 0.78 % |
| 15218015742 | Phi | Conventional | 101,000.00 | 0.00 | 151.50 | 1,818.00 | 0.00 | 1.95% | 0.00 | 0.00 | 241.39 | 0.24% | 1,728.11 | 1.71 % |
| 15218015773 | Nelson | Conventional | 329,440.00 | 0.00 | 1,647.20 | 4,941.60 | 448.04 | 2.14% | 0.00 | 0.00 | 0.00 | 0.00% | 7,036.84 | 2.14 % |
| 15218016104 | Bolling | Conventional | 233,603.00 | 0.00 | 1,168.02 | 3,504.05 | 303.68 | 2.13% | 0.00 | 0.00 | 2,500.00 | 1.07% | 2,475.75 | 1.06 % |
| 15218016240 | Joly | Conventional | 398,187.00 | 0.00 | 1,990.94 | 5,972.81 | 0.00 | 2.00% | 0.00 | 0.00 | 1,322.40 | 0.33% | 6,641.35 | 1.67 % |
| 15218016547 | Rieder | Conventional | 417,000.00 | 0.00 | 625.50 | 4,500.00 | 0.00 | 1.23% | 0.00 | 0.00 | 2,183.04 | 0.52% | 2,942.46 | 0.71 % |
| 15200000934 | Mattingly | Conventional | 206,161.00 | 0.00 | 1,030.81 | 3,092.42 | 0.00 | 2.00% | 0.00 | 0.00 | 171.11 | 0.08% | 3,952.12 | 1.92 % |
| 15200000950 | Tinsley Jr. | VA | 164,000.00 | 0.00 | 2,050.00 | 2,460.00 | 792.12 | 3.23% | 0.00 | 0.00 | 0.00 | 0.00% | 5,302.12 | 3.23 % |
| 15200001019 | Cantu | Conventional | 294,500.00 | 0.00 | 1,472.50 | 4,417.50 | 256.22 | 2.09% | 0.00 | 0.00 | 0.00 | 0.00% | 6,146.22 | 2.09 % |
| 15200001073 | Story | Conventional | 288,279.00 | 0.00 | 1,441.40 | 4,324.19 | 0.00 | 2.00% | 0.00 | 0.00 | 1,655.25 | 0.57% | 4,110.34 | 1.43 % |
| 15218014041 | Myers | Conventional | 387,917.00 | 0.00 | 1,939.59 | 5,818.76 | 0.00 | 2.00% | 0.00 | 0.00 | 4,175.80 | 1.08% | 3,582.55 | 0.92 % |
| 15218014042 | Ray | Conventional | 308,582.00 | 0.00 | 1,542.91 | 4,628.73 | 0.00 | 2.00% | 0.00 | 0.00 | 506.07 | 0.16% | 5,665.57 | 1.84 % |
| 15218014157 | Muck | FHA | 251,363.00 | 0.00 | 3,142.04 | 3,770.45 | 1,123.59 | 3.20% | 0.00 | 0.00 | 0.00 | 0.00% | 8,036.08 | 3.20 % |
| 15218014204 | King | Conventional | 374,261.00 | 0.00 | 1,871.31 | 5,613.92 | 0.00 | 2.00% | 0.00 | 0.00 | 2,282.99 | 0.61% | 5,202.24 | 1.39 % |
| 15218014208 | Shoenfelt | Conventional | 181,600.00 | 0.00 | 272.40 | 3,268.80 | 1,596.26 | 2.83% | 0.00 | 0.00 | 1,500.00 | 0.83% | 3,637.46 | 2.00 % |
| 15218014236 | Callaway | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 1,517.88 | 2.36% | 0.00 | 0.00 | 1,655.40 | 0.40% | 8,192.48 | 1.96 % |
| 15218014297 | Asencio | Conventional | 234,560.00 | 0.00 | 1,172.80 | 3,518.40 | 255.67 | 2.11% | 0.00 | 0.00 | 0.00 | 0.00% | 4,946.87 | 2.11 % |
| 15218014314 | O'Neal | Conventional | 142,500.00 | 0.00 | 213.75 | 2,565.00 | 0.00 | 1.95% | 0.00 | 72.00 | 627.00 | 0.49% | 2,079.75 | 1.46 % |
| 15218014371 | Calvert | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 783.96 | 0.19% | 7,556.04 | 1.81 % |
| 15218014375 | Hernandez | FHA | 310,880.00 | 0.00 | 3,886.00 | 4,663.20 | 2,176.16 | 3.45% | 0.00 | 0.00 | 0.00 | 0.00% | 10,725.36 | 3.45 % |
| 15218014561 | Bailey | Conventional | 263,150.00 | 0.00 | 394.73 | 4,500.00 | 2,520.98 | 2.82% | 0.00 | 0.00 | 2,000.00 | 0.76% | 5,415.70 | 2.06 % |
| 15218014569 | Valdez | Conventional | 195,024.00 | 0.00 | 975.12 | 2,925.36 | 0.00 | 2.00% | 0.00 | 0.00 | 423.20 | 0.22% | 3,477.28 | 1.78 % |
| 15218014614 | Vasquez | Conventional | 369,323.00 | 0.00 | 1,846.62 | 5,539.85 | 0.00 | 2.00% | 0.00 | 25.00 | 890.07 | 0.25% | 6,471.40 | 1.75 % |
| 15218014616 | MCCASKILL | Conventional | 234,800.00 | 0.00 | 1,174.00 | 3,522.00 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 4,696.00 | 2.00 % |
| 15218014644 | Beard | Conventional | 200,000.00 | 0.00 | 1,000.00 | 3,000.00 | 0.00 | 2.00% | 0.00 | 0.00 | 1,066.00 | 0.53% | 2,934.00 | 1.47 % |
| 15218014654 | LaFrance | VA | 243,692.00 | 0.00 | 3,046.15 | 3,655.38 | 0.00 | 2.75% | 0.00 | 0.00 | 1,191.65 | 0.49% | 5,509.88 | 2.26 % |
| 15201006582 | Shupe | VA | 168,036.00 | 0.00 | 2,100.45 | 2,520.54 | 725.92 | 3.16% | 0.00 | 0.00 | 0.00 | 0.00% | 5,346.91 | 3.18 % |
| 15201006588 | Stevens | Conventional | 316,358.00 | 0.00 | 474.54 | 4,500.00 | 0.00 | 1.57% | 0.00 | 0.00 | 563.12 | 0.18% | 4,411.42 | 1.39 % |
| 15201006589 | Lantrip | Conventional | 300,000.00 | 0.00 | 1,500.00 | 4,500.00 | 1,470.00 | 2.49% | 0.00 | 0.00 | 1,610.40 | 0.54% | 5,859.60 | 1.95 % |
| 15200000668 | Silva | Conventional | 338,267.00 | 0.00 | 1,691.34 | 5,074.01 | 104.86 | 2.03% | 0.00 | 0.00 | 2,000.00 | 0.59% | 4,870.21 | 1.44 % |
| 15200000685 | Calvillo | VA | 395,132.00 | 0.00 | 4,939.15 | 5,926.98 | 324.01 | 2.83% | 0.00 | 0.00 | 200.00 | 0.05% | 10,990.14 | 2.78 % |
| 15200000720 | Liljegren | Conventional | 264,000.00 | 0.00 | 1,320.00 | 3,960.00 | 0.00 | 2.00% | 0.00 | 0.00 | 132.00 | 0.05% | 5,148.00 | 1.95 % |

| | Loan # | Name | Type | Amount | | | | | % | | | | | % | | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15200000734 | Box | Conventional | 179,550.00 | 0.00 | 897.75 | 2,693.25 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 3,591.00 | 2.00 % |
| | 15201006465 | Hobbs | Conventional | 292,471.00 | 0.00 | 438.71 | 4,500.00 | 0.00 | 1.69% | 0.00 | 0.00 | 81.98 | 0.03% | 4,856.73 | 1.66 % |
| | 15201006482 | TUCCIARONE | Conventional | 110,000.00 | 0.00 | 550.00 | 1,650.00 | 0.00 | 2.00% | 0.00 | 0.00 | 3,000.00 | 2.73% | -800.00 | -0.73 % |
| | 15201006507 | Carmichael | Conventional | 203,974.00 | 0.00 | 305.96 | 3,671.53 | 0.00 | 1.95% | 0.00 | 0.00 | 200.00 | 0.10% | 3,777.49 | 1.85 % |
| | 15201006508 | Gladney | Conventional | 197,303.00 | 0.00 | 295.95 | 3,551.45 | 0.00 | 1.95% | 0.00 | 0.00 | 655.77 | 0.33% | 3,191.63 | 1.62 % |
| | 15201006525 | Lozano | Conventional | 145,000.00 | 1,450.00 | 725.00 | 2,175.00 | 0.00 | 3.00% | 0.00 | 0.00 | 1,699.40 | 1.17% | 2,650.60 | 1.83 % |
| | 15201006540 | Shearn | VA | 282,045.00 | 0.00 | 1,410.23 | 4,230.68 | 0.00 | 2.00% | 0.00 | 0.00 | 1,762.53 | 0.62% | 3,878.38 | 1.38 % |
| | 15201005779 | Avery | Conventional | 301,260.00 | 0.00 | 3,765.75 | 4,518.90 | 1,418.93 | 3.22% | 0.00 | 0.00 | 0.00 | 0.00% | 9,703.58 | 3.22 % |
| | 15201005792 | Gardinier | Conventional | 280,603.00 | 0.00 | 1,403.02 | 4,209.05 | 75.76 | 2.03% | 0.00 | 0.00 | 200.00 | 0.07% | 5,487.83 | 1.96 % |
| | 15201005870 | Kimpel | VA | 240,138.00 | 0.00 | 1,200.69 | 3,602.07 | 0.00 | 2.00% | 0.00 | 0.00 | 302.57 | 0.13% | 4,500.19 | 1.87 % |
| | 15201005920 | Brown | Conventional | 245,658.00 | 0.00 | 3,070.73 | 3,684.87 | 545.36 | 2.97% | 0.00 | 0.00 | 0.00 | 0.00% | 7,300.96 | 2.97 % |
| | 15201005950 | Wolfer | Conventional | 315,766.00 | 0.00 | 1,578.83 | 4,736.49 | 795.73 | 2.25% | 0.00 | 0.00 | 0.00 | 0.00% | 7,111.05 | 2.25 % |
| | 15201005997 | Hernandez | Conventional | 328,579.00 | 0.00 | 1,642.90 | 4,928.69 | 0.00 | 2.00% | 0.00 | 0.00 | 1,610.04 | 0.49% | 4,961.55 | 1.51 % |
| | 15201006030 | Baricuatro | Conventional | 314,524.00 | 0.00 | 471.79 | 4,500.00 | 1,201.48 | 1.96% | 0.00 | 0.00 | 3,826.00 | 1.22% | 2,347.27 | 0.75 % |
| | 25213011538 | Otto | Conventional | 247,857.00 | 0.00 | 1,239.29 | 3,717.86 | 2,094.39 | 2.85% | 0.00 | 0.00 | 1,019.40 | 0.41% | 6,032.14 | 2.43 % |
| | 15201006053 | O'Neal | Conventional | 305,782.00 | 0.00 | 458.67 | 4,500.00 | 0.00 | 1.62% | 0.00 | 0.00 | 168.18 | 0.05% | 4,790.49 | 1.57 % |
| | 15201005280 | Green | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 0.00 | 2.00% | 0.00 | 0.00 | 2,101.90 | 0.50% | 6,238.10 | 1.50 % |
| | 15201004961 | Bentley | Conventional | 237,383.00 | 0.00 | 1,186.92 | 3,560.75 | 0.00 | 2.00% | 0.00 | 0.00 | 99.70 | 0.04% | 4,647.97 | 1.96 % |
| | 15201005018 | Alamqari | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 1,522.05 | 2.37% | 0.00 | 0.00 | 1,944.90 | 0.47% | 7,917.15 | 1.90 % |
| | 15201003599 | Kastak | Conventional | 417,000.00 | 0.00 | 2,085.00 | 6,255.00 | 2,735.52 | 2.66% | 0.00 | 0.00 | 2,572.90 | 0.62% | 8,502.62 | 2.04 % |
| | 15201004202 | Pradhan | Conventional | 280,000.00 | 0.00 | 420.00 | 4,500.00 | 1,005.20 | 2.12% | 0.00 | 0.00 | 1,936.40 | 0.69% | 3,988.80 | 1.42 % |
| | 15201006070 | Kim | Conventional | 329,267.00 | 0.00 | 493.90 | 4,500.00 | 6,476.68 | 3.45% | 0.00 | 0.00 | 5,597.54 | 1.70% | 5,873.04 | 1.78 % |
| | 15201006074 | Hulbert | Conventional | 252,012.00 | 0.00 | 1,260.06 | 3,780.18 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 5,040.24 | 2.00 % |
| | 15201005682 | Carmichael | FHA | 191,973.00 | 0.00 | 959.87 | 2,879.60 | 879.24 | 2.46% | 0.00 | 0.00 | 0.00 | 0.00% | 4,718.70 | 2.46 % |
| | 15201005715 | Williams | Conventional | 302,706.00 | 0.00 | 3,783.83 | 4,540.59 | 1,477.21 | 3.24% | 0.00 | 0.00 | 0.00 | 0.00% | 9,801.62 | 3.24 % |
| | 15201005565 | Bollampally | VA | 332,634.00 | 0.00 | 1,663.17 | 4,989.51 | 0.00 | 1.71% | 0.00 | 0.00 | 1,182.00 | 0.36% | 5,470.68 | 1.64 % |
| | 15201005568 | Myers | Conventional | 372,339.00 | 0.00 | 1,861.70 | 4,500.00 | 0.00 | 2.00% | 0.00 | 0.00 | 85.64 | 0.02% | 6,276.06 | 1.69 % |
| | 15201006331 | Brazener | Conventional | 202,070.00 | 0.00 | 1,010.35 | 3,031.05 | 0.00 | 2.15% | 0.00 | 0.00 | 323.26 | 0.16% | 3,718.14 | 1.84 % |
| | 15201006356 | Lee | Conventional | 256,196.00 | 0.00 | 1,280.98 | 3,842.94 | 376.61 | 2.37% | 0.00 | 0.00 | 200.00 | 0.08% | 5,300.53 | 2.07 % |
| | 15201006384 | Ryan | FHA | 217,000.00 | 0.00 | 1,085.00 | 3,255.00 | 805.07 | 3.43% | 0.00 | 0.00 | 1,865.40 | 0.86% | 3,279.67 | 1.51 % |
| | 15201006405 | Forrest | Conventional | 284,725.00 | 0.00 | 3,551.73 | 4,262.07 | 1,929.30 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 9,743.09 | 3.43 % |
| | 15201006416 | Huckaba | FHA | 244,725.00 | 0.00 | 1,223.63 | 3,670.88 | 0.00 | 3.09% | 0.00 | 0.00 | 378.65 | 0.15% | 4,515.86 | 1.85 % |
| | 15201006136 | Oster | Conventional | 290,403.00 | 0.00 | 3,630.04 | 4,356.05 | 990.27 | 1.95% | 0.00 | 0.00 | 0.00 | 0.00% | 8,976.36 | 3.09 % |
| | 15201006191 | Wolfshohl | Conventional | 215,594.00 | 0.00 | 323.39 | 3,880.69 | 8.62 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 4,212.70 | 1.95 % |
| | 15201006250 | Sharp Jr. | FHA | 903,602.00 | 0.00 | 4,518.01 | 13,554.03 | 0.00 | 3.66% | 0.00 | 0.00 | 5,665.58 | 0.63% | 12,406.46 | 1.37 % |
| | 15201006269 | Craig | VA | 301,750.00 | 0.00 | 2,640.31 | 4,500.00 | 3,898.61 | 2.84% | 0.00 | 0.00 | 0.00 | 0.00% | 11,038.92 | 3.66 % |
| | 15201006285 | Joyner | | 284,047.00 | 0.00 | 3,550.59 | 4,260.71 | 258.48 | | 0.00 | 0.00 | 200.00 | 0.07% | 7,869.78 | 2.77 % |
| Michael Task | **Loan Officer Total** | | | 29,393,259.00 | 1,450.00 | -170,144.73 | 439,161.26 | 64,353.59 | 2.30% | 0.00 | 97.00 | 117,186.90 | 0.40% | 557,825.68 | 1.90 % |
| | 15201005605 | Cash | Conventional | 293,600.00 | 0.00 | 1,468.00 | 4,404.00 | 0.00 | 2.00% | 0.00 | 135.06 | 2,591.20 | 0.93% | 3,145.74 | 1.07 % |
| | 15201004685 | Seymour | FarmersHomeA | 218,367.00 | 0.00 | 2,729.59 | 3,275.51 | 72.06 | 2.78% | 0.00 | 0.00 | 0.00 | 0.00% | 6,077.16 | 2.78 % |
| | 15201004721 | Rhinehart | Conventional | 291,750.00 | 0.00 | 1,458.75 | 4,376.25 | 0.00 | 2.00% | 0.00 | 0.00 | 242.15 | 0.08% | 5,592.85 | 1.92 % |
| | 15201003974 | Hatt | FHA | 277,285.00 | 0.00 | 3,466.06 | 4,159.28 | 815.22 | 3.04% | 0.00 | 0.00 | 2,076.40 | 0.75% | 6,364.16 | 2.30 % |
| | 15201006057 | Lim | Conventional | 91,350.00 | 0.00 | 456.75 | 1,370.25 | 92.26 | 2.10% | 0.00 | 0.00 | 0.00 | 0.00% | 1,919.26 | 2.10 % |
| | 15201006549 | LEE | Conventional | 106,172.00 | 0.00 | 530.86 | 1,592.58 | 272.86 | 2.26% | 0.00 | 0.00 | 0.00 | 0.00% | 2,396.30 | 2.26 % |
| | 15218016654 | Rigby | FHA | 140,160.00 | 0.00 | 1,226.40 | 2,102.40 | 1,220.79 | 3.25% | 0.00 | 0.00 | 0.00 | 0.00% | 4,549.59 | 3.25 % |
| | 15218016869 | Basham | Conventional | 71,500.00 | 0.00 | 357.50 | 1,072.50 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 1,430.00 | 2.00 % |
| | 15218015491 | Cobb | Conventional | 217,920.00 | 0.00 | 1,089.60 | 3,268.80 | 0.00 | 2.00% | 0.00 | 0.00 | 274.58 | 0.13% | 4,083.82 | 1.87 % |
| | 15218015270 | Hrynyk | Conventional | 318,750.00 | 0.00 | 1,593.75 | 4,781.25 | 800.06 | 2.25% | 0.00 | 0.00 | 0.00 | 0.00% | 7,175.06 | 2.25 % |
| | 15218013778 | COBB | Conventional | 148,500.00 | 0.00 | 742.50 | 2,227.50 | 0.00 | 2.00% | 0.00 | 74.25 | 0.00 | 0.05% | 2,895.75 | 1.95 % |
| | 15201003484 | Kelly, Jr | Conventional | 255,200.00 | 0.00 | 1,276.00 | 3,828.00 | 0.00 | 2.00% | 0.00 | 0.00 | 0.00 | 0.00% | 5,104.00 | 2.00 % |
| | 15200000868 | Warren | Conventional | 293,400.00 | 0.00 | 1,467.00 | 4,401.00 | 935.95 | 2.32% | 0.00 | 0.00 | 0.00 | 0.00% | 6,803.95 | 2.32 % |
| | 15218015065 | Lamm | Conventional | 200,000.00 | 0.00 | 1,000.00 | 3,000.00 | 1,110.00 | 2.56% | 0.00 | 0.00 | 0.00 | 0.00% | 5,110.00 | 2.56 % |
| Ty Gosnay | 15218014921 | Cohen | Conventional | 322,500.00 | 0.00 | 1,612.50 | 4,837.50 | 528.90 | 2.16% | 0.00 | 0.00 | 0.00 | 0.00% | 6,978.90 | 2.16 % |
| | **Loan Officer Total** | | | 3,246,454.00 | 0.00 | 20,475.26 | 48,696.82 | 5,848.11 | 2.31% | 0.00 | 209.31 | 5,184.33 | 0.17% | 69,626.55 | 2.14 % |
| | 15218017793 | Matthews | Conventional | 213,750.00 | 0.00 | 1,068.75 | 3,206.25 | 0.00 | 2.00% | 0.00 | 17.00 | 271.46 | 0.13% | 3,986.54 | 1.87 % |
| | **Loan Officer Total** | | | 213,750.00 | 0.00 | 1,068.75 | 3,206.25 | 0.00 | 2.00% | 0.00 | 17.00 | 271.46 | 0.13% | 3,986.54 | 1.87 % |

OAK MORTGAGE ET AL 4.29.15 D 1 GN 15-785 000892

| Total | Total Total | Branch Total Total | | 38,426,801.00 41,008,968.00 | 1,450.00 4,194.11 | 221,147.13 229,067.59 | 576,214.41 617,890.22 | 75,807.02 81,641.52 | 2.28% 2.27% | 0.00 0.00 | 3,979.94 3,983.07 | 136,034.38 138,485.13 | 0.36% 0.35% | 734,604.24 790,325.24 | 1.91 % 1.93 % |

OAK MORTGAGE ET AL 4.29.15 D-1-GN-15-785 000893
Printed By: MNASSERFAR Printed On: 11/12/2014 5:45:40 PM

APPLICANT'S EXHIBIT NO. 75

| From: | Unspecified Sender |
|-------|-------------------|
| Sent: | |
| To: | Dirk Gosda (Dirk.Gosda@brookfieldrp.com) |
| Cc: | Bob Roberts <bob.roberts@gracytitle.com> |
| Subject: | Introduction & Meeting |

Hello Dirk,

My good friend and colleague, Bob Roberts with Gracy Title, referred me to you.
We appear to have much commonality of business and it would be advantageous to get to know each other better.

I have a been managing builder based mortgage platforms for the last 12 years for several local and national builders. I would appreciate the opportunity to meet you and get to know the needs of Brookfield Residential better. The builder centric model I have developed here at Ameripro is adding profitability, timely closings, and assisting on making sales for our builder partners.

As your schedule permits, please let me know a good date and time convenient for you to meet.

My best,
Michael

Michael Nasserfar
AmeriPro Funding Inc.
Branch Manager Builder Division, NMLS #209485
Residential Mortgage Loan Originator
12800 Hill Country Boulevard, G-116
Austin, TX 78738
Direct: 512.583.5791
Cell: 512.797.8916
Fax: 512.233.5853
Email: MNasserfar@AmeriProFunding.com
www.MichaelNasserfar.com



Company #131699

**WINNER**



Texas Association of Builders

*2013 Texas Star Awards Mortgage Industry Professional of the Year*

**Your Dedicated Lending Team**
Ty Gosnay – Production Manager – Tgosnay@AmeriProFunding.com
Julie Curby – Client Coordinator – JCurby@AmeriProFunding.com
Lisa Brown – Senior Loan Processor – LBrown@AmeriProFunding.com
Dana McGrath – Senior Loan Processor – DMcgrath@AmeriProFunding.com

Applicant's
Injunction Hearing
Exhibit 075

Confidentiality Notice: This communication may contain privileged and / or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing or using any of this information. If you received this communication in error, please contact the sender immediately and destroy the material in its entirety, whether electronic or hard copy. This communication may contain nonpublic personal information about consumers subject to the restrictions of the Gramm-Leach-Bliley Act. You may not directly or indirectly reuse or redisclose such information for any purpose other than to provide the services for which you are receiving the information. There are risks associated with the use of electronic transmission. The sender of the information does not control the method of transmittal or service providers and assumes no duty or obligation for the security.

**CONFIDENTIAL**

# The Right Expectations Start With Knowing Your Buying Power



When it comes to buying a home you want to set the right expectation, and we want to help you do just that. By knowing your buying power, you can confidently find the perfect home for you and your family

Apply Online @ www.MichaelNasserfar.com

**It doesn't cost a thing to talk. Connect with me today to learn about your options.**

Michael Nasserfar
512.797.8916 cell
mnasserfar@ameriprofunding.com
NMLS # 209485

  8300 N. MOPAC · Suite 120 · Austin, TX · 512.335.5300 · Company NMLS #131699

APPLICANT'S EXHIBIT NO. 78

 **Jackson Thomas** <jackson.thomas@oakmortgagegroup.com>
to Michael                                                                    Jan 8

just in case you missed this the first time.

 **Jackson Thomas, MBA**
SVP of Sales Production | Oak Mortgage Group
O: 214.461.0112 C: 214.763.8008 | F: 214.461.0131
5307 E Mockingbird Lane, Ste. 220, Dallas, TX 75206
NMLS# 1190420
Email: jackson.thomas@oakmortgagegroup.com
Apply now at: www.oakmortgagegroup.com

**Oak Mortgage Group has recently been featured in:**
Wall Street Journal, Dallas Business Journal, Bloomberg, Entrepreneur Magazine, CNN Money, National Mortgage Professionals Magazine, and Scottsman Guide. Additionally, Oak was named on Inc Magazine's 2014 list of Fastest-Growing Companies in America



---------- Forwarded message ----------
From: Heather Moorman <heather.moorman@oakmortgagegroup.com>
Date: Tue, Jan 6, 2015 at 3:14 PM
Subject: Welcome Michael | Transition Resources
To: michaelnasserfar@gmail.com
Cc: Liz Meyr <liz.meyr@oakmortgagegroup.com>

Hi Michael!

How are you today?

First off, I want to tell you how excited I am to have you on board. Your experience and vision is going to be a great asset to the team and we're really looking forward to working with you.

I know that transitioning to a new company can often times be stressful and nerve-wracking, but it's my job to do all that I can to help make the transition as smooth as possible :)

Attached you will find a copy of scripts to help with your transition. These scripts will help you for the following scenarios:

- Realtors in Pipeline
  - Phone Script (addressing fears & highlighting benefits)
  - Thank you note & gift (if you choose to send a gift)
  - Personalized email
- All other Realtors
  - Thank you note (this will be handwritten on Oak's post card w/ biz card in there)
  - Personalized email
- Borrowers in Pipeline
  - Phone script
  - F/U email
- All previous clients & database
  - Mass Email

Also attached is our marketing package and marketing checklist.

- The package is what our marketing team will be helping you with when you onboard.
- I will be setting up a meeting to discuss all of the details, but if you could come prepared with your checklist filled out, that would be great!

In the meantime, please let me know if there's anything you need me to help you with.

Best,

Heather

 HEATHER MOORMAN  |  MARKETING & COMMUNICATIONS SPECIALIST
OAK MORTGAGE GROUP
O: 214.461.0153   C: 832.504.5705
5307 E. MOCKINGBIRD LANE, SUITE 220, DALLAS, TX 75206
EMAIL: HEATHER.MOORMAN@OAKMORTGAGEGROUP.COM

APPLY NOW AT WWW.OAKMORTGAGEGROUP.COM

  

Oak Mortgage Group has recently been featured in:
Bloomberg, CNN Money, Reuters, Yahoo Finance, CBS MoneyWatch, Dallas Business Journal and was named in Inc.Magazine's 2014 list of Fastest-Growing Companies in the U.S.

**EXHIBIT**
24
4-29-15 KW

Applicant's
Injunction Hearing
Exhibit 078

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000135

APPLICANT'S EXHIBIT NO. 80

**Sent:** Monday, January 05, 2015 11:05:12 PM
**Subject:** To Do's:

To Do's:

Update TT that letter is out/received

Redirect eFax
Buy back website
Stop ibis network

Update and change:
Market alert
Gmail
Facebook
LinkedIn
IBIS - update to show oak mtg

Logo to Tamela
Link to Tamela

Who's the new contact APF for my pipeline?

Update Amanda

Update Connie

Draft new intro email to be sent to clients (both new and old)

Go see agents ASAP

Get new cards and marketing material



EXHIBIT
23
4-24-15 KW

Applicant's
Injunction Hearing
Exhibit 080

CONFIDENTIAL

APF00027969

APPLICANT'S EXHIBIT NO. 81



## Amaze Yourself. Amaze The World.

*A job at Oak Mortgage is unlike any other you've had. You'll be challenged. You'll be inspired. And you'll be proud. Because whatever your job is here, you'll be part of something big. Our purpose is to surprise our customers by instilling trust, peace of mind, and attention to the details that matter to them through a boutique-quality experience.*

### Compensation:

- Loan Officer Commissions – <u>Medalist 1000.</u> See Addendum B: Personal Production Commission Schedule
- Austin Branch Override & Bonus Schedule: <u>10-40 bps.</u> See Addendum B: Branch Manager Override and Bonus Schedule
- Signing Bonus: <u>$20,250</u> (split over the first 6 pay periods). See Offer Letter Addendum A.
- Marketing Signing Bonus: <u>$65,000.</u> See Addendum C: Oak Marketing Platform.
- Draw: <u>$30,000 / month for 4 months</u>. See Offer Letter Addendum A.
- Employee Benefits Package: See Addendum D & Welcome Kit for further details on Medical, Dental, Vision, Life, Disability, 401k benefit offerings.

### OFFER ACCEPTANCE:

I, _____ MICHAEL NASSERFAR _____ (Print Employee Name) understand the above job descriptions and agree to comply with, and be subject, to its conditions. I understand that the Company reserves the right to delegate, remove, expand or change any and all responsibilities listed above and will inform me of any such change. In addition to meeting the job duties listed above, I agree to abide by the Company policies contained in the employee handbook. I acknowledge that I can fulfill the above duties with or without reasonable accommodation.

CONDITIONS OF OFFER OF EMPLOYMENT - All candidates must successfully pass and provide the following:
- An active NMLS license
- Passing a Criminal Background Check & Employment History Verification
- Providing Verification of Sales Production Numbers
  - Current Year and Previous Year Loan Production and P&L documentation
  - Previous Year's W2 and a recent paystub

_____  1/19/15
Michael Nasserfar        Date

_____  1/19/15
J. Holden Thomas, CEO    Date

_____  11/16/2015
Jason Sherman, CMO       Date

_____  1/19/2015
Jackson Thomas, SVP      Date

**EXHIBIT**
11 4
4-30-15 KW

Applicant's
Injunction Hearing
Exhibit 081



## Offer Letter Addendum A

Per the phone conversation held on December 11, 2014, Oak Mortgage Group, "Oak" and Michael Nasserfar, "Michael" agree to the following:

### Legal Support & Protection:

Oak agrees to provide Michael with legal support and protection ("Legal Support and Protection") in the event a law suit is filed against Michael by Michael's previous employer, AmeriPro Funding Inc. (Company License 0921843) by covering the cost of Michael's legal fees associated with defending the law suit filed by Ameripro. This Legal Support & Protection is contingent on Michael abiding by the terms of Michael's Employment Agreement with Ameripro. This Legal Support & Protection will cover Michael during his tenure as an employee of Oak and after employment at Oak, unless Michael is terminated for cause as defined in Section 9 of Oak's Employment Agreement. If Michael resigns or terminates his employment with Oak, this Legal Support & Protection will terminate with no further obligation by Oak.

### Guaranteed Draw for the First 4 Months:

For the first 4 months, you will receive a guaranteed monthly earnings in the amount of $30,000 paid monthly. This will give you a floor in earnings each month. Any amount of compensation not covered by commissions on loan fundings will be supplemented by this guaranteed compensation. If you are terminated or resign within the first 12 months, the draw must be repaid.

### Austin Branch Office Budget:

Oak is committed to a vision for delivering world-class customer experience for the city of Austin. We want Michael Nasserfar to be one of the key people to help with the execution of this vision. Oak will provide the Austin Branch office with an annual budget of **$184,000**. The allocation will be **$60,000** annually for rent, **$24,000** annually for office-related expenses (i.e. furniture, marketing, printing, supplies, equipment, insurance, utilities, telephone, printing, packaging, mailing, advertising, and promotion), and **$100,000** for branch wages & support (i.e. Oak Team Program expenses outside of corporate processing, underwriting, and closing support).

### $20,250 Signing Bonus:

Oak is prepared to ensure you do not lose the Q4 bonus of $20,250 that you are set to receive on January 31, 2015 from AmeriPro Funding Inc. (Company License 0921843). If such bonus is not paid by Ameripro, then Oak agrees to issue a payment of **$3,375** for each of the first 6 full payroll cyles in which you are employed.

| | | | |
|---|---|---|---|
| _Michael Nasserfar_ | 1/19/15<br>Date | _J. Holden Thomas, CEO_ | 1/19/15<br>Date |
| | | _Jason Sherman, CMO_ | 1/19/15<br>Date |

**oak**



Addendum B

# 2015
# MORTGAGE BANKER
# COMMISSION SCHEDULE

## PAYMENT OF BENEFITS

All employees of Oak Mortgage Group designated as Mortgage Banker will participate in the Plan as of their employment date, or date of eligibility as otherwise determined. In addition to the terms of this individual compensation agreement, your compensation as a Mortgage Banker at Oak Mortgage is also governed by the Consumer Financial Protection Bureau 2013 Loan Originator Rule finalized in October 2013 and dated November 8, 2013, and any subsequent revisions to that rule. In accordance with that rule, you are eligible for commission compensation as outlined below. Your commission will be calculated by multiplying the basis points listed below times the dollar amount of all loans funded during the commission period. The basis points used to calculate the commission will be determined by the number of transactions (defined as unique addresses) funded in said commission period. $1455 in origination fees are required to be collected on each loan. No commission will be paid on employee mortgage loans. Loans may not be transferred between Mortgage Bankers. The Company reserves the right to modify your compensation at any time at its sole discretion.

## COMPENSATION PLAN

Commissions Earned. For loans sourced through the Loan Officer's own efforts, the Loan Officer will be paid in accordance with **Medalist 1000 Compensation Schedule** outlined in the table below. You may choose from the following 8 compensation plans. Please circle a Bronze, Silver, Gold, or Platinum and the associated volume or unit plan.

Monthly Payout Plan

|          | Volume Plan | Payout BPS | Units Plan | Payout BPS |
|----------|-------------|------------|------------|------------|
| Bronze   | <600k       | 100        | 1 - 3      | 100        |
|          | 600k +      | 115        | 4 - 5      | 115        |
|          | 900k +      | 130        | 6+         | 130        |
| Silver   | <900k       | 105        | 1 - 4      | 105        |
|          | 900k+       | 130        | 5 - 6      | 130        |
|          | 1.2M+       | 135        | 7+         | 135        |
| Gold     | <1.2M       | 110        | 1 - 5      | 110        |
|          | 1.2M+       | 125        | 6 - 7      | 125        |
|          | 1.6M+       | 140        | 8+         | 140        |
| Platinum | <1.6M+      | 115        | 1 - 6      | 115        |
|          | 1.6M+       | 130        | 7 - 8      | 130        |
|          | 2.0M+       | 145        | 9+         | 145        |





**Notes:**
Payouts apply to self-generated business only. No tier-
bonus is paid on Corporate sourced business.
Originator can change plan once a month for first three months. After that, it may only be changed every 3 months by providing notice to the sales manager.
Shortages have to be approved on a case by case basis by the production manager

| | |
|---|---|
| Minimum Production Requirement: | 12 units funded every quarter After 2 quarters of below MPR, you are at risk for termination |

## JUMBO LOANS ; BROKERED LOANS ; SECOND LIENS

A jumbo mortgage is a home loan with an amount that exceeds conforming loan limits imposed by Fannie Mae and Freddie Mac. The limit is currently $417,000 in most parts of the United States and is subject to change over time. For jumbo loans, the Austin branch has chosen for **no commission caps** to apply. The secondary department will set up the **Medalist 1000** plan to reflect this decision.

Mortgage Bankers may only transact brokered loans with vendors on the Company's approved list, and those loans must be locked by the Company's secondary department. Commission is **50 bps**.

In the event a participant leaves the employment of OAK Mortgage Group, Inc., commissions will be paid on loans that *close and fund within 30 days* of the employee's *last day worked.*





# AUSTIN BRANCH
# OVERRIDE &
# BONUS SCHEDULE

☑ Producing　　　☐ Nonproducing

A. **Volume Override:** Basis Points paid monthly on closed production of the entire branch. This override includes personal production. The Volume Override will be calculated at end of the month and will be paid out on the last day of the following month.

___10___ Basis Points

B. **Bonus:**

The bonus is conditioned upon and to the degree that your branch has a cumulative positive surplus. The Surplus Bonus will be calculated at the end of the calendar quarter and will be paid out on the last day of the following month.

| Surplus Profit in Basis Points | Quarterly Bonus in Basis Points |
|---|---|
| 45 – 59 | 5 |
| 60 – 74 | 7 |
| 75 – 89 | 10 |
| 90 – 104 | 15 |
| 105 – 119 | 20 |
| 120 – 134 | 25 |
| 135 – 149 | 30 |

C. Personal Production Commission Schedule:

- In House Closings: Tiers based on Production for Loans Closed on Programs Offered by OAK or for loans brokered for price.
    - Compensation Plan: **Medalist 1000**

- Brokered Loan Closings:
    - All loans brokered for programs will be paid a flat percentage at: **50 Bps**

- Special Instructions: For jumbo loans, the Austin branch has chosen for **no commission caps** to apply. The secondary department will set up the **Medalist 1000** plan to reflect this decision

_____　　Michael Nasserfar　　¹/19/15
Employee Signature　　　　　Printed Name　　　　Date

_____　　James Thomas　　　　¹/19/15
J. Holden Thomas, CEO　　　Printed Name　　　　Date

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000759

**oak**



## Addendum C: Michael Nasserfar
## $65,000 Oak Marketing Platform Signing Bonus

The Marketing bonus will be focused on allowing you to have top tier, best in class marketing campaign for the Austin district and will be tracked on a receipt basis. The key deliverables associated with the OMP are:

### Video ($13,000)
1. HD Documentary Style Video Shoot
2. Social Media Push
3. Reach 10,000 Prospective Realtors, Buyers, Title Companies, and Financial Planners

### Public Relations & Publications ($5,000)

### Social Media & Website Automation ($10,000)
1. Content Calendar
2. Push content for 3 months
3. Free access to Content Calendar
4. $500 a month for first 6 months to promote yourself.

### Realtor Presentation ($2,000)
1. Hold 5 focus groups (With Realtor Gifts)
2. Free access to customized presentation
3. Free access to digital presentation

### CMO Strategy Session ($30,000)
1. Bi-weekly sessions to work on strategy, messaging, and to review of progress towards goals.
2. Customized marketing plan for 2015

### Oak for the oppressed Trip ($5,000)
1. OFTO Marketing Brochure for every closing in 2015
2. OFTO video
3. Go on OFTO trip (All expenses paid) We can use that video footage, pictures etc. in presentations, promo videos etc.



ACCEPTED
03-15-00416-CV
7413240
THIRD COURT OF APPEALS
AUSTIN, TEXAS
10/16/2015 2:04:38 PM
JEFFREY D. KYLE
CLERK

PLAINTIFF'S EXHIBIT NO. 5

# Statement of Income
## Month and Year To Date
### Ameripro Funding, Inc.
For the period ending: 11/30/2014
By Branch
152180 (Nasserfar)

November

| | | | MTD | YTD |
|---|---|---|---|---|
| Income | | | | |
| 41100-152180 | Origination fees | | .00 | 4,194.11 |
| | Total Origination fees | | .00 | 4,194.11 |
| 41355-152180 | Application fee income | | .00 | 5,100.00 |
| | Total Application fees | | .00 | 5,100.00 |
| 41357-152180 | Credit report fee income | | .00 | 230.94 |
| 55600-152180 | Credit report expense | | .00 | 14,839.56 |
| | Total Credit reports | | .00 | 15,070.50 |
| 41380-152180 | Branch admin fee | | .00 | -550.00 |
| | Total Branch administration fees | | .00 | -550.00 |
| 41860-152180 | Brokered loan fee income | | .00 | 34,590.56 |
| | Total Brokered loan fees | | .00 | 34,590.56 |
| 41880-152180 | Misc production income | | .00 | 125.00 |
| | Total Other fees | | .00 | 125.00 |
| 42301-152180 | Premium discount - branch +YSP | | 22,351.60 | 331,289.33 |
| | Total Premium discount - branch | | 22,351.60 | 331,289.33 |
| 42300-152180 | Premium discount - lo | | 45,510.41 | 663,400.63 |
| | Total Premium discount - lo comp | | 45,510.41 | 663,400.63 |
| 42400-152180 | Pair-off allocation | | .00 | 1,771.51 |
| | Total Pair-off allocation | | .00 | 1,771.51 |
| 68502-152180 | Corporate fees - neo | | .00 | -500.00 |
| | Total Corporate neo fees | | .00 | -500.00 |



EXHIBIT
11
4-24-15 KW



tabbles
PLAINTIFF'S EXHIBIT

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000450

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000451

| | | MTD | YTD |
|---|---|---|---|
| Total Income | | 67,862.01 | 1,039,652.08 |
| Expense | | | |
| 52426-152180 | Lender credits - gfe cures | 23,078.37 | 161,563.50 |
| 52427-152180 | Lender credit - 10% cure | 41.80 | 4,024.87 |
| Total Lender/broker credits | | 23,120.17 | 165,588.37 |
| 52450-152180 | Origination errors expense | .00 | 74.00 |
| Total Origination errors | | .00 | 74.00 |
| 55110-152180 | Commission expense - loan officers | .00 | 352,325.77 |
| Total Commission expense - loan officers | | .00 | 352,325.77 |
| 55111-152180 | Commission offset | .00 | -48,693.40 |
| Total Commission offset | | .00 | -48,693.40 |
| 55280-152180 | Underwriting fees | 741.63 | 9,061.97 |
| Total Underwriting fees | | 741.63 | 9,061.97 |
| 55350-152180 | Verification fees | 847.89 | 15,757.93 |
| Total Verification fees | | 847.89 | 15,757.93 |
| 55700-152180 | Late / penalty | .00 | 25.92 |
| Total Late fees and penalties | | .00 | 25.92 |
| 60100-152180 | Salary and wages | 8,280.06 | 96,338.98 |
| Total Salary and wages | | 8,280.06 | 96,338.98 |
| 60450-152180 | Bonus - employee | .00 | 54,369.21 |
| Total Employee bonus | | .00 | 54,369.21 |
| 61000-152180 | Rent expense | 2,012.59 | 33,990.34 |
| Total Rent expense | | 2,012.59 | 33,990.34 |
| 61100-152180 | License and permits | .00 | 100.00 |
| Total License and permits | | .00 | 100.00 |
| 61300-152180 | Office supplies & expense | .00 | 1,155.46 |
| Total Office supplies & expense | | .00 | 1,155.46 |
| 61600-152180 | Postage | .00 | 5.32 |

| | | MTD | YTD |
|---|---|---:|---:|
| Total Postage | | .00 | 5.32 |
| 61380-152180 | Couriers & shipping | .00 | 54.25 |
| Total Couriers & shipping | | .00 | 54.25 |
| 61700-152180 | Bank charges | 12.47 | 18.40 |
| Total Bank charges | | 12.47 | 18.40 |
| 61900-152180 | Dues and subscriptions | .00 | 149.50 |
| Total Dues and subscriptions | | .00 | 149.50 |
| 62150-152180 | Repair and maintenance | .00 | 34.92 |
| Total Repair and maintenance | | .00 | 34.92 |
| 62200-152180 | Utilities | 197.98 | 1,794.33 |
| Total Utilities | | 197.98 | 1,794.33 |
| 62210-152180 | Internet service | 971.83 | 4,871.53 |
| Total Internet service | | 971.83 | 4,871.53 |
| 62250-152180 | Telephone | .00 | 200.34 |
| Total Telephone | | .00 | 200.34 |
| 62310-152180 | Health insurance | 1,290.60 | 12,365.01 |
| Total Life and health insurance | | 1,290.60 | 12,365.01 |
| 63100-152180 | Depreciation expense | .00 | 1,884.65 |
| Total Depreciation expense | | .00 | 1,884.65 |
| 64100-152180 | Payroll tax expense | -1,388.50 | 24,173.97 |
| Total Payroll tax expense | | -1,388.50 | 24,173.97 |
| 65600-152180 | Meals and entertainment | .00 | 1,707.21 |
| Total Meals and entertainment | | .00 | 1,707.21 |
| 66000-152180 | Computer expense | .00 | 29.22 |
| Total Computer expense | | .00 | 29.22 |
| 67100-152180 | Seminar and training | .00 | 348.00 |
| Total Seminar and training | | .00 | 348.00 |
| 70100-152180 | Advertising & marketing expense | .00 | 142,838.85 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000452

| | MTD | YTD |
|---|---|---|
| Total Advertising & marketing expense | .00 | 142,838.85 |
| 68501-152180    Corporate per file fees | 1,500.00 | 23,250.00 |
| Total Corporate per file fees | 1,500.00 | 23,250.00 |
| 68500-152180    Corporate allocation expense | 3,744.71 | 78,007.49 |
| Total Corporate allocation - volume based | 3,744.71 | 78,007.49 |
| Total Expenses | 41,331.43 | 986,667.10 |
| Net Income (loss) | 26,530.58 | 52,984.98 |

PLAINTIFF'S EXHIBIT NO. 6

EXHIBIT
12
4-24-15 KW
depobook.com

PLAINTIFF'S
EXHIBIT
6
exhibitsticker.com

JAN '14

# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 1/1/2014 to 1/31/2014

| GL/Desc/Vendor | Invoice Number | Transaction Description | GL.Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55110-152180 | | Commission Expense - Loan | | | | | | .00 | | | |
| | 120125?E | 1-15-14 COM, BON, TAX | | | | | 01/15/14 | | | 30,731.02 | |
| | 120125?E | 1-16-14 OC BATCH 2766 | | | | | 01/16/14 | | 30,731.02 | | |
| | 120125?E | 1-23-14 OC BATCH 2790 | | | | | 01/23/14 | | 19,338.98 | | |
| | 12012646 | 1-23-14 OC BATCH 2770 | | | | | 01/23/14 | | | 19,338.98 | |
| | 1201315?E | 1-31-14 SM PR | | | | | 01/31/14 | | 129.56 | | |
| | 1201348?E | 2/15 PR COM, BONUS | | | | | 01/31/14 | | 418.01 | | |
| | | Total JE: | | | | | | | 50,617.57 | 50,070.00 | |
| | | | | | | | | | | | 547.57 |
| | | Total for | | | | | | | | | 547.57 |
| 55111-152180 | | Commission Offset | | | | | | .00 | | | |
| | 120125?E | 1-15-14 COM, BON, TAX | | | | | 01/15/14 | | 3,630.78 | | |
| | 120125?E | 1-16-14 OC BATCH 2766 | | | | | 01/16/14 | | | 3,630.78 | |
| | | Total JE: | | | | | | | 3,630.78 | 3,630.78 | |
| | | Total for | | | | | | | | | .00 |
| 60100-152180 | | Salary And Wages | | | | | | .00 | | | |
| | 120125?E | 1-15-14 SM PR | | | | | 01/15/14 | | 2,000.02 | | |
| | 1201315?E | 1-31-14 SM PR | | | | | 01/31/14 | | 8,914.94 | | |
| | 1201348?E | 2/15 PAYROLL WAGE | | | | | 01/31/14 | | 2,634.46 | | |
| | | Total JE: | | | | | | | 13,549.42 | .00 | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | 2/15 PR COM,BONUS | | | | 12013489E | | 01/31/14 | | 525.00 | .00 | |
| | | | | | | | Total JE: | | 525.00 | .00 | |
| | | | | | | | Total for | .00 | | | 525.00 |
| | | | | | | | Total for | | | | 13,549.42 |
| 61000-152180 | Rent Expense | | | | | | | | | | |
| | PREFERRED OFFICE | JAN 2014 RENT | 14503330 | 3292 | 30101 | PE | 01/01/14 | | 2,740.78 | | |
| | | | | | | | Total | | 2,740.78 | .00 | |
| | | | | | | | Total for | .00 | | | 2,740.78 |
| 62310-152180 | Health Insurance | | | | | | | | | | |
| | NASSERFAR, MICHAEL H | | | | 12012523E | | 01/15/14 | | | 87.30 | |
| | TASK, MICHAEL E | | | | 12012523E | | 01/15/14 | | | 69.81 | |
| | OSIO, MARIA C | | | | 12013159E | | 01/31/14 | | | 10.35 | |
| | CORTESE, AMBER N | | | | 12013159E | | 01/31/14 | | | 87.82 | |
| | NASSERFAR, MICHAEL H | | | | 12013159E | | 01/31/14 | | | 87.30 | |
| | JONES, KIMBERLY B | | | | 12013159E | | 01/31/14 | | | 114.28 | |
| | STRANGE, GLADYS F | | | | 12013159E | | 01/31/14 | | | 99.81 | |
| | TASK, MICHAEL E | | | | 12013159E | | 01/31/14 | | | 69.81 | |
| | | | | | | | Total JE: | | .00 | 626.48 | |
| | | | | | | | Total for | | | | -626.48 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000468

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Reg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 Payroll Tax Expense | | | | | | | | 00 | | | |
| | 1-15-14 SM PR | | | | 1201252 | E | 01/15/14 | | 213.33 | | |
| | 1-15-14 COM, BON, TAX | | | | 1201252 | E | 01/15/14 | | 2,073.17 | | |
| | 1-16-14 OC BATCH 2766 | | | | 1201257 | E | 01/16/14 | | 2,608.61 | | |
| | 1-23-14 OC BATCH 2770 | | | | 1201257 | E | 01/23/14 | | 1,521.27 | | |
| | 1-23-14 OC BATCH 2770 | | | | 1201264 | E | 01/23/14 | | | 1,521.27 | |
| | 1-31-14 SM PR | | | | 1201315 | E | 01/31/14 | | 894.03 | | |
| | 2/15 PR COM,BONUS | | | | 1201348 | E | 01/31/14 | | 72.14 | | |
| | 2/15 PAYROLL WAGE | | | | 1201348 | E | 01/31/14 | | 201.54 | | |
| | | | | | | | Total JE: | | 5,510.92 | 3,594.44 | |
| | | | | | | | Total for | | | | 1,916.48 |
| 70100-152180 Advertising & Marketing | | | | | | | | .00 | | | |
| | Reclass - Centerra | | | | 1201210 | E | 01/01/14 | | 15,000.00 | | |
| | | | | | | | Total JE: | | 15,000.00 | .00 | |
| | | | | | | | Total for | | | | 15,000.00 |
| | | | | | | | Report | .00 | 91,574.47 | 57,921.70 | 33,652.77 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000469



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000470

Fees '14

# General Ledger by Branch
**Company: Ameripro Funding, Inc.**
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 2/1/2014 to 2/28/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL.Bank DB Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | .00 | | | |
| | | 15218013719|HAYGOOD| | 120134?E | 02/13/14 | | | 200.00 | |
| | | 15201006560|OSBORNE| | 120135?E | 02/14/14 | | | 200.00 | |
| | | 1520000804|NGUYEN| | 120135?E | 02/14/14 | | | 200.00 | |
| | | 15200008511|FURGERSON| | 120135?E | 02/18/14 | | | 100.00 | |
| | | 1520001019|CANTU| | 120137?E | 02/21/14 | | | 200.00 | |
| | | 15201006580|MOKHTAR| | 120138?E | 02/25/14 | | | 100.00 | |
| | | 15218014157|MUCK| PAUL, | 120139?E | 02/27/14 | | | 100.00 | |
| | | 1520000734|BOX| | 120140?E | 02/28/14 | | | 200.00 | |
| | | 15200008568|WARREN| | 120140?E | 02/28/14 | | | 100.00 | |
| | | | | Total JE: | | .00 | 1,400.00 | |
| | | | | Total for | .00 | | | -1,400.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | | |
| | | 15218013719|HAYGOOD| | 120134?E | 02/13/14 | | | 20.18 | |
| | | 15201006560|OSBORNE| | 120135?E | 02/14/14 | | | 12.06 | |
| | | 1520000804|NGUYEN| | 120135?E | 02/14/14 | | | 45.66 | |
| | | 15201006465|HOBBS| | 120138?E | 02/26/14 | | | 17.51 | |
| | | 15201061121|LEE| WOOJIN | 120138?E | 02/26/14 | | | 13.56 | |
| | | 1520000734|BOX| | 120140?E | 02/28/14 | | | 19.03 | |
| | | 15201003599|KASTAK| | 120140?E | 02/28/14 | | | 13.56 | |
| | | | | Total JE: | | .00 | 141.56 | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41370-152180 | Processing Fees | | | | | | Total for | .00 | | | -141.56 |
| | 15201004961 BENTLEY| | | | | | 1201338E | 02/11/14 | | | 475.00 | |
| | 15201004202|RAJINA| | | | | | 1201342E | 02/12/14 | | | 475.00 | |
| | 15218013719|HAYGOOD| | | | | | 1201349E | 02/13/14 | | | 475.00 | |
| | 15201006560|OSBORNE| | | | | | 1201353E | 02/14/14 | | | 475.00 | |
| | 15200008804|NGUYEN| | | | | | 1201354E | 02/14/14 | | | 475.00 | |
| | 15200000835|FURGERSON| | | | | | 1201359E | 02/18/14 | | | 495.00 | |
| | 15200001019|CANTU| | | | | | 1201375E | 02/21/14 | | | 475.00 | |
| | 15201005565|BOLLAMPALLY| | | | | | 1201380E | 02/24/14 | | | 475.00 | |
| | 15201005568|MYERS| | | | | | 1201383E | 02/25/14 | | | 475.00 | |
| | 15201006580|MOKHTAR| | | | | | 1201383E | 02/25/14 | | | 200.00 | |
| | 15201006465|HOBBS| | | | | | 1201387E | 02/26/14 | | | 475.00 | |
| | 25213011538|OTTO| | | | | | 1201388E | 02/26/14 | | | 475.00 | |
| | 15201005792|GARDINIER| | | | | | 1201390E | 02/27/14 | | | 475.00 | |
| | 15218014157|MUCK| PAUL | | | | | 1201390E | 02/27/14 | | | 575.00 | |
| | 15200000734|BOX| | | | | | 1201401E | 02/28/14 | | | 475.00 | |
| | 15200000868|WARREN | | | | | | 1201401E | 02/28/14 | | | 575.00 | |
| | 15201003599|KASTAK| | | | | | 1201401E | 02/28/14 | | | 475.00 | |
| | | | | | | | Total JE: | .00 | .00 | 8,020.00 | |
| 41380-152180 | Branch Admin Fee | | | | | | Total for | | | | .00 |
| | 15218013778 COBB| | | | | | 1201380E | 02/24/14 | .00 | 550.00 | .00 | |
| | | | | | | | Total JE: | | 550.00 | | |
| | | | | | | | Total JE: | | | -8,020.00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000471

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit End Bal |
|---|---|---|---|---|---|---|---|---|---|
| 41860-152180 | Brokered Loan Fee Income | | | | | | | | |
| | | 15200000719 NEWTON| | | | 12014430|E | 02/07/14 | | | 3,075.00 |
| | | | | | | Total JE: | | .00 | 3,075.00 |
| | | | | | | Total for | .00 | .00 | 3,075.00 -3,075.00 |
| 42300-152180 | Premium Discount - Lo | | | | | | | | |
| | | 15201005716|THOMAS| | | | 12013312|E | 02/03/14 | | 4,500.00 |
| | | 15201005079|PALLADINO| | | | 12013120|E | 02/03/14 | | 4,500.00 |
| | | 15201004961 BENTLEY| | | | 12013387|E | 02/11/14 | | 3,560.75 |
| | | 15201004202|RAJINA| | | | 12013422|E | 02/12/14 | | 4,500.00 |
| | | 15218013719|HAYGOOD| | | | 12013450|E | 02/13/14 | | 3,472.05 |
| | | 15201006560|OSBORNE| | | | 12013539|E | 02/14/14 | | 3,609.29 |
| | | 15200008804|NGUYEN| | | | 12013540|E | 02/14/14 | | 3,499.38 |
| | | 15201005739|ADAMS| | | | 12013540|E | 02/14/14 | | 3,471.63 |
| | | 15200008851|FURGERSON| | | | 12013583|E | 02/18/14 | | 1,890.00 |
| | | 15200001019|CANTU| | | | 12013575|E | 02/21/14 | | 4,417.50 |
| | | 15201005565|BOLLAMPALLY| | | | 12013800|E | 02/24/14 | | 4,989.51 |
| | | 15218013778 COBB| | | | 12013800|E | 02/24/14 | | 2,227.50 |
| | | 15201005568|MYERS| | | | 12013830|E | 02/25/14 | | 4,500.00 |
| | | 15201006580|MOKHTAR| | | | 12013832|E | 02/25/14 | | 6,255.00 |
| | | 15201006465|HOBBS| | | | 12013887|E | 02/26/14 | | 4,500.00 |
| | | 15201006112|LEE| WOO JIN | | | 12013887|E | 02/26/14 | | 1,440.00 |
| | | 15201006088|HONG| | | | 12013889|E | 02/26/14 | | 1,462.50 |
| | | 25213011538|OTTO| | | | 12013888|E | 02/26/14 | | 3,717.86 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000472

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 42301-152180 | | | | | | | | | | |
| Premium Discount - Branch | | | | | | | | | | |
| | 1520100579|GARDINIER| | | | 12013909E | 02/27/14 | | | 4,209.05 | |
| | 152180141571MUCK| PAUL | | | 12013902E | 02/27/14 | | | 3,770.45 | |
| | 15200000734|BOX| | | | 12014004E | 02/28/14 | | | 2,693.25 | |
| | 15200000868|WARREN | | | | 12014004E | 02/28/14 | | | 4,401.00 | |
| | 15201003599|KASTAK| | | | 12014004E | 02/28/14 | | | 6,255.00 | |
| | | | | | | Total JE: | | .00 | 87,841.72 | |
| | 1520100571610THOMAS| | | | 12013121E | 02/03/14 | | | 1,731.79 | |
| | 1520100571610THOMAS| | | | 12013121E | 02/03/14 | | | 1,431.23 | |
| | 15201005079|PALLADINO| | | | 12013121E | 02/03/14 | | | 1,785.80 | |
| | 15201004961 BENTLEY| | | | 12013389E | 02/11/14 | | | 1,186.92 | |
| | 15201004202|RAJINA| | | | 12013421E | 02/12/14 | | | 1,005.20 | |
| | 15201004202|RAJINA| | | | 12013421E | 02/12/14 | | | 420.00 | |
| | 15218013719|HAYGOOD| | | | 12013495E | 02/13/14 | | | 168.97 | |
| | 15218013719|HAYGOOD| | | | 12013491E | 02/13/14 | | | 2,893.38 | |
| | 152010065601OSBORNE| | | | 12013591E | 02/14/14 | | | 3,007.74 | |
| | 152010065601OSBORNE| | | | 12013591E | 02/14/14 | | | 887.88 | |
| | 1520000804|NGUYEN| | | | 12013540E | 02/14/14 | | | 3,499.38 | |
| | 15201005739|ADAMS| | | | 12013540E | 02/14/14 | | | 1,157.21 | |
| | 15201005739|ADAMS| | | | 12013540E | 02/14/14 | | | 1,150.27 | |
| | 1520000085|IFURGERSON| | | | 12013589E | 02/18/14 | | | 630.00 | |
| | 15200000851IFURGERSON| | | | 12013589E | 02/18/14 | | | 554.40 | |
| | 15200001019|CANTU| | | | 12013593E | 02/21/14 | | | 1,472.50 | |
| | 15200001019|CANTU| | | | 12013735E | 02/21/14 | | | 256.22 | |
| | 15201005565|BOLLAMPALLY| | | | 12013801E | 02/24/14 | | | 1,663.17 | |
| | | | | | | Total for | .00 | .00 | 87,841.72 | -87,841.72 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000473

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL.Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521801377|8 COBB| | | | 120138|0|E | | 02/24/14 | | | 742.50 | |
| | 1520100556|8|MYERS| | | | 120138|3|E | | 02/25/14 | | | 1,861.70 | |
| | 1520100658|0|MOKHTAR| | | | 120138|3|E | | 02/25/14 | | | 2,085.00 | |
| | 1520100646|5|HOBBS| | | | 120138|7|E | | 02/26/14 | | | 438.71 | |
| | 1520100611|2|LEE| WOOJIN | | | 120138|7|E | | 02/26/14 | | | 423.36 | |
| | 1520100611|2|LEE| WOOJIN | | | 120138|7|E | | 02/26/14 | | | 480.00 | |
| | 1520100608|8|HONG| | | | 120138|3|E | | 02/26/14 | | | 487.50 | |
| | 1520100608|8|HONG| | | | 120138|3|E | | 02/26/14 | | | 757.58 | |
| | 2521301153|8|OTTO| | | | 120138|3|E | | 02/26/14 | | | 2,094.39 | |
| | 2521301153|8|OTTO| | | | 120138|9|E | | 02/26/14 | | | 1,239.29 | |
| | 1520100579|2|GARDINIER| | | | 120139|0|E | | 02/27/14 | | | 1,403.02 | |
| | 1520100579|2|GARDINIER| | | | 120139|0|E | | 02/27/14 | | | 75.76 | |
| | 1521801415|7|MUCK| PAUL | | | 120139|0|E | | 02/27/14 | | | 1,123.59 | |
| | 1521801415|7|MUCK| PAUL. | | | 120139|1|E | | 02/27/14 | | | 3,142.04 | |
| | 1520000073|4|BOX| | | | 120140|0|E | | 02/28/14 | | | 897.75 | |
| | 1520000086|8|WARREN | | | | 120140|0|E | | 02/28/14 | | | 935.95 | |
| | 1520000086|8|WARREN | | | | 120140|0|E | | 02/28/14 | | | 1,467.00 | |
| | 1520100359|9|KASTAK| | | | 120140|0|E | | 02/28/14 | | | 2,735.52 | |
| | 1520100359|9|KASTAK| | | | 120140|0|E | | 02/28/14 | | | 2,085.00 | |
| | | | | | | | Total JE: | | .00 | 49,377.72 | -49,377.72 |
| | | | | | | | Total for | | | | |
| 42400-152180 | Pair-Off Allocation | | | | | | | | | | |
| | 1520100507|9|PALLADINO| | | | 120131|2|E | | 02/03/14 | .00 | | 1,771.51 | |
| | | | | | | | Total JE: | | .00 | 1,771.51 | 1,771.51 |
| | | | | | | | Total for | | | | -1,771.51 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000474

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | .00 | | | |
| | | 1520100049961 BENTLEY| | | | 12013388E | | 02/11/14 | | 99.70 | | |
| | | 15201004202|RAJINA| | | | 12013427E | | 02/12/14 | | 1,936.40 | | |
| | | 15201006560|OSBORNE| | | | 12013573E | | 02/14/14 | | 87.74 | | |
| | | 15200008004|NGUYEN| | | | 12013578E | | 02/14/14 | | 323.64 | | |
| | | 15201005565|BOLLAMPALLY| | | | 12013540E | | 02/24/14 | | 1,182.00 | | |
| | | 15201005568|MYERS| | | | 12013580E | | 02/25/14 | | 85.64 | | |
| | | 15201006580|MOKHTAR| | | | 12013833E | | 02/25/14 | | 350.28 | | |
| | | 15201006465|HOBBS| | | | 12013837E | | 02/26/14 | | 81.98 | | |
| | | 15201006112|LEE|WOO|JIN | | | 12013878E | | 02/26/14 | | 250.00 | | |
| | | 15201006088|HONG| | | | 12013883E | | 02/26/14 | | 250.00 | | |
| | | 25213011538|OTTO| | | | 12013888E | | 02/26/14 | | 1,019.40 | | |
| | | 15201005792|GARDINIER| | | | 12013890E | | 02/27/14 | | 200.00 | | |
| | | 15201003599|KASTAK| | | | 12014003E | | 02/28/14 | | 2,572.90 | | |
| | | | | | | | Total JE: | | 8,439.68 | .00 | |
| | | | | | | | Total for | | | | 8,439.68 |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | .00 | | | |
| | | 15200000085|FURGERSON| | | | 12013583E | | 02/18/14 | | 43.00 | | |
| | | 15218013778 COBB| | | | 12013803E | | 02/24/14 | | 74.25 | | |
| | | | | | | | Total JE: | | 117.25 | .00 | |
| | | | | | | | Total for | | | | 117.25 |
| 55110-152180 | Commission Expense - Loan | 2-14-14 SM PR | | | 12013453E | | 02/14/14 | 547.57 | 418.01 | | 117.25 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000475

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55311-152180 | Commission Offset | | | | | | | | | | |
| | 2/15 PR COM,BONUS | | | | 12013526 | | 02/14/14 | | | 418.01 | |
| | 2-28-14 SM PR | | | | 12013959E | | 02/28/14 | | 8,759.63 | | |
| | 3-15 PR ACCRUED TO | | | | 12044389E | | 02/28/14 | | 57,143.80 | | |
| | | | | | | Total JE: | | | 66,321.44 | 418.01 | |
| | | | | | | Total for | | .00 | | | 66,451.00 |
| | 2-28-14 SM PR | | | | 1201395E | | 02/28/14 | | 6,825.98 | | |
| | 3-15 PR ACCRUED TO | | | | 1204438E | | 02/28/14 | | 3,472.82 | | |
| | | | | | | Total JE: | | .00 | 10,298.80 | .00 | |
| 55280-152180 | Underwriting Fees | | | | | | | | | | |
| | Reclass FanMac and spread | | | | 12045428E | | 02/28/14 | | 1,494.08 | | |
| | | | | | | Total JE: | | | 1,494.08 | .00 | |
| | | | | | | Total for | | .00 | 1,494.08 | .00 | -10,298.80 |
| 55350-152180 | Verification Fees | | | | | | | | | | |
| ELLIE MAE | 45061 service encompass | INCTXVM105912 | 3292 | | 31019 | PE | 02/01/14 | | 1,421.24 | | |
| TALX CORP-RAPID | rapid reporting verifications | 1521957 | 3292 | | 31050 | PE | 02/11/14 | | 30.05 | | |
| ELLIE MAE | Encompass 45061-FEB 14 | INCTXVM106169 | 3292 | | 31177 | PE | 02/28/14 | | 639.87 | | |
| | | | | | | Total | | .00 | 2,091.16 | .00 | |
| | | | | | | Total for | | | 2,091.16 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000476

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55551-152180 | Appraisal Expense - | 152010049611[BENTLEY] | | | 12013970E | | 02/28/14 | .00 | 150.00 | | |
| | | | | | | Total JE: | | | 150.00 | | |
| | | | | | | Total for | | .00 | 150.00 | .00 | 150.00 |
| 55600-152180 | Credit Report Expense | Kroll -Chad Amex February | | | 12044393E | | 02/25/14 | .00 | 142.26 | | |
| | | | | | | Total JE: | | | 142.26 | .00 | |
| | | | | | | Total for | | 142.26 | | | 142.26 |
| 60100-152180 | Salary And Wages | | | | | | | 13,549.42 | | | |
| | 2-14-14 OC BATCH 2820 | | | | 12013470E | | 02/14/14 | | 323.08 | | |
| | 2-14-14 SM PR | | | | 12013490E | | 02/14/14 | | 9,205.08 | | |
| | 2/15 PAYROLL WAGE | | | | 12013520E | | 02/14/14 | | | 2,634.46 | |
| | 2-28-14 SM PR | | | | 12013950E | | 02/28/14 | | 6,494.43 | | |
| | 3-15 PR ACCRUED TO | | | | 12044390E | | 02/28/14 | | 1,156.92 | | |
| | | | | | | Total JE: | | | 17,179.51 | 2,634.46 | |
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | 2-14-14 SM PR | | | | 12013490E | | 02/14/14 | 525.00 | 525.00 | | |
| | 2/15 PR COM,BONUS | | | | 12013520E | | 02/14/14 | | 525.00 | 525.00 | |
| | 3-15 PR ACCRUED TO | | | | 12044380E | | 02/28/14 | | 4,185.00 | | |
| | | | | | | Total JE: | | | 4,710.00 | 525.00 | |
| | | | | | | Total for | | | 28,094.47 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000477

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 | | | | | | | | | | | |
| Rent Expense | | | | | | | | | | | |
| PREFERRED OFFICE | FEB 2014 RENT | 14503397 | 3292 | | 30398 | PE | 02/01/14 | | 2,140.78 | | |
| BUSINESS SUITES HILL | Fixed and Variable Charges | 303792 | 3292 | | 30999 | PE | 02/20/14 | | 312.50 | | |
| | | | | | | | Total | | 2,453.28 | .00 | |
| | | | | | | | Total for | 2,740.78 | | | 4,710.00 |
| 61300-152180 | | | | | | | | | | | |
| Office Supplies & Expense | | | | | | | | | | | |
| BUSINESS SUITES HILL | Fixed and Variable Charges | 303792 | 3292 | | 30999 | PE | 02/20/14 | | 87.70 | | |
| BUSINESS SUITES HILL | Febnary 2014 Fixed Charges 301745 | | 3292 | | 30394 | PE | 02/01/14 | | 47.64 | | |
| | | | | | | | Total | | 135.34 | .00 | |
| | | | | | | | Total for | .00 | | | 5,194.06 |
| 61380-152180 | | | | | | | | | | | |
| Couriers & Shipping | | | | | | | | | | | |
| CAPITOL COURIER^APF | acct# 105756 | 26833 | 3292 | | 31161 | PE | 02/28/14 | | 54.25 | | |
| | | | | | | | Total | | 54.25 | .00 | |
| | | | | | | | Total for | .00 | | | 135.34 |
| 62310-152180 | | | | | | | | | | | |
| Health Insurance | | | | | | | | | | | |
| | STRANGE, GLADYS F | | | | 120134JE | | 02/14/14 | | | 99.81 | |
| | STRANGE, GLADYS F | | | | 120134JE | | 02/14/14 | | | 99.81 | |
| | OSIO, MARIA C | | | | 120134JE | | 02/14/14 | | | 10.35 | |
| | CORTESE, AMBER N | | | | 120134JE | | 02/14/14 | | | 87.82 | |
| | NASSERFAR, MICHAEL H | | | | 120134JE | | 02/14/14 | | | 87.30 | |
| | | | | | | | Total for | -626.48 | | | 54.25 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000478

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | JONES, KIMBERLY B | | | | 120134?E | | 02/14/14 | | 114.28 | | |
| | TASK, MICHAEL E | | | | 120134?E | | 02/14/14 | | 69.81 | | |
| | STRANGE, GLADYS F | | | | 120139?E | | 02/28/14 | | 64.78 | | |
| | TASK, MICHAEL E | | | | 120139?E | | 02/28/14 | | 69.81 | | |
| | CORTESE, AMBER N | | | | 120139?E | | 02/28/14 | | 87.82 | | |
| | NASSERFAR, MICHAEL H | | | | 120139?E | | 02/28/14 | | 87.30 | | |
| | JONES, KIMBERLY B | | | | 120139?E | | 02/28/14 | | 114.28 | | |
| | | | | | | | Total JE: | .00 | | 993.17 | |
| 64100-152180 | Payroll Tax Expense | | | | | | | 1,916.48 | | | |
| | 2-14-14 OC BATCH 2820 | | | | 120134?E | | 02/14/14 | | | | |
| | 2-14-14 SM PR | | | | 120134?E | | 02/14/14 | | 27.59 | | |
| | 2/15 PR COM,BONUS | | | | 120135?E | | 02/14/14 | | 1,001.11 | | |
| | 2/15 PAYROLL WAGE | | | | 120135?E | | 02/14/14 | | | 72.14 | |
| | 2-28-14 SM PR | | | | 120139?E | | 02/28/14 | | 711.78 | | |
| | 3-15 PR ACCRUED TO | | | | 120443?E | | 02/28/14 | | 4,425.98 | 201.54 | |
| | 3-15 PR ACCRUED TO | | | | 120443?E | | 02/28/14 | | 88.50 | | |
| | 3-15 PR ACCRUED TO | | | | 120443?E | | 02/28/14 | | | | |
| | | | | | | | Total JE: | 6,254.96 | | 273.68 | |
| | | | | | | | Total for | 7,897.76 | | | -1,619.65 |
| 68500-152180 | Corporate Allocation | | | | | | | .00 | | | |
| | corp allocation charge | | | | 120144?E | | 02/28/14 | | 12,839.95 | | |
| | | | | | | | Total JE: | 12,839.95 | | .00 | |
| | | | | | | | Total for | 12,839.95 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000479

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68501-152180 | | | | | | | | | | | |
| Corporate Per File Fees | | | | | | | | .00 | | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014110E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014114E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014114E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014121E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014123E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014123E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014125E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014125E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014127E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014128E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014128E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014129E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014134E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014141E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014147E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014147E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014149E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014149E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 12014157E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014159E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 12014159E | | 02/28/14 | | 50.00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000480

70100-152180

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TechMark | | | | 1201419E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201419E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 1201420E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201420E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 1201420E | | 02/28/14 | | 100.00 | | |
| | TechMark | | | | 1201420E | | 02/28/14 | | 50.00 | | |
| | TechMark | | | | 1201420E | | 02/28/14 | | 100.00 | | |
| | | | | | | Total JE: | | | 2,700.00 | .00 | 2,700.00 |
| Advertising & Marketing | | | | | | Total for | | 15,000.00 | | | |
| CENTERRA HOMES OF | February 2014 Installment | 20140201 | 3292 | | 30444 | PE | 02/01/14 | | 15,000.00 | | |
| URBAN SPACE REAL | full pg advertisment | 20140219TASK | 3292 | | 30933 | PE | 02/19/14 | | 2,660.00 | | |
| | | | | | | Total | | | 17,660.00 | .00 | |
| | | | | | | Total for | | | | | 32,660.00 |
| | | | | | | Report | | 33,652.77 | 143,293.16 | 166,770.63 | 10,175.30 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000481



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000482

MARCH '14

# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 3/1/2014 to 3/31/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | -1,400.00 | | | |
| | 15218014314|O'NEAL| | | | 120143|E | | 03/04/14 | | | 100.00 | |
| | 15201005779|AVERY| | | | 120145|E | | 03/12/14 | | | 200.00 | |
| | 15201006582|SHUPE| | | | 120440|E | | 03/14/14 | | | 100.00 | |
| | 15200000668|SILVA| | | | 120445|E | | 03/18/14 | | | 200.00 | |
| | 15218014371|CALVERT| | | | 120448|E | | 03/27/14 | | | 100.00 | |
| | | | | | | | Total JE: | | .00 | 700.00 | |
| | | | | | | | Total for | | | | -2,100.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | | -141.56 | | | |
| | | | | | | | Total for | | | | -141.56 |
| 41370-152180 | Processing Fees | | | | | | | -8,020.00 | | | |
| | | | | | | | Total for | | | | -8,020.00 |
| 41380-152180 | Branch Admin Fee | | | | | | | 550.00 | | | |
| | | | | | | | Total for | | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | | | | | | | -3,075.00 | | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | 1521801389,2 HACKNEY| | | | 1204574E | | 03/20/14 | | | 4,475.00 | |
| | | | | Total JE: | | | | | .00 | 4,475.00 | |
| | | | | Total for | | | | | | | -7,550.00 |
| | | 1521801423,6|CALLAWAY| | | | 1204993E | | 03/31/14 | | | 6,255.00 | |
| | | 1521801461,6|MCCASKILL| | | | 1204480E | | 03/27/14 | | | 3,522.00 | |
| | | 1521801437,1|CALVER'T| | | | 1204480E | | 03/27/14 | | | 6,255.00 | |
| | | 1520100348,4|KELLY, JR| | | | 1204480E | | 03/27/14 | | | 3,828.00 | |
| | | 1521801464,4|BEARD| | | | 1204474E | | 03/26/14 | | | 3,000.00 | |
| | | 1520000066,8|SILVA| | | | 1204450E | | 03/18/14 | | | 5,074.01 | |
| | | 1520100657,9|SHUPE| | | | 1204440E | | 03/14/14 | | | 2,520.54 | |
| | | 1520100577,9|AVERY| | | | 1201453E | | 03/12/14 | | | 4,518.90 | |
| | | 1520100587,0|KIMPEL| | | | 1201432E | | 03/05/14 | | | 3,602.07 | |
| | | 1521801431,4|O'NEAL| | | | 1201431E | | 03/04/14 | -87,341.72 | | 2,565.00 | |
| | | | | Total JE: | | | | | .00 | 41,140.52 | |
| 42301-152180 | Premium Discount - Branch | 1521801431,4|O'NEAL| | | | 1201431E | | 03/04/14 | -49,377.72 | | 213.75 | |
| | | 1520100587,0|KIMPEL| | | | 1201432E | | 03/05/14 | | | 1,200.69 | |
| | | 1520100577,9|AVERY| | | | 1201453E | | 03/12/14 | | | 1,418.93 | |
| | | 1520100577,9|AVERY| | | | 1201453E | | 03/12/14 | | | 3,765.75 | |
| | | 1520100657,9|SHUPE| | | | 1204440E | | 03/14/14 | | | 725.92 | |
| | | 1520100657,9|SHUPE| | | | 1204440E | | 03/14/14 | | | 2,100.45 | |
| | | 1520000066,8|SILVA| | | | 1204450E | | 03/18/14 | | | 1,691.34 | |
| | | | | Total for | | | | | | | -128,982.24 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000483

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 Pair-Off Allocation | 152180142361|CALLAWAY| | | | 120449836E | | 03/31/14 | | | 2,085.00 | |
| | 152180142361|CALLAWAY| | | | 120449836E | | 03/31/14 | | | 1,517.88 | |
| | 152180146161|MCCASKILL| | | | 120449836E | | 03/27/14 | | | 1,174.00 | |
| | 152180143711|CALVERT| | | | 120448016E | | 03/27/14 | | | 2,085.00 | |
| | 15201003484|KELLY, JR| | | | 120448016E | | 03/27/14 | | | 1,276.00 | |
| | 15218014644|BEARD| | | | 120447946E | | 03/26/14 | | | 1,000.00 | |
| | 15200000668|SILVA| | | | 120445016E | | 03/18/14 | | | 104.86 | |
| | | | | | | | Total JE: | .00 | | 20,359.57 | -69,737.29 |
| | | | | | | | Total for | -1,771.51 | | | -1,771.51 |
| 52426-152180 Lender Credits – Gfe Cures | 152180143141|O'NEAL| | | | 120143116E | | 03/04/14 | 8,439.68 | 627.00 | | |
| | 152010058870|KIMPEL| | | | 120143216E | | 03/05/14 | | 302.57 | | |
| | 15200000668|SILVA| | | | 120445016E | | 03/18/14 | | 2,000.00 | | |
| | 15218014644|BEARD| | | | 120447946E | | 03/26/14 | | 1,066.00 | | |
| | 152180143711|CALVERT| | | | 120448016E | | 03/27/14 | | 783.96 | | |
| | 152180142361|CALLAWAY| | | | 120449836E | | 03/31/14 | | 1,665.40 | | |
| | | | | | | | Total JE: | | 6,444.93 | .00 | |
| 52427-152180 Lender Credit – 10% Cure | 152180143141|O'NEAL| | | | 120143116E | | 03/04/14 | 117.25 | 72.00 | | 14,884.61 |
| | | | | | | | Total for | 117.25 | 72.00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000484

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55110-152180 | Commission Expense - Loan | | | | | | Total JE: | 66,451.00 | | | |
| | 3-15-14 SM PR | | | | 1204438?E | | 03/15/14 | | 55,505.94 | | |
| | 3-15 PR ACCRUED TO | | | | 1204438?E | | 03/15/14 | | | 57,143.80 | |
| | 3-18-14 OC BATCH 2901 | | | | 1204438?E | | 03/18/14 | | 1,637.86 | | |
| | 3-31-14 SM PR | | | | 1204483?E | | 03/31/14 | | 39.60 | | |
| | 4/15 COM & BONUS | | | | 1204599?E | | 03/31/14 | | 31,273.11 | | |
| | | | | | | | Total JE: | | 88,456.51 | 57,143.80 | |
| | | | | | | | Total for | 72.00 | | .00 | 189.25 |
| 55111-152180 | Commission Offset | | | | | | | -10,298.80 | | | |
| | 3-15-14 SM PR | | | | 1204438?E | | 03/15/14 | | | 3,472.82 | |
| | 3-15 PR ACCRUED TO | | | | 1204438?E | | 03/15/14 | | 3,472.82 | | |
| | 3-31-14 SM PR | | | | 1204483?E | | 03/31/14 | | | 39.60 | |
| | 4/15 COM & BONUS | | | | 1204599?E | | 03/31/14 | | | 2,000.00 | |
| | | | | | | | Total JE: | | 3,472.82 | 5,512.42 | |
| | | | | | | | Total for | | | | 97,763.71 |
| | | | | | | | | | | | -12,338.40 |
| 55280-152180 | Underwriting Fees | | | | | | | | | | |
| | FANNIE MAE | | | | | | | | | | |
| | Desktop Underwriter | INV14-2692475 | 3292 | | 101605 PE | | 03/25/14 | 1,494.08 | 941.92 | .00 | |
| | | | | | | | Total | | 941.92 | | |
| | | | | | | | Total for | | | | 2,436.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000485

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | Verification Fees | | | | | | | 2,091.16 | | | |
| TALX CORP-RAPID | Cust #9400013 | 1528051 | 3292 | | 31454 | PE | 03/11/14 | | 97.78 | | |
| ELLIE MAE | Encompass 4506 T's- March | FNCTXVM106428 | 3292 | | 31687 | PE | 03/31/14 | | 2,130.67 | | |
| | | | | | | Total | | | 2,228.45 | .00 | |
| | | | | | | | | | | | 4,319.61 |
| 55551-152180 | Appraisal Expense - | | | | | | | 150.00 | | | |
| | 1520100496l BENTLEY] | | | | 12045433E | | 03/31/14 | | 150.00 | 150.00 | |
| | | | | | | Total JE: | | | .00 | 150.00 | |
| | | | | | | Total for | | | | | .00 |
| 55600-152180 | Credit Report Expense | | | | | | | 142.26 | | | |
| | Kroll Feb pd in Mar 2014 | | | | 12045810E | | 03/27/14 | | 1,162.83 | | |
| | Alloc Feb Credit Rpt Exp fr | | | | 12046100E | | 03/27/14 | | 433.36 | | |
| | Allocate Cred Plus Invoice | | | | 12046295E | | 03/31/14 | | 927.82 | | |
| | | | | | | Total JE: | | | 2,524.01 | .00 | |
| NATIONAL CREDITORS | Credit Report | 1640875 | 3292 | | 31433 | PE | 03/31/14 | | 70.00 | | |
| | | | | | | Total | | | 70.00 | | |
| | | | | | | Total for | | | | | .00 |
| 60100-152180 | Salary And Wages | | | | | | | 28,094.47 | | | |
| | 3-15-14 SM PR | | | | 12044383E | | 03/15/14 | | 7,016.55 | | |
| | 3-15 PR ACCRUED TO | | | | 12044388E | | 03/15/14 | | | 1,156.92 | |
| | Allocate Therrell wage to | | | | 12044860E | | 03/28/14 | | 500.00 | | |
| | | | | | | Total for | | | 2,736.27 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000486

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 Bonus - Employee | | | | | | | | | | |
| | 3-31-14 SM PR | | | | 120448JE | 03/31/14 | | 7,657.53 | | |
| | 4/15 WAGE ACCRUAL, TO | | | | 120459JE | 03/31/14 | | 1,269.23 | | |
| | | | | | Total JE: | | | 16,443.31 | 1,156.92 | |
| | | | | | Total for | | 4,710.00 | | | 43,380.86 |
| 61000-152180 Rent Expense | 3-15-14 SM PR | | | | 120443JE | 03/15/14 | | 4,185.00 | | |
| | 3-15 PR ACCRUED TO | | | | 120443JE | 03/15/14 | | | 4,185.00 | |
| | 4/15 COM & BONUS | | | | 120459JE | 03/31/14 | | 1,530.00 | | |
| | 4-15 COM, BONUS | | | | 120460JE | 03/31/14 | | 800.00 | | |
| | | | | | Total JE: | | | 6,515.00 | 4,185.00 | |
| PREFERRED OFFICE | MAR 2014 RENT | 14503507 | 3292 | | 30884 PE | 03/01/14 | 5,194.06 | 2,140.78 | | |
| | | | | | Total for | | | 2,140.78 | .00 | 7,040.00 |
| | Preferred Office | | 3292 | | 2693 CR | 03/03/14 | | | 2,000.00 | |
| | | | | | Total | | | .00 | 2,000.00 | |
| 61300-152180 Office Supplies & Expense | | | | | Total for | | 135.34 | | | 5,334.84 |
| 61380-152180 Couriers & Shipping | | | | | Total for | | 54.25 | | 135.34 | 135.34 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000487

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 | Health Insurance | | | | | | | -1,619.65 | | | |
| | TASK, MICHAEL E | | | | 1204438JE | | 03/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 1204438JE | | 03/15/14 | | | 454.30 | |
| | CORTESE, AMBER N | | | | 1204438JE | | 03/15/14 | | | 87.82 | |
| | NASSERFAR, MICHAEL H | | | | 1204438JE | | 03/15/14 | | | 87.30 | |
| | JONES, KIMBERLY B | | | | 1204438JE | | 03/15/14 | | | 114.28 | |
| | NASSERFAR, MICHAEL H | | | | 1204489JE | | 03/31/14 | | | 87.30 | |
| | TASK, MICHAEL E | | | | 1204489JE | | 03/31/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 1204489JE | | 03/31/14 | | | 454.30 | |
| | CORTESE, AMBER N | | | | 1204489JE | | 03/31/14 | | | 87.82 | |
| | JONES, KIMBERLY B | | | | 1204489JE | | 03/31/14 | | | 114.28 | |
| | | | | | | | Total JE: | .00 | | 1,627.02 | |
| | | | | | | | Total for | | | | 54.25 |
| 64100-152180 | Payroll Tax Expense | | | | | | | 7,897.76 | | | |
| | 3-15-14 SM PR | | | | 1204438JE | | 03/15/14 | | 4,962.38 | | |
| | 3-15 PR ACCRUED TO | | | | 1204438JE | | 03/15/14 | | | 4,425.98 | |
| | 3-15 PR ACCRUED TO | | | | 1204438JE | | 03/15/14 | | | 88.50 | |
| | 3-18-14 OC BATCH 2901 | | | | 1204438JE | | 03/18/14 | | 125.30 | | |
| | 3-31-14 SM PR | | | | 1204485JE | | 03/31/14 | | 577.33 | | |
| | 4/15 COM & BONUS | | | | 1204599JE | | 03/31/14 | | 2,356.44 | | |
| | 4/15 COM & BONUS | | | | 1204599JE | | 03/31/14 | | 97.10 | | |
| | 4/15 WAGE ACCRUAL TO | | | | 1204599JE | | 03/31/14 | | 61.20 | | |
| | 4-15 COM, BONUS | | | | 1204602JE | | 03/31/14 | | | | |
| | | | | | | | Total JE: | | 8,179.75 | 4,514.48 | -3,246.67 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000488

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | | | | | | | Total for | 12,839.95 | | | 11,563.03 |
| | corp allocation charge | | | | 120458 | 1E | 03/31/14 | | 9,645.76 | | |
| | | | | | | | Total JE: | | 9,645.76 | .00 | |
| | | | | | | | Total for | | | | 22,485.71 |
| 68501-152180 | Corporate Per File Fees | | | | | | | 2,700.00 | | | |
| | 1521801|4236|CALLAWAY| | | | | 1204546 | 1E | 03/31/14 | | 50.00 | | |
| | 1521801|4236|CALLAWAY| | | | | 1204546 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5950|WOLFER| | | | | 1204550 | 1E | 03/31/14 | | 50.00 | | |
| | 1520100|5950|WOLFER| | | | | 1204550 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5715|WILLIAMS| | | | | 1204550 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5715|WILLIAMS| | | | | 1204550 | 1E | 03/31/14 | | 50.00 | | |
| | 1520100|3484|KELLY, JR| | | | | 1204551 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|3484|KELLY, JR| | | | | 1204551 | 1E | 03/31/14 | | 50.00 | | |
| | 1521801|4616|MCCASKILL| | | | | 1204551 | 1E | 03/31/14 | | 100.00 | | |
| | 1521801|4616|MCCASKILL| | | | | 1204551 | 1E | 03/31/14 | | 50.00 | | |
| | 1521801|4371|CALVERT| | | | | 1204551 | 1E | 03/31/14 | | 100.00 | | |
| | 1521801|4371|CALVERT| | | | | 1204552 | 1E | 03/31/14 | | 50.00 | | |
| | 1521801|4644|BEARD| | | | | 1204552 | 1E | 03/31/14 | | 50.00 | | |
| | 1521801|4644|BEARD| | | | | 1204552 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5920|BROWN| | | | | 1204553 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5920|BROWN| | | | | 1204553 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5682|CARMICHAEL| | | | | 1204555 | 1E | 03/31/14 | | 50.00 | | |
| | 1520100|5682|CARMICHAEL| | | | | 1204555 | 1E | 03/31/14 | | 100.00 | | |
| | 1520100|5682|CARMICHAEL| | | | | 1204555 | 1E | 03/31/14 | | 50.00 | | |

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 70100-152180 | | | | | | | | | | | |
| Advertising & Marketing | | | | | | | | | | | |
| CENTERRA HOMES OF | March 2014 Installment | 20140301 | 3292 | 31365 | PE | 03/01/14 | 32,660.00 | | 15,000.00 | .00 | |
| | | | | | | Total | | | 15,000.00 | .00 | |
| | | | | | | Total for | | | | | 47,660.00 |
| | 152000000668|SILVA| | | | 1204558|E | | 03/31/14 | | 100.00 | | |
| | 152000000668|SILVA| | | | 1204558|E | | 03/31/14 | | 50.00 | | |
| | 152010006582|SHUPE| | | | 1204559|E | | 03/31/14 | | 50.00 | | |
| | 152010006582|SHUPE| | | | 1204559|E | | 03/31/14 | | 100.00 | | |
| | 152010057779|AVERY| | | | 1204559|E | | 03/31/14 | | 100.00 | | |
| | 152010057799|AVERY| | | | 1204560|E | | 03/31/14 | | 50.00 | | |
| | 152010058770|KIMPEL| | | | 1204560|E | | 03/31/14 | | 50.00 | | |
| | 152010058770|KIMPEL| | | | 1204569|E | | 03/31/14 | | 100.00 | | |
| | 152180143114|ONEAL| | | | 1204569|E | | 03/31/14 | | 50.00 | | |
| | 152180143114|ONEAL| | | | 1204569|E | | 03/31/14 | | 100.00 | | |
| | | | | | | Total JE: | | | 2,100.00 | .00 | |
| | | | | | | Total for | | | | | 4,800.00 |
| | | | | | | Report | | 10,175.30 | 164,235.24 | 142,964.73 | 31,445.81 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000490



*April '14*

## General Ledger by Branch

Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 4/1/2014 to 4/30/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 Application Fee Income | 1520000720|L11JEGREN| | | 12046|3E | | | 04/17/14 | -2,100.00 | .00 | 200.00 | |
| | | | | | Total JE: | | | | | 200.00 | |
| | | | | | Total for | | | -2,100.00 | | | -2,300.00 |
| 41357-152180 Credit Report Fee Income | | | | | Total for | | | -141.56 | | | -141.56 |
| 41370-152180 Processing Fees | | | | | Total for | | | -8,020.00 | | | -8,020.00 |
| 41380-152180 Branch Admin Fee | | | | | Total for | | | 550.00 | | | 550.00 |
| 41860-152180 Brokered Loan Fee Income | | | | | Total for | | | -7,550.00 | | | -7,550.00 |
| 42300-152180 Premium Discount - Lo | | | | | Total for | | | -128,982.24 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000491

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| | 15200000720|LILJEGREN| | | | 120461|JE | 04/17/14 | | | 3,960.00 | |
| | 15218015003|GRAY| | | | 120461|JE | 04/17/14 | | | 5,700.00 | |
| | 15201006269|CRAIG| | | | 120462|JE | 04/18/14 | | | 4,500.00 | |
| | 15218014921|COHEN| | | | 120462|JE | 04/21/14 | | | 4,837.50 | |
| | 15201004721|RHINEHART| | | | 120462|JE | 04/21/14 | | | 4,376.25 | |
| | 15201006070|KIM| | | | 120464|JE | 04/25/14 | | | 4,500.00 | |
| | 15218014968|BYTHEWOOD| | | | 120464|JE | 04/25/14 | | | 2,246.40 | |
| | 15201004685|SEYMOUR| | | | 120466|JE | 04/30/14 | | | 3,275.51 | |
| | | | | | | Total JE: | | .00 | 33,395.66 | |
| Premium Discount - Branch | | | | | | Total for | -69,737.29 | | | -162,377.90 |
| | 15200000720|LILJEGREN| | | | 120461|JE | 04/17/14 | | | 1,320.00 | |
| | 15218015003|GRAY| | | | 120461|JE | 04/17/14 | | | 1,900.00 | |
| | 15201006269|CRAIG| | | | 120462|JE | 04/18/14 | | | 3,898.61 | |
| | 15201006269|CRAIG| | | | 120462|JE | 04/18/14 | | | 2,640.31 | |
| | 15218014921|COHEN| | | | 120462|JE | 04/21/14 | | | 528.90 | |
| | 15218014921|COHEN| | | | 120462|JE | 04/21/14 | | | 1,612.50 | |
| | 15201004721|RHINEHART| | | | 120462|JE | 04/21/14 | | | 1,458.75 | |
| | 15201006070|KIM| | | | 120462|JE | 04/25/14 | | | 6,476.68 | |
| | 15201006070|KIM| | | | 120464|JE | 04/25/14 | | | 493.90 | |
| | 15218014968|BYTHEWOOD| | | | 120464|JE | 04/25/14 | | | 187.20 | |
| | 15218014968|BYTHEWOOD| | | | 120464|JE | 04/25/14 | | | 52.42 | |
| | 15201004685|SEYMOUR| | | | 120466|JE | 04/30/14 | | | 2,729.59 | |
| | 15201004685|SEYMOUR| | | | 120466|JE | 04/30/14 | | | 72.06 | |
| | | | | | | Total JE: | | .00 | 23,370.92 | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | Total for | -1,771.51 | | | -1,771.51 |
| | | | | | | | | | | | -93,108.21 |
| 52426-152180 | Lender Credits - Gfe Cures | 15200000720[LILJEGREN] | | | 1204613E | | 04/17/14 | 14,884.61 | 132.00 | | |
| | | 15218015003[GRAY] | | | 1204614E | | 04/17/14 | | 1,484.77 | | |
| | | 15201004721[RHINEHART] | | | 1204625E | | 04/21/14 | | 242.15 | | |
| | | 15201006070[KIM] | | | 1204643E | | 04/25/14 | | 5,597.54 | | |
| | | | | | | | Total JE: | 7,456.46 | | .00 | |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | Total for | 189.25 | | | 22,341.07 |
| | | | | | | | | | | | 189.25 |
| 55110-152180 | Commission Expense - Loan | 4-15-14 SM PR | | | 1204599E | | 04/15/14 | 97,763.71 | 31,273.11 | | |
| | | 15201005298 DUCATI | | | 1204602E | | 04/15/14 | | 150.00 | | |
| | | 15201006409 RIFFEE | | | 1204602E | | 04/15/14 | | 440.00 | | |
| | | 4/15 COM & BONUS | | | 1204599E | | 04/15/14 | | | 31,273.11 | |
| | | 5-15 PR ACCRUED TO | | | 1204752E | | 04/30/14 | | 29,045.25 | | |
| | | | | | | | Total JE: | 60,908.36 | | 31,273.11 | |
| | | | | | | | Total for | | | | 127,398.96 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000493

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 | Commission Offset | | | | | | -12,338.40 | | | |
| | 4-15-14 SM PR | | | | 1204599E | 04/15/14 | | 2,000.00 | | |
| | 4/15 COM & BONUS | | | | 1204599E | 04/15/14 | | | 2,000.00 | |
| | 5-15 PR ACCRUED TO | | | | 1204752E | 04/30/14 | | | 5,815.40 | |
| | | | | | | Total JE: | | 2,000.00 | 7,815.40 | -18,153.80 |
| 55280-152180 | Underwriting Fees | | | | | | | | | |
| | FANNIE MAE | Desktop underwriter | 04242014 | 3292 | 101643 PE | 04/24/14 | 2,436.00 | 1,006.88 | | |
| | | | | | | Total | | 1,006.88 | .00 | |
| 55350-152180 | Verification Fees | | | | | | | | | |
| | TALX CORP-RAPID | Cust # 9400013 Paid by | 1560001 | 3292 | 101647 PE | 04/11/14 | 4,319.61 | 180.17 | | |
| | ELLIE MAE | Encompass 4506 T service- | INCTXVM106696 | 3292 | 32361 PE | 04/30/14 | | 2,031.00 | | |
| | | | | | | Total | | 2,211.17 | .00 | 3,442.88 |
| | | | | | | Total for | | | | 6,530.78 |
| 55600-152180 | Credit Report Expense | | | | | | | | | |
| | Reclass Chad's Annex - Kroll | | | | 1204748E | 04/26/14 | 2,736.27 | 1,437.68 | | |
| | Reclass Chad's Annex - | | | | 1204749E | 04/26/14 | | 93.51 | | |
| | | | | | | Total JE: | | 1,531.19 | .00 | |
| | | | | | | Total for | | | | 4,267.46 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000494

| GL./Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 55700-152180 | Late / Penalty | | | | | | | | | |
| BUSINESS SUITES HILL | Fixed and Variable charges | 305247 | 3292 | 31278 | PE | 04/01/14 | | 20.01 | .00 | |
| | | | | | | Total | .00 | 20.01 | .00 | |
| | | | | | | Total for | | | | 20.01 |
| 60100-152180 | Salary And Wages | | | | | | | | | |
| | 4-15-14 SM PR | | | 1204599E | | 04/15/14 | 43,380.86 | 7,577.37 | | |
| | 4/15 WAGE ACCRUAL TO | | | 1204599E | | 04/15/14 | | | 1,269.23 | |
| | 4-30-14 SM PR | | | 1204698E | | 04/30/14 | | 4,869.23 | | |
| | Allocation of Therell to | | | 1204698E | | 04/30/14 | | 500.00 | | |
| | 5/15 PR ACCRUED TO | | | 1204752E | | 04/30/14 | | 5,517.05 | | |
| | | | | | | Total JE: | | 18,463.65 | 1,269.23 | |
| | | | | | | Total for | | | | 60,575.28 |
| 60450-152180 | Bonus - Employee | | | | | | | | | |
| | 4-15-14 SM PR | | | 1204599E | | 04/15/14 | 7,040.00 | | | |
| | 4/15 COM & BONUS | | | 1204599E | | 04/15/14 | | 1,530.00 | | |
| | 4-15 COM, BONUS | | | 1204602E | | 04/15/14 | | | 1,530.00 | |
| | 4-15 COM, BONUS | | | 1204602E | | 04/15/14 | | 800.00 | | |
| | 4-17-14 OC BATCH 2961 | | | 1204629E | | 04/17/14 | | 800.00 | | |
| | 5-15 PR ACCRUED TO | | | 1204752E | | 04/30/14 | | 1,670.00 | 800.00 | |
| | | | | | | Total JE: | | 4,000.00 | 2,330.00 | |
| 61000-152180 | Rent Expense | | | | | | | 5,334.84 | | 8,710.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000495

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61300-152180 | | | | | | | | | | | |
| PREFERRED OFFICE | APR 2014 RENT | 14503579 | 3292 | | 31288 | PE | 04/01/14 | | 2,140.78 | | |
| | | | | | | | Total | | 2,140.78 | .00 | |
| Office Supplies & Expense | | | | | | | Total for | | | | 7,475.62 |
| BUSINESS SUITES HILL | Fixed and Variable charges | 3052247 | 3292 | | 31278 | PE | 04/01/14 | 135.34 | 97.85 | | |
| BUSINESS SUITES HILL | may fixed charges | 307976 | 3292 | | 31817 | PE | 04/18/14 | | 30.16 | | |
| | | | | | | | Total | | 128.01 | .00 | |
| 61380-152180 | | | | | | | | | | | |
| Couriers & Shipping | | | | | | | Total for | | | | 263.35 |
| | | | | | | | | 54.25 | | | |
| | | | | | | | Total for | | | | 54.25 |
| 62310-152180 | | | | | | | | | | | |
| Health Insurance | ReclassAetna - April 2014 | | | | 120460 | JE | 04/01/14 | -3,246.67 | | | |
| | CURBY, JULIANE M | | | | 120459 | JE | 04/15/14 | | 803.51 | | |
| | CORTESE, AMBER N | | | | 120459 | JE | 04/15/14 | | | 454.30 | |
| | TASK, MICHAEL E | | | | 120459 | JE | 04/15/14 | | | 87.82 | |
| | NASSERFAR, MICHAEL H | | | | 120459 | JE | 04/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 120469 | JE | 04/30/14 | | | 87.30 | |
| | NASSERFAR, MICHAEL H | | | | 120469 | JE | 04/30/14 | | | 454.30 | |
| | TASK, MICHAEL E | | | | 120469 | JE | 04/30/14 | | | 6.83 | |
| | | | | | | | | | | 11.54 | |
| | | | | | | | Total JE: | | 803.51 | 1,171.90 | |
| | | | | | | | Total for | | | | -3,615.06 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000496

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | | | | |
| | 4-15-14 SM PR | | | | 1204599|E | | 04/15/14 | 11,563.03 | 2,971.98 | | |
| | 4/15 COM & BONUS | | | | 1204599|E | | 04/15/14 | | | 2,356.44 | |
| | 4/15 WAGE ACCRUAL TO | | | | 1204599|E | | 04/15/14 | | | 97.10 | |
| | 4/15 COM, BONUS | | | | 1204602|E | | 04/15/14 | | | 61.20 | |
| | 4-17-14 OC BATCH 2961 | | | | 1204625|E | | 04/17/14 | | 61.20 | | |
| | 4-30-14 SM PR | | | | 1204693|E | | 04/30/14 | | 357.45 | | |
| | 5-15 PR ACCRUED TO | | | | 1204752|E | | 04/30/14 | | 1,904.84 | | |
| | 5/15 PR ACCRUED TO | | | | 1204752|E | | 04/30/14 | | 422.05 | | |
| | | | | | | | Total JE: | | 5,717.52 | 2,514.74 | |
| | | | | | | | Total for | | | | 14,765.81 |
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | Corp Volume Allocation | | | | 1204723|E | | 04/30/14 | 22,485.71 | 10,060.93 | | |
| | | | | | | | Total JE: | | 10,060.93 | .00 | |
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |
| | 1521801|4968|BYTHEWOOD| | | | | 1204668|E | | 04/30/14 | | 50.00 | | |
| | 1521801|4968|BYTHEWOOD| | | | | 1204668|E | | 04/30/14 | | 100.00 | | |
| | 1520000|720|LILJEGREN| | | | | 1204668|E | | 04/30/14 | | 50.00 | | |
| | 1520000|720|LILJEGREN| | | | | 1204668|E | | 04/30/14 | | 100.00 | | |
| | 1520100|4685|SEYMOUR| | | | | 1204670|E | | 04/30/14 | | 100.00 | | |
| | 1520100|4685|SEYMOUR| | | | | 1204670|E | | 04/30/14 | | 50.00 | | |
| | 1521801|492|COHEN| | | | | 1204670|E | | 04/30/14 | | 50.00 | | |
| | | | | | | | Total for | 4,800.00 | | | 32,546.64 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000497

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521801492|COHEN| | | | 1204670E | | 04/30/14 | | 100.00 | | |
| | 1521801500|GRAY| | | | 1204672E | | 04/30/14 | | 100.00 | | |
| | 1521801500|GRAY| | | | 1204672E | | 04/30/14 | | 50.00 | | |
| | 1520100472|RHINEHART| | | | 1204674E | | 04/30/14 | | 100.00 | | |
| | 1520100472|RHINEHART| | | | 1204674E | | 04/30/14 | | 50.00 | | |
| | 1520100599|HERNANDEZ| | | | 1204678E | | 04/30/14 | | 100.00 | | |
| | 1520100599|HERNANDEZ| | | | 1204678E | | 04/30/14 | | 50.00 | | |
| | 1520100397|HATT| | | | 1204678E | | 04/30/14 | | 100.00 | | |
| | 1520100397|HATT| | | | 1204678E | | 04/30/14 | | 50.00 | | |
| | 1520100626|CRAIG| | | | 1204683E | | 04/30/14 | | 100.00 | | |
| | 1520100626|CRAIG| | | | 1204683E | | 04/30/14 | | 50.00 | | |
| | 1520100560|CASH| PAUL | | | 1204688E | | 04/30/14 | | 50.00 | | |
| | 1520100560|CASH| PAUL | | | 1204683E | | 04/30/14 | | 100.00 | | |
| | 1520100633|BRAZENER| | | | 1204686E | | 04/30/14 | | 100.00 | | |
| | 1520100633|BRAZENER| | | | 1204686E | | 04/30/14 | | 50.00 | | |
| | 1520100607|KIM| | | | 1204688E | | 04/30/14 | | 50.00 | | |
| | 1520100607|KIM| | | | 1204688E | | 04/30/14 | | 100.00 | | |
| | 1520100613|OSTER| SETH | | | 1204690E | | 04/30/14 | | 50.00 | | |
| | 1520100613|OSTER| SETH | | | 1204690E | | 04/30/14 | | 100.00 | | |
| | | | | | | | Total JE: | | 1,950.00 | .00 | |
| | | | | | | | Total for | | | | 6,750.00 |

68502-152180   Corporate Fees - Neo

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | NEO FEES-Gosnay | | | | 1204701E | | 04/30/14 | .00 | 500.00 | | |
| | | | | | | | Total JE: | | 500.00 | .00 | |
| | | | | | | | Total for | | | | 500.00 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 70100-152180 | | | | | | | | | | | |
| Advertising & Marketing | | | | | | | | 47,660.00 | | | |
| CENTERRA HOMES OF | April 2014 Installment | 20140401 | 3292 | | 31365 | PE | 04/01/14 | | 15,000.00 | | |
| CENTERRA HOMES OF | MSA- May2014 | 2014 MAY | 3292 | | 31887 | PE | 04/25/14 | | | 15,000.00 | |
| | | | | | | | Total | | 15,000.00 | 15,000.00 | 47,660.00 |
| | | | | | | | Total for | | | | |
| | | | | | | | Report | | 31,445.81 | 133,898.47 | 118,340.96 | 47,003.32 |



# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 5/1/2014 to 5/31/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | | -2,300.00 | | | |
| | 152180142083\|SHOENFELT\| | | | | 1204698 | E | 05/02/14 | | | 100.00 | |
| | 1520000782\|FOLTZ\| | | | | 1204699 | E | 05/02/14 | | | 200.00 | |
| | 15200009950\|TINSLEY\| | | | | 1204703 | E | 05/05/14 | | | 200.00 | |
| | 1520100654\|LEE\| IL | | | | 1204703 | E | 05/05/14 | | | 200.00 | |
| | 152180143751\|HERNANDEZ\| | | | | 1204736 | E | 05/12/14 | | | 100.00 | |
| | 1520100658\|STEVENS\| | | | | 1204752 | E | 05/15/14 | | | 200.00 | |
| | 1520100648\|TUCCIARONE\| | | | | 1204800 | E | 05/27/14 | | | 200.00 | |
| | | | | | | | Total JE: | .00 | | 1,200.00 | -3,500.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | | -141.56 | | | |
| | 15201005280\|GREEN\| | | | | 1204768 | E | 05/20/14 | | 20.18 | | |
| | 15201006405\|FORREST\| | | | | 1204792 | E | 05/23/14 | | 17.51 | | |
| | | | | | | | Total JE: | .00 | 37.69 | | |
| | | | | | | | Total for | | | | -179.25 |
| 41370-152180 | Processing Fees | | | | | | | -8,020.00 | | | |
| | | | | | | | Total for | | | | -8,020.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000500

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41380-152180 | Branch Admin Fee | | | | | | Total for | 550.00 | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | 15218015886 ROMANYK] | | | 1204891UE | | 05/30/14 | -7,550.00 | | 2,717.50 | |
| | | | | | | | Total JE: | | .00 | 2,717.50 | |
| | | | | | | | Total for | | | | -10,267.50 |
| 42300-152180 | Premium Discount - Lo | | | | | | | -162,377.90 | | | |
| | 15201005018|ALAMGAR| | | | 1204696UE | | 05/01/14 | | | 6,255.00 | |
| | 15218014208|SHOENFELT] | | | 1204698UE | | 05/02/14 | | | 3,268.80 | |
| | 15200007822|FOLTZ] | | | 1204699UE | | 05/02/14 | | | 4,500.00 | |
| | 15200000950|TINSLEY| | | | 1204703UE | | 05/05/14 | | | 2,460.00 | |
| | 15201006549|LEE] JL | | | 1204703UE | | 05/05/14 | | | 1,592.58 | |
| | 15201006053|O'NEAL] | | | 1204709UE | | 05/06/14 | | | 4,500.00 | |
| | 15201006191|WOLFSHOHL| | | 1204709UE | | 05/06/14 | | | 3,880.69 | |
| | 15201014561|BAILEY] | | | 1204709UE | | 05/06/14 | | | 4,500.00 | |
| | 15218015742|PHI] JUNG | | | 1204728UE | | 05/09/14 | | | 1,818.00 | |
| | 15218014375|HERNANDEZ| | | 1204736UE | | 05/12/14 | | | 4,663.20 | |
| | 15201006588|STEVENS| | | 1204752UE | | 05/15/14 | | | 4,500.00 | |
| | 15218015548|BRANCH| | | 1204764UE | | 05/19/14 | | | 4,500.00 | |
| | 15201005280|GREEN| | | 1204768UE | | 05/20/14 | | | 6,255.00 | |
| | 15218015270|HRYNYK| | | 1204768UE | | 05/20/14 | | | 4,781.25 | |
| | 15218015491|COBB] TOM | | | 1204775UE | | 05/21/14 | | | 3,268.80 | |
| | 15218015065|LAMM| | | 1204783UE | | 05/22/14 | | | 3,000.00 | |
| | 15201006030|BARICUATRO| | | 1204793UE | | 05/23/14 | | | 4,500.00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000501

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42301-152180 | Premium Discount - Branch | | | | | | | -93,108.21 | | | |
| | 152010065508|GLADNEY| | | | | 1204792|E | | 05/23/14 | | | 3,551.45 |
| | 152010060741|HULBERT| | | | | 1204792|E | | 05/23/14 | | | 3,780.18 |
| | 152010064405|FORREST| | | | | 1204792|E | | 05/23/14 | | | 4,262.07 |
| | 152010064482|TUCCIARONE| | | | | 1204800|E | | 05/27/14 | | | 1,650.00 |
| | 152010065507|CARMICHAEL| | | | | 1204807|E | | 05/28/14 | | | 3,671.53 |
| | 152180157773|NELSON| | | | | 1204813|E | | 05/29/14 | | | 4,941.60 |
| | | | | | | | Total JE: | | .00 | 90,100.15 | |
| | 152010050181|ALAMGARI| | | | | 1204690|E | | 05/01/14 | | | 2,085.00 |
| | 152010050181|ALAMGARI| | | | | 1204690|E | | 05/01/14 | | | 1,522.05 |
| | 152180142081|SHOENFELT| | | | | 1204698|E | | 05/02/14 | | | 1,596.26 |
| | 152180142081|SHOENFELT| | | | | 1204698|E | | 05/02/14 | | | 272.40 |
| | 152000007821|FOLTZ| | | | | 1204699|E | | 05/02/14 | | | 3,867.27 |
| | 152000007821|FOLTZ| | | | | 1204699|E | | 05/02/14 | | | 422.50 |
| | 152000009501|TINSLEY| | | | | 1204703|E | | 05/05/14 | | | 2,050.00 |
| | 152000009501|TINSLEY| | | | | 1204703|E | | 05/05/14 | | | 792.12 |
| | 152010065491|LEE|IL | | | | 1204703|E | | 05/05/14 | | | 530.86 |
| | 152010060053|ONEAL| | | | | 1204703|E | | 05/05/14 | | | 272.86 |
| | 152010060191|WOLFSHOHL| | | | | 1204709|E | | 05/06/14 | | | 458.67 |
| | 152010060191|WOLFSHOHL| | | | | 1204709|E | | 05/06/14 | | | 8.62 |
| | 152180145561|BAILEY| | | | | 1204709|E | | 05/06/14 | | | 323.39 |
| | 152180145561|BAILEY| | | | | 1204709|E | | 05/06/14 | | | 2,520.98 |
| | 152180157421|PHI|HUNG | | | | 1204728|E | | 05/09/14 | | | 394.73 |
| | 152180143775|HERNANDEZ| | | | | 1204728|E | | 05/09/14 | | | 151.50 |
| | 152180143775|HERNANDEZ| | | | | 1204736|E | | 05/12/14 | | | 2,176.16 |
| | | | | | Total for | | | | | | -252,478.05 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000502

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15218014375|HERNANDEZ| | | | | 1204736 | JE | 05/12/14 | | | 3,886.00 | |
| | 15201006588|STEVENS| | | | | 1204752 | TE | 05/15/14 | | | 474.54 | |
| | 15218015548|BRANCH| | | | | 1204764 | JE | 05/19/14 | | | 2,909.05 | |
| | 15218015548|BRANCH| | | | | 1204764 | JE | 05/19/14 | | | 5,432.45 | |
| | 15201005280|GREEN| | | | | 1204768 | JE | 05/20/14 | | | 2,085.00 | |
| | 15218015270|HRYNYK| | | | | 1204768 | JE | 05/20/14 | | | 800.06 | |
| | 15218015270|HRYNYK| | | | | 1204768 | JE | 05/20/14 | | | 1,593.75 | |
| | 15218015491|COBB| TOM | | | | 1204775 | JE | 05/21/14 | | | 1,089.60 | |
| | 15218015065|LAMM| | | | | 1204783 | JE | 05/22/14 | | | 1,000.00 | |
| | 15218015065|LAMM| | | | | 1204783 | JE | 05/22/14 | | | 1,110.00 | |
| | 15201006030|BARICUATRO| | | | | 1204791 | JE | 05/23/14 | | | 1,201.48 | |
| | 15201006030|BARICUATRO| | | | | 1204791 | JE | 05/23/14 | | | 471.79 | |
| | 15201006508|GLADNEY| | | | | 1204792 | JE | 05/23/14 | | | 295.95 | |
| | 15201006074|HULBERT| | | | | 1204792 | JE | 05/23/14 | | | 1,260.06 | |
| | 15201006405|FORREST| | | | | 1204792 | TE | 05/23/14 | | | 1,929.30 | |
| | 15201006405|FORREST| | | | | 1204792 | TE | 05/23/14 | | | 3,551.73 | |
| | 15201006482|TUCCIARONE| | | | | 1204800 | E | 05/27/14 | | | 550.00 | |
| | 15201006507|CARMICHAEL| | | | | 1204807 | E | 05/28/14 | | | 305.96 | |
| | 15218015773|NELSON| | | | | 1204813 | TE | 05/29/14 | | | 1,647.20 | |
| | 15218015773|NELSON| | | | | 1204813 | TE | 05/29/14 | | | 448.04 | |
| | | | | | | | Total JE: | | .00 | 51,487.33 | -144,595.54 |

42400-152180    Total for    Beg Bal -1,771.51

Pair-Off Allocation    Total for    End Bal -1,771.51

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | 22,341.07 | | | |
| | 15201005018|ALAMGARI| | | | 1204696E | | 05/01/14 | | 1,944.90 | | |
| | 15218014208|SHOENFELT| | | | 1204698E | | 05/02/14 | | 1,500.00 | | |
| | 1520000782|FOLTZ| | | | 1204699E | | 05/02/14 | | 6,506.39 | | |
| | 15201006053|O'NEAL| | | | 1204709E | | 05/06/14 | | 168.18 | | |
| | 15218014561|BAILEY| | | | 1204709E | | 05/09/14 | | 2,000.00 | | |
| | 15218015742|PHI| HUNG | | | 1204728E | | 05/09/14 | | 241.39 | | |
| | 15201006588|STEVENS| | | | 1204752E | | 05/15/14 | | 563.12 | | |
| | 15201005280|GREEN| | | | 1204768E | | 05/20/14 | | 2,101.90 | | |
| | 15218015491|COBB| TOM | | | 1204773E | | 05/21/14 | | 274.58 | | |
| | 15201006030|BARICUATRO| | | | 1204790E | | 05/23/14 | | 3,826.00 | | |
| | 15201006508|GLADNEY| | | | 1204792E | | 05/23/14 | | 655.77 | | |
| | 15201006482|TUCCIARONE| | | | 1204800E | | 05/27/14 | | 3,000.00 | | |
| | 15201006507|CARMICHAEL| | | | 1204803E | | 05/28/14 | | 200.00 | | |
| | | | | | | | Total JE: | | 22,982.23 | .00 | |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | Total for | | 189.25 | | |
| | | | | | | | Total for | | | | 45,333.30 |
| 55110-152180 | Commission Expense - Loan | | | | | | | 127,398.96 | | | |
| | 5-2-14 OC BATCH 2983 & | | | | 1204699E | | 05/02/14 | | 3,400.00 | | |
| | 5-15-14 SM PR | | | | 1204752E | | 05/15/14 | | 29,045.25 | | |
| | 5-15 PR ACCRUED TO | | | | 1204752E | | 05/15/14 | | | 29,045.25 | |
| | 5-30-14 SM PR | | | | 1204873E | | 05/30/14 | | 24,368.61 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204903E | | 05/30/14 | | 40,628.36 | | |
| | | | | | | | Total for | | | | 189.25 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000504

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 Commission Offset | 1520100057 LIMI JIN | | | | 12049033E | | 05/30/14 | | 150.00 | | |
| | | | | | | | Total JE: | | 97,592.22 | 29,045.25 | |
| | | | | | | | Total for | | | | 195,945.93 |
| | 6-15 SM PR ACCRUED TO | | | | 12049033E | | 05/31/14 | -18,153.80 | | 3,033.40 | |
| | 5-30-14 SM PR | | | | 12048733E | | 05/30/14 | | | 2,000.00 | |
| | 5-15 PR ACCRUED TO | | | | 12047533E | | 05/15/14 | | 5,815.40 | | |
| | 5-15-14 SM PR | | | | 12047523E | | 05/15/14 | | | 5,815.40 | |
| | 5-2-14 OC BATCH 2983 & | | | | 12046993E | | 05/02/14 | | 656.40 | | |
| | | | | | | | Total JE: | | 5,815.40 | 11,505.20 | |
| 55280-152180 Underwriting Fees FANNIE MAE | Desktop underwriter | INV14-2712337 | 3292 | | 101664 PE | | 05/23/14 | 3,442.88 | 925.69 | | |
| | | | | | | | Total | | 925.69 | .00 | |
| | | | | | | | Total for | | | | -23,843.60 |
| 55350-152180 Verification Fees TALX CORP-RAPID | income verifications- PBP | 1581920 | 3292 | | 101673 PE | | 05/11/14 | 6,530.78 | 268.72 | | |
| ELLIE MAE | Encompass4506T service- | INCTXVM106965 | 3292 | | 32773 PE | | 05/31/14 | | 81.28 | | |
| ELLIE MAE | Encompass4506T service- | INCTXVM106965 | 3292 | | 32773 PE | | 05/31/14 | | 1,112.91 | | |
| | | | | | | | Total | | 1,462.91 | .00 | |
| | | | | | | | Total for | | | | 4,368.57 |
| | | | | | | | Total for | | | | 7,993.69 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000505

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | Aunex – Chad May 2014 | | | 1204893E | | 05/26/14 | 4,267.46 | 1,275.15 | | |
| | | | | | | Total JE: | | | 1,275.15 | .00 | |
| | | | | | | Total for | | | | | 5,542.61 |
| 55700-152180 | Late / Penalty | | | | | | | | | | |
| | | | | | | Total for | | 20.01 | | | |
| | | | | | | | | | | | 20.01 |
| 60100-152180 | Salary And Wages | | | | | | | | | | |
| | 5-15-14 SM PR | | | | 1204752E | | 05/15/14 | | 7,117.07 | | |
| | 5/15 PR ACCRUED TO | | | | 1204752E | | 05/15/14 | | | 5,517.05 | |
| | 5-30-14 SM PR | | | | 1204873E | | 05/30/14 | | 4,238.00 | | |
| | Allocation of Therrell to | | | | 1204874E | | 05/30/14 | | 500.00 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204903E | | 05/30/14 | | 638.00 | | |
| | | | | | | Total JE: | | | 12,493.07 | 5,517.05 | |
| | | | | | | Total for | | 60,575.28 | | | 67,551.30 |
| 60450-152180 | Bonus – Employee | | | | | | | | | | |
| | 5-15-14 SM PR | | | | 1204752E | | 05/15/14 | | 1,670.00 | | |
| | 5-15 PR ACCRUED TO | | | | 1204752E | | 05/15/14 | | | 1,670.00 | |
| | 6-15 SM PR ACCRUED TO | | | | 1204903E | | 05/30/14 | | 13,116.16 | | |
| | | | | | | Total JE: | | | 14,786.16 | 1,670.00 | |
| | | | | | | Total for | | 8,710.00 | | | 21,826.16 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000506

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 | Rent Expense | | | | | | | 7,475.62 | | | |
| PREFERRED OFFICE | May 2014 Rent | 2014 MAY | 3292 | | 31876 | PE | 05/01/14 | | 2,140.78 | | |
| | | | | | | | Total | | 2,140.78 | .00 | 9,616.40 |
| 61300-152180 | Office Supplies & Expense | | | | | | | | | | |
| | | | | | | | Total for | 263.35 | | | 263.35 |
| 61380-152180 | Couriers & Shipping | | | | | | | | | | |
| | | | | | | | Total for | 54.25 | | | 54.25 |
| 62310-152180 | Health Insurance | | | | | | | | | | |
| | Reclass - Aetna May 2014 | | | | 12048303E | | 05/01/14 | -3,615.06 | 139.27 | | |
| | RECLASS LINCOLN - | | | | 120481IJE | | 05/01/14 | | 16.00 | | |
| | ALLOC - RECL LINCOLN - | | | | 120481JE | | 05/01/14 | | 89.65 | | |
| | TASK, MICHAEL E | | | | 1204752JE | | 05/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 1204752E | | 05/15/14 | | | 454.30 | |
| | NASSERFAR, MICHAEL H | | | | 1204752E | | 05/15/14 | | | 87.30 | |
| | GOSNAY, TYCORD R | | | | 1204752E | | 05/15/14 | | | 61.15 | |
| | CURBY, JULIANE M | | | | 1204873E | | 05/30/14 | | | 454.30 | |
| | NASSERFAR, MICHAEL H | | | | 1204873E | | 05/30/14 | | | 87.30 | |
| | GOSNAY, TYCORD R | | | | 1204873E | | 05/30/14 | | | 61.15 | |
| | TASK, MICHAEL E | | | | 1204873E | | 05/30/14 | | | 69.81 | |
| | | | | | | | Total JE: | | 244.92 | 1,345.12 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000507

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total for | | | | -4,715.26 |
| 64100-152180 | Payroll Tax Expense | | | | | | | 14,765.81 | | | |
| | 5-2-14 OC BATCH 2983 & | | | | 1204699TE | | 05/02/14 | | 275.70 | | |
| | 5-15-14 SM PR | | | | 1204753E | | 05/15/14 | | 1,401.53 | | |
| | 5-15 PR ACCRUED TO | | | | 1204752E | | 05/15/14 | | | 1,904.84 | |
| | 5/15 PR ACCRUED TO | | | | 1204752E | | 05/15/14 | | | 422.05 | |
| | 5-30-14 SM PR | | | | 1204873E | | 05/30/14 | | 1,011.18 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204903E | | 05/30/14 | | 48.81 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204903E | | 05/30/14 | | 3,879.40 | | |
| | | | | | | | Total JE: | | 6,616.62 | 2,326.89 | |
| | | | | | | | Total for | | | | 19,055.54 |
| 66000-152180 | Computer Expense | | | | | | | .00 | | | |
| | AmEx expenses - May | | | | 1204892E | | 05/31/14 | | 29.22 | | |
| | | | | | | | Total JE: | | 29.22 | .00 | |
| | | | | | | | Total for | | | | 29.22 |
| 68500-152180 | Corporate Allocation | | | | | | | 32,546.64 | | | |
| | Corp Allocation Charge - | | | | 12048730E | | 05/31/14 | | 8,341.59 | | |
| | | | | | | | Total JE: | | 8,341.59 | .00 | |
| | | | | | | | Total for | | | | 40,888.23 |
| 68501-152180 | Corporate Per File Fees | | | | | | | 6,750.00 | | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MTech Fees | | | | 12048270E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048270E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048270E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048269E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048269E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048271E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048271E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048271E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048271E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048271E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048272E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048272E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048273E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048273E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048273E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048279E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048279E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048278E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048285E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048293E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048293E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048313E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048313E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048319E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048319E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048323E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048323E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048327E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048332E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 12048333E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048340E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 12048340E | | 05/30/14 | | 50.00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000509

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | MTech Fees | | | | 1204835E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204835E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204837E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204837E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204837E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204838E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204837E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204839E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204839E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204841UE | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204841UE | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204841UE | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204840UE | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204841UE | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204842UE | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204842UE | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204842UE | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204843E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204843E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204843E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204843E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204843E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204840E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204840E | | 05/30/14 | | 50.00 | | |
| | MTech Fees | | | | 1204845E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204845E | | 05/30/14 | | 100.00 | | |
| | MTech Fees | | | | 1204845E | | 05/30/14 | | 50.00 | | |

Total JE: 3,900.00 .00

Total for 10,650.00

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68502-152180 Corporate Fees - Neo | | | | | | | | | | | |
| | | | | | | | Total for | 500.00 | | | 500.00 |
| 70100-152180 | | | | | | | | | | | |
| Advertising & Marketing | | | | | | | | | | | |
| CENTERRA HOMES OF | MSA-May2014 | 2014 MAY | 3292 | | 31887 | PE | 05/01/14 | 47,660.00 | 15,000.00 | | |
| CENTERRA HOMES OF | May 2014 Installment | 20140501 | 3292 | | 31746 | PE | 05/01/14 | | 15,000.00 | | |
| CW PRINT SERVICES, | Michael Nasserfar | 2155 | 3292 | | 32691 | PE | 05/01/14 | | 243.56 | | |
| P & B PRINT^ CORP | BC - Michael Nasserfar | 2988 | 3292 | | 32438 | PE | 05/09/14 | | 71.99 | | |
| MICHAEL NASSERFAR | purchse of domain name | 20140519 | 3292 | | 32435 | PE | 05/19/14 | | 10.00 | | |
| SPOTFROG | banner 4x5 | 2719 | 3292 | | 32705 | PE | 05/19/14 | | 85.52 | | |
| P & B PRINT^ CORP | BC - Ty Gosnay | 3079 | 3292 | | 32792 | PE | 05/28/14 | | 58.46 | | |
| SPOTFROG | 4x5 banner michael N, #2 | 2733 | 3292 | | 32797 | PE | 05/28/14 | | 85.52 | | |
| | | | | | | | Total | | 30,555.05 | .00 | |
| | | | | | | | Total for | | | | 78,215.05 |
| | | | | | | | Report | 47,003.32 | 209,161.01 | 196,952.18 | 59,212.15 |



# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 6/1/2014 to 6/30/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | | | | | | -3,500.00 | | | |
| | | 1520000084\|DITOMMASO\| | 120490UE | | | 06/12/14 | | | 200.00 | |
| | | 1520000107\|STORY\| | 120495UE | | | 06/24/14 | | | 100.00 | |
| | | 1520000093\|MATTINGLY\| | 120496JE | | | 06/26/14 | | | 200.00 | |
| | | 1520000685\|CALVILLO\| | 120496JE | | | 06/27/14 | | | 200.00 | |
| | | 1520000904\|MOLANDER\| | 120497UE | | | 06/30/14 | | | 100.00 | |
| | | | | | | Total JE: | | .00 | 800.00 | |
| | | | | | | | | .00 | 800.00 | -4,300.00 |
| 41357-152180 | Credit Report Fee Income | | | | | Total for | | | | -179.25 |
| | | | | | | | | | | -179.25 |
| 41370-152180 | Processing Fees | | | | | Total for | | | | -8,020.00 |
| | | | | | | | | | | -8,020.00 |
| 41380-152180 | Branch Admin Fee | | | | | Total for | | | | 550.00 |
| | | | | | | | | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | | | | | | | | | -10,267.50 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000512

| GL/Desc/Vendor | Tranaction Description / Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | | | | | | -252,478.05 | | | |
| | 152180159971 FROELICH| | | | 1204963UE | | 06/01/14 | | | 3,400.00 | |
| | 152180155596 WILSON| | | | 1204963JE | | 06/10/14 | | | 2,327.50 | |
| | 152180171717 GENCHEVA| | | | 1204930JE | | 06/13/14 | | | 1,507.00 | |
| | Total JE: | | | | | | | .00 | 7,234.50 | |
| | 152180155661MOSSMAN| | | | 1204854E | | 06/02/14 | | | 4,500.00 | |
| | 152000008411DITOMMASO| | | | 1204901E | | 06/12/14 | | | 3,282.02 | |
| | 152180166541RIGBY| | | | 1204900E | | 06/13/14 | | | 2,102.40 | |
| | 152180170581DEMPSEY| | | | 1204943E | | 06/23/14 | | | 5,850.00 | |
| | 152180167871WARNER| | | | 1204944E | | 06/23/14 | | | 4,045.49 | |
| | 152000010731STORY| | | | 1204950E | | 06/24/14 | | | 4,324.19 | |
| | 152000009341MATTINGLY| | | | 1204963E | | 06/26/14 | | | 3,092.42 | |
| | 152000006851CALVILLO| | | | 1204967E | | 06/27/14 | | | 5,926.98 | |
| | 152180170541HAZY| | | | 1204973E | | 06/30/14 | | | 3,750.00 | |
| | 152180167881STRICKLAND| | | | 1204974E | | 06/30/14 | | | 4,500.00 | |
| | 152180165471RIEDER| | | | 1204975E | | 06/30/14 | | | 4,500.00 | |
| | 152000009041MOLANDER| | | | 1204976E | | 06/30/14 | | | 6,124.53 | |
| | 152180169291CHEANEY| | | | 1204976E | | 06/30/14 | | | 3,819.00 | |
| | Total JE: | | | | | | | .00 | 55,817.03 | |
| | | | | | | Total for | | | | -17,502.00 |
| 42301-152180 | Premium Discount - Branch | | | | | | -144,595.54 | | | |
| | 152180155611MOSSMAN| | | | 1204854E | | 06/02/14 | | | 483.62 | |
| | 152180155611MOSSMAN| | | | 1204854E | | 06/02/14 | | | 1,025.27 | |
| | | | | | | Total for | | | | -308,295.08 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000513

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521801692 9|CHEANEY| | | | 1204976|E | | 06/30/14 | | | 1,273.00 | |
| | 1520000904|MOLANDER| | | | 1204976|E | | 06/30/14 | | | 2,041.51 | |
| | 1521801654 7|RIEDER| | | | 1204975|E | | 06/30/14 | | | 625.50 | |
| | 1521801678 8|STRICKLAND| | | | 1204974|E | | 06/30/14 | | | 693.00 | |
| | 1521801705 4|HAZY| | | | 1204974|E | | 06/30/14 | | | 762.50 | |
| | 1521801705 4|HAZY| | | | 1204973|E | | 06/30/14 | | | 1,250.00 | |
| | 1520000685|CALVILLO| | | | 1204973|E | | 06/27/14 | | | 4,939.15 | |
| | 1520000685|CALVILLO| | | | 1204963|E | | 06/27/14 | | | 324.01 | |
| | 1520000934|MATTINGLY| | | | 1204963|E | | 06/26/14 | | | 1,030.81 | |
| | 1520001073|STORY| | | | 1204950|E | | 06/24/14 | | | 1,441.40 | |
| | 1521801678 7|WARNER| | | | 1204944|E | | 06/23/14 | | | 1,348.50 | |
| | 1521801705 8|DEMPSEY| | | | 1204944|E | | 06/23/14 | | | 1,950.00 | |
| | 1521801665 4|RIGBY| | | | 1204900|E | | 06/13/14 | | | 1,220.79 | |
| | 1521801665 4|RIGBY| | | | 1204900|E | | 06/13/14 | | | 1,226.40 | |
| | 1520000084 1|DITOMMASO| | | | 1204900|E | | 06/12/14 | | | 711.10 | |
| | 1520000084 1|DITOMMASO| | | | 1204901|E | | 06/12/14 | | | 2,735.01 | |
| | | | | | | Total JE: | | | .00 | 25,081.57 | |
| 42400-152180 Pair-Off Allocation | | | | | | Total for | | | | -1,771.51 | -169,677.11 |
| 52426-152180 Lender Credits - Gfe Cures | | | | | | | | 45,323.30 | | | |
| | 1520000084 1|DITOMMASO| | | | 1204901|E | | 06/12/14 | | 200.00 | | |
| | 1521801678 7|WARNER| | | | 1204944|E | | 06/23/14 | | 1,818.19 | | |
| | 1520001073|STORY| | | | 1204950|E | | 06/24/14 | | 1,655.25 | | |
| | | | | | | Total for | | | | | -1,771.51 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000514

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | | | | |
| | 1520000934|MATTINGLY| | | | 12049637E | | 06/26/14 | | 171.11 | | |
| | 1520000685|CALVILLO| | | | 12049637E | | 06/27/14 | | 200.00 | | |
| | 1521801678B|STRICKLAND| | | | 120497WE | | 06/30/14 | | 7,841.50 | | |
| | 15218016547|RUEDER| | | | 1204975E | | 06/30/14 | | 2,183.04 | | |
| | 1520000904|MOLANDER| | | | 1204976E | | 06/30/14 | | 1,709.64 | | |
| | 15218016929|CHEANEY| | | | 120497QE | | 06/30/14 | | 550.74 | | |
| | 15218016929 CHEANEY| | | | | 1205008E | | 06/30/14 | | | 10.00 | |
| | | | | | Total JE: | | | 16,329.47 | | 10.00 | |
| | | | | | Total for | | | 189.25 | | | 61,642.77 |
| 55110-152180 | Commission Expense - Loan | | | | | | | | | | |
| | 6-15/14 SM PR | | | | 120491 4E | | 06/15/14 | 195,945.93 | 40,628.36 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204914E | | 06/15/14 | | | 40,628.36 | |
| | 7/15 PR ACCRUED TO | | | | 120507WE | | 06/30/14 | | 36,702.57 | | |
| | | | | | Total JE: | | | 77,330.93 | | 40,628.36 | |
| | | | | | Total for | | | | | | 189.25 |
| 55111-152180 | Commission Offset | | | | | | | | | | |
| | 6-15/14 SM PR | | | | 120491 4E | | 06/15/14 | -23,843.60 | | 3,033.40 | |
| | 6-15 SM PR ACCRUED TO | | | | 1204914E | | 06/15/14 | | 3,033.40 | | |
| | 7/15 PR ACCRUED TO | | | | 120507WE | | 06/30/14 | | 3,033.40 | 5,218.00 | |
| | | | | | Total JE: | | | | | 8,251.40 | |
| | | | | | | | | | | | 232,648.50 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000515

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55280-152180 | | | | | | | | | | | |
| FANNIE MAE | Underwriting Fees | INV14-2721866 | 3292 | | 101686 | PE | 06/24/14 | | 682.08 | | |
| | | | | | | | Total for | 4,368.57 | | | -29,061.60 |
| | | | | | | | Total | | 682.08 | .00 | 5,050.65 |
| 55350-152180 | Verification Fees | | | | | | | | | | |
| TALX CORP-RAPID | income verifications | 1601187 | 3292 | | 33035 | PE | 06/11/14 | | 479.14 | | |
| ELLIE MAE | Encompass 4506 T service | INCTXVM107243 | 3292 | | 33340 | PE | 06/30/14 | | 1,764.50 | | |
| | | | | | | | Total | | 2,243.64 | .00 | |
| | | | | | | | Total for | 7,993.69 | | | 10,237.33 |
| 55600-152180 | Credit Report Expense | | | | | | | | | | |
| | AMEX - June 2014 Chad | | | | 1205077JE | | 06/25/14 | | 1,261.59 | | |
| | AMEX - June 2014 Chad | | | | 1205104JE | | 06/25/14 | | 41.44 | | |
| | | | | | | | Total JE: | | 1,303.03 | .00 | |
| | | | | | | | Total for | 5,542.61 | | | 6,845.64 |
| 55700-152180 | Late / Penalty | | | | | | | | 20.01 | | |
| | | | | | | | Total for | | | | 20.01 |
| 60100-152180 | Salary And Wages | | | | | | | | 67,551.30 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000516

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6-15/14 SM PR | | | | 1204914E | | 06/15/14 | | 4,238.01 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204914E | | 06/15/14 | | | 638.00 | |
| | 6-30-14 SM PR | | | | 1205035E | | 06/30/14 | | 4,179.99 | | |
| | Allocation of Therrell to | | | | 1205064E | | 06/30/14 | | 500.00 | | |
| | 7-15 PR ACCRUED TO | | | | 1205071E | | 06/30/14 | | 638.00 | | |
| | | | | | | | Total JE: | | 9,556.00 | 638.00 | |
| | | | | | | | Total for | | | | 76,469.30 |
| 60450-152180 | Bonus - Employee | | | | | | | 21,826.16 | | | |
| | 6-15/14 SM PR | | | | 1204914E | | 06/15/14 | | 13,116.16 | | |
| | 6-15 SM PR ACCRUED TO | | | | 1204914E | | 06/15/14 | | | 13,116.16 | |
| | 7/15 PR ACCRUED TO | | | | 1205071E | | 06/30/14 | | 8,563.11 | | |
| | | | | | | | Total JE: | | 21,679.27 | 13,116.16 | |
| | | | | | | | Total for | | | | 30,389.27 |
| 61000-152180 | Rent Expense | | | | | | | 9,616.40 | | | |
| | PREFERRED OFFICE | JUNE 2014 RENT | 14503843 | 3292 | 32264 | PE | 06/01/14 | | 2,140.78 | | |
| | | | | | | | Total | | 2,140.78 | .00 | |
| | | | | | | | Total for | | | | 11,757.18 |
| 61100-152180 | License And Permits | | | | | | | .00 | | | |
| | LEAP 2014 recertification | | | | 1205020E | | 06/25/14 | | 100.00 | | |
| | | | | | | | Total JE: | | 100.00 | .00 | |
| | | | | | | | Total for | | | | 100.00 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61300-152180 | Office Supplies & Expense | | | | | | | 263.35 | | | |
| BUSINESS SUITES HILL | June2014 Fixed charges | 310469 | 3292 | | 32456 | PE | 06/01/14 | | 80.04 | | |
| | | | | | | | Total | | 80.04 | .00 | 343.39 |
| 61380-152180 | Couriers & Shipping | | | | | | | 54.25 | | | |
| | | | | | | | Total for | | | | 54.25 |
| 62310-152180 | Health Insurance | | | | | | | -4,715.26 | | | |
| | Aetna - June 2014 | | | | 120496 | JE | 06/01/14 | | 2,291.77 | | |
| | Lincoln - June 2014 | | | | 120497 | JE | 06/01/14 | | 166.47 | | |
| | NASSERFAR, MICHAEL H | | | | 120491 | JE | 06/15/14 | | | 87.30 | |
| | CURBY, JULIANE M | | | | 120491 | JE | 06/15/14 | | | 454.30 | |
| | TASK, MICHAEL E | | | | 120491 | JE | 06/15/14 | | | 69.81 | |
| | GOSNAY, TYCORD R | | | | 120491 | JE | 06/15/14 | | | 61.15 | |
| | NASSERFAR, MICHAEL H | | | | 120503 | JE | 06/30/14 | | | 87.30 | |
| | GOSNAY, TYCORD R | | | | 120503 | JE | 06/30/14 | | | 61.15 | |
| | CURBY, JULIANE M | | | | 120503 | JE | 06/30/14 | | | 454.30 | |
| | TASK, MICHAEL E | | | | 120503 | JE | 06/30/14 | | | 69.81 | |
| | | | | | | | Total JE: | | 2,458.24 | 1,345.12 | |
| CONTINENTAL | June 2014 Paylogix/Aflac | 20140601 | 3292 | | 101679 | PE | 06/01/14 | | 37.86 | | |
| | | | | | | | Total | | 37.86 | .00 | |
| | | | | | | | Total for | | | | -3,564.28 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000518

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 Payroll Tax Expense | | | | | | | | 19,055.54 | | | |
| | 6-15/14 SM PR | | | | | 1204914E | 06/15/14 | | 2,388.57 | | |
| | 6-15 SM PR ACCRUED TO | | | | | 120491AE | 06/15/14 | | | 48.81 | |
| | 6-15 SM PR ACCRUED TO | | | | | 120491AE | 06/15/14 | | | 3,879.40 | |
| | 6-30-14 SM PR | | | | | 120503JE | 06/30/14 | | 211.30 | | |
| | 7-15 PR ACCRUED TO | | | | | 120507JJE | 06/30/14 | | 48.81 | | |
| | 7/15 PR ACCRUED TO | | | | | 120507JJE | 06/30/14 | | 3,063.65 | | |
| | | | | | | Total JE: | | | 5,712.33 | 3,928.21 | 20,839.66 |
| 65600-152180 Meals And Entertainment MICHAEL NASSERFAR | Reimbursement 6/4 | 20140604 | AJE | | 455 | PE | 06/10/14 | | 19.00 | | |
| | | | | | | Total | | | 19.00 | .00 | |
| | | | | | | Total for | | .00 | | | 19.00 |
| 66000-152180 Computer Expense | | | | | | | | 29.22 | | | 29.22 |
| 67100-152180 Seminar And Training MICHAEL NASSERFAR | Reimbursement 6/4 | 20140604 | AJE | | 455 | PE | 06/10/14 | | 348.00 | | |
| | | | | | | Total | | | 348.00 | .00 | |
| | | | | | | Total for | | .00 | | | 348.00 |
| 68500-152180 Corporate Allocation | | | | | | | | | 40,888.23 | | 348.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000519

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |
| | Jun 2014 alloc charge | | | | 1205018E | | 06/30/14 | 6,133.65 | | | |
| | | | | | | | Total JE: | 6,133.65 | | .00 | |
| | | 15200000841|D|TOMMASO| | | | 12049800E | | 06/30/14 | | 100.00 | | |
| | | 15200000841|D|TOMMASO| | | | 12049800E | | 06/30/14 | | 50.00 | | |
| | | 15200001073|STORY| | | | 12049800E | | 06/30/14 | | 50.00 | | |
| | | 15200001073|STORY| | | | 12049800E | | 06/30/14 | | 100.00 | | |
| | | 15218017054|HAZY| | | | 12049800E | | 06/30/14 | | 100.00 | | |
| | | 15218017054|HAZY| | | | 12049800E | | 06/30/14 | | 50.00 | | |
| | | 15200000904|MOLANDER| | | | 12049827E | | 06/30/14 | | 100.00 | | |
| | | 15200000904|MOLANDER| | | | 12049827E | | 06/30/14 | | 50.00 | | |
| | | 15218016929|CHEANEY| | | | 12049833E | | 06/30/14 | | 50.00 | | |
| | | 15218016929|CHEANEY| | | | 12049833E | | 06/30/14 | | 100.00 | | |
| | | 15218015561|MOSSMAN| | | | 12049839E | | 06/30/14 | | 50.00 | | |
| | | 15218015561|MOSSMAN| | | | 12049845E | | 06/30/14 | | 100.00 | | |
| | | 15218016654|RIGBY| | | | 12049863E | | 06/30/14 | | 50.00 | | |
| | | 15218016654|RIGBY| | | | 12049863E | | 06/30/14 | | 100.00 | | |
| | | 15218016788|STRICKLAND| | | | 12049873E | | 06/30/14 | | 50.00 | | |
| | | 15218016788|STRICKLAND| | | | 12049893E | | 06/30/14 | | 100.00 | | |
| | | 15200000934|MATTINGLY| | | | 12049893E | | 06/30/14 | | 100.00 | | |
| | | 15200000934|MATTINGLY| | | | 12049893E | | 06/30/14 | | 50.00 | | |
| | | 15218016547|RIEDER| | | | 12049949E | | 06/30/14 | | 50.00 | | |
| | | 15218016547|RIEDER| | | | 12049949E | | 06/30/14 | | 100.00 | | |
| | | 15201006416|HUCKABA| | | | 12049959E | | 06/30/14 | | 100.00 | | |
| | | 15201006416|HUCKABA| | | | 12049959E | | 06/30/14 | | 50.00 | | |
| | | | | | | | Total for | 10,650.00 | | 47,021.88 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000520

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL/Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **68502-152180** Corporate Fees - Neo | 15218016787|WARNER| | | | | 120500 DE | 06/30/14 | | 50.00 | | |
| | 15218016787|WARNER| | | | | 120500 DE | 06/30/14 | | 100.00 | | |
| | 15200000685|CALVILLO| | | | | 120500 EE | 06/30/14 | | 50.00 | | |
| | 15200000685|CALVILLO| | | | | 120500 EE | 06/30/14 | | 100.00 | | |
| | 15218017058|DEMPSEY| | | | | 120500 4ΩE | 06/30/14 | | 100.00 | | |
| | 15218017058|DEMPSEY| | | | | 120500 40E | 06/30/14 | | 50.00 | | |
| | | | | | Total JE: | | | | 2,100.00 | .00 | |
| | | | | | | Total for | | | 12,750.00 | | |
| **70100-152180** Advertising & Marketing | | | | | | | | | 500.00 | | 500.00 |
| | | | | | | Total for | | | 500.00 | | 500.00 |
| CENTERRA HOMES OF | June 2014 Installment | 20140601 | 3292 | | 32256 PE | 06/01/14 | | 78,215.05 | 15,000.00 | | |
| MICHAEL NASSERFAR | Reinbursement 6/4 | 20140604 | AJE | | 455 PE | 06/10/14 | | | 3,475.79 | | |
| | | | | | Total | | | | 18,475.79 | .00 | |
| | | | | | Total for | | | | 3,475.79 | | 96,690.84 |
| | | | | | Report | | | 59,212.15 | 169,763.51 | 156,850.35 | 72,125.31 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000521





July 14

# General Ledger by Branch

Company: Ameripro Funding, Inc.

Branch: 152180 (Nasserfar)

GLs from 10000 to 99995

From 7/1/2014 to 7/31/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 | Application Fee Income | 15218014297|ASENCIO| | | 120501|E | | | 07/01/14 | -4,300.00 | | 100.00 | -4,400.00 |
| | | | | | | Total JE: | | | .00 | 100.00 | |
| | | | | | | Total for | | | | | -4,400.00 |
| 41357-152180 | Credit Report Fee Income | | | | | Total for | | -179.25 | | | -179.25 |
| 41370-152180 | Processing Fees | | | | | Total for | | -8,020.00 | | | -8,020.00 |
| 41380-152180 | Branch Admin Fee | | | | | Total for | | 550.00 | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | 15218014758 COKER | | | 120507|E | | 07/09/14 | -17,502.00 | 440.00 | | |
| | | 15218014758 COKER | | | 120507|E | | 07/09/14 | | | 12,816.21 | |
| | | | | | | Total JE: | | | 440.00 | 12,816.21 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000522

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | 15218014758 COKER | | | 1205071IE | | 07/09/14 | .00 | .00 | 125.00 | |
| | | | | | | | Total JE: | | | 125.00 | |
| | | | | | | | Total for | | | | -29,878.21 |
| | | | | | | | | | | | -125.00 |
| 42300-152180 | Premium Discount - Lo | | | | | | | -308,295.08 | | | |
| | | 15218014297\|ASENCIO\| | | | 1205013IE | | 07/01/14 | | | 3,518.40 | |
| | | 15201006540\|SHEARN\| | | | 1205023IE | | 07/07/14 | | | 4,230.68 | |
| | | 15218016989\|BAKER\| | | | 1205057IE | | 07/11/14 | | | 1,517.40 | |
| | | 15218017405\|GARWOOD\| | | | 1205078IE | | 07/16/14 | | | 4,272.00 | |
| | | 15218017920\|THOMAS\| | | | 1205089IE | | 07/18/14 | | | 6,255.00 | |
| | | 15200000870\|BLOK\| | | | 1205109IE | | 07/23/14 | | | 6,255.00 | |
| | | 15218017863\|BENEDETTI\| | | | 1205109IE | | 07/24/14 | | | 2,902.50 | |
| | | 15218017835\|SHAW\| | | | 1205119IE | | 07/25/14 | | | 6,255.00 | |
| | | 15218017996\|CRAWFORD\| | | | 1205123IE | | 07/31/14 | | | 3,915.00 | |
| | | 15218017883\|LIESMAN\| | | | 1205134IE | | 07/31/14 | | | 3,755.64 | |
| | | | | | | | Total JE: | | .00 | 42,876.62 | |
| | | | | | | | Total for | | | | -125.00 |
| 42301-152180 | Premium Discount - Branch | | | | | | | -169,677.11 | | | |
| | | 15218014297\|ASENCIO\| | | | 1205013IE | | 07/01/14 | | | 255.67 | |
| | | 15218014297\|ASENCIO\| | | | 1205013IE | | 07/01/14 | | | 1,172.80 | |
| | | 15201006540\|SHEARN\| | | | 1205023IE | | 07/07/14 | | | 1,410.23 | |
| | | 15218016989\|BAKER\| | | | 1205057IE | | 07/11/14 | | | 156.80 | |
| | | | | | | | Total for | | | | -351,171.70 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000523

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | | | | |
| | 15218016989|BAKER| | | | | 12050521E | 07/1/14 | | 505.80 | | |
| | 15218017405|GARWOOD| | | | | 12050736E | 07/16/14 | | 469.92 | | |
| | 15218017405|GARWOOD| | | | | 12050736E | 07/16/14 | | 1,424.00 | | |
| | 15200008870|BLOK| | | | | 12050889E | 07/18/14 | | 2,085.00 | | |
| | 15218017920|THOMAS| | | | | 12051035E | 07/23/14 | | 2,085.00 | | |
| | 15218017863|BENEDETTI| | | | | 12051093E | 07/24/14 | | 967.50 | | |
| | 15218017835|SHAW| | | | | 12051137E | 07/25/14 | | 2,085.00 | | |
| | 15218017996|CRAWFORD| | | | | 12051322E | 07/31/14 | | 1,302.39 | | |
| | 15218017996|CRAWFORD| | | | | 12051322E | 07/31/14 | | 1,305.00 | | |
| | 15218017883|LIESMAN| | | | | 12051343E | 07/31/14 | | 3,129.70 | | |
| | | | | | | Total JE: | | .00 | 18,354.81 | |
| | | | | | | | | | | -188,031.92 |
| | | | | | | Total for | | | -1,771.51 | |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | | | |
| | 15201006540|SHEARN| | | | | 12050236E | 07/07/14 | 61,642.77 | 1,762.53 | | |
| | 15218017405|GARWOOD| | | | | 12050736E | 07/16/14 | | 1,148.40 | | |
| | 15200008870|BLOK| | | | | 12051035E | 07/23/14 | | 1,843.14 | | |
| | 15218017863|BENEDETTI| | | | | 12051093E | 07/24/14 | | 265.10 | | |
| | 15218017835|SHAW| | | | | 12051137E | 07/25/14 | | 2,931.12 | | |
| | 15218017996|CRAWFORD| | | | | 12051322E | 07/31/14 | | 1,607.40 | | |
| | 15218017883|LIESMAN| | | | | 12051343E | 07/31/14 | | 1,029.05 | | |
| | | | | | | Total JE: | | 10,586.74 | .00 | |
| | | | | | | Total for | | | -1,771.51 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000524

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 Lender Credit - 10% Cure | | | | | | | Total for | | | | 72,229.51 |
| 55110-152180 Commission Expense - Loan | | | | | | | | | | | |
| | 25213011538 OTTO| | | | | 1205069E | 07/15/14 | 232,648.50 | | | |
| | 7-15-14 SM PR | | | | | 1205071E | 07/15/14 | | 150.00 | | |
| | 7/15 PR ACCRUED TO | | | | | 1205070E | 07/15/14 | | 36,702.57 | 36,702.57 | |
| | 7-31-14 SM PR | | | | | 1205173E | 07/31/14 | | 5,588.38 | | |
| | 8-15 COM&BONUS | | | | | 1205223E | 07/31/14 | | 23,521.28 | | |
| | 15201006030|BARICUATRO| | | | | | 1205223E | 07/31/14 | | 150.00 | | |
| | 15218014828|ESKRIDGE| | | | | | 1205227E | 07/31/14 | | 440.00 | | |
| | 15218014630|WU| DENNIS | | | | | 1205227E | 07/31/14 | | 440.00 | | |
| | 15218014921|COHEN| | | | | | 1205223E | 07/31/14 | | 440.00 | | |
| | | | | | | | Total JE: | | 67,432.23 | 36,702.57 | |
| | | | | | | | Total for | | | | 189.25 |
| 55111-152180 Commission Offset | | | | | | | | -29,061.60 | | | |
| | 7-15-14 SM PR | | | | | 1205071E | 07/15/14 | | | 1,218.00 | |
| | 7-15-14 SM PR | | | | | 1205071E | 07/15/14 | | | 4,000.00 | |
| | 7/15 PR ACCRUED TO | | | | | 1205070E | 07/15/14 | | 5,218.00 | | |
| | 7-31-14 SM PR | | | | | 1205173E | 07/31/14 | | | 1,815.40 | |
| | 8-15 COM&BONUS | | | | | 1205223E | 07/31/14 | | | 2,000.00 | |
| | | | | | | | Total JE: | | 5,218.00 | 9,033.40 | |
| | | | | | | | Total for | | | | 263,378.16 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000525

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55280-152180 | Underwriting Fees | | | | | | Total for | | | | -32,877.00 |
| FANNIE MAE | Desktop Underwriter | INV14-2731711 | 3292 | | 101700 PE | | 07/25/14 | | 812.00 | | |
| | | | | | | | Total | 5,050.65 | 812.00 | .00 | 5,862.65 |
| 55350-152180 | Verification Fees | | | | | | Total for | 10,237.33 | | | |
| ELLIE MAE | encompass 4506T service | INCTXVM107527 | 3292 | | 33761 PE | | 07/31/14 | | 1,322.64 | | |
| TALX CORP-RAPID | income verifications | 1606907 | 3292 | | 33448 PE | | 07/08/14 | | 371.71 | | |
| | | | | | | | Total | | 1,694.35 | .00 | 11,931.68 |
| 55600-152180 | Credit Report Expense | | | | | | Total for | 6,845.64 | | | |
| | Chad's Amex - July 2014 | | | | 1205173E | | 07/25/14 | | 1,393.94 | | |
| | | | | | | | Total JE: | | 1,393.94 | .00 | |
| 55700-152180 | Late / Penalty | | | | | | Total for | 20.01 | | | 20.01 |
| 60100-152180 | Salary And Wages | | | | | | | 76,469.30 | | | |
| | 7-15-14 SM PR | | | | 12050TUE | | 07/15/14 | | 638.00 | | |
| | 7-15-14 SM PR | | | | 12050TUE | | 07/15/14 | | 3,600.00 | | 8,239.58 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000526

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 | | | | | | | | | | | |
| Bonus - Employee | | | | | | | | | | | |
| | 7-15 PR ACCRUED TO | | | | 120507IJE | | 07/15/14 | | | | |
| | 7-31-14 SM PR | | | | 120517JE | | 07/31/14 | | 4,238.02 | | |
| | 8-15 WAGE ACCRUED TO | | | | 120522JE | | 07/31/14 | | 754.00 | | |
| | 152180-Therrell Jul wage | | | | 120522JE | | 07/31/14 | | 500.00 | | |
| | | | | | | | Total JE: | | 9,730.02 | 638.00 | |
| | 8-15 COM&BONUS | | | | 120522JE | | 07/31/14 | | 6,422.95 | | |
| | 7/15 PR ACCRUED TO | | | | 120507IJE | | 07/15/14 | | | 8,563.11 | |
| | 7-15-14 SM PR | | | | 120507IJE | | 07/15/14 | | 1,530.00 | | |
| | 7-15-14 SM PR | | | | 120507IJE | | 07/15/14 | | 7,033.11 | | |
| | | | | | | | Total JE: | | 14,986.06 | 8,563.11 | |
| | | | | | | | Total for | 30,389.27 | | | 85,561.32 |
| 61000-152180 | | | | | | | | | | | |
| Rent Expense | | | | | | | | | | | |
| PREFERRED OFFICE | JULY 2014 RENT | 14503924 | 3292 | | 32833 PE | | 07/01/14 | 11,757.18 | 2,140.78 | | |
| | | | | | | | Total | | 2,140.78 | .00 | |
| | | | | | | | Total for | | | | 36,812.22 |
| 61100-152180 | | | | | | | | | | | |
| License And Permits | | | | | | | | | | | |
| | | | | | | | Total for | 100.00 | | | 13,897.96 |
| 61300-152180 | | | | | | | | | | | |
| Office Supplies & Expense | | | | | | | | 343.39 | | 100.00 | 100.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000527



# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 8/1/2014 to 8/31/2014

| GL/Desc/Vendor | Invoice Number | GL Bank | DB | Ref | JR | Date | Transaction Description | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41355-152180 Application Fee Income | | | | | | | | -4,400.00 | | | |
| | 1521801404Z|RAY| GERRY | | | 1205170E | | 08/04/14 | | | | 100.00 | |
| | 15201006589|LANTRIP| | | | 1205195E | | 08/08/14 | | | | 200.00 | |
| | 15200000780|SCHALCHLIN| | | | 1205198E | | 08/08/14 | | | | 200.00 | |
| | | | | | | Total JE: | | | .00 | 500.00 | |
| | | | | | | Total for | | | | | -4,900.00 |
| 41357-152180 Credit Report Fee Income | | | | | | | | -179.25 | | | |
| | | | | | | Total for | | | | | -179.25 |
| 41370-152180 Processing Fees | | | | | | | | -8,020.00 | | | |
| | | | | | | Total for | | | | | -8,020.00 |
| 41380-152180 Branch Admin Fee | | | | | | | | 550.00 | | | |
| | | | | | | Total for | | | | | 550.00 |
| 41860-152180 Brokered Loan Fee Income | | | | | | | | -29,878.21 | | | |
| | | | | | | Total for | | | | | -29,878.21 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | | | | | |
| | | | | | | Total for | | -125.00 | | | -125.00 |
| 42300-152180 | Premium Discount - Lo | | | | | | | -351,171.70 | | | |
| | 15218014042|RAY| GERRY | | | | 120517UE | | 08/04/14 | | | 4,628.73 | |
| | 152180168669|BASHAM| | | | | 120517UE | | 08/06/14 | | | 1,072.50 | |
| | 152180174406|BENTLEY| | | | | 120518UE | | 08/07/14 | | | 3,720.00 | |
| | 15218018048|BROOKS| | | | | 120519UE | | 08/08/14 | | | 3,676.50 | |
| | 15218017793|MATTHEWS| | | | | 120519UE | | 08/08/14 | | | 3,206.25 | |
| | 15201006589|LANTRIP| | | | | 120519UE | | 08/08/14 | | | 4,500.00 | |
| | 15218014654|LAFRANCE| | | | | 120519UE | | 08/08/14 | | | 3,655.38 | |
| | 15200000780|SCHALCHLIN| | | | | 120519UE | | 08/08/14 | | | 3,660.05 | |
| | 15218016240|JOLY| DAINA | | | | 120521UE | | 08/14/14 | | | 5,972.81 | |
| | 15201013555|SHEPHERD| | | | | 120523UE | | 08/15/14 | | | 4,694.63 | |
| | 15200000920|SCHOONOVER| | | | | 120523UE | | 08/18/14 | | | 3,249.00 | |
| | 15218018067|BOONE| | | | | 120523UE | | 08/18/14 | | | 6,000.00 | |
| | 15218018412|BUCKNER| | | | | 120527UE | | 08/27/14 | | | 3,405.00 | |
| | 15218015137|LAIS| ERIC | | | | 120528UE | | 08/28/14 | | | 3,240.00 | |
| | 15218018267|PICANSO| | | | | 120531UE | | 08/29/14 | | | 6,255.00 | |
| | 152180150880|BENAVIDES| | | | | 120531UE | | 08/29/14 | | | 6,255.00 | |
| | 15218018407|CAPLAN| | | | | 120513UE | | 08/29/14 | | | 2,811.35 | |
| | | | | | | Total JE: | | | .00 | 70,002.20 | |
| 42301-152180 | Premium Discount - Branch | | | | | | | | | | |
| | | | | | | Total for | | -188,031.92 | | | -421,173.90 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000404

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521801404 2|RAY| GERRY | | | | 1205170 E | 08/04/14 | | | 1,542.91 | |
| | 152180168 69|BASHAM| | | | | 1205178 8E | 08/06/14 | | | 357.50 | |
| | 1521801740 6|BENTLEY| | | | | 1205182 E | 08/07/14 | | | 1,240.00 | |
| | 1521801740 6|BENTLEY| | | | | 1205182 E | 08/07/14 | | | 136.40 | |
| | 15218018048|BROOKS| | | | | 1205194 E | 08/08/14 | | | 1,225.50 | |
| | 152180177 93|MATTHEWS| | | | | 1205194 E | 08/08/14 | | | 1,068.75 | |
| | 152010658 9|LANTRIP| | | | | 1205193 E | 08/08/14 | | | 1,470.00 | |
| | 152010658 9|LANTRIP| | | | | 1205193 E | 08/08/14 | | | 1,500.00 | |
| | 1521801465 4|LAFRANCE| | | | | 1205195 E | 08/08/14 | | | 3,046.15 | |
| | 15200000780|SCHALCHLIN| | | | | 1205194 E | 08/08/14 | | | 3,050.04 | |
| | 152180162 40|JOLY| DAINA | | | | 1205219 E | 08/14/14 | | | 1,990.94 | |
| | 152010135 55|SHEPHERD| | | | | 1205230 E | 08/15/14 | | | 1,564.88 | |
| | 15200000920|SCHOONOVER| | | | | .1205239 E | 08/18/14 | | | 1,083.00 | |
| | 15200000920|SCHOONOVER| | | | | 1205239 E | 08/18/14 | | | 1,193.47 | |
| | 15218018067|BOONE| | | | | 1205239 E | 08/18/14 | | | 544.00 | |
| | 15218018067|BOONE| | | | | 1205235 E | 08/18/14 | | | 2,000.00 | |
| | 15218018412|BUCKNER| | | | | 1205227 U E | 08/27/14 | | | 1,135.00 | |
| | 152180151 37|LAIS| ERIC | | | | 1205280 E | 08/28/14 | | | 751.68 | |
| | 152180151 37|LAIS| ERIC | | | | 1205280 E | 08/28/14 | | | 1,080.00 | |
| | 15218018267|PICANSO| | | | | 1205310 E | 08/29/14 | | | 1,668.00 | |
| | 15218018267|PICANSO| | | | | 1205310 E | 08/29/14 | | | 2,085.00 | |
| | 152180150 80|BENAVIDES| | | | | 1205310 E | 08/29/14 | | | 2,085.00 | |
| | 15218018407|CAPLAN| | | | | 1205313 E | 08/29/14 | | | 2,342.79 | |
| | 15218018407|CAPLAN| | | | | 1205313 E | 08/29/14 | | | 110.58 | |

Total JE: .00 34,271.59

Total for -222,303.51

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000405

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000406

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 | Pair-Off Allocation | | | | | | Total for | -1,771.51 | | | -1,771.51 |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | 72,229.51 | | | |
| | | 1521801404Z|RAY| GERRY | | | 120517UE | | 08/04/14 | | 506.07 | | |
| | | 1521801804S|BROOKS| | | | 120519QE | | 08/08/14 | | 762.26 | | |
| | | 1521801779J|MATTHEWS| | | | 120519SE | | 08/08/14 | | 271.46 | | |
| | | 1520100658J|LANTRIP| | | | 120519SE | | 08/08/14 | | 1,610.40 | | |
| | | 1521801465J|LAFRANCE| | | | 120519SE | | 08/08/14 | | 1,191.65 | | |
| | | 1520000078O|SCHALCHLIN| | | | 120519GE | | 08/08/14 | | 392.84 | | |
| | | 1521801624O|OLY| DAINA | | | 120519FE | | 08/14/14 | | 1,322.40 | | |
| | | 1520101355S|SHEPHERD| | | | 120523QE | | 08/15/14 | | 1,145.49 | | |
| | | 1521801806J|BOONE| | | | 120523SE | | 08/18/14 | | 1,823.40 | | |
| | | 1521801841Z|BUCKNER| | | | 120527UE | | 08/27/14 | | 402.31 | | |
| | | 1521801826J|PICANSO| | | | 120531WE | | 08/29/14 | | 1,697.40 | | |
| | | 1521801508O|BENAVIDES| | | | 120531UE | | 08/29/14 | | 1,793.90 | | |
| | | 1521801840J|CAPLAN| | | | 120531FE | | 08/29/14 | | 1,500.00 | | |
| | | | | | | | Total JE: | | 14,419.58 | .00 | |
| | | | | | | | Total for | | 86,649.09 | | |
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | | | | |
| | | 1521801779J|MATTHEWS| | | | 120519SE | | 08/08/14 | | 17.00 | | |
| | | | | | | | Total JE: | 189.25 | 17.00 | .00 | |
| | | | | | | | Total for | | 206.25 | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55110-152180 | Commission Expense - Loan | | | | | | | 263,378.16 | | | |
| | 8-15 SM PR | | | | 120522-3E | | 08/15/14 | | 23,521.28 | | |
| | 1520100603O|BARICUATRO| | | | | 1205225E | | 08/15/14 | | 150.00 | | |
| | 1521801482S|ESKRIDGE| | | | | 1205225E | | 08/15/14 | | 440.00 | | |
| | 1521801463O|WU| DENNIS | | | | 1205225E | | 08/15/14 | | 440.00 | | |
| | 1521801492I|COHEN| | | | | 1205225E | | 08/15/14 | | 440.00 | | |
| | 1520100603O|BARICUATRO| | | | | 1205228E | | 08/15/14 | | | 150.00 | |
| | 1521801482S|ESKRIDGE| | | | | 1205228E | | 08/15/14 | | | 440.00 | |
| | 8-15 COM&BONUS | | | | 120522-3E | | 08/15/14 | | | 23,521.28 | |
| | 1521801492I|COHEN| | | | | 1205229E | | 08/15/14 | | | 440.00 | |
| | 1521801463O|WU| DENNIS | | | | 1205229E | | 08/15/14 | | | 440.00 | |
| | 8-29-14 SM PR | | | | 1205278E | | 08/29/14 | | 9,512.21 | | |
| | 9-15 COM & BONUS | | | | 1205383E | | 08/29/14 | | 27,451.85 | | |
| | | | | | | Total JE: | | | 61,955.34 | 24,991.28 | |
| | | | | | | Total for | | | | | 300,342.22 |
| 55111-152180 | Commission Offset | | | | | | | -32,877.00 | | | |
| | 8-15 SM PR | | | | 120522-3E | | 08/15/14 | | | 2,000.00 | |
| | 8-15 COM&BONUS | | | | 120522-3E | | 08/15/14 | | 2,000.00 | | |
| | 8-29-14 SM PR | | | | 1205278E | | 08/29/14 | | | 3,496.25 | |
| | 9-15 COM & BONUS | | | | 1205383E | | 08/29/14 | | 2,000.00 | 2,000.00 | |
| | | | | | | Total JE: | | | 2,000.00 | 7,496.25 | |
| | | | | | | Total for | | | | | |
| 55280-152180 | Underwriting Fees | | | | | | | | | | |
| FANNIE MAE | Desktop underwriter | INV14-2741777 | 3292 | | 101712 PE | | 08/25/14 | | 5,862.65 | 649.60 | |
| | | | | | | Total for | | | | | -38,373.25 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000407

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | | | | | | | Total | 649.60 | .00 | | 6,512.25 |
| Verification Fees | | | | | | | | | | | |
| TALX CORP-RAPID | income verifications | 1643131 | 3292 | | 33858 | PE | 08/08/14 | 11,931.68 | 317.78 | | |
| | | | | | Total | | | | 317.78 | .00 | |
| | | | | | Total for | | | | | | 12,249.46 |
| 55600-152180 | Credit Report Expense | | | | | | | | | | |
| | American Express - Chad | | | | 1205383E | | 08/25/14 | 8,239.58 | 1,898.57 | | |
| | Reclass - Credit Plus Invoices | | | | 1205389E | | 08/25/14 | | 17.00 | | |
| | | | | | Total JE: | | | | 1,915.57 | .00 | |
| | | | | | Total for | | | | | | 10,155.15 |
| 55700-152180 | Late / Penalty | | | | | | | | | | |
| AT&T^152180 | 8/5 – 9/4/14 acct | 20140805 | 3292 | | 33921 | PE | 08/05/14 | 20.01 | 5.91 | | |
| | | | | | Total | | | | 5.91 | .00 | |
| 60100-152180 | Salary And Wages | | | | | | | | | | |
| | 8-15 SM PR | | | | 1205223E | | 08/15/14 | 85,561.32 | 4,354.00 | | |
| | 8-15 WAGE ACCRUED TO | | | | 1205223E | | 08/15/14 | | | 754.00 | |
| | 8-29-14 SM PR | | | | 1205278E | | 08/29/14 | | 4,238.00 | | |
| | 9-15 WAGE ACCRUED TO | | | | 1205383E | | 08/29/14 | | 580.00 | | |
| | Total for | | | | | | | | | | 25.92 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000408

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 60450-152180 | Bonus – Employee | | | | | | Total JE: | 9,172.00 | | 754.00 | 93,979.32 |
| | 8-15 SM PR | | | | 1205223E | | 08/15/14 | | 6,422.95 | | |
| | 8-15 COM&BONUS | | | | 1205223E | | 08/15/14 | | | | |
| | 9-15 COM & BONUS | | | | 1205383E | | 08/29/14 | | 7,535.32 | | |
| | | | | | | | Total JE: | 13,958.27 | | 6,422.95 | |
| 61000-152180 | Rent Expense | | | | | | Total for | | | | 44,347.54 |
| | HC Galleria | | | | 1205379E | | 08/01/14 | 13,897.96 | 263.91 | | |
| | Aug 2014 | | | | 1205383E | | 08/01/14 | | 3,996.90 | | |
| | | | | | | | Total JE: | | 4,260.81 | .00 | |
| 61100-152180 | License And Permits | | | | | | Total for | 100.00 | | | 18,158.77 |
| 61300-152180 | Office Supplies & Expense | | | | | | | | | | |
| | BUSINESS SUITES HILL | August 2014 Fixed Chgs / | 315073 | 3292 | 33367 | PE | 08/01/14 | 536.34 | 142.11 | | |
| | CPI OFFICE PRODUCTS ^ | Ordered by Michael | 4013213-0 | 3292 | 33928 | PE | 08/11/14 | | 280.00 | | |
| | CPI OFFICE PRODUCTS ^ | Michael Nasserfar ordered | 4013949-0 | 3292 | 33928 | PE | 08/12/14 | | 40.04 | | |
| | | | | | | | Total | | 462.15 | .00 | 100.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000409

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61380-152180 | Couriers & Shipping | | | | | | Total for | 54.25 | | | 998.49 |
| | | | | | | | | | | | 54.25 |
| 61900-152180 | Dues And Subscriptions | CORE inv 5200 Aug 2014 | | | 120535 GE | | 08/01/14 | .00 | 149.50 | .00 | |
| | | | | | | | Total JE | | 149.50 | .00 | |
| | | | | | | | Total for | | | | 149.50 |
| 62200-152180 | Utilities | CITY OF AUSTIN ^ 152180  Acct#25866 41328 | 20140812 | 3292 | 33749 PE | | 08/12/14 | 600.19 | 357.20 | .00 | |
| | | | | | | | Total | | 357.20 | .00 | |
| | | | | | | | Total for | | | | 149.50 |
| 62210-152180 | Internet Service | | | | | | | .00 | | | |
| AT&T^ 171-796-9232 206 | Fiber broadband - Data only | 874394209 | 3292 | 101718 PE | | | 08/01/14 | | 912.50 | | |
| AT&T^ 171-796-9232 206 | Fiber Broadband - August | 3852175203 | 3292 | 33922 PE | | | 08/19/14 | | 1,949.74 | | |
| | | | | | | | Total | | 2,862.24 | .00 | |
| | | | | | | | Total for | | | | 957.39 |
| 62250-152180 | Telephone | | | | | | | .00 | | | |
| AT&T^152180 | 8/5 - 9/4/14 acct | 20140805 | 3292 | 33921 PE | | | 08/05/14 | | 78.81 | | |
| | | | | | | | Total for | | 2,862.24 | | 2,862.24 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000410

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000411

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 | Health Insurance | | | | | | Total for | -2,297.79 | | | |
| | Aetna Aug 2014 | | | | 1205243E | | 08/01/14 | | 2,291.77 | | |
| | Lincoln Aug 2014 | | | | 1205338E | | 08/01/14 | | 256.12 | | |
| | Reclass Continental/Aflac | | | | 1205379E | | 08/01/14 | | 37.86 | | |
| | NASSERFAR, MICHAEL H | | | | 1205223E | | 08/15/14 | | | 87.30 | |
| | TASK, MICHAEL E | | | | 1205223E | | 08/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 1205223E | | 08/15/14 | | | 454.30 | |
| | GOSNAY, TYCORD R | | | | 1205223E | | 08/15/14 | | | 61.15 | |
| | CURBY, JULIANE M | | | | 1205278E | | 08/29/14 | | | 454.30 | |
| | TASK, MICHAEL E | | | | 1205278E | | 08/29/14 | | | 69.81 | |
| | GOSNAY, TYCORD R | | | | 1205278E | | 08/29/14 | | | 61.15 | |
| | NASSERFAR, MICHAEL H | | | | 1205278E | | 08/29/14 | | | 87.30 | |
| | | | | | | | Total JE: | | 2,585.75 | 1,345.12 | |
| | | | | | | | Total for | | | | 78.81 |
| 63100-152180 | Depreciation Expense | | | | | | Total for | .00 | | | |
| | AUGUST DEPRECIATION | | | | 1205349E | | 08/31/14 | | 1,099.72 | | |
| | AUGUST DEPRECIATION | | | | 1205349E | | 08/31/14 | | 76.65 | | |
| | | | | | | | Total JE: | | 1,176.37 | .00 | |
| | | | | | | | Total for | | | | -1,057.16 |
| 64100-152180 | Payroll Tax Expense | | | | | | | | | | 22,118.78 |

78.81 .00 78.81

1,176.37

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 65500-152180 | Meals And Entertainment | | | | | | | | | |
| | 8-15 SM PR | | | | 1205223E | 08/15/14 | | 1,408.53 | | |
| | 8-15 COM&BONUS | | | | 1205223E | 08/15/14 | | | 2,137.73 | |
| | 8-15 WAGE ACCRUED TO | | | | 1205223E | 08/15/14 | | | 57.68 | |
| | 8-29-14 SM PR | | | | 1205278E | 08/29/14 | | 381.55 | | |
| | 9-15 COM & BONUS | | | | 1205383E | 08/29/14 | | 2,523.52 | | |
| | 9-15 WAGE ACCRUED TO | | | | 1205383E | 08/29/14 | | 44.37 | | |
| | | | | | | Total JE: | | 4,357.97 | 2,195.41 | |
| | | | | | | Total for | | | | 24,281.34 |
| 66000-152180 | Computer Expense | | | | | | 19.00 | | | 19.00 |
| | | | | | | Total for | | | | |
| 67100-152180 | Seminar And Training | | | | | | 29.22 | | | 29.22 |
| | | | | | | Total for | | | | |
| 68500-152180 | Corporate Allocation | | | | | | 348.00 | | | 348.00 |
| | Aug 2014 Corp Allocation | | | | 120534UE | 08/31/14 | 52,076.10 | 5,833.52 | .00 | 57,909.62 |
| | | | | | | Total for | | | | |
| | | | | | | Total JE: | | 5,833.52 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000412

GL/Desc/Vendor

68501-152180 Corporate Per File Fees

| Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 14,400.00 | | | |
| Aug MTech | | | | 1205299E | | 08/04/14 | | 50.00 | | |
| Aug MTech | | | | 1205299E | | 08/04/14 | | 100.00 | | |
| Aug MTech | | | | 1205294E | | 08/06/14 | | 100.00 | | |
| Aug MTech | | | | 1205294E | | 08/06/14 | | 50.00 | | |
| Aug MTech | | | | 1205293E | | 08/07/14 | | 100.00 | | |
| Aug MTech | | | | 1205293E | | 08/07/14 | | 50.00 | | |
| Aug MTech | | | | 1205288E | | 08/08/14 | | 100.00 | | |
| Aug MTech | | | | 1205288E | | 08/08/14 | | 50.00 | | |
| Aug MTech | | | | 1205297E | | 08/08/14 | | 50.00 | | |
| Aug MTech | | | | 1205297E | | 08/08/14 | | 100.00 | | |
| Aug MTech | | | | 1205307E | | 08/08/14 | | 50.00 | | |
| Aug MTech | | | | 1205307E | | 08/08/14 | | 100.00 | | |
| Aug MTech | | | | 1205307E | | 08/08/14 | | 50.00 | | |
| Aug MTech | | | | 1205303E | | 08/08/14 | | 100.00 | | |
| Aug MTech | | | | 1205308E | | 08/08/14 | | 50.00 | | |
| Aug MTech | | | | 1205308E | | 08/08/14 | | 100.00 | | |
| Aug MTech | | | | 1205309E | | 08/14/14 | | 100.00 | | |
| Aug MTech | | | | 1205305E | | 08/14/14 | | 50.00 | | |
| Aug MTech | | | | 1205303E | | 08/14/14 | | 100.00 | | |
| Aug MTech | | | | 1205296E | | 08/15/14 | | 50.00 | | |
| Aug MTech | | | | 1205296E | | 08/15/14 | | 100.00 | | |
| Aug MTech | | | | 1205289E | | 08/18/14 | | 50.00 | | |
| Aug MTech | | | | 1205289E | | 08/18/14 | | 100.00 | | |
| Aug MTech | | | | 1205305E | | 08/18/14 | | 50.00 | | |
| Aug MTech | | | | 1205305E | | 08/18/14 | | 100.00 | | |
| Aug MTech | | | | 1205296E | | 08/27/14 | | 50.00 | | |
| Aug MTech | | | | 1205296E | | 08/27/14 | | 100.00 | | |
| Aug MTech | | | | 1205300E | | 08/28/14 | | 50.00 | | |
| Aug MTech | | | | 1205300E | | 08/28/14 | | 50.00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000413

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **68502-152180** Corporate Fees - Neo | | | | | | | | | | | |
| | Aug MTech | | | | 120530GE | | 08/28/14 | | 100.00 | | |
| | Aug MTech | | | | 120529GE | | 08/29/14 | | 100.00 | | |
| | Aug MTech | | | | 120529GE | | 08/29/14 | | 100.00 | | |
| | Aug MTech | | | | 120529GE | | 08/29/14 | | 50.00 | | |
| | Aug MTech | | | | 120530GE | | 08/29/14 | | 50.00 | | |
| | Aug MTech | | | | 120530GE | | 08/29/14 | | 100.00 | | |
| | Aug MTech | | | | 120530GE | | 08/29/14 | | 100.00 | | |
| | Aug MTech | | | | 120530GE | | 08/29/14 | | 50.00 | | |
| | | | | | | Total JE: | | 2,550.00 | | .00 | |
| | | | | | | Total for | | 500.00 | | | 16,950.00 |
| **70100-152180** Advertising & Marketing | | | | | | | | | | | |
| CENTERRA HOMES OF | AUG 2014 Installment | 20140801 | 3292 | | 33235 | PE | 08/01/14 | 112,090.84 | 15,000.00 | | |
| P & B PRINT^CORP | BC- mike nasserfar, mike | 3479 | 3292 | | 34127 | PE | 08/26/14 | | 256.55 | | |
| | | | | | | Total | | | 15,256.55 | .00 | 127,347.39 |
| | | | | | | Total for | | | | | |
| | | | | | | Report | | 82,792.68 | 144,341.92 | 147,978.80 | 79,155.80 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000414



# General Ledger by Branch

Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 09/1/2014 to 09/30/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 41100-152180 | Origination Fees | | | | | | -4,194.11 | | | |
| | | | | | | Total for | | | | -4,194.11 |
| 41355-152180 | Application Fee Income | 1521801420.4|KING| | 1205384E | | 09/15/14 | -4,900.00 | | 100.00 | |
| | | | | | | Total JE: | | .00 | 100.00 | |
| | | | | | | Total for | | | | -5,000.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | -230.94 | | | |
| | | | | | | Total for | | | | -230.94 |
| 41380-152180 | Branch Admin Fee | | | | | | 550.00 | | | |
| | | | | | | Total for | | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | 15218018956 | 1205412E | | | 09/12/14 | -29,878.21 | | 1,449.35 | |
| | | 15218019693 MACE| | 1205483E | | | 09/26/14 | | | 1,380.00 | |
| | | | | | | Total JE: | | .00 | 2,829.35 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000415

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | | | | | |
| | | | | | | | Total for | -125.00 | | | -32,707.56 |
| | | | | | | | | | | | -125.00 |
| 42300-152180 | Premium Discount - Lo | | | | | | | | | | |
| | 1520106384|RYAN| | | | 1205439E | | 09/30/14 | | | 3,255.00 | |
| | 1521814829|LAUGHLIN| | | | 1205432E | | 09/29/14 | | | 3,708.50 | |
| | 1521814883|WHITE| JOHN | | | 1205427E | | 09/26/14 | | | 4,394.52 | |
| | 1521814614|VASQUEZ| | | | 1205385E | | 09/15/14 | | | 5,539.85 | |
| | 1521814204|KING| | | | 1205384E | | 09/15/14 | | | 5,613.92 | |
| | 1521818659|KRAHENBUHL| | | | 1205384E | | 09/15/14 | | | 3,384.00 | |
| | 1521818452|BLANTON| | | | 1205384E | | 09/15/14 | | | 6,255.00 | |
| | 1521819228|SOUCY| LEE | | | 1205376E | | 09/12/14 | | | 4,792.50 | |
| | 1521814569|VALDEZ| | | | 1205370E | | 09/11/14 | | | 2,925.36 | |
| | 1521818719|FELTNER| | | | 1205344E | | 09/05/14 | | | 4,050.00 | |
| | | | | | | | Total JE: | | .00 | 43,918.65 | |
| | | | | | | | Total for | -519,270.01 | | | -563,188.66 |
| 42301-152180 | Premium Discount - Branch | | | | | | | -263,478.18 | | | |
| | 1521818719|FELTNER| | | | 1205344E | | 09/05/14 | | | 1,350.00 | |
| | 1521814569|VALDEZ| | | | 1205370E | | 09/11/14 | | | 975.12 | |
| | 1521819228|SOUCY| LEE | | | 1205376E | | 09/12/14 | | | 1,597.50 | |
| | 1521819228|SOUCY| LEE | | | 1205376E | | 09/12/14 | | | 1,124.64 | |
| | 1521818452|BLANTON| | | | 1205384E | | 09/15/14 | | | 2,264.31 | |
| | 1521818452|BLANTON| | | | 1205384E | | 09/15/14 | | | 2,085.00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000416

| GL/Desc/Vendor | Transaction Description / Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|
| | 152180|8659|KRAHENBUHL| | | | 12053840E | 09/15/14 | | | 282.00 | |
| | 152180|4204|KING| | | | 12053849E | 09/15/14 | | | 1,871.31 | |
| | 152180|4614|VASQUEZ| | | | 12053859E | 09/15/14 | | | 1,846.62 | |
| | 152180|4883|WHITE| JOHN | | | 12054270E | 09/26/14 | | | 670.90 | |
| | 152180|4883|WHITE| JOHN | | | 12054270E | 09/26/14 | | | 1,464.84 | |
| | 152180|4829|LAUGHLIN| | | | 12054326E | 09/29/14 | | | 1,236.17 | |
| | 1520100|6384|RYAN| | | | 12054397E | 09/30/14 | | | 805.07 | |
| | 1520100|6384|RYAN| | | | 12054397E | 09/30/14 | | | 1,085.00 | |
| | | | | | Total JE: | | .00 | 18,658.48 | -282,136.66 |
| 42400-152180 | Pair-Off Allocation | | | | Total for | -1,771.51 | | | -1,771.51 |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | | |
| | 152180|8719|FELTNER| | | | 12053440E | 09/05/14 | 104,871.27 | 688.50 | | |
| | 152180|4569|VALDEZ| | | | 12053770E | 09/11/14 | | 423.20 | | |
| | 152180|8659|KRAHENBUHL| | | | 12053840E | 09/15/14 | | 1,064.08 | | |
| | 152180|4204|KING| | | | 12053849E | 09/15/14 | | 2,282.99 | | |
| | 152180|4614|VASQUEZ| | | | 12053859E | 09/15/14 | | 890.07 | | |
| | 152180|4829|LAUGHLIN| | | | 12054326E | 09/29/14 | | 135.98 | | |
| | 1520100|6384|RYAN| | | | 12054397E | 09/30/14 | | 1,865.40 | | |
| | | | | | Total JE: | | 7,350.22 | .00 | |
| | | | | | Total for | | | | 112,221.49 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000417

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - 10% Cure | 152180146141VASQUEZ| | | 1205383E | | | 09/15/14 | 773.44 | 25.00 | | 798.44 |
| | | | | | | Total JE: | | | 25.00 | .00 | |
| | | | | | | Total for | | 773.44 | | | 798.44 |
| 52450-152180 | Origination Errors Expense | | | | | | | 74.00 | | | 74.00 |
| | | | | | | Total for | | 74.00 | | | 74.00 |
| 55110-152180 | Commission Expense - Loan | | | | | | | 300,342.22 | | | |
| | 9-15-14 SM PR | | | | 1205382E | | 09/15/14 | | 27,451.85 | | |
| | 9-15 COM & BONUS | | | | 1205383E | | 09/15/14 | | | 27,451.85 | |
| | 9-30-14 SM PR | | | | 1205462E | | 09/30/14 | | 6,914.68 | | |
| | 10-15 SM PR ACCRUAL | | | | 1205504E | | 09/30/14 | | 15,792.19 | | |
| | | | | | | Total JE: | | | 50,158.72 | 27,451.85 | |
| | | | | | | Total for | | 300,342.22 | | | 323,049.09 |
| 55111-152180 | Commission Offset | | | | | | | -38,373.25 | | | |
| | 9-15-14 SM PR | | | | 1205382E | | 09/15/14 | | | 2,000.00 | |
| | 9-15 COM & BONUS | | | | 1205383E | | 09/15/14 | | 2,000.00 | | |
| | 9-30-14 SM PR | | | | 1205462E | | 09/30/14 | | | 1,815.40 | |
| | 10-15 SM PR ACCRUAL | | | | 1205504E | | 09/30/14 | | | 3,635.75 | |
| | | | | | | Total JE: | | | 2,000.00 | 7,451.15 | |
| | | | | | | Total for | | | | | -43,824.40 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000418

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **55280-152180** | **Underwriting Fees** | | | | | | | | | | |
| FANNIE MAE | DesktopUnderwriter | INV14-2751554 | 3292 | | 101736 | PE | 09/15/14 | 7,064.42 | 682.08 | | |
| | | | | | | | Total | | 682.08 | .00 | |
| | | | | | | | Total for | | | | 7,746.50 |
| **55350-152180** | **Verification Fees** | | | | | | | | | | |
| ELLIE MAE | Encompass 4506 T service- | INCTXVM107816 | 3292 | | 34312 | PE | 09/01/14 | 12,703.84 | 975.12 | | |
| TALX CORP-RAPID | income verification cust# | 1662613 | 3292 | | 34347 | PE | 09/08/14 | | 394.31 | | |
| | | | | | | | Total | | 1,369.43 | .00 | |
| | | | | | | | Total for | | | | 14,073.27 |
| **55600-152180** | **Credit Report Expense** | | | | | | | | | | |
| | Amex Chad - Sept 2014 | | | | 120550 | JE | 09/25/14 | 11,065.22 | 1,659.31 | | |
| | | | | | | | Total JE: | | 1,659.31 | .00 | |
| | | | | | | | Total for | | | | 12,724.53 |
| **55700-152180** | **Late / Penalty** | | | | | | | | | | |
| | | | | | | | | 25.92 | | | |
| | | | | | | | Total for | | | | 25.92 |
| **60100-152180** | **Salary And Wages** | | | | | | | | | | |
| | 9-15-14 SM PR | | | | 120538 | JE | 09/15/14 | 70,048.91 | 4,180.00 | | |
| | 9-15 WAGE ACCRUED TO | | | | 120538 | JE | 09/15/14 | | | 580.00 | |
| | 9-30-14 SM PR | | | | 120546 | JE | 09/30/14 | | 4,238.01 | | |
| | Therrell Salary Allocation | | | | 120550 | JE | 09/30/14 | | 500.00 | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 10-15 SM PR ACCRUAL | | | | 120550.JE | | 09/30/14 | | 638.00 | 580.00 | |
| | | | | | | | Total JE: | | 9,556.01 | 580.00 | |
| 60450-152180 Bonus - Employee | | | | | | | Total for | | | | 79,024.92 |
| | 9-15-14 SM PR | | | | 120538.JE | | 09/15/14 | 40,497.54 | 7,535.32 | | |
| | 9-15 COM & BONUS | | | | 120538.JE | | 09/15/14 | | | 7,535.32 | |
| | 10-15 SM PR ACCRUAL | | | | 120550.JE | | 09/30/14 | | 6,620.63 | | |
| | | | | | | | Total JE: | | 14,155.95 | 7,535.32 | |
| | | | | | | | Total for | | | | 47,118.17 |
| 61000-152180 Rent Expense | Sep 2014 | | | | 120550.JE | | 09/30/14 | 20,158.77 | 3,996.90 | | |
| | | | | | | | Total JE: | | 3,996.90 | .00 | |
| | CSHV HCG RETAIL, LLC | 7/8-7/31/14,08/14,09/14 Mkg R-G-1160901 2014 3292 | | | 34010 | PE | 09/01/14 | | 148.75 | | |
| | CSHV HCG RETAIL, LLC | Stmt# R-G-1160901 2014 | R-G-116090152014 3292 | | 34009 | PE | 09/01/14 | | 875.83 | | |
| | CSHV HCG RETAIL, LLC | Stmt# R-G-116090152014 | R-G-116090152014 3292 | | 34009 | PE | 09/01/14 | | 888.01 | | |
| | | | | | | | Total | | 1,912.59 | | |
| 61100-152180 License And Permits | | | | | | | Total for | | | | 26,068.26 |
| | | | | | | | | 100.00 | | | |
| | | | | | | | Total for | | | | 100.00 |
| 61300-152180 Office Supplies & Expense | | | | | | | | 998.49 | | | 100.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000420

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| **61380-152180** | | | | | | | | | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | AJE | 608 | PE | 09/05/14 | | 156.97 | | |
| | | | | | | Total | | 156.97 | .00 | 1,155.46 |
| Couriers & Shipping | | | | | | | | | | |
| | | | | | | Total for | 54.25 | | | 54.25 |
| **61600-152180** | Postage | BUSINESS SUITES HILL | Sept 2014 Fxd/ Aug 2014 | 316619 | 3292 | 34008 PE | 09/01/14 | .00 | 5.32 | .00 |
| | | | | | | Total | | 5.32 | .00 | |
| | | | | | | Total for | | | | 5.32 |
| **61700-152180** | Bank Charges | AT&T* 171-796-9232 206 | Fiber Broadband - Sept 2014 | 379324S206 | 3292 | 34327 PE | 09/19/14 | .00 | 5.93 | .00 |
| | | | | | | Total | | 5.93 | .00 | |
| | | | | | | Total for | | | | 5.93 |
| **61900-152180** | Dues And Subscriptions | | | | | Total for | 149.50 | | | 149.50 |
| **62150-152180** | Repair And Maintenance | Davidson Document | | 1205460E | | 09/19/14 | .00 | 10.63 | .00 | 149.50 |
| | | | | | | Total JE: | | 10.63 | .00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000421

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62200-152180 Utilities | | | | | | | | | | | |
| CITY OF AUSTIN ^ 152180 Electric Serv 8/07-9/09/14 | | 201408 1328 | 3292 | | 34300 | PE | 09/11/14 | | 371.04 | | |
| | | | | | | | Total | 957.39 | 371.04 | .00 | |
| | | | | | | | Total for | | | | 1,328.43 |
| 62210-152180 Internet Service | | | | | | | | | | | |
| AT&T^ 171-796-9232 206 | Fiber Broadband - Sept 2014 3793245206 | | 3292 | | 34327 | PE | 09/19/14 | | 61.34 | | |
| | | | | | | | Total | 2,862.24 | 61.34 | .00 | |
| | | | | | | | Total for | | | | 2,923.58 |
| 62250-152180 Telephone | | | | | | | | | | | |
| | | | | | | | Total for | 78.81 | | | 78.81 |
| 62310-152180 Health Insurance | | | | | | | | | | | |
| | Lincoln Financial Sep | | | | 12054623E | | 09/01/14 | | 259.60 | | |
| | Aetna Sep 2014 | | | | 12054723E | | 09/01/14 | | 2,115.78 | | |
| | Lincoln Dental Sep 2014 | | | | 12054743E | | 09/01/14 | | 308.88 | | |
| | NASSERFAR, MICHAEL H | | | | 12053823E | | 09/15/14 | | | 92.03 | |
| | TASK, MICHAEL E | | | | 12053823E | | 09/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 12053823E | | 09/15/14 | | | 488.30 | |
| | GOSNAY, TYCORD R | | | | 12053823E | | 09/15/14 | | | 71.15 | |
| | GOSNAY, TYCORD R | | | | 12054623E | | 09/30/14 | | | 71.15 | |
| | | | | | | | | 8,468.91 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000422

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000423

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | Payroll Tax Expense | | | | | | | 22,505.79 | | | |
| | 9-15-14 SM PR | | | | 120538?JE | | 09/15/14 | | 1,599.30 | | |
| | 9-15 COM & BONUS | | | | 120538?JE | | 09/15/14 | | | 2,523.52 | |
| | 9-15 WAGE ACCRUED TO | | | | 120538?JE | | 09/15/14 | | | 44.37 | |
| | 9-30-14 SM PR | | | | 120546?JE | | 09/30/14 | | 350.14 | | |
| | 10-15 SM PR ACCRUAL | | | | 120550?JE | | 09/30/14 | | | 48.81 | |
| | 10-15 SM PR ACCRUAL | | | | 120550?JE | | 09/30/14 | | | 1,436.45 | |
| | | | | | | | Total JE: | | 3,434.70 | 2,567.89 | |
| CONTINENTAL | | | | | | | | | | | |
| | Sept 2014 Paylogix/ Aflac | 20140901 | 3292 | | 101752 PE | | 09/01/14 | | 37.86 | | |
| | | | | | | | Total | | 37.86 | .00 | 9,748.45 |
| | NASSERFAR, MICHAEL H | | | | 120546?JE | | 09/30/14 | | 92.03 | | |
| | TASK, MICHAEL E | | | | 120546?JE | | 09/30/14 | | 69.81 | | |
| | CURBY, JULIANE M | | | | 120546?JE | | 09/30/14 | | 488.30 | | |
| | | | | | | | Total JE: | | 2,684.26 | 1,442.58 | |
| 65600-152180 | Meals And Entertainment | | | | | | | 19.00 | | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 64.40 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 76.19 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 48.71 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 40.53 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 51.15 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828A | | | 608 | PE | 09/05/14 | | 29.23 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | | | 609 | PE | 09/05/14 | | 31.88 | | |
| | | | | | | | Total for | | | | 23,372.60 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 40.00 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 67.00 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 104.91 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 51.00 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 47.47 | | |
| MICHAEL NASSERFAR | Reimbursement - Aug 2014 | 20140828B | AJE | 609 | PE | 09/05/14 | | 26.82 | | |
| MICHAEL NASSERFAR | Reimbursement - August | 20140828C | AJE | 610 | PE | 09/05/14 | | 702.52 | | |
| MICHAEL NASSERFAR | Reimbursement - August | 20140828C | AJE | 610 | PE | 09/05/14 | | 83.47 | | |
| MICHAEL NASSERFAR | Reimbursement - August | 20140828C | AJE | 610 | PE | 09/05/14 | | 104.22 | | |
| MICHAEL NASSERFAR | Reimbursement - August | 20140828C | AJE | 610 | PE | 09/05/14 | | 48.71 | | |
| MICHAEL NASSERFAR | Reimbursement - August | 20140828C | AJE | 610 | PE | 09/05/14 | | 70.00 | | |
| | | | | | | Total | 1,688.21 | | .00 | 1,707.21 |

**66000-152180** — Computer Expense — Total for 29.22

**67100-152180** — Seminar And Training — Total for 348.00

**68500-152180** — Corporate Allocation — Corp allocation charge — 1205488?E — 09/30/14 — Beg Bal 65,712.86 — Debit 3,820.93 — Total JE: 3,820.93 — Credit .00 — End Bal 69,533.79 — Total for 348.00

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000424

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68501-152180 | Corporate Per File Fees | | | | | | | 18,150.00 | | | |
| | 15218018719|FELTNER| | | | | 1205344E | 09/05/14 | | 150.00 | | |
| | 15218014569|VALDEZ| | | | | 1205370E | 09/11/14 | | 150.00 | | |
| | 15218019228|SOUCY|LEE | | | | 1205376E | 09/12/14 | | 150.00 | | |
| | 15218018452|BLANTON| | | | | 1205384E | 09/15/14 | | 150.00 | | |
| | 15218018659|KRAHENBUHL| | | | | 1205384E | 09/15/14 | | 150.00 | | |
| | 15218014204|KING| | | | | 1205384E | 09/15/14 | | 150.00 | | |
| | 15218014614|VASQUEZ| | | | | 1205384E | 09/15/14 | | 150.00 | | |
| | 15218014883|WHITE|JOHN | | | | 1205427E | 09/26/14 | | 150.00 | | |
| | 15218014829|LAUGHLIN| | | | | 1205432E | 09/29/14 | | 150.00 | | |
| | 15201006384|RYAN| | | | | 1205439E | 09/30/14 | | 150.00 | | |
| | | | | | | Total JE: | | 1,500.00 | | .00 | |
| 68502-152180 | Corporate Fees - Neo | | | | | Total for | | | | | 19,650.00 |
| | | | | | | | | | 500.00 | | 500.00 |
| | Advertising & Marketing | | | | | | | | | | |
| | CENTERRA HOMES OF | Sept 2014 Installment | 20140901 | 3292 | 33748 | PE | 09/01/14 | 127,347.39 | 15,000.00 | | |
| 70100-152180 | P & B PRINT^ CORP | | | | | | | | | | |
| | BC- Nasserfar,Task,Gosnay, 3525 | | 3292 | 34337 | PE | 09/02/14 | | | 344.24 | | |
| | | | | | | Total | | | 15,344.24 | .00 | |
| | | | | | | Total for | | | | | 142,691.63 |
| | | | | | | Report | | -45,763.81 | 121,987.64 | 112,535.27 | -36,311.44 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000425



# General Ledger by Branch
Company: Ameripro Funding, Inc.
Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 10/1/2014 to 10/31/2014

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41100-152180 | Origination Fees | | | | | | | -4,194.11 | | | |
| | | | | | | | Total for | | | | -4,194.11 |
| 41355-152180 | Application Fee Income | | | | | | | -5,000.00 | | | |
| | | 15218014041\|MYERS\| | | | 1205539E | | 10/21/14 | | | 100.00 | |
| | | | | | | | Total JE: | | .00 | 100.00 | |
| | | | | | | | Total for | | | | -5,100.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | | -230.94 | | | |
| | | | | | | | Total for | | | | -230.94 |
| 41380-152180 | Branch Admin Fee | | | | | | | 550.00 | | | |
| | | | | | | | Total for | | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | | | | | | | -32,707.56 | | | |
| | | 152180119081 HEINE\| KYLE | | | 1205562E | | 10/15/14 | | | 1,883.00 | |
| | | | | | | | Total JE: | | .00 | 1,883.00 | |
| | | | | | | | Total for | | | | -34,590.56 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41880-152180 | Misc Production Income | | | | | | | | | | |
| | | | | | | Total for | | | | | -125.00 |
| | | | | | | | | | | | -125.00 |
| 42300-152180 | Premium Discount - Lo | | | | | | | -563,188.66 | | | |
| | | 15218019148|WADE| | | | 1205474 | E | 10/06/14 | | | 3,150.00 | |
| | | 15218018010|FOSSAS| | | | 1205490 | E | 10/09/14 | | | 5,343.75 | |
| | | 15218019569|CUTBIRTH| | | | 1205492 | E | 10/10/14 | | | 2,880.00 | |
| | | 15218018563|FOREMAN| | | | 1205508 | E | 10/15/14 | | | 2,175.00 | |
| | | 15218014404|MYERS| | | | 1205533 | E | 10/21/14 | | | 5,818.76 | |
| | | 15218015253|SUTPHEN| | | | 1205545 | E | 10/24/14 | | | 4,680.33 | |
| | | 15218019949|BARRAS| | | | 1205546 | E | 10/24/14 | | | 3,959.18 | |
| | | 15218016104|BOLLING| | | | 1205554 | E | 10/28/14 | | | 3,504.05 | |
| | | 15218015719|NGO| HIEP | | | 1205562 | E | 10/30/14 | | | 3,300.00 | |
| | | 15218018474|GAINES| | | | 1205563 | E | 10/30/14 | | | 4,925.75 | |
| | | 15218020226|WRIGHT| | | | 1205567 | E | 10/31/14 | | | 2,398.80 | |
| | | 15218019738|DAUTREMONT| | | | 1205567 | E | 10/31/14 | | | 2,338.80 | |
| | | 15218015318|GREENE| | | | 1205569 | E | 10/31/14 | | | 5,727.14 | |
| | | 15218018164|GOINS| | | | 1205569 | E | 10/31/14 | | | 4,500.00 | |
| | | | | | | Total JE: | | | .00 | 54,701.56 | |
| 42301-152180 | Premium Discount - Branch | | | | | | | -282,136.66 | | | |
| | | 15218019148|WADE| | | | 1205474 | E | 10/06/14 | | | 1,050.00 | |
| | | 15218018010|FOSSAS| | | | 1205490 | E | 10/09/14 | | | 1,781.25 | |
| | | 15218019569|CUTBIRTH| | | | 1205492 | E | 10/10/14 | | | 960.00 | |
| | | | | | | Total for | | | | | -617,890.22 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000427

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521801956 9|CUTBIRTH| | | | | 1205496E | | 10/10/14 | | | 345.60 | |
| | 1521801856 3|FOREMAN| | | | | 1205508E | | 10/15/14 | | | 725.00 | |
| | 1521801856 3|FOREMAN| | | | | 1205508E | | 10/15/14 | | | 279.85 | |
| | 1521801404 1|MYERS| | | | | 1205539E | | 10/21/14 | | | 1,939.59 | |
| | 1521801525 3|SUTPHEN| | | | | 1205545E | | 10/24/14 | | | 1,560.11 | |
| | 1521801994 9|BARRAS| | | | | 1205549E | | 10/24/14 | | | 1,319.73 | |
| | 1521801610 4|BOLLING| | | | | 1205554E | | 10/28/14 | | | 1,168.02 | |
| | 1521801610 4|BOLLING| | | | | 1205554E | | 10/28/14 | | | 303.68 | |
| | 1521801571 9|NGO| HEP | | | | 1205563E | | 10/30/14 | | | 1,100.00 | |
| | 1521801847 4|GAINES| | | | | 1205563E | | 10/30/14 | | | 49.26 | |
| | 1521801847 4|GAINES| | | | | 1205563E | | 10/30/14 | | | 4,104.79 | |
| | 1521802022 6|WRIGHT| | | | | 1205570E | | 10/31/14 | | | 799.60 | |
| | 1521802022 6|WRIGHT| | | | | 1205567E | | 10/31/14 | | | 319.84 | |
| | 1521801973 8|DAUTREMONT| | | | | 1205567E | | 10/31/14 | | | 689.17 | |
| | 1521801973 8|DAUTREMONT| | | | | 1205567E | | 10/31/14 | | | 779.60 | |
| | 1521801531 8|GREENE| | | | | 1205569E | | 10/31/14 | | | 2,309.94 | |
| | 1521801531 8|GREENE| | | | | 1205569E | | 10/31/14 | | | 4,772.61 | |
| | 1521801816 4|GOINS| | | | | 1205569E | | 10/31/14 | | | 443.43 | |
| | | | | | | | Total JE: | | .00 | 26,801.07 | |
| 42400-152180 Pair-Off Allocation | | | | | | | Total for | -1,771.51 | | | -308,937.73 |
| 52426-152180 Lender Credits - Gfe Cures | 1521801914 8|WADE| | | | | 1205474E | | 10/06/14 | 112,221.49 | 75.60 | -1,771.51 |
| | | | | | | | Total for | 112,221.49 | 75.60 | | -1,771.51 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000428

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | | | |
| | 15218018010|FOSSAS| | | | 12054903E | 10/09/14 | | 440.00 | | |
| | 1521801404|MYERS| | | | 12055339E | 10/21/14 | | 4,175.80 | | |
| | 15218015253|SUTPHEN| | | | 12055435E | 10/24/14 | | 8,740.44 | | |
| | 152180199|49|BARRAS| | | | 12055469E | 10/24/14 | | 2,787.70 | | |
| | 15218016104|BOLLING| | | | 12055436E | 10/28/14 | | 2,500.00 | | |
| | 15218015719|NGO| HIEP | | | 12055629E | 10/30/14 | | 2,673.80 | | |
| | 15218018474|GAINES| | | | 12055630E | 10/30/14 | | 2,500.00 | | |
| | 152180153181|GREENE| | | | 12055690E | 10/31/14 | | 1,185.40 | | |
| | 15218018164|GOINS| | | | 12055693E | 10/31/14 | Total JE: | 1,184.90 | | |
| | | | | | | | | 26,263.64 | .00 | |
| | 15218019738|DAUTREMONT| | | | 12055672E | 10/31/14 | Total JE: | 27.00 | | |
| | | | | | | | | 3,184.63 | .00 | |
| | 15218018010|FOSSAS| | | | 12054903E | 10/09/14 | | 2,778.75 | | |
| | 15218019148|WADE| | | | 12054744E | 10/06/14 | 798.44 | 378.88 | | |
| | | | | | | Total for | | | | 138,485.13 |
| 52450-152180 | Origination Errors Expense | | | | | | 74.00 | | | |
| | | | | | | Total for | | | | 74.00 |
| 55110-152180 | Commission Expense - Loan | | | | | | | | | |
| | 10-15 SM PR | | | | 12055037E | 10/15/14 | 323,049.09 | 15,792.19 | 15,792.19 | |
| | 10-15 SM PR ACCRUAL | | | | 12055045E | 10/15/14 | | | | |
| | | | | | | Total for | | | | 3,983.07 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000429

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 | Commission Offset | | | | | | | | | |
| | 10-31 SM PR | | | | 120556?3E | 10/31/14 | | 524.40 | | |
| | 11-15 COM-BON | | | | 120563?4E | 10/31/14 | | 28,752.28 | | |
| | | | | | | Total JE: | | 45,068.87 | 15,792.19 | |
| | | | | | | Total for | -43,824.40 | | | 352,325.77 |
| 55280-152180 | Underwriting Fees | | | | | | | | | |
| | FANNIE MAE | | | | | | | | | |
| | Desktop Underwriter | INV14-2760828 | 3292 | | 101754 PE | 10/15/14 | | 573.84 | | |
| | | | | | | Total | | 573.84 | .00 | |
| | 10-15 SM PR | | | | 120550?3E | 10/15/14 | | 3,635.75 | | |
| | 10-15 SM PR ACCRUAL | | | | 120550?4E | 10/15/14 | | 3,635.75 | | |
| | 10-31 SM PR | | | | 120556?2E | 10/31/14 | | 2,000.00 | | |
| | 11-15 COM-BON | | | | 120563?4E | 10/31/14 | | 2,869.00 | | |
| | | | | | | Total JE: | | 3,635.75 | 8,504.75 | |
| | | | | | | Total for | 7,746.50 | | | -48,693.40 |
| 55350-152180 | Verification Fees | | | | | | | | | |
| | ELLIE MAE | Encompass 4506 T Service- INCTXVM108109 | 3292 | | 101757 PE | 10/01/14 | | 586.57 | | |
| | TALX CORP-RAPID | income verifications Cust # 1660983 | 3292 | | 34693 PE | 10/01/14 | | 125.10 | | |
| | TALX CORP-RAPID | Income Verifications Cust# 1669083 | 3292 | | 34695 PE | 10/08/14 | | 125.10 | | |
| | | | | | | Total | | 836.77 | .00 | |
| | | | | | | Total for | 14,073.27 | | | 14,910.04 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000430

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | Chad AMEX - OCT 2014 | | | 1205566E | | 10/25/14 | 12,724.53 | | | |
| | | | | | | Total JE: | | | 2,115.03 | 2,115.03 | |
| | | | | | | Total for | | | | .00 | 14,839.56 |
| 55700-152180 | Late / Penalty | | | | | Total for | | 25.92 | | | 25.92 |
| 60100-152180 | Salary And Wages | 10-15 SM PR | | | 1205503E | | 10/15/14 | 79,024.92 | 4,238.00 | | |
| | | 10-15 SM PR ACCRUAL | | | 1205504E | | 10/15/14 | | | 638.00 | |
| | | 10-31 SM PR | | | 1205562E | | 10/31/14 | | 4,738.00 | | |
| | | 11-15 WAGE ACCRUAL | | | 1205634E | | 10/31/14 | | 696.00 | | |
| | | | | | | Total JE: | | | 9,672.00 | 638.00 | |
| | | | | | | Total for | | | | | 88,058.92 |
| 60450-152180 | Bonus - Employee | 10-15 SM PR | | | 1205503E | | 10/15/14 | 47,118.17 | 6,620.63 | | |
| | | 10-15 SM PR ACCRUAL | | | 1205504E | | 10/15/14 | | | 6,620.63 | |
| | | 11-15 COM-BON | | | 1205634E | | 10/31/14 | | 7,251.04 | | |
| | | | | | | Total JE: | | | 13,871.67 | 6,620.63 | |
| | | | | | | Total for | | | | | 54,369.21 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000431

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 | Rent Expense | | | | | | | 26,068.26 | | | |
| | Oct 2014 | | | | | | | | | | |
| CSHV HCG RETAIL,LLC | OCT RENT 2014/RNT EXP | 201410 6072 | 3292 | | 1205630E | | 10/31/14 | | 3,996.90 | | |
| | | | | | | | Total JE: | | 3,996.90 | .00 | |
| | | | | | 34636 PE | | 10/01/14 | | 1,912.59 | | |
| | | | | | | | Total | | 1,912.59 | .00 | |
| | | | | | | | Total for | | | | 31,977.75 |
| 61100-152180 | License And Permits | | | | | | Total for | 100.00 | | | 100.00 |
| 61300-152180 | Office Supplies & Expense | | | | | | Total for | 1,155.46 | | | 1,155.46 |
| 61380-152180 | Couriers & Shipping | | | | | | Total for | 54.25 | | | 54.25 |
| 61600-152180 | Postage | | | | | | Total for | 5.32 | | | 5.32 |
| 61700-152180 | Bank Charges | | | | | | Total for | 5.93 | | | 5.93 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000432

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61900-152180 | Dues And Subscriptions | | | | | | | | | | |
| | | | | | | | Total for | 149.50 | | | 149.50 |
| 62150-152180 | Repair And Maintenance | Davidson Document | | | 1205550E | | 10/17/14 | 10.63 | 24.29 | | |
| | | | | | | | Total JE: | | 24.29 | .00 | |
| | | | | | | | Total for | | | | 34.92 |
| 62200-152180 | Utilities | CITY OF AUSTIN ^152180  Electric service 09/09-10/08 | 258667965768 | 3292 | 101767 PE | | 10/10/14 | 1,328.43 | 267.92 | | |
| | | | | | | | Total | | 267.92 | .00 | |
| | | | | | | | Total for | | | | 1,596.35 |
| 62210-152180 | Internet Service | AT&T^ 171-796-9232 206  Fiber Broadband - Oct 2014 | 68761562609 | 3292 | 34802 PE | | 10/19/14 | 2,923.58 | 976.12 | | |
| | | | | | | | Total | | 976.12 | .00 | |
| | | | | | | | Total for | | | | 3,899.70 |
| 62250-152180 | Telephone | AT&T^ 152180 -DO NOT  Service 10/05 - 11/04/14 | 201410 2025 | 3292 | 34801 PE | | 10/05/14 | 78.81 | 121.53 | | |
| | | | | | | | Total | | 121.53 | .00 | |
| | | | | | | | Total for | | | | 200.34 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000433

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 Health Insurance | | | | | | | | 9,748.45 | | | |
| | Aetna Oct 2014 | | | | 1205549E | | 10/01/14 | | 2,115.76 | | |
| | Lincoln Dental Oct 2014 | | | | 1205543E | | 10/01/14 | | 355.32 | | |
| | Lincoln Financial Oct 2014 | | | | 1205550E | | 10/01/14 | | 259.60 | | |
| | GOSNAY, TYCORD R | | | | 1205503E | | 10/15/14 | | | 71.15 | |
| | TASK, MICHAEL E | | | | 1205503E | | 10/15/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 1205503E | | 10/15/14 | | | 488.30 | |
| | NASSERFAR, MICHAEL H | | | | 1205562E | | 10/31/14 | | | 488.30 | |
| | CURBY, JULIANE M | | | | 1205562E | | 10/31/14 | | | 92.03 | |
| | TASK, MICHAEL E | | | | 1205562E | | 10/31/14 | | | 69.81 | |
| | GOSNAY, TYCORD R | | | | 1205563E | | 10/31/14 | | | 71.15 | |
| | NASSERFAR, MICHAEL H | | | | 1205563E | | 10/31/14 | | | 92.03 | |
| | | | | | | Total JE: | | | 2,730.68 | 1,442.58 | |
| CONTINENTAL | Oct 2014 Paylogix / Aflac | 20141001 | 3292 | | 101755 PE | | 10/01/14 | | 37.86 | | |
| | | | | | | Total | | | 37.86 | .00 | |
| | | | | | | Total for | | | | | 11,074.41 |
| 63100-152180 Depreciation Expense | | | | | | | | .00 | | | |
| | OCTOBER | | | | 1205574E | | 10/31/14 | | 99.60 | | |
| | OCTOBER | | | | 1205574E | | 10/31/14 | | 1,164.74 | | |
| | October Depreciation | | | | 1205613E | | 10/31/14 | | 620.31 | | |
| | | | | | | Total JE: | | | 1,884.65 | .00 | |
| | | | | | | Total for | | | | | .00 |
| 64100-152180 Payroll Tax Expense | | | | | | | | 23,372.60 | | | |
| | 10-15 SM PR | | | | 1205503E | | 10/15/14 | | 784.12 | | |
| | | | | | | | | | | | 1,884.65 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000434

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 Meals And Entertainment | 10-15 SM PR ACCRUAL | | | | 1205504E | 10/15/14 | | 48.81 | | |
| | 10-15 SM PR ACCRUAL | | | | 1205504E | 10/15/14 | | 1,436.45 | | |
| | 10-31 SM PR | | | | 1205562E | 10/31/14 | | 302.99 | | |
| | 11-15 COM-BON | | | | 1205634E | 10/31/14 | | 2,534.78 | | |
| | 11-15 WAGE ACCRUAL | | | | 1205634E | 10/31/14 | | 53.24 | | |
| | | | | | | Total JE: | | 3,675.13 | 1,485.26 | |
| | | | | | | Total for | 1,707.21 | | | 25,562.47 |
| 66000-152180 Computer Expense | | | | | | Total for | 29.22 | | | 29.22 |
| 67100-152180 Seminar And Training | | | | | | Total for | 348.00 | | | 348.00 |
| 68500-152180 Corporate Allocation | Oct 2014 corp alloc charge | | | | 1205602E | 10/31/14 | 69,533.79 | 4,728.99 | | |
| | | | | | | Total JE: | | 4,728.99 | .00 | |
| | | | | | | Total for | | | | 74,262.78 |
| 68501-152180 Corporate Per File Fees | | | | | | | 19,650.00 | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000435

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15218019148|WADE| | | | | 12054744E | 10/06/14 | | 150.00 | | |
| | 15218018010|FOSSAS| | | | | 12054903E | 10/09/14 | | 150.00 | | |
| | 15218019569|CUTBIRTH| | | | | 12054992E | 10/10/14 | | 150.00 | | |
| | 15218018563|FOREMAN| | | | | 12055003E | 10/15/14 | | 150.00 | | |
| | 15218014041|MYERS| | | | | 12055333E | 10/21/14 | | 150.00 | | |
| | 15218015253|SUTPHEN| | | | | 12055453E | 10/24/14 | | 150.00 | | |
| | 15218019949|BARRAS| | | | | 12055469E | 10/24/14 | | 150.00 | | |
| | 15218016104|BOLLING| | | | | 12055548E | 10/28/14 | | 150.00 | | |
| | 15218015719|NGO| HIEP | | | | 12055627E | 10/30/14 | | 150.00 | | |
| | 15218018474|GAINES| | | | | 12055633E | 10/30/14 | | 150.00 | | |
| | 15218020226|WRIGHT| | | | | 12055637E | 10/31/14 | | 150.00 | | |
| | 15218019738|DAUTREMONT| | | | | 12055637E | 10/31/14 | | 150.00 | | |
| | 15218015318|GREENE| | | | | 12055659E | 10/31/14 | | 150.00 | | |
| | 15218018164|GOINS| | | | | 12055650E | 10/31/14 | | 150.00 | | |
| | | | | | | | Total JE: | 2,100.00 | | .00 | |
| 68502-152180 | | | | | | | | | | | |
| Corporate Fees - Neo | | | | | | | Total for | 500.00 | | | 21,750.00 |
| 70100-152180 | | | | | | | | | | | 142,691.63 |
| Advertising & Marketing | | | | | | | | | | | |
| P & B PRINT^CORP | Nasserfar Poster Project | 3798 | 3292 | | 34685 | PE | 10/08/14 | | 147.22 | .00 | |
| | | | | | | | Total | | 147.22 | | |
| | | | | | | | Total for | | | | 142,838.85 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000436

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL.Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Report | -36,311.44 | 127,826.08 | 117,969.04 | -26,454.40 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000437



# General Ledger by Branch

**Company: Ameripro Funding, Inc.**
**Branch: 152180 (Nasserfar)**
GLs from 10000 to 99995
From 11/1/2014 to 11/30/2014

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41100-152180 | Origination Fees | | | | | | Total for | -4,194.11 | | | -4,194.11 |
| 41355-152180 | Application Fee Income | | | | | | Total for | -5,100.00 | | | -5,100.00 |
| 41357-152180 | Credit Report Fee Income | | | | | | Total for | -230.94 | | | -230.94 |
| 41380-152180 | Branch Admin Fee | | | | | | Total for | 550.00 | | | 550.00 |
| 41860-152180 | Brokered Loan Fee Income | | | | | | Total for | -34,590.56 | | | -34,590.56 |
| 41880-152180 | Misc Production Income | | | | | | Total for | -125.00 | | | -125.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000438

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | | | | | | | -617,890.22 | | | |
| | 15218020112|NGUYEN| | | | | 12056240E | | 11/13/14 | | | 5,370.09 | |
| | 15218014701|DIMBERO| | | | | 12056291E | | 11/14/14 | | | 6,255.00 | |
| | 15218017759|RAPISAND| | | | | 12056300E | | 11/14/14 | | | 4,481.97 | |
| | 15218015896|BALDERAS| | | | | 12056359E | | 11/17/14 | | | 3,174.62 | |
| | 15218019900|SHEFFIELD| | | | | 12056395E | | 11/17/14 | | | 3,342.00 | |
| | 15218016822|CHAMBERS| | | | | 12056503E | | 11/18/14 | | | 4,500.00 | |
| | 15201005903|LANTHIER| | | | | 12056510E | | 11/18/14 | | | 6,255.00 | |
| | 15218016996|CHAO| | | | | 12056533E | | 11/19/14 | | | 3,278.07 | |
| | 15218020471|HARRIS| | | | | 12056583E | | 11/21/14 | | | 4,053.66 | |
| | 15218020217|KINCL, JOHN | | | | | 12056722E | | 11/25/14 | | | 4,800.00 | |
| | | | | | | | Total JE: | | .00 | 45,510.41 | |
| | | | | | | | Total for | | | | -663,400.63 |
| 42301-152180 | Premium Discount - Branch | | | | | | | -308,937.73 | | | |
| | 15218020112|NGUYEN| | | | | 12056240E | | 11/13/14 | | | 1,790.03 | |
| | 15218020112|NGUYEN| | | | | 12056240E | | 11/13/14 | | | 465.41 | |
| | 15218014701|DIMBERO| | | | | 12056291E | | 11/14/14 | | | 2,085.00 | |
| | 15218014701|DIMBERO| | | | | 12056291E | | 11/14/14 | | | 3,919.80 | |
| | 15218017759|RAPISAND| | | | | 12056300E | | 11/14/14 | | | 1,493.99 | |
| | 15218015896|BALDERAS| | | | | 12056359E | | 11/17/14 | | | 895.24 | |
| | 15218015896|BALDERAS| | | | | 12056359E | | 11/17/14 | | | 2,645.51 | |
| | 15218019900|SHEFFIELD| | | | | 12056395E | | 11/17/14 | | | 1,114.00 | |
| | 15218016822|CHAMBERS| | | | | 12056503E | | 11/18/14 | | | 392.61 | |
| | 15201005903|LANTHIER| | | | | 12056510E | | 11/18/14 | | | 1,167.60 | |
| | 15201005903|LANTHIER| | | | | 12056510E | | 11/18/14 | | | 2,085.00 | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42400-152180 Pair-Off Allocation | 152180169996|CHAO| | | | | 120565J3E | 11/19/14 | | | 253.50 | |
| | 152180169996|CHAO| | | | | 120565J3E | 11/19/14 | | | 1,092.69 | |
| | 152180204711|HARRIS| | | | | 120565J9E | 11/21/14 | | | 1,351.22 | |
| | 152180202171|KINCL|JOHN | | | | 120567J2E | 11/25/14 | | | 1,600.00 | |
| | | | | | | | Total JE: | | .00 | 22,351.60 | -331,289.33 |
| | | | | | | | Total for | -1,771.51 | | | -1,771.51 |
| 52426-152180 Lender Credits - Gfe Cures | 152180201112|NGUYEN| | | | | 120562J4E | 11/13/14 | 138,485.13 | 2,500.00 | | |
| | 152180147011|DIMBERO| | | | | 120562J3E | 11/14/14 | | 2,225.90 | | |
| | 152180177759|RAPISAND| | | | | 120563J0E | 11/14/14 | | 3,049.79 | | |
| | 152180158968|BALDERAS| | | | | 120563J3E | 11/17/14 | | 2,500.00 | | |
| | 152180199000|SHEFFIELD| | | | | 120563J3E | 11/17/14 | | 873.38 | | |
| | 152180168221|CHAMBERS| | | | | 120565J0E | 11/18/14 | | 3,677.84 | | |
| | 152010059031|LANTHIER| | | | | 120565J0E | 11/18/14 | | 2,500.00 | | |
| | 152180169996|CHAO| | | | | 120565J3E | 11/19/14 | | 2,500.00 | | |
| | 152180204711|HARRIS| | | | | 120565J9E | 11/21/14 | | 3,184.26 | | |
| | 152180202171|KINCL|JOHN | | | | 120567J2E | 11/25/14 | | 67.20 | | |
| | | | | | | | Total JE: | | 23,078.37 | .00 | |
| 52427-152180 Lender Credit - 10% Cure | | | | | | | Total for | | 3,983.07 | | 161,563.50 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000440

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 52450-152180 Origination Errors Expense | 152180201112|NGUYEN| | | | | 12056240E | 11/13/14 | | 4.00 | | |
| | 15201005903|LANTHIER| | | | | 12056505E | 11/18/14 | | 37.80 | | |
| | | | | | | Total JE: | | | 41.80 | .00 | 4,024.87 |
| | | | | | | Total for | | 74.00 | | | 74.00 |
| 55110-152180 Commission Expense - Loan | 11-15 COM-BON | | | | | 12056340E | 11/14/14 | | 28,752.28 | 28,752.28 | |
| | | | | | | Total JE: | | | 28,752.28 | 28,752.28 | |
| | 11-14 SM PR | | | | | 12056593E | 11/14/14 | | 28,752.28 | | |
| | | | | | | Total for | | 352,325.77 | | | 352,325.77 |
| 55111-152180 Commission Offset | 11-14 SM PR | | | | | 12056559E | 11/14/14 | | | 2,869.00 | |
| | 11-15 COM-BON | | | | | 12056340E | 11/14/14 | | | 2,869.00 | |
| | | | | | | Total JE: | | | 2,869.00 | 2,869.00 | |
| | | | | | | Total for | | -48,693.40 | | | -48,693.40 |
| 55280-152180 FANNIE MAE Underwriting Fees | Desktop Underwriter | INV14-2770407 | 3292 | PE | 2625 | | 11/15/14 | 8,320.34 | 741.63 | | |
| | | | | | | Total | | | 741.63 | .00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000441

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55350-152180 | Verification Fees | | | | | | Total for | 14,910.04 | | | 9,061.97 |
| ELLIE MAE | Encompass 4506 T service- | INCTXVM1108403 | 3292 | | 35051 | PE | 11/01/14 | | 972.99 | | |
| TALX CORP-RAPID | income verifications Cust # | 1660983 | 3292 | | 34693 | PE | 11/03/14 | | | 125.10 | |
| | | | | | | | Total | | 972.99 | 125.10 | |
| 55600-152180 | Credit Report Expense | | | | | | Total for | 14,839.56 | | | 15,757.93 |
| 55700-152180 | Late / Penalty | | | | | | Total for | 25.92 | | | 25.92 |
| 60100-152180 | Salary And Wages | | | | | | | | | | |
| | 11-14 SM PR | | | | 120565591E | | 11/14/14 | 88,058.92 | 4,546.03 | | |
| | 11-15 WAGE ACCRUAL | | | | 120563414E | | 11/14/14 | | | 696.00 | |
| | 11-28-14 SM PR 11/28 | | | | 120577991E | | 11/28/14 | | 4,430.03 | | |
| | | | | | | | Total JE: | | 8,976.06 | 696.00 | |
| | | | | | | | Total for | | | | 96,338.98 |
| 60450-152180 | Bonus - Employee | | | | | | | | | | |
| | 11-14 SM PR | | | | 120565593E | | 11/14/14 | 54,369.21 | 7,251.04 | | |
| | 11-15 COM-BON | | | | 120563414E | | 11/14/14 | | | 7,251.04 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000442

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 61000-152180 | Rent Expense | | | | | | | | | |
| | CSIIV HCG RETAIL,LLC  NOV RENT 2014 | 201411 6072 | 3292 | 34636 | PE | 11/01/14 | 31,977.75 | 2,012.59 | .00 | 33,990.34 |
| | | | | | | Total | | 2,012.59 | .00 | |
| | | | | | | Total JE: | 7,251.04 | 7,251.04 | | 54,369.21 |
| 61100-152180 | License And Permits | | | | | Total for | 100.00 | | | 100.00 |
| 61300-152180 | Office Supplies & Expense | | | | | Total for | 1,155.46 | | | 1,155.46 |
| 61380-152180 | Couriers & Shipping | | | | | Total for | 54.25 | | | 54.25 |
| 61600-152180 | Postage | | | | | Total for | 5.32 | | | 5.32 |
| 61700-152180 | Bank Charges | | | | | | | | | |
| | CITY OF AUSTIN ^ 152180  electric service 10/08-11/07 | 258667305554 | 3292 | 34901 | PE | 11/10/14 | 5.93 | 12.47 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000443

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61900-152180 | Dues And Subscriptions | | | | | | Total for | 149.50 | 12.47 | .00 | 18.40 |
| 62150-152180 | Repair And Maintenance | | | | | | Total for | 34.92 | | | 149.50 |
| 62200-152180 | Utilities | | | | | | | | | | |
| | CITY OF AUSTIN ^ 152180 electric service 10/08-11/07 | 258667305554 | 3292 | | 34901 | PE | 11/10/14 | | 197.98 | | |
| | CITY OF AUSTIN ^ 152180 Electric service 09/09-10/08 | 258667965768 | 3292 | | 34949 | PE | 11/13/14 | | 267.92 | | |
| | CITY OF AUSTIN ^ 152180 Electric service 09/09-10/08 | 258667965768 | 3292 | | 101767 | PE | 11/13/14 | | 465.90 | 267.92 | |
| | | | | | | | Total | | | 267.92 | |
| | | | | | | | Total for | 1,596.35 | | | 34.92 |
| 62210-152180 | Internet Service | | | | | | | | | | |
| | AT&T^ 171-796-9232 206 | acct# 171-796-9232 206 Nov 360592620 | 3292 | | 35117 | PE | 11/19/14 | | 971.83 | | |
| | | | | | | | Total | 3,899.70 | 971.83 | .00 | 1,794.33 |
| 62250-152180 | Telephone | | | | | | Total for | 200.34 | | | 4,871.53 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000444

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62310-152180 | Health Insurance | | | | | | Total for | 11,074.41 | | | 200.34 |
| | AETNA NOV 2014 | | | | 120567 XE | | 11/01/14 | | 2,115.76 | | |
| | LINCOLN FINANCIAL | | | | 120567 XE | | 11/01/14 | | 259.60 | | |
| | Lincoln Dental Nov 2014 | | | | 120567 XE | | 11/01/14 | | 355.32 | | |
| | NASSERFAR, MICHAEL H | | | | 120565 XE | | 11/14/14 | | | 92.03 | |
| | CURBY, JULIANE M | | | | 120565 XE | | 11/14/14 | | | 488.30 | |
| | GOSNAY, TYCORD R | | | | 120565 XE | | 11/14/14 | | | 71.15 | |
| | THERRELL, THOMAS R | | | | 120565 XE | | 11/14/14 | | | 17.68 | |
| | TASK, MICHAEL E | | | | 120565 XE | | 11/14/14 | | | 69.81 | |
| | THERRELL, THOMAS R | | | | 120579 XE | | 11/28/14 | | | 17.68 | |
| | GOSNAY, TYCORD R | | | | 120579 XE | | 11/28/14 | | | 71.15 | |
| | NASSERFAR, MICHAEL H | | | | 120579 XE | | 11/28/14 | | | 92.03 | |
| | CURBY, JULIANE M | | | | 120579 XE | | 11/28/14 | | | 488.30 | |
| | TASK, MICHAEL E | | | | 120579 XE | | 11/28/14 | | | 69.81 | |
| | | | | | | | Total JE: | | 2,730.68 | 1,477.94 | |
| | CONTINENTAL | Nov 2014 Paylogix / Aflac | 201411 INS | 3292 | 101781 PE | | 11/01/14 | | 37.86 | | |
| | | | | | | | Total | | 37.86 | .00 | |
| 63100-152180 | Depreciation Expense | | | | | | Total for | 1,884.65 | | | 1,884.65 |
| 64100-152180 | Payroll Tax Expense | 11-14 SM PR | | | 120565 XE | | 11/14/14 | 25,562.47 | 1,042.27 | | |

*(handwritten)* Why is this yearly ins also here?

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000445

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 Meals And Entertainment | 11-15 COM-BON | | | | 1205634E | | 11/14/14 | | 2,534.78 | | |
| | 11-15 WAGE ACCRUAL | | | | 1205634E | | 11/14/14 | | 53.24 | | |
| | 11-28-14 SM PR 11/28 | | | | 1205779E | | 11/28/14 | | 157.25 | | |
| | | | | | | | Total JE: | | 1,199.52 | 2,588.02 | |
| | | | | | | | Total for | | | | 24,173.97 |
| | | | | | | | Total for | | 1,707.21 | | 1,707.21 |
| 66000-152180 Computer Expense | | | | | | | Total for | | 29.22 | | 29.22 |
| 67100-152180 Seminar And Training | | | | | | | Total for | | 348.00 | | 348.00 |
| 68500-152180 Corporate Allocation | Corp Alloc Charge - Nov | | | | 1205790E | | 11/30/14 | 74,262.78 | 3,744.71 | | |
| | | | | | | | Total JE: | | 3,744.71 | .00 | |
| 68501-152180 Corporate Per File Fees | 1521802011|NGUYEN| | | | | 1205624E | | 11/13/14 | 21,750.00 | 150.00 | | |
| | 1521801470|DIMBERO| | | | | 1205629E | | 11/14/14 | | 150.00 | | |
| | | | | | | | Total for | | 78,007.37 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000446

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15218017759|RAPISANDI | | | | 1205630E | | 11/14/14 | | 150.00 | | |
| | 15218015896|BALDERAS| | | | | 1205635E | | 11/17/14 | | 150.00 | | |
| | 15218019900|SHEFFIELD| | | | | 1205635E | | 11/17/14 | | 150.00 | | |
| | 15218016822|CHAMBERS| | | | | 1205650E | | 11/18/14 | | 150.00 | | |
| | 15201005903|LANTHIER| | | | | 1205650E | | 11/18/14 | | 150.00 | | |
| | 15218016996|CHAO| | | | | 1205653E | | 11/19/14 | | 150.00 | | |
| | 15218020471|HARRIS| | | | | 1205659E | | 11/21/14 | | 150.00 | | |
| | 15218020217|KINCL,JOHN | | | | 1205672E | | 11/25/14 | | 150.00 | | |
| | | | | | | | Total JE: | | 1,500.00 | .00 | |

68502-152180 Corporate Fees - Neo

| | | | | | | | Total for | 500.00 | 23,250.00 | | 500.00 |

70100-152180 Advertising & Marketing

| | | | | | | | Total for | 142,838.85 | | | 142,838.85 |

| | | | | | | | Report | -26,454.40 | 85,358.73 | 111,889.31 | -52,984.98 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000447

# General Ledger by Branch
## Company: Ameripro Funding, Inc.
### Branch: 152180 (Nasserfar)
GLs from 10000 to 99995
From 12/1/2014 to 12/31/2014

| GL/Desc/Vendor | Invoice Number | GL Bank | DB | Ref | JR | Date | Transaction Description | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 41100-152180 Origination Fees | | | | | | | | -4,194.11 | | | |
| Total for | | | | | | | | | | | -4,194.11 |
| 41355-152180 Application Fee Income | | | | | | | | -5,100.00 | | | |
| Total for | | | | | | | | | | | -5,100.00 |
| 41357-152180 Credit Report Fee Income | | | | | | | | -230.94 | | | |
| Total for | | | | | | | | | | | -230.94 |
| 41380-152180 Branch Admin Fee | | | | | | | | 550.00 | | | |
| Total for | | | | | | | | | | | 550.00 |
| 41860-152180 Brokered Loan Fee Income | | | | | | | | -34,590.56 | | | |
| Total for | | | | | | | | | | | -34,590.56 |
| 41880-152180 Misc Production Income | | | | | | | | -125.00 | | | |
| Total for | | | | | | | | | | | -125.00 |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 42300-152180 | Premium Discount - Lo | | | | | | | -663,400.63 | | | |
| | 15218020752\|D'AUTREMONT\| | | | | 120575TE | | 12/02/14 | | | 2,160.00 | |
| | 15218020912\|GHEZZI\| | | | | 12057911E | | 12/05/14 | | | 5,130.00 | |
| | 15218020287\|BOTKIN\| | | | | 120580TE | | 12/10/14 | | | 4,795.05 | |
| | 15218017238\|BROCKWAY\| | | | | 120581TE | | 12/15/14 | | | 3,769.21 | |
| | 15218020360\|LITTLE\| | | | | 120582TE | | 12/18/14 | | | 5,998.80 | |
| | 15218017332\|HUNT\| | | | | 120583TE | | 12/19/14 | | | 4,271.54 | |
| | 15218021174\|RAY\| | | | | 120583TE | | 12/19/14 | | | 2,906.63 | |
| | 15218014852\|CROSS\| KYLE | | | | 120583TE | | 12/19/14 | | | 5,338.98 | |
| | 15218017333\|RIVERS\| | | | | 120583TE | | 12/19/14 | | | 4,196.28 | |
| | 15218017106\|TAYLOR | | | | 120583TE | | 12/19/14 | | | 4,204.59 | |
| | 15218020106\|LUTOSTANSKI\| | | | | 120583TE | | 12/19/14 | | | 3,455.22 | |
| | 15218020292\|METCALF\| | | | | 120584TE | | 12/22/14 | | | 3,075.00 | |
| | 15218016213\|WOODRUFF\| | | | | 120584TE | | 12/22/14 | | | 4,647.49 | |
| | 15218021322\|D'AUTREMONT\| | | | | 120585TE | | 12/23/14 | | | 2,340.00 | |
| | 15218017240\|PENE\| | | | | 120585TE | | 12/23/14 | | | 3,675.00 | |
| | 15218016057\|CARTER\| | | | | 120585TE | | 12/23/14 | | | 1,500.00 | |
| | 15218020916\|GONSOULIN\| | | | | 120586TE | | 12/30/14 | | | 4,840.50 | |
| | 15218017239\|DEWALD\| | | | | 120586TE | | 12/30/14 | | | 4,221.12 | |
| | 15218021463\|CHRISTMAN\| | | | | 120586TE | | 12/30/14 | | | 5,343.75 | |
| | 15218018130\|BUTALA\| | | | | 120586TE | | 12/30/14 | | | 3,000.00 | |
| | 15218017582\|ERNST\| | | | | 120586TE | | 12/30/14 | | | 5,345.55 | |
| | 15218017829\|CHASTAIN\| | | | | 120586TE | | 12/30/14 | | | 4,478.72 | |
| | 15218021203\|ABERRA\| | | | | 120587TE | | 12/31/14 | | | 4,328.26 | |

Total JE:    .00    93,021.69

Total for    -756,422.32

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000455

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000456

| GL/Desc/Vendor | Transaction Description / Invoice Number | Ref | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|
| 42301-152180 | Premium Discount - Branch | | | -331,289.33 | | | |
| | 152180207521D'AUTREMONT| | 12057591E | 12/02/14 | | | 720.00 | |
| | 1521802091|GHEZZI| | 12057910E | 12/05/14 | | | 1,710.00 | |
| | 1521802028|BOTKIN| | 12058007E | 12/10/14 | | | 431.55 | |
| | 1521802287|BOTKIN| | 12058007E | 12/10/14 | | | 1,598.35 | |
| | 1521801723|BROCKWAY| | 12058019E | 12/15/14 | | | 3,141.00 | |
| | 1521801723|BROCKWAY| | 12058019E | 12/15/14 | | | 826.71 | |
| | 1521802036|LITTLE| | 12058029E | 12/18/14 | | | 1,999.60 | |
| | 1521801732|HUNT| | 12058032E | 12/19/14 | | | 1,423.85 | |
| | 1521802174|RAY| | 12058032E | 12/19/14 | | | 1,302.17 | |
| | 1521802174|RAY| | 12058032E | 12/19/14 | | | 2,422.19 | |
| | 152180148521CROSS|KYLE | 12058037E | 12/19/14 | | | 1,779.66 | |
| | 1521801733|RIVERS| | 12058034E | 12/19/14 | | | 1,398.76 | |
| | 1521801710|TAYLOR | 12058034E | 12/19/14 | | | 1,575.32 | |
| | 1521801710|TAYLOR | 12058034E | 12/19/14 | | | 1,401.53 | |
| | 1521802010|LUTOSTANSKI| | 12058034E | 12/19/14 | | | 780.00 | |
| | 1521802029|METCALF| | 12058046E | 12/22/14 | | | 1,151.74 | |
| | 1521801621|WOODRUFF| | 12058048E | 12/22/14 | | | 1,025.00 | |
| | 1521802132|D'AUTREMONT| | 12058053E | 12/23/14 | | | 1,549.17 | |
| | 1521802132|D'AUTREMONT| | 12058053E | 12/23/14 | | | 684.84 | |
| | 1521801724|PENE| | 12058052E | 12/23/14 | | 445.90 | 1,754.20 | |
| | 1521801724|PENE| | 12058052E | 12/23/14 | | | 500.00 | |
| | 1521801605|CARTER| | 12058053E | 12/23/14 | | | 219.00 | |
| | 1521802091|GONSOULIN| | 12058672E | 12/30/14 | | | 1,613.50 | |
| | 1521801723|DEWALD| | 12058682E | 12/30/14 | | | 1,238.20 | |
| | 1521801723|DEWALD| | 12058682E | 12/30/14 | | | 1,407.04 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000456

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 152180214163\|CHRISTMAN\| | | | | 1205868\|E | | 12/30/14 | | | 488.06 | |
| | 152180214163\|CHRISTMAN\| | | | | 1205868\|E | | 12/30/14 | | | 1,781.25 | |
| | 152180181130\|BUTALA\| | | | | 1205869\|E | | 12/30/14 | | | 646.00 | |
| | 152180181130\|BUTALA\| | | | | 1205869\|E | | 12/30/14 | | | 1,000.00 | |
| | 152180175821\|ERNST\| | | | | 1205869\|E | | 12/30/14 | | | 4,454.63 | |
| | 152180178329\|CHASTAIN\| | | | | 1205869\|E | | 12/30/14 | | | 1,492.91 | |
| | 152180211203\|ABERRA\| | | | | 1205879\|E | | 12/31/14 | | | 1,442.76 | |
| | 152180211203\|ABERRA\| | | | | 1205879\|E | | 12/31/14 | | | 213.53 | |
| | | | | | | | Total JE: | | 445.90 | 45,172.52 | |
| 42400-152180 | Pair-Off Allocation | | | | | | Total for | -1,771.51 | | -376,015.95 | |
| 52426-152180 | Lender Credits - Gfe Cures | | | | | | | 161,563.50 | | | |
| | 152180207521\|D'AUTREMONT\| | | | | 1205875\|E | | 12/02/14 | | | 507.20 | |
| | 152180209912\|GHEZZI\| | | | | 1205879\|E | | 12/05/14 | | | 1,405.62 | |
| | 152180202287\|BOTKIN\| | | | | 1205800\|E | | 12/10/14 | | | 4,500.00 | |
| | 152180172238\|BROCKWAY\| | | | | 1205818\|E | | 12/15/14 | | | 2,500.00 | |
| | 152180203601\|LITTLE\| | | | | 1205829\|E | | 12/18/14 | | | 450.00 | |
| | 152180173321\|HUNT\| | | | | 1205837\|E | | 12/19/14 | | | 2,995.50 | |
| | 152180148521\|CROSS\| KYLE | | | | 1205837\|E | | 12/19/14 | | | 323.90 | |
| | 152180173331\|RIVERS\| | | | | 1205837\|E | | 12/19/14 | | | 3,132.62 | |
| | 152180171061\|TAYLOR | | | | 1205837\|E | | 12/19/14 | | | 2,500.00 | |
| | 152180201061\|JUTOSTANSKI\| | | | | 1205837\|E | | 12/19/14 | | | 2,992.94 | |
| | 152180202092\|METCALF\| | | | | 1205846\|E | | 12/22/14 | | | 2,500.00 | |
| | | | | | | | Total for | | | -1,771.51 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000457

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000458

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| 52427-152180 | Lender Credit - 10% Cure | | | | | | | | | |
| | 152180162131WOODRUFF] | | | | 1205844$E | 12/22/14 | | 3,237.40 | | |
| | 15218021322|D'AUTREMONT] | | | | 1205852$E | 12/23/14 | | 1,000.00 | | |
| | 152180172401PENE] | | | | 1205852$E | 12/23/14 | | 2,500.00 | | |
| | 15218016057|CARTER] | | | | 1205853$E | 12/23/14 | | 2,500.00 | | |
| | 152180172391DEWALD] | | | | 1205868$E | 12/30/14 | | 2,500.00 | | |
| | 152180214631CHRISTMAN] | | | | 1205868$E | 12/30/14 | | 2,500.00 | | |
| | 15218018130|BUTALA] | | | | 1205869$E | 12/30/14 | | 2,500.00 | | |
| | 152180175821ERNST] | | | | 1205869$E | 12/30/14 | | 3,273.32 | | |
| | 152180178291CHASTAIN] | | | | 1205864$E | 12/30/14 | | 3,222.57 | | |
| | 15218021203|ABERRA] | | | | 1205875$E | 12/31/14 | | 2,500.00 | | |
| | | | | | Total JE: | | 49,541.07 | .00 | | 211,104.57 |
| | | | | | Total for | | | | | |
| | 15218020360|LITTLE] | | | | 1205829$E | 12/18/14 | 4,024.87 | 150.00 | | |
| | | | | | Total JE: | | | 150.00 | .00 | |
| | | | | | Total for | | | | | |
| 52450-152180 | Origination Errors Expense | | | | | | 74.00 | | | 4,174.87 |
| | | | | | Total for | | | | | |
| 55110-152180 | Commission Expense - Loan | | | | | | 375,093.61 | | | 74.00 |
| | 12-4-14 QC BATCH 3439 | | | | 1205787$E | 12/04/14 | | 2,330.15 | | |
| | 12-15-14 SM PR | | | | 1205827$E | 12/15/14 | | 20,437.69 | | |
| | DEC PR ACCRUAL TO | | | | 1205820$E | 12/15/14 | | 22,767.84 | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55111-152180 | Commission Offset | | | | | | | | | | |
| | 12-31-14 SM PR | | | | 12058761E | | 12/31/14 | | 4,560.24 | | |
| | | | | | | Total JE: | | | 27,337.08 | 22,767.84 | |
| | | | | | | Total for | | | | | 379,662.85 |
| | 12-4-14 OC BATCH 3439 | | | | 12057813E | | 12/04/14 | -53,369.18 | | | |
| | 12-15-14 SM PR | | | | 12058223E | | 12/15/14 | | | 1,000.00 | |
| | DEC PR ACCRUAL TO | | | | 12058202E | | 12/15/14 | | 4,675.78 | 3,675.78 | |
| | 12-31-14 SM PR | | | | 12058761E | | 12/31/14 | | | 2,000.00 | |
| | | | | | | Total JE: | | | 4,675.78 | 6,675.78 | |
| | | | | | | Total for | | | | | -55,369.18 |
| 55280-152180 | Underwriting Fees | | | | | | | 9,093.95 | | | |
| FANNIE MAE | Desktop Underwriter | INV14-2779926 | 3292 | | 35260 | PE | 12/01/14 | | 503.45 | | |
| FREDDIE | Nov 2014 Transactions | 20141201 | 3292 | | 101787 | PE | 12/01/14 | | 31.98 | | |
| | | | | | | Total | | | 535.43 | .00 | |
| | | | | | | Total for | | | | | 9,629.38 |
| 55350-152180 | Verification Fees | | | | | | | 16,022.57 | | | |
| | Wells Fargo | | | | 12059101E | | 12/31/14 | | 20.00 | | |
| | | | | | | Total JE: | | | 20.00 | .00 | |
| ELLIE MAE | Encompass 4506 T Service- | INCTXVMI08710 | 3292 | | 35345 | PE | 12/01/14 | | 679.84 | | |
| ELLIE MAE | Encompass 4506 T Service- | INCTXVMI09017 | 0 | | 0 | PE | 12/31/14 | | 636.67 | | |
| | | | | | | Total | | | 1,316.51 | .00 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000459

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 55600-152180 | Credit Report Expense | | | | | | Total for | 16,984.26 | | | 17,359.08 |
| 55700-152180 | Late / Penalty | | | | | | Total for | 25.92 | | | 25.92 |
| 60100-152180 | Salary And Wages | 12-15-14 SM PR | | | 12058223E | | 12/15/14 | 96,918.98 | 4,430.04 | | |
| | | DEC PR ACCRUAL TO | | | 12058203E | | 12/15/14 | | | 580.00 | |
| | | 12-31-14 SM PR | | | 12058763E | | 12/31/14 | | 4,488.03 | | |
| | | | | | | | Total JE: | | 8,918.07 | 580.00 | |
| | | | | | | | Total for | | | | 105,257.05 |
| 60450-152180 | Bonus - Employee | 12-15-14 SM PR | | | 12058223E | | 12/15/14 | 78,120.75 | 23,751.54 | | |
| | | DEC PR ACCRUAL TO | | | 12058203E | | 12/15/14 | | 23,751.54 | | |
| | | | | | | | Total JE: | | 23,751.54 | 23,751.54 | |
| | | | | | | | Total for | | | | 78,120.75 |
| 61000-152180 | Rent Expense | Dec 2014 | | | 12122070E | | 12/31/14 | 37,987.24 | 3,996.90 | | |
| | | | | | | | Total JE: | | 3,996.90 | .00 | |
| | | | | | | | Total for | | | | 78,120.75 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000460

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSIIV HCG RETAIL,LLC | DEC 2014 RENT | 201412 6072-1 | 3292 | | 35036 | PE | 12/01/14 | | 2,176.50 | | |
| | | | | | | | Total | | 2,176.50 | .00 | |
| 61100-152180 | | | | | | | Total for | | | | 44,160.64 |
| License And Permits | | | | | | | | 100.00 | | | |
| | | | | | | | Total for | | | | 100.00 |
| 61300-152180 | | | | | | | | 1,155.46 | | | |
| Office Supplies & Expense | | | | | | | | | | | |
| MICHAEL NASSERFAR | Reimbursement 11/26 | 20141126 | AJE | | 825 | PE | 12/08/14 | | 168.87 | | |
| | | | | | | | Total | | 168.87 | .00 | |
| 61380-152180 | | | | | | | Total for | | | | 1,324.33 |
| Couriers & Shipping | | | | | | | | 54.25 | | | |
| | | | | | | | Total for | | | | 54.25 |
| 61600-152180 | | | | | | | | 5.32 | | | |
| Postage | | | | | | | | | | | |
| | | | | | | | Total for | | | | 5.32 |
| 61700-152180 | | | | | | | | 18.40 | | | |
| Bank Charges | | | | | | | | | | | |
| | | | | | | | Total for | | | | 18.40 |
| 61900-152180 | | | | | | | | 149.50 | | | |
| Dues And Subscriptions | | | | | | | | | | | |

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 62150-152180 | Repair And Maintenance | | | | | | Total for | 34.92 | | | 34.92 |
| | | | | | | | | | | | 149.50 |
| 62200-152180 | Utilities | | | | | | | | | | |
| | CITY OF AUSTIN ^ 152180 electric service 11/07-12/08 | 2586640944441 | 3292 | | 35331 | PE | 12/10/14 | 147.91 | | | |
| | | | | | | | Total | | 147.91 | .00 | |
| | | | | | | | Total for | 1,794.33 | | | 1,942.24 |
| 62210-152180 | Internet Service | | | | | | Total for | 4,871.53 | | | 4,871.53 |
| 62250-152180 | Telephone | | | | | | Total for | 200.34 | | | 200.34 |
| 62310-152180 | Health Insurance | | | | | | | 12,365.01 | | | |
| | AETNA DEC 2014 | | | | 120581 9E | | 12/01/14 | | 2,115.76 | | |
| | LINCOLN DENTAL DEC | | | | 120586 02E | | 12/01/14 | | 430.82 | | |
| | LINCOLN FINANCIAL | | | | 120586 9E | | 12/01/14 | | 337.95 | | |
| | TASK, MICHAEL E | | | | 120582 23E | | 12/15/14 | | | 69.81 | |
| | GOSNAY, TYCORD R | | | | 120582 NE | | 12/15/14 | | | 71.15 | |
| | THERRELL, THOMAS R | | | | 120582 3E | | 12/15/14 | | | 17.68 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000462

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CONTINENTAL | | | | | | | | | | | |
| | CURBY, JULIANE M | | | | 120582736E | | 12/15/14 | | | 488.30 | |
| | NASSERFAR, MICHAEL H | | | | 120582236E | | 12/15/14 | | | 92.03 | |
| | NASSERFAR, MICHAEL H | | | | 120587636E | | 12/31/14 | | | 92.03 | |
| | THERRELL, THOMAS R | | | | 120587636E | | 12/31/14 | | | 17.68 | |
| | GOSNAY, TYCORD R | | | | 120587636E | | 12/31/14 | | | 71.15 | |
| | TASK, MICHAEL E | | | | 120587636E | | 12/31/14 | | | 69.81 | |
| | CURBY, JULIANE M | | | | 120587636E | | 12/31/14 | | | 488.30 | |
| | | | | | | | Total JE: | | 2,884.53 | 1,477.94 | |
| | Dec 2014 Paylogix/ Aflac | 201412 INS | | 0 | | PE | 12/01/14 | | 37.86 | 37.86 | |
| | | | | | | | Total | | 37.86 | .00 | |
| | | | | | | | Total for | | | | |
| 63100-152180 | Depreciation Expense | | | | | | | .00 | | | |
| | DECEMBER | | | | 120586336E | | 12/31/14 | | 1,405.67 | | |
| | DECEMBER | | | | 120586336E | | 12/31/14 | | 1,505.27 | | |
| | | | | | | | Total JE: | | 1,505.27 | .00 | |
| | | | | | | | Total for | | | | 13,809.46 |
| 64100-152180 | Payroll Tax Expense | | | | | | | 27,419.38 | | | |
| | 12-4-14 OC BATCH 3439 | | | | 120578736E | | 12/04/14 | | 19.29 | | |
| | 12-15-14 SM PR | | | | 120582336E | | 12/15/14 | | 1,082.99 | | |
| | DEC PR ACCRUAL TO | | | | 120582036E | | 12/15/14 | | | 3,201.04 | |
| | DEC PR ACCRUAL TO | | | | 120582036E | | 12/15/14 | | 198.95 | | |
| | 12-31-14 SM PR | | | | 120587636E | | 12/31/14 | | | 44.37 | |
| | | | | | | | Total JE: | | 1,301.23 | 3,245.41 | |
| | | | | | | | Total for | | | | 1,505.27 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000463

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65600-152180 | Meals And Entertainment | | | | | | Total for | 1,707.21 | | | 25,475.20 |
| | MICHAEL NASSERFAR Reimbursement 11/26 | 20141126 | A/E | | 825 | PE | 12/08/14 | 1,089.41 | | | |
| | | | | | | | Total | | 1,089.41 | .00 | |
| 66000-152180 | Computer Expense | | | | | | Total for | 29.22 | | | 2,796.62 |
| 67100-152180 | Seminar And Training | | | | | | Total for | 348.00 | | | 29.22 |
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | Corp alloc - Dec 2014 | | | | 121220AE | | 12/31/14 | 78,007.49 | 8,273.06 | | 348.00 |
| | | | | | | | Total JE: | | 8,273.06 | .00 | |
| 68501-152180 | Corporate Per File Fees | | | | | | Total for | | | | |
| | | 1521802075ID'AUTREMONT| | | | | 120575AE | 12/02/14 | 23,250.00 | 150.00 | | |
| | | 1521802091|GHEZZI| | | | | 120579AE | 12/05/14 | | 150.00 | | |
| | | 1521802028|JBOYKIN| | | | | 120580AE | 12/10/14 | | 150.00 | | |
| | | 1521801723|BROCKWAY| | | | | 120581AE | 12/15/14 | | 150.00 | | |
| | | 1521802036|LITTLE| | | | | 120582AE | 12/18/14 | | 150.00 | | |
| | | | | | | | Total for | | | | 86,280.55 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000464

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000465

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **68502-152180** Corporate Fees - Neo | | | | | | | | | | | |
| | 152180173321HUNT| | | | | 120583261E | | 12/19/14 | | 150.00 | | |
| | 15218021174|RAY| | | | | 120583261E | | 12/19/14 | | 150.00 | | |
| | 152180148521CROSS| KYLE | | | | 120583261E | | 12/19/14 | | 150.00 | | |
| | 152180173331RIVERS| | | | | 120583261E | | 12/19/14 | | 150.00 | | |
| | 152180171061TAYLOR | | | | 120583461E | | 12/19/14 | | 150.00 | | |
| | 152180201061LUTOSTANSKI| | | | | 120583461E | | 12/19/14 | | 150.00 | | |
| | 152180202922|METCALF| | | | | 120584461E | | 12/22/14 | | 150.00 | | |
| | 152180162131WOODRUFF| | | | | 120584861E | | 12/22/14 | | 150.00 | | |
| | 152180213221D'AUTREMONT| | | | | 120584861E | | 12/23/14 | | 150.00 | | |
| | 15218017240|PENE| | | | | 120585261E | | 12/23/14 | | 150.00 | | |
| | 152180160571CARTER| | | | | 120585361E | | 12/23/14 | | 150.00 | | |
| | 152180209161GONSOULIN| | | | | 120585961E | | 12/30/14 | | 150.00 | | |
| | 152180172391DEWALD| | | | | 120586761E | | 12/30/14 | | 150.00 | | |
| | 152180214631CHRISTMAN| | | | | 120586861E | | 12/30/14 | | 150.00 | | |
| | 15218018130|BUTALA| | | | | 120586861E | | 12/30/14 | | 150.00 | | |
| | 152180175821ERNST| | | | | 120586961E | | 12/30/14 | | 150.00 | | |
| | 152180178291CHASTAIN| | | | | 120586961E | | 12/30/14 | | 150.00 | | |
| | 152180212031ABERRA| | | | | 120587361E | | 12/31/14 | | 150.00 | | |
| | | | | | | | Total JE: | | 3,450.00 | .00 | |
| | | | | | | | Total for | | 26,700.00 | | |
| **70100-152180** Advertising & Marketing MICHAEL NASSERFAR | Reimbursement 11/26 | 20141126 | AJE | | 825 | PE | 12/08/14 | 142,838.85 | 211.90 | | |
| | | | | | | | Total for | 500.00 | | 500.00 | |

| GL/Desc/Vendor | Tranaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Total | | 211.90 | .00 | |
| | | | | | | | Total for | | | | 143,050.75 |
| | | | | | | | Report | -2,762.40 | 141,934.82 | 196,692.72 | -57,520.30 |

PLAINTIFF'S EXHIBIT NO. 7

PLAINTIFF'S EXHIBIT 7
tabbies®

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000364

EXHIBIT
13
4-24-15
depobook.com

# Funded Loan Report
## Ameripro Funding, Inc.
For FundingDate between 1/1/2014 and 12/31/2014
Branch: 152180 (Nasserfar)
Template: Branch Income by loan

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|
| ACEVEDO| PHILLIP | 152180 | FAY STRANGE | 15201000323 | 01/23/2014 | $228,969 | $- | $- | $- | $- |
| DUCATI| WILLIAM | 152180 | FAY STRANGE | 15201005296 | 01/24/2014 | 274,411 | 2,744.11 | | | |
| GIANDANA| RICHARD | 152180 | FAY STRANGE | 15201005368 | 01/29/2014 | 250,029 | | | | |
| PALLADINO| ANDREA | 152180 | FAY STRANGE | 15201035079 | 02/03/2014 | 357,159 | | | | |
| RUNGE| LOUIS | 152180 | FAY STRANGE | 15201006134 | 01/14/2014 | 287,920 | | | | |
| SEGURA| RAYMOND | 152180 | FAY STRANGE | 15201006641 | 01/31/2014 | 176,491 | | | | |
| THOMAS| VICTOR | 152180 | FAY STRANGE | 15201005716 | 02/03/2014 | 266,248 | | | | |
| CAMERON| CHRISTOPHER | 152180 | JOAN WILSON | 15216016177 | 05/01/2014 | $16,000 | | | | |
| FURGERSON| BRITTNEY | 152180 | KIMBERLY JONES | 15200000851 | 02/18/2014 | 126,000 | | | 100.00 | |
| HAYGOOD| LANE | 152180 | KIMBERLY JONES | 15216013719 | 02/13/2014 | 231,470 | | | 200.00 | |
| HONG| WOOKYOUNG | 152180 | KIMBERLY JONES | 15201006088 | 02/28/2014 | 97,500 | | | | |
| LEE| WOO JIN | 152180 | KIMBERLY JONES | 15201006112 | 02/28/2014 | 96,000 | | | | |
| MOKHTAR| MOHAMED | 152180 | KIMBERLY JONES | 15201006580 | 02/25/2014 | 417,000 | | | 100.00 | |
| PAREDES| MARIA | 152180 | KIMBERLY JONES | 15201006058 | 03/07/2014 | 88,000 | | | | |
| MOONE| THOMAS | 152180 | MICHAEL E TASK | 15216516057 | 06/18/2014 | 400,000 | | | | |
| BROOKS| TIMOTHY | 152180 | MICHAEL E TASK | 15216019048 | 06/06/2014 | 245,100 | | | | |
| BUSTAMANTE| MARK | 152180 | MICHAEL E TASK | 15216018355 | 03/13/2014 | 97,435 | | | | |
| CAPLAN| MARSHALL | 152180 | MICHAEL E TASK | 15216018407 | 06/26/2014 | 187,423 | | | | |
| CHEANEY| CHRIS | 152180 | MICHAEL E TASK | 15216018929 | 06/30/2014 | 264,500 | | | | |
| CRAWFORD| CHARLES | 152180 | MICHAEL E TASK | 15216017996 | 07/31/2014 | 281,000 | | | | |
| DAUTREMONT| MATTHIAS | 152190 | MICHAEL E TASK | 15216020752 | 12/02/2014 | 144,000 | | | | |
| DAUTREMONT| MATTHIAS | 152180 | MICHAEL E TASK | 15216021322 | 12/23/2014 | 155,000 | | | | |

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| $- | $- | $- | $- | $- | $- | $- | $343.45 | $4,121.44 | $4,464.89 |
| | | 38.13 | -3.13 | | | | 411.61 | 4,939.40 | 8,130.12 |
| | | | -1,422.67 | | | | 375.04 | 4,500.00 | 3,452.37 |
| | | | | | | | 1,785.80 | 4,500.00 | 6,285.80 |
| | | | | | | | 431.88 | 4,500.00 | 4,931.88 |
| | | | -28.08 | | | | 263.24 | 3,158.84 | 3,394.00 |
| | | | | | | | 3,163.02 | 4,500.00 | 7,663.02 |
| | | | -1,955.90 | | | | | 8,260.00 | 4,244.10 |
| | | 20.18 | -43.00 | | | | 1,184.40 | 1,890.00 | 3,131.40 |
| | | 13.58 | | | | | 3,082.35 | 3,472.05 | 6,754.58 |
| | | | -250.00 | | | | 1,245.08 | 1,462.50 | 2,457.58 |
| | | | -250.00 | | | | 903.36 | 1,440.00 | 2,106.92 |
| | | | -350.28 | | | | 2,085.00 | 6,255.00 | 8,089.72 |
| | | | | | | | 440.00 | 1,320.00 | 1,760.00 |
| | | | -1,823.40 | | | | 2,544.00 | 6,000.00 | 6,720.60 |
| | | | -762.26 | | | | 1,225.50 | 3,676.50 | 4,139.74 |
| | | | | | | 1,449.35 | | | 1,449.35 |
| | | | -1,500.00 | | | | 2,453.37 | 2,811.35 | 3,764.72 |
| | | | -540.74 | | | | 1,273.00 | 3,819.00 | 4,551.26 |
| | | | -1,607.40 | | | | 2,607.39 | 3,915.00 | 4,914.99 |
| | | | -507.20 | | | | 720.00 | 2,160.00 | 2,372.80 |
| | | | -1,000.00 | | | | 1,464.84 | 2,340.00 | 2,804.84 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000365

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| DAUTREMONT\| MATTHIAS | 152180 | MICHAEL E TASK | 1521801979738 | 10/31/2014 | 155,920 | | , | , | | , |
| DEMPSEY\| BARBARA | 152180 | MICHAEL E TASK | 1521801708 | 06/23/2014 | 390,000 | | , | , | | , |
| FELTNER\| BRUCE | 152180 | MICHAEL E TASK | 1521801718719 | 09/05/2014 | 210,000 | | , | , | | , |
| FOREMAN\| MELISSA | 152180 | MICHAEL E TASK | 1521801858563 | 10/15/2014 | 145,000 | | , | , | | , |
| FOSSAS\| DAVID | 152180 | MICHAEL E TASK | 1521801880010 | 10/09/2014 | 358,250 | | , | , | | , |
| GENCHEVA\| DANIELA | 152180 | MICHAEL E TASK | 1521801717117 | 06/13/2014 | 103,200 | | , | , | | , |
| GHEZZI\| CHRISTINA | 152180 | MICHAEL E TASK | 1521802090912 | 12/05/2014 | 342,000 | | , | , | | , |
| GONSOULIN\| SCOTT | 152180 | MICHAEL E TASK | 1521802090316 | 12/30/2014 | 322,700 | | , | , | | , |
| HAZY\| MICHAEL | 152180 | MICHAEL E TASK | 1521801717054 | 09/30/2014 | 250,000 | | , | , | | , |
| HEINE\| KYLE | 152180 | MICHAEL E TASK | 1521801909081 | 10/15/2014 | 140,800 | | , | , | | , |
| KINCL\| JOHN | 152180 | MICHAEL E TASK | 1521802090217 | 11/25/2014 | 320,000 | | , | , | | , |
| MACE\| SHONDA | 152180 | MICHAEL E TASK | 1521801909593 | 09/26/2014 | 69,000 | | , | , | | , |
| SCHOONOVER\| CELIA | 152180 | MICHAEL E TASK | 1520000009520 | 09/18/2014 | 216,600 | | , | , | | , |
| SHAW\| JAYSON | 152180 | MICHAEL E TASK | 1521801717835 | 07/25/2014 | 417,000 | | , | , | | , |
| SHEPHERD\| TRICIA | 152180 | MICHAEL E TASK | 1520101013555 | 09/15/2014 | 312,975 | | , | , | | , |
| THOMAS\| TERESA | 152180 | MICHAEL E TASK | 1521801717920 | 07/18/2014 | 417,000 | | , | , | | , |
| WADE\| NATHAN | 152180 | MICHAEL E TASK | 1521801919148 | 10/05/2014 | 210,000 | | , | , | | , |
| ABERRA\| GETNET | 152180 | MICHAEL E TASK | 1521802021203 | 12/31/2014 | 288,551 | | , | , | | , |
| ADAMS\| ALFRED | 152180 | MICHAEL NASSERFAR | 1520100057030 | 02/14/2014 | 231,442 | | , | , | | , |
| ALAMGARI\| NAGENDER | 152180 | MICHAEL NASSERFAR | 1520100057030 | 05/01/2014 | 417,000 | | , | , | | , |
| ASENCIO\| VERONICA | 152180 | MICHAEL NASSERFAR | 1521801714297 | 07/01/2014 | 234,560 | | , | , | | , |
| AVERY\| MARK | 152180 | MICHAEL NASSERFAR | 1520100057079 | 03/12/2014 | 301,260 | | , | , | 100.00 | , |
| BAILEY\| JOHN | 152180 | MICHAEL NASSERFAR | 1521801714561 | 05/06/2014 | 263,150 | | , | , | 200.00 | , |
| BAKER\| GARY | 152180 | MICHAEL NASSERFAR | 1521801016989 | 07/11/2014 | 101,160 | | , | , | | , |
| BALDERAS\| RAYMOND | 152180 | MICHAEL NASSERFAR | 1521801015896 | 11/17/2014 | 211,641 | | , | , | | , |
| BARICUATRO\| MARICA | 152180 | MICHAEL NASSERFAR | 1520100026030 | 05/23/2014 | 314,524 | | , | , | | , |
| BARRAS\| JEREMY | 152180 | MICHAEL NASSERFAR | 1521801019949 | 10/24/2014 | 263,945 | | , | , | | , |
| BEARD\| JESSE | 152180 | MICHAEL NASSERFAR | 1521801146044 | 03/26/2014 | 200,000 | | , | , | | , |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000366

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | -27.00 | | | | 1,468.77 | 2,338.80 | 3,780.57 |
| | | | | | | | 1,950.00 | 5,850.00 | 7,800.00 |
| | | | -688.50 | | | | 1,350.00 | 4,050.00 | 4,711.50 |
| | | | | | | | 1,004.85 | 2,175.00 | 3,179.85 |
| | | | -3,218.75 | | | | 1,781.25 | 5,343.75 | 3,906.25 |
| | | | | | | 1,507.00 | | | 1,507.00 |
| | | | -1,405.62 | | | | 1,710.00 | 5,130.00 | 5,434.38 |
| | | | | | | | 1,813.50 | 4,840.50 | 6,454.00 |
| | | | | | | | 2,012.50 | 3,750.00 | 5,762.50 |
| | | | -67.20 | | | | 1,600.00 | 4,800.00 | 6,332.80 |
| | | | | | | 1,883.00 | | | 1,883.00 |
| | | | | | | 1,380.00 | | | 1,380.00 |
| | | | -454.48 | | | | 1,050.00 | 3,150.00 | 3,745.52 |
| | | | | | | | 2,085.00 | 6,255.00 | 8,340.00 |
| | | | -1,145.49 | | | | 1,564.88 | 4,694.63 | 5,114.02 |
| | | | -2,931.12 | | | | 2,085.00 | 6,255.00 | 5,408.88 |
| | | | | | | | 2,276.47 | 3,249.00 | 5,525.47 |
| | | | -2,500.00 | | | | 1,656.29 | 4,328.26 | 3,484.55 |
| | | | | | | | 2,307.48 | 3,471.63 | 5,779.11 |
| | | | -1,944.90 | | | | 3,607.05 | 6,255.00 | 7,917.15 |
| | | | | | | | 1,428.47 | 3,518.40 | 5,046.87 |
| | | | | | | | 5,184.68 | 4,518.90 | 8,903.58 |
| | | | -2,000.00 | | | | 2,915.71 | 4,500.00 | 5,415.71 |
| | | | | | | | 662.60 | 1,517.40 | 2,180.00 |
| | | | -2,500.00 | | | | 3,540.75 | 3,174.62 | 4,215.37 |
| | | | -3,826.00 | | | | 1,673.27 | 4,500.00 | 2,347.27 |
| | | | -2,787.70 | | | | 1,319.73 | 3,959.18 | 2,491.21 |
| | | | -1,066.00 | | | | 1,000.00 | 3,000.00 | 2,934.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000367

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| BENAVIDES, ISAAC | 152180 | MICHAEL NASSERFAR | 15218015090 | 08/29/2014 | 417,000 | | | | | |
| BENEDETTI, BRETT | 152180 | MICHAEL NASSERFAR | 15218017863 | 07/24/2014 | 193,500 | | | | | |
| BENTLEY, BARTON | 152180 | MICHAEL NASSERFAR | 15201004991 | 02/11/2014 | 237,383 | | | | | |
| BENTLEY, JEREMIAH | 152180 | MICHAEL NASSERFAR | 15218017406 | 08/07/2014 | 248,000 | | | | | |
| BLANTON, WHITNEY | 152180 | MICHAEL NASSERFAR | 15218018452 | 09/15/2014 | 417,000 | | | | | |
| BLOK, JUSTIN | 152180 | MICHAEL NASSERFAR | 15700000870 | 07/23/2014 | 417,000 | | | | | |
| BOLLAMPALLY, SIRISHA | 152180 | MICHAEL NASSERFAR | 15201005665 | 02/24/2014 | 332,634 | | | | | |
| BOLLING, KATHRYN | 152180 | MICHAEL NASSERFAR | 15218016104 | 10/28/2014 | 233,603 | | | | | |
| BOTKIN, CHRISTINA | 152180 | MICHAEL NASSERFAR | 15218020287 | 12/10/2014 | 319,870 | | | | | |
| BOX, JACLYN | 152180 | MICHAEL NASSERFAR | 15200000734 | 02/28/2014 | 179,550 | | | | | |
| BRANCH, DAVID | 152180 | MICHAEL NASSERFAR | 15218015548 | 05/19/2014 | 332,463 | | | | 200.00 | |
| BRAZENER, CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15201006331 | 04/25/2014 | 202,070 | | | | | |
| BROCKWAY, JOANNE | 152180 | MICHAEL NASSERFAR | 15218017238 | 12/15/2014 | 251,280 | | | | | |
| BROWN, ERICA | 152180 | MICHAEL NASSERFAR | 15201005920 | 03/25/2014 | 245,658 | | | | | |
| BUCKNER, FREDERICK | 152180 | MICHAEL NASSERFAR | 15218018412 | 09/27/2014 | 227,000 | | | | | |
| BUTALA, JAY | 152180 | MICHAEL NASSERFAR | 15218018130 | 12/30/2014 | 200,000 | | | | | |
| BYTHEWOOD, BENJAMIN | 152180 | MICHAEL NASSERFAR | 15218014968 | 04/25/2014 | 124,800 | | | | | |
| CALLAWAY, DANIEL | 152180 | MICHAEL NASSERFAR | 15218014236 | 03/31/2014 | 417,000 | | | | | |
| CALVERT, MEREDITH | 152180 | MICHAEL NASSERFAR | 15218014371 | 03/27/2014 | 417,000 | | | | 100.00 | |
| CALVILLO, EFREN | 152180 | MICHAEL NASSERFAR | 15200000685 | 06/27/2014 | 355,132 | | | | 200.00 | |
| CANTU, PATRICIA | 152180 | MICHAEL NASSERFAR | 15200001019 | 02/21/2014 | 294,500 | | | | 200.00 | |
| CARMICHAEL, ALLISON | 152180 | MICHAEL NASSERFAR | 15201005650 | 05/28/2014 | 203,974 | | | | | |
| CARMICHAEL, DANIEL | 152180 | MICHAEL NASSERFAR | 15201005682 | 03/21/2014 | 191,973 | | | | | |
| CARTER, MATTHEW | 152180 | MICHAEL NASSERFAR | 15218016057 | 12/23/2014 | 100,000 | | | | | |
| CHAMBERS, PAMELA | 152180 | MICHAEL NASSERFAR | 15218016822 | 11/18/2014 | 261,742 | | | | | |
| CHAO, MAYRA | 152180 | MICHAEL NASSERFAR | 15218016996 | 11/19/2014 | 218,538 | | | | | |
| CHASTAIN, GREG | 152180 | MICHAEL NASSERFAR | 15218017829 | 12/30/2014 | 298,581 | | | | | |
| CHRISTMAN, RICHARD | 152180 | MICHAEL NASSERFAR | 15218021463 | 12/30/2014 | 356,250 | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000368

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  | -1,793.90 |  |  |  | 2,085.00 | 6,255.00 | 6,546.10 |
|  |  |  | -265.10 |  |  |  | 967.50 | 2,902.50 | 3,604.90 |
|  |  |  | -99.70 |  |  |  | 1,185.92 | 3,560.75 | 4,647.97 |
|  |  |  |  |  |  |  | 1,378.40 | 3,720.00 | 5,096.40 |
|  |  |  |  |  |  |  | 4,349.31 | 6,255.00 | 10,604.31 |
|  |  |  | -1,843.14 |  |  |  | 2,085.00 | 6,255.00 | 6,496.86 |
|  |  |  | -1,182.00 |  |  |  | 1,653.17 | 4,989.51 | 5,470.68 |
|  |  |  | -2,500.00 |  |  |  | 1,471.70 | 3,504.05 | 2,475.75 |
|  |  |  | -4,500.00 |  |  |  | 2,029.90 | 4,795.05 | 2,324.95 |
|  |  | 19.03 |  |  |  |  | 897.75 | 2,893.25 | 3,810.03 |
|  |  |  | -402.31 |  |  |  | 1,135.00 | 3,405.60 | 4,137.69 |
|  |  |  | -2,500.00 |  |  |  | 1,616.00 | 3,000.00 | 2,146.00 |
|  |  |  |  |  |  |  | 3,616.09 | 3,684.87 | 7,300.96 |
|  |  |  | -323.26 |  |  |  | 1,010.35 | 3,031.05 | 3,718.14 |
|  |  |  | -2,500.00 |  |  |  | 3,987.71 | 3,769.21 | 5,236.92 |
|  |  |  |  |  |  |  | 8,341.50 | 4,500.00 | 12,841.50 |
|  |  |  |  |  |  |  | 239.62 | 2,246.40 | 2,486.02 |
|  |  |  | -1,665.40 |  |  |  | 3,602.88 | 6,255.00 | 8,192.48 |
|  |  |  | -783.96 |  |  |  | 2,085.00 | 6,255.00 | 7,656.04 |
|  |  |  |  |  |  |  | 5,263.16 | 5,926.98 | 11,190.14 |
|  |  |  | -200.00 |  |  |  | 1,728.72 | 4,417.50 | 6,346.22 |
|  |  |  | -200.00 |  |  |  | 305.96 | 3,671.53 | 3,777.49 |
|  |  |  |  |  |  |  | 1,839.11 | 2,879.60 | 4,718.71 |
|  |  |  | -2,500.00 |  |  |  | 719.00 | 1,500.00 | -281.00 |
|  |  |  | -3,677.84 |  |  |  | 392.61 | 4,500.00 | 1,214.77 |
|  |  |  | -2,500.00 |  |  |  | 1,346.19 | 3,278.07 | 2,124.26 |
|  |  |  | -3,222.57 |  |  |  | 1,492.91 | 4,478.72 | 2,749.06 |
|  |  |  | -2,500.00 |  |  |  | 2,269.31 | 5,343.75 | 5,113.08 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000369

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| CRAIG\| TIMOTHY | 152180 | MICHAEL NASSERFAR | 15201006269 | 04/18/2014 | 301,750 | | | | | |
| CROSS\| KYLE | 152180 | MICHAEL NASSERFAR | 15218014852 | 12/19/2014 | 355,932 | | | | | |
| CUTBIRTH\| PRESTON | 152180 | MICHAEL NASSERFAR | 15218019569 | 10/10/2014 | 192,000 | | | | | |
| DEWALD\| WESLEY | 152180 | MICHAEL NASSERFAR | 15218017239 | 12/31/2014 | 281,408 | | | | | |
| DIMBERO\| EDWARD | 152180 | MICHAEL NASSERFAR | 15218014701 | 11/14/2014 | 417,000 | | | | | |
| DITOMMASO\| JAMES | 152180 | MICHAEL NASSERFAR | 15200000841 | 06/12/2014 | 218,801 | | | | | |
| ERNST\| JAMES | 152180 | MICHAEL NASSERFAR | 15218017582 | 12/30/2014 | 358,370 | | | | 200.00 | |
| FOLTZ\| ANGELA | 152180 | MICHAEL NASSERFAR | 15200000782 | 05/02/2014 | 281,660 | | | | 200.00 | |
| FORREST\| JAMES | 152180 | MICHAEL NASSERFAR | 15201006405 | 05/23/2014 | 284,138 | | | | | |
| GAINES\| AMOS | 152180 | MICHAEL NASSERFAR | 15218018474 | 10/30/2014 | 328,383 | | | | | |
| GARDINIER\| JOSEPH | 152180 | MICHAEL NASSERFAR | 15201005792 | 02/27/2014 | 280,603 | | | | | |
| GARWOOD\| MINDY | 152180 | MICHAEL NASSERFAR | 15218017405 | 07/16/2014 | 284,800 | | | | | |
| GLADNEY\| BURNETT | 152180 | MICHAEL NASSERFAR | 15201006508 | 05/23/2014 | 197,303 | | | | | |
| GOINS\| MICHAEL | 152180 | MICHAEL NASSERFAR | 15218018184 | 10/31/2014 | 295,621 | | | | | |
| GRAY\| CYNTHIA | 152180 | MICHAEL NASSERFAR | 15218015003 | 04/17/2014 | 380,000 | | | | | |
| GREEN\| CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15218015318 | 10/31/2014 | 381,809 | | | | | |
| GREEN\| BRIAN | 152180 | MICHAEL NASSERFAR | 15201005280 | 05/20/2014 | 417,000 | | | | | |
| HARRIS\| KRISTAL | 152180 | MICHAEL NASSERFAR | 15218020471 | 11/21/2014 | 270,244 | | | | | |
| HERNANDEZ\| MARISSA | 152180 | MICHAEL NASSERFAR | 15201005997 | 04/02/2014 | 328,579 | | | | | |
| HERNANDEZ\| OTTO | 152180 | MICHAEL NASSERFAR | 15218014375 | 05/12/2014 | 310,880 | | | | 100.00 | |
| HOBBS\| MATTHEW | 152180 | MICHAEL NASSERFAR | 15201006465 | 02/25/2014 | 292,471 | | | | | |
| HUCKABA\| SETH | 152180 | MICHAEL NASSERFAR | 15201006416 | 09/20/2014 | 244,725 | | | | | |
| HULBERT\| COLLIN | 152180 | MICHAEL NASSERFAR | 15201006074 | 05/23/2014 | 252,012 | | | | | |
| HUNT\| CHARLES | 152180 | MICHAEL NASSERFAR | 15218017332 | 12/19/2014 | 284,769 | | | | | |
| JOLY\| DAINA | 152180 | MICHAEL NASSERFAR | 15218016240 | 08/14/2014 | 398,187 | | | | | |
| JOYNER\| ROGDELL | 152180 | MICHAEL NASSERFAR | 15201006285 | 09/30/2014 | 284,047 | | | | | |
| KASTAK\| WILLIAM | 152180 | MICHAEL NASSERFAR | 15201003599 | 02/28/2014 | 417,000 | | | | | |
| KIMPEL\| THOMAS | 152180 | MICHAEL NASSERFAR | 15201005970 | 03/05/2014 | 240,138 | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000370

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 6,538.92 | 4,500.00 | 11,038.92 |
| | | | -323.90 | | | | 1,779.66 | 5,338.98 | 6,794.74 |
| | | | | | | | 1,305.60 | 2,880.00 | 4,185.60 |
| | | | -2,500.00 | | | | 2,645.24 | 4,221.12 | 4,366.36 |
| | | | | | | | 3,448.11 | 3,282.02 | 6,728.13 |
| | | | -2,225.00 | | | | 6,004.80 | 6,255.00 | 10,033.90 |
| | | | -3,273.32 | | | | 4,454.63 | 5,345.55 | 6,526.86 |
| | | | -6,506.39 | | | | 4,289.77 | 4,500.00 | 2,463.38 |
| | | 17.51 | | | | | 5,481.03 | 4,262.07 | 9,760.61 |
| | | | -1,148.40 | | | | 1,893.92 | 4,272.00 | 5,017.52 |
| | | | -200.00 | | | | 1,478.78 | 4,209.05 | 5,467.83 |
| | | | -2,500.00 | | | | 4,154.05 | 4,925.75 | 6,579.80 |
| | | | -1,484.77 | | | | 1,900.00 | 5,700.00 | 6,115.23 |
| | | | -1,184.90 | | | | 443.43 | 3,758.53 | 3,758.53 |
| | | | -855.77 | | | | 295.95 | 3,551.45 | 3,191.83 |
| | | | -1,185.40 | | | | 7,082.55 | 5,727.14 | 11,624.29 |
| | | 20.18 | -2,101.90 | | | | 2,085.00 | 6,255.00 | 6,258.28 |
| | | | -3,184.26 | | | | 1,351.22 | 4,053.66 | 2,220.62 |
| | | | -1,610.04 | | | | 1,642.90 | 4,928.69 | 4,961.55 |
| | | | -1,494.77 | | | | 6,062.16 | 4,663.20 | 10,825.36 |
| | | 17.51 | -81.98 | | | | 438.71 | 4,500.00 | 4,874.24 |
| | | | -378.65 | | | | 1,223.63 | 3,670.88 | 4,515.86 |
| | | | | | | | 1,260.06 | 3,780.18 | 5,040.24 |
| | | | -2,995.50 | | | | 1,423.85 | 4,271.54 | 2,669.89 |
| | | | -1,322.40 | | | | 1,990.94 | 5,972.81 | 6,641.35 |
| | | | -200.00 | | | | 3,809.07 | 4,260.71 | 7,869.78 |
| | | 13.56 | -2,572.90 | | | | 4,820.52 | 6,255.00 | 8,516.18 |
| | | | -302.57 | | | | 1,200.69 | 3,602.07 | 4,500.19 |

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| KIM\| MCKINLEY | 152180 | MICHAEL NASSERFAR | 15201006070 | 04/25/2014 | 329,287 | | | | | |
| KING\| ROCKWELL | 152180 | MICHAEL NASSERFAR | 15218014204 | 09/15/2014 | 374,261 | | | | 100.00 | |
| KRAHENBUHL\| CHRISTIAN | 152180 | MICHAEL NASSERFAR | 15218016859 | 09/15/2014 | 188,000 | | | | | |
| LAFRANCE\| KEVIN | 152180 | MICHAEL NASSERFAR | 15218014654 | 08/08/2014 | 243,692 | | | | | |
| LAIS\| ERIC | 152180 | MICHAEL NASSERFAR | 15218015137 | 08/28/2014 | 216,000 | | | | | |
| LANTHIER\| KURT | 152180 | MICHAEL NASSERFAR | 15201005903 | 11/18/2014 | 417,000 | | | | | |
| LANTRIP\| LAURA | 152180 | MICHAEL NASSERFAR | 15201006589 | 08/09/2014 | 300,000 | | | | 200.00 | |
| LAUGHLIN\| AARON | 152180 | MICHAEL NASSERFAR | 15218014829 | 09/29/2014 | 247,233 | | | | | |
| LEE\| PAUL | 152180 | MICHAEL NASSERFAR | 15201006356 | 05/27/2014 | 256,196 | | | | | |
| LIESMAN\| MATTHEW | 152180 | MICHAEL NASSERFAR | 15218017883 | 07/31/2014 | 250,376 | | | | | |
| LILJEGREN\| JENNIFER | 152180 | MICHAEL NASSERFAR | 15200000720 | 09/26/2014 | 264,000 | | | | 200.00 | |
| LITTLE\| KRISTINA | 152180 | MICHAEL NASSERFAR | 15218020360 | 12/18/2014 | 399,920 | | | | | |
| LOZANO\| TIMOTHY | 152180 | MICHAEL NASSERFAR | 15201006525 | 05/22/2014 | 145,000 | | | | | |
| LUTOSTANSKI NICHOLAS | 152180 | MICHAEL NASSERFAR | 15218020108 | 12/19/2014 | 230,347 | | 1,450.00 | | | |
| MATTINGLY\| LLOYD | 152180 | MICHAEL NASSERFAR | 15200000934 | 09/26/2014 | 205,161 | | | | 200.00 | |
| MCCASKILL\| GREGORY | 152180 | MICHAEL NASSERFAR | 15218014616 | 12/22/2014 | 234,800 | | | | | |
| METCALF\| RUSSELL | 152180 | MICHAEL NASSERFAR | 15218020292 | 06/30/2014 | 205,000 | | | | | |
| MOLANDER\| MATT | 152180 | MICHAEL NASSERFAR | 15200000304 | 06/02/2014 | 408,302 | | | | | |
| MOSSMAN\| FRANCES | 152180 | MICHAEL NASSERFAR | 15218015961 | 06/02/2014 | 322,413 | | | | 100.00 | |
| MUCK\| PAUL | 152180 | MICHAEL NASSERFAR | 15218014157 | 02/27/2014 | 251,363 | | | | 100.00 | |
| MYERS\| AMANDA | 152180 | MICHAEL NASSERFAR | 15218014041 | 10/21/2014 | 387,917 | | | | 100.00 | |
| MYERS\| ROBERT | 152180 | MICHAEL NASSERFAR | 15201005568 | 02/25/2014 | 372,339 | | | | | |
| NELSON\| WILLIAM | 152180 | MICHAEL NASSERFAR | 15218015773 | 05/29/2014 | 329,440 | | | | | |
| NEWTON\| WHITNEY | 152180 | MICHAEL NASSERFAR | 15200000719 | 02/10/2014 | 260,000 | | | | | |
| NGO\| HIEP | 152180 | MICHAEL NASSERFAR | 15218015719 | 10/30/2014 | 220,000 | | | | | |
| NGUYEN\| LINH | 152180 | MICHAEL NASSERFAR | 15200000804 | 02/14/2014 | 233,292 | | | | 200.00 | |
| NGUYEN\| TUONG | 152180 | MICHAEL NASSERFAR | 15218020112 | 11/13/2014 | 358,006 | | | | | |
| O'NEAL\| JANET | 152180 | MICHAEL NASSERFAR | 15201006053 | 05/08/2014 | 305,782 | | | | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000372

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| , | , | , | -5,597.54 | , | , | , | 6,970.58 | 4,500.00 | 5,873.04 |
| , | , | , | -2,282.99 | , | , | , | 1,871.31 | 5,613.92 | 5,302.24 |
| , | , | , | -1,064.08 | , | , | , | 292.00 | 3,384.00 | 2,501.92 |
| , | , | , | -1,191.65 | , | , | , | 3,046.15 | 3,655.88 | 5,509.88 |
| , | , | , | , | , | , | , | 1,831.88 | 3,240.00 | 5,071.88 |
| , | , | , | -2,537.80 | , | , | , | 3,252.60 | 6,255.00 | 6,969.80 |
| , | , | , | -1,610.40 | , | , | , | 2,970.00 | 4,500.00 | 6,059.60 |
| , | , | , | -135.98 | , | , | , | 1,236.17 | 3,708.50 | 4,808.69 |
| , | , | , | -200.00 | , | , | , | 1,657.59 | 3,842.94 | 5,300.53 |
| , | , | , | -1,029.05 | , | , | , | 3,129.70 | 3,755.64 | 5,856.29 |
| , | , | , | -132.00 | , | , | , | 1,320.00 | 3,960.00 | 5,348.00 |
| , | , | , | 600.00 | , | , | , | 1,999.60 | 5,998.80 | 7,398.40 |
| , | , | , | -1,609.40 | , | , | , | 725.00 | 2,175.00 | 2,650.60 |
| , | , | , | -2,992.94 | , | , | , | 1,151.74 | 3,455.22 | 1,814.02 |
| , | , | , | -171.11 | , | , | , | 1,030.81 | 3,092.42 | 4,152.12 |
| , | , | , | , | , | , | , | 1,174.00 | 3,522.00 | 4,696.00 |
| , | , | , | -2,500.00 | , | , | , | 1,025.00 | 3,075.00 | 1,600.00 |
| , | , | , | -1,709.64 | , | , | , | 2,041.51 | 6,124.53 | 6,556.40 |
| , | , | , | , | , | , | , | 1,508.89 | 4,500.00 | 6,008.89 |
| , | , | , | -4,175.80 | , | , | , | 4,265.63 | 3,770.45 | 8,136.08 |
| , | , | , | , | , | , | , | 1,939.59 | 5,818.76 | 3,682.55 |
| , | , | , | -85.64 | , | , | , | 1,861.70 | 6,008.89 | 6,276.06 |
| , | , | , | , | , | , | , | 2,095.24 | 4,500.00 | 7,036.84 |
| , | , | , | , | , | , | 3,075.00 | , | , | 3,075.00 |
| , | , | , | -2,673.80 | , | , | , | 1,100.00 | 3,300.00 | 1,726.20 |
| , | , | 45.66 | -323.64 | , | , | , | 3,499.38 | 3,499.38 | 6,920.78 |
| , | , | , | -2,504.00 | , | , | , | 2,255.44 | 5,370.09 | 5,121.53 |
| , | , | , | -168.18 | , | , | , | 458.67 | 4,500.00 | 4,780.49 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000373

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| O'NEAL\| JANET | 152180 | MICHAEL NASSERFAR | 15218014314 | 03/04/2014 | 142,500 | | · | · | 100.00 | · |
| OSBORNE\| LAWRENCE | 152180 | MICHAEL NASSERFAR | 15201008550 | 02/14/2014 | 240,619 | | · | · | 200.00 | · |
| OSTER\| SETH | 152180 | MICHAEL NASSERFAR | 15201006138 | 04/28/2014 | 290,403 | | · | · | | · |
| OTTO\| DANIEL | 152180 | MICHAEL NASSERFAR | 25213011538 | 02/26/2014 | 247,857 | | · | · | | · |
| PENE\| MATTHEW | 152180 | MICHAEL NASSERFAR | 15218017240 | 12/23/2014 | 245,000 | | · | · | | · |
| PHI\| HUNG | 152180 | MICHAEL NASSERFAR | 15218017759 | 05/09/2014 | 101,000 | | · | · | | · |
| PICANSO\| ROBIN | 152180 | MICHAEL NASSERFAR | 15218015742 | 08/29/2014 | 417,000 | | · | · | | · |
| RAJIN\| PRADHAN | 152180 | MICHAEL NASSERFAR | 15218018267 | 12/19/2014 | 280,000 | | · | · | | · |
| RAPISAND\| CYNTHIA | 152180 | MICHAEL NASSERFAR | 15201004202 | 02/12/2014 | 299,798 | | · | · | | · |
| RAY\| DARRELL | 152180 | MICHAEL NASSERFAR | 15218017759 | 11/14/2014 | 193,775 | | · | · | | · |
| RAY\| GERRY | 152180 | MICHAEL NASSERFAR | 15218021174 | 12/19/2014 | 308,582 | | · | · | | · |
| RIEDER\| MARK | 152180 | MICHAEL NASSERFAR | 15218014042 | 03/04/2014 | 417,000 | | · | · | 100.00 | · |
| RIVERS\| CLAY | 152180 | MICHAEL NASSERFAR | 15218018547 | 09/30/2014 | 279,752 | | · | · | | · |
| RYAN\| MARCUS | 152180 | MICHAEL NASSERFAR | 15218017333 | 12/19/2014 | 217,000 | | · | · | | · |
| SCHALCHLIN\| SCOTT | 152180 | MICHAEL NASSERFAR | 15201056384 | 09/30/2014 | 244,003 | | · | · | 200.00 | · |
| SHARP\| JAMES | 152180 | MICHAEL NASSERFAR | 1520000780 | 08/08/2014 | 903,602 | | · | · | | · |
| SHEARN\| KELLY | 152180 | MICHAEL NASSERFAR | 15201056250 | 07/11/2014 | 282,045 | | · | · | | · |
| SHEFFIELD\| AUSTIN | 152180 | MICHAEL NASSERFAR | 15201056540 | 07/07/2014 | 222,800 | | · | · | | · |
| SHOENFELT\| ADAM | 152180 | MICHAEL NASSERFAR | 15218019900 | 11/17/2014 | 181,600 | | · | · | 100.00 | · |
| SHUPE\| JAMES | 152180 | MICHAEL NASSERFAR | 15218014208 | 05/02/2014 | 168,036 | | · | · | 100.00 | · |
| SILVA\| TIFFANY | 152180 | MICHAEL NASSERFAR | 15201006582 | 03/14/2014 | 338,267 | | · | · | | · |
| SOLIMAN\| ARISTOTLE | 152180 | MICHAEL NASSERFAR | 152000XX658 | 03/18/2014 | 417,000 | | · | · | 200.00 | · |
| SOUCY\| LEE | 152180 | MICHAEL NASSERFAR | 15218019228 | 12/11/2014 | 319,500 | | · | · | 100.00 | · |
| STEVENS\| GLEN | 152180 | MICHAEL NASSERFAR | 15201006598 | 09/12/2014 | 316,358 | | · | · | 200.00 | · |
| STORY\| ADAM | 152180 | MICHAEL NASSERFAR | 15200001073 | 05/15/2014 | 289,279 | | · | · | 100.00 | · |
| STRICKLAND\| WILLIAM | 152180 | MICHAEL NASSERFAR | 15218016788 | 08/24/2014 | 462,000 | | · | · | | · |
| SUTPHEN\| CHRISTOPHER | 152180 | MICHAEL NASSERFAR | 15218015253 | 06/30/2014 | 312,022 | | · | · | | · |
| TAYLOR\| CARTER LORINDA | 152180 | MICHAEL NASSERFAR | 15218017106 | 10/24/2014 | 280,306 | | · | · | | · |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000374

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| . | . | . | 699.00 | . | . | . | 213.75 | 2,565.00 | 2,179.75 |
| . | . | 12.05 | -87.74 | . | . | . | 3,895.62 | 3,609.29 | 7,629.23 |
| . | . | . | . | . | . | . | 4,620.31 | 4,356.05 | 8,976.36 |
| . | . | . | -1,019.40 | . | . | . | 3,333.68 | 3,717.86 | 6,032.14 |
| . | . | . | -2,500.00 | . | . | . | 1,308.30 | 3,675.00 | 2,483.30 |
| . | . | . | -241.39 | . | . | . | 151.50 | 1,818.00 | 1,728.11 |
| . | . | . | -1,897.40 | . | . | . | 3,753.00 | 6,255.00 | 8,310.60 |
| . | . | . | -1,936.40 | . | . | . | 1,425.20 | 4,500.00 | 3,988.80 |
| . | . | . | -3,049.79 | . | . | . | 1,493.99 | 4,481.97 | 2,928.17 |
| . | . | . | . | . | . | . | 3,724.38 | 2,906.63 | 6,630.99 |
| . | . | . | -392.84 | . | . | . | 3,050.04 | 3,660.05 | 6,517.25 |
| . | . | . | -5,665.58 | . | . | . | 1,690.07 | 3,255.00 | 3,279.67 |
| . | . | . | -1,762.53 | . | . | . | 4,518.01 | 13,554.03 | 12,408.46 |
| . | . | . | -873.38 | . | . | . | 1,410.23 | 4,230.68 | 3,878.38 |
| . | . | . | -2,183.04 | . | . | . | 1,114.00 | 3,342.00 | 3,582.62 |
| . | . | . | -3,132.62 | . | . | . | 1,398.76 | 4,195.28 | 2,462.42 |
| . | . | . | -505.07 | . | . | . | 625.50 | 4,500.00 | 2,942.46 |
| . | . | . | -1,865.40 | . | . | . | 1,542.91 | 4,628.73 | 5,765.57 |
| . | . | . | . | . | . | . | 2,826.37 | 2,520.54 | 5,446.91 |
| . | . | . | -1,500.00 | . | . | . | 1,859.66 | 3,268.80 | 3,737.46 |
| . | . | . | -2,000.00 | . | . | . | 1,798.20 | 5,074.01 | 5,070.21 |
| . | . | . | . | . | . | . | . | . | . |
| . | . | . | -563.12 | . | . | . | 2,722.14 | 4,792.50 | 7,514.64 |
| . | . | . | -1,655.25 | . | . | . | 474.54 | 4,500.00 | 4,611.42 |
| . | . | . | -7,841.50 | . | . | . | 1,441.40 | 4,324.19 | 4,210.34 |
| . | . | . | -8,740.44 | . | . | . | 693.00 | 4,500.00 | -2,648.50 |
| . | . | . | -2,500.00 | . | . | . | 1,560.11 | 4,680.33 | -2,500.00 |
| . | . | . | . | . | . | . | 2,976.85 | 4,204.59 | 4,681.44 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000375

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|
| TINSLEY| LAWRENCE | 152180 | MICHAEL NASSERFAR | 15200000950 | 05/05/2014 | 164,000 | | | | |
| TUCCIARONE| CAROLYNN | 152180 | MICHAEL NASSERFAR | 15201008482 | 05/27/2014 | 110,000 | | | 200.00 | |
| VALDEZ| ALFREDO | 152180 | MICHAEL NASSERFAR | 15218014569 | 09/11/2014 | 195,024 | | | 200.00 | |
| VASQUEZ| BRANDON | 152180 | MICHAEL NASSERFAR | 15218014514 | 09/15/2014 | 369,323 | | | | |
| WARNER| JESSE | 152180 | MICHAEL NASSERFAR | 15218016787 | 05/23/2014 | 269,699 | | | | |
| WHITE| JOHN | 152180 | MICHAEL NASSERFAR | 15218014883 | 09/26/2014 | 292,968 | | | | |
| WILLIAMS| TERRIN | 152180 | MICHAEL NASSERFAR | 15201005715 | 03/28/2014 | 302,706 | | | | |
| WOLFER| JOSHUA | 152180 | MICHAEL NASSERFAR | 15201005950 | 03/28/2014 | 315,768 | | | | |
| WOLFSHOHL| SAM | 152180 | MICHAEL NASSERFAR | 15201006191 | 05/08/2014 | 215,594 | | | | |
| WOODRUFF| STEVEN | 152180 | MICHAEL NASSERFAR | 15218016213 | 12/22/2014 | 309,933 | | | | |
| WRIGHT| THERESA | 152180 | MICHAEL NASSERFAR | 15218020226 | 10/31/2014 | 159,920 | | | | |
| BASHAM| TIMOTHY | 152180 | MICHAEL TASK | 15218016669 | 08/06/2014 | 71,500 | | | | |
| CASH| PAUL | 152180 | MICHAEL TASK | 15201005605 | 04/29/2014 | 293,600 | | | | |
| COBB| FRANK | 152180 | MICHAEL TASK | 15201013778 | 02/24/2014 | 148,500 | | | | |
| COBB| TOM | 152180 | MICHAEL TASK | 15218015491 | 05/21/2014 | 217,920 | | | | |
| COHEN| ELIETTE | 152180 | MICHAEL TASK | 15218014921 | 04/21/2014 | 322,500 | | | | |
| COKER |RONALD | 152180 | MICHAEL TASK | 15218014758 | 07/09/2014 | 281,334 | | | | |
| FROELICH| JOHN | 152180 | MICHAEL TASK | 15218015971 | 05/14/2014 | 340,000 | | | | |
| HACKNEY| CLINTON | 152180 | MICHAEL TASK | 15218013892 | 04/04/2014 | 400,000 | | | | |
| HATT| DANIEL | 152180 | MICHAEL TASK | 15201003974 | 04/23/2014 | 277,285 | | | | |
| HRYNYK| TREVOR | 152180 | MICHAEL TASK | 15218015270 | 05/20/2014 | 318,750 | | | | |
| KELLY, JR| WILLIAM | 152180 | MICHAEL TASK | 15201003484 | 03/27/2014 | 255,200 | | | | |
| LAMM| TONY | 152180 | MICHAEL TASK | 15218015065 | 05/22/2014 | 200,000 | | | | |
| LEE| IL | 152180 | MICHAEL TASK | 15201006549 | 05/06/2014 | 106,172 | | | 200.00 | |
| LIM| JIN WOO | 152180 | MICHAEL TASK | 15201005057 | 05/14/2014 | 91,350 | | | | |
| MAULDIN| HEATHER | 152180 | MICHAEL TASK | 15201006450 | 01/09/2014 | 209,000 | | | | |
| RHINEHART| BROOKS | 152180 | MICHAEL TASK | 15201004721 | 04/21/2014 | 291,750 | | | | |
| RIGBY| EMILY | 152180 | MICHAEL TASK | 15218016654 | 06/13/2014 | 140,160 | | | | |

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2,842.12 | 2,460.00 | 5,502.12 |
| | | | -3,000.00 | | | | 550.00 | -650.00 | -650.00 |
| | | | -423.20 | | | | 975.12 | 2,925.35 | 3,477.23 |
| | | | -915.07 | | | | 1,846.62 | 5,539.85 | 6,471.40 |
| | | | -1,818.19 | | | | 1,348.50 | 4,045.49 | 3,575.80 |
| | | | | | | | 2,135.74 | 4,394.52 | 6,550.28 |
| | | | | | | | 5,261.04 | 4,540.59 | 9,801.63 |
| | | | | | | | 2,374.58 | 4,736.49 | 7,111.05 |
| | | | | | | | 332.01 | 3,890.69 | 4,212.70 |
| | | | -3,237.40 | | | | 1,549.17 | 4,647.49 | 2,959.26 |
| | | | | | | | 1,119.44 | 2,308.80 | 3,518.24 |
| | | | | | | | 357.50 | 1,072.50 | 1,430.00 |
| | | | -2,728.26 | | | | 1,468.00 | 4,404.00 | 3,145.74 |
| | | | -74.25 | | | | 742.50 | 2,227.50 | 2,345.75 |
| | | | -274.58 | | | | 1,089.60 | 3,268.80 | 4,083.02 |
| | -550.00 | | | | | 3,400.00 | - | - | 3,400.00 |
| | | | | | | 4,475.00 | - | - | 4,475.00 |
| | | | | | | | 2,141.40 | 4,837.50 | 6,978.90 |
| | | | | | | 12,376.21 | - | 12,376.21 | 12,376.21 |
| | | | -2,076.40 | | | | 4,291.28 | 4,159.28 | 6,364.16 |
| | | | | | | | 2,393.81 | 4,781.25 | 7,175.06 |
| | | | | | | | 1,276.00 | 3,828.00 | 5,104.00 |
| | | | | | | | 2,110.00 | 3,000.00 | 5,110.00 |
| | | | | | | | 803.72 | 1,592.58 | 2,595.30 |
| | | 13.56 | | | | | 549.01 | 1,370.25 | 1,932.82 |
| | | | -500.00 | | | | 313.50 | 3,762.00 | 3,575.50 |
| | | | -242.15 | | | | 1,458.75 | 4,376.25 | 5,592.85 |
| | | | | | | | 2,447.19 | 2,102.40 | 4,549.59 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000377

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| ROMANYK| ANDREW | 152180 | MICHAEL TASK | 15218015886 | 05/30/2014 | 224,250 | | . | . | . | . |
| SEYMOUR| ADAM | 152180 | MICHAEL TASK | 15201004685 | 04/30/2014 | 218,367 | | . | . | . | . |
| WARREN | EMILY | 152180 | MICHAEL TASK | 15200000868 | 02/28/2014 | 293,400 | | . | . | 100.00 | . |
| WILSON| TAYLOR | 152180 | MICHAEL TASK | 15218015596 | 06/10/2014 | 252,398 | | . | . | . | . |
| MATTHEWS| CHRISTOPHER | 152180 | TY GOSNAY | 15218017793 | 08/08/2014 | 213,750 | | . | . | . | . |
| | | | | | $52,791,598 | | $4,194.11 | $0.00 | $5,100.00 | $0.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000378

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| . | . | . | . | . | . | 2,717.50 | . | . | 2,717.50 |
| . | . | . | . | . | . | . | 2,801.65 | 3,275.51 | 6,077.18 |
| . | . | . | . | . | . | . | 2,402.95 | 4,401.00 | 6,903.95 |
| . | . | . | . | . | . | 2,327.50 | . | . | 2,327.50 |
| . | . | . | -288.46 | . | . | . | 1,068.75 | 3,208.25 | 3,966.54 |
| $0.00 | -$550.00 | $230.94 | -$215,279.44 | $0.00 | $0.00 | $34,590.56 | $376,013.95 | $766,422.32 | $960,724.44 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000379

General Ledger By Branch
Company Name: (APF) Ameripro Funding, Inc.
From: 10000
To: 99995

For Branch: 152180 (Nasserfar)

From: 1/1/2014
To: 5/31/2014

G/L Number
41355-152180

G/L Desc / Vendor
Application Fee Income

| Transaction Desc | Invoice Numb | Bank | Db | Ref # | JR | Date | Beg Bal | Debit | Credit | End Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 0 | | |
| 15218013719|HAYGOOD| LANE | | | | 12013495 | JE | 2/13/2014 | | | 200 |
| 15201006560|OSBORNE| LAWRENCE | | | | 12013539 | JE | 2/14/2014 | | | 200 |
| 15200000804|NGUYEN| LINH | | | | 12013541 | JE | 2/14/2014 | | | 200 |
| 15200000851|FURGERSON| BRITTNEY | | | | 12013589 | JE | 2/18/2014 | | | 100 |
| 15200001019|CANTU| PATRICIA | | | | 12013755 | JE | 2/21/2014 | | | 200 |
| 15201006580|MOKHTAR| MOHAMED | | | | 12013832 | JE | 2/25/2014 | | | 100 |
| 15218014157|MUCK| PAUL | | | | 12013912 | JE | 2/27/2014 | | | 100 |
| 15200000734|BOX| JACLYN | | | | 12014014 | JE | 2/28/2014 | | | 200 |
| 15200000868|WARREN | EMILY | | | | 12014015 | JE | 2/28/2014 | | | 100 |
| 15218014314|O'NEAL| JANET | | | | 12014312 | JE | 3/4/2014 | | | 100 |
| 15201005779|AVERY| MARK | | | | 12014534 | JE | 3/12/2014 | | | 200 |
| 15201006582|SHUPE| JAMES | | | | 12044403 | JE | 3/14/2014 | | | 100 |
| 15200000668|SILVA| TIFFANY | | | | 12044507 | JE | 3/18/2014 | | | 200 |
| 15218014371|CALVERT| MEREDITH | | | | 12044803 | JE | 3/27/2014 | | | 100 |
| 15200000720|LILJEGREN| JENNIFER | | | | 12046130 | JE | 4/17/2014 | | | 200 |
| 15218014208|SHOENFELT| ADAM | | | | 12046985 | JE | 5/2/2014 | | | 100 |
| 15200000782|FOLTZ| ANGELA | | | | 12046990 | JE | 5/2/2014 | | | 200 |
| 15200000950|TINSLEY| LAWRENCE | | | | 12047034 | JE | 5/5/2014 | | | 200 |
| 15201006549|LEE| IL | | | | 12047038 | JE | 5/5/2014 | | | 200 |
| 15218014375|HERNANDEZ| OTTO | | | | 12047368 | JE | 5/12/2014 | | | 100 |
| 15201006588|STEVENS| GLEN | | | | 12047527 | JE | 5/15/2014 | | | 200 |
| 15201006482|TUCCIARONE| CAROLYNN | | | | 12048001 | JE | 5/27/2014 | | | 200 |

Total JE: 0 3,500.00

Total for 41355-152180 : -3,500.00

41357-152180   Credit Report Fee Income

| | | | | | | | | | 0 | |
|---|---|---|---|---|---|---|---|---|---|---|
| 15218013719|HAYGOOD| LANE | | | | 12013495 | JE | 2/13/2014 | | | 20.18 |
| 15201006560|OSBORNE| LAWRENCE | | | | 12013539 | JE | 2/14/2014 | | | 12.06 |
| 15200000804|NGUYEN| LINH | | | | 12013541 | JE | 2/14/2014 | | | 45.66 |
| 15201006465|HOBBS| MATHEW | | | | 12013877 | JE | 2/26/2014 | | | 17.51 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000380

| | | | | |
|---|---|---|---|---|
| 15201006112 |LEE| WOOJIN | 12013878 JE | 2/26/2014 | 13.56 |
| 15200000734 |BOX| JACLYN | 12014014 JE | 2/28/2014 | 19.03 |
| 15201003599 |KASTAK| WILLIAM | 12014018 JE | 2/28/2014 | 13.56 |
| 15201005280 |GREEN| BRIAN | 12047688 JE | 5/20/2014 | 20.18 |
| 15201006405 |FORREST| JAMES | 12047927 JE | 5/23/2014 | 17.51 |
| | | Total JE: | 0 | 179.25 |

Total for 41357-152180 :    0    -179.25

## 41370-152180 Processing Fees

| | | | | |
|---|---|---|---|---|
| 15201004961 BENTLEY| BARTON | 12013387 JE | 2/11/2014 | 475 |
| 15201004202 |RAJINA| PRADHAN | 12013422 JE | 2/12/2014 | 475 |
| 15218013719 |HAYGOOD| LANE | 12013495 JE | 2/13/2014 | 475 |
| 15201006560 |OSBORNE| LAWRENCE | 12013539 JE | 2/14/2014 | 475 |
| 15200000804 |NGUYEN| LINH | 12013541 JE | 2/14/2014 | 475 |
| 15200000851 |FURGERSON| BRITTNEY | 12013589 JE | 2/18/2014 | 495 |
| 15200001019 |CANTU| PATRICIA | 12013755 JE | 2/21/2014 | 475 |
| 15201005565 |BOLLAMPALLY| SIRISHA | 12013801 JE | 2/24/2014 | 475 |
| 15201005568 |MYERS| ROBERT | 12013831 JE | 2/25/2014 | 475 |
| 15201006580 |MOKHTAR| MOHAMED | 12013832 JE | 2/25/2014 | 200 |
| 15201006465 |HOBBS| MATTHEW | 12013877 JE | 2/26/2014 | 475 |
| 25213011538 |OTTO| DANIEL | 12013886 JE | 2/26/2014 | 475 |
| 15201005792 |GARDINIER| JOSEPH | 12013909 JE | 2/27/2014 | 475 |
| 15218014157 |MUCK| PAUL | 12013912 JE | 2/27/2014 | 575 |
| 15200000734 |BOX| JACLYN | 12014014 JE | 2/28/2014 | 475 |
| 15200000868 |WARREN | EMILY | 12014015 JE | 2/28/2014 | 575 |
| 15201003599 |KASTAK| WILLIAM | 12014018 JE | 2/28/2014 | 475 |
| | | Total JE: | 0 | 8,020.00 |

Total for 41370-152180 :    -8,020.00

## 41380-152180 Branch Admin Fee

| | | | | |
|---|---|---|---|---|
| 15218013778 COBB| FRANK | 12013804 JE | 2/24/2014 | 550 |
| | | Total JE: | 0 | 550 |

Total for 41380-152180 :    550

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000381

**41860-152180  Brokered Loan Fee Income**

| Account / Name | JE | Date | | | Amount |
|---|---|---|---|---|---|
| 15200000719 NEWTON| WHITNEY | 12014305 JE | 2/7/2014 | | | 3,075.00 |
| 15218013892 HACKNEY| CLINTON | 12045740 JE | 3/20/2014 | | | 4,475.00 |
| Total JE: | | | 0 | 0 | 7,550.00 |

Total for 41860-152180 :    -7,550.00

**42300-152180  Premium Discount - Lo**

1.5%

| Account / Name | JE | Date | | | Amount |
|---|---|---|---|---|---|
| 15201005716|THOMAS| VICTOR | 12013121 JE | 2/3/2014 | | | 4,500.00 |
| 15201005079|PALLADINO| ANDREA | 12013122 JE | 2/3/2014 | | | 4,500.00 |
| 15201004961 BENTLEY| BARTON | 12013387 JE | 2/11/2014 | | | 3,560.75 |
| 15201004202|RAJINA| PRADHAN | 12013422 JE | 2/12/2014 | | | 4,500.00 |
| 15218013719|HAYGOOD| LANE | 12013495 JE | 2/13/2014 | | | 3,472.05 |
| 15201006560|OSBORNE| LAWRENCE | 12013539 JE | 2/14/2014 | | | 3,609.29 |
| 15200000804|NGUYEN| LINH | 12013541 JE | 2/14/2014 | | | 3,499.38 |
| 15201005739|ADAMS| ALFRED | 12013545 JE | 2/14/2014 | | | 3,471.63 |
| 15200000851|FURGERSON| BRITTNEY | 12013589 JE | 2/18/2014 | | | 1,890.00 |
| 15200001019|CANTU| PATRICIA | 12013755 JE | 2/21/2014 | | | 4,417.50 |
| 15201005565|BOLLAMPALLY| SIRISHA | 12013801 JE | 2/24/2014 | | | 4,989.51 |
| 15218013778 COBB| FRANK | 12013804 JE | 2/24/2014 | | | 2,227.50 |
| 15201005568|MYERS| ROBERT | 12013831 JE | 2/25/2014 | | | 4,500.00 |
| 15201006580|MOKHTAR| MOHAMED | 12013832 JE | 2/25/2014 | | | 6,255.00 |
| 15201006465|HOBBS| MATTHEW | 12013877 JE | 2/26/2014 | | | 4,500.00 |
| 15201006112|LEE| WOOJIN | 12013878 JE | 2/26/2014 | | | 1,440.00 |
| 15201006088|HONG| WOOKYOUNG | 12013881 JE | 2/26/2014 | | | 1,462.50 |
| 25213011538|OTTO| DANIEL | 12013886 JE | 2/26/2014 | | | 3,717.86 |
| 15201005792|GARDINIER| JOSEPH | 12013909 JE | 2/27/2014 | | | 4,209.05 |
| 15218014157|MUCK| PAUL | 12013912 JE | 2/27/2014 | | | 3,770.45 |
| 15200000734|BOX| JACLYN | 12014014 JE | 2/28/2014 | | | 2,693.25 |
| 15200000868|WARREN | EMILY | 12014015 JE | 2/28/2014 | | | 4,401.00 |
| 15201003599|KASTAK| WILLIAM | 12014018 JE | 2/28/2014 | | | 6,255.00 |
| 15218014314|O'NEAL| JANET | 12014312 JE | 3/4/2014 | | | 2,565.00 |
| 15201005870|KIMPEL| THOMAS | 12014322 JE | 3/5/2014 | | | 3,602.07 |
| 15201005779|AVERY| MARK | 12014534 JE | 3/12/2014 | | | 4,518.90 |
| 15201006582| SHUPE| JAMES | 12044403 JE | 3/14/2014 | | | 2,520.54 |
| 15200000668|SILVA| TIFFANY | 12044507 JE | 3/18/2014 | | | 5,074.01 |
| 15218014644|BEARD| JESSE | 12044747 JE | 3/26/2014 | | | 3,000.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000382

| | | | |
|---|---|---|---|
| 15201003484|KELLY, JR| WILLIAM | 12044801 JE | 3/27/2014 | 3,828.00 |
| 15218014371|CALVERT| MEREDITH | 12044803 JE | 3/27/2014 | 6,255.00 |
| 15218014616|MCCASKILL| GREGORY | 12044805 JE | 3/27/2014 | 3,522.00 |
| 15218014236|CALLAWAY| DANIEL | 12044988 JE | 3/31/2014 | 6,255.00 |
| 15200000720|LILJEGREN| JENNIFER | 12046130 JE | 4/17/2014 | 3,960.00 |
| 15218015003|GRAY| CYNTHIA | 12046141 JE | 4/17/2014 | 5,700.00 |
| 15201006269|CRAIG| TIMOTHY | 12046200 JE | 4/18/2014 | 4,500.00 |
| 15218014921|COHEN| ELIETTE | 12046251 JE | 4/21/2014 | 4,837.50 |
| 15201004721|RHINEHART| BROOKS | 12046253 JE | 4/21/2014 | 4,376.25 |
| 15201006070|KIM| MCKINLEY | 12046430 JE | 4/25/2014 | 4,500.00 |
| 15218014968|BYTHEWOOD| BENJIMAN | 12046435 JE | 4/25/2014 | 2,246.40 |
| 15201004685|SEYMOUR| ADAM | 12046626 JE | 4/30/2014 | 3,275.51 |
| 15218015177|CAMERON| CHRISTOPHER | 12046964 JE | 5/1/2014 | 6,200.00 |
| 15218014208|SHOENFELT| ADAM | 12046985 JE | 5/2/2014 | 3,268.80 |
| 15200000782|FOLTZ| ANGELA | 12046990 JE | 5/2/2014 | 4,500.00 |
| 15200000950|TINSLEY| LAWRENCE | 12047034 JE | 5/5/2014 | 2,460.00 |
| 15201006549|LEE| IL | 12047038 JE | 5/5/2014 | 1,592.58 |
| 15201006053|O'NEAL| JANET | 12047091 JE | 5/6/2014 | 4,500.00 |
| 15201006191|WOLFSHOHL| SAM | 12047092 JE | 5/6/2014 | 3,880.69 |
| 15218014561|BAILEY| JOHN | 12047093 JE | 5/6/2014 | 4,500.00 |
| 15218015742|PHI| HUNG | 12047286 JE | 5/9/2014 | 1,818.00 |
| 15218014375|HERNANDEZ| OTTO | 12047368 JE | 5/12/2014 | 4,663.20 |
| 15201006588|STEVENS| GLEN | 12047527 JE | 5/15/2014 | 4,500.00 |
| 15218015548|BRANCH| DAVID | 12047642 JE | 5/19/2014 | 4,500.00 |
| 15201005280|GREEN| BRIAN | 12047688 JE | 5/20/2014 | 6,255.00 |
| 15218015270|HRYNYK| TREVOR | 12047689 JE | 5/20/2014 | 4,781.25 |
| 15218015491|COBB| TOM | 12047753 JE | 5/21/2014 | 3,268.80 |
| 15218015065|LAMM| TONY | 12047835 JE | 5/22/2014 | 3,000.00 |
| 15201006030|BARICUATRO| MARICA | 12047917 JE | 5/23/2014 | 4,500.00 |
| 15201006508|GLADNEY| BURNETT | 12047920 JE | 5/23/2014 | 3,551.45 |
| 15201006074|HULBERT| COLLIN | 12047924 JE | 5/23/2014 | 3,780.18 |
| 15201006405|FORREST| JAMES | 12047927 JE | 5/23/2014 | 4,262.07 |
| 15201006482|TUCCIARONE| CAROLYNN | 12048001 JE | 5/27/2014 | 1,650.00 |
| 15201006507|CARMICHAEL| ALLISON | 12048074 JE | 5/28/2014 | 3,671.53 |

Total JE:　0　247,481.45

Total for 42300-152180 :　-247,481.45

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000383

42301-152180  Premium Discount - Branch

| Account / Name | Reference | | Date | | Amount |
|---|---|---|---|---|---|
| 15201005716\|THOMAS\| VICTOR | 12013121 JE | | 2/3/2014 | | 1,731.79 |
| 15201005716\|THOMAS\| VICTOR | 12013121 JE | | 2/3/2014 | | 1,431.23 |
| 15201005079\|PALLADINO\| ANDREA | 12013122 JE | | 2/3/2014 | | 1,785.80 |
| 15201004961 BENTLEY\| BARTON | 12013387 JE | | 2/11/2014 | | 1,186.92 |
| 15201004202\|RAJINA\| PRADHAN | 12013422 JE | | 2/12/2014 | | 420 |
| 15201004202\|RAJINA\| PRADHAN | 12013422 JE | | 2/12/2014 | | 1,005.20 |
| 15218013719\|HAYGOOD\| LANE | 12013495 JE | | 2/13/2014 | | 2,893.38 |
| 15218013719\|HAYGOOD\| LANE | 12013495 JE | | 2/13/2014 | | 168.97 |
| 15201006560\|OSBORNE\| LAWRENCE | 12013539 JE | | 2/14/2014 | | 887.88 |
| 15201006560\|OSBORNE\| LAWRENCE | 12013539 JE | | 2/14/2014 | | 3,007.74 |
| 15200000804\|NGUYEN\| LINH | 12013541 JE | | 2/14/2014 | | 3,499.38 |
| 15201005739\|ADAMS\| ALFRED | 12013545 JE | | 2/14/2014 | | 1,157.21 |
| 15201005739\|ADAMS\| ALFRED | 12013545 JE | | 2/14/2014 | | 1,150.27 |
| 15200000851\|FURGERSON\| BRITTNEY | 12013589 JE | | 2/18/2014 | | 630 |
| 15200000851\|FURGERSON\| BRITTNEY | 12013589 JE | | 2/18/2014 | | 554.4 |
| 15200001019\|CANTU\| PATRICIA | 12013755 JE | | 2/21/2014 | | 1,472.50 |
| 15200001019\|CANTU\| PATRICIA | 12013755 JE | | 2/21/2014 | | 256.22 |
| 15201005565\|BOLLAMPALLY\| SIRISHA | 12013801 JE | | 2/24/2014 | | 1,663.17 |
| 15218013778 COBB\| FRANK | 12013804 JE | | 2/24/2014 | | 742.5 |
| 15201005568\|MYERS\| ROBERT | 12013831 JE | | 2/25/2014 | | 1,861.70 |
| 15201006580\|MOKHTAR\| MOHAMED | 12013832 JE | | 2/25/2014 | | 2,085.00 |
| 15201006465\|HOBBS\| MATTHEW | 12013877 JE | | 2/26/2014 | | 438.71 |
| 15201006112\|LEE\| WOOJIN | 12013878 JE | | 2/26/2014 | | 423.36 |
| 15201006112\|LEE\| WOOJIN | 12013878 JE | | 2/26/2014 | | 480 |
| 15201006088\|HONG\| WOOKYOUNG | 12013881 JE | | 2/26/2014 | | 757.58 |
| 15201006088\|HONG\| WOOKYOUNG | 12013881 JE | | 2/26/2014 | | 487.5 |
| 25213011538\|OTTO\| DANIEL | 12013886 JE | | 2/26/2014 | | 2,094.39 |
| 25213011538\|OTTO\| DANIEL | 12013886 JE | | 2/26/2014 | | 1,239.29 |
| 15201005792\|GARDINIER\| JOSEPH | 12013909 JE | | 2/27/2014 | | 75.76 |
| 15201005792\|GARDINIER\| JOSEPH | 12013909 JE | | 2/27/2014 | | 1,403.02 |
| 15218014157\|MUCK\| PAUL | 12013912 JE | | 2/27/2014 | | 1,123.59 |
| 15218014157\|MUCK\| PAUL | 12013912 JE | | 2/27/2014 | | 3,142.04 |
| 15200000734\|BOX\| JACLYN | 12014014 JE | | 2/28/2014 | | 897.75 |
| 15200000868\|WARREN \| EMILY | 12014015 JE | | 2/28/2014 | | 1,467.00 |
| 15200000868\|WARREN \| EMILY | 12014015 JE | | 2/28/2014 | | 935.95 |

0

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000384

| Account | Last Name | First Name | JE Number | Date | Amount |
|---|---|---|---|---|---|
| 152010003599 | KASTAK | WILLIAM | 12014018 JE | 2/28/2014 | 2,085.00 |
| 152010003599 | KASTAK | WILLIAM | 12014018 JE | 2/28/2014 | 2,735.52 |
| 152018014314 | O'NEAL | JANET | 12014312 JE | 3/4/2014 | 213.75 |
| 152010005870 | KIMPEL | THOMAS | 12014322 JE | 3/5/2014 | 1,200.69 |
| 152010005779 | AVERY | MARK | 12014534 JE | 3/12/2014 | 3,765.75 |
| 152010005779 | AVERY | MARK | 12014534 JE | 3/12/2014 | 1,418.93 |
| 152010006582 | SHUPE | JAMES | 12044403 JE | 3/14/2014 | 2,100.45 |
| 152010006582 | SHUPE | JAMES | 12044403 JE | 3/14/2014 | 725.92 |
| 152000000668 | SILVA | TIFFANY | 12044507 JE | 3/18/2014 | 104.86 |
| 152000000668 | SILVA | TIFFANY | 12044507 JE | 3/18/2014 | 1,691.34 |
| 152018014644 | BEARD | JESSE | 12044747 JE | 3/26/2014 | 1,000.00 |
| 152010003484 | KELLY, JR | WILLIAM | 12044801 JE | 3/27/2014 | 1,276.00 |
| 152018014371 | CALVERT | MEREDITH | 12044803 JE | 3/27/2014 | 2,085.00 |
| 152018014616 | MCCASKILL | GREGORY | 12044805 JE | 3/27/2014 | 1,174.00 |
| 152018014236 | CALLAWAY | DANIEL | 12044988 JE | 3/31/2014 | 2,085.00 |
| 152018014236 | CALLAWAY | DANIEL | 12044988 JE | 3/31/2014 | 1,517.88 |
| 152000000720 | LILJEGREN | JENNIFER | 12046130 JE | 4/17/2014 | 1,320.00 |
| 152018015003 | GRAY | CYNTHIA | 12046141 JE | 4/17/2014 | 1,900.00 |
| 152010006269 | CRAIG | TIMOTHY | 12046200 JE | 4/18/2014 | 2,640.31 |
| 152010006269 | CRAIG | TIMOTHY | 12046200 JE | 4/18/2014 | 3,898.61 |
| 152018014921 | COHEN | ELIETTE | 12046251 JE | 4/21/2014 | 528.9 |
| 152018014921 | COHEN | ELIETTE | 12046251 JE | 4/21/2014 | 1,612.50 |
| 152010004721 | RHINEHART | BROOKS | 12046253 JE | 4/21/2014 | 1,458.75 |
| 152010006070 | KIM | MCKINLEY | 12046430 JE | 4/25/2014 | 6,476.68 |
| 152010006070 | KIM | MCKINLEY | 12046430 JE | 4/25/2014 | 493.9 |
| 152018014968 | BYTHEWOOD | BENJIMAN | 12046435 JE | 4/25/2014 | 52.42 |
| 152018014968 | BYTHEWOOD | BENJIMAN | 12046435 JE | 4/25/2014 | 187.2 |
| 152010004685 | SEYMOUR | ADAM | 12046626 JE | 4/30/2014 | 72.06 |
| 152010004685 | SEYMOUR | ADAM | 12046626 JE | 4/30/2014 | 2,729.59 |
| 152018014208 | SHOENFELT | ADAM | 12046985 JE | 5/2/2014 | 1,596.26 |
| 152018014208 | SHOENFELT | ADAM | 12046985 JE | 5/2/2014 | 272.4 |
| 152000000782 | FOLTZ | ANGELA | 12046990 JE | 5/2/2014 | 3,867.27 |
| 152000000782 | FOLTZ | ANGELA | 12046990 JE | 5/2/2014 | 422.5 |
| 152000000950 | TINSLEY | LAWRENCE | 12047034 JE | 5/5/2014 | 2,050.00 |
| 152000000950 | TINSLEY | LAWRENCE | 12047034 JE | 5/5/2014 | 792.12 |
| 152010006549 | LEE | IL | 12047038 JE | 5/5/2014 | 272.86 |
| 152010006549 | LEE | IL | 12047038 JE | 5/5/2014 | 530.86 |

| Account / Name | JE | Date | Amount |
|---|---|---|---|
| 15201006053|O'NEAL| JANET | 12047091 JE | 5/6/2014 | 458.67 |
| 15201006191|WOLFSHOHL| SAM | 12047092 JE | 5/6/2014 | 8.62 |
| 15201006191|WOLFSHOHL| SAM | 12047092 JE | 5/6/2014 | 323.39 |
| 15218014561|BAILEY| JOHN | 12047093 JE | 5/6/2014 | 2,520.98 |
| 15218014561|BAILEY| JOHN | 12047093 JE | 5/6/2014 | 394.73 |
| 15218015742|PHI| HUNG | 12047286 JE | 5/9/2014 | 151.5 |
| 15218014375|HERNANDEZ| OTTO | 12047368 JE | 5/12/2014 | 3,886.00 |
| 15218014375|HERNANDEZ| OTTO | 12047368 JE | 5/12/2014 | 2,176.16 |
| 15201006588|STEVENS| GLEN | 12047527 JE | 5/15/2014 | 474.54 |
| 15218015548|BRANCH| DAVID | 12047642 JE | 5/19/2014 | 2,909.05 |
| 15218015548|BRANCH| DAVID | 12047642 JE | 5/19/2014 | 5,432.45 |
| 15201005280|GREEN| BRIAN | 12047688 JE | 5/20/2014 | 2,085.00 |
| 15218015270|HRYNYK| TREVOR | 12047689 JE | 5/20/2014 | 800.06 |
| 15218015270|HRYNYK| TREVOR | 12047689 JE | 5/20/2014 | 1,593.75 |
| 15218015491|COBB| TOM | 12047753 JE | 5/21/2014 | 1,089.60 |
| 15218015065|LAMM| TONY | 12047835 JE | 5/22/2014 | 1,000.00 |
| 15218015065|LAMM| TONY | 12047835 JE | 5/22/2014 | 1,110.00 |
| 15201006030|BARICUATRO| MARICA | 12047917 JE | 5/23/2014 | 471.79 |
| 15201006030|BARICUATRO| MARICA | 12047917 JE | 5/23/2014 | 1,201.48 |
| 15201006508|GLADNEY| BURNETT | 12047920 JE | 5/23/2014 | 295.95 |
| 15201006074|HULBERT| COLLIN | 12047924 JE | 5/23/2014 | 1,260.06 |
| 15201006405|FORREST| JAMES | 12047927 JE | 5/23/2014 | 1,929.30 |
| 15201006405|FORREST| JAMES | 12047927 JE | 5/23/2014 | 3,551.73 |
| 15201006482|TUCCIARONE| CAROLYNN | 12048001 JE | 5/27/2014 | 550 |
| 15201006507|CARMICHAEL| ALLISON | 12048074 JE | 5/28/2014 | 305.96 |

Total JE:  0  138,893.25

Total for 42301-152180 :  -138,893.25

42400-152180  Pair-Off Allocation

| Account / Name | JE | Date | | Amount |
|---|---|---|---|---|
| 15201005079|PALLADINO| ANDREA | 12013122 JE | 2/3/2014 | 0 | 1,771.51 |

Total JE:  0  1,771.51

Total for 42400-152180 :  -1,771.51

52426-152180  Lender Credits - Gfe Cures

| Account / Name | JE | Date | | Amount |
|---|---|---|---|---|
| 15201004961 BENTLEY| BARTON | 12013387 JE | 2/11/2014 | 0 | 99.7 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000386

| ID | JE | Date | Amount |
|---|---|---|---|
| 15201004202\|RAJINA\| PRADHAN | 12013422 JE | 2/12/2014 | 1,936.40 |
| 15201006560\|OSBORNE\| LAWRENCE | 12013539 JE | 2/14/2014 | 87.74 |
| 15200000804\|NGUYEN\| LINH | 12013541 JE | 2/14/2014 | 323.64 |
| 15201005565\|BOLLAMPALLY\| SIRISHA | 12013801 JE | 2/24/2014 | 1,182.00 |
| 15201005568\|MYERS\| ROBERT | 12013831 JE | 2/25/2014 | 85.64 |
| 15201006580\|MOKHTARI\| MOHAMED | 12013832 JE | 2/25/2014 | 350.28 |
| 15201006465\|HOBBS\| MATTHEW | 12013877 JE | 2/26/2014 | 81.98 |
| 15201006112\|LEE\| WOOJIN | 12013878 JE | 2/26/2014 | 250 |
| 15201006088\|HONG\| WOOKYOUNG | 12013881 JE | 2/26/2014 | 250 |
| 25213011538\|OTTO\| DANIEL | 12013886 JE | 2/26/2014 | 1,019.40 |
| 15201005792\|GARDINIER\| JOSEPH | 12013909 JE | 2/27/2014 | 200 |
| 15201003599\|KASTAK\| WILLIAM | 12014018 JE | 2/28/2014 | 2,572.90 |
| 15218014314\|O'NEAL\| JANET | 12014312 JE | 3/4/2014 | 627 |
| 15201005870\|KIMPEL\| THOMAS | 12014322 JE | 3/5/2014 | 302.57 |
| 15200000668\|SILVA\| TIFFANY | 12044507 JE | 3/18/2014 | 2,000.00 |
| 15218014644\|BEARD\| JESSE | 12044747 JE | 3/26/2014 | 1,066.00 |
| 15218014371\|CALVERT\| MEREDITH | 12044803 JE | 3/27/2014 | 783.96 |
| 15218014236\|CALLAWAY\| DANIEL | 12044988 JE | 3/31/2014 | 1,665.40 |
| 15200007720\|LILJEGREN\| JENNIFER | 12046130 JE | 4/17/2014 | 132 |
| 15218015003\|GRAY\| CYNTHIA | 12046141 JE | 4/17/2014 | 1,484.77 |
| 15201004721\|RHINEHART\| BROOKS | 12046253 JE | 4/21/2014 | 242.15 |
| 15201006070\|KIM\| MCKINLEY | 12046430 JE | 4/25/2014 | 5,597.54 |
| 15218015177\|CAMERON\| CHRISTOPHER | 12046964 JE | 5/1/2014 | 1,526.90 |
| 15218014208\|SHOENFELT\| ADAM | 12046985 JE | 5/2/2014 | 1,500.00 |
| 15200000782\|FOLTZ\| ANGELA | 12046990 JE | 5/2/2014 | 6,506.39 |
| 15201006053\|O'NEAL\| JANET | 12047091 JE | 5/6/2014 | 168.18 |
| 15218014561\|BAILEY\| JOHN | 12047093 JE | 5/6/2014 | 2,000.00 |
| 15218015742\|PHI\| HUNG | 12047286 JE | 5/9/2014 | 241.39 |
| 15201006588\|STEVENS\| GLEN | 12047527 JE | 5/15/2014 | 563.12 |
| 15201005280\|GREEN\| BRIAN | 12047688 JE | 5/20/2014 | 2,101.90 |
| 15218015491\|COBB\| TOM | 12047753 JE | 5/21/2014 | 274.58 |
| 15201006030\|BARICUATRO\| MARICA | 12047917 JE | 5/23/2014 | 3,826.00 |
| 15201006508\|GLADNEY\| BURNETT | 12047920 JE | 5/23/2014 | 655.77 |
| 15201006482\|TUCCIARONE\| CAROLYNN | 12048001 JE | 5/27/2014 | 3,000.00 |
| 15201006507\|CARMICHAEL\| ALLISON | 12048074 JE | 5/28/2014 | 200 |

Total JE: 44,905.30

0

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000387

130,798.96

## 55111-152180 Commission Offset

Total for 55110-152180 :

| | | | | Date | | |
|---|---|---|---|---|---|---|
| | | | 0 | | | |
| 1-15-14 COM, BON, TAX ACCRUE TO DEC | | 12012524 JE | | 1/15/2014 | 3,630.78 | |
| 1-16-14 OC BATCH 2766 | | 12012573 JE | | 1/16/2014 | | 3,630.78 |
| 2-28-14 SM PR | | 12013953 JE | | 2/28/2014 | | 6,825.98 |
| 3-15 PR ACCRUED TO FEB | | 12044381 JE | | 2/28/2014 | | 3,472.82 |
| 3-15-14 SM PR | | 12044380 JE | | 3/15/2014 | | 3,472.82 |
| 3-15 PR ACCRUED TO FEB | | 12044383 JE | | 3/15/2014 | 3,472.82 | |
| 3-31-14 SM PR | | 12044859 JE | | 3/31/2014 | | 39.6 |
| 4/15 COM & BONUS ACCRUAL TO MAR | | 12045992 JE | | 3/31/2014 | | 2,000.00 |
| 4-15-14 SM PR | | 12045991 JE | | 4/15/2014 | | 2,000.00 |
| 4/15 COM & BONUS ACCRUAL TO MAR | | 12045994 JE | | 4/15/2014 | 2,000.00 | |
| 5-15 PR ACCRUED TO APR | | 12047522 JE | | 4/30/2014 | | 5,815.40 |
| 5-2-14 OC BATCH 2983 & 2982 | | 12046997 JE | | 5/2/2014 | | 656.4 |
| 5-15-14 SM PR | | 12047521 JE | | 5/15/2014 | | 5,815.40 |
| 5-15 PR ACCRUED TO APR | | 12047524 JE | | 5/15/2014 | 5,815.40 | |
| | | | Total JE: | | 14,919.00 | 33,729.20 |

Total for 55111-152180 :    -18,810.20

## 55280-152180 Underwriting Fees

| | | | | Date | | |
|---|---|---|---|---|---|---|
| | | | 0 | | | |
| Reclass FanMae and spread to BR | | 12045429 JE | | 2/28/2014 | 1,494.08 | |
| | | | Total JE: | | 1,494.08 | 0 |
| Desktop Underwriter | INV14-2692475 3292 | 101605 PE | | 3/25/2014 | 941.92 | |
| Desktop underwriter | 4242014 3292 | 101643 PE | | 4/24/2014 | 1,006.88 | |
| | | | Total PE: | | 1,948.80 | 0 |

FANNIE MAE
FANNIE MAE

Total for 55280-152180 :    3,442.88

## 55350-152180 Verification Fees

| | | | | Date | | |
|---|---|---|---|---|---|---|
| | | | 0 | | | |
| 4506t service encompass | INCTXVM105912 3292 | 31019 PE | | 2/1/2014 | 1,421.24 | |
| rapid reporting verifications | 1521957 3292 | 31050 PE | | 2/11/2014 | 30.05 | |
| Encompass 4506T - FEB 14 | INCTXVM106169 3292 | 31177 PE | | 2/28/2014 | 639.87 | |
| Cust #9400013 | 1528051 3292 | 31454 PE | | 3/11/2014 | 97.78 | |
| Encompass 4506 T's - March 2014 | INCTXVM106428 3292 | 31687 PE | | 3/31/2014 | 2,130.67 | |
| Cust # 9400013 Paid by Phone | 1560001 3292 | 101647 PE | | 4/11/2014 | 180.17 | |

ELLIE MAE
TALX CORP-RAPID REPORTING
ELLIE MAE
TALX CORP-RAPID REPORTING
ELLIE MAE
TALX CORP-RAPID REPORTING

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000388

ELLIE MAE

Encompass 4506 T service- April    INCTXVM106696   3292   32361 PE   4/30/2014   2,031.00   0   *TM'SS*
   6,530.78    6,530.78

Total PE:

### 55551-152180 Appraisal Expense - Impounded

Total for 55350-152180 :   0

15201004961|BENTLEY| BARTON   15201004961 JE   2/28/2014   150   150
15201004961 BENTLEY| BARTON   12045436 JE   3/31/2014   150   150

Total JE:

Total for 55551-152180 :   0

### 55600-152180 Credit Report Expense

Kroll -Chad Amex February 2014   12044436 JE   2/25/2014   142.26
Kroll Feb pd in Mar 2014   12045815 JE   3/27/2014   1,162.83
Alloc Feb Credit Rpt Exp fr AMEX   12046106 JE   3/27/2014   433.36
Allocate Cred Plus Invoice Jan   12046294 JE   3/31/2014   927.82
Reclass Chad's Amex - Kroll   12047489 JE   4/26/2014   1,437.68
Reclass Chad's Amex - Credit Plus   12047491 JE   4/26/2014   93.51

Total JE:   4,197.46   0

NATIONAL CREDITORS CONNECTION, INC   Credit Report   1640875   3292   31433 PE   3/11/2014   70   70   *Credit reports*

Total PE:   0

Total for 55600-152180 :   4,267.46

### 5. J0-152180 Late / Penalty

BUSINESS SUITES HILL COUNTRY GALLERIA   Fixed and Variable charges   305247   3292   31278 PE   4/1/2014   20.01   20.01   0

Total PE:

Total for 55700-152180 :   20.01

### 60100-152180 Salary And Wages

1-15-14 SM PR   12012522 JE   1/15/2014   2,000.02
1-31-14 SM PR   12013158 JE   1/31/2014   8,914.94
2/15 PAYROLL WAGE ACCRUAL   12013489 JE   1/31/2014   2,634.46

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000389

| Description | JE # | Date | Amount | |
|---|---|---|---|---|
| 2-14-14 OC BATCH 2820 | 12013472 JE | 2/14/2014 | 323.08 | |
| 2-14-14 SM PR | 12013490 JE | 2/14/2014 | 9,205.08 | |
| 2/15 PAYROLL WAGE ACCRUAL | 12013527 JE | 2/14/2014 | | 2,634.46 |
| 2-28-14 SM PR | 12013953 JE | 2/28/2014 | 6,494.43 | |
| 3-15 PR ACCRUED TO FEB | 12044382 JE | 2/28/2014 | 1,156.92 | |
| 3-15-14 SM PR | 12044380 JE | 3/15/2014 | 7,016.55 | |
| 3-15 PR ACCRUED TO FEB | 12044384 JE | 3/15/2014 | | 1,156.92 |
| Allocate Therrell wage to 152180 | 12044860 JE | 3/28/2014 | 500 | |
| 3-31-14 SM PR | 12044859 JE | 3/31/2014 | 7,657.53 | |
| 4/15 WAGE ACCRUAL TO MAR | 12045993 JE | 3/31/2014 | 1,269.23 | |
| 4-15-14 SM PR | 12045991 JE | 4/15/2014 | 7,577.37 | |
| 4/15 WAGE ACCRUAL TO MAR | 12045995 JE | 4/15/2014 | | 1,269.23 |
| 4-30-14 SM PR | 12046980 JE | 4/30/2014 | 4,869.23 | |
| Allocation of Therrell to 152180 | 12046981 JE | 4/30/2014 | 500 | |
| 5/15 PR ACCRUED TO APR | 12047523 JE | 4/30/2014 | 5,517.05 | |
| 5-15-14 SM PR | 12047521 JE | 5/15/2014 | 7,117.07 | |
| 5/15 PR ACCRUED TO APR | 12047525 JE | 5/15/2014 | | 5,517.05 |
| Total JE: | | | 72,752.96 | 10,577.66 |

62,175.30

Total for 60100-152180 :    0

## 60450-152180  Bonus - Employee

| Description | JE # | Date | Amount | |
|---|---|---|---|---|
| 2/15 PR COM,BONUS ACCRUAL | 12013488 JE | 1/31/2014 | | 525 |
| 2-14-14 SM PR | 12013490 JE | 2/14/2014 | 525 | |
| 2/15 PR COM,BONUS ACCRUAL | 12013526 JE | 2/14/2014 | 525 | |
| 3-15 PR ACCRUED TO FEB | 12044381 JE | 2/28/2014 | | 525 |
| 3-15-14 SM PR | 12044380 JE | 3/15/2014 | 4,185.00 | |
| 3-15 PR ACCRUED TO FEB | 12044383 JE | 3/15/2014 | 4,185.00 | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045992 JE | 3/15/2014 | | 4,185.00 |
| 4/15 COM, BONUS ACCRUED TO MAR | 12046026 JE | 3/31/2014 | 1,530.00 | |
| 4-15-14 SM PR | 12045991 JE | 3/31/2014 | 800 | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045994 JE | 4/15/2014 | 1,530.00 | |
| 4/15 COM, BONUS ACCRUED TO MAR | 12046027 JE | 4/15/2014 | | 1,530.00 |
| 4-17-14 OC BATCH 2961 | 12046297 JE | 4/15/2014 | 800 | |
| 5-15 PR ACCRUED TO APR | 12047522 JE | 4/17/2014 | | 800 |
| 5-15-14 SM PR | 12047521 JE | 4/30/2014 | 1,670.00 | |
| 5-15 PR ACCRUED TO APR | 12047524 JE | 5/15/2014 | 1,670.00 | |
| | | 5/15/2014 | | 1,670.00 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000390

| | Total JE: | | | | | 17,420.00 | 8,710.00 |
| | Total for 60450-152180 : | | | | | | 8,710.00 |

**61000-152180  Rent Expense**

| Vendor | Memo | Ref | | Type | Date | Amount | |
|---|---|---|---|---|---|---|---|
| PREFERRED OFFICE NETWORK^LAKEWAY | JAN 2014 RENT | 14503330 | 3292 | 30101 PE | 1/1/2014 | 2,740.78 | |
| PREFERRED OFFICE NETWORK^LAKEWAY | FEB 2014 RENT | 14503397 | 3292 | 30398 PE | 2/1/2014 | 2,140.78 | |
| BUSINESS SUITES HILL COUNTRY GALLERIA | Fixed and Variable Charges | 303792 | 3292 | 30999 PE | 2/20/2014 | 312.5 | |
| PREFERRED OFFICE NETWORK^LAKEWAY | MAR 2014 RENT | 14503507 | 3292 | 30884 PE | 3/1/2014 | 2,140.78 | |
| PREFERRED OFFICE NETWORK^LAKEWAY | APR 2014 RENT | 14503579 | 3292 | 31288 PE | 4/1/2014 | 2,140.78 | |
| PREFERRED OFFICE NETWORK^LAKEWAY | May 2014 Rent | 2014 MAY | 3292 | 31876 PE | 5/1/2014 | 2,140.78 | |
| Preferred Office Network:0621 | | | 3292 | 2693 CR | 3/3/2014 | 11,616.40 | |
| | Total PE: | | | | | 0 | 2,000.00 |
| | Total CR: | | | | | 0 | 2,000.00 |
| | Total for 61000-152180 : | | | | | | 9,616.40 |

**61300-152180  Office Supplies & Expense**

| Vendor | Memo | Ref | | Type | Date | Amount | |
|---|---|---|---|---|---|---|---|
| BUSINESS SUITES HILL COUNTRY GALLERIA | February 2014 Fixed Charges | 301745 | 3292 | 30394 PE | 2/1/2014 | 47.64 | |
| BUSINESS SUITES HILL COUNTRY GALLERIA | Fixed and Variable Charges | 303792 | 3292 | 30999 PE | 2/20/2014 | 87.7 | |
| BUSINESS SUITES HILL COUNTRY GALLERIA | Fixed and Variable charges | 305247 | 3292 | 31278 PE | 4/1/2014 | 97.85 | |
| BUSINESS SUITES HILL COUNTRY GALLERIA | may fixed charges | 307976 | 3292 | 31817 PE | 4/18/2014 | 30.16 | |
| | Total PE: | | | | | 0 | 263.35 |
| | Total for 61300-152180 : | | | | | | 263.35 |

**61380-152180  Couriers & Shipping**

| | Total PE: | | | | | 0 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000391

CAPITOL COURIER^APF ACCT#105756          acct# 105756          26833   3292          31161   PE          2/28/2014

54.25

Total PE:                          54.25
                                   54.25          0

Total for 61380-152180 :          0

62310-152180  Health Insurance

| JE # | | Name | Date | Amount |
|---|---|---|---|---|
| 12012522 | JE | TASK, MICHAEL E | 1/15/2014 | 69.81 |
| 12012522 | JE | NASSERFAR, MICHAEL H | 1/15/2014 | 87.3 |
| 12013158 | JE | STRANGE, GLADYS F | 1/31/2014 | 99.81 |
| 12013158 | JE | JONES, KIMBERLY B | 1/31/2014 | 114.28 |
| 12013158 | JE | NASSERFAR, MICHAEL H | 1/31/2014 | 87.3 |
| 12013158 | JE | TASK, MICHAEL E | 1/31/2014 | 69.81 |
| 12013158 | JE | OSIO, MARIA C | 1/31/2014 | 10.35 |
| 12013158 | JE | CORTESE, AMBER N | 1/31/2014 | 87.82 |
| 12013472 | JE | STRANGE, GLADYS F | 2/14/2014 | 99.81 |
| 12013490 | JE | STRANGE, GLADYS F | 2/14/2014 | 99.81 |
| 12013490 | JE | NASSERFAR, MICHAEL H | 2/14/2014 | 87.3 |
| 12013490 | JE | TASK, MICHAEL E | 2/14/2014 | 69.81 |
| 12013490 | JE | OSIO, MARIA C | 2/14/2014 | 10.35 |
| 12013490 | JE | CORTESE, AMBER N | 2/14/2014 | 87.82 |
| 12013490 | JE | JONES, KIMBERLY B | 2/14/2014 | 114.28 |
| 12013953 | JE | TASK, MICHAEL E | 2/28/2014 | 69.81 |
| 12013953 | JE | NASSERFAR, MICHAEL H | 2/28/2014 | 87.3 |
| 12013953 | JE | JONES, KIMBERLY B | 2/28/2014 | 114.28 |
| 12013953 | JE | CORTESE, AMBER N | 2/28/2014 | 87.82 |
| 12013953 | JE | STRANGE, GLADYS F | 2/28/2014 | 64.78 |
| 12044380 | JE | CURBY, JULIANE M | 3/15/2014 | 454.3 |
| 12044380 | JE | TASK, MICHAEL E | 3/15/2014 | 69.81 |
| 12044380 | JE | CORTESE, AMBER N | 3/15/2014 | 87.82 |
| 12044380 | JE | JONES, KIMBERLY B | 3/15/2014 | 114.28 |
| 12044380 | JE | NASSERFAR, MICHAEL H | 3/15/2014 | 87.3 |
| 12044859 | JE | JONES, KIMBERLY B | 3/31/2014 | 114.28 |
| 12044859 | JE | CORTESE, AMBER N | 3/31/2014 | 87.82 |
| 12044859 | JE | NASSERFAR, MICHAEL H | 3/31/2014 | 87.3 |
| 12044859 | JE | TASK, MICHAEL E | 3/31/2014 | 69.81 |
| 12046010 | JE | CURBY, JULIANE M | 3/31/2014 | 454.3 |
| | | Reclass/Aetna - April 2014 | 4/1/2014 | 803.51 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000392

| | | | |
|---|---|---|---|
| NASSERFAR, MICHAEL H | 12045991 JE | 4/15/2014 | 87.3 |
| CORTESE, AMBER N | 12045991 JE | 4/15/2014 | 87.82 |
| TASK, MICHAEL E | 12045991 JE | 4/15/2014 | 69.81 |
| CURBY, JULIANE M | 12045991 JE | 4/15/2014 | 454.3 |
| NASSERFAR, MICHAEL H | 12046980 JE | 4/30/2014 | 6.83 |
| TASK, MICHAEL E | 12046980 JE | 4/30/2014 | 11.54 |
| CURBY, JULIANE M | 12046980 JE | 4/30/2014 | 454.3 |
| Reclass - Aetna May 2014 | 12048039 JE | 5/1/2014 | 139.27 |
| Reclass Lincoln - May 2014 | 12048053 JE | 5/1/2014 | 16 |
| CURBY, JULIANE M | 12047521 JE | 5/15/2014 | 454.3 |
| TASK, MICHAEL E | 12047521 JE | 5/15/2014 | 69.81 |
| GOSNAY, TYCORD R | 12047521 JE | 5/15/2014 | 61.15 |
| NASSERFAR, MICHAEL H | 12047521 JE | 5/15/2014 | 87.3 |
| Total JE: | | | 958.78 5,091.13 |

-4,132.35

Total for 62310-152180 : 0

**64100-152180  Payroll Tax Expense**

| | | | |
|---|---|---|---|
| 1-15-14 SM PR | 12012522 JE | 1/15/2014 | 213.33 |
| 1-15-14 COM, BON, TAX ACCRUE TO DEC | 12012524 JE | 1/15/2014 | 2,073.17 |
| 1-16-14 OC BATCH 2766 | 12012573 JE | 1/16/2014 | 2,608.61 |
| 1-23-14 OC BATCH 2770 | 12012575 JE | 1/23/2014 | 1,521.27 |
| 1-23-14 OC BATCH 2770 | 12012648 JE | 1/23/2014 | 1,521.27 |
| 1-31-14 SM PR | 12013158 JE | 1/31/2014 | 894.03 |
| 2/15 PR COM,BONUS ACCRUAL | 12013488 JE | 1/31/2014 | 72.14 |
| 2/15 PAYROLL WAGE ACCRUAL | 12013489 JE | 1/31/2014 | 201.54 |
| 2-14-14 OC BATCH 2820 | 12013472 JE | 2/14/2014 | 27.59 |
| 2-14-14 SM PR | 12013490 JE | 2/14/2014 | 1,001.11 |
| 2/15 PR COM,BONUS ACCRUAL | 12013526 JE | 2/14/2014 | 72.14 |
| 2/15 PAYROLL WAGE ACCRUAL | 12013527 JE | 2/14/2014 | 201.54 |
| 2-28-14 SM PR | 12013953 JE | 2/28/2014 | 711.78 |
| 3-15 PR ACCRUED TO FEB | 12044381 JE | 2/28/2014 | 4,425.98 |
| 3-15 PR ACCRUED TO FEB | 12044382 JE | 2/28/2014 | 88.5 |
| 3-15-14 SM PR | 12044380 JE | 3/15/2014 | 4,962.38 |
| 3-15 PR ACCRUED TO FEB | 12044383 JE | 3/15/2014 | 4,425.98 |
| 3-15 PR ACCRUED TO FEB | 12044384 JE | 3/15/2014 | 88.5 |
| 3-18-14 OC BATCH 2901 | 12044386 JE | 3/18/2014 | 125.3 |

| Description | JE # | Date | Amount | Amount |
|---|---|---|---|---|
| 3-31-14 SM PR | 12044859 JE | 3/31/2014 | 577.33 | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045992 JE | 3/31/2014 | 2,356.44 | |
| 4/15 WAGE ACCRUAL TO MAR | 12045993 JE | 3/31/2014 | 97.1 | |
| 4-15 COM, BONUS ACCRUED TO MAR | 12046026 JE | 3/31/2014 | 61.2 | |
| 4-15-14 SM PR | 12045991 JE | 4/15/2014 | 2,971.98 | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045994 JE | 4/15/2014 | | 2,356.44 |
| 4/15 WAGE ACCRUAL TO MAR | 12045995 JE | 4/15/2014 | | 97.1 |
| 4-15 COM, BONUS ACCRUED TO MAR | 12046027 JE | 4/15/2014 | | 61.2 |
| 4-17-14 OC BATCH 2961 | 12046297 JE | 4/17/2014 | 61.2 | |
| 4-30-14 SM PR | 12046980 JE | 4/30/2014 | 357.45 | |
| 5-15 PR ACCRUED TO APR | 12047522 JE | 4/30/2014 | 1,904.84 | |
| 5/15 PR ACCRUED TO APR | 12047523 JE | 4/30/2014 | 422.05 | |
| 5-2-14 OC BATCH 2983 & 2982 | 12046997 JE | 5/2/2014 | 275.7 | |
| 5-15-14 SM PR | 12047521 JE | 5/15/2014 | 1,401.53 | |
| 5-15 PR ACCRUED TO APR | 12047524 JE | 5/15/2014 | | 1,904.84 |
| 5/15 PR ACCRUED TO APR | 12047525 JE | 5/15/2014 | | 422.05 |
| Total JE: | | | 27,340.38 | 13,224.23 |

Total for 64100-152180 :  14,116.15

### 68500-152180  Corporate Allocation Expense

| Description | JE # | Date | Amount | |
|---|---|---|---|---|
| corp allocation charge | 12014491 JE | 2/28/2014 | 12,839.95 | |
| corp allocation charge | 12045813 JE | 3/31/2014 | 9,645.76 | |
| Corp Volume Allocation | 12047235 JE | 4/30/2014 | 10,060.93 | |
| Total JE: | | | 32,546.64 | 0 |

Total for 68500-152180 :  32,546.64

### 68501-152180  Corporate Per File Fees

| Description | JE # | Date | Amount | |
|---|---|---|---|---|
| Tech/Mark | 12014101 JE | 2/28/2014 | 50 | |
| Tech/Mark | 12014101 JE | 2/28/2014 | 100 | |
| Tech/Mark | 12014105 JE | 2/28/2014 | 100 | |
| Tech/Mark | 12014105 JE | 2/28/2014 | 50 | |
| Tech/Mark | 12014107 JE | 2/28/2014 | 50 | |
| Tech/Mark | 12014107 JE | 2/28/2014 | 100 | |
| Tech/Mark | 12014114 JE | 2/28/2014 | 50 | |
| Tech/Mark | 12014114 JE | 2/28/2014 | 100 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000394

| Name | ID | Date | Value |
|---|---|---|---|
| Tech/Mark | 12014120 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014120 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014125 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014125 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014127 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014127 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014128 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014128 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014141 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014141 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014142 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014142 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014147 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014147 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014149 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014149 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014150 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014150 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014192 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014192 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014194 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014194 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014195 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014195 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014203 JE | 2/28/2014 | 50 |
| Tech/Mark | 12014203 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014227 JE | 2/28/2014 | 100 |
| Tech/Mark | 12014227 JE | 2/28/2014 | 50 |
| 15218014236|CALLAWAY| DANIEL | 12045467 JE | 3/31/2014 | 100 |
| 15218014236|CALLAWAY| DANIEL | 12045467 JE | 3/31/2014 | 50 |
| 15201005950|WOLFER| JOSHUA | 12045502 JE | 3/31/2014 | 100 |
| 15201005950|WOLFER| JOSHUA | 12045502 JE | 3/31/2014 | 50 |
| 15201005715|WILLIAMS| TERRIN | 12045508 JE | 3/31/2014 | 100 |
| 15201005715|WILLIAMS| TERRIN | 12045508 JE | 3/31/2014 | 50 |
| 15201003484|KELLY, JR| WILLIAM | 12045513 JE | 3/31/2014 | 50 |
| 15201003484|KELLY, JR| WILLIAM | 12045513 JE | 3/31/2014 | 100 |
| 15218014616|MCCASKILL| GREGORY | 12045516 JE | 3/31/2014 | 100 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000395

| Account | Last | First | JE | Date | Amount |
|---|---|---|---|---|---|
| 15218014616 | MCCASKILL | GREGORY | 12045516 JE | 3/31/2014 | 50 |
| 15218014371 | CALVERT | MEREDITH | 12045518 JE | 3/31/2014 | 100 |
| 15218014371 | CALVERT | MEREDITH | 12045518 JE | 3/31/2014 | 50 |
| 15218014644 | BEARD | JESSE | 12045528 JE | 3/31/2014 | 50 |
| 15218014644 | BEARD | JESSE | 12045528 JE | 3/31/2014 | 100 |
| 15201005920 | BROWN | ERICA | 12045538 JE | 3/31/2014 | 50 |
| 15201005920 | BROWN | ERICA | 12045538 JE | 3/31/2014 | 100 |
| 15201005682 | CARMICHAEL | DANIEL | 12045555 JE | 3/31/2014 | 50 |
| 15201005682 | CARMICHAEL | DANIEL | 12045555 JE | 3/31/2014 | 100 |
| 15200000668 | SILVA | TIFFANY | 12045580 JE | 3/31/2014 | 50 |
| 15200000668 | SILVA | TIFFANY | 12045580 JE | 3/31/2014 | 100 |
| 15201006582 | SHUPE | JAMES | 12045594 JE | 3/31/2014 | 50 |
| 15201006582 | SHUPE | JAMES | 12045594 JE | 3/31/2014 | 100 |
| 15201005779 | AVERY | MARK | 12045612 JE | 3/31/2014 | 100 |
| 15201005779 | AVERY | MARK | 12045612 JE | 3/31/2014 | 50 |
| 15201005870 | KIMPEL | THOMAS | 12045657 JE | 3/31/2014 | 50 |
| 15201005870 | KIMPEL | THOMAS | 12045657 JE | 3/31/2014 | 100 |
| 15218014314 | O'NEAL | JANET | 12045658 JE | 3/31/2014 | 50 |
| 15218014314 | O'NEAL | JANET | 12045658 JE | 3/31/2014 | 100 |
| 15218014968 | BYTHEWOOD | BENJIMAN | 12046680 JE | 4/30/2014 | 100 |
| 15218014968 | BYTHEWOOD | BENJIMAN | 12046680 JE | 4/30/2014 | 50 |
| 15200000720 | LILJEGREN | JENNIFER | 12046689 JE | 4/30/2014 | 100 |
| 15200000720 | LILJEGREN | JENNIFER | 12046689 JE | 4/30/2014 | 50 |
| 15201004685 | SEYMOUR | ADAM | 12046703 JE | 4/30/2014 | 100 |
| 15201004685 | SEYMOUR | ADAM | 12046703 JE | 4/30/2014 | 50 |
| 15218014921 | COHEN | ELIETTE | 12046705 JE | 4/30/2014 | 100 |
| 15218014921 | COHEN | ELIETTE | 12046705 JE | 4/30/2014 | 50 |
| 15218015003 | GRAY | CYNTHIA | 12046727 JE | 4/30/2014 | 50 |
| 15218015003 | GRAY | CYNTHIA | 12046727 JE | 4/30/2014 | 100 |
| 15201004721 | RHINEHART | BROOKS | 12046742 JE | 4/30/2014 | 50 |
| 15201004721 | RHINEHART | BROOKS | 12046742 JE | 4/30/2014 | 100 |
| 15201005997 | HERNANDEZ | MARISSA | 12046785 JE | 4/30/2014 | 50 |
| 15201005997 | HERNANDEZ | MARISSA | 12046785 JE | 4/30/2014 | 100 |
| 15201003974 | HATT | DANIEL | 12046787 JE | 4/30/2014 | 50 |
| 15201003974 | HATT | DANIEL | 12046787 JE | 4/30/2014 | 100 |
| 15201006269 | CRAIG | TIMOTHY | 12046837 JE | 4/30/2014 | 100 |
| 15201006269 | CRAIG | TIMOTHY | 12046837 JE | 4/30/2014 | 50 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000396

## 68501-152180

| Account / Name | Ref | Type | Date | Amount | |
|---|---|---|---|---|---|
| 15201005605|CASH| PAUL | 12046859 | JE | 4/30/2014 | 50 | |
| 15201005605|CASH| PAUL | 12046859 | JE | 4/30/2014 | 100 | |
| 15201006331|BRAZENER| CHRISTOPHER | 12046864 | JE | 4/30/2014 | 100 | |
| 15201006331|BRAZENER| CHRISTOPHER | 12046864 | JE | 4/30/2014 | 50 | |
| 15201006070|KIM| MCKINLEY | 12046882 | JE | 4/30/2014 | 100 | |
| 15201006070|KIM| MCKINLEY | 12046882 | JE | 4/30/2014 | 50 | |
| 15201006136|OSTER| SETH | 12046907 | JE | 4/30/2014 | 50 | |
| 15201006136|OSTER| SETH | 12046907 | JE | 4/30/2014 | 100 | |
| Total JE: | | | | 6,750.00 | 0 |

**Total for 68501-152180 :** 6,750.00

## 68502-152180  Corporate Fees - Neo

| Account / Name | Ref | Type | Date | Amount | |
|---|---|---|---|---|---|
| NEO FEES-Gosnay | 12047078 | JE | 4/30/2014 | 500 | |
| Total JE: | | | | 500 | 0 |

**Total for 68502-152180 :** 500

## 70100-152180  Advertising & Marketing Expense

| Description | Name | Number | Type | Ref | | Date | Amount | |
|---|---|---|---|---|---|---|---|---|
| Reclass - Centerra | | 12012100 | IE | | | 1/1/2014 | 15,000.00 | |
| Total JE: | | | | | | | 15,000.00 | 0 |
| February 2014 Installment | CENTERRA HOMES OF TEXAS LLC^CORP | 30444 | PE | 20140201 | 3292 | 2/1/2014 | 15,000.00 | |
| full pg advertisment | URBAN SPACE REAL ESTATE | 30933 | PE | 20140219TASK | 3292 | 2/19/2014 | 2,660.00 | |
| March 2014 Installment | CENTERRA HOMES OF TEXAS LLC^CORP | 31365 | PE | 20140301 | 3292 | 3/1/2014 | 15,000.00 | |
| April 2014 Installment | CENTERRA HOMES OF TEXAS LLC^CORP | 31365 | PE | 20140401 | 3292 | 4/1/2014 | 15,000.00 | |
| MSA- May2014 | CENTERRA HOMES OF TEXAS LLC^CORP | 31887 | PE | 2014 MAY | 3292 | 4/25/2014 | 15,000.00 | |
| MSA- May2014 | CENTERRA HOMES OF TEXAS LLC^CORP | 31887 | PE | 2014 MAY | 3292 | 5/1/2014 | 15,000.00 | 15,000.00 |
| May 2014 Installment | CENTERRA HOMES OF TEXAS LLC^CORP | 31746 | PE | 20140501 | 3292 | 5/1/2014 | 15,000.00 | |
| BC - Michael Nasserfar | P & B PRINT^ CORP | 0 | PE | 2988 | | 5/9/2014 | 71.99 | |
| purchse of domain name | MICHAEL NASSERFAR | 0 | PE | 20140519 | | 5/19/2014 | 10 | |
| Total PE: | | | | | | | 77,741.99 | 15,000.00 |

**Total for 70100-152180 :** 77,741.99

**Report Total:** 0   637,097.56   663,827.85   77,741.99   -26,730.29

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000397

**52427-152180  Lender Credit - 10% Cure**

Total for 52426-152180 :                                    44,905.30

| | | | | | |
|---|---|---|---|---|---|
| | | | | 0 | |
| 15200000851\|FURGERSON\| BRITTNEY | 12013589 JE | 2/18/2014 | 43 | | |
| 15218013778 COBB\| FRANK | 12013804 JE | 2/24/2014 | 74.25 | | |
| 15218014314\|O'NEAL\| JANET | 12014312 JE | 3/4/2014 | 72 | | |
| 15218015177\|CAMERON\| CHRISTOPHER | 12046964 JE | 5/1/2014 | 429 | | |
| Total JE: | | | 618.25 | 0 | 618.25 |

**.0-152180  Commission Expense - Loan Officers**

Total for 52427-152180 :

| | | | | | |
|---|---|---|---|---|---|
| | | | | 0 | |
| 1-15-14 COM, BON, TAX ACCRUE TO DEC | 12012524 JE | 1/15/2014 | | | |
| 1-16-14 OC BATCH 2766 | 12012573 JE | 1/16/2014 | 30,731.02 | 30,731.02 | |
| 1-23-14 OC BATCH 2770 | 12012575 JE | 1/23/2014 | 19,338.98 | | |
| 1-23-14 OC BATCH 2770 | 12012648 JE | 1/23/2014 | | 19,338.98 | |
| 1-31-14 SM PR | 12013158 JE | 1/31/2014 | 129.56 | | |
| 2/15 PR COM,BONUS ACCRUAL | 12013488 JE | 1/31/2014 | 418.01 | | |
| 2-14-14 SM PR | 12013490 JE | 2/14/2014 | 418.01 | | |
| 2/15 PR COM,BONUS ACCRUAL | 12013526 JE | 2/14/2014 | | 418.01 | |
| 2-28-14 SM PR | 12013953 JE | 2/28/2014 | 8,759.63 | | |
| 3-15 PR ACCRUED TO FEB | 12044381 JE | 2/28/2014 | 57,143.80 | | |
| 3-15-14 SM PR | 12044380 JE | 3/15/2014 | 55,505.94 | | |
| 3-15 PR ACCRUED TO FEB | 12044383 JE | 3/15/2014 | | 57,143.80 | |
| 3-18-14 OC BATCH 2901 | 12044386 JE | 3/18/2014 | 1,637.86 | | |
| 3-31-14 SM PR | 12044859 JE | 3/31/2014 | 39.6 | | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045992 JE | 3/31/2014 | 31,273.11 | | |
| 4-15-14 SM PR | 12045991 JE | 4/15/2014 | 31,273.11 | | |
| 15201005298 DUCAT\| WILLIAM | 12046021 JE | 4/15/2014 | 150 | | |
| 15201006409 RIFFEE\| EVAN | 12046022 JE | 4/15/2014 | 440 | | |
| 4/15 COM & BONUS ACCRUAL TO MAR | 12045994 JE | 4/15/2014 | | 31,273.11 | |
| 5-15 PR ACCRUED TO APR | 12047522 JE | 4/30/2014 | 29,045.25 | | |
| 5-2-14 OC BATCH 2983 & 2982 | 12046997 JE | 5/2/2014 | 3,400.00 | | |
| 5-15-14 SM PR | 12047521 JE | 5/15/2014 | 29,045.25 | | |
| 5-15 PR ACCRUED TO APR | 12047524 JE | 5/15/2014 | | 29,045.25 | |
| Total JE: | | | 298,749.13 | 167,950.17 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000398

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61380-152180 | July American Express | | | | 120518UE | | 07/31/14 | | 83.87 | .00 | |
| | | | | | | | Total JE | | 83.87 | .00 | |
| BUSINESS SUITES HILL | July Fixed Charges | 312447 | 3292 | | 32903 PE | | 07/01/14 | | 109.08 | | |
| | | | | | | | Total | | 109.08 | | |
| | | | | | | | Total for | | | | 536.31 |
| Couriers & Shipping | | | | | | | | 54.25 | | | |
| | | | | | | | Total for | | | | 54.25 |
| 62200-152180 | Utilities | | | | | | | .00 | | | |
| CITY OF AUSTIN ^ 152180 Acct# 25866 41328 | | 201407714 | 3292 | | 33331 PE | | 07/14/14 | | 600.19 | .00 | |
| | | | | | | | Total | | 600.19 | .00 | 600.19 |
| 62310-152180 | Health Insurance | | | | | | | | | | |
| | Aetna - July 2014 | | | | 120510UE | | 07/01/14 | -3,564.28 | 2,291.77 | | |
| | Lincoln - July 2014 | | | | 120511UE | | 07/01/14 | | 166.47 | | |
| | NASSERFAR, MICHAEL H | | | | 120507UE | | 07/15/14 | | | 87.30 | |
| | CURBY, JULIANE M | | | | 120507UE | | 07/15/14 | | | 454.30 | |
| | GOSNAY, TYCORD R | | | | 120507UE | | 07/15/14 | | | 61.15 | |
| | TASK, MICHAEL E | | | | 120507UE | | 07/15/14 | | | 69.81 | |
| | GOSNAY, TYCORD R | | | | 120517JE | | 07/31/14 | | | 61.15 | |
| | NASSERFAR, MICHAEL H | | | | 120517JE | | 07/31/14 | | | 21.29 | |
| | TASK, MICHAEL E | | | | 120517JE | | 07/31/14 | | | 20.31 | |
| | CURBY, JULIANE M | | | | 120517JE | | 07/31/14 | | | 454.30 | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000399

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 64100-152180 | | | | | | | | | | | |
| CONTINENTAL | July 2014 Paylogix / Aflac | 20140701 | 3292 | | 101697 PE | | 07/01/14 | | | | |
| | | | | | | Total JE: | | | 2,458.24 | 1,229.61 | |
| | | | | | | | | | 37.86 | | |
| | | | | | | Total | | | 37.86 | .00 | -2,297.79 |
| | | | | | | Total for | | | | | |
| Payroll Tax Expense | | | | | | | | 20,839.66 | | | |
| | 7-15-14 SM PR | | | | 120507 JE | | 07/15/14 | | 488.98 | | |
| | 7-15-14 SM PR | | | | 120507 JE | | 07/15/14 | | 1,327.56 | | |
| | 7-15 PR ACCRUED TO | | | | 120507 JE | | 07/15/14 | | | 48.81 | |
| | 7/15 PR ACCRUED TO | | | | 120507 JE | | 07/15/14 | | | | |
| | 7-31-14 SM PR | | | | 120517 JE | | 07/31/14 | | 379.63 | | |
| | 8-15 COM&BONUS | | | | 120522 JE | | 07/31/14 | | | 3,063.65 | |
| | 8-15 WAGE ACCRUED TO | | | | 120522 JE | | 07/31/14 | | 2,137.73 | | |
| | | | | | | | | | 57.68 | | |
| | | | | | | Total JE: | | | 4,391.58 | 3,112.46 | 22,118.78 |
| 65600-152180 | Meals And Entertainment | | | | | Total for | | | 19.00 | | 19.00 |
| 66000-152180 | Computer Expense | | | | | Total for | | | 29.22 | | 29.22 |
| 67100-152180 | Seminar And Training | | | | | Total for | | | 348.00 | | |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000400

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Beg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68500-152180 | Corporate Allocation | | | | | | | | | | |
| | Corp Allocation Charge - | | | | 120518JE | | 07/31/14 | 47,021.88 | 5,054.22 | | |
| | | | | | | | Total JE: | | 5,054.22 | .00 | |
| | | | | | | | Total for | | | | 348.00 |
| 68501-152180 | Corporate Per File Fees | | | | | | | | | | |
| | | 15218017835|SHAW| | | | 120513JE | | 07/31/14 | | 50.00 | | |
| | | 15218017835|SHAW| | | | 120513JE | | 07/31/14 | | 100.00 | | |
| | | 15218017996|CRAWFORD| | | | 120513JE | | 07/31/14 | | 100.00 | | |
| | | 15218017996|CRAWFORD| | | | 120513JE | | 07/31/14 | | 50.00 | | |
| | | 15218017883|LIESMAN| | | | 120513JE | | 07/31/14 | | 50.00 | | |
| | | 15218017883|LIESMAN| | | | 120513JE | | 07/31/14 | | 50.00 | | |
| | | 15218016989|BAKER| | | | 120513JE | | 07/31/14 | | 100.00 | | |
| | | 15218016989|BAKER| | | | 120513JE | | 07/31/14 | | 50.00 | | |
| | | 15218017920|THOMAS| | | | 120513JE | | 07/31/14 | | 100.00 | | |
| | | 15218017920|THOMAS| | | | 120514JE | | 07/31/14 | | 50.00 | | |
| | | 15201006540|SHEARN| | | | 120514JE | | 07/31/14 | | 100.00 | | |
| | | 15201006540|SHEARN| | | | 120514JE | | 07/31/14 | | 50.00 | | |
| | | 15218017405|GARWOOD| | | | 120514JE | | 07/31/14 | | 100.00 | | |
| | | 15218017405|GARWOOD| | | | 120514JE | | 07/31/14 | | 50.00 | | |
| | | 15218017863|BENEDETTI| | | | 120514JE | | 07/31/14 | | 50.00 | | |
| | | 15218017863|BENEDETTI| | | | 120514JE | | 07/31/14 | | 100.00 | | |
| | | 15218014297|ASENCIO| | | | 120515JE | | 07/31/14 | | 100.00 | | |
| | | 15218014297|ASENCIO| | | | 120515JE | | 07/31/14 | | 50.00 | | |
| | | 15201006250|SHARP| | | | 120515JE | | 07/31/14 | | 100.00 | | |
| | | 15201006250|SHARP| | | | 120515JE | | 07/31/14 | | 100.00 | | |
| | | | | | | | Total for | 12,750.00 | | | 52,076.10 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000401

| GL/Desc/Vendor | Transaction Description | Invoice Number | GL Bank | DB | Ref | JR | Date | Reg Bal | Debit | Credit | End Bal |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 68502-152180 | Corporate Fees - Neo | | | | | | | | | | |
| | 15201006250|S[I|ARP] | | | | 120515JE | | 07/31/14 | | 50.00 | | |
| | 15200000870|B|LOK| | | | 120515JE | | 07/31/14 | | 100.00 | | |
| | 15200000870|B|LOK| | | | 120515JE | | 07/31/14 | | 50.00 | | |
| | | | | | | Total JE: | | 1,650.00 | | .00 | |
| | | | | | | Total for | | | | | 14,400.00 |
| | | | | | | | | | | 500.00 | |
| | | | | | | Total for | | 500.00 | | | 500.00 |
| 70100-152180 | Advertising & Marketing | | | | | | | | | | |
| CENTERRA HOMES OF | July 2014 Installment | 20140701 | 3292 | | 32808 PE | | 07/01/14 | | 15,000.00 | | |
| CHASE TUTOR | sponsorship | 20140710 | 3292 | | 33113 PE | | 07/10/14 | | 400.00 | | |
| | | | | | | Total | | 15,400.00 | | .00 | |
| | | | | | | Total for | | 96,690.84 | | | 112,090.84 |
| | | | | | | Report | | 72,125.31 | 144,219.16 | 133,551.79 | 82,792.68 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000402



OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000448

Nov
Loan List

# Funded Loan Report
## Ameripro Funding, Inc.
### For FundingDate between 11/1/2014 and 11/30/2014
### Branch: 152180 (Nasserfar)
### Template: Branch Income by loan

| Borrower Name | Branch Code | Loan Officer | Loan Number | Funding Date | Loan Amount | Processor | Origination Points | Discount Fees | Application Fees | Processing Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| KINCL\| JOHN | 152180 | MICHAEL E TASK | 15218020217 | 11/25/2014 | $320,000 | | $- | $- | $- | $- |
| lALDERAS\| RAYMOND | 152180 | MICHAEL NASSERFAR | 15218015896 | 11/17/2014 | 211,641 | | - | - | - | - |
| CHAMBERS\| PAMELA | 152180 | MICHAEL NASSERFAR | 15218016822 | 11/18/2014 | 261,742 | | - | - | - | - |
| CHAO\| MAYRA | 152180 | MICHAEL NASSERFAR | 15218016996 | 11/19/2014 | 218,538 | | - | - | - | - |
| DIMBERG\| EDWARD | 152180 | MICHAEL NASSERFAR | 15218014701 | 11/14/2014 | 417,000 | | - | - | - | - |
| HARRIS\| KRISTAL | 152180 | MICHAEL NASSERFAR | 15218020471 | 11/21/2014 | 270,244 | | - | - | - | - |
| LANTHIER\| KURT | 152180 | MICHAEL NASSERFAR | 15201005903 | 11/18/2014 | 417,000 | | - | - | - | - |
| NGUYEN\| TUONG | 152180 | MICHAEL NASSERFAR | 15218020112 | 11/13/2014 | 358,006 | | - | - | - | - |
| RAPISAND\| CYNTHIA | 152180 | MICHAEL NASSERFAR | 15218017759 | 11/14/2014 | 298,798 | | - | - | - | - |
| SHEFFIELD\| AUSTIN | 152180 | MICHAEL NASSERFAR | 15218019900 | 11/17/2014 | 222,800 | | - | - | - | - |
| | | | | | $2,995,769 | | $0.00 | $0.00 | $0.00 | $0.00 |
| | | | | | | | $0.00 | $0.00 | $0.00 | $0.00 |

| Underwriting Fees | Branch Admin Fees | Credit Report Fees | Lender Credit | Escrow Waiver Fees | Lock Extension Fees | Brokered Loan Income | Prem Discount Branch | Prem Discount LO | Total Loan Income |
|---|---|---|---|---|---|---|---|---|---|
| $- | $- | $- | -$67.20 | $- | $- | $- | $1,600.00 | $4,800.00 | $5,332.80 |
| | | | -2,500.00 | | | | 3,540.75 | 3,174.62 | 4,215.37 |
| | | | -3,677.84 | | | | 392.61 | 4,500.00 | 1,214.77 |
| | | | -2,500.00 | | | | 1,346.19 | 3,278.07 | 2,124.26 |
| | | | -2,225.90 | | | | 6,004.80 | 8,255.00 | 10,033.90 |
| | | | -3,184.26 | | | | 1,351.22 | 4,053.66 | 2,220.62 |
| | | | -2,537.60 | | | | 3,252.60 | 6,255.00 | 6,969.80 |
| | | | -2,504.00 | | | | 2,255.44 | 5,370.09 | 5,121.53 |
| | | | -3,049.79 | | | | 1,493.99 | 4,481.97 | 2,926.17 |
| | | | -873.38 | | | | 1,114.00 | 3,342.00 | 3,582.62 |
| $0.00 | $0.00 | $0.00 | -$23,120.17 | $0.00 | $0.00 | $0.00 | $22,351.60 | $45,510.41 | $44,741.84 |

OAK MORTGAGE ET AL 4.21.15 D-1-GN-15-785 000449

PLAINTIFF'S EXHIBIT NO. 34



PLAINTIFF'S
EXHIBIT
34

Michael Task
9550 Savannah Ridge Dr. #32
Austin, TX 78726

May 5, 2015

**DELIVERY VIA FEDERAL EXPRESS**
**OVERNIGHT DELIVERY**

Ali Hedayatifar, Esq.
General Counsel
TENURA HOLDINGS, INC.
8300 N. Mopac Expressway, Suite 220
Austin, Texas 78759

Dear Mr. Hedayatifar:

I have diligently searched for any and all originals and duplicates of any and all paper records and paper documents, if any, regarding my prior employment with AmeriPro Funding, Inc. Enclosed are all duplicates, if any, and any and all originals of any and all paper records and paper documents, if any, regarding my prior employment with AmeriPro Funding, Inc. With this delivery, I no longer have in my possession any paper records or paper documents (either originals or duplicates) of any nature or kind regarding my prior employment with AmeriPro Funding, Inc.

Thank you.

Michael Task



# Order Form

**Must be processed at a FedEx shipping counter.**

**Sender's Copy**

Print and press hard.

Sender's FedEx Account Number

MICHAEL TASK    512 350-3660

7550 Savannah Ridge Dr. #32

Austin                    TY    78726

A. Hedayatifar, ESQ    512 524-8800
TENURA HOLDINGS
8300 N. MOPAC EXPWY., STE 200

USTIN                    TX
USA                      78759

**ge Information**

dential Delivery Address    ☑ Nonresidential (Business) Delivery Address

of Packages _____    Weight _____    Declared Value $ _____

r is limited to $100 per package unless you declare a higher value. See back for details. Declared value of $500 or more will default to Direct equired. For multiple packages to one delivery address, ask the shipping agent to declare a value for each package.

Order Form is for FedEx Ground shipments within the U.S. and for FedEx International Ground shipments from the U.S. to s FedEx Ground Order Form, you agree to the service conditions on the back of the Sender's Copy of this document and in the e Guide, including terms that limit our liability. Hazardous materials cannot be shipped using this FedEx Ground Order Form.

**4  Delivery Signature Options**    If you require a signature, check Direct or Indirect.

☐ No Signature Required
Package may be left without obtaining a signature for delivery.

☑ Direct Signature
Anyone at the delivery address may sign for delivery. Fee applies.

☐ Indirect Signature
If no one is available at delivery address, anyone at a neighboring address may sign for delivery. Available for U.S. residential shipments only. Fee applies.

**5  FedEx Home Delivery® Convenient Delivery Options**
U.S. residential deliveries for packages up to 70 lbs.

☐ FedEx Date Certain Home Delivery®
Delivery on a specific date you select, Tuesday through Saturday, provided the date is not before the standard delivery time and is within two weeks after it. Fee applies.

☐ FedEx Evening Home Delivery®
Delivery between 5 and 8 p.m. on the scheduled date of delivery. Fee applies.

☐ FedEx Appointment Home Delivery®
Delivery on a specific date and time you select. We attempt to contact the recipient in advance. Fee applies.

**6  Payment**

Bill transportation charges to:

☑ Sender
Acct. No. in Section 1 will be billed.

☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Enter FedEx Acct. No. below.

FedEx Acct. No. _____

**7  FedEx International Ground Information**

| Commodity Description  REQUIRED | Value for Customs  REQUIRED |
|---|---|
|  |  |
|  |  |
| Total Value for Customs USD |  |

Bill duties and taxes to:

☐ Sender
Acct. No. in Section 1 will be billed.

☐ Recipient    ☐ Third Party
Enter FedEx Acct. No. below.

ALL FedEx International Ground shipments may be subject to duties and taxes, which FedEx does not estimate prior to clearance.

FedEx Acct. No. _____

| FedEx Use Only | Base Rate | Total Charge |
|---|---|---|
|  | $          $ |  |
| Tracking Number |  |  |
| Employee Number |  | 6059140 |

Part 156776 Rev. Date 9/12 OP-253WSC • ©1994-2012 FedEx • PRINTED IN U.S.A. RRDO

fedex.com 1800 GoFedEx 1800 463 3339

OAK MORTGAGE ET AL 5.9.15 D-GN-15-785  000913



May 6, 2015

Dear Customer:

The following is the proof-of-delivery for tracking number **780609089417**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery location: | Austin, TX |
| Signed for by: | MTURNEY | Delivery date: | May 6, 2015 09:22 |
| Service type: | FedEx Ground | | |
| Special Handling: | Direct Signature Required | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 780609089417 | Ship date: | May 5, 2015 |
| | | Weight: | 16.3 lbs/7.4 kg |

**Recipient:**
AUSTIN, TX US

**Shipper:**
AUSTIN, TX US

Thank you for choosing FedEx.

FedEx

Ship ▾ | Track ▾ | Manage ▾ | Learn ▾ | ✱ FedEx Office ® ▾

My Profile | Support | Locations | 🌐 English | Search Subr

Login

## FedEx Tracking

## 780609089417

Ship (P/U) date :
**Tues 5/05/2015**

AUSTIN, TX US

**Delivered**

Signed for by: MTURNEY

Actual delivery :
**Wed 5/06/2015 9:22 am**

AUSTIN, TX US

## Travel History

| ▲ Date/Time | Activity | Location |
|---|---|---|
| **5/06/2015 - Wednesday** | | |
| 9:22 am | Delivered | Austin, TX |
| 5:10 am | On FedEx vehicle for delivery | Austin, TX |
| 5:00 am | At local FedEx facility | Austin, TX |
| **5/05/2015 - Tuesday** | | |
| 7:16 pm | Arrived at FedEx location | Austin, TX |
| 6:15 pm | Picked up | Austin, TX |
| 5:00 pm | In FedEx possession | Austin, TX |
| | Tendered at FedEx location | |
| 5:00 pm | Shipment information sent to FedEx | |

## Shipment Facts

| | | | | |
|---|---|---|---|---|
| Tracking number | 780609089417 | | Service | FedEx Ground |
| Weight | 16.3 lbs / 7.39 kgs | | Signature services | Direct signature required |
| Total pieces | 1 | | Packaging | Package |
| Special handling section | Direct Signature Required | | | |

FedEx.

| Customer Focus | Featured Services | Companies | Follow FedEx | 🌐 United States - English |
|---|---|---|---|---|
| New Customer Center | FedEx One Rate | FedEx Express | | |
| Small Business Center | FedEx SameDay | FedEx Ground | | |
| Service Guide | FedEx Home Delivery | FedEx Office | | |
| Customer Support | Healthcare Solutions | FedEx Freight | | |
| | Online Retail Solutions | FedEx Custom Critical | | |
| **Company Information** | Packaging Services | FedEx Trade Networks | | |
| About FedEx | Ancillary Clearance Services | FedEx SupplyChain | | |
| Careers | | FedEx TechConnect | | |
| Investor Relations | **Other Resources** | | | |
| | FedEx Compatible | | | |
| | Developer Resource Center | | | |
| | FedEx Ship Manager Software | | | |
| | FedEx Mobile | | | |

© FedEx 1995-2015

Global Home | Site Map | fedex.com Terms of Use | Security and Privacy

OAK MORTGAGE ET AL 5.9.15 D-GN-15-785  000915



6317 BEE CAVE RD
Austin, TX 78746

Location:        MMRKE
Device ID:       MMRKE-POS1
Employee:        2264643
Transaction:     850127206801

---

**GROUND**
  780609089417    16.30 lb (S)     17.49
    Direct Signature

Scheduled Delivery Date is 1 business days


      Shipment subtotal:    17.49


          Total Due:    17.49

     (V) CreditCard:    17.49
    ************9492


M = Weight entered manually
S = Weight read from scale
T = Taxable item

Subject to additional charges. See FedEx Service Guide
at fedex.com for details. All merchandise sales final.


Visit us at: fedex.com
Or call 1.800.GoFedEx
1.800.463.3339

May 5, 2015 4:56:53 PM

---

********** WE LISTEN **********
Tell us how we're doing
& receive a discount on your next order!
fedex.com/welisten or 800-398-0242
Redemption Code: _____

*** Thank you ***

---

OAK MORTGAGE ET AL 5.9.15 D-GN-15-785  000916

COURT'S EXHIBIT NO. 1

## Oak Mortgage vs Ameripro

 **Grant, Tom (Vol. 01) - 05/04/2015**      **1 CLIP (RUNNING 00:23:42.721)**

## TOM GRANT, ...



**TG-0504-0000516**      **20 SEGMENTS (RUNNING 00:23:42.721)**

**1. PAGE 5:16 TO 5:24 (RUNNING 00:00:05.772)**

TOM GRANT,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. BUNDREN:

    Q    Good afternoon.

    A    Good afternoon.

    Q    Would you state your name for the record, please.

    A    Charles Thomas Grant, Jr.

**2. PAGE 7:04 TO 11:01 (RUNNING 00:05:29.169)**

    Q    All right. Would you just kind of briefly give me a background on your -- kind of your -- your educational background, just real briefly, but -- you know, what you've done and where you grew up?

    A    Raised in Houston, Texas, graduated from the University of Houston, did some -- part of my MBA at -- Weatherhead School of Management at Case Western in -- in Cleveland, Ohio.

Started in home building -- I think it was 1997 with Kimball Hill Homes in -- in Houston, Texas. No, that was '95. Excuse me. Transferred to Cleveland, Ohio in 1997, started Avision there. I was in Cleveland till 2004. Transferred to Austin, Texas in 2004, been here ever since.

    Q    And have you been a home builder in the Austin, Texas area since 2004?

    A    Yes, sir.

    Q    Okay. Have you operated with different names?

    A    Kimball Hill Homes, Meritage Homes, and then this -- our company, my company, Centerra Homes.

    Q    When did you first meet Michael Nasserfar, my client?

    A    When I was hired by Meritage Homes. I think it was February -- around February 14th, 2007, I believe. 2007.

    Q    How did you meet Mr. Nasserfar?

    A    He was -- we had a joint venture mortgage company, and they officed out of our building over -- off of 183 and Mopac. And Michael's was part of the joint venture with First Continental and Meritage Homes. He was one of three loan officers that we had there.

    Q    It's part of a joint venture?

    A    Uh-huh.

    Q    Is that correct?

    A    Yes.

    Q    Okay. You were working with Meritage Homes at the time?

    A    Correct.

    Q    And Michael was working with First Continental?

    A    Correct.

    Q    And First Continental is a lending company that does residential mortgages?



EXHIBIT
Court's
1
CC. 5-27-15

A    Correct.
Q    And he was a loan officer; is that right?
A    Correct.
Q    And was Mr. Nasserfar acting as a loan officer for borrowers that were seeking to purchase a Meritage home?
A    No, I mean -- well, I mean, we would sell the home. Then we would refer to the mortgage company. Sometimes we'd have them look at them before we -- you know, it depended.
Like, if you had an entry-level buyer, a lot of times, you'd want to look at the -- at their credit worthiness before you went through all the trouble of writing the contract. But for the most part, we were a first-time, move-up and luxury builder. And so the majority of our -- our contracts were written and then referred to the mortgage company.
Q    Was Mr. Nasserfar the loan officer who assisted the borrowers with their mortgage?
A    Correct.
Q    And they were going to purchase the home from Meritage?
A    Correct.
Q    And you worked at Meritage?
A    Correct.
Q    Okay. How long did that relationship, as you just described, how long did that go on?
A    It was almost two years. I think I left in November 4th, 2009.
Q    Did you stay in contact with Mr. Nasserfar?
A    Yes.
Q    Okay. And when you -- you say you left. Is that when you left Meritage?
A    Meritage did a consolidation between Austin and San Antonio, and I was not retained in that consolidation.
Q    And where did you go after Meritage -- after you left there?
A    I started my own company the next day, basically. There -- there wasn't -- you know, 2009, it was a -- the worst part of the market here. There wasn't any cover. There was nowhere to go, so, you know, I mean, I could sit around and wait for the market to recover or go do something. So my partner and I decided -- decided we'd start our home building company.
Q    And what was the name of that company?
A    Centerra Homes of Texas, LLC.
Q    Okay. And what is your position with the company?
A    You know, there's two of us, so I'm manager, I'm president and principal. You know, whatever. Kind of wear all the hats. Call me whatever you want.
Q    Has Mr. Nasserfar worked with Centerra Homes doing the same thing he was doing when you were at Meritage?

### 3. PAGE 11:05 TO 14:11 (RUNNING 00:04:15.037)

A    Yes.
Q    Okay. Describe what Mr. Nasserfar did with Centerra Homes.
A    So we were with -- when I -- when I started Centerra, we started looking at lender relationships. Michael was still with First Continental, but Michael was handling the Guillen [phonetic] book of business.
And Wendy Hardle [phonetic] who was another loan officer at Meritage Homes was handling

Scott Felder and Roan King, who was the third loan officer with the joint venture, the Meritage/First Continental joint venture, was still at First Continental, but he didn't have, you know, a builder to work with on the new -- on new residential construction.

So we started to work with Roan King at that time. And as things progressed, you know, and the lending environment started to change, CFB -- CFPB became involved. Things were changing. First Continental just struggled, and Roan struggled.

So when Michael went to AmeriPro, we met with Chad Overhauser and Michael on a couple of occasions, really looked at that deal hard, because, you know, we were having issues where we were and didn't want to -- those to continue, and ultimately made the decision to go with AmeriPro and Michael.

Q    You know Michael before he went to work at AmeriPro?

A    Yes.

Q    And you knew him as a loan officer?

A    Yes.

Q    What did you think of his abilities, in your experience with him, while he was at First Continental?

A    He was the best that I had dealt with, the most predictable.

Q    And so you started to have some problems with First Continental when you formed your own company, correct?

A    Correct.

Q    So did you approach -- did you know Chad Overhauser before you met with him and Michael Nasserfar?

A    No, no. I only knew Michael.

Q    Okay. And did you go to AmeriPro because of Michael?

A    Yes.

Q    Did you have a meeting with them?

A    Yes.

Q    Okay. And what -- what was the substance of your discussions with AmeriPro at that time?

A    Well, I think, one, we wanted to know -- you know, our business is -- is -- with the lender is -- really boils down to two components. There's a contract to start, period. We're -- we work on a to-be-built model.

So what that means is, we don't start a lot of inventory homes, spec homes. We sell build-to-order. And so we like to start them as quickly as we can, especially the way the market's been the last few years where it's been heating up because you have a cost-increasing environment.

So you try to get that contract-to-start cycle really tight. We will not start the home till we know the buyer is credit-worthy. So we try hard to get a quick turn on the front end and -- and -- and get a look at the customer and get some level of commitment from the lender.

And then we have the completion-to-close cycle, which is, once the home's complete, we want it to close as quickly as possible so that it funds. That's the only time we get paid. And Michael has always been exceptional at managing those two cycles.

Q    Did you know anybody at AmeriPro prior to the time that you met with Mr. Overhauser and Michael Nasserfar?

A    No. I have to be honest. I wasn't even

aware, really, of AmeriPro till Michael brought it --
you know, till Michael talked to us about, you know,
doing business there.
        Q    And the business that he talked to you about
doing at AmeriPro, was that the same kind of business
that he was doing for you when you were at Meritage?
        A    Yeah.

### 4. PAGE 14:13 TO 14:17  (RUNNING 00:00:08.113)

        A    Yes.
        Q    (By Mr. Bundren)  Was there any difference in
the -- what he did at Meritage versus what he was doing
at AmeriPro?
        A    Not that I could see.

### 5. PAGE 14:19 TO 15:04  (RUNNING 00:00:27.869)

        Q    (By Mr. Bundren)  Was he a loan officer at --
when you were at Meritage?
        A    Yes.
        Q    And was he a loan officer at AmeriPro?
        A    Yes.
        Q    And who was your primary contact at AmeriPro?
        A    Michael.
        Q    And did he do the same thing for you at
AmeriPro that he had done for you when you were working
with Meritage?
        A    Yes.

### 6. PAGE 15:07 TO 18:21  (RUNNING 00:04:29.195)

        Q    (By Mr. Bundren)  Has -- has Centerra ever
been a borrower for AmeriPro?
        A    Have we ever borrowed from AmeriPro?
        Q    Yes, sir.
        A    No.
        Q    Do you -- did you ever borrow money from
AmeriPro?
        A    No.
        Q    Okay.  When Michael left -- you know Michael
left AmeriPro?
        A    Yes.
        Q    Okay.  How did you find out that he left
AmeriPro?
        A    Michael called on a Thursday or a Friday
night.  I mean, I remember I was driving on 35.  I think
it was in February.  And it was the first that I had
heard any mention of, you know, the fact that he may
leave.  And he alluded to the fact that he may leave.  I
don't know how I formed an opinion, but I formed an
opinion that that would probably happen in -- over the
course of several months.
                Then, the following Monday or Tuesday --
I can't remember what day it was -- I get a call from
him saying that Friday would be his last day at
AmeriPro.  That surprised me.
        Q    Did he say anything else other than "Friday
will be my last day"?
        A    I don't recall the conversation.  I think I
was, you know, mentally scrambling trying to figure out
what does this mean and how -- you know, how is this
going to go?  Because, you know, the loan officer, in my
opinion, is critical.
                He -- that's the person that manages that
part of the customer relationship.  And that's the
part -- they're the -- they're the ones that make things
happen on the loan side to where the cycles become

predictable.

And when they're not on their game, things fall through the cracks, and it gets painful for us. As an example, someone that doesn't close on time, if they've got a moving truck or furniture being delivered or appliances being delivered because they've been told a certain date, and then they don't close, we can't allow them to put contents into a house until they -- until they close. It opens up exposure for us.

And so, you know, telling people no, trying to reschedule, there's always a lot of drama. It's already an unsettling time, and so, you know, immediately I go to those two cycles that are so important to me, contract-to-start and completion-to-close. And if it's not handled well, it causes heartburn with the customer, and it reflects on us.

Q By "customer," you mean your buyer?

A My buyer.

Q Okay. Who's a borrower?

A Yeah. But, I mean, to me, it's my customer, right? I refer them to the lender. Okay? But they're mine. I sold them, I put them on contract.

Q Yeah.

A I'm going to build them the house. I need the lender to make those two cycles go and predictably. That's what I need.

Q While you worked with a Michael Nasserfar at AmeriPro, how did the cycles work?

A He was really predictable.

Q What does that mean?

A Means things went as they should. They went as -- ultimately, someone has to set an expectation with the customer or the consumer, my customer -- our customer, I guess, because it's theirs as well. And then you have to perform based on, you know, what you tell people you're going to do. And if you say, "Your house is going to close on this day," it needs to close. And Michael makes that happen.

And I know that there are times when there's last-minute issues that pop up. At that point, communication's really key with both parties. Let us know -- actually multiple parties. Let us know, let the title company know, and let the customer know. All those have to know that things are changing, have to overcommunicate. And he does a really good job with that.

Q When -- when Michael told you that he was leaving AmeriPro, did he tell you where he was going to go?

A No.

Q Did he solicit any business from you in that call?

A No.

### 7. PAGE 18:23 TO 19:01 (RUNNING 00:00:11.729)

Q (By Mr. Bundren) And when he left, were there borrowers of AmeriPro that were still there that were in process of closing?

A Yes. And I believe there still are.

### 8. PAGE 19:07 TO 22:03 (RUNNING 00:03:43.505)

Q And how has the process worked for your customers since Mr. Nasserfar left AmeriPro?

A It's been -- there's been a much higher level

of complaint. There have been loans that haven't closed. There have been people who showed up at the title company and -- and no one knew they were coming. They didn't close.

The level of complaint on customer surveys has gone up. It's typical of any time there's turnover in a -- in a mortgage relationship. I mean, if the loan officer leaves, or even if a processer leaves, you generally feel it. And so the level of complaint is -- you know, has gone up significantly from when Michael was there.

Q   Do you know where Michael is today?

A   Oak Mortgage.

Q   And how did you find out that he's at Oak Mortgage?

A   He contacted us once he was over there. I don't -- I don't recall the dates or all of that. I just remember -- you know, we met with -- I didn't. My partner met with Oak. I was out of town.

When I came back in town, I met with Chad Overhauser and Eric Weiss. And there was one other guy there. I can't remember his name. I have his business card at the house. I met with those guys, and, you know, we -- we told both parties the same thing. "We're going to have a competitive environment here. We have to compete every day. We're going to refer every contract to both parties."

Q   What do you mean by "both parties"?

A   Well, to Oak and to AmeriPro. "And we'll let you guys, you know, compete. And it will be good for the customers, should be good for everybody."

I mean, I have to compete every day. I told them both I don't feel any -- you know, any reason not to have a competitive environment between both parties. And that's what we did.

Q   And what happened?

A   Just over time, you know, I mean, like I said, we've had loans not -- I mean, it is highly unusual that someone shows up at a title company and nobody knows they're coming. I mean, I -- I can count on one hand in 20-plus years of being in this business that that's happened. So that happened. That was a red flag. There's been, you know, like I --

Q   Who was the lender when that happened?

A   AmeriPro.

There's been a high level of complaint. You know, the customer surveys where people are saying specific things, making comments specifically, and rating AmeriPro very low.

So we do a 1 to 5 scale, and then we allow comments at the bottom. Been several times where they've scored the lowest possible number on the survey, which was unusual.

And then, you know, made specific comments about the lender's performance, specifically about the turnover and the different people that they would speak to each time. That was a -- you know, kind of a prevalent thing. "Every time I talk to somebody, it's a different person and I get a different answer or a different day or different information."

And so that was the feedback that we were receiving from our customers.

Q   And what you just described, was that feedback about Oak Mortgage or AmeriPro?

A   AmeriPro. I haven't had any of that feedback yet on Michael's deals. I don't know how many of them

00022:01 have closed, though, to be honest with you.
Q    And that's since Mr. Nasserfar left AmeriPro?
A    Correct.

### 9. PAGE 22:24 TO 23:04 (RUNNING 00:00:19.768)

Q    I'm going to back up for a second to when you first started talking with AmeriPro.  I'm backing up on you a little bit.
To be clear, did you even know who they were except for Michael Nasserfar?
A    No.

### 10. PAGE 23:06 TO 23:10 (RUNNING 00:00:08.909)

A    No.  I didn't know anything about them.
Q    (By Mr. Bundren)  Okay.  If Michael Nasserfar had not been there, would you have went to AmeriPro and had a discussion with him?
A    No.

### 11. PAGE 23:12 TO 24:07 (RUNNING 00:01:09.627)

Q    (By Mr. Bundren)  So what was the incentive or who was the incentive for you to go to AmeriPro to begin with?
A    Michael.  There was a relationship there.  There was a history.  My whole team -- the whole home building team that I have has been assembled trying to get the very best people that I've worked with in the past.
And I've tried really hard.  And you can ask people around town; you can talk to the people that work at our company.  We've all, for the most part, worked together in a prior life.  And so I've kind of cherry-picked the very best people intentionally.
And that was what we were trying to do with the relationship with Michael, was just get somebody who was predictable and would handle their part of the business.
Q    Today, do you -- does your company today, Mr. Grant, provide any products or services to AmeriPro?
A    No.  I mean, we're working through the backlog that we have.  We don't provide any services there.

### 12. PAGE 25:11 TO 25:13 (RUNNING 00:00:05.615)

Has Centerra ever paid AmeriPro any money for products or services?
A    No.

### 13. PAGE 25:15 TO 25:17 (RUNNING 00:00:04.970)

Q    (By Mr. Bundren)  Do you have any intention in the future to pay AmeriPro for any products or services?
A    No.

### 14. PAGE 25:19 TO 27:08 (RUNNING 00:01:37.362)

Q    (By Mr. Bundren)  Do you have any today -- any contract with AmeriPro?
A    No.
Q    Do you intend in the future to have any contract with AmeriPro?
A    No.
Q    We talked a little bit about your company's public presence.  Does your company, Centerra, have a website?
A    Yes.

Q    And that's available to anybody to go to?
A    Sure.
Q    It's not password-protected?
A    Nope.
Q    Okay.  Anybody can go to the website if they choose to?
A    Yes.
Q    And by going to the website, can they obtain information about your company?
A    Yes.
Q    Can they obtain contact information?
A    Yes.
Q    Can they obtain your address, phone number, and e-mail?
A    Yes.
Q    And if someone wanted to find out about Centerra, would that be a good -- that website be a good place to go?
A    Yes.
Q    Do you maintain public offices?
A    Well, models, yes.
Q    Okay.  Inside of those models, is there information about Centerra Homes?
A    Yes.
Q    And is there information about who to contact at Centerra Homes?
A    Yes.
Q    Okay.  Would it be difficult for someone on the web or in the public arena to find out about Centerra Homes if they chose to?

### 15. PAGE 27:11 TO 27:11 (RUNNING 00:00:01.869)

A    I don't -- I don't think so.

### 16. PAGE 27:15 TO 28:07 (RUNNING 00:01:00.643)

Q    Okay.  You just have model homes; is that correct?
A    Yes.
Q    Do you have advertising materials that you use in the public arena?
A    Yes.
Q    Okay.  Do you run radio ads?
A    We're a party to radio ads.  We don't run them.  We build in a lot of master-plan communities, and we have -- as part of those agreements, we fund a marketing budget that comes out of each lot purchase.  Could be anywhere from 1,000 to $2,000 a lot.
        And so there are times when, you know, there's different types of media that you utilize and we're included in, you know.  And radio's one of them.  TV at times.  Billboards, "Statesman", and in various, you know, banner and display ads on Zillow, Trulia, whatever.  You know, different sites.

### 17. PAGE 28:24 TO 28:25 (RUNNING 00:00:06.722)

Q    Do you consider Centerra or any of its contact information to be a trade secret of AmeriPro?

### 18. PAGE 29:03 TO 29:06 (RUNNING 00:00:09.267)

A    No.
Q    (By Mr. Bundren)  Has anyone at AmeriPro ever told you that you and your company is a trade secret of AmeriPro?

## Oak Mortgage vs Ameripro

**19. PAGE 29:08 TO 29:08 (RUNNING 00:00:00.582)**

A    No.

**20. PAGE 29:23 TO 29:25 (RUNNING 00:00:06.998)**

Q    Do you think it would be any secret that AmeriPro has funded home loans to some of your buyers?
A    No.

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:23:42.721)**